# EXHIBIT

# "1"

# LEASE

## ROSS FLORIDA DRESS FOR LESS, L.C.
Palm Springs Mile Shopping Center
Hialeah, Florida

### TABLE OF CONTENTS

1. SALIENT LEASE TERMS.................................................................1
    1.1.   Effective Date...........................................................1
    1.2.   Parties/Addresses.....................................................1
    1.3.   Location Information..................................................2
    1.4.   Critical Dates............................................................2
    1.5.   Lease Term...............................................................3
    1.6.   Rent.........................................................................3
    1.7.   Guaranteed Co-Tenancy...........................................3
    1.8.   Common Area Charge Administrative Fee...............4
    1.9.   Title Report..............................................................4
    1.10.  Contents of Lease....................................................4

2. DEFINITIONS OF GENERAL APPLICATION ...............................5

3. GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS.....................11
    3.1.   Lease......................................................................11
    3.2.   Nature of the Shopping Center.............................11
    3.3.   Grant of Common Area Use...................................11
    3.4.   Grant of Utility Easements....................................12
    3.5.   Utility Rooms..........................................................12
    3.6.   Site Plan Alterations...............................................12
    3.7.   Dimensions.............................................................13

4. LEASE TERM...............................................................................13
    4.1.   Term.......................................................................13
    4.2.   Commencement Date.............................................13
    4.3.   Acknowledgment of Commencement.....................13
    4.4.   Option Periods......................................................13

5. CONSTRUCTION AND ACCEPTANCE.......................................14
    5.1.   Landlord's Construction Obligations.....................14
    5.2.   Construction Commencement.................................14
    5.3.   Completion of Construction...................................14
    5.4.   Construction Completion Notice............................15
    5.5.   Rollover..................................................................16
    5.6.   Remedies Cumulative.............................................16
    5.7.   Right to Cancel......................................................16
    5.8.   Automatic Termination...........................................16
    5.9.   Entry Prior to Delivery Date..................................16





06/08/00

|  | 5.10. | Walk-Through Inspection and Punchlist. | 17 |
|  | 5.11. | Completion of Store. | 17 |
|  | 5.12. | Acceptance. | 17 |
| 6. | RENT. | | 18 |
|  | 6.1. | Minimum Rent. | 18 |
|  | 6.2. | Percentage Rent. | 20 |
|  | 6.3. | Reimbursements. | 21 |
|  | 6.4. | Other Payment Provisions. | 21 |
| 7. | COMMON AREA MAINTENANCE. | | 22 |
|  | 7.1. | Landlord's Obligation to Maintain Common Areas. | 22 |
|  | 7.2. | Tenant's Common Area Contribution. | 22 |
|  | 7.3. | Landlord's Administrative Fee. | 23 |
|  | 7.4. | Security Patrol. | 23 |
|  | 7.5. | Trash. | 24 |
|  | 7.6. | Promotional Fund. | 24 |
|  | 7.7. | Payment of Tenant's Common Area Contribution, Landlord's Administrative Fee, and Security Patrol Costs. | 24 |
| 8. | REAL ESTATE TAXES AND ASSESSMENTS. | | 25 |
|  | 8.1. | Obligation to Pay. | 25 |
|  | 8.2. | Tenant's Pro Rata Share. | 25 |
|  | 8.3. | Exclusions. | 27 |
|  | 8.4. | Rebates. | 27 |
|  | 8.5. | Contest. | 27 |
| 9. | INSURANCE. | | 28 |
|  | 9.1. | Casualty Insurance. | 28 |
|  | 9.2. | Liability Insurance. | 29 |
|  | 9.3. | Evidence of Insurance. | 30 |
|  | 9.4. | Waiver of Subrogation. | 30 |
|  | 9.5. | Tenant's Right to Self-Insure. | 31 |
| 10. | UTILITIES SERVICES. | | 31 |
| 11. | MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE | | 31 |
|  | 11.1. | Maintenance and Repair by Tenant. | 31 |
|  | 11.2. | Maintenance and Repair by Landlord. | 32 |
|  | 11.3. | Repairs Required by Governmental Authorities. | 33 |
|  | 11.4. | Hazardous Material. | 34 |
| 12. | ALTERATIONS. | | 37 |
|  | 12.1. | Permitted Alterations. | 37 |
|  | 12.2. | Communication Equipment. | 38 |
| 13. | NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES. | | 39 |
|  | 13.1. | Non-Disturbance and Subordination. | 39 |
|  | 13.2. | Estoppel Certificates. | 39 |

13.3.  Processing Fees for Non-Disturbance Agreements and Estoppel Certificates. ........ 40

14. INDEMNIFICATION ................................................................................................. 40
    14.1.  Tenant Indemnity. ............................................................................................ 40
    14.2.  Landlord Indemnity. ......................................................................................... 40

15. USE .......................................................................................................................... 41
    15.1.  Tenant's Business. ............................................................................................. 41
    15.2.  No Express or Implied Covenant of Operation ................................................. 41
    15.3.  Protection. ........................................................................................................ 41
    15.4.  Prohibited and Exclusive Uses. ........................................................................ 42

16. SURRENDER ........................................................................................................... 42
    16.1.  Condition of Premises. ..................................................................................... 42
    16.2.  Continuance of Possession. .............................................................................. 42

17. LANDLORD'S WARRANTY ..................................................................................... 43
    17.1.  Landlord's Warranty. ....................................................................................... 43
    17.2.  Landlord's Title. ............................................................................................... 43
    17.3.  Remedies. ......................................................................................................... 43

18. QUIET ENJOYMENT .............................................................................................. 43

19. ASSIGNMENT/SUBLETTING ................................................................................. 43
    19.1.  General. ............................................................................................................ 43
    19.2.  Related Entity. .................................................................................................. 44
    19.3.  Stock. ............................................................................................................... 44
    19.4.  Release of Liability. .......................................................................................... 44
    19.5.  Recapture on Assignment or Sublease of Store. ............................................... 44
    19.6.  Nullity. ............................................................................................................. 45
    19.7.  Landlord Notice to Assignee. ........................................................................... 45

20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES ................................... 45
    20.1.  Defaults. ........................................................................................................... 45
    20.2.  Alternative Dispute Resolution. ....................................................................... 47
    20.3.  Unlawful Detainer. ........................................................................................... 48
    20.4.  Attorneys' Fees. ............................................................................................... 49

21. CASUALTY ............................................................................................................... 49
    21.1.  Definitions. ....................................................................................................... 49
    21.2.  Insured Casualty. .............................................................................................. 49
    21.3.  Uninsured Casualty. ......................................................................................... 50
    21.4.  End of Term Casualty. ...................................................................................... 51
    21.5.  Shopping Center Casualty. ............................................................................... 51
    21.6.  Restoration. ...................................................................................................... 51
    21.7.  Waiver of Statute. ............................................................................................ 52
    21.8.  Laws. ................................................................................................................ 52
    21.9.  Tolling of Term. ............................................................................................... 52
    21.10. Effect of Termination. ...................................................................................... 52

21.11.   Tenant's Right of First Offer. ........................................................................53

22. CONDEMNATION. ...............................................................................................53
   22.1.   Taking. ..........................................................................................................53
   22.2.   Right to Terminate. .....................................................................................53
   22.3.   Claims. ..........................................................................................................54
   22.4.   Waiver. ..........................................................................................................54

23. MECHANIC'S LIENS. ...........................................................................................54

24. SIGNS. ......................................................................................................................54
   24.1.   Governmental Approval and Compliance. ...............................................54
   24.2.   Building Signs. ..............................................................................................55
   24.3.   Pylon or Monument Signs. .........................................................................55
   24.4.   Temporary Signs. ..........................................................................................55
   24.5.   Contingency. .................................................................................................55

25. NOTICE. ...................................................................................................................55

26. GENERAL CONDITIONS. ....................................................................................56
   26.1.   Partial Invalidity. ..........................................................................................56
   26.2.   Relationship of Parties. ...............................................................................56
   26.3.   Time. ..............................................................................................................56
   26.4.   Waiver. ..........................................................................................................56
   26.5.   Partial Months. .............................................................................................56
   26.6.   Consent. ........................................................................................................56
   26.7.   Gender. ..........................................................................................................57
   26.8.   Captions. .......................................................................................................57
   26.9.   Governing Law. ............................................................................................57
   26.10.  Due Authority. .............................................................................................57
   26.11.  No Prior Agreements. ..................................................................................57
   26.12.  Entry by Landlord. .......................................................................................57
   26.13.  Neutral Interpretation. ................................................................................58
   26.14.  Force Majeure. .............................................................................................58
   26.15.  Successors in Interest. ..................................................................................58
   26.16.  Memorandum of Lease. ...............................................................................58
   26.17.  Real Estate Brokers. .....................................................................................58




06/08/00

1      **THIS LEASE** (the "Lease") is made by and between Landlord and Tenant who are
2  designated in Section 1.2 hereof as of the Effective Date.  Landlord and Tenant hereby agree as
3  follows:

4                            **1.  SALIENT LEASE TERMS**

5  **1.1.**    **Effective Date.**

6    ~~June~~ July 27, 2000.

7  **1.2.**    **Parties/Addresses.**

8        **1.2.1.**    **Landlord:**     **PALM SPRINGS MILE ASSOCIATES, LTD.,**
9                                     a Florida limited partnership
10              Address:   419 West 49th Street, Suite 300
11              City/State/Zip:   Hialeah, Florida 33012
12              Facsimile #:    (305) 821-0921
13              Phone #:      (305) 821-7111
14              Initial Contact Name:  David Eisenstadt
15              Landlord's Taxpayer I.D. #: 58-1609315
16              **Rent payments and duplicates of all notices hereunder to:**
17              c/o Phillips International Holding Corp.
18              417 Fifth Avenue, 3rd Floor
19              New York, New York 10016
20              **Duplicate Notices to:**
21              Martin L. Forman, Esq.
22              Kotite & Kotite, LLP
23              805 Third Avenue
24              New York, New York 10016
25        **1.2.2.**    **Tenant:**       **ROSS FLORIDA DRESS FOR LESS, L.C.,**
26                                       a Florida limited liability company
27              Address:       8333 Central Avenue
28              City/State/Zip:   Newark, CA 94560
29              Attention:     Real Estate Legal Notice Dept.
30              Facsimile #:    (510) 505-4174
31              Phone #:      (510) 505-4400
32              Initial Contact Name:   Gary Scott

1           Tenant's Taxpayer I.D. #: 94-1390387

2    **1.3.**    **Location Information.**

3        1.3.1.    Shopping Center Name:   Palm Springs Mile Shopping Center.

4                  Location:   419 West 49th Street, Hialeah, Florida.

5

6        1.3.2.    Minimum Leasable Floor Area for Pro Rata Share Denominator:

7             (a)    Insurance:    1,200,000 square feet.

8                                                    (Section 9.2.2)

9             (b)    Security Patrol: 320,132 square feet

10                                              (Section 7.4)

11           (c)    Taxes: 320,132 square feet.

12                                            (Section 8.2.3)

13           (d)    Landlord's Administrative Fee: 320,132 square feet.

14                                          (Section 7.3)

15        1.3.3.    Store Agreed Size:   Approximately 30,936 square feet of Leasable Floor Area,
16 including a minimum of 140 feet of frontage on the Common Areas subject to Section 3.7.  This
17 includes the Building only unless the loading dock is both enclosed and exclusive to Tenant.

18    **1.4.**    **Critical Dates.**

19        1.4.1.    Tenant's obligation for Minimum Rent and Reimbursements shall commence on
20 the earlier of (a) ninety (90) days after the Delivery Date, or (b) the date Tenant opens the Store for
21 business to the public (the "Commencement Date"), subject to modification due to events of
22 Tenant Delay as described in Section 5.4(b).

23                                                    (Section 4.2)

24

25        1.4.2.    Intended Delivery Date:   January 15, 2001.

26                                                    (Article 2)

27

28        1.4.3.    Tenant's Right to Cancel Date for Landlord's failure to commence construction:
29 any date which is more than six (6) months after the Effective Date.

30

31        1.4.4.    Tenant's Right to Cancel Date for Landlord's failure to complete construction:
32 any date which is more than twelve (12) months after the Effective Date.

33                                                    (Section 5.7)

34

35        1.4.5.    Automatic Termination Date:   June 15, 2002.

36                                                    (Section 5.8)

37

1   **1.5.   Lease Term.**

2       **1.5.1.**   <u>Initial Term</u>:  From the Commencement Date through the January 31 next
3   following the expiration of one hundred twenty (120) months after the Commencement Date. As a
4   hypothetical example and for illustration purposes only, if the Commencement Date is on
5   September 15, 2000, then the expiration of the Initial Term shall be January 31, 2011.

6       **1.5.2.**   <u>Option Periods</u>:  Total Number of five (5) year Option Periods:  Four (4).
7                                                     (Section 4.4)
8
9   **1.6.   Rent.**

| | | | Per Sq. Ft. Per Year | Monthly | Annually |
|---|---|---|---|---|---|
| **1.6.1.** | Minimum: | | | | |
| | (a) | Initial Term Commencement Date through 5th full Lease Year | $10.00 | $25,780.00 | $309,360.00 |
| | | 6th full Lease Year through 10th full Lease Year | $10.65 | $27,455.70 | $329,468.40 |
| | (b) | Option Periods | | | |
| | | First: | $11.15 | $28,744.70 | $344,936.40 |
| | | Second: | $11.65 | $30,033.70 | $360,404.40 |
| | | Third: | $12.15 | $31,322.70 | $375,872.40 |
| | | Fourth: | $12.65 | $32,611.70 | $391,340.40 |

10
11   The Minimum Rent amounts above may be adjusted per Section 3.7.

12       **1.6.2.**   <u>Percentage Rent Factor</u>:  Two percent (2%).
13                                                   (Section 6.2.2)
14   **1.7.   Guaranteed Co-Tenancy.**

15       **1.7.1.**   <u>Commencement Date Co-Tenancy Requirements</u>.

| | | Co-Tenant's Name | Occupied (minimum sq. ft.) |
|---|---|---|---|
| | (a) | | |
| | (i) | T.J. Maxx | 35,000 square feet |
| | (ii) | Winn Dixie Supermarket | 54,000 square feet |

16
17       and   (b) Sixty-five percent (65%) of the Leasable Floor Area of the Shopping Center
18   (excluding Tenant from the numerator and denominator of such computation) shall be occupied by
19   operating retailers including the Co-Tenants specified in Section 1.7.1(a) above.

20   (Section 6.1.3)

1        1.7.2.     <u>Operating Co-Tenancy Requirements</u>.

        (a)     <u>Co-Tenant's Name</u>                             <u>Occupied</u>
(minimum sq. ft.)

Winn Dixie Supermarket, or another     54,000 square feet
supermarket occupying the Winn Dixie
Supermarket space depicted on the Site Plan,
occupying a minimum of 32,400 square feet
("Suitable Replacement Tenant")

2
3        and     (b) 100,000 square feet of Leasable Floor Area [excluding Tenant and Winn Dixie
4 Supermarket (or a Suitable Replacement Tenant) from such 100,000 square feet] of the Shopping Center
5 is occupied by operating retailers.
6
7 **1.8.**    **Common Area Charge Administrative Fee.**

8         Five percent (5%).

9 **1.9.**    **Title Report.**

10        That certain Proforma Loan Policy Report on the state of Landlord's title to the Shopping
11 Center issued by Lawyer's Title Insurance Company, dated May 18, 2000, and numbered 001087A.
12 See Section 17.2.

13 **1.10.**   **Contents of Lease.**

14        1.10.1.    Pages: 1 - 60

15        1.10.2.    Sections: 1.1 - 26.17

16        1.10.3.    Exhibits:

17             **A**      Legal Description of the Shopping Center
18             **B**      Site Plan
19             **B-1**    Adjacent Office Building Parking Area
20             **C**      Construction Obligations of Landlord
21             **D**      Prohibited Uses
22             **E**      Acknowledgment of Commencement
23             **F**      Non-Disturbance Agreement
24             **G**      Intentionally Deleted
25             **H**      Exclusive Uses
26             **H-1**    T.J. Maxx Waiver

| 1 | I | Permitted Title Exceptions |
| 2 | J | Sign(s) |
| 3 | K | Guaranty |

4

5    2. **DEFINITIONS OF GENERAL APPLICATION**

6    **Abatement Work.**  See Section 11.4.3.

7    **Annual Statement.**  See Section 7.4.5.

8    **Building.**  The structure in which the Store is located.

9    **Building Envelope.**  Those certain areas designated on Exhibit B within the boundaries of
10    which buildings may be constructed.

11    **CAM Audit.**  See Section 7.4.7.

12    **Casualty.**  See Section 21.1.1.

13    **Commencement Date.**  See Section 4.2.

14    **Common Area(s).**  Those portions of, and facilities within the Shopping Center which are
15    intended solely for the common use of the occupants, their customers, agents, employees and
16    suppliers, such as the parking areas, driveways, walkways, loading zones (whether or not such
17    loading zones are available for common use) and landscaping, but specifically excluding the whole
18    or any portion of any building located within the Shopping Center.  Enclosed malls are not
19    includable for purposes of Common Area Charges hereof unless the Store has a direct customer
20    door opening onto such mall intended for access of customers rather than emergency egress and
21    Landlord keeps the mall open to customer access during all of Tenant's operating hours.  Any area
22    which is not enclosed by demising walls, but which is substantially used for the benefit of one
23    tenant or group of tenants such as, for example, those areas sometimes referred to in the shopping
24    center industry as "food courts," shall not be considered Common Areas.  A "food court" is an
25    open area of the Shopping Center which accommodates a common seating, serving or service area
26    for the patrons of two or more retailers of prepared food whose premises are proximate to such
27    seating, serving or service area.

28    **Common Area Charges.**  See Section 7.3.

29    **Communication Equipment.**  See Section 12.2.1.

30    **Control Area.**  The area so designated on **Exhibit B** which may not be altered without the
31    prior express written consent of Tenant.

32    **Co-Tenants.**  See Section 6.1.3.

1     **Delivery Date**. Except as provided in Section 24.3, Delivery Date is the first date within a
2 Permitted Delivery Period upon which the last of the following occurs (hereinafter "deliver" or
3 "delivery"):

4     (a)    Substantial Completion shall mean completion of all of Landlord's Construction
5 Obligations except for the Punchlist as specified in Section 5.10, however, the Punchlist items must
6 be completed and/or corrected to the extent required in Section 5.10, <u>and</u>, both the following
7 conditions are satisfied: (i) Tenant is legally permitted to occupy the Store in order to perform any
8 work required of Tenant, and (ii) Tenant is otherwise able, legally and in accordance with sound
9 business practice, to conduct its normal retail operations (including, without limitation, interviewing
10 and hiring employees, installing fixtures and equipment, stocking the Store with merchandise and
11 opening for business to the public) without material impediment arising from incomplete or
12 defective performance of Landlord's Construction Obligations;

13     (b)    Receipt by Tenant of written certification of Substantial Completion from
14 Landlord's architect subject to Punchlist Items as specified in Section 5.10 hereafter;

15     (c)    Receipt by Tenant of written evidence that Landlord's Work has passed final
16 inspection by the authority by whom the building permit for Landlord's Construction Obligations
17 was issued and Tenant receives a ~~temporary~~ certificate of ~~occupancy~~ completion for Landlord's
Work;

18     (d)    Receipt by Tenant of a report and certificate from a licensed environmental
19 consultant, reasonably acceptable to Tenant, certifying to Tenant that such consultant conducted a
20 comprehensive survey of the Store, after the date of the Substantial Completion but not more than
21 thirty (30) days prior to the Delivery Date, and that the Store, including, without limitation, the
22 walls, ceilings, structural steel, flooring, pipes and boilers (if any), are free of Hazardous Materials
23 (including asbestos-containing materials);

24     (e)    Receipt by Tenant of two (2) fully executed originals of this Lease, and a
25 Memorandum of Lease signed by Landlord and Tenant and notarized so that such Memorandum
26 of Lease may be recorded;

27     (f)    Delivery to Tenant of exclusive possession of the Store with Landlord's and its
28 contractors' agents and employees' tools, equipment and materials removed from the Store;

29     (g)    Electric power is available to the Store; and

30     (h)    The Store has been secured by Landlord from unauthorized entry by those without
31 a key (an adjacent premises without a store front or store rear or which has any unlocked opening
32 in its exterior walls shall be deemed to render the Store insecure).

33     Notwithstanding anything to the contrary contained in this Lease, and notwithstanding any
34 delays in completion of Landlord's Construction Obligations due to Force Majeure, in no event will
35 the Delivery Date be on a date other than during a Permitted Delivery Period (as defined in this
36 Article 2). If a Force Majeure occurs and Landlord complies with the provisions of Section 26.14,
37 the Delivery Date will be on the first day of the next Permitted Delivery Period, and the
38 determination of the Commencement Date shall be unaffected and be determined in accordance
39 with Section 1.4.1. As a hypothetical example and for illustration purposes only, if the Permitted
40 Delivery Period expires on June 15, and Landlord notifies Tenant that the Delivery Date will occur

on June 14, but bona fide Force Majeure events delay Landlord's delivery to June 30, the Delivery Date will not occur on June 30, but will occur August 15, and the Commencement Date will be calculated from August 15 (i.e., if the Commencement Date is to occur 120 days after the Delivery Date, then the Commencement Date would be December 13).

**Environmental Regulation**. See Section 11.4.1.

**Exempted Discontinuances**. See Section 6.1.3(d).

**Final Plans**. See Exhibit C.

**Force Majeure**. See Section 26.14.

**Full Lease Year**. The expression "Full Lease Year" refers to a Lease Year which consists of twelve (12) complete calendar months commencing on a February 1 and Terminating on the ensuing January 31.

**Gross Sales**. See Section 6.2.1.

**Hazardous Materials**. See Section 11.4.1.

**HVAC**. See Section 11.1.

**Inline Building**. The building in the Shopping Center in which the Store is situated and any other building in the Shopping Center that is not located on an "Outparcel," and which has more than one (1) tenant with common demising walls.

**Insurance Bill**. See Section 9.1.4.

**Intended Delivery Date**. That date specified in Section 1.4.2.

**Invitee(s)**. An Invitee shall mean any agent, employee, customer or other entity or individual who comes upon the Shopping Center property for business or retail consumption purposes, or to perform services for the occupants of the Shopping Center, by the invitation of any party who is entitled to grant access to the Shopping Center such as the Landlord, the Tenant or any other occupant of the Shopping Center.

**Landlord's Construction Obligations**. The construction obligations imposed on Landlord by Section 5.1 and described in **Exhibit C**, also referred to herein as "Landlord's Work."

**Leasable Floor Area**. All areas available, or held for the exclusive use and occupancy of occupants or future occupants of the Shopping Center, measured from the exterior surface of exterior walls and from the center of interior demising partitions excepting that:

(a)     Any mezzanines intended to be used for distribution, sale or display of merchandise to retail customers ("Retail") shall be excluded from the computation of Leasable Floor Area. Any such mezzanines not intended for Retail shall be excluded from Leasable Floor Area.

(b)     In addition, any areas ("Outdoor Areas") which are located wholly or partially outside of a building, or which, although located substantially inside of a building, are not bounded on all sides by exterior walls or a roof, such as outdoor sales, seating, garden or storage areas, or enclosed truck docks or loading areas, shall be included in Leasable Floor Area if and to the extent that such Outdoor Areas are available or held for the exclusive use and occupancy of occupants or future occupants of the Shopping Center, whether or not such Outdoor Areas are clearly delineated and whether or not any rental or other charges are paid by tenants with respect to such Outdoor Areas. Outdoor Areas shall, to the extent that they are bounded by walls, be measured in the same manner as provided above; otherwise, they shall be measured along lines which reasonably delineate the boundaries of such Outdoor Areas.

(c)     A kiosk is a structure of no more than one hundred (100) square feet, set within the Common Areas and completely surrounded by pedestrian walkways or driveways. Kiosks shall be includable in Leasable Floor Area.

**Lease Year.**  The first Lease Year shall extend from the Commencement Date to the first January 31 thereafter.  Subsequent Lease Years shall commence on the following February 1 and terminate the following January 31, except that the final Lease Year shall terminate on the expiration or earlier termination of this Lease.

**Legal Rate.**  In the event any rental or other payment due from one party to the other is not paid when due, or in the event interest is required to be paid under the terms of this Lease, such rental or payment amount shall bear interest at the rate of the lesser of (a) ten percent (10%) per annum, or (b) the prime rate per annum quoted by the Wall Street Journal for short term commercial loans, plus one percent (1%) per annum, but not in any event exceeding the highest rate permissible by law which is not usurious.

**LFA Minimums.**  Solely for purposes of calculating Tenant's pro rata share of various reimbursable costs, the minimum amount of Leasable Floor Area in the Shopping Center agreed by the parties and set forth in Section 1.3.2.

**Minimum Rent.**  See Section 6.1.

**Off-Site Improvements.**  Public improvements not located within the Shopping Center, without which the Shopping Center could not reasonably be used for its intended purpose, such as, without limitation, roadways, offramps, utility lines and turning lanes.

**Option.**  See Section 4.4.

**Option Periods.**  See Section 4.4.

**Outparcel.**  Any parcel of land upon which a building is or may be constructed which is between the Store and any street bordering the Shopping Center.

**Percentage Rent.**  See Section 6.2.

**Permitted Delivery Periods.**  Any of the following periods, during which the Delivery Date occurs, but not including any period of time prior to the Intended Delivery Date: January 15



JUL. 5. 2000  9:23AM    SOS  FORTS PROPERTY DEVELOPMENT       NO. 2928   P. 14

1  through February 15; May 15 through June 15; or August 15 through September 15.  These dates
2  are not subject to alteration, notwithstanding a Force Majeure event.

3  **Prohibited Uses**.  See Section 3.2.2.

4  **Punchlist**.  The list of unfinished construction items described in **Exhibit C** which are a
5  part of Landlord's Work, which are insufficient in the aggregate, to impede Tenant's conduct of
6  business.

7  **Recommencement Date**.  See Section 21.2.

8  **Redelivery Date**.  The last of the following to occur after a Casualty or Taking:  (a) the date
9  on which Landlord's architect, or contractor having charge of the Restoration, certifies by written
10  notice to the parties that the Restoration as having been substantially completed; and (b) Tenant
11  receives such written approvals to reopen for business as may be required from any governmental
12  agency.

13  **Reduced Occupancy Period**.  See Section 6.1.3.

14  **Reimbursements**.  Tenant's obligation to reimburse Landlord under the provisions of
15  Sections 7.4. , 8.2.1 and 9.1

16  **Rent**.  The terms "Rent" or "Rental" shall mean all Minimum Rent, Percentage Rent, and
17  Reimbursements which may be due from Tenant to Landlord pursuant to this Lease.

18  **Requirements**.  See Section 11.3.2.

19  **Restoration**.  See Section 21.1.4.

20  **Roof Repairs**.  See Section 12.2.2.

21  **Section Numbers**.  In this Lease, all references to "Section" shall mean the section
22  numbers of this Lease, unless otherwise indicated.

23  **Shopping Center**.  That certain real property development with all appurtenances generally
24  described in Section 1.3 above, which is to occur on the property described with particularity in
25  Exhibit A.
   no new or remodeled Inline Building except the Adjacent Office Building

26  **Site Plan**.  The Site Plan is the plan attached hereto as **Exhibit B**.  Landlord warrants that
27  the Site Plan depicts the Shopping Center described in Exhibit A and that the boundaries thereof
28  are delineated thereon with substantial accuracy.  Excepting the Adjacent Office Building, as that
29  term is defined in Section 3.2.1 below, the Inline Buildings (i.e., buildings in which multiple tenants
30  with common demising walls are located) depicted thereon contain or shall contain no more than
31  one (1) story (but mezzanines having Leasable Floor Area not in excess of one-third (1/3) of the
32  occupant's ground floor Leasable Floor Area, when not used for selling purposes, shall be
33  permitted) and shall not exceed the height of the exterior elevation of the Store on the Final Plans
34  described in **Exhibit C**.  The highest point of any exterior elevation of any other new or remodeled
35  building in the Shopping Center (including architectural features and rooftop equipment) between
36  the Store and the roads which the Store and the Shopping Center face and/or from which the
   Excepting the two buildings identified as  one story CBS and located south of
   the Store,

JUL 25 '00 09:27

1   Store has side visibility shall not exceed eighteen (18) feet in height measured from the finished
2   floor elevation of the Store.

3   **Special Form Policy.** See Section 9.1.1.

4   **Store.** The Store is that portion of the Shopping Center as delineated, pursuant to
5   Section 1.3, on **Exhibit B,** having the dimensions and containing the Leasable Floor Area specified
6   in Section 1.3, including the use of the roof as specified in Section 12.2.

7   **Substitute Rent.** Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two
8   percent (2%) of Tenant's Gross Sales during the preceding month. Substitute Rent, where
9   applicable in this Lease, shall be paid in lieu of Minimum Rent, Percentage Rent and
10  Reimbursements.

11  **Support Systems.** See Section 11.4.2.

12  **Taking.** See Section 22.1.

13  **Tax or Taxes.** See Section 8.1.

14  **Tax Bill.** See Section 8.1.

15  **Tax Year.** The twelve (12) month period used by the taxing authority as the period to
16  which the Tax Bill applies.

17  **Tenant Delays.** Delays in performance of Landlord's obligations caused by Tenant.

18  **Tenant's Work.** The work to the Store by Tenant after the Delivery Date necessary for
19  Tenant to open the Store for business to the general public; or performed at any time during the
20  Term for the purpose of improving the Store.

21  **Term.** References to the Term of this Lease shall include the initial term described in
22  Section 1.5.1 ("Initial Term") and any extension of such Term ("Option Period").

23  **Termination Notice.** A notice provided by the Tenant to the Landlord not less than
24  thirty (30) days prior to a proposed termination of the Lease in which the Tenant notifies the
25  Landlord of its election to terminate the Lease if permitted to do so under any provision of this
26  Lease.

27  **Third Party Audit.** See Section 7.4.8.

28  **Unamortized Cost.** The remaining balance of an original amount expended by Tenant, as
29  amortized from the date on which such expenditure was made to the date the balance is to be
30  calculated as reflected in the books and records of the Tenant for public reporting purposes, at an
31  interest rate of ten percent (10%) per annum.

32  **Utility Room.** See Section 3.5.

1      3.   GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS

2      3.1.   Lease.

3          Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Store
4    depicted on the Site Plan, together with all easements, rights and privileges appurtenant thereto, on
5    the terms and conditions set forth herein.  As a material inducement and consideration for
6    Landlord entering into this Lease, Ross Stores, Inc. shall execute a Guaranty in the form of
7    attached Exhibit K.
     and (iv) the spaces of any existing tenancies whose leases permit "any and all
8      3.2.   Nature of the Shopping Center.     lawful uses".

9          3.2.1.   Retail Use.  Tenant has entered into this Lease in reliance upon representations
10   by Landlord that the Shopping Center is and shall remain retail in character, and, further, that
11   portion of the Shopping Center marked on the Site Plan as the "Restricted Area" shall not be used
12   for office (except (i) the space adjacent to the Store marked on the Site Plan as the "Three Story
13   CBS" space containing approximately thirty thousand (30,000) square feet of Leasable Floor Area
14   (referred to as the "Adjacent Office Building"), (ii) the health clinic adjacent to Piccadilly Cafeteria
15   not to exceed six thousand (6,000) square feet of Leasable Floor Area, and (iii) any office use in the
16   Free Area as that term is defined in Section 3.6.2 below) or residential purposes, or as a theater,
17   auditorium, meeting hall, school (except if not open to the public and connected to a retail use),
18   church or other place of public assembly, "flea market," gymnasium, health club, dance hall, billiard
19   or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the
20   sale, display, leasing or repair of motor vehicles, night club or adult book or adult audio/video
21   products (which are defined as stores in which at least ten percent (10%) of the inventory is not
22   available for sale or rental to children under fifteen (15) years old because such inventory explicitly
23   deals with or depicts human sexuality).  No restaurant shall be permitted in the Restricted Area of
24   the Shopping Center shown on the Site Plan within three hundred (300) feet of the front wall of
25   the Store, excepting (i) Piccadilly Cafeteria or other restaurant operators in the Piccadilly Cafeteria
26   space depicted on the Site Plan, (ii) the "Expansion Space" fronting on West 4th Avenue as
27   depicted on the Site Plan, and (iii) the spaces occupied by Papa John's pizza and Winn-Dixie
28   Supermarkets shown on the Site Plan.

29         3.2.2.   Further Prohibited Uses.  Landlord further agrees that those uses which are
30   listed in Exhibit D ("Prohibited Uses") shall not be permitted in the Shopping Center and Tenant
31   agrees not to engage in such uses.

32   3.3.   Grant of Common Area Use.

33         Tenant, as well as its agents, employees, customers and invitees, shall have and is granted
34   nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "easement"),
35   which easement shall be appurtenant to the Store and run with the Land.  Landlord shall use
36   reasonable efforts to provide that office tenants and their employees use the "Adjacent Office
37   Building Parking Area" marked on Exhibit B-1 instead of the parking area within the Control Area
38   shown on the Site Plan.  In no event shall Tenant's invitees' use of Common Areas be conditioned
39   upon payment of parking or other charges by Tenant or Tenant's invitees.

3.4.    Grant of Utility Easements.

Subject to the reasonable approval of Landlord as to location, and subject also to the existing rights of other tenants, Landlord hereby grants to Tenant the nonexclusive right by easement to install, replace, maintain and use utility conduits serving the Store within the Shopping Center.

3.5.    Utility Rooms.

In the event any meters, controls or conduits for any utility system serving the Store are at any time situated outside the Store (the "Utility Room"), Tenant shall at all reasonable times have access to the Utility Room and to controls and other conduits therein in common with Landlord and other tenants affected by such utility systems. No other parties (other than Landlord and the other tenants affected by such utility systems and their contractors, public utility employees, and government inspectors) shall have access to the Utility Room at any time without the consent of Tenant. Landlord shall provide adequate heat and security for the Utility Room and shall cause the Utility Room to be kept locked at all times. Access to the Utility Room shall be restricted to an exterior entrance situated in the rear wall of the building in which it is located.

3.6.    Site Plan Alterations.

3.6.1.    Control Area and Inline Buildings. The Site Plan is a material consideration for Tenant entering into this Lease. No material change, alteration, deletion, or addition shall be made to the Control Area on the Site Plan nor shall any change requiring storefront reconstruction of a façade front wall of any premises in an Inline Building be made without the prior written consent of the Tenant which consent shall not be unreasonably withheld, delayed or conditioned. Except as to any existing improvements, the tops of the roofs (including architectural features) of any new or remodeled Inline Building shall not exceed that of the Store.   Notwithstanding the above, Landlord may make changes in storefronts without the prior written consent of Tenant.

3.6.2.    Common Areas. Except in the triangular area directly to the north of the Store as depicted on the Site Plan and identified as "Free Area," and except as to the Outparcel located south of the Store and identified on the Site Plan as "Not A Part," Landlord shall not make (or permit) any material change or alteration to be made in the Common Areas of the Shopping Center outside the Control Area affecting the configuration of the Common Areas, methods of ingress and egress, direction of traffic, lighting, curbing (except that Landlord may relocate curb cuts on streets other than West 49th Street and Red Road) or other alterations affecting the visibility of the Store without the express prior written consent of the Tenant which consent shall not be unreasonably withheld, delayed or conditioned.

3.6.3.    Building Envelopes. No construction of any building, or remodeling of a building on any Outparcel within the Restricted Area may occur except within the Building Envelopes and limited in Leasable Floor Area as designated on Exhibit B. Additionally, the tops of the roofs of such Outparcel buildings, including any architectural features and rooftop equipment, shall not exceed twenty-four (24) feet in height measured from the finished floor elevation of the Store.



3.7.   **Dimensions.**

Within thirty (30) days following the Substantial Completion of Landlord's Construction Obligations, Landlord shall cause the Store to be measured and shall deliver to Tenant an architect's certificate stating the Leasable Floor Area thereof.  In the event that the Leasable Floor Area of the Store is less than the size specified in Section 1.3.3 (the "Agreed Size"), Minimum Rent and all other charges (except Percentage Rent) shall be proportionately reduced and the parties shall set forth the actual Leasable Floor Area of the Store, the adjusted Minimum Rent and other corrections necessitated by the adjustment in Store size in the Acknowledgment of Commencement in **Exhibit E** hereto.  In the event that the Leasable Floor Area of the Store is more than the Agreed Size, Minimum Rent and all other charges (except Percentage Rent) shall be based upon the Agreed Size. Nothing herein shall be construed as permitting a material variance in dimensions or area.  For purposes of this Section 3.7, a material variance is any decrease in the amount of Store frontage set forth in Section 1.3.3 or any decrease in the Agreed Size by more than one-half ($\frac{1}{2}$) of one percent (1%) of the amount of square feet of Leasable Floor Area.  Landlord shall simultaneously provide to Tenant a certificate from the project architect as to the total Leasable Floor Area in the Shopping Center depicted on **Exhibit B**.  Tenant shall have the right to dispute through its own licensed architect the amounts so represented and, if so, any unresolved dispute shall be resolved as provided in Section 20.2.  Until the amount of Leasable Floor Area in the Store and in the Shopping Center has been finally determined, Tenant may defer payment of Minimum Rent to the extent of the disputed amount and the disputed portion of its pro rata share of any charges which require the use of Leasable Floor Area for computational purposes under the terms of this Lease (e.g., Taxes, insurance and Common Area Charges).

## 4.  LEASE TERM

4.1.   **Term.**

The Term of this Lease shall commence on the Commencement Date and shall expire as specified in Section 1.5.

4.2.   **Commencement Date.**

The Term shall commence on the Commencement Date as set forth in Section 1.4.1.

4.3.   **Acknowledgment of Commencement.**

Within ninety (90) days after the Commencement Date, Landlord and Tenant shall execute a written acknowledgment in the form attached hereto as **Exhibit E**, and by this reference it is hereby incorporated herein.

4.4.   **Option Periods.**

Tenant shall have the right to extend the Term of this Lease (an "Option") for the number of separate, consecutive additional periods ("Option Periods") which are specified in Section 1.5.2, on the terms and conditions set forth herein, except that the number of Option Periods remaining to be exercised shall, in each case, be reduced by one.  If Tenant elects to exercise an Option, Tenant shall notify Landlord in writing at least two hundred ten (210) days prior to the expiration

of the Term, or the then current Option Period, as the case may be. If Tenant neglects to timely exercise any Option, Tenant's right to exercise shall not expire or lapse unless Tenant fails to exercise such Option within fifteen (15) days after notice from Landlord of Tenant's failure to timely exercise the Option. If Landlord does so notify Tenant, Tenant shall have the right at any time within fifteen (15) days after such notice to notify Landlord in writing of either Tenant's unqualified and irrevocable exercise of its Option, or Tenant's unqualified and irrevocable waiver of its Option. If Tenant fails to respond within such fifteen (15) day period, Tenant shall conclusively be deemed to have waived its Option and this Lease shall terminate on the then expiration date of the Term.

## 5.  CONSTRUCTION AND ACCEPTANCE

**5.1.  Landlord's Construction Obligations.**

**5.1.1.**   Current.  Landlord, at its own cost and expense, shall construct and remodel the Store, strictly in accordance with the terms and conditions specified in **Exhibit C**, to this Lease. Landlord shall be responsible for Landlord's Work, and Landlord shall defend, protect and hold Tenant harmless from all costs, claims, demands and liabilities, including attorneys' fees and expenses, arising out of Landlord's failure to pay for the costs of Landlord's Work, and claims for defective work.  The obligations of this Section 5.1 are a material consideration to Tenant without which Tenant would not have entered into this Lease.

**5.1.2.**   Future.  If at any time during the Term, Landlord undertakes the upgrading of the exterior facades of other inline buildings facing the inside of the Shopping Center, then Landlord shall be obligated to similarly upgrade the exterior of the building in which the Store is situated so that the Shopping Center presents a uniform appearance of quality, design and age. Landlord's failure to meet the provisions of this Section 5.1.2 within sixty (60) days following the completion of the general upgrading of other buildings in the Shopping Center shall constitute a material default under the provisions of this Lease entitling Tenant to all remedies at law, in equity or under the terms hereof.

**5.2.  Construction Commencement.**

If Landlord fails to commence to perform Landlord's Construction Obligations, including the construction of the Store prior to the date specified in Section 1.4.3 of the Lease ("Commencement of Construction"), then at any time thereafter, but prior to commencement thereof, Tenant shall have the right to terminate this Lease by notifying Landlord in writing.  If the Store is a new building to be constructed, to commence construction means to commence pouring the foundation for the Store.  However, if the Store is to be constructed in an existing building, Commencement of Construction means the day that the contractor's workers commence the Work in the Store for the interior improvements in the Store specifically for use by Tenant and other elements of Landlord's Work as described in **Exhibit C**.

**5.3.  Completion of Construction.**

Landlord shall use commercially reasonable efforts to complete Landlord's Construction Obligations and deliver possession of the Store to Tenant prior to the Intended Delivery Date, subject to delays caused by events of Force Majeure.

1   **5.4.    Construction Completion Notice.**

2      (a)    The parties acknowledge the necessity for Landlord to provide Tenant with the
3   notice specified in this Section 5.4 in order that Tenant shall have adequate time to, among other
4   things, hire personnel, arrange promotion, purchase and delivery of merchandise, perform Tenant's
5   improvements and fixturization of the Store and enter into other commitments required to timely
6   occupy and conduct business within the Store.  Not less than ~~ninety (90)~~ calendar days prior to the [one hundred five (105)]
7   Delivery Date, Landlord must notify Tenant in writing as to when the Delivery Date will occur (the
8   "Construction Completion Notice").    On or before the Delivery Date as specified in the
9   Construction Completion Notice, Tenant shall have the right, but not the obligation, to notify
10  Landlord of the first date that Tenant intends to operate in the Store for retail business to the
11  general public (the "Opening Date Notice").  In the event Landlord does not timely deliver the
12  Store as stated in the Construction Completion Notice (subject to delays caused by events of Force
13  Majeure, which delays in the aggregate may not in any case exceed sixty (60) days), Tenant will
14  suffer damages arising from Tenant's need for adequate and proper advance notice of delivery.  It
15  would be impractical or extremely difficult to fix actual damages in the event of Landlord's breach
16  under this Section 5.4.  Therefore, in the event of a breach by Landlord of its obligations under this
17  Section 5.4, the parties acknowledge that the damages to be suffered by the Tenant in such event
18  are difficult to ascertain, however, after negotiation the parties have made their best reasonable
19  estimate of such damage and Landlord shall pay to Tenant upon Landlord's opening of the Store, as
20  liquidated damages (the "Liquidated Damages"), the sum of One Hundred Thousand Dollars
21  ($100,000) which sum shall be paid to Tenant in a lump sum by Landlord to Tenant upon demand.
22  Nothing herein shall prohibit Tenant, in addition to claiming the Liquidated Damages, from
23  postponing occupancy and the commencement of Rent as specified in Section 5.5 hereof.  In the
24  event Landlord fails to pay to Tenant the Liquidated Damages as required by this Section, Tenant
25  may, at its option, deduct the full amount of the Liquidated Damages from the Rent or other
26  charges coming due until Tenant has fully recovered such amount.  Further, if Tenant delivers an
27  Opening Date Notice to Landlord, and thereafter, Landlord fails to timely deliver the Store at least
28  seven (7) business days before the Opening Date, in addition to Tenant's rights and remedies set
29  forth in this Section and Sections 5.5, 5.6, 5.7 and 5.8 due to a missed Delivery Date, Tenant shall
30  also have the right to occupy the Store without any obligation to pay Landlord Rent on and after
31  the Commencement Date (notwithstanding the provisions of Section 6.1.1 of this Lease) for a
32  period equal to the number of days between the missed Delivery Date as specified in the
33  Construction Completion Notice and the later of:  (a) the actual Delivery Date; or (b) the first day
34  of the next Permitted Delivery Period.  Force Majeure shall not apply to this Section.

35      (b)    Notwithstanding anything to the contrary contained in Section 5.4(a) above, in the
36  event Landlord does not timely deliver the Store due to an event or events of Tenant Delay of
37  which (i) Landlord has notified Tenant in writing within three (3) days of any occurrence thereof
38  including the nature and projected extent of such delay (a "Tenant Delay Notification"), (ii)
39  Landlord can demonstrate result in actual delays in completion of Landlord's Work in the Store, (iii)
40  Tenant has not remedied to Landlord's reasonable satisfaction within three (3) days from the date
41  of receipt of the Tenant Delay Notification, and (iv) cause the actual Delivery Date to occur outside
42  a Permitted Delivery Period, then the Delivery Date shall be deemed to be the last date to occur as
43  set forth in Article 2, Delivery Date, above, whether or not such date occurs within a Permitted
44  Delivery Period, ~~and~~ [then] Tenant may elect either to (A) accept occupancy of the Store outside the
45  Permitted Delivery Period, or (B) postpone occupancy pursuant to Section 5.5, but the
46  Commencement Date shall be calculated based upon the actual Delivery Date notwithstanding



Tenant's election to postpone occupancy, except that Tenant's obligation to commence payment of Minimum Rent and Reimbursements shall ~~be moved forward~~ one (1) day for each day of Tenant Delay.

commence                sooner

5.5.   **Rollover.**

Notwithstanding any other provisions of this Lease, Tenant shall not be obligated to accept delivery of the Store at any time other than during a Permitted Delivery Period nor at any time (within or without such a period) if Landlord has failed to give notice in accordance with Section 5.4 hereof. If (a) Landlord offers to deliver the Store to Tenant on a date outside of the Permitted Delivery Period and Tenant does not accept delivery of the Store on such date, or (b) Landlord fails to deliver a timely Construction Completion Notice to Tenant, the Delivery Date shall, at Tenant's option, be deferred ("Rollover") until the first day which falls within that Permitted Delivery Period which occurs or is in effect after the one hundred fifth (105th) day subsequent to delivery.

5.6.   **Remedies Cumulative.**

The Rollover remedy described in Section 5.5 above shall apply in addition to all other remedies at law, or in equity, or under the terms of this Lease.

5.7.   **Right to Cancel.**

If for any reason Landlord has not completed Landlord's Construction Obligations, or the Store is not delivered to Tenant prior to the date specified in Section 1.4.4 of this Lease ("Right to Cancel Date"), Tenant may, at its sole option, cancel this Lease by written notice to Landlord, provided, however, the Right to Cancel Date may be extended for events of Force Majeure which delays in the aggregate may not exceed sixty (60) days. If the Delivery Date occurs prior to Tenant's exercise of its Right to Cancel, Tenant's Right to Cancel shall be void.

5.8.   **Automatic Termination.**

This Lease shall be automatically terminated if the Delivery Date does not occur on or before the date specified in Section 1.4.5 of this Lease notwithstanding any Force Majeure Events ("Automatic Termination Date").

5.9.   **Entry Prior to Delivery Date.**

Upon at least 24-hours notice, Tenant shall have the right, without an obligation to pay Rent, to enter the Store for inspection, review, and coordination of construction purposes (but not business operations) prior to the Delivery Date, however, such exception regarding operation shall not apply subsequent to the Delivery Date specified in any Construction Completion Notice. Tenant agrees that it shall not interfere in any way with the progress of Landlord's Work by such entry and any such interference shall be deemed a Tenant Delay. No such entry by Tenant shall be deemed an acceptance of the Store.

 

1    5.10.    Walk-Through Inspection and Punchlist.

2    Within ten (10) days after Landlord notifies Tenant of the Substantial Completion of
3    Landlord's Construction Obligations, Landlord's construction representative and Tenant's
4    construction representative shall meet at and do a complete walk through inspection ("Walk-
5    Through Inspection") of the Store to (a) identify any uncompleted Landlord's Work as required
6    herein, and (b)identify any incomplete or noncomplying items of Landlord's Work. Within five (5)
7    business days after the Walk-Through Inspection, Tenant shall deliver to Landlord a list
8    ("Punchlist") containing all items described in (a) and (b) above which were identified during the
9    Walk-Through Inspection as not having been completed (i) to the extent necessary to permit
10   Tenant to commence Tenant's Work without interference from Landlord's contractor performing
11   Landlord's Work, and (ii) to sufficiently allow Tenant's retail operations to commence in the Store
12   without impediment to the conduct thereof by the incomplete nature of Landlord's Work. If
13   Tenant does submit such a list, and the items set forth on the list are, in fact, part of Landlord's
14   Work under this Lease, Landlord shall promptly and diligently complete or correct such items
15   within thirty (30) days thereafter or diligently commence such repairs within thirty (30) days and
16   complete same as soon as reasonably possible thereafter. In any event, the Delivery Date shall not
17   be deemed to have occurred until the listed items are completed and/or corrected to the extent
18   necessary to permit Tenant to commence Tenant's Work without unreasonable interference from
19   Landlord's contractor performing Landlord's Work and without unreasonable delay caused by the
20   incomplete nature of Landlord's Work. A sum equal to the amount of Minimum Rent for one (1)
21   full month may be withheld by Tenant in the event Landlord has not completed the Punchlist
22   within forty-five (45) days after Tenant has submitted the Punchlist to Landlord and such failure to
23   complete is not the result of Tenant Delays. Upon completion of the Punchlist, Tenant shall pay
24   Landlord any Minimum Rent withheld pursuant to this Section 5.10.

25   5.11.    Completion of Store.

26   Notwithstanding any other provisions of this Lease, the Delivery Date shall not occur until
27   Landlord has substantially completed all of Landlord's Work in accordance with Exhibit C.

28   5.12.    Acceptance.

29   5.12.1.    On the Delivery Date. Tenant's occupancy of the Store shall not constitute an
30   acceptance of Landlord's Work, or relieve Landlord of responsibility for any warranty or
31   maintenance obligations under this Lease. On the Delivery Date, Landlord shall deliver the
32   following to Tenant:

33   (a)    A fully executed certificate of occupancy for the Store, certificate of completion,
34   or its equivalent; and

35   (b)    All certificates of insurance required by this Lease.

36   5.12.2.    Landlord's Post-Delivery Date Obligations.

37   (a)    Within sixty (60) days after the Delivery Date, Landlord shall deliver all of the
38   following to Tenant:

39   (i)    A certificate of completion or comparable permit or certificate.

(ii)  A list of all contractors and subcontractors with contracts in excess of Twenty Five Thousand Dollars ($25,000) used for the construction of the Store.  Said list shall contain the following information about each contractor, subcontractor and, if available, supplier: name, business address, phone number (including area code), facsimile number and e-mail address, contact person for the project, and state license number if required for the execution of work on the Store;

(iii)  To the extent in Landlord's possession, equipment operation manuals, catalogue data sheets and material safety data sheets on all major equipment and/or fixtures used in the Store;

(iv)  For maintenance use, one percent (1%) of the floor and wall covering material installed of each color and pattern required for the Store; a one (1) gallon container of paint for each color and surface texture used; and each container, box or roll shall be labeled with color, texture and room location in addition to manufacturer's label;

(v)  Completed Punchlist properly signed and dated by Landlord or its general contractor indicating that all items have been completed; and

(vi)  One (1) copy of final project record documents for the Store indicating actual as-built conditions.

(b)  Within six (6) months after the Delivery Date, Landlord shall deliver to Tenant all fully executed and dated warranties and guarantees applying to the Store.

(c)  If the items required in Sections 5.12.2 (a) and (b) above, are not furnished to Tenant within the required time periods, Tenant may defer payment of one (1) month's Minimum Rent due under this Lease until such items are furnished to Tenant.

# 6.  RENT

## 6.1.  Minimum Rent.

**6.1.1.**  Payment and Amount.  Commencing on the Commencement Date and continuing through the Term of this Lease (except as otherwise expressly set forth in this Lease), Tenant shall pay Minimum Rent to Landlord in equal monthly installments at the rates specified in Section 1.6.1 (the "Minimum Rent").  Minimum Rent shall be payable in advance on or before the first (1st) day of each calendar month.  If the Lease commences other than on the first day of a calendar month, the first month's Minimum Rent shall be prorated accordingly and paid with the Minimum Rent for the first full month.

**6.1.2.**  Place of Payment.  All Minimum Rent and other payments to be made by Tenant to Landlord shall be sent to PALM SPRINGS MILE ASSOCIATES, LTD., c/o Phillips International Holding Corp., 417 Fifth Avenue, 3rd Floor, New York, New York  10016, or at such other address designated in writing by Landlord.

1      6.1.3.    Co-Tenancy.

2      (a)    Commencement Date Co-Tenancy Requirements.  A "Reduced Occupancy
3   Period" shall occur at the Commencement Date unless all the following requirements are satisfied: (i) all
4   the co-tenants specified in Section 1.7.1 (the "Commencement Date Co-Tenants") shall be open in the
5   Shopping Center every customary business day (except customary holidays) for retail business at least
6   from 10:00 a.m. to 6:00 p.m.; (ii) all the Commencement Date Co-Tenants are operating in at least the
7   Leasable Floor Area specified in Section 1.7.1(a) under bona fide leases of an original term of a minimum
8   of three (3) years' duration; and (iii) retail tenants of the Shopping Center, including the Commencement
9   Date Co-Tenants, are open and operating under bona fide leases in at least the percentage of the
10  Leasable Floor Area of the Shopping Center indicated in Section 1.7.1(b) (the Store shall be excluded
11  from the numerator and denominator of the fraction used to calculate such percentage).

12      (b)    Operating Co-Tenancy Requirements.  A "Reduced Occupancy Period" shall
13  occur at any time subsequent to the Commencement Date unless all the following requirements are
14  satisfied: (i) the co-tenant specified in Section 1.7.2(a) (the "Operating Co-Tenant") shall be open in the
15  Shopping Center every customary business day (except customary holidays) for retail business at least
16  from 10:00 a.m. to 6:00 p.m.; (ii) the Operating Co-Tenant is operating in at least the Leasable Floor Area
17  specified in Section 1.7.2(a) under a bona fide lease; and (iii) retail tenants of the Shopping Center
18  (excluding the Operating Co-Tenant and the Store) are open and operating under bona fide leases in at
19  least the Leasable Floor Area of the Shopping Center indicated in Section 1.7.2(b).

20      (c)    Co-Tenancy Remedies.  If a Reduced Occupancy Period exists on the
21  Commencement Date, Tenant, at its election may (i) defer opening the Store until the first date within
22  the first permitted Delivery Period for which the Commencement Date Co-Tenancy Requirements have
23  been met; or (ii) open the Store, in which case Tenant's total obligation for Rent shall be replaced by
24  Substitute Rent which shall be payable within twenty (20) days after the close of each calendar month
25  until the Commencement Date Co-Tenancy Requirements have been met and the Reduced Occupancy
26  Period is brought to an end: provided that if such Reduced Occupancy Period continues in effect for
27  more than three hundred sixty-five (365) days from the Commencement Date, Tenant may terminate
28  this Lease upon thirty (30) days' notice to Landlord.  If a Reduced Occupancy Period occurs at any time
29  after the Commencement Date (except in the event of an Exempted Discontinuance as hereinafter
30  defined), and continues in effect for a period of three hundred sixty-five (365) consecutive days,
31  thereafter, Tenant's total obligation for Rent shall be replaced by Substitute Rent which shall be payable
32  within twenty (20) days after the close of each calendar month during the Reduced Occupancy Period.  If
33  the Reduced Occupancy Period continues for a period of three hundred sixty-five (365) consecutive
34  calendar days, Tenant may, at its option, (i) continue to pay Substitute Rent until such Reduced
35  Occupancy Period is terminated, or (ii) terminate this Lease upon thirty (30) days' notice to Landlord
36  (the "Termination Notice") at any time during which prior Reduced Occupancy period continues.  The
37  provisions of this Section 6.1.3(b) shall apply to any subsequent Reduced Occupancy Period.

38      (d)    Exempted Discontinuance.  An Exempted Discontinuance shall mean the
39  closure of a tenant's space because of casualty, condemnation, repairs or remodeling for a period not to
40  exceed two hundred (200) days.  In the event of an Exempted Discontinuance, the tenant's space shall
41  not be calculated in the numerator or the denominator of the fraction specified in Section 1.7.1(b) (or
42  deducted from the total number of square feet of Leasable Floor Area required by Section 1.7.2(b)) from
43  the commencement of the Exempted Discontinuance until the earlier of: (i) the expiration of such two

hundred (200) day period; or (ii) the expiration of the Exempted Discontinuance, but shall be included thereafter.

## 6.2.   Percentage Rent.

6.2.1.    Gross Sales.  Gross Sales are revenue received by Tenant from the selling price of all merchandise or services sold in or from the Store by Tenant, its subtenants, licensees and concessionaires, whether for cash or for credit, excluding, however, the following:  (a) the sales price of all merchandise returned and accepted for full credit or the amount of the cash refund or allowance made thereon, if previously recorded as Gross Sales; (b) the sums and credits received in settlement of claims for loss or damage to merchandise;  (c) the consideration received in connection with a sale of inventory which occurs other than in the ordinary course of Tenant's business, including, but not limited to, a sale in bulk or to a jobber, liquidator or assignee; (d) sales taxes, so-called luxury taxes, excise taxes, gross receipt taxes, and other taxes now or hereafter imposed upon the sale or value of merchandise or services, whether added separately to the retail selling price of the merchandise or services and collected from customers or included in the retail selling price; (e) receipts from the collection of public utility bills; (f) bank card discounts or fees (e.g., Visa, MasterCard, etc.), interest, carrying charges, or other finance charges in respect of sales made on credit not to exceed two percent (2%) of Gross Sales; (g) sales of fixtures, trade fixtures, or personal property that are not merchandise held for sale at retail; (h) sales to employees and senior citizens at discount each not to exceed two percent (2%) of Gross Sales; (i) revenue received from mailing, alterations, delivery or other services performed on a non-profit basis for the benefit of customers; (j) Tenant's accounts receivable, not to exceed two percent (2%) of Gross Sales, which have been determined to be uncollectible for federal income tax purposes during the Lease Year; provided, however, that if such accounts are actually collected in a later Lease Year, the amount shall be included in the Gross Sales for such later Lease Year; (k) rents, subrents or other consideration received in connection with an assignment, sublease, license, concession or other transfer of any portion of the Store but sales by such assignees, sublessees and concessionaires shall be included as Gross Sales; (l) amounts received for merchandise transferred to any other place of business of Tenant (or its subtenants, concessionaires and/or licensees) or to any business organization affiliated with Tenant wherever located; provided such merchandise is not used to complete a sale originated in the Store;  and (m) any Internet or other sale contracted on a telecommunications network whether or not the sale item is delivered to the customer at the Store, provided that the Store is used for retail sales to walk-in customers and not as a warehouse facility for Internet sales.

6.2.2.    Amount and Calculation of Percentage Rent.

(a)    Calculation.  Tenant shall pay to Landlord as Percentage Rent for each Full Lease Year during the Term (i.e., which contains twelve (12) full calendar months), a sum equal to the amount by which the percentage specified in Section 1.6.2 of Tenant's Gross Sales made during each Full Lease Year exceeds the aggregate total of the Minimum Rent paid for such Full Lease Year.

(b)    Partial Year.  The Percentage Rent for any Lease Year having less than twelve (12) full months shall be based upon Gross Sales for the twelve (12) months immediately succeeding the Commencement Date (as to the first Lease Year) and for the twelve (12) month period immediately preceding the expiration or earlier termination of the Lease (as to the final Lease Year).  The Percentage Rent due for such period shall be established by multiplying the Percentage Rent which would have been

1   due for such twelve (12) month period by a fraction, the numerator of which is the number of days in
2   such Lease Year and the denominator of which is three hundred sixty-five (365).

3            (c)    Gross Sales Statement.  Within seventy-five (75) days after the close of each
4   Lease Year, Tenant shall submit to Landlord a statement certified by an officer of Tenant indicating the
5   amount of its Gross Sales for the previous Lease Year.  Tenant shall accompany such statement with a
6   payment of the Percentage Rent due, if any, after all deductions and offsets.  Landlord covenants to keep
7   such information confidential, except for information provided to its accountants or lenders, or if
8   required pursuant to any litigation between the parties hereto or as acquired by law.

9            (d)    Maintenance of Records.  Tenant shall maintain adequate records for a period of
10   two (2) years after the close of each Lease Year for the purpose of allowing Landlord to verify the
11   reported Gross Sales for such year.  At any time within said two (2) years, Landlord or its agents may
12   inspect such records at Tenant's main office specified in Section 1.2.2 hereinabove during normal
13   business hours.  If such inspection or audit discloses an underpayment of Percentage Rent, Landlord
14   shall promptly deliver a copy of the audit report to Tenant for its review.  Within thirty (30) days
15   thereafter, Tenant may, by written notice to Landlord, object to the conclusions or process of the audit
16   report stating its conclusions as to the amount due, if any.  If Landlord disputes Tenant's conclusions,
17   then within ten (10) days of receipt of Tenant's objection to its audit report, Landlord may institute the
18   appropriate alternative dispute resolution under Section 20.2 of this Lease.  If Tenant agrees with the
19   audit report, then it shall promptly thereafter pay to Landlord the amount of the underpayment.  In the
20   event an adjustment is required because of an understatement of Gross Sales in excess of three percent
21   (3%), and additional Percentage Rent is due, Tenant shall reimburse Landlord for Landlord's reasonable
22   expenses incurred in conducting such inspection or audit.

23         6.2.3.    No Representation.  Landlord acknowledges that Tenant has made no
24   representation as to the Gross Sales which may be generated from the Store nor that Gross Sales
25   will ever reach a volume sufficient to require payment of Percentage Rent.

26   **6.3.**    **Reimbursements.**

27        In addition to the Minimum Rent and Percentage Rent described above in this Article 6,
28   Tenant shall be responsible to pay its share of Common Area Charges as described in Section 7.4.1,
29   Taxes as described in Section 8.2.1, and Insurance Bill as described in Section 9.1.4.

30   **6.4.**    **Other Payment Provisions.**

31         6.4.1.    Late Payment.  Any sum including Rent accruing to Landlord or Tenant under
32   the provisions of this Lease which is not paid within ten (10) days of due date shall bear interest at
33   the Legal Rate from the due date.

34         6.4.2.    Timely Billing of Charges.  All charges due from Tenant to Landlord for which
35   Tenant must be billed by Landlord must be billed within twenty-four (24) months after the close of
36   the calendar year in which the charge is incurred by Landlord, or Landlord will have waived its right
37   to reimbursement which may have otherwise been established in any section of this Lease.

38         6.4.3.    Disputed Sums.  Under the terms of this Lease numerous charges are and may
39   be due from Tenant to Landlord and vice versa, including without limitation, real estate Taxes,
40   Common Area Charges, casualty and liability insurance premium reimbursements and other items.

1  In the event that at any time during the Term a bona fide dispute arises with respect to the amount
2  due for any of such charges claimed by a party to be due, that portion of the amount which is
3  undisputed shall be paid by Tenant or Landlord, as the case may be, pending the resolution of the
4  dispute between the parties by litigation or otherwise, and the disputed portion may be withheld
5  pending resolution. Tenant's withholding of a disputed amount in the event of a bona fide dispute
6  shall not be deemed a default by Tenant under the terms of this Lease. Upon resolution, the
7  obligated party shall pay to the other the remaining sum liquidated as due (if any) with interest
8  thereupon at the Legal Rate.

9  ## 7.  COMMON AREA MAINTENANCE

10  **7.1.   Landlord's Obligation to Maintain Common Areas.**

11      **7.1.1.**   <u>Maintain Common Areas</u>.  Landlord shall maintain all Common Areas in first
12  class condition, repair and cleanliness, including sidewalk pressure cleaning. Landlord shall keep the
13  Common Areas well lighted for a period of sixty (60) minutes following the end of Tenant's
14  business hours in the Store and thereafter maintain reasonable security lighting in the Common
15  Areas. No construction or construction-related activity shall be permitted in the Restricted Area of
16  the Common Areas, except for emergency repairs (or necessary repairs which cannot be delayed)
17  diligently pursued, during the period from October 15 of any year to January 2 of the ensuing year,
18  without the prior written consent of Tenant, which consent may not unreasonably be withheld and
19  may include conditions designed to eliminate interference with the operation of the Shopping
20  Center or the effect of such activity upon Tenant's business. Tenant shall be responsible for
21  customary periodic sweeping and cleaning of sidewalks adjacent to the Store's frontage. Landlord
22  shall provide reasonable security services for the Common Areas.

23      **7.1.2.**   <u>Common Area Metering</u>.  The Common Areas shall be served by meters which
24  do not serve any other areas of the Shopping Center. Landlord shall cause all utilities for the
25  Common Areas to be separately metered from those of Tenant and/or the Store.

26      **7.1.3.**   <u>Holiday Event</u>.  Landlord shall have the right, not more than once in any Lease
27  Year, to conduct a one (1) day holiday event in the primary parking area of the Shopping Center
28  between the hours of 8:00 a.m. and 12:00 p.m., provided that such event does not obstruct
29  Tenant's and Tenant's customers' ingress and egress to the Store ~~or Tenant's drive aisles or primary~~
30  ~~parking field.~~

31  **7.2.   Tenant's Common Area Contribution.**

32      **7.2.1.**   <u>Annual Fee/CPI Increase</u>.  Tenant shall pay an annual fee for all of Landlord's
33  costs and expenses related to the Store, the Common Area, and the Shopping Center as defined in
34  Section 7.2.2, equal to One Dollar and Fifty Cents ($1.50) times the number of square feet of
35  Leasable Floor Area in the Store determined pursuant to Section 3.7 above, pro rated for any partial
36  calendar year ("Tenant's Common Area Contribution"). Tenant's Common Area Contribution
37  shall be increased annually upon the anniversary of the Commencement Date of this Lease, in
38  proportion with the percentage increase in the CPI (as hereinafter defined) during the period from
39  the month of the Commencement Date to the calendar month (or the most recent CPI available)
40  for each succeeding anniversary of the Commencement Date. In no event shall Tenant's Common
41  Area Contribution for any year be less than One Dollar and Fifty Cents ($1.50) times the Store's

Leasable Floor Area. For purposes of this Lease, CPI shall mean the Consumer Price Index [All Urban Consumers] (base year 1982-84 = 100) for the Miami area published by the United States Department of Labor, Bureau of Labor Statistics. If the CPI is changed so that the base is changed from 1982-84 = 100, the CPI shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the CPI is discontinued or revised during the Term, such other governmental index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if the CPI had not been discontinued or revised. If there is no such replacement, then Landlord and Tenant shall select another price index which is reasonably satisfactory to both. Tenant's Common Area Contribution shall not be reduced below the prior year's Tenant's Common Area Contribution on the basis of the CPI adjustment above.

       7.2.2.   <u>Included and Excluded Expenses</u>.

       (a)   Except as provided in Section 7.2.2(b), it is intended that Tenant's Common Area Contribution shall be payment for <u>all</u> of Landlord's costs and expenses with respect to the Store, the Shopping Center and the Common Area, including, without limitation, all costs for or related in any way to maintenance, repair, construction, cleaning, insurance deductibles, marketing, utilities, remediation of Hazardous Materials (as hereinafter defined), signage, trash collection, taxes, overhead and administrative expenses, financing, casualty losses, condemnation, reserves, bad debts, interest, financing charges, salaries, promotional activities, sewer charges, equipment purchase or leasing costs, security, and costs of compliance with any Requirements (as hereinafter defined).

       (b)   In addition to Tenant's Common Area Contribution, Tenant shall pay the following: (i) Landlord's costs of security as provided in Section 7.4 hereafter; (ii) Landlord's "Administrative Fee" as provided in Section 7.3 hereafter; (iii) Tenant's Pro Rata Share of Taxes, as provided in Section 8.2 hereafter; and (iv) Tenant's Pro Rata Share of Landlord's Insurance as provided in Sections 9.1.2 and 9.2.2 hereafter (excepting plate glass and boiler and machinery insurance).

**7.3.   Landlord's Administrative Fee.**

       7.3.1.   Tenant shall pay Landlord an annual administrative fee equal to five percent (5%) of Tenant's Common Area Contribution. Payment shall be made as specified in Section 7.7.1 hereafter.

**7.4.   Security Patrol.**

       Tenant shall reimburse Landlord for its "Pro Rata Share of Security Patrol Costs" (as hereinafter defined) of the Shopping Center. Payment shall be made as provided in Section 7.7.1. Tenant's Pro Rata Share of Security Patrol Costs is defined as that fraction of Security Patrol Costs, the numerator of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor Area of the Shopping Center; provided, however, in no event shall the denominator of said fraction be less than the Minimum Leasable Floor Area set forth in Section 1.3.2. Security Patrol Costs shall mean all reasonable direct costs for security patrol and surveillance in the Shopping Center, exclusive of office rental, and Landlord's supervision and overhead expenses.

1    **7.5.**    **Trash.**

2      Tenant shall be responsible for its own trash removal.

3    **7.6.**    **Promotional Fund.**

4      Tenant shall have no obligation to contribute to a marketing fund or merchant's association
5 for the Shopping Center.

6    **7.7.**    **Payment of Tenant's Common Area Contribution, Landlord's Administrative Fee,**
7        **and Security Patrol Costs.**

8      **7.7.1.**    Payment. Commencing on the Commencement Date, Tenant shall pay its
9 Common Area Contribution, Landlord's Administrative Fee, and Security Patrol Costs as follows:
10 Beginning with the first (1st) day of the Term following Tenant's receipt of Landlord's written
11 statement of Tenant's Common Area Contribution, Landlord's Administrative Fee, and a
12 reasonable written estimate for the following calendar year of Landlord's Security Patrol Costs (but
13 not in any event before thirty (30) days after receipt thereof), Tenant shall include one-twelfth
14 (1/12th) of its annual obligations set forth in such statement and estimate with each payment of
15 Minimum Rent for the ensuing twelve (12) month period.

16      **7.7.2.**    Annual Statement. Within ninety (90) days following the close of each calendar
17 year, Landlord shall submit to Tenant a statement ("Annual Statement"), in which Landlord shall
18 set forth in reasonable detail the Landlord's actual expenditures for Security Patrol Costs for such
19 calendar year and Tenant's Pro Rata Share of Security Patrol Costs (collectively "Tenant Security
20 Reimbursement"). The Annual Statement shall be certified by a representative of Landlord to be
21 correct. In the event Landlord fails to provide such Annual Statement within the time required
22 hereby, Tenant may thereupon continue to make current payments without increase until such time
23 as the Annual Statement is received by Tenant, and Tenant shall pay the amount due within thirty
24 (30) days thereafter.

25      **7.7.3.**    Reconciliation of Annual Statement. If the Annual Statement indicates that
26 Tenant's payments of estimated Tenant Security Reimbursement exceeded Tenant's total obligation
27 relating to such calendar year, Landlord shall accompany said Annual Statement with a memo
28 crediting Tenant's account in the amount of such overpayment or, if the amount of the credit
29 exceeds one (1) full month's estimated payment for Tenant Security Reimbursement, Landlord shall
30 accompany said Annual Statement with a payment to Tenant of the amount of such excess. If the
31 Annual Statement shows that Tenant's payments of estimated Tenant Security Reimbursement
32 were less than its total obligation relating to such calendar year, Tenant shall pay the difference to
33 Landlord within thirty (30) days of Tenant's receipt of the Annual Statement. Notwithstanding the
34 foregoing, if at the time Landlord delivers such Annual Statement to Tenant, Tenant is auditing
35 Landlord's records of Tenant Security Reimbursement, any adjustment (if required) and any credit
36 or payment shall be made upon conclusion of such audit.

37      **7.7.4.**    Audit. Upon request, Landlord shall provide to Tenant copies of all invoices
38 and other written evidence of Tenant Security Reimbursement paid by Landlord. In addition,
39 Tenant shall have the right, not more frequently than once in any calendar year, to audit (the
40 "Security Cost Audit") all of Landlord's or Landlord's agent's records pertaining to Tenant Security
41 Reimbursement with a representative of Tenant's choice. Landlord shall retain its records regarding

1 Tenant Security Reimbursement for a period of at least two (2) years following the final billing for
2 each calendar year during the Term. At any time during such two (2) year period, upon thirty (30)
3 days' advance notice to Landlord, Tenant may conduct a Security Cost Audit. The Security Cost
4 Audit shall commence on a date (the "Audit Date") of which Tenant has notified Landlord not less
5 than thirty (30) days in advance and to which Landlord and Tenant have mutually agreed. In the
6 event of cancellation of the Audit by Landlord, Tenant shall be relieved of its obligation to make
7 monthly payments of the estimated Tenant Security Reimbursement until the first to occur of
8 twelve (12) months thereafter, or until the Security Cost Audit is performed and completed. Any
9 overbilling discovered in the course of the Security Cost Audit shall be refunded to Tenant within
10 thirty (30) days of Landlord's receipt of a copy of the Security Cost Audit. In the event the
11 overstatement of charges exceeds three percent (3%) of the sum previously billed to Tenant by
12 Landlord, Landlord shall reimburse Tenant for all expenses of the Security Cost Audit within thirty
13 (30) days following receipt of a copy of the Security Cost Audit. The expenses of this audit,
   when taken together with expenses of the Tenant Audits in Section 8.2.5 and
   9.1.3(c), shall not exceed Four Thousand Dollars ($4,000) per year.

14 ## 8.  REAL ESTATE TAXES AND ASSESSMENTS

15 **8.1.   Obligation to Pay.**

16 Landlord shall pay all real property taxes and assessments ("Tax" or "Taxes") levied by a
17 government agency against the Shopping Center or smaller Tax parcel which includes the Store (the
18 "Tax Bill") on or before the last day that such Taxes may be paid without penalty, commission,
19 interest or other charge. A "Tax parcel" is a single parcel of land for which the relevant taxing
20 authority renders a separate billing.

21 **8.2.   Tenant's Pro Rata Share.**

22 **8.2.1.   Payment of Tenant's Pro Rata Share.**

23 (a)   In addition to the Minimum Rent herein reserved, Tenant shall reimburse
24 Landlord for Tenant's Pro Rata Share of the Tax Bill, as calculated in accordance with Section 8.2.3, of
25 the Tax Bill applicable to each Tax Year or part thereof which falls within the Term, subject to the
26 provisions of this Article 8. Tenant's payment shall be made within twenty (20) days after receipt by
27 Tenant of (a) a copy of Landlord's cancelled check for payment of Taxes or other evidence of payment
28 reasonably satisfactory to Tenant, (b) a copy of Landlord's Tax Bill, and (c) a statement in writing from
29 Landlord setting forth the amount of Tenant's Pro Rata Share of the Tax Bill and the method of
30 calculation thereof. Subject to Tenant's receipt of written evidence of Landlord's payment of Landlord's
31 Tax Bill as specified above, Tenant's schedule of payments shall be concurrent with Landlord's
32 obligations for payment to the taxing authority.

33 (b)   In the event Landlord's lender requires Landlord to prepay Taxes on a monthly
34 basis and provides written evidence to Tenant verifying same, Landlord may, at its option, require Tenant
35 to pay to Landlord, in advance, Tenant's Pro Rata Share of the Taxes applicable to each Tax Year or part
36 thereof which falls within the Term (not including any management or administrative fees). Beginning
37 with the first full calendar month which is at least thirty (30) days after Tenant's receipt of Landlord's
38 written notice of Landlord's estimate of the amount of Taxes levied against the Shopping Center for the
39 current Tax Year (the "Tax Estimate"), which amount shall not exceed the Taxes levied against the
40 Shopping Center by the taxing authority for the preceding Tax Year, Tenant shall pay a sum equal to
41 one-twelfth (1/12) of Tenant's Pro Rata Share of the Tax Estimate with each payment of Minimum

Hialeah, Florida
Project No. E000002
4061.324/22:917.5

- 25 -

06/08/00

JUL 05 '00 09:34

PAGE 30

1  Rent for the twelve (12) month period commencing on the first day of the first full calendar month
2  which is not less than thirty (30) days after receipt of the Tax Estimate. Within thirty (30) days after
3  Landlord's receipt of the Tax Bill(s) from the taxing authority for the entire period of time which is the
4  subject of the Tax Estimate upon which Tenant has made payment, Landlord shall provide Tenant with
5  a reconciliation of Tenant's account with respect to estimated tax payments, together with a copy of all
6  of such Tax Bill(s). Should such reconciliation establish that Tenant has not paid sufficient amount of
7  estimated tax payments to cover its Pro Rata Share of Taxes for the Tax Year in question, Tenant shall
8  pay to Landlord the full amount of any shortage within thirty (30) days of the date of billing. If it is
9  established that Tenant has overpaid its Pro Rata Share of Taxes, Tenant shall be entitled to offset the
10 amount of such overpayment against the next payments of any type due to Landlord under the terms of
11 this Lease, or, if the overpayment exceeds the total amount of any such payments remaining payable to
12 Landlord by Tenant under this Lease, Landlord shall reimburse the amount of such excess to Tenant at
13 the time of delivery to Tenant of the reconciliation statement, but in no event later than thirty (30) days
14 of receipt of Tenant's billing therefor.

15     8.2.2.   Installments. In the event of assessments which may be paid in installments by
16 reason of bonding or otherwise, Landlord shall elect to make payment based upon the longest
17 period of installment payments permitted by the appropriate taxing authority. Tenant shall bear no
18 liability as to installments due following the expiration or earlier termination of this Lease except for
19 prorated amounts due prior to the expiration or earlier termination of this Lease. Tenant shall not
20 be responsible for any interest, late charge or other penalty resulting from Landlord's late payment
21 or non-payment of Taxes, nor any administrative or other charge which may be claimed by
22 Landlord.

23     8.2.3.   Calculation of Tenant's Pro Rata Share. Tenant's Pro Rata Share of the Tax Bill
24 is defined as that fraction of Taxes the numerator of which is the Leasable Floor Area in the Store
25 and the denominator of which is the Leasable Floor Area in the Tax parcel (as shown on
26 Exhibit B); provided, however, in no event shall the denominator of said fraction be less than the
27 Minimum Leasable Floor Area as set forth in Section 1.3.2. Such computation shall be made
28 separately for each Tax Year and shall be set forth in reasonable detail as a part of Landlord's
29 statement to Tenant pursuant to Section 7.4.5. The Tax parcel on which the Store is located shall
30 not contain more Common Areas than is consistent with the overall Common Area square footage
31 to building area ratio of the Shopping Center.

32     8.2.4.   Partial Year. Should Tenant be in occupancy during only a portion of the first
33 or final Tax Year, Tenant shall be responsible to pay Landlord only for a pro rata portion of its Tax
34 obligation as described herein, based on the portion of such Tax Year included in the Term of this
35 Lease.

36     8.2.5.   Tenant Audit. Tenant shall have the right, after not less than thirty (30) days'
37 notice, to audit Landlord's or Landlord's agent's records pertaining to Taxes with a representative
38 of Tenant's choice. Landlord shall retain its records regarding Taxes for a period of at least two (2)
39 years following the final billing for the calendar year in question. At any time during such two (2)
40 year period, Tenant may conduct its audit. Any overbilling discovered in the course of such audit
41 shall be refunded to Tenant within thirty (30) days of Landlord's receipt of a copy of the audit with
42 interest thereon at the Legal Rate specified in Article 2. In the event the overstatement of charges
43 exceeds three percent (3%) of the sum previously billed to Tenant by Landlord, Landlord shall
44 reimburse Tenant for all reasonable expenses of such audit. The expenses of this audit, when
taken together with expenses of the audits in Sections 7, 7.4 and 9.1.3(c),
shall not exceed Four Thousand Dollars ($4,000) per year.

Project No. E000002
6-81-324/221817-6

Hialeah, Florida

09/08/00

JLL 05 '00 09:34

1    8.2.6.    <u>Florida Rent Tax</u>. If any governmental taxing authority levies, assesses, or
2 imposes any tax, excise or assessment (other than income or franchise tax) upon or against the Rent
3 payable by Tenant to Landlord ("Rent Tax"), either by way of substitution for or in addition to any
4 existing tax on land, buildings or otherwise, Tenant shall directly pay, or reimburse Landlord, for
5 the Rent Tax, as the case may be.

6 **8.3.    Exclusions.**

7    There shall be excluded from the Taxes to which Tenant contributes: (a) any increase in
8 Taxes caused by construction in the Shopping Center commenced subsequent to the date of this
9 Lease until such time as such newly constructed space constitutes Leasable Floor Area; (b) any
10 increase in Taxes (excepting once during the Initial Term and once during the aggregate of the
11 Option Periods) caused by a "change of ownership" as defined in any law, regulation, ruling, or
12 decision under which a reassessment or tax increase results from a transfer of all or a portion of any
13 estate or interest in the Shopping Center (excepting only:  (i) one (1) increase resulting from a
14 change in ownership of the Shopping Center if completed within one (1) year following the
15 Effective Date; (ii) one (1) increase caused by a change in ownership during the Initial Term; and
16 (iii) two (2) increases caused by a change in ownership during the aggregate of all the Option
17 Periods) except if resulting from a transfer by Tenant; (c) income, excess profits, gross profits,
18 estate, single business, inheritance, succession, transfer, franchise, capital or other tax or assessment
19 upon Landlord or the Rent payable under this Lease; (d) bonds and/or assessments which have
20 been or, subsequent to the date hereof are, levied for the purpose of funding the costs of
21 construction for Landlord's development or redevelopment of, all or any portion of the Shopping
22 Center or capital improvements constructed therein or with respect thereto, or any Off-Site
23 Improvements; (e) tax increment financing fees, taxes or assessments; (f) any special (non-general)
24 assessments which apply to the Shopping Center; and (g) any Taxes assessed against land in the
25 Shopping Center that has not been fully developed as buildings or Common Areas.

26 **8.4.    Rebates.**

                              non-appealable
27    Any final rebates, refunds, or abatements of real estate Taxes received by Landlord
28 subsequent to the reimbursement of Taxes by Tenant (net of Landlord's reasonable costs and
29 expenses), including, but not limited to, tax increment financing rebates or subsidies received by
30 Landlord from the applicable taxing authority, shall, provided Tenant has previously made a
31 contributory payment in respect thereof, be refunded to Tenant on a pro rata basis within ten (10)
32 days of receipt by Landlord. Any such rebate, refund or abatement realized by Landlord prior to
33 payment by Tenant shall result in an immediate reduction in Tenant's pro rata share of Taxes then
34 due to Landlord.

35 **8.5.    Contest.**

36    In the event Tenant and tenants occupying at least fifty percent (50%) of the Leasable Floor
37 Area of the Shopping Center request that Landlord contest Taxes, Landlord shall contest the
38 validity or amount of Taxes in the Tax Bill as are permitted by law. Landlord shall provide Tenant
39 with government notices of assessment (or reassessment) in time sufficient to reasonably permit
40 Tenant, to cause Landlord, to make contest; and if Landlord fails to do so, then there shall be
41 excluded from the Tax Bill, any increased Taxes resulting from such assessment (or reassessment).
42 Landlord shall notify Tenant immediately upon Landlord's filing of any contest. The term

1  "contest" as used in this Section 8.5 means contest, appeal, abatement or other proceeding
2  prescribed by applicable law to obtain a tax reduction or tax refund, howsoever denominated. The
3  net benefit of any contest, after the payment of expenses thereof, shall inure to the benefit of
4  Tenant and all other occupants of the parcel(s) included in the Tax Bill in the same proportions as
5  their respective obligations for Taxes to which the contest relates.

6                                  **9. INSURANCE**

7  **9.1.    Casualty Insurance.**

8          **9.1.1.**    Special Form Policy.  A policy of fire and casualty insurance at least as broad as
9  the form of the Insurance Services Offices' Causes of Loss Special Form ("Special Form Policy").
10 The term "Casualty Insurance" means insurance covering damage to tangible real and personal
11 property.

12         **9.1.2.**    Landlord Insurance.  Commencing on the Delivery Date, as defined in Article 2
13 hereof, and at all times during the Term, Landlord shall maintain a Special Form Policy insuring
14 against damage to the Shopping Center and the Store, including Tenant's leasehold improvements
15 and alterations in the Store, but excluding Tenants' trade fixtures, trade equipment and other
16 personal property situated thereon.  It is contemplated that Landlord will also carry other insurance
   without limitation,
17 on the Shopping Center, including workers' compensation, commercial auto and EDP/Inland
18 Marine (such other insurance, together with the Special Form Policy, collectively "Landlord's
19 Insurance").  Further, upon completion of construction of the Shopping Center (exclusive of pads,
20 outparcels and any phase of development to be completed at a later date) such insurance shall be
21 obtained with an owner's rating for the Shopping Center based upon a completed project as
22 opposed to a property under development. All Special Form Policy(ies) shall be in the amount of
23 the full guaranteed replacement cost, including demolition cost.  Landlord shall on the
24 Commencement Date, and thereafter upon request of Tenant, provide Tenant with a certificate of
25 Landlord's Insurance coverage from an insurer licensed to do business within the state in which the
26 Store is located, and which insurer is rated at least B+ and X in Best's Insurance Reports, or
27 equivalent.

28         **9.1.3.**    Tenant's Share.

29              (a)    Tenant shall be responsible to reimburse Landlord for Tenant's pro rata share of
30 the premium cost for Landlord's Insurance described in Section 9.1.2 above, excluding any management
31 or administrative fees, within thirty (30) days after receipt by Tenant of written evidence of Landlord's
32 payment of the insurance premium, together with a statement, indicating the total cost of the premium
33 applicable to the Shopping Center, accompanied by a copy of the premium billing and the certificate of
34 insurance from Landlord's policy, and setting forth such further information as Tenant may reasonably
35 require to substantiate the amount of such premium and the manner in which the premium and Tenant's
36 pro rata share thereof have been calculated.  If Landlord covers the Store with a Special Form Policy
37 which includes premises other than the Shopping Center, Landlord shall provide a breakdown indicating
38 the premium portion thereof attributable to the Store.  Tenant's pro rata share for purposes of this
39 Section 9.1.3(a) shall be that fraction of the total premium the numerator of which is the Leasable Floor
40 Area of the Store and the denominator of which is the Leasable Floor Area of the lesser of:  (i) the
41 Shopping Center; or (ii) the applicable portion thereof for which the premium billing was issued by the
42 insurer, and which includes the Store (the "Insurance Bill"), provided, however, in no event shall the

1  denominator of said fraction be less than the Minimum Leasable Floor Area as set forth in Section 1.3.2.
2  Tenant shall not be responsible for any interest, late charge or other penalty resulting from Landlord's
3  late payment or nonpayment of the insurance premium.

4  (b)   In the event Landlord fails to provide such written evidence of payment after
5  twenty (20) days notice from Tenant, and after a second (2nd) five (5) day notice from Tenant, Tenant
6  may obtain the same or similar coverage and deduct from Rent coming due under this Lease an amount
7  equal to the amount of Tenant's pro rata share of the Insurance Bill, which sum shall be repaid to
8  Landlord (less the cost of any insurance Tenant carried before Landlord provided the evidence of
9  coverage) upon Landlord's delivery to Tenant of the evidence herein required of Landlord's payment of
10  such insurance premiums. In the event Tenant receives a notice of cancellation of the Special Form
11  Policy or other evidence indicating that Landlord has failed to maintain the Special Form Policy on the
12  Store, Tenant shall not be responsible for reimbursement under Section 9.1.3(a). In the event Landlord
13  fails to maintain the Special Form Policy on the Store and it is not possible for Tenant to separately
14  insure the Store, Tenant may obtain the Special Form Policy for the entire Shopping Center and deduct
15  all premium amounts related thereto from Rent coming due.

16  (c)   Landlord or Landlord's agent shall retain full and detailed records of all costs
17  incurred by Landlord for the Special Form Policy. Copies of any of said records shall be made available
18  to Tenant upon request and Tenant shall have the right to audit all of such records, including the policy,
19  after thirty (30) days' notice, with a representative of Tenant's choice, provided such audit shall not be
20  conducted more than once per calendar year. Any overbilling discovered in the course of such audit
21  shall be refunded to Tenant together with interest at the Legal Rate specified in Article 2 within thirty
22  (30) days of Landlord's receipt of a copy of the audit. In the event the overstatement of charges exceeds
23  three percent (3%) of the sum previously billed to Tenant by Landlord, Landlord shall reimburse Tenant
24  for all expenses of such audit. Landlord shall retain its records regarding insurance premiums for a
25  period of at least two (2) years following the final billing for the calendar year in question. At any time
26  during such two (2) year period, Tenant may conduct its audit. The expenses of this audit, when
    taken together with the expenses of the audits in Sections 7.7.4 and 8.2.5
27  9.2.   Liability Insurance.  shall not exceed Four Thousand Dollars ($4,000) per year.

28  9.2.1.   Tenant. Tenant shall, at its sole cost and expense, commencing on the Delivery
29  Date, and at all times during the Term, keep in force a policy or policies of commercial general
30  liability insurance, or an endorsement on a blanket commercial general liability insurance policy or
31  policies, naming Landlord as an additional insured, protecting against (except to the extent caused
32  by the negligence or willful act of Landlord or its agents, contractors, employees or representatives
33  and not waived per Section 9.4 hereof) any and all claims and liabilities arising out of injuries to or
34  the death of any persons in the Store, or for property damage therein, in the minimum amount of
35  THREE MILLION DOLLARS ($3,000,000) combined single limit for any one occurrence at the
36  Store (i.e., at this location) so long as Tenant also carries an excess liability policy the coverage of
37  which includes the Store, and the policy amount of which is at least FIVE MILLION DOLLARS
38  ($5,000,000). Said policy or policies shall contain a cross-liability endorsement, and shall be with an
39  insurer which is rated at least A- and X in Best's Insurance Reports, or equivalent.

40  9.2.2.   Landlord. Landlord shall, subject to Tenant's reimbursement as provided
41  hereafter in this Section 9.2.2, commencing on the Delivery Date, as defined in Article 2 hereof,
42  and at all times during the Term, keep or cause to be kept in force a policy or policies of
43  commercial general liability insurance for the Common Areas or an endorsement on a blanket



1  commercial general liability insurance policy or policies naming Tenant as an additional insured,
2  protecting against (except to the extent caused by the negligence or willful act of Tenant or its
3  agents, contractors, invitees, employees or representatives and not waived per Section 9.4 hereof)
4  any and all claims and liabilities arising out of injuries to or the death of any persons in the
5  Common Area and the Store or for property damage therein, in the minimum amount of FIVE
6  MILLION DOLLARS ($5,000,000) combined single limit for any one occurrence.  Said policy or
7  policies shall include contractual liability insurance recognizing the liability assumed in Section 14.2,
8  contain a cross-liability endorsement, and shall be with an insurer which is rated at least B+ and X
9  in Best's Insurance Reports, or equivalent.  Tenant shall reimburse Landlord for its pro rata share
10  of Landlord's commercial general liability insurance in the manner of calculation provided in
11  Section 9.1.3 above.

12  **9.3.  Evidence of Insurance.**

13     Landlord and Tenant agree to deliver to the other certificates of insurance evidencing the
14  existence in force of the policies of insurance described in Sections 9.2.1 and 9.2.2, together with
15  endorsements showing that the parties have been named as additional insureds.  Each of the
16  certificates shall provide that such insurance shall not be canceled or materially amended unless at
17  least twenty (20) days' prior written notice of such cancellation or amendment is given to the party
18  designated on such certificate as the holder thereof.

19  **9.4.  Waiver of Subrogation.**

20     On and after the Delivery Date and throughout the Term, Landlord and Tenant hereby
21  waive and release any and all right to maintain a direct action to recover against the other, including
22  the employees, officers, directors and agents of Landlord and Tenant, for damages and any and all
23  loss (including loss of Rent) to any property located within the Store or the Shopping Center,
24  which damage or loss occurs during a period which is covered or could be covered by a Special
25  Form Policy required under this Lease, and which arises out of the other party's negligence or
26  otherwise tortious acts or omissions, but only to the extent that the cost of repairing such damage
27  or loss is covered by insurance required under this Lease, or would have been covered by insurance
28  proceeds payable under any policy required to be maintained under this Lease, but not so
29  maintained.  Each policy of such insurance shall either, (a) contain a waiver of subrogation by the
30  insurer against Tenant and Landlord, as the case may be, or (b) include the name of the Landlord or
31  Tenant, as the case may be, as an additional insured, but not as a party, to whom any loss shall be
32  made payable.  In the event a party is unable to obtain such a waiver, it shall immediately notify the
33  other of this inability.  In the absence of such notification, each party shall be deemed to have
34  obtained such waiver of subrogation.  Further, Tenant's agreement to indemnify Landlord, and
35  Landlord's agreement to indemnify Tenant under this Lease, are not intended and shall not relieve
36  any insurance carrier of its obligations under policies required to be carried by Tenant or Landlord
37  pursuant to the provisions of this Lease, to the extent such policies cover, or if carried would have
38  covered the matters subject to the parties' respective indemnification obligations; nor shall they
39  supersede any inconsistent agreement of the parties set forth in any other provision of this Lease.
40  This mutual waiver is in addition to any other waiver or release contained in this Lease.  The
41  provisions of this Section 9.4 shall not apply to Landlord's obligation to repair and replace any
42  portion of the Store and Tenant's merchandise damaged by roof leaks as specified in Section 11.2.1.

1   **9.5.   Tenant's Right to Self-Insure.**

2        Notwithstanding anything to the contrary herein contained, the Tenant described in
3   Section 1.2.2 (the "Signatory Tenant") shall have the option, either alone or in conjunction with any
4   parent, subsidiaries or affiliates of Signatory Tenant, provided Signatory Tenant (or Guarantor, if
5   any), has a minimum net worth of at least TWENTY MILLION DOLLARS ($20,000,000), to
6   maintain self-insurance (except the liability insurance specified in Section 9.2.1) and/or provide or
7   maintain any insurance required by Signatory Tenant under this Lease under blanket and/or broad
8   form insurance policies maintained by Signatory Tenant or by any such parent, subsidiaries or
9   affiliates of Signatory Tenant, provided the same does not thereby decrease the insurance coverage
10   or limits set forth in this Lease. Any self-insurance shall be deemed to contain all of the terms and
11   conditions applicable to such insurance as required in this Lease, including, without limitation, a full
12   waiver of subrogation. If Signatory Tenant elects to so self-insure, then with respect to any claims
13   which may result from incidents occurring during the Lease Term, such self-insurance obligation
14   shall survive the expiration or earlier termination of this Lease to the same extent as the insurance
15   required would survive.

16                     **10. UTILITIES SERVICES**

17        As of the Delivery Date, Landlord agrees to make available for Tenant's use at the Store all
18   necessary utilities including electric, water, gas, sewerage, as well as access (but not the system itself)
19   for Tenant's communications and telephone, all sufficient to service Tenant's operations, and
20   having no less capacity than specified in the Final Plans (as defined in **Exhibit C**). Notwithstanding
21   the foregoing, Landlord shall not be obligated to provide Tenant with DSL, T-1 cable or Internet
22   or other similar communications lines. Tenant agrees to pay all use charges for all such utilities
23   provided to the Store commencing on the Delivery Date and throughout the Term. If Landlord or
24   an affiliated company of Landlord provides some or all of such utility services, Tenant's obligation
25   to pay for such services shall be commercially reasonable rates charged by regional or local utility
26   providers. At all times during the Term, Tenant shall have the right to contract with any third party
27   of Tenant's choice to provide some or all of the utility services for the Store. Landlord shall, at
28   Landlord's sole cost and expense, pay for all utility hookup, connection or impact fees and permits.
29   Landlord shall separate out all utilities and install separate meters for the Store. The utilities shall be
30   registered by Tenant in Tenant's name. Tenant shall be entitled to collect, and Landlord shall
31   cooperate with Tenant in collecting, any rebate which is made available by a utility company for the
32   installation of energy efficient lighting.

33            **11. MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE**

34   **11.1.   Maintenance and Repair by Tenant.**

35        Subject to the terms of Articles 21 and 22, Tenant shall maintain the storefront (except
36   canopy) plate glass, and all exterior doors, as well as the interior and interior systems (including
37   interior sprinkler heads and sprinkler recertification in the event Tenant modifies the sprinkler
38   system) serving the Store (except for Landlord's interior and systems maintenance obligations
39   under Section 11.2 hereof), in good repair and condition, reasonable wear and tear excepted.
40   Tenant shall, at its expense, perform or cause to be performed all maintenance and servicing of the
41   heating, ventilating, and air conditioning system serving the Store (the "HVAC") in accordance with

Hialeah, Florida
Project No. E000002
6061.324/221017.6
            - 31 -
            06/08/00

the terms of a customary air conditioning service contract as performed by reputable service companies in the state in which the Shopping Center is located. However, neither Landlord nor Tenant shall be responsible for any "replacements" to the HVAC beyond maintenance and servicing (other than replacements of noncapital components, such as air filters). A "replacement" as that term is used in this Section 11.1 shall mean that the compressor, condenser, motors, the chiller, duct work or heating/cooling coils must be removed and replaced by new equipment.

## 11.2. Maintenance and Repair by Landlord.

**11.2.1.** Landlord's Obligations. Landlord shall, at its sole cost and expense (not passed through to Tenant as a Tenant Common Area Reimbursement or otherwise), be responsible for defects in the construction of the Store, and shall maintain, repair and replace the foundation, floor slab, flooring (to the extent damaged by slab movement or roof leaking), roof, roofing (including the interior ceiling, walls, floors and merchandise damaged from roof or gutter leaks which are the result of Landlord's active or passive negligence), roof drainage system, including gutters and downspouts, exterior walls, storefront canopy, all structural portions of the Store, sprinkler system (including the monitoring and testing thereof but excluding interior sprinkler heads), all concealed wiring and plumbing, pipes, conduits and utility systems and lines inside the Store, including in the exterior walls and interior walls of the Store, and Landlord shall maintain and repair all such wiring, plumbing, pipes, conduits and utility systems and lines outside the Store, whether exclusively serving the Store or not, in good and sightly condition consistent with comparable shopping center facilities in the county in which the Shopping Center is located. Landlord shall maintain and repair any damage or defects in any part of the Store caused by the acts or omissions of Landlord, its agents or contractors regardless of which party has the maintenance obligation under this Article 11. Tenant may give Landlord notice of the need for such repairs as may be required under the terms of this Section 11.2, and Landlord shall proceed forthwith to effect the same with reasonable diligence, but in no event later than thirty (30) days after having received notice. If Landlord fails to repair or maintain the Store within the thirty (30) day period imposed herein, or such additional reasonable time as shall be required, provided that Landlord has commenced cure within the thirty (30) day period and is diligently prosecuting such cure to completion (which additional reasonable time shall not in any event exceed sixty (60) days) then, provided Tenant notifies Landlord in writing and Landlord still does not repair same within ten (10) days of Tenant's notice, Tenant may perform the repairs, maintenance or replacements and deduct the cost thereof from the subsequent Rent payment(s) next coming due if not paid within thirty (30) days after receipt of billing therefor from Tenant. In the event of an emergency, with respect to the roof of the Store, and with as much notice as is reasonable under the circumstances, which notice shall consist of calling the Shopping Center offices at (305) 821-7111 and waiting at least four (4) hours for response, Tenant may undertake immediate repairs which are Landlord's responsibility. If Landlord shall fail to reimburse Tenant for the cost of an emergency repair within thirty (30) days after receipt of billing therefor from Tenant, Tenant may deduct the cost from the subsequent installments of Rent payment(s) thereafter coming due.

**11.2.2.** Earth Movement. Landlord agrees that any maintenance, repairs, alterations or replacements that shall be required at any time on or after the Delivery Date and during the Term of this Lease as a result of movement of the Store such as settling, or as the result of settling of the Common Areas without charge to Tenant whether directly or through Reimbursements.

1  **11.2.3.**    First Year Repairs.  Notwithstanding the foregoing provisions of Section 11.1
2  above, Landlord shall make all repairs, alterations and replacements (other than those required as
3  the result of repairs, alterations, replacements, other improvements or installations by Tenant or
4  any subtenant or concessionaire of Tenant or the agents of any of them) to the Store which may
5  become necessary for any cause except for Tenant's negligence or willful acts or omissions on or
6  after the Delivery Date and during the first twelve (12) months of the Term.

7  **11.2.4.**    Shopping Center Maintenance.  Landlord shall, at no cost or expense to Tenant,
8  maintain and repair all buildings within the Shopping Center in good condition, consistent with the
9  standards for comparable shopping centers in the county in which the Shopping Center is located.

10  **11.3.   Repairs Required by Governmental Authorities.**

11  **11.3.1.**    Store.  After completion of Landlord's Construction Obligations, any repairs,
12  alterations or other improvements to the Store required by governmental authority or insurance
13  rating bureau having jurisdiction shall be performed by Tenant at its sole cost and expense.  Any
14  such work, however, which is required to the Shopping Center in general, other than for tenants or
15  occupants obligated similarly to Tenant, or to all similar buildings or uses in the area of the
16  Shopping Center, shall be done at the sole cost and expense of Landlord.

17  **11.3.2.**    Shopping Center.  Landlord warrants that the construction and the proposed
18  use of the Shopping Center's Common Areas and buildings, including the Store, for retail and
19  office purposes shall comply with all laws, ordinances, regulations and standards of public
20  authorities and insurance rating bureaus having jurisdiction, including, without limitation,
21  Environmental Regulations, as hereinafter defined, and zoning and building codes as of the
22  Delivery Date (all of the foregoing being hereinafter collectively referred to as the "Requirements").

23  **11.3.3.**    Non-Compliance.  Landlord agrees that if, at any time on or after the Delivery
24  Date, any public authorities or insurance rating bureau having jurisdiction shall determine that as of
25  the Delivery Date the portion of the Store comprising Landlord's Work, or any portion of the
26  Shopping Center other than the Store was constructed, in violation of, any Requirement and shall
27  request compliance, with any Requirement or, absent such a request from the government
28  authority, if the portion of the Store comprising Landlord's Work or any portion of the Shopping
29  Center other than the Store is otherwise not in compliance with or is in violation of any
30  Requirement, and if failure to comply shall in any way adversely affect the use of the Store by
31  Tenant or adversely affect any other rights of Tenant under this Lease or impose any obligation
32  upon Tenant not contained in this Lease or shall increase the obligation of Tenant (such as, by way
33  of example, increased insurance costs), Landlord shall, upon receipt of notice thereof, at Landlord's
34  sole cost and expense, cause such repairs, alterations or other work to be done or action to be taken
35  so as to bring about the compliance, or to effect the Requirement requested.  If by reason of such
36  failure of compliance or by reason of such repairs, alterations or other work done by Landlord,
37  Tenant shall be deprived of the use or enjoyment of the whole or any material part of the Store or
38  the Common Areas, Rent shall abate and in lieu thereof Tenant shall pay Substitute Rent on a per
39  diem basis until compliance with the Requirement is completed.

40  **11.3.4.**    Zoning.  If, from and after the Delivery Date, the applicable zoning shall not
41  permit the retail sale of apparel, soft goods, and merchandise customarily sold in Tenant's Florida

stores, Tenant may, without waiving any other rights Tenant may have on account thereof, terminate this Lease by giving notice thereof to Landlord.

**11.4.   Hazardous Material.**

   **11.4.1.   <u>Definition</u>.**  As used herein, the term "Hazardous Material" or "Hazardous Materials" shall mean (a) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne), which is or is deemed by governmental authority to be a pollutant or a contaminant, or which is or is deemed by governmental authority to be hazardous, toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or which presents a risk, to public health or to the environment, or which is or may become regulated by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions, guidelines or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto ("Environmental Regulation"); (b) petroleum, including crude oil or any fraction thereof; (c) any asbestos or asbestos containing material, (d) any polychlorinated biphenyl; (e) any radioactive material; and (f) urea formaldehyde.

   **11.4.2.   <u>Landlord's Warranties and Representations</u>.**  Landlord expressly represents and warrants that:

      (a)   To its actual knowledge, no escape, seepage, leakage, spillage, discharge, emission, release or disposal of Hazardous Material has occurred within the Store to date, and the Store, as well as the soil, groundwater and soil vapor within or under the Store, are free of Hazardous Material as of the Effective Date, and will be free of Hazardous Material as of the Delivery Date and throughout the Lease Term.

      (b)   It shall not use or knowingly permit any Hazardous Materials to be used in the construction of the Store or in connection with the installation of any utility system or other facility which serves the Store including by way of example, but not by limitation, the interior of any partition or demising walls, whether structural or otherwise, columns or beams, and all utility lines, shafts and ducts, HVAC or other equipment.  Such utility systems and other facilities as hereinabove described, whether located in the Store or other portions of the building or the Shopping Center, shall be collectively referred to as "Support Systems."

   **11.4.3.   <u>Landlord's Responsibilities Prior to the Delivery Date to Tenant</u>.**  Prior to the Delivery Date, Landlord shall cause the Store to be inspected, at its sole cost and expense, by a licensed environmental consultant who shall issue a report and certificate relating to the Hazardous Materials content of the Store, including all portions thereof as described above, including all Support Systems, as described above.  Landlord shall furnish to Tenant a copy of the inspector's report certifying that the Store is free of Hazardous Materials.  If Hazardous Materials are found to be present, then Landlord, at its sole cost and expense, shall cause such Hazardous Materials to be removed from the Store (hereinafter referred to as the "Abatement Work"), and Landlord shall complete such removal prior to the Delivery Date.  Upon completion of the Abatement Work, Landlord shall furnish Tenant evidence of removal of the Hazardous Material, including copies of the final inspection report together with a Clearance Certificate or other document of release or approval from any applicable governmental authority as aforesaid.

1        **11.4.4.**    Landlord's Responsibilities After the Delivery Date. If Hazardous Materials are
2 found to be present in the Store, at any time after delivery of possession of the Store to Tenant,
3 then Tenant shall have the right to vacate the Store, at which time all Rent shall abate, unless the
4 Hazardous Materials were introduced by Tenant, its agents, employees or contractors. Landlord
5 shall, at its sole cost and expense, complete such Abatement Work as soon as practicable after the
6 discovery of such Hazardous Materials. Upon completion of the Abatement Work, Landlord shall
7 furnish Tenant with a copy of the Clearance Certificate. During such Abatement Work, Tenant's
8 fixturization or construction period, if applicable (as provided for elsewhere in this Lease), shall be
9 tolled until the Abatement Work is complete and a Clearance Certificate is issued. In the event
10 Landlord is required to undertake Abatement Work, it is understood and agreed that Landlord shall
11 be responsible for the cost of the replacement of all of Tenant's improvements and alterations
12 damaged or destroyed as a result of such Abatement Work. If Tenant is required to undertake
13 Abatement Work because the Hazardous Materials were introduced by Tenant, Tenant shall be
14 responsible for the cost of the Abatement Work and any work necessary to repair and replace the
15 Store.

16        **11.4.5.**    Tenant's Rights.

17            (a)    Tenant's Awareness of Hazardous Materials. If, at any time, Tenant becomes
18 aware of the presence of Hazardous Materials in the Store, Tenant shall give Landlord written notice to
19 remove and/or abate same and to restore the Store to a condition which is free of Hazardous Materials,
20 unless the presence of such Hazardous Materials was a result of the acts or omissions of Tenant, its
21 employees, agents or contractors. If within sixty (60) days of receipt of such notice Landlord has not
22 completed or commenced (which commencement shall include, but not be limited to, seeking approval
23 of a remediation plan from applicable governmental entities) and diligently proceeded toward completion
24 of the Abatement Work, Tenant may either (i) terminate this Lease upon thirty (30) days' written notice
25 to Landlord, or (ii) undertake all necessary Abatement Work, including the hiring of any contractors and
26 experts Tenant reasonably deems necessary to effect and supervise the Abatement Work.

27            (b)    Claim Against Landlord. If Tenant effects Abatement Work, Tenant shall be
28 entitled to claim from Landlord all reasonable costs and expenses associated therewith, including, but not
29 limited to, (i) the Abatement Work, (ii) disposal of Hazardous Materials, (iii) air quality and materials
30 testing, (iv) related consultants' and experts' fees, and (v) fines, fees or costs of any nature whatsoever
31 charged or assessed by any governmental authority or agency regulating and/or supervising such
32 Abatement Work and/or disposal of Hazardous Materials.

33            (c)    Reimbursement of Tenant. Landlord shall promptly reimburse Tenant for
34 Tenant's costs and expenses incurred pursuant to Section 11.4.5(b) above within thirty (30) days after
35 Landlord's receipt of copies of Tenant's paid invoices or documentation. In addition to any other
36 remedy which Tenant may have under this Lease, at law or in equity, in the event of Landlord's breach of
37 any of the provisions of this Section 11.4, Tenant shall be entitled (i) to deduct from Rent payable to
38 Landlord hereunder all consequential damages (including lost profits), expenses, costs, fees and fines
39 incurred by it as a result of such breach, and (ii) to extend the Term hereof by a period equal to the time
40 elapsed from the date of Tenant's initial notice to Landlord to the date that the Abatement Work is
41 completed, and during such period, all Rent and other charges payable hereunder shall abate.

42        **11.4.6.**    Landlord's Indemnity. Excepting Hazardous Materials introduced by Tenant, its
43 employees, contractors or agents, or existing solely as a result of Tenant's negligence or willful

1  misconduct, Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold
2  Tenant and its successors and assigns harmless from and against any and all losses, liabilities,
3  damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever,
4  including, without limitation, attorneys' and consultants' fees and costs, and the costs of cleanup,
5  remediation, Abatement Work, paid, incurred or suffered by, or asserted against, Tenant and/or its
6  successors and/or assigns as a result of any claim, demand or judicial or administrative action by any
7  person or entity (including governmental or private entities) for, with respect to, or as a direct or
8  indirect result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge,
9  emission, release or disposal on, under or from the Shopping Center or the improvements thereon
10 of any Hazardous Material, or the breach of any Environmental Regulation to which Landlord or
11 any portion of the Shopping Center is subject. The representations, warranties and indemnity
12 contained in this Section 11.4 shall survive the termination of this Lease. Landlord shall be solely
13 responsible for and shall comply with all laws, rules, ordinances or regulations of any governmental
14 authority having jurisdiction over the Store and the Shopping Center with respect to the presence
15 or removal of Hazardous Materials.

16        **11.4.7.**   <u>Tenant Responsibilities</u>.  Tenant shall not use, generate, manufacture, produce,
17 store, treat, dispose or permit the escape on, under, about or from the Store, or any part thereof,
18 any Hazardous Materials in violation of any Environmental Regulations. Further, Tenant shall not
19 use, generate, manufacture, produce, store, treat, dispose or permit the escape on, under, about or
20 from the Store in violation of any Environmental Regulations, any material, substance, or chemical
21 which is regulated by any federal, state or local law, rule, ordinance or regulation (collectively
22 "Regulated Materials"). In the event Landlord approves a proposed use, storage and disposal of
23 specific Hazardous Materials and/or Regulated Materials in the Store, Tenant shall comply with all
24 laws, rules, regulations, statutes and ordinances with respect to such use and storage, including,
25 without limitation, the removal and disposal of such hazardous Materials and/or Regulated
26 Materials at the expiration or earlier termination of the Lease Term. Notwithstanding anything to
27 the contrary contained in this Lease, in the event any of the equipment installed by Tenant and
28 serving the Store such as, but not limited to, refrigerators, air conditioning systems, and
29 supplemental HVAC systems utilize refrigerants containing chlorofluorocarbons ("CFCs"),
30 Landlord, in its sole discretion, shall have the option to require Tenant to remove such equipment
31 at the expiration or earlier termination of the Lease Term. In addition, Tenant shall be responsible
32 for compliance with all laws, rules, regulations, statutes and ordinances with respect to such
33 • equipment and/or the use of CFCs which may include the removal and disposal of such equipment.

34        <u>Tenant Indemnity</u>.  Excepting as to Hazardous Materials introduced by Landlord, its
35 employees, agents or contractors, or existing solely as a result of Landlord's negligence or willful
36 misconduct, Tenant hereby indemnifies Landlord and its successors and assigns and agrees to hold
37 Landlord and its successors and assigns harmless from and against any and all losses, liabilities,
38 damages, injuries, penalties, fines, costs, expenses and claims of any kind whatsoever, including,
39 without limitation, attorneys' and consultants' fees and costs, and the cost of cleanup, remediation,
40 Abatement Work, paid, incurred or suffered by, or asserted against Landlord and/or its successors
41 and/or assigns as a result of any claim, demand or judicial or administrative action by any person or
42 entity (including governmental or private entities) for, with respect to, or as a direct or indirect
43 result of the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission,
44 release or disposal in, on, under or from the Store of any Hazardous Material, or the breach of any
45 Environmental Regulation to which Tenant or any part of the Store is subject. The





representations, warranties and indemnity contained in this Section 11.4 shall survive the termination of this Lease.

11.4.8. Radon. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

## 12. ALTERATIONS

12.1. **Permitted Alterations.**

12.1.1. Tenant may make non-structural alterations or improvements to the interior of the Store which do not affect systems serving the Store or other portions of the Shopping Center, in a good and workmanlike manner, and in conformity with all laws, ordinances and regulations of public authorities having jurisdiction. Tenant shall not make any alterations to the foundation, roof, or any structural portions of the Store without first obtaining the written approval of Landlord, except as specified in Section 12.2. Such approval may not be unreasonably withheld, conditioned or delayed. Any disapproval shall be supported by a written statement of reasons and suggested revisions to the proposed work that, if incorporated by Tenant, shall constitute the plans as approved without further review by Landlord. Subject to subsection 12.1.2 following, all alterations and improvements made to the Store by Landlord or Tenant (other than Store furniture, trade fixtures, equipment and personal property installed by Tenant), shall, at the end of the Term, become Landlord's property, and, at the end of the Term, shall remain in the Store without compensation to Tenant, unless otherwise stated in this Lease to the contrary.

12.1.2. It is further agreed that upon termination of this Lease, Tenant must remove its furniture, fixtures, equipment and personal property, and Landlord will accept the Store, with all alterations made by Tenant, without any obligation upon Tenant to restore the Store to its former condition; provided, however, Tenant shall repair any damage caused by any removal of Tenant's fixtures and equipment.

12.1.3. All Tenant alterations shall be subject to the following:

(a) Cost of Tenant's Alterations. Tenant's alterations shall be performed by Tenant at Tenant's sole cost and expense.

(b) Compliance. Tenant will perform all Tenant's alterations with reasonable dispatch, using only new, first class materials and supplies, in a good and workmanlike manner in accordance with Tenant's plans and with all Legal Requirements and any and all approvals, permits, licenses or consents required by any ordinance, law or public regulations or by any authority at any time having jurisdiction and in accordance with the requirements of any public or quasi-public body having similar jurisdiction. Tenant warrants that Tenant's alterations, when completed, will comply with all Legal Requirements, and that the Shopping Center shall not violate any Legal Requirements as a result of Tenant's alterations.

(c)   Mechanic's Lien.   The cost of Tenant's alterations shall be paid by Tenant in cash or its equivalent, so that the Store and the Shopping Center shall at all times be free of liens for labor and materials supplied in connection with Tenant's alterations.   If at any time the Store or the Shopping Center shall be encumbered by any mechanics' or other liens, charges or claims for the payment of money or otherwise, or any violations or other encumbrances of any and all kinds, nature and description, growing out of or in connection with Tenant's alterations or any other matter pertaining to Tenant, then Tenant shall, within twenty (20) days after receipt of notice of same or request by Landlord, prove to the satisfaction of Landlord that every such claim and charge has been fully paid, provided for, and discharged or bonded.   Without limiting Tenant's liability for failure to comply with this paragraph, if Landlord bonds or discharges any mechanic's or other lien upon Tenant's failure to do so, then, in addition to the cost of such bonding or discharging and all other costs and disbursements which Tenant would owe to Landlord in respect of same hereunder, Tenant shall also pay to Landlord the greater of One Thousand Dollars ($1,000) or Landlord's actual legal fees incurred in connection therewith.   Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject the estate of Landlord to liability under the Construction Lien Law of the State of Florida as set forth in Chapter 713, Florida Statutes, it being expressly understood that Landlord's estate shall not be subject to such liability.   Tenant agrees to include in the Memorandum of Lease described in Section 26.16 below the verbatim language of this Section 12.1.3(c).

(d)   Insurance.   During the course of Tenant's alterations, Tenant (and all of its contractors and subcontractors) will carry or cause to be carried adequate Worker's Compensation Insurance, Builders Risk, Comprehensive General Liability and such other insurance as may be required by law to be carried by Landlord or Tenant or required by Article 9 hereof in connection with such construction, and such insurance (except the Worker's Compensation Insurance) shall name Landlord, Landlord's managing agent, and all mortgagees and ground lessors and such other parties as Landlord shall designate as additional insureds.

(e)   Non-Interference.   All of Tenant's alterations shall be done in such a manner so as not to interfere with, delay, or impose any expense upon Landlord in the maintenance of the Shopping Center; nor to physically affect any part of the Shopping Center outside the interior of the Store; nor impair the structural integrity of any building nor affect the proper functioning of any of the mechanical, electrical, HVAC, plumbing, sanitary or other systems of the Shopping Center.   In addition, Tenant agrees that all of Tenant's Work shall be performed in a manner which will not create any work stoppage, labor disruption or dispute or violate Landlord's union contracts (if any) affecting the Shopping Center, nor will it interfere with the business of Landlord, or with any other tenant or occupant of the Shopping Center.

(f)   Permits.   No Tenant's alterations shall be undertaken until Tenant shall have procured and paid for, so far as the same may be required from time to time, all permits and authorizations of all municipal departments and governmental subdivisions having jurisdiction.

**12.2.   Communication Equipment.**

**12.2.1.**   At any time subsequent to the Delivery Date, Tenant shall have the right to place upon the Store one or more so-called "satellite dish(es)" or other similar device(s) and to replace, remove, and repair any such device(s), such as antenna, for the purpose of receiving and sending radio, television, computer, telephone, or other communication signals (collectively, the "Communication Equipment").   Any such installation shall be in accordance with plans and

specifications approved in advance by Landlord. Such equipment shall be installed in a location or locations substantially shielded from visibility from the principal frontages of the Shopping Center. Tenant shall be responsible for any damage to the Store caused by installing, removing, replacing, or repairing any such device(s).

12.2.2.   In the event Landlord desires to perform roof repairs and/or roof replacements to the Store and/or the building or its rooftop equipment in which the Store is located (the "Roof Repairs"), Landlord shall give Tenant at least fifteen (15) days (except in an emergency when reasonable notice shall be required) prior written notice of the date Landlord intends to commence such Roof Repairs.   Tenant shall, within twenty (20) days following receipt of such notice, undertake such measures as it deems suitable to protect its Communication Equipment from interference by Landlord, its agents, contractors or employees, in the course of any Roof Repairs. Nothing herein shall relieve Landlord of its obligation not to cause any interference with, or damage to, the Communication Equipment, and Landlord shall remain fully responsible for any loss, cost, or claim resulting from any damage to any part of the Communication Equipment arising as a result of the Roof Repairs.

## 13. NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES

13.1.   Non-Disturbance and Subordination.

13.1.1.   Existing Loans/Master Lease(s).   Landlord covenants to obtain from each lender whose loan is secured by the Store or the Shopping Center, within sixty (60) days after the execution of this Lease, an executed agreement ("Non-Disturbance Agreement"), which is commercially reasonable and reasonably satisfactory to Landlord, Tenant and Landlord's lender.   If Tenant and Lender are unable to reach agreement on a Non-Disturbance Agreement within sixty (60) days after execution of this Lease, and Landlord does not obtain same within twenty (20) days of written notice of Tenant, Tenant may terminate this Lease by written notice to Landlord at any time prior to Tenant's receipt of all required Non-Disturbance Agreements, or if Tenant has not terminated this Lease, Tenant may withhold one (1) month's Rent, pending delivery of said Agreements. The form set forth in Exhibit F is acceptable to Tenant.

13.1.2.   Future Loans.   Tenant shall, within twenty (20) business days after Tenant's receipt of Landlord's request, subordinate this Lease in the future to any first mortgage or deed of trust placed by Landlord upon the Store, or the Shopping Center or building of which the Store forms a part, with an insurance company, bank or any other lender which customarily provides financing for shopping centers, provided that such lender executes a Non-Disturbance Agreement substantially in the form set forth in Exhibit F or other commercially reasonable form reasonably satisfactory to Tenant, Landlord and Lender.

13.2.   Estoppel Certificates.

Within twenty (20) business days after the last to occur of (a) receipt of request therefor, and, if the request is made by Landlord (b) receipt by Tenant of the fee described in Section 13.3 below, either party shall deliver to the other a written statement acknowledging (i) the Commencement Date and termination date of this Lease, (ii) that this Lease is in full force and effect (if true), (iii) that this Lease has not been modified (or if it has, stating the dates of such

1   modifications), and (iv) any such other pertinent information which is customary to supply to such
2   a requesting party for purposes of financing or sale (in the case of Landlord's request) or financing,
3   assignment or sublease, or sale (in the case of Tenant's request). Landlord may exercise its right
4   hereunder only in connection with a proposed sale, financing or refinancing of the Shopping
5   Center plus another one (1) each calendar year, and Tenant may exercise its right hereunder only in
6   connection with a proposed assignment or subletting of the Store, or a financing of its furniture,
7   fixtures, equipment or personal property.

8   **13.3.   Processing Fees for Non-Disturbance Agreements and Estoppel Certificates.**
               within any two (2) year period
9       At the time of the second request within any two (2) year period for a Non-Disturbance
10  Agreement under Section 13.1.2 or the second request for an Estoppel Certificate under
11  Section 13.2 during the Term, the requesting party shall pay to the other, to defray the expenses of
12  processing, the sum of Seven Hundred Fifty Dollars ($750) for each such Non-Disturbance
13  Agreement or Estoppel Certificate.

14                          **14. INDEMNIFICATION**

15   **14.1.   Tenant Indemnity.**

16       Tenant agrees to hold Landlord harmless from and indemnify and defend Landlord against
17  any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
18  (including, without limitation, attorneys' fees, reasonable investigative and discovery costs), of
19  whatever nature, to any person or property caused or claimed to be caused by or resulting from any
20  occurrence within the Store or the Shopping Center on and after the Delivery Date and during the
21  Term resulting from the negligent or willful act or omission of Tenant, or Tenant's employees,
22  agents or contractors, provided nothing contained herein shall require Tenant to indemnify
23  Landlord against matters resulting solely from the negligence or willful acts or omissions of
24  Landlord or Landlord's employees, agents, or contractors, except to the extent Tenant has waived a
25  claim against Landlord pursuant to Section 9.4 hereof.

26   **14.2.   Landlord Indemnity.**

27       Landlord agrees to hold Tenant harmless from and indemnify and defend Tenant against
28  any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
29  (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
30  whatever nature, to any person or property caused or claimed to be caused by or resulting from any
31  occurrence within the Store or the Shopping Center resulting from the negligent or willful act or
32  omission of Landlord, or Landlord's employees, agents or contractors, on and after the date of this
33  Lease, provided nothing contained herein shall require Landlord to indemnify Tenant against
34  matters resulting solely from the negligence or willful acts or omissions of Tenant or Tenant's
35  employees, agents or contractors, except to the extent Landlord has waived a claim against Tenant
36  pursuant to Section 9.4 hereof.

## 15. USE

.1.   Tenant's Business.

Tenant's intended use of the Store shall be principally as a full line department store, cluding, at its option, the sale of soft goods merchandise, including men's, women's and children's parel, shoes, accessories, such as jewelry and cosmetics, domestics and linens, housewares, art, :tures, posters, frames, artificial floral, office supplies, sporting goods, furniture and lamps, ndow and floor coverings, electronics, videos, books, toys, party goods, pet supplies, luggage and .ckaged foods, and such other items as are sold in Tenant's similarly merchandised stores, subject ily to the Exclusive Uses set forth in Exhibit H and the Prohibited Uses set forth in Exhibit D.

.2.   No Express or Implied Covenant of Operation.

15.2.1.   Except as provided in Section 15.2.2, it is expressly acknowledged by Landlord .at this Lease contains no express or implied covenant for Tenant to conduct business in the :ore, continuously or otherwise, or (when conducting business in the Store) to operate during any articular hours or to conduct its business in any particular manner. Tenant has the sole right in its .nrestricted discretion to decide whether or not to operate in the Store and in what manner to onduct operations, if any.

15.2.2.   Tenant agrees to open the Store as a Ross Dress for Less retail business to the ublic, fully stocked and staffed for a period of one (1) day within six (6) months after the :ommencement Date.

5.3.   Protection.   | non-replenishably purchased and not restocked items (as contrasted to regularly purchased and restocked items sold at a discount price)

Except with respect to tenant leases specified in Schedule H, Landlord shall not enter into a :ase for space in the Shopping Center, or permit the assignment or sublease of any lease for space 1 the Shopping Center (to the extent Landlord may withhold its consent thereto) whereby such :nant or occupant uses or intends to use fifteen thousand (15,000) square feet or more of its 'remises for an Off-Price Use. "Off-Price Use," for the purpose hereof, shall mean the display nd/or sale of those items specified in Section 15.1 above on an every day basis at prices reduced rom those charged by full price retailers, such as full price department stores: provided, however, his definition shall not prohibit sales events by a retailer at a price discounted from that retailer's very day price. Examples of business operators which operate an Off-Price Use are: Factory 2-U, \ordstrom Rack, Goody's, Burlington Coat, Steinmart, and Filene's Basement. If the foregoing 'rovision is violated and not cured by Landlord within thirty (30) days of Tenant's "Notice of Violation", Tenant, in addition to all other remedies available at law or in equity, including injunctive 'elief, shall have the right, exercisable by written notice to Landlord, either to terminate this Lease )r to pay Substitute Rent within fifteen (15) days after the close of each calendar month during the )eriod of the violation. The parties agree that the monetary damages to be suffered by Tenant as a result of a breach by Landlord (or Landlord's tenant(s)) of the provisions of this Section 15.3 are difficult to ascertain and that the payment of Substitute Rent, after negotiation, constitutes the best estimate by the parties of the amount of such damage. If Tenant elects to terminate this Lease as provided in this Section, this Lease shall terminate on a date indicated by Tenant in its notice of termination, which in no event shall be sooner than thirty (30) nor later than ninety (90) days after the date of Tenant's notice of termination. In the event of termination, Landlord shall be obligated

Hialeah, Florida
Project No. E000002
6061534/2216176

- 41 -

06/08/00

5 '00 09:41

PAGE. 46

to pay Tenant for the Unamortized Costs of Tenant's leasehold improvements in or upon the Store, which costs Tenant agrees to specify in its notice of termination but not in excess of One Hundred Thousand Dollars ($100,000). If Tenant elects to pay Substitute Rent, such payment shall be retroactive to the date any such Off-Price Use commenced, and Tenant shall deduct any overpayments of Rent from Rent coming due under this Lease. At such time as all such Off-Price Uses cease (the "Cure Date"), Rent shall resume at the rate which would have pertained at the Cure Date had the violation of this Section 15.3 not occurred. The provisions hereof shall apply to any subsequent operation of an Off-Price Use. Notwithstanding that the following tenants may be considered Off-Price Users, Tenant agrees that the following existing leases of the Shopping Center are not deemed to be a violation of this Section 15.3: T.J. Maxx, Ultra Fabrics, Fashion Bug, Dots, Fabulous Diamonds, Fashion Cents, US Tops, Eckerds, Winn-Dixie Supermarkets and Piccadilly Cafeteria. The provisions of this Section 15.3 shall not prevent Landlord from leasing space to a retail tenant whose business is primarily the sale of one of the products specified in Section 15.1 above, provided such retail tenant is not an Off-Price User.

(including options to extend as contained therein)

15.4.    Prohibited and Exclusive Uses.

Tenant's use of the Store shall not violate those prohibited uses and exclusive uses as set forth in Exhibits D and H, respectively. Tenant shall be responsible for violations by Tenant of the waiver from T.J. Maxx in the form attached as Exhibit H-1.

# 16. SURRENDER

16.1.    Condition of Premises.

Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession of the Store to Landlord in broom clean condition, and in good order and repair, reasonable wear and tear and damage by Casualty or Condemnation excepted, and with all of Tenant's alterations and leasehold improvements in place. Tenant shall remove from the Store all of Tenant's furniture, fixtures, equipment and personal property. However, Tenant shall have no obligation to remove from the Store or to demolish any alterations or leasehold improvements made to the Store nor to restore the Store to its condition prior to Tenant's use and occupancy thereof.

16.2.    Continuance of Possession.

If Tenant shall remain in possession of the Store or any portion thereof after the expiration of the Term, then in the absence of an agreement in writing between the parties, Tenant shall be deemed a tenant at sufferance until acceptance of Rent by Landlord, at which time, Tenant shall become a tenant from month-to-month under the same terms and conditions as existed immediately prior to the expiration of this Lease, however, Minimum Rent shall be increased to an amount equal to one hundred twenty-five percent (125%) of the most recent monthly installment of Minimum Rent.

1                  **17. LANDLORD'S WARRANTY**

2   **17.1.   Landlord's Warranty.**

3        Landlord warrants to Tenant (a) that Tenant, while operating in the Store for the use stated
4 in Section 15.1, except as to the Exclusive Uses set forth in **Exhibit H**, will not be in violation of
5 any exclusives, restrictions or other agreements which Landlord may have with other lessees,
6 lenders, governmental authorities or any other parties, and (b) that, as of the Delivery Date, the use
7 stated in Section 15.1 is not presently a violation of any restrictions imposed by any governmental
8 body or authority. Except as arising out of any waiver from T.J. Maxx, Landlord shall hold Tenant
9 harmless from any claims or damages suffered or claimed to be suffered by Tenant as a result of
10 any breach or alleged breach of Landlord's warranties.

11   **17.2.   Landlord's Title.**

12        Landlord covenants that Landlord has lawful title to the Shopping Center and full right to
13 make this Lease. Landlord has provided Tenant with the Title Report. Landlord further covenants
14 that at the time of recording of the Memorandum of Lease, the Shopping Center will be free from
15 all other liens, title exceptions and other encumbrances of any kind whatsoever, except those set
16 forth in **Exhibit I** attached hereto and incorporated by this reference ("Permitted Exceptions").
17 Except for its present lender Prudential Securities Credit Corp., LLC, Landlord covenants that no
18 other party is required to consent to this Lease as a condition to the effectiveness of this Lease or
19 any of the provisions hereof, including but not limited to, the consent of any lender or ground
20 lessor relating to the Shopping Center.

21   **17.3.   Remedies.**

22        In the event of a violation of any of the covenants made by Landlord in this Article 17,
23 Tenant may give Landlord notice of the violations, and if Landlord fails to cure the violation within
24 sixty (60) days of such notice, Tenant may, in addition to its other remedies available at law and in
25 equity, terminate this Lease by written notice to Landlord. The provisions of this Article 17 shall
26 supersede and prevail over any inconsistent provision in Article 20 of this Lease.

27                  **18. QUIET ENJOYMENT**

28        Landlord represents and warrants that it has full authority to execute and perform this Lease
29 and to grant the subject leasehold estate to Tenant, and that Tenant shall peaceably and quietly
30 have, hold and enjoy the Store with all appurtenances on and after the Delivery Date and during the
31 Term and without any manner of hindrance or interference with its quiet enjoyment, possession
32 and use.

33                **19. ASSIGNMENT/SUBLETTING**

34   **19.1.   General.**

35        Subject to the provisions of Sections 19.2, 19.3, 19.4, and 19.5, and except for Tenant's right
36 to assign or sublet this Store to a Related Entity without Landlord's consent, Tenant shall have the
37 right to assign this Lease, or sublet the Store, or any portion thereof (a "Transfer" and the assignee

1  or sublessee thereof is herein "Transferee") subject to the prior written approval of Landlord,
2  which approval shall not be unreasonably withheld, conditioned or delayed.   This prohibition
3  includes any subletting or assignment which would otherwise occur by operation of law, and any
4  assignment or subletting to or by a receiver or trustee in any federal or state bankruptcy, insolvency
5  or other proceedings.   Neither the making (whether with Landlord's consent or not) of any
6  assignment, mortgage, pledge, encumbrance or subletting, in whole or in part, nor the acceptance
7  by Landlord of rent from any assignee, subtenant, or other third party shall constitute consent by
8  Landlord to any assignment or subletting nor a waiver of any rights or remedies of Landlord nor
9  shall operate to relieve Tenant from Tenant's obligations under this Lease and, notwithstanding any
10  such assignment, mortgage, pledge, encumbrance or subletting, except as provided in this
11  Article 19, Tenant shall remain liable for the payment of all Rent and for the due performance of all
12  the covenants, agreements, terms and provisions of this Lease to the full end of the Term of this
13  Lease.  Tenant shall have the right to operate departments within the Store by means of licenses or
14  concession agreements, provided that such departments shall not be separated by walls with doors
15  (other than after hours security screens or walls) from the balance of Tenant's operations in the
16  Store.

17  **19.2.   Related Entity.**

18         The term "Related Entity" means:  a corporation or other entity with which Tenant may
19  merge or consolidate; or to which Tenant sells at least ten (10) stores in the state of Florida; or any
20  parent, affiliate or subsidiary of Tenant; or an affiliate or subsidiary of Tenant's parent.

21  **19.3.   Stock.**

22         The sale of stock by Tenant or by any shareholder of Tenant shall not constitute a Transfer
23  under the terms of this Lease.

24  **19.4.   Release of Liability.**

25         Intentionally Omitted.

26  **19.5.   Recapture on Assignment or Sublease of Store.**

27         Except for a transfer to a Related Entity, in the event that Tenant intends to seek a
28  sublessee or assignee (a "Transferee") for twenty-five percent (25%) or more of the Leasable Floor
29  Area of the Store to a business entity which operates fewer than twenty (20) retail stores or has a
30  net worth of less than Twenty Million Dollars ($20,000,000) in the United States, then prior to
31  making the Store available for any such subletting or assignment (a "Transfer"), Tenant shall first
32  give Landlord written notice of its intention to do so ("Transfer Notice"), which notice shall
33  include (a) a statement of the Unamortized Cost of leasehold improvements to the Store which
34  were paid for by Tenant, and (b) a proposed Lease termination date which is not sooner than
35  ninety (90) nor later than one hundred eighty (180) days following the date of the Transfer Notice.
36  If Tenant issues a Transfer Notice to Landlord, Landlord may terminate this Lease; provided,
37  however, it must do so by written notice ("Recapture Notice") given to Tenant within thirty (30)
38  days after the date of the Transfer Notice ("Election Period") electing a termination date sixty (60)
39  days from the date of the Recapture Notice.  Landlord's Recapture Notice shall be accompanied by
40  Landlord's payment to Tenant of the Unamortized Costs as set forth in the Transfer Notice.  In
41  the event Landlord gives Tenant a Recapture Notice within the Election Period, this Lease shall

terminate as to all obligations accruing on and after the date of termination designated by Landlord in the Recapture Notice, unless Tenant rescinds the Transfer Notice by written notice to Landlord given with twenty (20) days following receipt of the Recapture Notice. If Landlord does not give a Recapture Notice within the Election Period as provided for by this Section 19.5, then at anytime thereafter Tenant may Transfer the entire Store.

**19.6.  Nullity.**

Any purported assignment or subletting consummated in violation of the provisions of this Article 19 shall, at Landlord's election, be null and void, of no force or effect, and shall be a default under this Lease. The receipt of rental from any party other than Tenant shall not be deemed a consent to an assignment or subletting, nor relieve Tenant of its obligations to pay rental or from its covenants or obligation of this Lease.

**19.7.  Landlord Notice to Assignee.**

Landlord, when giving notice to any Transferee of this Lease related to any default hereunder, shall simultaneously give notice thereof to Tenant, who may cure said default at any time during the notice period; and in the event that Tenant shall cure the default, Tenant shall be subrogated to all rights and remedies of Landlord as against the Transferee related to the default and shall have the right at its election to recover possession of the Store from the defaulting Transferee, to cancel and revoke the Transfer, and to be restored by Landlord to its leasehold estate hereunder.

## 20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES

**20.1.  Defaults.**

    **20.1.1.**  <u>Tenant's Default.</u>

        (a)  <u>Breach.</u>  The occurrence of either of the following shall constitute a default by Tenant pursuant to this Lease: (i) a failure by Tenant to pay Rent within ten (10) business days after Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by Tenant to perform obligations pursuant to this Lease, other than as specified in (i) above, within thirty (30) days after Tenant's receipt of written notice from Landlord specifying such failure or, if it reasonably would require more than thirty (30) days to cure such failure, within a time reasonably necessary to cure such failure after Tenant's receipt of such written notice provided, that Tenant has commenced curing same within the thirty (30) day period and is diligently attempting to cure same, and provided further that such cure period shall not exceed ninety (90) days after Tenant's receipt of such notice. In the event Tenant withholds Rent pursuant to a bona fide dispute between Landlord and Tenant, and in accordance with the terms of this Lease, Tenant shall not be deemed a default under the provisions of this Lease. Tenant, however, agrees to pay any undisputed amount in the event of a bona fide dispute.

        (b)  <u>Insolvency.</u>  If Tenant makes an assignment for the benefit of creditors, or if any proceedings are commenced under the provisions of the Bankruptcy Act whereby Tenant seeks to be, or would be, discharged of its debts, or the payment of its debts are sought to be delayed, this Lease shall be governed by the provisions of the Federal Bankruptcy Act.

   (c) <u>Prohibition Against Landlord Accelerating Rent</u>.

    (i) Except as provided in Section 20.1.1(c)(2) below, and whether or not Landlord terminates this Lease, Tenant shall have no obligation to pay Rent until the date it would otherwise be due in the absence of Tenant's default. Landlord shall have no right to accelerate Rent which would become due except as provided hereafter.

    (ii) In the event Landlord terminates this Lease due to a default by Tenant, Landlord may recover from Tenant the balance of the Rent payable by Tenant for the remainder of the Term, minus the fair market rental value of the Store for such period, each discounted to present value using a discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%) per annum, together with costs and expenses proximately caused by Tenant's breach of the Lease.

   : (d) <u>Personal Property Waiver</u>. Landlord waives such liens, if any, to which it may have a right with respect to the merchandise, furniture, trade fixtures and other personal property of Tenant located on or about the Store, and Landlord shall from time to time execute such documents reasonably acceptable to Landlord, as Tenant may reasonably request to acknowledge such waiver.

   (e) <u>Landlord's Remedy for Improper Offset</u>. Certain provisions of this Lease grant to Tenant the right to offset specified amounts against, or to deduct such amounts from, Rent or other charges payable under this Lease. The exercise by Tenant of any such right or Tenant's withholding of any disputed amount of Rent or other sum shall not constitute a default under this Lease unless and until (i) an arbitrator per Section 20.2.3 shall determine by means of a final award that such right to offset, deduct, or refusal to pay has been exercised improperly by Tenant, and (ii) following the entry of such award, and within thirty (30) days after receipt by Tenant from Landlord of a bill in the amount determined by such award to have been improperly offset, deducted, or withheld by Tenant, Tenant shall fail to pay such amount to Landlord, together with interest thereon at the Legal Rate retroactive to the date that the offset or deduction was taken by Tenant.

  20.1.2. <u>Landlord's Default</u>.

   (a) <u>Breach</u>. Except for a violation by Landlord under Section 17.1 (Landlord's Warranty), and except for Tenant's rights to terminate this Lease or pay Substitute Rent under Sections 6.1.3, 15.3 and 21.2 (all of which require specific notice provisions which are shorter than thirty (30) days), the occurrence of either of the following shall constitute a default by Landlord pursuant to this Lease: (i) Landlord's failure to perform any of its obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default; or (ii) Landlord's failure to perform any maintenance, repair or replacement obligation within thirty (30) days after Landlord's receipt of written notice from Tenant specifying such failure. Notwithstanding the foregoing Subsections 20.1.2(a)(i) and 20.1.2(a)(ii), the thirty (30) day period provided in each Subsection may be extended (not to exceed ninety (90) days after Landlord's receipt of such notice) <u>provided</u>: (A) such obligation cannot be reasonably performed within thirty (30) days after such notice; (B) Landlord commences efforts to cure the default within thirty (30) days after receipt of Tenant's notice of default; and (C) Landlord diligently pursues completion of the obligation.

(b)   Remedies.

(i)   General. Except as otherwise provided in this Lease, in the event of Landlord's monetary or material default under this Lease, and in the event Landlord fails to cure same after an additional ninety (90) days' notice, in addition to availing itself of any other remedies available at law and in equity and without the requirement of any further additional ninety (90) day notice, Tenant may, at its option, upon written notice to Landlord, terminate this Lease, or may incur any expense necessary to perform the obligation of Landlord specified in such notice and deduct such expense from the Rent or other charges coming due.

(ii)   Interruption of Service. In addition to the remedies described above, in the event the Tenant is prevented from using the Store, or any portion thereof (the "Unusable Area"), to conduct its normal retail operations for a period in excess of thirty (30) business days if within the control of Landlord or for a period in excess of one hundred eighty (180) business days if not within the control of Landlord because of (A) the interruption of any utility service to the Unusable Area which is required to be provided by the terms of this Lease, (B) the presence, in a form or concentration in violation of applicable law then in effect, of Hazardous Materials regarded as unhealthful by applicable regulations then in effect in or about the Store (unless caused by Tenant), or (C) due to Force Majeure, then the provisions of this Subsection 20.1.2.(b)(ii) shall apply. Tenant shall promptly deliver to Landlord notice of the interruption (the "Interruption Notice") of such condition. If any condition set forth in the first sentence of this Subsection shall not be cured within forty-five (45) days after Landlord's receipt of the Interruption Notice, then Tenant, upon notice to Landlord after expiration of such period, may terminate this Lease either as to (a) the Unusable Area in which case this Lease shall be amended to reflect that the Unusable Area is no longer a part of the Store, and the Rent payable hereunder by Tenant shall be adjusted proportionately, or (b) the entire Store, which termination shall be deemed effective upon Tenant's vacation of the entire Store.

**20.2.   Alternative Dispute Resolution.**

**20.2.1.**   Means of Resolution. In the event that any controversy or dispute ("Dispute") shall arise under this Lease and in the event that the parties have been unable to resolve such Dispute within thirty (30) days, the Dispute shall be resolved as provided in this Section 20.2. All Disputes, the monetary value of which exceeds Fifty Thousand Dollars ($50,000), or which involve an equitable remedy, shall require the utilization of Mediation as provided in Section 20.2.2 below. All Disputes, the monetary value of which is less than Fifty Thousand Dollars ($50,000) shall be settled by Arbitration as discussed in Section 20.2.3 below.

20.2.2.   Mediation.   The parties shall first try in good faith to settle the Dispute by mediation pursuant to the provisions as set forth below. Either party may initiate Mediation. The party commencing the Mediation shall first give a written notice (a "Mediation Notice") to the other party setting forth the nature of the Dispute. The Mediation shall be administered by the American Arbitration Association under its Commercial Mediation Rules, except to the extent that this Section 20.2.2 is inconsistent therewith, in which event this Section 20.2.2 shall govern and prevail. If the parties cannot agree on the selection of a Mediator within twenty (20) days after receipt of the Mediation Notice, the Mediator shall be selected in accordance with the American Arbitration Association procedure. If the Dispute or any part thereof has not been resolved by mediation as provided above within sixty (60) days after receipt of the Mediation Notice, or if a party fails to participate in Mediation, then at the option of either party by written notice, the Dispute shall be determined by suit or action in court, unless it is a matter for Arbitration as described in Section 20.2.1 above.

20.2.3.   Arbitration.   Either or both parties may initiate the Arbitration process.  The party initiating the Arbitration process shall first give a written notice (an "Arbitration Notice") to the other party setting forth the nature of the Dispute. The Arbitration shall be administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, except to the extent that this Section 20.2.3 is inconsistent therewith, in which event this Section 20.2.3 shall govern and prevail. Judgment upon the award rendered by the Arbitrator may be entered in any court of competent jurisdiction.  Unless otherwise agreed to by the parties, the matter shall be submitted to one (1) Arbitrator and shall be heard in the state in which the Store is located.  If the parties cannot agree on the selection of an Arbitrator within ten (10) days after the initiation of the Arbitration process, the Arbitrator shall be selected in accordance with the American Arbitration Association procedure, which selection shall be binding on the parties. The Arbitrator shall resolve the controversy in accordance with applicable law and the terms and conditions of this Lease. The Arbitrator shall allow the parties reasonable opportunities for pre-hearing document exchange and other pre-hearing discovery of evidence as determined by the arbitrator in his or her discretion. The determination of the Arbitrator shall be final, binding and conclusive upon the parties.

20.2.4.   Costs of Mediation and/or Arbitration.   The costs of the Mediation and/or Arbitration shall be shared equally between the parties, provided, however, that such costs along with all other costs and expenses, including attorneys' fees, shall be subject to award in full or in part by the Mediator and/or Arbitrator in the Mediator and/or Arbitrator's discretion to the prevailing party.

20.2.5.   Confidentiality.   Except as otherwise required by law, the parties, Mediator and/or Arbitrator agree to keep confidential and not disclose to third parties any information or documents obtained in connection with the Mediation and/or Arbitration process, including the resolution of the Dispute.

20.3.   Unlawful Detainer.

Landlord agrees not to file, prosecute, or maintain any proceeding for eviction, unlawful detainer, or termination of the Lease against Tenant (and any such proceeding shall be null and void), and Tenant agrees not to enforce or pursue other remedies, during the Alternative Dispute Resolution process as set forth in Section 20.2 and/or in the event of a bona fide dispute between the parties with respect to any alleged default by Tenant or any provision of this Lease, including,

1   without limitation, Tenant's non-payment of Rent pursuant to Tenant's right to withhold, deduct or
2   offset Rent in accordance with this Lease.

3   **20.4. Attorneys' Fees.**

4       20.4.1.   <u>Third Party Litigation</u>.   If either party becomes a party to any litigation
5   (including Arbitration) concerning this Lease, the Store or the Shopping Center by reason of any
6   act or omission of the other party or its authorized representatives, and not by its own act or
7   omission or that of its authorized representatives, the other party shall be liable to that party for
8   reasonable attorneys' fees, court costs, investigation expenses, discovery costs and costs of appeal
9   incurred by it in the litigation.

10      20.4.2.   <u>Actions Between the Parties</u>.   If either party commences an action against the
11  other party arising out of or in connection with this Lease, or in the event of an Alternative Dispute
12  Resolution proceeding between the parties relating to this Lease, the prevailing party shall be
13  entitled to have and recover from the losing party reasonable attorneys' fees, costs of suit,
14  investigation costs and discovery costs, including costs of appeal.  When this Lease imposes upon a
15  party an obligation to indemnify the other, the indemnification obligation shall include the
16  obligation to pay the indemnitee's reasonable attorneys' fees, costs and disbursements, whether the
17  indemnitee be the plaintiff or defendant.

18                                    **21. CASUALTY**

19  **21.1.  Definitions.**

20      21.1.1.   <u>Casualty</u>.   An event, or act of God, such as fire, windstorm, flood, earthquake,
21  riot, civil commotion, strike, perils or other matters which are unforeseen and unpredictable,
22  whether insured or uninsured, which causes damage or destruction to the Store or the Shopping
23  Center.

24      21.1.2.   <u>Casualty Date</u>.  The date of the occurrence of a Casualty.

25      21.1.3.   <u>Permitted Repair Period</u>.  A period of two hundred seventy (270) days following
26  the Casualty Date.

27      21.1.4.   <u>Restoration (sometimes referred to herein as "Restore")</u>.  Restoration, rebuilding
28  or repairs due to a Casualty under Section 21.2 of this Lease or due to a Taking under Section 22.1
29  of this Lease.

30  **21.2.  Insured Casualty.**

31      If the Store is damaged or destroyed by a Casualty insured against or that Landlord is
32  obligated to insure against under this Lease, to the extent that Restoration cannot reasonably be
33  completed within the Permitted Repair Period, as reasonably determined by Landlord (and
34  Landlord shall deliver notice to Tenant of such determination within sixty (60) days of the Casualty
35  Date), Tenant may, at its option, terminate this Lease as of the Casualty Date by notice to Landlord
36  within thirty (30) days after the later of (a) Landlord's Notice, or (b) the Casualty Date.  If Tenant
37  does not so terminate this Lease, or if Restoration to the Store may be completed within the

1    Permitted Repair Period, then this Lease shall not terminate, and Landlord shall diligently proceed
2    to Restore the Store to substantially the condition as existed immediately prior to the Casualty, and
3    Landlord shall diligently pursue such Restoration to completion.   If the Restoration is not
4    completed within the Permitted Repair Period, Tenant may terminate this Lease by written notice
5    to Landlord at any time prior to the Redelivery Date.  All Rent payable hereunder shall abate from
6    the Casualty Date to the earlier of (a) sixty (60) days following the Redelivery Date (but only if the
7    Redelivery Date falls within a Permitted Delivery Period, and if the Redelivery Date does not fall
8    within a Permitted Delivery Period, the sixtieth (60th) day following the first day of the next
9    ensuing Permitted Delivery Period); or (b) the date on which Tenant again opens for business in
10   the Store (in either case the "Recommencement Date"); provided that if Tenant continues to do
11   business in the Store during the period of Restoration, Tenant's total obligation for Rent shall
12   equitably abate with reference to the nature, extent and duration of the deprivation of Tenant's
13   business in connection with such Restoration, and provided further that in the event of any dispute
14   as to such equitable abatement, the matter shall be referred to Alternative Dispute Resolution
15   pursuant to Section 20.2 above.   The election by Tenant to carry the insurance on the Store
16   pursuant to the terms of Section 9.5 shall not create any obligation on the part of Tenant to
17   Restore, but Tenant shall make available to Landlord the proceeds from such insurance for
18   Landlord's use in discharging Landlord's Restoration obligations under this Section 21.2.  In no
19   event shall Tenant be deemed to be responsible for the amount of any deductible with respect to
20   such insurance.

21   **21.3.   Uninsured Casualty.**

22          If the Store is damaged or destroyed by a peril not covered by the standard form of Special
23   Form Policy (hereinafter an "Uninsured Casualty"), or if not otherwise covered by Landlord's
24   insurance and the cost of the Restoration of the Store as reasonably determined by Landlord
25   exceeds by more than Two Hundred Fifty Thousand Dollars ($250,000), the amount of insurance
26   proceeds available (i.e., net of any applicable deductible) to Landlord, Landlord shall have the
27   option to elect not to Restore the Store and to terminate this Lease on at least ninety (90) days
28   prior written notice to Tenant.  If only the Store and no other part of the building containing the
29   Store is damaged, Tenant may elect to pay the difference between the cost of Restoration and
30   available insurance proceeds (the "Difference") by delivering written notice of such election,
31   together with payment of such Difference to a Stakeholder as defined in Section 21.6 hereof, to
32   Landlord within thirty (30) days after delivery of Landlord's notice of election to terminate this
33   Lease.  Upon receipt of such notice and confirmation of payment to the Stakeholder, if any, the
34   Landlord termination shall be deemed rescinded and Landlord shall proceed with the Restoration
35   of the Store.  If Landlord elects to terminate this Lease under this Section 21.3 and Tenant does
36   not elect to pay the Difference, this Lease shall terminate as of the date set forth in Landlord's
37   notice of election to terminate this Lease.  If this Lease is not terminated under this Section 21.3, all
38   Rent payable hereunder shall abate from the Casualty Date to the Recommencement Date;
39   provided that if Tenant continues to do business in the Store during the period of Restoration,
40   Tenant's total obligation for Rent shall equitably abate with reference to the nature, extent and
41   duration of the deprivation of Tenant's business in connection with such Restoration, and provided
42   further that in the event of any dispute as to such equitable abatement, the matter shall be referred
43   to Alternative Dispute Resolution pursuant to Section 20.2 above.

1  **21.4.   End of Term Casualty.**

2       Notwithstanding any provision in this Article 21 to the contrary, Landlord shall not be
3  required to Restore any Casualty to the Store occurring during the final eighteen (18) months of the
4  Term if the cost of such Restoration is greater than One Hundred Fifty Thousand Dollars
5  ($150,000) unless, within thirty (30) days after receipt of Landlord's notice to Tenant that it intends
6  not to effect Restoration, Tenant exercises in writing any option to extend the Term given Tenant
7  hereunder.  If Tenant does not elect to so extend the Term, Tenant shall so notify Landlord within
8  thirty (30) days of Landlord's notice of election not to Restore, and, thereupon, this Lease shall
9  terminate effective as of the Casualty Date.

10  **21.5.   Shopping Center Casualty.**

11       In the event that the Store is not damaged or destroyed by a Casualty, but other buildings in
12  the Shopping Center, or the building of which the Store forms a part, excluding the Store, or if any
13  of the Common Areas, are damaged or destroyed by a Casualty, whether or not insured against,
14  Landlord shall promptly remove all rubble and debris resulting from such damage or destruction,
15  and Landlord shall promptly Restore such damaged buildings in the Shopping Center as well as the
16  Common Areas as nearly as possible to the condition the same were in immediately prior to such
17  damage or destruction.  Notwithstanding anything to the contrary contained herein, and regardless
18  of the extent of damage, Landlord shall promptly remove all rubble and debris so that the
19  Common Areas are usable.  If the damage to the Common Areas shall render the whole or any part
20  of the Store unsuitable for Tenant's use, all Rent payable hereunder shall abate from the Casualty
21  Date to the Recommencement Date; provided that if Tenant continues to do business in the Store
22  during the period of Restoration, Tenant's total obligation for Rent shall equitably abate with
23  reference to the nature, extent and duration of the deprivation of Tenant's business in connection
24  with such Restoration, and provided further that in the event of any dispute as to such equitable
25  abatement, the matter shall be referred to Alternative Dispute Resolution pursuant to Section 20.2
26  above.

27  **21.6.   Restoration.**

28       If Landlord is obligated to Restore the Store under the terms of this Article 21 but does not
29  commence Restoration as soon as practicable after the Casualty, or does not continue the
30  Restoration of the Store thereafter with reasonable dispatch, whether due to the unavailability of
31  insurance proceeds or otherwise, Tenant, upon thirty (30) days' prior notice to Landlord, shall have
32  the right to terminate this Lease; provided that if Tenant elects to continue to do business in the
33  Store during the period of Restoration, Tenant's total obligation for Rent shall equitable abate with
34  reference to the nature, extent and duration of the deprivation of Tenant's business in connection
35  with such Restoration and provided that in the event of any dispute as to such equitable abatement,
36  the matter shall be referred to Alternative Dispute Resolution pursuant to Section 20.2 above.  In
37  addition, Tenant shall be relieved of the obligation to pay for casualty insurance for the remainder
38  of the Term.

1   21.7.   Waiver of Statute.

2       The parties waive such rights of Lease termination as are granted to them under the laws of
3   the state wherein the Store is located, it being their agreement that the rights of termination in the
4   event of Casualty, as set forth herein, shall be exclusive.

5   21.8.   Laws.

6       If applicable governmental laws and regulations prohibit the Restoration of any damage to
7   the Store or Common Areas, either party may elect to terminate this Lease effective thirty (30) days
8   after the delivery to the other party of written notice of the election to terminate. Notwithstanding
9   anything in this Article 21, to the contrary, if applicable laws and regulations require seismic,
10  disability access, life safety or other retrofitting as a condition to Restoration and the costs of same
11  exceed Landlord's insurance Proceeds, and if Tenant does not elect to pay Landlord the Difference,
12  then Landlord shall have the right to elect to terminate this Lease effective thirty (30) days after
13  delivery to Tenant of written notice to terminate.

14  21.9.   Tolling of Term.

15      During the period between Landlord's completion of Landlord's Restoration obligations
16  and the Recommencement Date, Tenant and Tenant's employees, agents and contractors shall have
17  the right to enter upon the Store for the purpose of erecting, constructing, or installing such
18  improvements, alterations, fixtures, equipment and furniture as Tenant deems necessary for
19  resuming business in the Store. In the event Rent shall completely abate for any period pursuant to
20  the provisions of this Article 21, the Term shall toll for the period of such abatement, in which
21  event, the monthly installments of Rent following the end of the period of such abatement shall
22  recommence and thereafter continue at the same Rent rate that was in effect at the time of such
23  abatement; the remaining scheduled increases of Minimum Rent shall be postponed for the period
24  of such abatement to reflect such tolling, the expiration date of the then applicable Term (whether
25  the Initial Term or any Option Period) and the commencement and expiration dates of any
26  subsequent Option Periods shall be extended for the period of such abatement, as shall be the
27  deadline dates for notices exercising Option Periods. Any period of tolling shall be added to the
28  calculation of the Initial Term (or any then current Option Period, as the case may be) for purposes
29  of the calculation of the Expiration Date. For example, if the Term of the Lease is tolled under the
30  provisions of this Section 21.10 for a period of four (4) months, and the tolling occurs during the
31  Initial Term, then the definition of Initial Term in Section 1.5.1 shall be:   "From the
32  Commencement Date through the January 31 next following the expiration of one hundred
33  twenty-four (124) months thereafter."

34  21.10.  Effect of Termination.

35      Upon termination of this Lease pursuant to this Article 21, each of the parties shall be
36  thereby released from all further obligations and duties to the other party as of the Casualty Date,
37  except for items and liabilities which have theretofore accrued and be then unpaid, and Landlord
38  shall promptly refund to Tenant all unearned Rent and other amounts prepaid by Tenant under this
39  Lease.

21.11.  **Tenant's Right of First Offer.**

The provisions of this Article 21 to the contrary notwithstanding, if this Lease is terminated in accordance with this Article 21, and Landlord elects to rebuild the Store or a substantially similar building in the Shopping Center within one (1) year after the Casualty Date, Landlord shall first offer such space in such building to Tenant before marketing such space in any other manner on terms no less favorable than those for which Landlord will market such space.

## 22. CONDEMNATION

22.1.  **Taking.**

A "Taking" means any governmental act, condemnation proceeding, moratorium, initiative, or referendum whereby Landlord or Tenant is divested of ownership or any of the incidents thereof, or any transfer in lieu thereof.  In the event Tenant does not terminate this Lease as provided in Section 22.2 following, Landlord shall promptly and diligently Restore the Store, Common Areas, or other space, as the case may be, to as near their condition as existed prior to such Taking as is reasonably possible.  During the course of such Restoration, if Tenant is not operating in the Store, all Rent shall abate from the date of the Taking to the Recommencement Date.  If Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay within fifteen (15) days after the close of each calendar month Substitute Rent.  Any Rent paid pursuant to clause (b) of the definition of Substitute Rent shall be classified as Minimum Rent for purposes of computing the sum of Percentage Rent due in any given Lease Year under the provisions of Section 6.2.2.  When Restoration is complete, Tenant's total obligation for Minimum Rent shall be adjusted as provided in Section 3.7 in the event the size of the Store is reduced.  When Restoration is complete, if the size of the Store is not reduced, but the size of the Common Areas is reduced, Minimum Rent shall thereafter be reduced to an amount calculated by multiplying the Minimum Rent stated in this Lease by a fraction the numerator of which is the fair market rental value of the Store immediately following the Taking and the denominator of which is the fair market rental value of the Store immediately prior to Taking.

22.2.  **Right to Terminate.**

22.2.1.    Tenant may terminate this Lease upon written notice to Landlord in the event of any one or more of the following Takings:

(a)    A Taking of any portion of or interest in the Store:

(b)    Any Taking of the Common Areas if the number of parking spaces is reduced below a ratio of four (4) parking spaces for each one thousand (1,000) square feet of Leasable Floor Area in the Shopping Center, or access to the Store is materially impaired, or access to the Shopping Center is materially impaired;

(c)    Any Taking of any portion of the Shopping Center which materially impairs the operation of Tenant's business;

        (d)     Any Taking of twenty percent (20%) or more of the Leasable Floor Area of the Shopping Center (not including the Store in either the numerator or denominator of such calculation); or

        (e)     Tenant's termination must be exercised within sixty (60) days following the date of such Taking by written notice to Landlord.

    22.2.2.    Landlord may terminate this Lease upon written notice to Tenant, within sixty (60) days following the date of such Taking, in the event of any one or both of the following Takings:

        (a)     A Taking of the Store; or

        (b)     Any Taking of fifty percent (50%) or more of the Leasable Floor Area of the Restricted Area of the Shopping Center (not including the Store in either the numerator or denominator of such calculation).

**22.3.   Claims.**

Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any condemnation proceedings or otherwise for the value of their respective interests, as well as any damages.

**22.4.   Waiver.**

The parties waive such rights of Lease termination as may be granted them in the event of condemnation by the laws of the state wherein the Store is located, it being their agreement that the rights of termination set forth in this Lease shall be exclusive.

## 23. MECHANIC'S LIENS

Tenant shall prevent any mechanic's, materialman's or other liens against the Store or the Shopping Center in connection with any labor, materials or services furnished or claimed to have been furnished. If any such lien shall be filed against the Store or the Shopping Center, the party through whom the lien arose will cause the same to be discharged within thirty (30) days of the filing of the lien, provided, however, that either party may contest any such lien, so long as the enforcement thereof is stayed by bonding or otherwise expunging the lien from the official property records in the jurisdiction.

## 24. SIGNS

**24.1.   Governmental Approval and Compliance.**

All signs shall be subject to approval by local governmental authority. Landlord shall cooperate with Tenant in obtaining approval for Tenant's signs as shown on **Exhibit J** ("Tenant's Signs") and made a part hereof, from the local governmental authority.

1    24.2.   **Building Signs.**

2    Tenant may erect and maintain Tenant's Signs upon the exterior of the Store, those Tenant
3    signs depicted on Exhibit J, which Landlord hereby approves.  Tenant's Signs shall be included by
4    Landlord in the sign criteria for the Shopping Center.

5    24.3.   **Pylon or Monument Signs.**

6    (a)    Tenant may install its sign panels upon the existing pylon and monument signs
7    (in the existing Upton's space) as depicted in Exhibit J, which signs Landlord hereby approves.  Such sign
8    structures will be located at the location indicated upon the Site Plan.  The Delivery Date shall not occur
9    until each such pylon or monument sign structure(s) is ready for Tenant's installation of its sign faces.

10    (b)    Landlord shall use commercially reasonable efforts to construct a new pylon sign
11    shown on the Site Plan as the "New Pylon" within one hundred eighty (180) days of the Delivery Date.
12    Upon construction of the New Pylon, Tenant shall install its sign panels on the New Pylon as shown in
13    Exhibit J and remove its panels from the existing pylon sign.

14    24.4.   **Temporary Signs.**

15    During the period of construction described in Section 5.1, Tenant shall have the right to
16    construct temporary signage adjacent to and/or on the Store and at the perimeter of the Shopping
17    Center indicating the anticipated opening of the Store for business.  Additionally, Tenant may,
18    through the thirtieth (30th) day following the opening of the Store for business, advertise such new
19    business by means of banners, flags and other signage attached to the Store, provided only such
20    temporary signage is (a) permissible under local ordinances, and (b) does not damage the building
21    exterior.

22    24.5.   **Contingency.**

23    Tenant's obligations under this Lease are contingent upon Tenant obtaining governmental
24    approvals for its signs as depicted in Exhibit J attached hereto.  In the event Tenant is unable to
25    obtain such approvals prior to July 1, 2000, Tenant may, upon notice to Landlord within twenty
26    (20) days thereafter, terminate this Lease, it being understood that if Tenant does not deliver such
27    notice to Landlord within such twenty (20) day period that Tenant's right to terminate this Lease
28    pursuant to this Section 24.5 shall expire and be of no further force and effect.

29    ## 25. NOTICE

30    Any notice to be given in connection with this Lease shall reference (a) this Lease, (b) the
31    store number which has been assigned to the Store by the Tenant (if known to Landlord), and
32    (c) the location of the Store.  The notice shall be served (a) personally, or (b) by certified mail,
33    return receipt requested, or (c) by reputable courier service which provides written evidence of
34    delivery, addressed as specified in Section 1.2 or to such other address as requested by either party
35    in writing, or (d) by telephone facsimile upon which the date and time of transmission is machine
36    imprinted to the number specified in Section 1.2.  Copies of any notices to Tenant shall be sent to
37    Bartko, Zankel, Tarrant & Miller, 900 Front Street, Suite 300, San Francisco, CA 94111.  Copies of
38    any notices to Landlord shall be sent to PIHC, 417 Fifth Avenue, 3rd Floor, New York, NY 10016,

1   and Martin L. Forman, Esq., Kotite & Kotite, LLP, 805 Third Avenue, New York, NY 10022.  All
2   notices given in the manner specified herein shall be effective upon actual receipt or upon refusal to
3   accept delivery.

4        Either party, by written notice to the other, may designate two additional parties to receive
5   copies of notices.  Any notice party to this lease may change its address or location for service of
6   notices, for themselves or any of their respective designees by written notice.

## 26. GENERAL CONDITIONS

8   **26.1.  Partial Invalidity.**

9        If any term, covenant, condition, provision or restriction of this Lease is held by a Court of
10  competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof
11  shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

12  **26.2.  Relationship of Parties.**

13       Nothing contained in this Lease shall be deemed or construed by the parties hereto or by
14  any third person to create the relationship of principal and agent, or of partnership, or of joint
15  venture, or of any other association between the parties other than Landlord and Tenant, or to
16  prevent Landlord or Tenant from entering into ventures in direct competition with the Shopping
17  Center, or the Store.

18  **26.3.  Time.**

19       Time is of the essence in the performance of each provision of this Lease.

20  **26.4.  Waiver.**

21       The waiver of the performance of any term, covenant, condition, provision or restriction of
22  this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of
23  the same term, covenant, condition, provision or restriction.  The various rights, options, elections,
24  powers and remedies of the parties contained in this Lease shall be construed as cumulative and no
25  one of them exclusive of any other or of any legal or equitable remedy which either party might
26  otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a
27  party shall not in any way impair its right to any other right or remedy.

28  **26.5.  Partial Months.**

29       For purposes of computing dates for expirations, Option Periods, Rent adjustments or
30  cancellations (except for those dates specifically designated herein), any partial month at the
31  commencement of the Term shall be disregarded.

32  **26.6.  Consent.**

33       Unless a different standard is otherwise specifically stated, wherever in this Lease Landlord
34  or Tenant is required to give its consent or approval to any action on the part of the other, such
35  consent or approval shall not be unreasonably withheld, conditioned or delayed.

1 **26.7. Gender.**

2   Words of gender used in this Lease shall be deemed to include other genders, and singular
3 and plural words shall be deemed to include the other, as the context may require.

4 **26.8. Captions.**

5   Section headings in this Lease are for convenience only, are not a part of the agreement of
6 the parties and shall not constitute an aid in interpreting this Lease.

7 **26.9. Governing Law.**

8   This Lease shall be construed in accordance with and governed by the laws of the state
9 wherein the Store is located, except as otherwise required by mandatory provisions of law.

10 **26.10. Due Authority.**

11   If Tenant or Landlord is a corporation, partnership, limited liability company, trustee or
12 other entity, each individual executing this Lease on behalf of said entity (in his/her representative
13 capacity only) represents and warrants that he or she is duly authorized to execute and deliver this
14 Lease on behalf of the entity and that this Lease is binding upon the entity.

15 **26.11. No Prior Agreements.**

16   It is understood that there are no oral agreements or representations between the parties
17 hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations,
18 arrangements, brochures, agreements or representations and understandings, if any, between the
19 parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and
20 none thereof shall be used to interpret or construe this Lease. There are no other representations
21 or warranties between the parties, and all reliance with respect to representations is solely upon the
22 representations and agreements contained in this Lease.

23 **26.12. Entry by Landlord.**

24   Upon reasonable prior notice, in no event to be less than five (5) business days (except in
25 the case of a bona fide emergency, in which event, no prior written notice shall be required, but
26 prior verbal notice shall be required promptly confirmed in writing thereafter), Landlord may enter
27 the Store during Tenant's business hours for purposes of inspection, to show the Store to
28 prospective purchasers and lenders, or to perform maintenance and repair obligations imposed
29 upon Landlord by this Lease. All maintenance, repairs or replacements by Landlord to the interior
30 of the Store or using the interior of the Store or maintenance, repairs or replacements to any
31 portion of the Shopping Center that will create dust, noise, vibration or other disturbance of
32 Tenant's use of the Store shall be performed only during hours that the Store is not open to the
33 public. Should Landlord unreasonably interfere with Tenant's business by such entry, Rent shall
34 equitably abate with reference to the nature, extent and duration of the deprivation of Tenant's
35 business in connection with Landlord's entry into the Store. In the event of any dispute as to such
36 equitable abatement, the matter shall be deferred to Alternative Dispute Resolution pursuant to
37 Section 20.2 above.

1   **26.13.   Neutral Interpretation.**

2       Landlord and Tenant agree that this Lease has been freely negotiated and that in the event a
3   dispute arises with respect to the meaning or interpretation of any provision of this Lease, no
4   presumption, inference or conclusion shall be drawn against the party that drafted the provision in
5   question.

6   **26.14.   Force Majeure.**

7       As used in this Lease, the term "Force Majeure" means delay resulting from causes beyond
8   a party's reasonable control such as strikes, walkouts or other labor disputes, acts of God, inability
9   to obtain labor, materials or merchandise, governmental restrictions, regulations or controls
10  (hereinafter "governmental matters") excluding from "governmental matters" planning and building
11  permits, if issued within the average time period for doing so in the issuing jurisdiction for the last
12  twelve (12) months, and governmental approvals and inspections if performed pursuant to the
13  jurisdictions and conditions within the average period of time of requesting the jurisdictions
14  approval or inspection, judicial orders, war, riot or civil commotion, fire or casualty.   The party
15  obliged to perform shall give prompt notice to the other as soon as reasonably possible after the
16  onset of such delay stating the cause and an estimate of the duration thereof.  IF, as a result of an
17  event of Force Majeure, either party shall be delayed or hindered or prevented from the
18  performance of any act required hereunder (other than the making of payments) within the time
19  period set forth herein, the performance of such act shall be excused for the period of delay not to
20  exceed sixty (60) days in any calendar year, and the period of performance of such act shall be
21  extended for a period equivalent to the period of such delay not to exceed sixty (60) days in any
22  calendar year, unless a provision of this Lease expressly states that Force Majeure is not applicable,
23  such as the end dates of Permitted Delivery Periods and the Automatic Termination Date.
24  Financial inability to perform shall not constitute an event of Force Majeure.

25  **26.15.   Successors in Interest.**

26      The terms, conditions and covenants herein contained shall inure to the benefit of and be
27  binding upon the heirs, assigns and other successors in interest to the parties hereto, except as
28  otherwise provided in this Lease.

29  **26.16.   Memorandum of Lease.**

30      This Lease shall not be recorded.  However, a Memorandum of Lease shall be executed, in
31  recordable form, by both parties concurrently herewith.  Either party may record the same at its
32  own cost and expense.

33  **26.17.   Real Estate Brokers.**

34      Landlord and Tenant each represents and warrants to the other party that it has not
35  authorized or employed, or acted by implication to authorize or employ, any real estate broker or
36  salesman to act for it in connection with this Lease, other than Florida Shopping Center Group
37  ("Brokers"), who shall be paid by Landlord at the rate of Two Dollars ($2) per square foot of
38  Leasable Floor Area in the Store, one-third (1/3) upon the execution of this Lease, one-third (1/3)
39  upon the Delivery Date, and one-third (1/3) upon Tenant's opening for business.  Landlord and
40  Tenant shall each indemnify, defend and hold the other party harmless from and against any and all

## ADDENDUM ONE

26.18 <u>Landlord's Exculpation</u>.     Except for Landlord's (i) fraud or (ii) intentional material misconduct or misrepresentation, Landlord's liability hereunder shall be limited to Landlord's then interest in the Shopping Center for recovery of any judgment against Landlord, and no other assets of Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries, members or officers) shall be subject to any action or proceeding for the enforcement of any right or remedy of Tenant hereunder nor shall Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries, members or officers) be personally liable for any judgment under this Lease.

G:\Work Files\WPD\HP\PALMSPRI\addendum.one2

1  claims by any other real estate broker or salesman whom the indemnifying party authorized or
2  employed, or acted by implication to authorize or employ, to act for the indemnifying party in
3  connection with this Lease.  Further, in the event Landlord fails to pay the Brokers within ten (10)
4  days of the date that such commission is due to be paid, Tenant, at its option, may pay the Brokers'
5  fees and collect the same from Landlord by litigation or otherwise, or with Landlord's approval,
6  deduct the same from Rent as it comes due.  SEE ADDENDUM ONE ATTACHED HERETO

| LANDLORD: | TENANT: |
|---|---|
| PALM SPRINGS MILE ASSOCIATES, LTD., a Florida limited partnership | ROSS FLORIDA DRESS FOR LESS, L.C., a Florida limited liability company |

By:  PHILIPS PALM SPRINGS SUB-VIII, INC.

    By:  _____
    Name: _Sheila Levine_
    Title: _V.P._

Witness: _Diana Marrone_
Printed Name: _Diana Marrone_

Witness: _Randy Sunkin_
Printed Name: _Randy Sunkin_

By:  ROSS STORES, INC.,
    a Delaware corporation
Its:  Managing Member

    By:  _____
        James Fassio
    Its:  Sr. Vice President

Witness: _Heidi Carlson_
Printed Name: _Heidi Carlson_

Witness: _Richard Lietz_
Printed Name: _RICHARD LIETZ_

    By:  _____
        Gregg McGillis
    Its:  Vice President, Real Estate

Witness: _Heidi Carlson_
Printed Name: _Heidi Carlson_

Witness: _Richard Lietz_
Printed Name: _RICHARD LIETZ_

7

State of California )
)
County of Alameda )

1
2 On June 9, 2000 before me, Shannon Brown _____ , a
3 Notary Public, personally appeared James Fassio and Gregg McGillis, personally known to me or
4 (proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
5 to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
6 authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
7 entity upon behalf of which the person(s) acted, executed the instrument.
8
9 WITNESS my hand and official seal.
10

SHANNON BROWN
Commission # 1213316
Notary Public - California
Alameda County
My Comm. Expires Mar 15, 2003

_____
11                                                      Notary Public
12
13

State of ___NEW YORK___ )
)
County of ___NEW YORK___ )

14
15
16 On July 25, 20__ before me, LEONARD GOLD _____ , a
17 Notary Public, personally appeared ___SHEILA LEVINE___ ,
18 personally known to me or (proved to me on the basis of satisfactory evidence) to be the person(s)
19 whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
20 executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
21 instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
22 instrument.
23
24
25 WITNESS my hand and official seal.
26

_____
27                                                      Notary Public

LEONARD S. GOLD
Notary Public, State of New York
No. 02GO5002284
Qualified in New York County
Commission Expires September 28, 2000

EXHIBIT A
LEGAL DESCRIPTION OF THE SHOPPING CENTER

**Component 2**

A portion of "FLORIDA FRUIT LAND CO'S SUBDIVISION" of Section 1, Township 53 South, Range 40 East, as recorded in Plat Book 2 at Page 17, of the Public Records of Dade County, Florida, being more particularly described as follows:

Commence at the Point of Intersection of the Northerly Right-of-Way Line of West 49th Street (N.W. 103rd Street) with the Westerly Right-of-Way Line of West 4th Avenue (Red Road) as shown on that certain Right-of-Way Map, as recorded in Plat Book 65 at Page 70 of the Public Records of Dade County, Florida; thence North 0 degrees 55'11" East, for 175.00 feet to the Point of Beginning of the following described parcel; thence North 87 degrees 43'14" West, for 175.00 feet; thence South 0 degrees 55'11" West, along a line West of and parallel with the West Right-of-Way Line of the aforesaid West 4th Avenue (Red Road), for 175.00 feet; thence North 87 degrees 43'14" West, along the Northerly Right-of-Way Line of West 49th Street (N.W. 103rd Street) as per State Road Department Right-of-Way Map as recorded in Plat Book 60 at Page 53 of the Public Records of Dade County, Florida, for 987.60 feet to a Point of Curvature; thence Northwesterly and Northerly, along a circular curve to the right, having a radius of 25.00 feet and a central angle of 88 degrees 39'30" for an arc distance of 38.68 feet to a Point of Tangency; thence North 0 degrees 56'16" East, along the Easterly Right-of-Way Line of West 6th Avenue, as shown on the plat of "FIFTH ADDITION TO PALM SPRINGS SUBDIVISION SECTION THREE", as recorded in Plat Book 65 at Page 33 of the Public Records of Dade County, Florida, for 722.45 feet to a Point of Curvature; thence Northeasterly and Easterly, along a circular curve at the right, having a radius of 25.0 feet and a central angle of 91 degrees 20'30" for an arc distance of 39.86 feet to a Point of Tangency; thence South 87 degrees 43'14" East for 603.63 feet to a Point of Curvature; thence Easterly and Northeasterly, along a circular curve to the left, having a radius of 651.09 feet an a central angle of 48 degrees 21'34" for an arc distance of 549.54 feet to a Point of Reverse Curvature; thence Northeasterly, along a circular curve to the right, having a radius of 141.09 feet and a central angle of 37 degrees 12'11" for an arc distance of 91.61 feet to a Point on a Curve, said point bears North 85 degrees 12'32" West, from the radius point of the next described curve (last mentioned three courses being coincident with the Southerly Right-of-Way Line of West 51st Place, as shown on said plat of "FIFTH ADDITION TO PALM SPRINGS SUBDIVISION SECTION THREE"); thence Southerly, along a circular curve to the left, having a radius of 5873.65 feet and a central angle of 3 degrees 52'17" for an arc distance of 396.87 feet to a Point of Tangency; thence South 0 degrees 55'11" West, for 463.80 feet to the Point of Beginning (last mentioned two courses being coincident with the Westerly Right-of-Way Line of the aforesaid West 4th Avenue, (Red Road) lying and being in Hialeah, Dade County, Florida.

TOGETHER WITH all rights under the reservation of easements as set forth in instrument recorded in Official Records Book 15881, Page 3796. (AS TO COMPONENTS 1 AND 2)

EXHIBIT C

CONSTRUCTION OBLIGATIONS OF LANDLORD (TURNKEY)

1.　**Description of Work.**　Landlord shall furnish all labor and materials to construct and complete in a good, expeditious and workmanlike manner to the satisfaction of Tenant the work described in the Final Plans (the "Work" or the "Improvements") for the Store. Landlord shall supervise and direct all Work, using its best skill and attention. Landlord shall be solely responsible for all construction means and methods, techniques, sequences and procedures, and for coordinating all portions of the Work. All Work shall be performed in accordance with the terms and conditions of the Lease to which this Exhibit is attached (the "Lease").

2.　**Prototype Plans.**　Landlord acknowledges having previously received Tenant's prototype plans and specifications and Tenant's Design Guidelines for a typical Ross store (collectively, "Prototype Plans").

3.　**Shell Plans.**

3.1.　Definition and Requirements. "Shell" is defined as the fully enclosed building structure in which all structural members have been constructed and installed; and all exterior materials have been completely installed such that the building is wind and water tight. "Construction" means the type of building material (block, tilt wall, etc.) Included on the plans for the Shell ("Shell Plan") are surveyed dimensions, building lines, column lines, shear walls, openings and clearances, clear heights, exterior elevations, as well as all interior obstructions to use (such as piping, conduits, drains, equipment, devices, mezzanines), utility entrances and assemblies for the sprinkler system, communications lines, water, gas, electricity, and sewer, foundation walls and footings extending above the surface of the floor, and retained building systems, if any, such as mechanical, plumbing, docks and compactor pads as well as adjacent grades and docks. The type of Construction shall also be set forth.

3.2.　When Due. Prior to execution of the Lease, Landlord shall have provided Tenant with the Shell Plan for Tenant's Store, elevations of all other buildings in the Shopping Center and a Site Plan of the Shopping Center, all in an AutoCad v.14 ".dwg" format.

3.3.　Tenant Review. Tenant shall review and approve the Shell Plans or provide Landlord with its comments within thirty (30) business days after the later to occur of: (1) Tenant's receipt of the Shell Plans or (2) Tenant's receipt of a fully executed original of the Lease.

3.4.　Ratification. Landlord shall, within ten (10) business days after receipt of Tenant's approval of or comments to the Shell Plans, ratify said Shell Plans as approved by Tenant or incorporate Tenant's requested modifications.

4.     **Tenant Plans.**  Based on the approved Shell Plans, Tenant shall deliver to Landlord a floor plan for the Store ("Tenant's Floor Plan") on or before the later to occur of ninety (90) days from (1) the date of execution of the Lease, or (2) Landlord's ratification of the Shell Plans with Tenant's requested modifications, if any, incorporated therein.

5.     **Completed Plans.**

5.1.     Production of Landlord's Completed Plans.   Within forty-five (45) business days after Landlord's receipt of the Tenant Floor Plan, Landlord's architect(s) (hereinafter "Architect") shall provide Tenant with a copy of complete plans of the Work to be performed in fulfillment of Landlord's construction obligations for the shell of Tenant's Store and interior improvement and related site work, for Tenant's review and comment ("Completed Plans").  The Completed Plans shall be based upon and shall incorporate the Prototype Plans, Shell Plans and Tenant Floor Plan.

5.2.     Tenant Review of Completed Plans.  Within thirty (30) business days after receipt of the Completed Plans, Tenant shall approve or disapprove the Completed Plans and provide the Architect with Tenant's requested modifications, if any.

5.3.     Revision of Completed Plans.  Within fifteen (15) business days following receipt of any comments by Tenant to the Completed Plans, revised Completed Plans shall be prepared by Landlord's architect and submitted to Tenant for approval.  Landlord and Tenant shall each have ten (10) business days thereafter to either approve or disapprove the revised plans.  Any disapproval by either Landlord or Tenant must be accompanied by a specific description of the revisions that the disapproving party would require in order to approve the revised Completed Plans.  Architect shall incorporate any suggested revisions received from Landlord or Tenant into the revised Completed Plans and resubmit the revised Completed Plans to both Landlord and Tenant for approval within five (5) business days following receipt of a notice of disapproval.  If the parties cannot reach agreement within twenty (20) business days after receipt of the revised Completed Plans, the Lease may be terminated by either party on written notice to the other at any time thereafter.

6.     **Final Plans.**

6.1.     The Landlord's Final Plans ("Final Plans") shall consist of the revised Completed Plans with all requested and mutually approved modifications incorporated therein. Any site plan included in the Final Plans shall substantially conform to the Site Plan of the Lease.  In the event of any conflict between such site plan and Exhibit "B", Exhibit "B" shall control.  The Final Plans shall include without limitation, parking areas, exterior elevations, and landscaping, as well as the Store building.  The Store building shall contain approximately the number of square feet as set forth in this Lease.  The Final Plans shall set forth the construction to be performed by each party, it being understood that trade fixtures, except as otherwise provided in the Final Plans, shall be the responsibility of Tenant, and all other construction shall be the responsibility of Landlord.  Slot walls shall not be considered trade fixtures.

6.2.   <u>Final Plans - Record Set</u>.   A Record Set, identified as such, of the Permitted Work embodied in the Final Plans to be performed pursuant to the Landlord's construction obligations under the Lease shall be submitted to Tenant within ten (10) business days of issuance of the Building Permit described in paragraph 8 hereof AutoCad V14 files of Tenant's Store and Site Plan.

7.   **Approvals.**   Any disapproval or proposed revisions hereunder shall be on reasonable grounds and supported by a detailed written statement thereof.   An untimely, unreasonable or unsupported disapproval or a failure to respond within the time allowed shall be deemed an approval for all purposes hereof.

8.   **Plan Format.**   All plans of any type required to be provided to Tenant by Landlord under the terms of this Exhibit must be in an AutoCad v.14 ".DWG" format as well as in printed form in order to constitute a valid submission.

9.   **Permits.**

9.1.   <u>Application.</u> Upon approval of the Final Plans by both parties, Landlord at its own cost and expense, shall forthwith make application to all relevant governmental agencies for necessary building permits, licenses and other grants of authority which may be required in connection with the construction of the Improvements (hereinafter collectively the "Building Permit").  Upon issuance of the Building Permit, a final initialed and dated set of plans reflecting all governmentally required changes shall be delivered to Tenant to review and approve. Tenant's review and Landlord's revision of the Final Plans shall occur on the same time schedule as set forth in 5.1 and 5.2 above.  If the parties cannot reach agreement within twenty (20) business days after receipt of the revised Final Plans, the Lease may be terminated by either party on written notice to the other at any time thereafter.  No changes, including those required by local building authority plan check, shall be made in the Final Plans without Tenant's prior written approval.

9.2.   <u>Failure to Obtain</u>.  Landlord shall have ninety (90) business days from the date the Final Plans are approved by both parties in which to obtain the Building Permit. If the Building Permit is not obtained (including the inability to obtain any required variance from such governmental authority) within the ninety (90) day period, Tenant, at its sole option, may terminate this Lease upon written notice to Landlord.  If the Building Permit is not obtained, despite Landlord's best efforts, within two hundred seventy (270) business days from the date the Final Plans are approved by both parties hereto, either party may terminate this Lease thereafter by written notice to the other.

9.3.   Landlord shall timely keep Tenant fully informed of the status of the application for the Building Permit and any negotiations relating to its issuance.  Further, at the election of Tenant, Tenant may take part in any such negotiations.



10.    **Land Entitlement Permits.**  Should it be necessary for Landlord to obtain a Land Entitlement Permit (as defined hereinbelow) of any sort, the time for preparation of Tenant's Floor Plan, Completed or Final Plans shall be extended by the time reasonably required to obtain such Land Entitlement Permit.  If Landlord, despite diligent efforts, is unable to obtain a Land Entitlement Permit (including the inability to obtain any required variance from the appropriate governmental authority) prior to October 15, 2000, either party may terminate this Lease upon written notice to the other at any time thereafter but prior to issuance thereof.  Landlord shall prepare such plans and specifications as may be reasonably required for the processing of such Land Entitlement Permit for the Store only.  The term "Land Entitlement Permit" as used herein shall include without limitation an environmental impact report or statement or its equivalent, a zoning change or variance, an architectural or design review approval, general plan change, planned unit development approval or its equivalent, subdivision approval or its equivalent, or any other approval pertaining to the use or general design of the Shopping Center,  Store or Improvements other than a Building Permit.

11.    **Access to Premises.**  Tenant's construction representatives at all times shall have access to the premises during construction for purposes of inspection.

12.    **Landlord to Pay for Plans.**  Within ten (10) days after receipt of Tenant's invoice, Landlord shall pay Tenant an allowance ("Architectural Allowance") of Ten Thousand Dollars ($10,000) on account of the costs incurred by Tenant in the preparation, revision and review of the Completed and Final Plans as well as the preparation of the Floor Plan, site specific plans, specifications and requirements. Notwithstanding any other provision of this Lease, the obligation imposed herein upon Landlord shall exist even if the Lease to which this Exhibit is attached is terminated by reason of Landlord's inability to obtain Building Permits, Land Entitlement Permits or financing or failure of Landlord and Tenant to agree upon a set of Final Plans; provided, however, if this Lease is so terminated, the right to use the plans shall vest in Landlord; otherwise, title to the plans shall vest in Tenant.

13.    **Landlord to Pay for Leasehold Improvements.**  "Turnkey" condition includes a Landlord purchased trash compactor and a pad to place it on.  Landlord shall also pay to Tenant a Leasehold Improvements Allowance of Sixty Eight Thousand Seven Hundred Two Dollars ($68,702) for Tenant's installation of, among other items, slotwall and fitting rooms, which are not to be considered trade fixtures as set forth in Tenant's Design Guidelines, a copy of which Landlord acknowledges receipt.  Landlord shall pay the Leasehold Improvements Allowance within ten (10) business days of its receipt of Tenant's invoice therefor.

14.    **Change Orders.**  Any changes to the Final Plans desired by Tenant subsequent to the approval of such plans by both parties shall be requested in writing.  Landlord agrees to use its reasonable, good faith efforts to incorporate plan changes requested in writing by Tenant and to notify Tenant immediately of any cost increase or potential delay which shall result if such changes are incorporated into the Work, based on the information provided by Architect and Landlord's general contractor.  Landlord shall not be required to incorporate any plan changes requested by Tenant unless Tenant: (a) approves in writing and agrees to pay to Landlord the actual cost increase (including any associated architectural, engineering and general conditions

Hialeah, Florida                                    - 4 -                                    6/7/00
Project No. E000002
6061.324/221137.2

JUL 17 '00 13:02 FR BARTKO ZANKEL       415 956 1152 TO 1?·?8913710       P.02/09

*EXHIBIT   F*

RECORDING REQUESTED BY

Ross Stores. Inc.

AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Tarrant & Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Attn.: Martin I. Zankel

_____
SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

### LOCATION: Hialeah, Florida

1
2
3       This Subordination. Nondisturbance and Attornment Agreement (the "Agreement") is
4   effective this ___ day of _____, 20___, by and between _____ (the
5   "Lender"), ROSS FLORIDA DRESS FOR LESS, L.C., Florida limited liability company (the "Tenant")
6   and PALM SPRINGS MILE ASSOCIATES, LTD., a Florida limited partnership (the "Landlord").

7                                   **RECITALS**

8       A.      Lender is or will be the ground lessor with respect to, or the holder of indebtedness
9   secured by a lien or liens upon. the real property described in Exhibit "A" attached hereto and by this
10  reference incorporated herein.  The Exhibit "A" property and improvements thereon is hereinafter
11  referred to as the "Shopping Center."  The instruments creating such lien or liens whether they be
12  denominated as being "mortgage," "deed of trust," "deed to secure debt," "security agreement,"
13  "vendor's lien," "ground lease," or otherwise, and any instruments modifying or amending the same, or
14  entered into in substitution or replacement thereof, are hereinafter collectively referred to as being the
15  "Mortgage."

16      B.      Tenant has executed, or will execute, a certain lease with Landlord, dated for reference
17  purposes on _____, for all or a portion of the Shopping Center, which portion (the
18  "Premises") is more particularly set forth in said lease.  Said lease and all amendments and
19  modifications thereto are herein collectively referred to as the "Lease."

20      C.      Tenant has requested that Lender agree not to disturb Tenant's possessory rights under
21  the Lease in the event that Lender should foreclose on the Mortgage, provided that Tenant is not in
22  default of the Lease.

23      D.      The parties desire to establish certain rights and obligations with respect to their
24  respective interests by means of this Agreement.

Hialeah, FL                              - 1 -                              07/17/00
6061.324/223872.1

# AGREEMENTS

NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein contained, and intending to be legally bound by hereby agree as follows:

1.    Subject to the terms and conditions of this Agreement, and for so long as this Agreement remains binding upon Lender, the Lease shall be, in accordance with the terms and conditions hereof, subordinate to the lien of the Mortgage and all voluntary and involuntary advances made thereunder.

2.    Lender approves of the Lease.

3.    Provided that Tenant is not in default so as to permit the Landlord to terminate the Lease or Tenant's right to possession of the Premises, Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, whether judicial or non-judicial, or Lender pursuant to acceptance of a deed in lieu of foreclosure or any assignment of Landlord's interest under the Lease, in the exercise of any of the rights arising, or which may arise, out of the Mortgage or in any other manner:  (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its right to use, quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit or privilege granted to or inuring to the benefit of Tenant under the Lease (including any right of renewal or extension thereof); (ii) shall not terminate or affect the Lease;  (iii) shall recognize Tenant's rights, benefits and privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all of the terms, covenants, and conditions of the Lease for the remaining balance of the term of the Lease with the same force and effect as if Lender  were the Landlord under the Lease.  Lender hereby covenants that any sale by it of the Shopping Center pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder. However, in no event shall Lender be:

(a)    Liable for any act or omission of Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent such act or omission is of a continuing nature, such as, for example, a repair obligation;

(b)    Liable for any offsets or deficiencies which the Tenant might be entitled to assert against the Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent that Lender has received the benefit of the act of the Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that would otherwise have been paid by Lender as Landlord;

(c)    Bound by any payment of rent or additional rent made by Tenant to Landlord for more than one month in advance, which payment was not required under the terms of the Lease;

(d)    Bound by any amendment or modification of the Lease executed after the date of this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the Lease; and, (ii) is made without Lender's prior written consent (except to the extent that the Lease may specifically contemplate any amendment or modification thereof).

(e)    Be liable for any security deposit under the Lease unless such security has been physically delivered to Lender.

4.   In the event of the termination of the Mortgage by foreclosure, summary proceedings or otherwise, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the Landlord thereunder to terminate the Lease, then, and in any such event, Tenant shall not be made a party in the action or proceeding to terminate the Mortgage unless not to do so would be disadvantageous procedurally to Lender, in which case, such joinder of Tenant as a party shall not extinguish or interfere with any rights of Tenant under the Lease, nor shall Tenant be evicted or moved or its possession or right to possession under the terms of the Lease be disturbed or in any way interfered with, and, subject to the provisions of this Agreement, Tenant will attorn to Lender or any other party which obtains title to the Shopping Center pursuant to any remedy provided for by the Mortgage or otherwise, such attornment to be effective and self-operative without the execution of any other instruments on the part of any party, and the Lease shall continue in full force and effect as a direct Lease from Lender or such party to Tenant under all the terms and provisions of the Lease (including any rights to renew or extend the term thereof). In the event of such attornment, Lender shall be deemed to have assumed and shall assume the performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the time Lender becomes Landlord and until such time as such obligations are assumed by a bona fide purchaser.

5.   Tenant hereby confirms that the Lease is in full force and effect.

6.   So long as the Deed of Trust remains outstanding and unsatisfied, in the event of a default under the terms of the Lease, Tenant will mail or deliver to Lender at the address and in the manner herein below provided, written notice thereof, specifying in reasonable detail the nature of the default, prior to terminating or seeking to terminate the Lease. Lender shall have the option thereafter, the same right to cure any defaults or to take action as the Landlord within such grace period as is entitled under the lease; provided, however, if the nature of the default is such that it does not materially and/or adversely affect Tenant's use and enjoyment of the Premises under the Lease. If such default cannot be reasonable cured by Lender within such thirty (30) day period, the commencement of action by Lender within such thirty (30) day period to remedy the same shall be sufficient so long as Lender diligently pursues, without interruption, such curative action to completion.

7.   Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of the Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

8.   Unless and until Lender or any subsequent purchaser succeeds to the interest of Landlord under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease.

9.   If Landlord executes and delivers to Lender an Assignment of Leases and Rents conveying the rent under the Lease upon an event of default by Landlord under the Mortgage, after receipt of notice from Lender to Tenant (at the address set forth below) that rents under the Lease should be paid to Lender, Tenant shall thereafter pay to Lender all monies thereafter due to Landlord under the Lease. In such event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Lender hereby indemnify and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such

notice. Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with the provisions hereof. Any dispute between Lender (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Mortgage, shall be dealt with and adjusted solely between Lender (or any other purchaser) and Landlord, and Tenant shall not be made a party thereto.

10.     Lender shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

11.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against which the same is brought to be asserted.

12.     Tenant agrees that without the prior written consent of Lender, it shall not: (a) amend, modify, terminate, or cancel the Lease or any extensions or renewal thereof; or (b) tender a surrender of the Lease or make a prepayment of any rent or additional rent in excess of one (1) month.

13.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, including without limitation, the covenants of Lender herein shall be specifically binding upon any purchaser of the Shopping Center at foreclosure or at a sale under power of sale.

14.     In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of no further force or effect.

15.     This Agreement shall be governed and construed according to the laws of the state where the Shopping Center is located.

16.     Lender shall not institute any litigation naming Tenant as a defendant for the purpose of foreclosing or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises unless Tenant is required to be named in such litigation by law, and then only for the purpose of complying with the applicable foreclosure statute and so long as Tenant's failure to defend against any such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in this Agreement. The term "Lender" as used herein shall include any successor-in-interest to the Lender (including a purchaser at foreclosure or sale in lieu thereof).

17.     If Tenant becomes a party to any litigation by reason of Lender's enforcement of any rights granted Lender by the Mortgage and Tenant is not in default under the terms and conditions of its Lease so as to permit the Landlord thereunder to terminate the Lease, Lender shall indemnify, defend and hold Tenant harmless against any loss, damage, liability (or any claims in respect to the aforementioned), costs or expenses (including without limitation reasonable attorneys' fees and investigative and discovery costs, court costs, witness fees and cost of appeal) of whatever nature caused by or resulting from Lender's enforcement of the rights granted Lender under the Mortgage.

18.    To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postage paid by United States registered or certified mail with return receipt requested. Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication. For purposes hereof, Lender's address is:

_____
_____
_____
Attn.:_____

and Tenant's address is:

        Ross Stores, Inc.
        8333 Central Avenue
        Newark, CA 94560
        Attn.: Legal Notice Department

and Landlord's address is:

        Palm Springs Mile Associates, LTD.
        419 West 49th Street, Suite 300
        Hialeah, FL 33012
        Attn.: David Eisenstadt

        At any time(s), each party may change its address for the purposes hereof by giving the other party a change of address notice in the manner stated above.

        19.    This Agreement (a) contains the entire understanding of Lender and Tenant regarding matters dealt with herein (any prior written or oral agreements between them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part only by a written instrument signed on behalf of the party against whom enforcement of the modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and their respective successors and assigns.

        20.    In the event of any litigation arising out of the enforcement or interpretation of any of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its reasonable attorneys' fees, including costs of suit, discovery and appeal. The "prevailing party" shall be that party who obtains substantially the relief sought in the action.

        21.    In the event the Lease is terminated as a result of Landlord's bankruptcy or reorganization, whereby Lender obtains fee title to the Shopping Center (or in the case Lender is the ground lessor, retains fee title without the encumbrance of the ground lease), Lender agrees that the Lease shall remain in effect as between Lender (as Landlord) and Tenant, subject to the terms of this Agreement, and, upon Tenant's written request, Lender and Tenant agree to execute a reinstatement agreement documenting that the Lease has been reinstated as between Lender (as Landlord) and Tenant and that the terms and conditions thereof shall be as stated in the Lease, subject to the provisions of this Agreement.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first written above.

| LANDLORD: | TENANT: |
|---|---|
| PALM SPRINGS MILE ASSOCIATES, | ROSS FLORIDA DRESS FOR LESS, L.C., |
| LTD., a Florida limited partnership | a Florida limited liability company |

By: PHILIPS PALM SPRINGS SUB-VIII, INC.

By:     _____
Name:   _____
Title:    _____

Witness:      _____
Printed Name: _____

Witness:      _____
Printed Name: _____

**LENDER:**

By: _____
Name: _____
Title: _____

Witness:      _____
Printed Name: _____

Witness:      _____
Printed Name: _____

By:  ROSS STORES, INC.,
     a Delaware corporation
Its:  Managing Member

    By:  _____
       James Fassio
    Its:  Sr. Vice President

Witness:  _____
Printed Name: _____

Witness:  _____
Printed Name: _____

    By:  _____
       Gregg McGillis
    Its:  Vice President, Real Estate

Witness:  _____
Printed Name: _____

Witness:  _____
Printed Name: _____

State of Califonia_____)
                                        ) ss.
County of Alameda_____)


       On _____ before me, _____,
a Notary Public, personally appeared James Fassio and Gregg McGillis, personally known to me or
(proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.

       WITNESS my hand and official seal.


_____
Notary Public


State of _____)
                                        ) ss.
County of _____)


       On _____ before me, _____, a Notary
Public, personally appeared _____,
personally known to me or (proved to me on the basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

       WITNESS my hand and official seal.


_____
Notary Public

JUL 17 '00 13:05 FR BART J ZANKEL          415 956 1152 TO 1 28913710          P.09/09

State of _____ )
                                          )   ss.
County of _____ )

      On _____ before me, _____, a Notary Public, personally appeared _____, personally known to me or (proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

      WITNESS my hand and official seal.

_____
Notary Public

## EXHIBIT H
## EXCLUSIVES

**Piccadilly Cafeteria**

Section 23.12. With respect to property located inside the so-called Palm Springs Mile Shopping Center that is owned by Palm Springs Mile Associates, Ltd., Palm Springs Mile Associates, Ltd. agrees not to lease space to Luby's Cafeteria during any period of time that Tenant is still operating the Premises.

**Eckerd**

Tenant will have the exclusive right to operate a drug prescription department in the area of the Shopping Center to the extent owned and controlled by Landlord and bounded as follows: West 51st Street to the North, West 49th Street to the South, West 4th Avenue to the East and West 6th Avenue to the West;

**Dairy Queen**

Notwithstanding the foregoing, provided this Lease is in full force and effect and Tenant is using the Demised Premises for the use set forth in Section 8.01, Landlord hereafter agrees not to enter into any new lease for space in that portion of the Shopping Center cross-hatched on Exhibit C (the "Exclusive Area") to a tenant whose primary business is the sale of ice cream. Paragraph shall automatically become null and void if:

**Winn Dixie**

28.   Landlord covenants and agrees that so long as this Lease is in full force and effect and Tenant is not in default beyond any notice and cure period and Tenant is operating a supermarket in the demised premises, the Tenant shall have the exclusive right to operate a supermarket in the shopping center as described in Exhibit "B" and as graphically portrayed on Exhibit "A". Landlord further covenants and agrees that it will not hereafter directly or indirectly lease or rent any property located within said shopping center for occupancy as a supermarket, grocery store, meat, fish or vegetable market;

**Care Florida**

Notwithstanding anything in this lease to the contrary, Landlord agrees not to lease space to any new Tenant for the term of this lease within the Shopping Center as defined in Exhibit A-2 of this lease for the following uses or medical specialties: medical center, prepaid health care center, H.M.O., general practice, internal medicine or cardiology.

Hialeah, Florida                    EXHIBIT H - Page 1
Project No. E000002
6061.324/220702.1



**United Artists**

5.4   (a)   So long as (i) Tenant shall have duly kept and performed all of the terms, covenants and conditions of this Lease on Tenant's part to be kept and performed, (ii) Tenant shall be occupying the Premises and actively conducting business therein in accordance with the uses permitted hereinabove, and (iii) no Event of Default shall have occurred under this Lease, **Landlord agrees that, during the Term of this Lease, Landlord shall not enter into any lease covering any space located in the area of the Shopping Center between West 4th Avenue (Red Road) and West 12th Avenue and south of West 49th Street, which lease permits the premises demised thereunder to be used as a movie theatre;

*in Section 5.1*

***and (iv) no change of Tenant's permitted use has been effectuated pursuant to Section 5.7,

**TJ Maxx**

4. (A) Landlord agrees that as long as any retail sales activity shall be conducted in the *Demised* Premises the Shopping Center shall not be used for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan and real estate offices, not being deemed non-retail), or for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor, sporting event, sports or game facility, off-track betting club or for any establishment for the sale or display of pornographic materials. Notwithstanding the foregoing (i) office uses may be conducted in the existing office building, (ii) the existing medical clinic may be conducted in its existing location, (iii) the existing cafeteria may be conducted in its existing location, (iv) there may be a beauty school of no more than 7,500 square feet provided it is no closer than 100 feet from the Demised Premises and (v) there may be an aggregate of 10,000 square feet of office uses and the uses described in this sentence. [an additional]

(B) Landlord agrees that (excluding the Uptons premises while such lease is in effect or a replacement department store in the same location), during the term of this lease, no other individual premises in the Shopping Center shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of soft goods (as defined by the trade from time to time), including in the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of soft goods. A "Sports Authority" or similar concept, or "Baby's R Us" or similar concept shall not be deemed to violate the foregoing.

**Dots**

, Landlord hereafter agrees not to (i) enter into any new lease for space in the Shopping Center set forth on Exhibit "A" (the "Exclusive Area") to a tenant whose business and marketing concept is the retail sale of women's apparel using a one-price, specific price or ceiling price selling, marketing and advertising concept, or (ii) consent to a change in use in an existing lease (which lease provides for Landlord consent) for space in the Exclusive Area which would permit the retail sale of women's apparel using a one-price, specific price or ceiling price selling, marketing and advertising concept .

**GNC**

Landlord shall not have the right to enter into any future leases which would permit the tenants thereunder to operate a retail store utilizing more t 25% of its gross leasable floor area for the display and sale of health foods, vitamins, sports nutrition products, or mineral supplements in the Shop; } Center during the term hereof.

EXHIBIT H-1
TJ MAXX WAIVER


**THE TJX COMPANIES, INC.**

March 31, 2000

Philips International Realty Corp.
419 West 49th Street
Suite 300
Hialeah, FL 33012
Attn: David Eisenstadt

Ross Stores, Inc.
8333 Central Avenue
Newark, CA 94560
Attn: Richard Lietz

Re:     Palm Springs Mile Shopping Center
        499 West 49th Street
        Haileah, FL

Gentlemen:

The TJX Companies, Inc. hereby waives the provisions of its exclusive contained in Paragraph 4(B) of Schedule B of its lease dated May 29, 1998 of premises in the above referenced Shopping Center (the "TJX Lease") with respect to the operation of a store by Ross Stores, Inc. or any of its affiliates in the Shopping Center.

It is understood and agreed this waiver only relates to Ross Stores, Inc. or its affiliates and the provisions of Paragraph 4(B) of Schedule B of the TJX Lease shall not be deemed waived or modified in any way except as provided herein.

Sincerely,
The TJX Companies, Inc.

By: _____
    Jay H. Meltzer
    Senior Vice President and
    Secretary/Clerk

Hialeah, Florida                      EXHIBIT H-1
Project No. E000002
6061.324/220702.1



## EXHIBIT I
## PERMITTED TITLE EXCEPTIONS

ROSS FLORIDA DRESS FOR LESS, L.C., agrees to take its leasehold interest subject only to the following items and exceptions stated in the Proforma Loan Policy issued by Lawyers Title Insurance Corporation, dated May 18, 2000, Case No. 000187a, for the subject location in Hialeah, Florida:

Exhibit A
Schedule B, Part I:   Exceptions numbered 19 through 24
Schedule B, Part II:  Exceptions numbered 7-10.

However, with respect to Schedule B, Part II: Exceptions numbered 7-10, ROSS FLORIDA DRESS FOR LESS, L.C., does not accept or agree to be subject to any provisions of such leases, except to the extent expressly set forth in the Lease between ROSS FLORIDA DRESS FOR LESS, L.C. and PALM SPRINGS MILE ASSOCIATES, LTD.; and

with respect to the mortgages listed on Exhibit A, they shall be subject to a signed Non-Disturbance Agreement signed by Palm Springs Mile Associates, Ltd. and Prudential Securities Credit Corp., LLC, per Section 28.1 of the Lease.



6/7/00

Hialeah, Florida
Project No. E000002
6061.324/224001.1

- 1 -



PARKING

ROSS

Existing
pylon sign
to be replaced

SITE PLAN
NOT TO SCALE

65% OF ORIGINAL SIZE

EXHIBIT

REVISED

bma
bill moore & associates
(510) 526-0296   fax 526-6092
1387 senaro ave.   p.o. box 6153   albany, ca 94706

ROSS
DRESS FOR LESS

Palm Springs Mile Shopping Center
NWC W. 49th St. and W. 4th Ave.
HIALEAH, FL

SHEET
K
27 APR 00



24"H X 48"W X 1" DEEP STEEL PAN
OVAL "ROSS" LOGO WALL PLAQUE
WITH PORCELAIN ENAMEL FINISH
TWO (2) REQ'D AS SHOWN
(SEE SHEET EL FOR DETAILS)

LANDLORD TO CREATE FLAT EVEN
SURFACE 12" MIN. AROUND PLAQUES.

72"H INDIVIDUAL "ROSS" LOGO LETTERS:
FACES: LEXAN SG 300-22136 MATTE BLUE
RETURNS: 8" ALUM. W/ BRITE DIP CHROME FINISH
NEON: FOUR-TUBE 15MM POWDER BLUE
MOUNTING: 1/4"-20 GALV. HANGER BOLTS
PEG OFF: 1/2" SPACERS

42"H INDIVIDUAL "DRESS FOR LESS" LOGO LETTERS:
ALL CALL OUTS SAME AS "ROSS" EXCEPT:
RETURNS: 5" ALUM. W/ BRITE DIP CHROME FINISH
NEON: THREE-TUBE 15MM POWDER BLUE

SIGN FASCIA BY LANDLORD (SEE NOTES)

ARCHITECTURAL
LIGHTING
BY LANDLORD

23" X 48" X 10" DOUBLE-FACE
INTERNALLY ILLUMINATED
UNDER-CANOPY SIGN,
MINIMUM 8'-0" ABOVE FINISH FL.
CENTER OVER ENTRANCE DOORS
(SEE SHEET UC FOR DETAILS)

ADJACENT PARAPET
MAY NOT BE HIGHER
THAN THE ROSS BASE
BUILDING

ILLUMINATED TILE NICHE
BY LANDLORD (SEE NOTE)

BLUE TILE ACCENT
BANDS BY LANDLORD

**NOTES:**
LANDLORD TO FURNISH ADEQUATE ACCESS BEHIND LOGO LETTERS FOR INSTALLATION AND
MAINTENANCE, PER ARTICLE 600 OF THE 1993 N.E.C.

LANDLORD TO SUPPLY TWO (2) 20 AMP 120V DEDICATED SIGN CIRCUITS AND JUNCTION BOXES TO
AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM.

LANDLORD TO PROVIDE PLYWOOD BACKING MINIMUM OF 12" AROUND SIGN BACKGROUND.

SIGN BACKGROUND FOR THE "ROSS DRESS FOR LESS" SIGN(S) LETTERS IS TO BE OF A LIGHT
COLOR (MINIMUM 75% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE BLUE SIGN,
SUCH AS SHERWIN WILLIAMS LIMOGE CREAM.

THE BASE BUILDING COLOR IS TO HAVE A MINIMUM L.R.V. OF 55%. ALL COLORS ARE SUBJECT TO
ROSS STORES, INC. REVIEW AND APPROVAL.

## ① STOREFRONT ¥ ELEVATION
SCALE: 3/32" = 1'- 0"



REVISED

**bma**
bill moore & associates
(510) 526-0296   fax 526-6092

**ROSS**

Palm Springs Mile Shopping Center
NWC W. 48th St. and W. 4th Ave.
HIALEAH, FL

SHEET
**S1**
31 MAY 00

**This Copy is 64% of the Original Document Size**



65% OF ORIGINAL SIZE



18'-4"

10'-0"

30'-7"

WINN-DIXIE

T.J.MAXX

ROSS

FABULOUS
DIAMONDS

PICCADILLY
CAFETERIA   ECKERD

PHILLIPS INTERNATIONAL REALTY CO.
OWNER / MANAGER

9'-6"
30"

ROSS TENANT FACE:
5'-6" X 18'-4" WHITE LEXAN PANEL
FIRST SURFACE DECORATED WITH
30" HIGH 'ROSS' REVERSED OUT OF
3M 3630-157 SULTAN BLUE VINYL
(TWO FACES REQUIRED)

30'-7" HIGH AND 23'-0"
WIDE PYLON STRUCTURE BY
LANDLORD (SEE NOTES)

(1)  D/F PYLON SIGN • ELEVATION
SCALE 3/16" = 1'-0"

NOTES:
SEE SHEET K FOR PYLON SIGN POSITION
LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE,
FINISHES, LIGHTING AND ELECTRICAL SERVICE
BILL MOORE & ASSOC. TO PROVIDE SCANNABLE "ROSS"
LOGO TYPE TO L/L'S SIGN CONTRACTOR
LANDLORD TO PROVIDE BMA WITH LOGO PLOT (PROOF)
PRIOR TO FABRICATION AND PHOTOS OF FINISHED DISPLAY




3.9



REVISED
9 JUN 00


bill moore & associates
(510) 526-0274   fax 526-6092


Palm Springs Mile Shopping Center
NWC W. 49TH ST. and W. 4TH AVE.
HIALEAH, FL


SHEET
P
4 MAY 00

TOTAL P.02



EXISTING PYLON STRUCTURE BY
LANDLORD (SEE NOTES)

ROSS TENANT FACE:
REFACE EXISTING CABINET WITH
WHITE LEXAN PANEL, FIRST
SURFACE DECORATED WITH
'ROSS' REVERSED OUT OF
3M 3630-157 SULTAN BLUE VINYL
(TWO FACES REQUIRED)



1   **TEMPORARY D/F PYLON SIGN • ELEVATION**
SCALE 3/16" = 1'-0"

NOTES:
SEE SHEET K FOR PYLON SIGN POSITION

LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE
FINISHES, LIGHTING AND ELECTRICAL SERVICE

BILL MOORE & ASSOC. TO PROVIDE SCANNABLE ? ???
LOGO TYPE TO L/L'S SIGN CONTRACTOR

LANDLORD TO PROVIDE BMA WITH LOGO PLOT ????
PRIOR TO FABRICATION AND PHOTOS OF FINISHED DISPLAY



REVISED

bill moore & associates
(510) 526-0296    fax 526-6092



Palm Springs Mile Shopping Center
NWC W. 49th St. and W. 4th Ave.
**HIALEAH, FL**

SHEET
**TP**
4 MAY 00





INSTALLATION INSTRUCTIONS:   DRILL SIX (6) 5/16" DIA. X 3 1/2" DEEP HOLES INTO WALL AS PER PATTERN.
SCREW 1/4-20 GALV. STUDS INTO EMPTY T-NUTS IN BACK OF PLAQUE UNTIL THEY CONTACT CUP POINT SCREW
(DO NOT OVER TIGHTEN). FILL HOLES IN WALL AND COAT ALL-THREAD WITH RTV-6708 SILICONE ADHESIVE.
MOUNT PLAQUE ONTO WALL PUSHING STUDS INTO HOLES UNTIL PLAQUE IS FLUSH AGAINST WALL SURFACE.

HOLE  
1" PLAQUE  
1/4-20 GALV. STUD.  
1/2" MAX.

24" X 48" X 1" STEEL PAN WITH
BAKED PORCELAIN ENAMEL FINISH

3/4" EXTERIOR GRADE MDO PLYWOOD
ALL SURFACES PRIMED AND SEALED

EPOXY GLUE BOND BETWEEN PLYWOOD
AND STEEL PAN.

FINISH WALL MATERIAL

1/4-20 X 3.5 GALV. STUD
TYPICAL OF SIX (6)

THREADED 1/4-20 T-NUT
WITH 1/4-20 X 0.125 CUP POINT SCREW
PRE-SET INTO PLYWOOD BACKING.
TYPICAL OF SIX (6)

RTV-6708 SILICONE ADHESIVE

5/16" DIA. X 3" DEEP HOLE IN WALL
TYPICAL OF SIX (6)

## SECTION AT MOUNT
SCALE: 3/4" = 1"

65% OF ORIGINAL SIZE

QUE LOCATIONS
TES TO SUPPLY PLAQUES,
LATION PATTERNS.
VARY ACCORDING TO TYPE OF
ANDLORD TO VERIFY CONDITIONS
N SURFACE 12" MINIMUM AROUND
N(5).

48"  
8"  16"  16"  8"  
C FOR T-NUTS   C FOR T-NUTS  
0.25"  0.25"  
38" ROSS

0.25"  
9.6" ROSS  
24"  
0.25"

6"  
C FOR T-NUTS  
12"  
6"

72" ABOVE WALKWAY

WHITE COPY  
PMS #296C DARK BLUE COPY OUTLINE  
PMS #294C BLUE BACKGROUND  
PMS #296C DARK BLUE 1ST OUTLINE  
WHITE 2ND OUTLINE  
PMS #294C BLUE 3RD OUTLINE

(1) OVAL ENTRANCE LOGO PLAQUE ELEVATION
SCALE: 1-1/2"=1'-0"

| REVISED | bma<br>bill moore & associates<br>(510) 526-0296   fax 526-6092 | ROSS  Palm Springs Mile Shopping Center<br>NWC W. 49th St. and W. 4th Ave.<br>HIALEAH, FL | SHEET<br>EL<br>4 MAY 00 |



**SECTION A-A**   SCALE : 3" = 1'-0"

**UNDER-CANOPY SIGN ELEVATION**   SCALE : 1" = 1'-0"

*65% OF ORIGINAL SIZE*

NOTES:
SEE SHEET 51 FOR UNDER-CANOPY SIGN LOCATION.

LANDLORD TO PROVIDE ACCESS ABOVE CEILING FOR
SIGN INSTALLATION, AND 120V ELECTRICAL SERVICE
AND J-BOX WITHIN FIVE (5) FEET OF SIGN LOCATION
CONNECTED TO ENERGY MANAGEMENT SYSTEM.

**Labels (Section A-A):**
- 1" RIGID; PRIME & PAINT TO MATCH CEILING
- 1" X 1" METAL RETAINER PAINTED TO MATCH SULTAN BLUE
- TWO-LAMP BALLAST
- 1" PIPE FLANGE
- 1" X 4" 'C' CHANNEL WELDED TO CABINET EDGE
- 0.177 (3/16") WHITE LEXAN FACES WITH 9-1/4" HIGH WHITE 'ROSS' COPY AND 3/4" WIDE WHITE OUTLINE REVERSED OUT OF 3M 3630-157 SULTAN BLUE VINYL OVERLAY
- 2" X 2" 'C' CHANNEL LAMP SUPPORT WELDED TO CABINET EDGE
- F36-T12-DHO FLUORESCENT LAMP TYPICAL OF TWO (2) AT 9" O.C.
- FOG INSIDE OF CABINET WHITE
- CABINET EGDE PAINTED TO MATCH SULTAN BLUE
- 3/4" OUTLINE 1" RETAINER
- 5-1/8"
- 9-1/4" COPY
- 5-1/8"
- LAMPS AT 9" O.C.
- 10"

**Labels (Elevation):**
- LANDLORD TO PROVIDE 120V PRIMARY ELECTRICAL SERVICE AND J-BOX ABOVE CEILING WITHIN FIVE (5) FEET OF SIGN.
- SIGN INSTALLERS TO PROVIDE: WOOD OR STEEL ANGLE CROSS MEMBER (AND WOOD BLOCKING IF NECESSARY) ANCHORED TO CANOPY JOISTS. DRILL 1-1/2" DIA. FOR PIPE SUPPORTS AND FASTEN WITH FENDER WASHERS AND LOCK NUTS AS REQUIRED.
- ESCUTCHEON PLATE AT CEILING
- SIGN INSTALLERS TO PROVIDE: 1" DIA. PIPE SUPPORTS (TYP. OF TWO) CUT TO LENGTH FOR FINISH CABINET HEIGHT AND THREAD ENDS TO SECURE INSIDE CABINET AND ABOVE CEILING. PRIME AND PAINT TO MATCH CEILING.
- 23" x 46" x 10" DOUBLE-FACE ALUM. CABINET: PRIME W/ ZINC CHROMATE PAINT CABINET EDGE AND 1" RETAINERS TO MATCH SULTAN BLUE. FACES: 0.177 (3/16") WHITE LEXAN FACE WITH 9 1/4" HIGH 'ROSS' COPY AND 3/4" WIDE WHITE OUTLINE REVERSED OUT OF 3M 3630-157 SULTAN BLUE TRANSLUCENT VINYL OVERLAY
- INSTALL CABINET SO THAT DISCONNECT SWITCH AND U.L. LABEL ARE ON END CABINET FACING STORE
- 8'-0" MIN. A.F.F.
- 24" O.C.
- TO BE VERIFIED BY FIELD CHECK
- 3/4" OUTLINE 1" RETAINER
- 5-1/8"
- 9-1/4" COPY
- 5-1/8"
- 23"
- A
- A
- 3/4"
- 1"
- 4-3/4"
- 33-1/2" LOGO
- 4-1/4"
- 3/4"
- 46"

REVISED

bma
bill moore & associates
(510) 526-0296   fax 526-6092

ROSS   Palm Springs Mile Shopping Center
NWC W. 48th St. and W. 4th Ave.
HIALEAH, FL

SHEET
UC
4 MAY 00

EXHIBIT
J
6 : 9

Temporary "Opening Soon" sign package consisting of the following elements on the store front:

A.    6'-0" x 20'-0"  "Ross Dress For Less Opening Soon"
      banner.  Banner to be installed as soon as wall is complete

B.    50" x 40" "Ross Dress For Less Opening Soon" window
      banners. (2 min.)

C.    3'-0" x 16'-0" "Now Hiring" banner.



STOREFRONT SIGNAGE ELEVATION

page 11 of 19

**Notes:**

Banner provided and installed by Bill Moore
& Associates

On removal of banners, all wall penetrations
to be sealed and touched up

REVISED
18 DEC 98
18 JAN 99
22 JAN 99
24 APR 00

bill moore & associates
(510) 526-0296    fax 526-6092
1067 solano ave    p o box 6163    albany, ca 94706

**ROSS** DRESS FOR LESS

**PROTOTYPE STOREFRONT**
**"ROSS Opening Soon" Combo**
**GRAPHIC REQUIREMENTS**

SHEET
**01a**
23 NOV 98

Case 1:20-cv-21865-FAM   Document 1-1 Entered on FLSD Docket 05/04/2020   Page 94 of 125

ROSS STORES, INC. REQUIRES:

Temporary "Opening Soon" sign package consisting of the following elements on the store front.

A.   3'-0" x 15'-0"  "Opening Soon" banner.   Install banner along
     with the installation of the building signs.  (1 min.)

B.   40" x 50" "Ross Dress For Less Opening Soon" window
     banners. (2 min.)

C.   3'-0" x 16'-0" "Now Hiring" banner.



STOREFRONT SIGNAGE ELEVATION

page 14 of 19

Notes:

Banner provided and installed by Bill Moore
& Associates

On removal of banners, all wall penetrations
to be sealed and touched up

| REVISED | | | |
|---|---|---|---|
| 18 DEC 98 | | | |
| 18 JAN 99 | | | |
| 5 AUG 99 | | | |
| 24 APR 00 | | | |

bma
bill moore & associates
(510) 526-0296   fax 526-6092
1057 solano ave   p.o. box 6153   albany, ca 94706

ROSS
DRESS FOR LESS

PROTOTYPE STOREFRONT
"ROSS Opening Soon" Combo
GRAPHIC REQUIREMENTS

SHEET
01b
23 NOV 98

Temporary "Now Open" sign package consisting of the following elements on the store front:

A. 3'-0" x 16'-0" "Now Open" banner.

B. 3'-0" x 6'-0" or 4'-0" x 8'-0" bunting.

C. Multicolor pennant flags to be installed where applicable.

D. 3'-0" x 16'-0" "Now Hiring" banner.



STOREFRONT SIGNAGE ELEVATION

page 17 of 19

Now Open sign package to be provided and installed by Bill Moore & Associates.

Now Open sign package to be installed prior to the store opening

Now Open sign package to remain for a minimum of 30 days.

Upon removal of Now Open sign package, all wall penetrations to be sealed and touched up

REVISED
18 DEC 98
18 JAN 99
5 AUG 99
15 MAR 00
24 MAR 00

bma
bill moore & associates
(510) 526-0296   fax 526-6092

ROSS
DRESS FOR LESS

PROTOTYPE STOREFRONT
"Now Open"
GRAPHIC REQUIREMENTS

SHEET
N01
23 NOV 98

EXHIBIT K
GUARANTY


As a material inducement to and in consideration of **PALM SPRINGS MILE ASSOCIATES, LTD.**, a Florida limited partnership ("Landlord") entering into a written lease (the "Lease") with **ROSS FLORIDA DRESS FOR LESS, L.C.**, a Florida limited liability company ("Tenant"), dated the same date as this Guaranty, pursuant to which Landlord leased to Tenant and Tenant leased from Landlord premises located in the City of Hialeah, County of Dade, State of Florida, **ROSS STORES, INC.**, a Delaware corporation ("Guarantor"), whose address is 8333 Central Avenue, Newark, CA 94560, guarantees and promises to and for the benefit of Landlord the performance of all obligations of Tenant under the Lease.

The provisions of the Lease may be changed by agreement between Landlord and Tenant at any time, or by course of conduct, without the consent of or without notice to Guarantor. This Guaranty shall guarantee the performance of the Lease as changed. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty.

If Tenant defaults with respect to any payment obligation under the Lease, Landlord shall have the right to proceed immediately against Guarantor and/or Tenant, and to enforce against Guarantor and/or Tenant any rights that Landlord may have under the Lease or pursuant applicable laws with respect to such default. If the Lease terminates and Landlord has any right(s) that it is entitled to enforce against Tenant after termination, Landlord shall have the right to enforce such right(s) against Guarantor.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any other remedy in Landlord's power. Guarantor waives any defense by reason of any disability of Tenant. Until all of Tenant's monetary obligations to Landlord under the Lease have been discharged in full, Guarantor has no right of subrogation against Tenant. Guarantor waives its right to enforce any remedies that Landlord now has, or later may have, against Tenant. Guarantor waives any right to participate in any security now or later held by Landlord.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including, without limitation, reasonable attorneys' fees.

Guarantor's obligations under this Guaranty shall be binding on Guarantor's successors, but shall be no greater than Tenant's or as otherwise set forth in this Lease.


Dated: _____        ROSS STORES, INC.,
                                        a Delaware corporation

                                        By:_____
                                        Its:_____

Hialeah, Florida                   EXHIBIT K                          6/7/00
Project No. E000002
6061.324/220713.1

costs and expenses) caused by such changes, and (b) approves in writing and agrees to extensions of all construction deadlines in the Lease (including, without limitation, those set forth in Section 1.4 and Article 4) equal to the delays caused by such changes.

15.   **Change Order Payment or Refund.**   On the Delivery Date, Tenant shall reimburse Landlord in cash for the net cost increase, if any caused by plan changes requested in writing by Tenant.  If the net effect of Tenant's changes is a cost savings, Landlord shall timely remit such savings in cash to Tenant.

6/7/00

EXHIBIT D
PROHIBITED USES

1. No food use.

2. No use utilizing hazardous substances or materials.

3. No auto center.

4. No auto parts store.

5. No hardware store.

6. No beauty or nail salon.

7. No dollar store or schlock store.

8. No dry cleaner.

9. No laundromat.

10. No funeral establishment.

11. No automobile sale, leasing, repair or display establishment or used car lot, including body repair facilities.

12. No auction or bankruptcy sale (except for those bankruptcy sales by retailers as ordered or provided under the bankruptcy code, or auctions ordered by a court having a competent jurisdiction.

13. No pawn shop (except for retail jewelry stores which buy and sell jewelry as a part of their business).

14. No outdoor circus, carnival or amusement park.

15. No outdoor meetings.

16. No bowling alley.

17. No primarily pool or billiard establishment.

18. No shooting gallery.

19. No off-track betting (provided that state sponsored lottery tickets shall not be prohibited).

20. No refinery.

21. No adult bookstore or facility selling or displaying pornographic books, literature, or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human coxuality), massage parlor.

22. No residential use, including but not limited to living quarters, sleeping apartments or lodging rooms.

23. No theater.

24. No auditorium, meeting hall, school or other place of public assembly (except temporary public assemblies having a duration of no more than two (2) weeks, occurring no more often than five (5) times per year).

25. No unemployment agency, service or commission.

26. No gymnasium, health club, exercise or dance studio (this #26 shall not apply to the premises labeled "Dry Cleaners" on Exhibit "B".

27. No dance hall.

28. No cocktail lounge, bar, disco or night club.

29. No bingo or similar games of chance (provided that state sponsored lottery tickets shall not be prohibited).

30. No video game (except as an incidental part of another primary business which use shall be limited to no more than 50 sq.ft.) or amusement arcade.

31. No skating or roller rink.

32. No car wash, car repair or car rental agency.

33. No second hand store, auction house, or flea market.

34. No non-retail use (which shall not prohibit such uses commonly referred to as "quasi-retail" or "service retail" such as a travel agency, real estate office, insurance agency, accounting service, etc.).

Hialeah, Florida                                   EXHIBIT D
Project No. E000002
6061.324/220702.1

1
2
3

4.   The notice date    ie first option is on or before
————————, 20___.

LANDLORD:
PALM SPRINGS MILE ASSO        ANT:
LTD., a Florida limited partner  S FLORIDA DRESS FOR LESS, L.C.,
                                 rida limited liability company

By:   PHILIPS   PALM   SPRING ROSS STORES, INC.,
      INC.                    a Delaware corporation
                              Managing Member

By:
Name: ———————————
Title: ———————————        By: ——————————————————
      ———————————          James Fassio
                          Its:   Sr. Vice President
Witness:
Printed Name: ——————————  ness: ——————————————————
                          ted Name: ——————————————
Witness:
Printed Name: ——————————  ness: ——————————————————
                          ted Name: ——————————————

                          By: ——————————————————
                              Gregg McGillis
                          Its:   Vice President, Real Estate

                          ness: ——————————————————
                          ted Name: ——————————————

                          ness: ——————————————————
                          ted Name: ——————————————

4
5
6
7
8
9
10
11

Hialeah, Florida
Project No. E000002
6061.324/220702.1                      E        6/7/00



# PHILIPS INTERNATIONAL

Steven Weinberger
General Counsel

June 21, 2005

**BY REGULAR MAIL**

Ms. Sandy Chesnut
Real Estate Law Department
4440 Rosewood Drive
Pleasanton, CA 94588-3050

Re:   Ross Store No. 511
      Palm Springs Mile Shopping Center
      Hialeah, Florida

Dear Ms. Chesnut:

In response to your letter dated, June 8, 2005, please be advised that the SNDA was never executed by our lender CIBC Inc.

Very truly yours,

Steven Weinberger
General Counsel



**Property Development**

June 8, 2005

CERTIFIED MAIL –
RETURN RECEIPT REQUESTED

Ms. Diana Marrone
**Palm Springs Mile Associates, Ltd.**
419 West 49th Street, Suite 300
Hialeah, FL  33012

Re:     **Ross Store No. 511**
        **Palm Springs Mile Shopping Center**
        **Hialeah, Florida**
        **SNDA**

Dear Ms. Marrone:

At your request, Ross Stores, Inc. executed four (4) copies of a Subordination, Nondisturbance and Attornment Agreement ("SNDA") for the above referenced store location with CIBC Inc. as lender and were mailed to you under a cover letter dated January 21, 2005. Our cover letter requested that two (2) fully executed copies and a recorded copy of the SNDA be returned to Ross and Ross Stores, Inc. reserved its right to rescind its execution if the documents were not timely received.

According to a review of our files, we have not received the fully executed or recorded document as of this date. Accordingly, Ross' signature on each copy of the SNDA will be deemed rescinded and the documents rendered "void" as of June 28, 2005 unless you contact us before this date.

Please contact me at (925) 965-4833 if you have any questions.

Sincerely,

**ROSS STORES, INC.**

Sandy Chesnut
Real Estate Law Department





**Property Development**

November 15, 2001

**Mr. David Lee Eisenstadt**
**Palm Springs Mile Associates, Ltd.**
**419 W. 49th Street, Ste. 300**
**Hialeah, FL 33012**

Re:    ROSS STORE # 511
       Hialeah, Florida

Dear Mr. Eisenstadt:

Enclosed are four (4) copies of a Subordination, Nondisturbance and Attornment Agreement for the referenced location, executed on behalf of Ross Dress For Less Florida, L.C. ("Ross").

Please return two (2) fully executed copies of the Subordination Agreement to my attention within thirty (30) days of the date of this letter, and a copy of the recorded document once it becomes available. If we do not receive the fully executed documents within this time frame, Ross' signature will be deemed rescinded and the documents void.

Sincerely,
**ROSS STORES, INC.**

Tameca Carr
Real Estate Department

Enclosures

cc:    Kim Goto, Esq.
       Property Management (w/ encl.)
       Kwame Thompson, BZTM (w/ encl.)

Real Estate • Property Management • Construction • Store Design • Facilities
**ROSS STORES, INC.** • 8333 Central Ave., Newark, California 94560-3433 • (510) 505-4400 Phone • (510) 505-4174 Fax

| | |
|---|---|
| RECORDING REQUESTED BY<br><br>Ross Stores, Inc.<br><br>AND WHEN RECORDED MAIL TO:<br><br>Ross Stores, Inc.<br>8333 Central Avenue<br>Newark, CA  94560<br>Attn.: Kimberly Goto, Esq.<br>    Real Estate Department | |

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

## LOCATION: HIALEAH, FLORIDA

1
2          This Subordination, Nondisturbance and Attornment Agreement (the "Agreement") is
3  effective as of this 15th day of November , 2001, by and between UNION PLANTERS, N.A., a national
4  banking association (the "Lender"), ROSS FLORIDA DRESS FOR LESS, L.C., a Florida limited
5  liability company (the "Tenant") and PALM SPRINGS MILE ASSOCIATES, a Florida limited
6  partnership (the "Landlord").

7                                        **RECITALS**

8          A.     Lender is or will be the holder of indebtedness secured by a lien or liens upon, the real
9  property described in Exhibit "A" attached hereto and by this reference incorporated herein.  The Exhibit
10 "A" property and improvements thereon is hereinafter referred to as the "Shopping Center."  The
11 instruments creating such lien or liens whether they be denominated as being "mortgage," "deed of
12 trust," "deed to secure debt," "security agreement," "vendor's lien," or otherwise, and any instruments
13 modifying or amending the same, or entered into in substitution or replacement thereof, are hereinafter
14 collectively referred to as being the "Mortgage."

15         B.     Tenant has executed, or will execute, a certain lease with Landlord, dated for reference
16 purposes on July 27, 2000, for all or a portion of the Shopping Center, which portion (the "Premises") is
17 more particularly set forth in said lease.  Said lease and all amendments and modifications thereto are
18 herein collectively referred to as the "Lease."

19         C.     Tenant has requested that Lender agree not to disturb Tenant's possessory rights under the
20 Lease in the event that Lender should foreclose on the Mortgage, provided that Tenant is not in default
21 of the Lease.

22         D.     The parties desire to establish certain rights and obligations with respect to their
23 respective interests by means of this Agreement.

Store No. 511                                          ·Page 1                                          11/13/01
Hialeah, FL

1                        **AGREEMENTS**

2                NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein
3    contained, and intending to be legally bound by hereby agree as follows:

4           1.     Subject to the terms and conditions of this Agreement, and for so long as this Agreement
5    remains binding upon Lender, the Lease shall be, in accordance with the terms and conditions hereof,
6    subordinate to the lien of the Mortgage and all voluntary and involuntary advances made thereunder.

7
8           2.     Lender approves of the Lease.

9
10         3.     Provided that Tenant is not in default so as to permit the Landlord to terminate the Lease
11  or Tenant's right to possession of the Premises, Lender or the purchaser at a foreclosure sale pursuant to
12  any action or proceeding to foreclose the Mortgage, whether judicial or non-judicial, or Lender pursuant
13  to acceptance of a deed in lieu of foreclosure or any assignment of Landlord's interest under the Lease,
14  in the exercise of any of the rights arising, or which may arise, out of the Mortgage or in any other
15  manner:  (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its
16  right to use, quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit
17  or privilege granted to or inuring to the benefit of Tenant under the Lease (including any right of renewal
18  or extension thereof); (ii) shall not terminate or affect the Lease;  (iii) shall recognize Tenant's rights,
19  benefits and privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all
20  of the terms, covenants, and conditions of the Lease for the remaining balance of the term of the Lease
21  with the same force and effect as if Lender  were the Landlord under the Lease.  Lender hereby
22  covenants that any sale by it of the Shopping Center pursuant to the exercise of any rights and remedies
23  under the Mortgage or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder.
24  However, in no event shall Lender be:

25         (a)    Liable for any act or omission of Landlord arising prior to the date Lender takes
26  possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the
27  extent such act or omission is of a continuing nature, such as, for example, a repair obligation;

28         (b)    Liable for any offsets or deficiencies which the Tenant might be entitled to assert
29  against the Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease
30  or becomes a mortgagee in possession, except to the extent that Lender has received the benefit of the
31  act of the Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that
32  would otherwise have been paid by Lender as Landlord;

33         (c)    Bound by any payment of rent or additional rent made by Tenant to Landlord for
34  more than one month in advance, which payment was not required under the terms of the Lease;

35         (d)    Bound by any amendment or modification of the Lease executed after the date of
36  this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the
37  Lease; and, (ii) is made without Lender's prior written consent (except to the extent that the Lease may
38  specifically contemplate any amendment or modification thereof).

39

4.     In the event of the termination of the Mortgage by foreclosure, summary proceedings or otherwise, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the Landlord thereunder to terminate the Lease, then, and in any such event, Tenant shall not be made a party in the action or proceeding to terminate the Mortgage unless not to do so would be disadvantageous procedurally to Lender, in which case, such joinder of Tenant as a party shall not extinguish or interfere with any rights of Tenant under the Lease, nor shall Tenant be evicted or moved or its possession or right to possession under the terms of the Lease be disturbed or in any way interfered with, and, subject to the provisions of this Agreement, Tenant will attorn to Lender or any other party which obtains title to the Shopping Center pursuant to any remedy provided for by the Mortgage or otherwise, such attornment to be effective and self-operative without the execution of any other instruments on the part of any party, and the Lease shall continue in full force and effect as a direct Lease from Lender or such party to Tenant under all the terms and provisions of the Lease (including any rights to renew or extend the term thereof). In the event of such attornment, Lender shall be deemed to have assumed and shall assume the performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the time Lender becomes Landlord and until such time as such obligations are assumed by a bona fide purchaser.

5.     Tenant hereby confirms that the Lease is in full force and effect.

6.     Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of the Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

7.     Unless and until Lender or any subsequent purchaser succeeds to the interest of Landlord under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease.

8.     If Landlord executes and delivers to Lender an Assignment of Leases and Rents conveying the rent under the Lease upon an event of default by Landlord under the Mortgage, after receipt of notice from Lender to Tenant (at the address set forth below) that rents under the Lease should be paid to Lender, Tenant shall thereafter pay to Lender all monies thereafter due to Landlord under the Lease. In such event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Lender hereby indemnify and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice. Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with the provisions hereof. Any dispute between Lender (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Mortgage, shall be dealt with and adjusted solely between Lender (or any other purchaser) and Landlord, and Tenant shall not be made a party thereto.

Store No. 511
Hialeah, FL                                    Page 3                                  11/13/01

9.     Lender shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

10.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against which the same is brought to be asserted.

11.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, including without limitation, the covenants of Lender herein shall be specifically binding upon any purchaser of the Shopping Center at foreclosure or at a sale under power of sale.

12.     In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of no further force or effect.

13.     This Agreement shall be governed and construed according to the laws of the state where the Shopping Center is located.

14.     Lender shall not institute any litigation naming Tenant as a defendant for the purpose of foreclosing or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises unless Tenant is required to be named in such litigation by law, and then only for the purpose of complying with the applicable foreclosure statute and so long as Tenant's failure to defend against any such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in this Agreement.  The term "Lender" as used herein shall include any successor-in-interest to the Lender (including a purchaser at foreclosure or sale in lieu thereof).

15.     To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postage paid by United States registered or certified mail with return receipt requested.  Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication.  For purposes hereof, Lender's address is:

> Union Planters Bank, N.A.
> 2800 Ponce de Leon Blvd., 10th Floor
> Coral Gables, FL  33134
> Attn.: Commercial Real Estate Department



11/13/01

and Tenant's address is:

        Ross Florida Dress For Less, L.C.
        c/o Ross Stores, Inc.
        8333 Central Avenue
        Newark, CA  94560
        Attn.:  Real Estate Legal Notice Department

and Landlord's address is:

        Palm Springs Mile Associates, Ltd.
        419 W. 49th Street, Suite 300
        Hialeah, FL  33012
        Attn.:_____

        At any time(s), each party may change its address for the purposes hereof by giving the other party a change of address notice in the manner stated above.

    16.    This Agreement (a) contains the entire understanding of Lender and Tenant regarding matters dealt with herein (any prior written or oral agreements between them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part only by a written instrument signed on behalf of the party against whom enforcement of the modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and their respective successors and assigns.

    17.    In the event of any litigation arising out of the enforcement or interpretation of any of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its reasonable attorneys' fees, including costs of suit, discovery and appeal.  The "prevailing party" shall be that party who obtains substantially the relief sought in the action.

    18.    In the event the Lease is terminated as a result of Landlord's bankruptcy or reorganization, whereby Lender obtains fee title to the Shopping Center (or in the case Lender is the ground lessor, retains fee title without the encumbrance of the ground lease), Lender agrees that the Lease shall remain in effect as between Lender (as Landlord) and Tenant, subject to the terms of this Agreement, and, upon Tenant's written request, Lender and Tenant agree to execute a reinstatement



1  agreement documenting that the Lease has been reinstated as between Lender (as Landlord) and Tenant
2  and that the terms and conditions thereof shall be as stated in the Lease, subject to the provisions of this
3  Agreement.

4          IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of
5  the day and year first written above.

**TENANT:**
**ROSS DRESS FOR LESS FLORIDA, L.C,**
**a Florida limited liability company**

By:  ROSS STORES, INC.,
     a Delaware corporation
Its: Managing Member

By: _____
    James Fassio
Its:  Sr. Vice President

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

By: _____
    Gregg McGillis
Its:  Vice President, Real Estate

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

**LENDER:**
**UNION PLANTERS BANK, N.A.,**
**a national banking association**

By: _____
Its: _____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____



By: _____
Its: _____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

Store No. 511
Hialeah, FL

Page 6

11/13/01

**LANDLORD:**
**PALM SPRINGS MILE ASSOCIATES,**
**LTD., a Florida limited partnership**

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

By: _____
Its: _____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

By: _____
Its: _____

1

2

1

State of California                        )
                                            ) ss.

County of Alameda                   )

2

3                 On _November 15 20_ before me, _Tameca H Carr_____,

4  a Notary Public, personally appeared James Fassio and Gregg McGillis, personally known to me or

5  (proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed

6  to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their

7  authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the

8  entity upon behalf of which the person(s) acted, executed the instrument.

9                 WITNESS my hand and official seal.

10

11

```
TAMECA Y. CARR
Commission # 1191567
Notary Public - California
San Mateo County
My Comm. Expires Jul 30, 2002
```

_Tameca H Carr_____
Notary Public

12

13

State of _____ )
                                            ) ss.
County of _____ )

14

15              On _____ before me, _____, a Notary

16  Public, personally appeared _____,

17  personally known to me or (proved to me on the basis of satisfactory evidence) to be the person(s) whose

18  name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the

19  same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the

20  person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

21                 WITNESS my hand and official seal.

22

_____
Notary Public

23

Store No. 511                                  Page 8                                         11/13/01
Hialeah, FL

1

State of _____ )
                                           )   ss.
County of _____ )

2

3

4        On _____ before me, _____, a Notary
5   Public, personally appeared _____,
6   personally known to me or (proved to me on the basis of satisfactory evidence) to be the person(s) whose
7   name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
8   same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
9   person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

10       WITNESS my hand and official seal.

11

                        _____
                        Notary Public
12
13

OFF.
REC: 19338PG2450

## EXHIBIT A
## LEGAL DESCRIPTION OF THE SHOPPING CENTER

**Component 2**

A portion of "FLORIDA FRUIT LAND CO'S SUBDIVISION" of Section 1, Township 53 South, Range 40 East, as recorded in Plat Book 2 at Page 17, of the Public Records of Dade County, Florida, being more particularly described as follows:

Commence at the Point of Intersection of the Northerly Right-of-Way Line of West 49th Street (N.W. 103rd Street) with the Westerly Right-of-Way Line of West 4th Avenue (Red Road) as shown on that certain Right-of-Way Map, as recorded in Plat Book 65 at Page 70 of the Public Records of Dade County, Florida; thence North 0 degrees 55'11" East, for 175.00 feet to the Point of Beginning of the following described parcel; thence North 87 degrees 43'14" West, for 175.00 feet; thence South 0 degrees 55'11" West, along a line West of and parallel with the West Right-of-Way Line of the aforesaid West 4th Avenue (Red Road), for 175.00 feet; thence North 87 degrees 43'14" West, along the Northerly Right-of-Way Line of West 49th Street (N.W. 103rd Street) as per State Road Department Right-of-Way Map as recorded in Plat Book 60 at Page 53 of the Public Records of Dade County, Florida, for 987.60 feet to a Point of Curvature; thence Northwesterly and Northerly, along a circular curve to the right, having a radius of 25.00 feet and a central angle of 88 degrees 39'30" for an arc distance of 38.68 feet to a Point of Tangency; thence North 0 degrees 56'16" East, along the Easterly Right-of-Way Line of West 6th Avenue, as shown on the plat of "FIFTH ADDITION TO PALM SPRINGS SUBDIVISION SECTION THREE", as recorded in Plat Book 65 at Page 33 of the Public Records of Dade County, Florida, for 722.45 feet to a Point of Curvature; thence Northeasterly and Easterly, along a circular curve at the right, having a radius of 25.0 feet and a central angle of 91 degrees 20'30" for an arc distance of 39.86 feet to a Point of Tangency; thence South 87 degrees 43'14" East for 603.63 feet to a Point of Curvature; thence Easterly and Northeasterly, along a circular curve to the left, having a radius of 651.09 feet an a central angle of 48 degrees 21'34" for an arc distance of 549.54 feet to a Point of Reverse Curvature; thence Northeasterly, along a circular curve to the right, having a radius of 141.09 feet and a central angle of 37 degrees 12'11" for an arc distance of 91.61 feet to a Point on a Curve, said point bears North 85 degrees 12'32" West, from the radius point of the next described curve (last mentioned three courses being coincident with the Southerly Right-of-Way Line of West 51st Place, as shown on said plat of "FIFTH ADDITION TO PALM SPRINGS SUBDIVISION SECTION THREE"); thence Southerly, along a circular curve to the left, having a radius of 5873.65 feet and a central angle of 3 degrees 52'17" for an arc distance of 396.87 feet to a Point of Tangency; thence South 0 degrees 55'11" West, for 463.80 feet to the Point of Beginning (last mentioned two courses being coincident with the Westerly Right-of-Way Line of the aforesaid West 4th Avenue, (Red Road) lying and being in Hialeah, Dade County, Florida.

TOGETHER WITH all rights under the reservation of easements as set forth in instrument recorded in Official Records Book 15881, Page 3796. (AS TO COMPONENTS 1 AND 2)

Tax Folio No. 04.3001.001.0010

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA.
RECORD VERIFIED
HARVEY RUVIN
CLERK CIRCUIT COURT



Hialeah, Florida                                EXHIBIT A
Project No. E000002
6061.324/223952.1

Sender's Account No. **131582682**

Reprint Control No. **81105717**

Airbill Number **1555017342**

**FROM (Company)**

PALM SPRINGS MILE

Street Address ASSOC STE 300

419 W 49TH ST

City HIALEAH   State FL   ZIP CODE (Required) 33012

Sent by (Name/Dept)

David Eisenstadt (305) 821-7111   Phone

**Payment**
unless marked otherwise

Bill to:
☐ Receiver   ☐ 3rd Party

Account # (Required if 3rd Party)   **MMR**

☐ Paid in Advance   Check No.   Amount

Billing Reference (will appear on invoice)

**5 Service Type**
One box must be checked. Assumed Express unless noted.

☐ **Express** (Letter - 150 lbs)

☒ **Next Afternoon** (Letter - 5 lbs)

Next Afternoon over 5 lbs. charged at the Express rate. Next Afternoon to Bold Red destinations only.

☐ **Second Day** (Letter - 135 lbs)

**2 TO (Company)**

ROSS FLORIDA DRESS FOR LESS/ ROSS STORES

Street Address

8333 CENTRAL AVENUE

City NEWARK,   State CALIFORNIA   ZIP CODE (Required) 94560

Attention: (Name/Dept)   Phone (Important)

Legal Dept

Description Estoppel Certificate KNDA
302-320

**6 # of Pcs** 1   **7 Weight (lbs)** 8 OZ   **8 Packaging** One box must be checked
☒ Letter Express   ☐ Express Pack   ☐ Other Packaging

**Special Instructions**
☐ Saturday Delivery Extra charge Express only Not available to all locations
☐ Hold at Airborne
☐ Lab Pack Service

Declared Value ☐ or Full Insurance ☐ $ _____ Shipment Valuation .00

Airborne Signature

Date   Time   Route No.

Received At

☐ Drop Box #   ☐ Airborne Terminal

**DOCUMENTS**

**3 Sender's Signature**   Date 10/18/01

www.airborne.com

SENDER'S COPY

**AIRBORNE EXPRESS.**

PO BOX 662, SEATTLE, WA 98111-0662

1-800-247-2676

Estoppel
SNDA

FILE COPY

**FILE COPY**

**1** Sender Account Number
131582682
Print Format No.
81804717

FROM (Company)
PALM SPRINGS MILE
Street Address
ASSOC STE 300
417 W 49TH ST
City                    State
HIALEAH        FL    33012
Sent by (Name/Dept)        Phone
David Eisenstadt (305) 821-7111

**2** TO (Company)
ROSS FLORIDA DRESS FOR LESS/ ROSS STORES
Street Address
8333 CENTRAL AVENUE
City                    State
NEWARK,    CALIFORNIA
ZIP CODE (Required)
94560
Attention: (Name/Dept)        Phone (important)
Legal Dept -
Description
Estoppel Certificate & Nda
308-320

DOCUMENTS

**3** Sender's Signature        Date
Hilda Lonedia    10/18/01

**4** Payment
Sender will be billed unless marked otherwise
Bill to:
Receiver  3rd Party
Paid in Advance    Check No.    Amount
Billing Reference (will appear on invoice)

Origin
MMR
Account # (Required if 3rd Party)

Airbill Number
9555117342

**5** Service Type
Express (Letter - 150 lbs)
Next Afternoon (Letter - 5 lbs) [X]
Second Day (Letter - 150 lbs)

**6** # of Pkgs
1
**7** Weight (LBS)
8 OZ
**8** Packaging
Letter Express [X]  Express Pack  Other Packaging

Special Instructions
Saturday Delivery    Hold at Airborne
Lab Pack Service

Declared Value  or  Full Insurance  $    .00

Airborne Signature
Date    Time    Route No.
Received At
Drop Box #    Airborne Terminal

**AIRBORNE EXPRESS**
PO BOX 662 SEATTLE WA 98111-0662
1-800-247-2676

www.airborne.com

SENDER'S COPY

## TENANT ESTOPPEL CERTIFICATE

Dated: November 12, 2001

RE:   **ROSS STORE # 511**
      **PALM SPRINGS MILE SHOPPING CENTER**
      **HIALEAH, FLORIDA**

TO WHOM IT MAY CONCERN, please be advised as follows:

**1.    LEASE:**

1.1.1   **ROSS FLORIDA DRESS FOR LESS, L.C.,** a Florida limited liability company ("Tenant"), is the current Tenant under that certain lease dated **July 27, 2000,** between **ROSS FLORIDA DRESS FOR LESS, L.C.,** as Tenant and **PALM SPRINGS MILE ASSOCIATES, LTD.,** as Landlord. **PALM SPRINGS MILE ASSOCIATES, LTD.,** a Florida limited partnership, ("Landlord") is the current Landlord under said lease.

Capitalized terms used in this Tenant Estoppel Certificate without definition shall have the meanings ascribed to such terms in said lease.

1.2.   The aforementioned lease has not been amended, modified or supplemented, except by any approved plans, specifications and construction documents, and

> **by: Subordination, Nondisturbance and Attornment Agreement, dated August 25, 2000.**
> **by: Acknowledgement of Commencement, dated August 24, 2001.**

Said lease, as amended, modified and/or supplemented, is hereinafter referred to as the "Lease."

**2.    FULL FORCE AND EFFECT:**

The Lease is in full force and effect and represents the entire agreement between Landlord and Tenant as to the Store referenced above and described with particularity in the Lease.

**3.    COMMENCEMENT AND EXPIRATION DATES:**  (check one)

( x )   The current Term of the Lease shall expire on **January 31, 2012,** unless otherwise extended or terminated.  Tenant is in possession of the Store.

(   )   The Commencement Date of the Initial Term of the Lease shall be _____ (    ) days after the Delivery Date as defined in the Lease.  The expiration date of the Initial Term of the Lease, unless sooner terminated, shall be the January 31 next following one hundred twenty (120) months from the Commencement Date.

**4.    OPTIONS:**

There are **four ( 4 )** remaining options to extend the current term of the Lease for **five ( 5 )** years each.

**5.    SECURITY DEPOSIT:**

Landlord holds no security deposit.

**6.    MINIMUM RENT:**  (check one)

6.      **MINIMUM RENT:** (check one)

( x )   The current Minimum Rent payable under the Lease is **$25,780** per month.  Monthly Minimum Rent has been paid through **November 30, 2001.**   No prepayment of any Minimum Rent for more than one (1) month has been made.

(  )   Beginning on the Commencement Date, the monthly Minimum Rent shall be $_____, based on the Leasable Floor Area of the Store being as stated in the Lease.  Minimum Rent may be subject to adjustment based on the size of the Store and/or other provisions of the Lease.

Notwithstanding potential rights or remedies in favor of Tenant for a Landlord default, or for the occurrence of certain conditions, there are not currently, nor will there be, any periods of free or reduced rent remaining under the Term of the Lease, as of the date of this Tenant Estoppel Certificate, except as follows:  **See Section 9 herein.**

7.      **OFFSET RIGHTS:**

Tenant has no current exercisable rights to offset, reduce or avoid the payment of Rent or other charges (hereinafter "Rights of Offset"): except as follows:  **See Section 9 herein.**

In the future, Tenant may exercise its Rights of Offset pursuant to the terms of the Lease.

If it is discovered by or disclosed to Tenant after the date hereof that there existed on the date hereof any default, claim, or defense, or by reason thereof, Rights of Offset, not actually known to Tenant on the date hereof, such default, claim, defense or Rights of Offset shall not be affected, waived or released by the issuance of this Tenant Estoppel Certificate, and Tenant shall not be estopped from asserting the same.

8.      **TENANT IMPROVEMENT ALLOWANCE AND CONSTRUCTION:**

8.1     Construction:  (check one)

(  )   Landlord has not yet completed its construction obligations as described in the Lease.

(  )   Landlord has completed its construction obligations described in the Lease, except for punchlist matters.

( x )   Landlord has completed its construction obligations as described in the Lease and Tenant has accepted delivery of the Store.

8.2     The remaining amount of any unpaid planning, construction or improvements allowance, reimbursement obligation or credit due Tenant from Landlord is $-0-.

9.      **DEFAULT:**

9.1     Tenant has no actual knowledge of (a) any default of Landlord under the Lease or (b) any condition which, with the passage of time or the giving of notice or both, will become a default of Landlord under the Lease, except as follows:  **Roof leaks in the front of store as reported by store manager.**

9.2     Tenant is not in default of the Lease beyond any applicable cure period.

10.    **RIGHT TO PURCHASE:**

Except as set forth in the Lease, Tenant has no option or right of first refusal to purchase the Store or any portion of the Shopping Center, complex or property on which the Store is located.

11.    **BANKRUPTCY:**

To Tenant's actual knowledge, there are no pending actions against Tenant, voluntary or otherwise, under the bankruptcy laws of the United States or any state thereof.

12.    **ASSIGNMENT OR SUBLEASE:**

Other than a corporate transfer to a parent, affiliate or subsidiary of Tenant, Tenant has not assigned or sublet the Store, except as follows:  **None.**

13.    **MISCELLANEOUS:**

Notwithstanding the certifications herein, in no event shall this Tenant Estoppel Certificate subject Tenant to any liability whatsoever, despite the negligent or otherwise inadvertent failure of Tenant to disclose correct or relevant information; provided that, as between Tenant and any third-party recipient for whose benefit this certificate is issued, Tenant shall be estopped from denying the accuracy of this Tenant Estoppel Certificate. In no event shall this Tenant Estoppel Certificate amend or modify the Lease, and Tenant shall not be estopped from denying the accuracy of this Tenant Estoppel Certificate as between Tenant and Landlord, Landlord's affiliates or lenders.

**TENANT:**
**ROSS FLORIDA DRESS FOR LESS, L.C.,**
**a Florida limited liability company**

By:   ROSS STORES, INC.,
       a Delaware corporation
Its:   Managing Member

By:   _____
       Gregg McGillis
Its:   Vice President, Real Estate



**Property Development**

November 12, 2001

**David Lee Eisenstadt**                                                  **Via Airborne Express**
**Palm Springs Mile Associates, Ltd.**
419 W. 49th Street
Suite 300
**Hialeah, FL 33012**

Re:     **ROSS STORE # 511**
          **Hialeah, Florida**

Dear Mr. Eisenstadt:

Enclosed at your request is a Tenant Estoppel Certificate for the referenced location, executed on behalf of Ross Stores, Inc.

Please contact me at (510) 505-4869 if you have any questions.

Sincerely,
ROSS STORES, INC.

Tameca Carr
Real Estate Department

Enclosures

cc:     Kim Goto, Esq.
          Kwame Thompson, BZTM (w/enclosure)
          Property Management Dept. (w/enclosure)

RECORDING REQUESTED BY
Ross Stores, Inc.

AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Tarrant & Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Attn: Martin I. Zankel, Esq.

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## MEMORANDUM OF LEASE

1.   This Memorandum of Lease is effective upon recordation and is entered into by and between PALM SPRINGS MILE ASSOCIATES, LTD., a Florida limited partnership ("Landlord") having its principal place of business at 419 West 49th Street, Suite 300, Hialeah, Florida 33012 and ROSS FLORIDA DRESS FOR LESS, L.C., a Florida limited liability company ("Tenant") having its principal place of business at c/o Ross Stores, Inc., 8333 Central Avenue, Newark, CA 94560, who agree as follows:

2.   By written lease (the "Lease"), Landlord leases to Tenant and Tenant hires from Landlord a portion of the real property located in the City of Hialeah, County of Dade, State of Florida, described in Exhibit A hereto, for a term of approximately ten (10) years which term is subject to extension by Tenant for four (4) additional periods of five (5) years each. The Exhibit A lands are sometimes herein referred to as the "Shopping Center."

3.   Landlord has granted Tenant and its authorized representatives and invitees the nonexclusive right to use the Shopping Center common area with others who are entitled to use those areas subject to Landlord's rights as set forth in the Lease.

4.   The provisions of the Lease are incorporated into this Memorandum of Lease by reference. The Lease contains the following section(s):

"3.2.1. Retail Use. Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center is and shall remain retail in character, and, further, that portion of the Shopping Center marked on the Site Plan as the "Restricted Area" shall not be used for office (except (i) the space adjacent to the Store marked on the Site Plan as the "Three Story CBS" space containing approximately thirty thousand (30,000) square feet of Leasable Floor Area (referred to as the "Adjacent Office Building"), (ii) the health clinic adjacent to Picadilly Cafeteria not to exceed six thousand (6,000) square feet of Leasable Floor Area, and (iii) any office use in the Free Area as that term is defined in Section 3.6.2 below), or residential purposes, or as a theater, auditorium, meeting hall, school (except if not open to the public and connected to a retail use), church or other

Hialeah, Florida
Project No. E000002
6061.324/220710.1

- 1 -

6/7/00

1    place of public assembly, "flea market," gymnasium, health club, dance hall, billiard
2    or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car
3    wash, facility for the sale, display, leasing or repair of motor vehicles, night club or
4    adult book or adult audio/video products (which are defined as stores in which at
5    least ten percent (10%) of the inventory is not available for sale or rental to children
6    under fifteen (15) years old because such inventory explicitly deals with or depicts
7    human sexuality).  No restaurant shall be permitted in the Restricted Area of the
8    Shopping Center shown on the Site Plan within three hundred (300) feet of the
9    front wall of the Store, excepting (i) Piccadilly Cafeteria or other restaurant
10    operators in the Piccadilly Cafeteria space depicted on the Site Plan, (ii) the
11    "Expansion Space" fronting on West 4th Avenue as depicted on the Site Plan, and
12    (iii) the spaces occupied by Papa John's pizza and Winn-Dixie Supermarkets shown
13    on the Site Plan."

14    "12.1.3.  All Tenant alterations shall be subject to the following:

15    ...............(c)  <u>Mechanic's Lien</u>.  The cost of Tenant's alterations shall be paid
16    by Tenant in cash or its equivalent, so that the Store and the Shopping Center shall
17    at all times be free of liens for labor and materials supplied in connection with
18    Tenant's alterations.  If at any time the Store or the Shopping Center shall be
19    encumbered by any mechanics' or other liens, charges or claims for the payment of
20    money or otherwise, or any violations or other encumbrances of any and all kinds,
21    nature and description, growing out of or in connection with Tenant's alterations
22    or any other matter pertaining to Tenant, then Tenant shall, within twenty (20)
23    days after receipt of notice of same or request by Landlord, prove to the satisfaction
24    of Landlord that every such claim and charge has been fully paid, provided for, and
25    discharged or bonded.  Without limiting Tenant's liability for failure to comply
26    with this paragraph, if Landlord bonds or discharges any mechanic's or other lien
27    upon Tenant's failure to do so, then, in addition to the cost of such bonding or
28    discharging and all other costs and disbursements which Tenant would owe to
29    Landlord in respect of same hereunder, Tenant shall also pay to Landlord the
30    greater of One Thousand Dollars ($1,000) or Landlord's actual legal fees incurred in
31    connection therewith.  Nothing contained in this Lease shall be construed as a
32    consent on the part of Landlord to subject the estate of Landlord to liability under
33    the Construction Lien Law of the State of Florida as set forth in Chapter 713,
34    Florida Statutes, it being expressly understood that Landlord's estate shall not be
35    subject to such liability.  Tenant agrees to include in the Memorandum of Lease
36    described in Section 26.16 below the verbatim language of this Section 12.1.3(c)."

37    "15.3.  Protection.  Except with respect to tenant leases specified in
38    Schedule H, Landlord shall not enter into a lease for space in the Shopping Center,
39    or permit the assignment or sublease of any lease for space in the Shopping Center
40    (to the extent Landlord may withhold its consent thereto) whereby such tenant or
41    occupant uses or intends to use fifteen thousand (15,000) square feet or more of its
42    premises for an Off-Price Use," as defined in the Lease, and subject to the
exclusions set forth in the Lease.

5.     The provisions of the Lease to be performed by Landlord whether to be performed at the Tenant's store, or any other portion of the Shopping Center, whether affirmative or negative in nature, are intended to and shall bind the Landlord, its successors and assigns at any time and shall inure to the benefit of Tenant, its successors and assigns.

6.     This Memorandum of Lease is prepared for the purpose of constructive notice and in no way modifies the provisions of the Lease.

Contents of Memorandum of Lease:

Paragraphs 1-6
Exhibit A - Shopping Center Legal Description
Exhibit B - Site Plan

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Memorandum of Lease on this 9th day of June , 2000.

LANDLORD:
PALM SPRINGS MILE ASSOCIATES,
LTD., a Florida limited partnership

TENANT:
ROSS FLORIDA DRESS FOR LESS, L.C.,
a Florida limited liability company

By:  PHILIPS PALM SPRINGS SUB-VIII, INC.

By: _____
Name:  Sheila Levine
Title:  V.P.

Witness:  Diana Marone
Printed Name:  Diana Marone

Witness:  Randy Sunkin
Printed Name:  Randy Sunkin

By:  ROSS STORES, INC.,
     a Delaware corporation
Its:  Managing Member

By: _____
Its:  James Fassio
Its:  Sr. Vice President

Witness:  Heidi Carlson
Printed Name:  Heidi Carlson

Witness:  Richard Lietz
Printed Name:  RICHARD LIETZ

By: _____
Gregg McGillis
Its:  Vice President, Real Estate

Witness:  Heidi Carlson
Printed Name:  Heidi Carlson

Witness:  Richard Lietz
Printed Name:  RICHARD LIETZ

1   State of California                              )
2                                                    ) ss.
3   County of Alameda                                )
4
5       On June 9, 2000 ____ before me, Shannon Brown ____,
6   a Notary Public, personally appeared James Fassio and Gregg McGillis, personally known to
7   me or proved to me, on the basis of satisfactory evidence, to be the person(s) whose name(s)
8   is/are subscribed to the within instrument and acknowledged to me that he/she/they executed
9   the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
10  the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
11  the instrument.
12
13  WITNESS my hand and official seal.
14
15
16          SHANNON BROWN
17          Commission # 1213316
            Notary Public - California
            Alameda County                   _____
18          My Comm. Expires Mar 15, 2003     Notary Public
19
20
21  State of ___New York___                          )
22                                                    ) ss.
23  County of ___New York___                         )
24
25      On ___July 25 2000___ before me, ___Leonard Gold___, a Notary
26  Public, personally appeared ___Sheila Levine___,
27  personally known to me or proved to me, on the basis of satisfactory evidence, to be the
28  person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
29  that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
30  his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which
31  the person(s) acted, executed the instrument.
32
33  WITNESS my hand and official seal.
34
35
36          _____
37          Notary Public
38
39                          LEONARD S. GOLD
                            Notary Public, State of New York
                            No. 02GO5002284
                            Qualified in New York County
                            Commission Expires September 28, 2000

Hialeah, Florida                        - 4 -                              6/7/00
Project No. E000002
6061.324/220710.1

# EXHIBIT A
## LEGAL DESCRIPTION OF THE SHOPPING CENTER

<u>Component 2</u>

A portion of "FLORIDA FRUIT LAND CO'S SUBDIVISION" of Section 1, Township 53 South, Range 40 East, as recorded in Plat Book 2 at Page 17, of the Public Records of Dade County, Florida, being more particularly described as follows:

Commence at the Point of Intersection of the Northerly Right-of-Way Line of West 49th Street (N.W. 103rd Street) with the Westerly Right-of-Way Line of West 4th Avenue (Red Road) as shown on that certain Right-of-Way Map, as recorded in Plat Book 65 at Page 70 of the Public Records of Dade County, Florida; thence North 0 degrees 55'11" East, for 175.00 feet to the Point of Beginning of the following described parcel; thence North 87 degrees 43'14" West, for 175.00 feet; thence South 0 degrees 55'11" West, along a line West of and parallel with the West Right-of-Way Line of the aforesaid West 4th Avenue (Red Road), for 175.00 feet; thence North 87 degrees 43'14" West, along the Northerly Right-of-Way Line of West 49th Street (N.W. 103rd Street) as per State Road Department Right-of-Way Map as recorded in Plat Book 60 at Page 53 of the Public Records of Dade County, Florida, for 987.60 feet to a Point of Curvature; thence Northwesterly and Northerly, along a circular curve to the right, having a radius of 25.00 feet and a central angle of 88 degrees 39'30" for an arc distance of 38.68 feet to a Point of Tangency; thence North 0 degrees 56'16" East, along the Easterly Right-of-Way Line of West 6th Avenue, as shown on the plat of "FIFTH ADDITION TO PALM SPRINGS SUBDIVISION SECTION THREE", as recorded in Plat Book 65 at Page 33 of the Public Records of Dade County, Florida, for 722.45 feet to a Point of Curvature; thence Northeasterly and Easterly, along a circular curve at the right, having a radius of 25.0 feet and a central angle of 91 degrees 20'30" for an arc distance of 39.86 feet to a Point of Tangency; thence South 87 degrees 43'14" East for 603.63 feet to a Point of Curvature; thence Easterly and Northeasterly, along a circular curve to the left, having a radius of 651.09 feet an a central angle of 48 degrees 21'34" for an arc distance of 549.54 feet to a Point of Reverse Curvature; thence Northeasterly, along a circular curve to the right, having a radius of 141.09 feet and a central angle of 37 degrees 12'11" for an arc distance of 91.61 feet to a Point on a Curve, said point bears North 85 degrees 12'32" West, from the radius point of the next described curve (last mentioned three courses being coincident with the Southerly Right-of-Way Line of West 51ˢᵗ Place, as shown on said plat of "FIFTH ADDITION TO PALM SPRINGS SUBDIVISION SECTION THREE"); thence Southerly, along a circular curve to the left, having a radius of 5873.65 feet and a central angle of 3 degrees 52'17" for an arc distance of 396.87 feet to a Point of Tangency; thence South 0 degrees 55'11" West, for 463.80 feet to the Point of Beginning (last mentioned two courses being coincident with the Westerly Right-of-Way Line of the aforesaid West 4th Avenue, (Red Road) lying and being in Hialeah, Dade County, Florida.

TOGETHER WITH all rights under the reservation of easements as set forth in instrument recorded in Official Records Book 15881, Page 3796. (AS TO COMPONENTS 1 AND 2)

Hialeah, Florida
Project No. E000002
6061.324/223952.1

EXHIBIT A





