# EXHIBIT

## "3"

LEASE

ROSS DRESS FOR LESS, INC.
PALM SPRINGS PLAZA
PALM SPRINGS, FLORIDA

---

## TABLE OF CONTENTS

1. **SALIENT LEASE TERMS** ................................................................. 1
    1.1. Effective Date. ........................................................................ 1
    1.2. Parties/Addresses. .................................................................. 1
    1.3. Location Information. .............................................................. 2
    1.4. Critical Dates. ........................................................................ 3
    1.5. Lease Term. ............................................................................ 4
    1.6. Minimum Rent. ...................................................................... 4
    1.7. Required Co-Tenancy. ............................................................ 4
    1.8. Common Area Charge Administrative Fee. ............................ 5
    1.9. Title Report. .......................................................................... 5
    1.10. Contents of Lease. ................................................................ 5

2. **DEFINITIONS OF GENERAL APPLICATION** ................................... 6

3. **GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS** ........ 14
    3.1. Lease. .................................................................................... 14
    3.2. Nature of the Shopping Center. ............................................ 14
    3.3. Grant of Common Area Use. ................................................ 16
    3.4. Grant of Utility Licenses. ...................................................... 16
    3.5. Utility Rooms. ...................................................................... 17
    3.6. Site Plan or Shopping Center Alterations. ............................ 17
    3.7. Dimensions. .......................................................................... 18

4. **LEASE TERM** ..................................................................................... 19
    4.1. Term. .................................................................................... 19
    4.2. Commencement Date. ............................................................ 19
    4.3. Acknowledgment of Commencement. .................................... 19
    4.4. Option Periods. .................................................................... 19

5. **CONSTRUCTION AND ACCEPTANCE** .............................................. 19
    5.1. Landlord's Construction Obligations. .................................... 19
    5.2. Construction Commencement. .............................................. 22
    5.3. Completion of Construction. ................................................ 22
    5.4. Delivery Notice. .................................................................... 23
    5.5. Rollover. ................................................................................ 24
    5.6. Remedies Cumulative. .......................................................... 24
    5.7. Construction Completion Cancel Date. .................................. 24
    5.8. Automatic Termination. ........................................................ 24

"Palm Springs"              - i -              9/14/2009
Palm Springs Plaza                           Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

|   |   | 5.9. | Entry Prior to Delivery Date. | 24 |
|   |   | 5.10. | Intentionally Deleted. | 25 |
|   |   | 5.11. | Additional Delivery Requirements. | 25 |
|   | 6. | **RENT** | | **26** |
|   |   | 6.1. | Minimum Rent. | 26 |
|   |   | 6.2. | Reimbursements. | 28 |
|   |   | 6.3. | Other Payment Provisions. | 28 |
|   |   | 6.4. | Gross Sales Statement for Purposes of Calculating Substitute Rent. | 28 |
|   | 7. | **COMMON AREA MAINTENANCE** | | **29** |
|   |   | 7.1. | Landlord's Obligation to Maintain Common Areas. | 29 |
|   |   | 7.2. | Tenant's Pro Rata Share. | 30 |
|   |   | 7.3. | Definition of Common Area Charges. | 30 |
|   |   | 7.4. | Payment of Tenant's Pro Rata Share. | 33 |
|   | 8. | **REAL ESTATE TAXES AND ASSESSMENTS** | | **36** |
|   |   | 8.1. | Obligation to Pay. | 36 |
|   |   | 8.2. | Tenant's Pro Rata Share. | 36 |
|   |   | 8.3. | Exclusions. | 38 |
|   |   | 8.4. | Rebates. | 38 |
|   |   | 8.5. | Contest. | 39 |
|   |   | 8.6. | Intentionally Omitted. | 39 |
|   | 9. | **INSURANCE** | | **39** |
|   |   | 9.1. | Property Insurance. | 39 |
|   |   | 9.2. | Liability Insurance. | 41 |
|   |   | 9.3. | Evidence of Insurance. | 42 |
|   |   | 9.4. | Waiver of Subrogation. | 42 |
|   |   | 9.5. | Tenant's Right to Self-Insure. | 42 |
|   | 10. | **UTILITIES SERVICES** | | **43** |
|   | 11. | **MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE** | | **44** |
|   |   | 11.1. | Maintenance and Repair by Tenant. | 44 |
|   |   | 11.2. | Maintenance and Repair by Landlord. | 44 |
|   |   | 11.3. | Repairs Required by Governmental Authorities. | 45 |
|   |   | 11.4. | Hazardous Material. | 46 |
|   | 12. | **ALTERATIONS** | | **49** |
|   |   | 12.1. | Permitted Alterations. | 49 |
|   |   | 12.2. | Communication Equipment. | 51 |
|   | 13. | **NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES** | | **51** |
|   |   | 13.1. | Non-Disturbance and Subordination. | 51 |
|   |   | 13.2. | Estoppel Certificates. | 52 |
|   |   | 13.3. | Processing Fees for Non-Disturbance Agreements and Estoppel Certificates. | 52 |

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

- ii -

9/14/2009
Final

14. INDEMNIFICATION ................................................................................ 52
    14.1.  Tenant Indemnity. ............................................................... 52
    14.2.  Landlord Indemnity. ............................................................ 53

15. USE ........................................................................................................ 53
    15.1.  Tenant's Business. ................................................................ 53
    15.2.  Operation. ........................................................................... 53
    15.3.  Protection. ........................................................................... 54
    15.4.  Exclusive Uses. ................................................................... 54
    15.5.  Other Exclusives Not Binding on Tenant. ........................ 55
    15.6.  Go Dark. ............................................................................. 55

16. SURRENDER ......................................................................................... 56
    16.1.  Condition of Premises. ....................................................... 56
    16.2.  Continuance of Possession. ............................................... 56

17. LANDLORD'S COVENANTS ............................................................... 56
    17.1.  Landlord's Warranty. .......................................................... 56
    17.2.  Landlord's Title. .................................................................. 56
    17.3.  Remedies. ........................................................................... 57
    17.4.  Termination of Rainbow Lease. ......................................... 57

18. QUIET ENJOYMENT ............................................................................ 57

19. ASSIGNMENT/SUBLETTING .............................................................. 57
    19.1.  General. ............................................................................... 57
    19.2.  Related Entity. ..................................................................... 58
    19.3.  Stock. .................................................................................. 58
    19.4.  No Release of Liability. ...................................................... 58
    19.5.  Landlord Notice to Assignee. ............................................ 58
    19.6.  Restriction on Landlord's Right to Assign. ....................... 58
    19.7.  Recapture on Assignment or Sublease of Store. ............... 59

20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES ............... 59
    20.1.  Defaults. ............................................................................. 59
    20.2.  Alternative Dispute Resolution Process. ........................... 61
    20.3.  Unlawful Detainer. ............................................................. 62
    20.4.  Attorneys' Fees. .................................................................. 62

21. CASUALTY ............................................................................................ 63
    21.1.  Definitions. ......................................................................... 63
    21.2.  Insured Casualty. ................................................................ 63
    21.3.  Uninsured Casualty. ........................................................... 64
    21.4.  End of Term Casualty. ....................................................... 64
    21.5.  Shopping Center Casualty. ................................................. 65
    21.6.  Insurance Proceeds. ........................................................... 65
    21.7.  Tenant Repair. .................................................................... 65

"Palm Springs"          - iii -          9/14/2009
Palm Springs Plaza          Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1      21.8.    Waiver of Statute...............................................................................65
2      21.9.    Laws.................................................................................................65
3      21.10.  Tolling of Term.................................................................................66
4      21.11.  Effect of Termination........................................................................66
5      21.12.  Tenant's Right of First Offer............................................................66

6      **22. CONDEMNATION** .........................................................................**67**
7      22.1.    Taking..............................................................................................67
8      22.2.    Right to Terminate..........................................................................67
9      22.3.    Claims.............................................................................................68
10    22.4.    Waiver.............................................................................................68

11   **23. MECHANIC'S LIENS**.....................................................................**68**

12   **24. SIGNS**.............................................................................................**68**
13    24.1.    Governmental Approval and Compliance.........................................68
14    24.2.    Building Signs..................................................................................69
15    24.3.    Pylon or Monument or Directional Signs.........................................69
16    24.4.    Temporary Signs..............................................................................69

17   **25. NOTICE** ........................................................................................**70**

18   **26. GENERAL CONDITIONS** .............................................................**70**
19    26.1.    Partial Invalidity..............................................................................70
20    26.2.    Relationship of Parties.....................................................................70
21    26.3.    Time................................................................................................70
22    26.4.    Waiver.............................................................................................70
23    26.5.    Partial Months.................................................................................71
24    26.6.    Consent...........................................................................................71
25    26.7.    Gender............................................................................................71
26    26.8.    Governing Law.................................................................................71
27    26.9.    Due Authority..................................................................................71
28    26.10.  No Prior Agreements.......................................................................71
29    26.11.  Entry by Landlord............................................................................72
30    26.12.  Neutral Interpretation......................................................................72
31    26.13.  Force Majeure..................................................................................72
32    26.14.  Successors in Interest.......................................................................72
33    26.15.  Memorandum of Lease.....................................................................73
34    26.16.  Real Estate Brokers..........................................................................73
35    26.17.  Contingency; Tenant's Due Diligence Period....................................73
36    26.18.  Limitation of Landlord's Liability. ...................................................74
37    26.19.  OFAC Statement..............................................................................75
38

"Palm Springs"           - iv -           9/14/2009
Palm Springs Plaza                      Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1        **THIS LEASE** (the "Lease") is made as of the Effective Date by and between Landlord and
2 Tenant who are designated in Section 1.2 hereof.  Landlord and Tenant hereby agree as follows:

3                       **1.  SALIENT LEASE TERMS**

4 **1.1.**    **Effective Date.**

5      *September 22, 2009* .

6 **1.2.**    **Parties/Addresses.**

7      **1.2.1.**      **Landlord:**          **PHILIPS LAKE WORTH L.P.,**

8                        a New York limited partnership

9            (a)     **Address for all payments of Rent:**

| | | |
|---|---|---|
| 10 | Address: | Post Office Box 2112 |
| 11 | City/State/Zip: | Riverhead, NY 11901-0112 |
| 12 | Landlord's Taxpayer I.D. #: | 13-4028816 |

13           (b)     **Address for all purposes other than payment of Rent:**

| | | |
|---|---|---|
| 14 | Address: | 419 West 49th Street, Suite 300 |
| 15 | City/State/Zip: | Hialeah, FL 33012 |
| 16 | Facsimile #: | (305) 821-0921 |
| 17 | Phone #: | (305) 821-7111 |
| 18 | Initial Contact Name: | Diana Marrone |
| 19 | Landlord's Taxpayer I.D. #: | 13-4028816 |

20                   with copies to:

| | | |
|---|---|---|
| 21 | Address: | 295 Madison Avenue, 2nd Fl. |
| 22 | City/State/Zip: | New York, NY 10017 |
| 23 | Facsimile #: | (212) 545-1355 |
| 24 | Phone #: | (212) 545-1100 |
| 25 | Initial Contact Name: | Vice President |

26                   and

| | | |
|---|---|---|
| 27 | Address: | 295 Madison Avenue, 2nd Fl. |
| 28 | City/State/Zip: | New York, NY 10017 |
| 29 | Facsimile #: | (212) 545-1355 |
| 30 | Phone #: | (212) 545-1100 |
| 31 | Initial Contact Name: | General Counsel |

32

"Palm Springs"                  - 1 -                  9/14/2009
Palm Springs Plaza                                                         Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1      **1.2.2.**     Tenant:    **ROSS DRESS FOR LESS, INC.,**

2                      a Virginia corporation

3           (a)      **Address for all invoices for Rent and Reimbursements due under this**
4                    **Lease, and change of Landlord or Payee, or change of Landlord's or**
5                    **Payee's address:**

6                    Address:         4440 Rosewood Drive, Building #4
7                                        Mail Stop PL4 4E 3
8                    City/State/Zip:    Pleasanton, CA  94588-3050
9                    Attention:       **Property Management Department**

10                  Facsimile #:     (925) 965-4865
11                  Phone #:        (925) 965-4400
12

13           (b)      **Address for all notices (other than invoices), including notices of**
14                    **default and notices pertaining to disputed invoices:**

15                    Address:         4440 Rosewood Drive, Building #4
16                                          Mail Stop PL4 4E 2
17                    City/State/Zip:    Pleasanton, CA  94588-3050
18                    Attention:       **Real Estate Law Department**

19                  Facsimile #:     (925) 965-4174
20                  Phone #:        (925) 965-4400

21           (c)      Initial Contact Name: **Jac Gee**

22           (d)      Tenant's Taxpayer I.D. #:  20-0594333

23   **1.3.**    **Location Information.**

24       **1.3.1.**     Shopping Center Name:  Palm Springs Plaza

25                  Location:    Congress Ave. & 10th Ave. North
26                                 Palm Springs, Palm Beach County, Florida
27

28       **1.3.2.**     Minimum  Leasable  Floor  Area  for  Pro  Rata  Share  Denominator  and
29 Co-Tenancy Denominator:

30           (a)      Common Area Charges:      220,307
31                                                                (Section 7.2)

32           (b)      Taxes:                  220,307
33                                                                (Section 8.2.3)

34           (c)      Property Insurance:        220,307
35                                                              (Section 9.1.4)

"Palm Springs"                         - 2 -                      9/14/2009
Palm Springs Plaza                                           Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1             (d)    Co-Tenancy:        194,437

2           (Section 6.1.3)

3  The amount of square feet of Leasable Floor Area in Section 1.3.2(d) above reflects the exclusion of
4  the Store Agreed Size as required by Section 6.1.3(a) below.

5      **1.3.3.**    Store Agreed Size:  The Store Agreed Size is approximately twenty-five thousand
6  six hundred sixty-eighty (25,668) square feet of Leasable Floor Area, including a minimum of one
7  hundred seventy-four (174) feet of frontage on that portion of the Common Areas that contain the
8  principal parking area for Tenant's customers, subject to adjustment of the Leasable Floor Area
9  pursuant to the provisions of Section 3.7.  The Store Agreed Size does not include the one hundred
10  forty nine (149) square foot restroom located behind the Store, however Tenant will have access to
11  such space.  Except as shown on **Exhibit B**, Tenant's Store frontage shall be linear, shall not
12  include any indentations, and shall not be set back from the storefront of adjacent tenants.  The
13  Store Agreed Size includes the Building only unless the loading dock is both enclosed and exclusive
14  to Tenant.

15  **1.4.**   **Critical Dates.**

16      **1.4.1.**    Tenant's obligation for Minimum Rent shall commence on the date (the
17  "Commencement Date") which is one hundred forty (140) days following the date of receipt of
18  Tenant's building permits for Tenant's Work, and following completion of Landlord's Work.
19  Landlord acknowledges that the Commencement Date for Minimum Rent has been shortened to
20  compensate Landlord for up to $25,000 of work to the Storefront identified on Sheet S1 of **Exhibit**
21  **J**.  On or before the Delivery Date, Landlord shall provide to Tenant invoices of such work to
22  establish the cost of the work to the Storefront, which shall be performed by a contractor qualified
23  to perform such work in the State of Florida.  In the event such work is less than $25,000, then
24  Tenant shall be entitled to an offset of Minimum Rent equal to the difference between the actual
25  costs of such work and $25,000.  Tenant's obligation for Reimbursements shall commence on the
26  date which is one hundred eighty (180) days following the date of receipt of Tenant's building
27  permits for Tenant's Work, and following completion of Landlord's Work. Tenant shall diligently
28  use commercially reasonable efforts to obtain such permits.
29      (Section 4.2)

30      **1.4.2.**    Intended Delivery Date:  May 10, 2010.
31      (Article 2)

32      **1.4.3.**    Date of Tenant's Right to Cancel for Landlord's failure to commence
33  construction ("Construction Commencement Cancel Date"): March 1, 2010.
34      (Section 5.2)

35      **1.4.4.**    Date of Tenant's Right to Cancel for Landlord's failure to complete construction
36  ("Construction Completion Cancel Date"):   May 10, 2011.
37      (Section 5.7)

38      **1.4.5.**    Automatic Termination Date:   May 8, 2012.
39      (Section 5.8)

"Palm Springs"                 - 3 -              9/14/2009
Palm Springs Plaza                                           Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1  **1.5.    Lease Term.**

2      **1.5.1.    Initial Term:** From the Commencement Date through the January 31 next
3  following the expiration of one hundred twenty (120) months after the Commencement Date. As a
4  hypothetical example and for illustration purposes only, if the Commencement Date is
5  September 15, 2009, then the expiration of the Initial Term shall be January 31, 2020.

6      **1.5.2.    Option Periods:** Total number of five (5) year Option Periods: Four (4).
7                                                                           (Section 4.4)

8  **1.6.    Minimum Rent.**

|  |  | Per Sq. Ft. Per Year | Monthly | Annually |
|---|---|---|---|---|
| (a) | Initial Term Commencement Date through 5th Full Lease Year | $9.00 | $19,251.00 | $231,012.00 |
|  | 6th Full Lease Year through 10th Full Lease Year | $9.50 | $20,320.50 | $243,846.00 |
| (b) | Option Periods |  |  |  |
|  | First: | $10.50 | $22,459.50 | $269,514.00 |
|  | Second: | $11.50 | $24,598.50 | $295,182.00 |
|  | Third: | $12.50 | $26,737.50 | $320,850.00 |
|  | Fourth: | $13.50 | $28,876.50 | $346,518.00 |

9      The Minimum Rent amounts listed above may be adjusted to reflect the actual Leasable
10  Floor Area of the Store calculated in accordance with the provisions of Section 3.7.

11  **1.7.    Required Co-Tenancy.**

12      **1.7.1.** The following Co-Tenants ("Required Co-Tenants") operating in no less than
13  the Required Leasable Floor Area indicated as follows:

|  | Co-Tenant's Name | Required Leasable Floor Area (minimum sq. ft.) |
|---|---|---|
| (a) | La Reina Supermarket | 27,736 |
| (b) | Harbor Freight Tools | 15,296 |

14                                                                          (Section 6.1.3)

15      Provided that the Required Co-Tenancy set forth in Sections 1.7.1 and 1.7.2 is satisfied on
16  the Commencement Date, during the remainder of the Term, any of the Required Co-Tenants may

1  be replaced by a nationally or regionally recognized replacement retail tenant reasonably acceptable
2  to Tenant, operating in not less than ninety percent (90%) of the Required Leasable Floor Area of
3  the Required Co-Tenant being replaced.  For purposes of this Lease a replacement tenant must be
4  an open and operating retailer in the space vacated by the named Co-Tenant above which it
5  purports to replace.

6      **1.7.2.**
7              (a)      Required percentage of Leasable Floor Area of the Shopping Center to be
8  occupied by operating retailers on the Commencement Date and for eighteen (18) months thereafter:
9  Sixty percent (60%), excluding the Leasable Floor Area of the Store from the numerator and
10  denominator of such calculation.

11              (b)      Required percentage of Leasable Floor Area of the Shopping Center to be
12  occupied by operating retailers after eighteen (18) months: Seventy percent (70%), excluding the
13  Leasable Floor Area of the Store from the numerator and denominator of such calculation.
14                                                                                          (Section 6.1.3)
15
16  **1.8.    Common Area Charge Administrative Fee.**

17              Five percent (5%).
18                                                                                          (Section 7.3)

19  **1.9.    Title Report.**

20              That certain report on the state of Landlord's title to the Shopping Center or the Store
21  issued by First American Title Insurance Company, dated October 14, 2008, and numbered NCS-
22  206472A-CLW2.
23                                                                                          (Section 17.2)

24  **1.10.    Contents of Lease.**

25      **1.10.1.**    Pages:  1 - 76

26      **1.10.2.**    Sections:  1.1 - 26.19

27      **1.10.3.**    Exhibits:

28              **A**    Legal Description of the Shopping Center
29              **B**    Site Plan
30              **C**    Construction Obligations of Tenant
31              **D**    Landlord's Prohibited Uses
32              **E**    Acknowledgment of Commencement
33              **F**    Non-Disturbance Agreement
34              **G**    Delivery Notice

1               **H**     Exclusive Uses

2               **I**     Permitted Title Exceptions

3               **J**     Tenant's Signs

4               **K**     Guaranty

5               **L**     Existing Tenants

6

7               **2. DEFINITIONS OF GENERAL APPLICATION**

8     **Abatement Work.** See Section 11.4.3.

9     **Annual Statement.** See Section 7.4.5.

10     **Building.** The structure in which the Store is located.

11     **Building Envelope.** Those certain areas designated on **Exhibit B** within the boundaries of
12 which buildings may be constructed.

13     **Business Days.** Business days shall mean Mondays through Fridays excluding the
14 following holidays: New Years Day, Martin Luther King, Jr. Day, President's Day, Memorial Day,
15 July 4th, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas. If
16 any of the foregoing holidays falls on a Saturday, then the Friday before shall constitute the holiday
17 and if any of the foregoing holidays falls on a Sunday, then the Monday following shall constitute
18 the holiday.

19     **CAM Audit.** See Section 7.4.7.

20     **Casualty.** See Section 21.1.1.

21     **Commencement Date.** See Sections 1.4.1 and 4.2.

22     **Common Area(s).** Those portions of, and facilities within the Shopping Center which are
23 intended solely for the common use of the occupants, their customers, agents, employees and
24 suppliers, such as the parking areas, driveways, walkways, loading zones (whether or not such
25 loading zones are available for common use) and landscaping, but specifically excluding the whole
26 or any portion of any building located within the Shopping Center. Enclosed malls are not
27 includable for purposes of Common Area Charges hereof unless the Store has a direct customer
28 door opening onto such mall intended for access of customers rather than emergency egress and
29 Landlord keeps the mall open to customer access during all of Tenant's operating hours. Any area
30 which is not enclosed by demising walls, but which is substantially used for the benefit of one tenant
31 or group of tenants such as, for example, those areas sometimes referred to in the shopping center
32 industry as "food courts," shall not be considered Common Areas. A "food court" is an open area
33 of the Shopping Center which accommodates a common seating, serving or service area for the
34 patrons of two or more retailers of prepared food whose premises are proximate to such seating,
35 serving or service area.

"Palm Springs"                - 6 -              9/14/2009
Palm Springs Plaza                                  Final
Palm Springs, FL
Store No. 1345
MED 0058.5 5 5

1       **Common Area Charges**.  See Section 7.3.

2       **Communication Equipment**.  See Section 12.2.1.

3       **Control Area.**  The area so designated on **Exhibit B** which may not be altered except as
4 expressly set forth in this Lease.  If no Control Area is indicated on **Exhibit B**, the Control Area
5 shall be the same as the Common Areas.

6       **Co-Tenancy Report**.  See Section 6.1.3(f).

7       **Co-Tenants**.  See Sections 1.7.1 and 6.1.3.

8       **Delivery Date.**  The Delivery Date is the first Permitted Delivery Day after the last of the
9 following conditions is satisfied (hereinafter "deliver" or "delivery").  Each of the conditions set
10 forth in clauses (a) through (r) below are conditions of delivery and in the aggregate are the
11 "Delivery Conditions."  All documents and other written evidence required below to be submitted
12 to satisfy the Delivery Conditions (the "Delivery Evidence") shall be delivered to Tenant at the
13 address specified in Section 1.2.2(b).

14       (a)     Landlord has completed Landlord's Construction Obligations in compliance
15 with the terms of this Lease;

16       (b)     Landlord has (i) completed (or caused to be completed) all of the Common
17 Areas and Off-Site Improvements, (ii) completed the buildings depicted on **Exhibit B** (excluding
18 Outparcel buildings) consisting of at least two hundred twenty thousand three hundred seven
19 (220,307) square feet of Leasable Floor Area (the "Minimum Building LFA"), and (iii) fulfilled all
20 construction obligations imposed by this Lease and applicable governmental authorities, including
21 obtaining any requisite governmental authorizations and approvals to permit Tenant to open for
22 business, subject to Tenant's completion of Tenant's Work.  Tenant acknowledges that as of the
23 Effective Date, the Landlord has met the foregoing Delivery Date condition set forth in (i) and (ii)
24 above, and Landlord covenants that the conditions shall not be changed in any material respect prior
25 to the Delivery Date;

26       (c)     Receipt by Tenant of written evidence that Landlord's Construction
27 Obligations have passed final inspection by the authority by whom the building permit for
28 Landlord's Construction Obligations was issued;

29       (d)     If the Store is to be constructed within an existing Building, Landlord's
30 delivery to Tenant of a report and certificate from a licensed environmental consultant reasonably
31 acceptable to Tenant ("Environmental Report"), certifying to Tenant that such consultant
32 conducted a comprehensive survey of the Store and Landlord's Parcel, dated not more than thirty
33 (30) days prior to the date of the Delivery Notice, and that the Store and Landlord's Parcel,
34 including, without limitation, the walls, ceilings, structural steel, flooring, pipes and boilers, are free
35 of Hazardous Materials (including asbestos containing materials) present in violation of applicable
36 Environmental Regulations as that term is defined herein.  URS Corporation and LFR Corporation
37 are deemed to be reasonably acceptable licensed environmental consultants.  Landlord and Tenant
38 acknowledge the environmental concerns related to the former Ocean Cleaners dry cleaning facility

"Palm Springs"                                 - 7 -                              9/14/2009
Palm Springs Plaza                                               Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1  at 3321 South Congress Ave., and Landlord will comply with any governmental requirements at no
2  cost to Tenant and with a full indemnification of Tenant from any costs or damages associated with
3  such environmental concerns as and to the extent provided in Section 11.4.6 of this Lease;

4            (e)    Landlord's delivery to Tenant of a roof inspection report, prepared by
5  Pegnato & Pegnato, or another roof inspection (not construction) company ("Roof Inspection
6  Company") satisfactory to Tenant (the "Roof Inspection Report"). The Roof Inspection Report
7  shall be dated no more than thirty (30) days prior to the date of the Delivery Notice and shall be
8  delivered to Tenant concurrently with the Delivery Notice pursuant to Section 5.4. The Roof
9  Inspection Report must prove that the roof has a life expectancy of less than ten (10) years from the
10  date of the Roof Inspection Report. Landlord has provided Tenant with a Watertight Roofing
11  System Warranty ("WRSW") from Advanced Roofing. Landlord represents and warrants that the
12  replacement of the roof was completed on September 22, 2006;

13            (f)    Receipt by Tenant of at least one (1) fully executed original of this Lease, and
14  a Memorandum of Lease signed by Landlord and Tenant and notarized so that such Memorandum
15  of Lease may be recorded;

16            (g)    Delivery to Tenant of exclusive possession of the Store in broom clean
17  condition with Landlord's and its contractors' agents and employees' and previous tenant's tools,
18  equipment, materials and personal property removed from the Store;

19            (h)    Landlord has Substantially Completed Landlord's Construction Obligations
20  in compliance with the terms of this Lease. Substantial Completion shall mean completion of all of
21  Landlord's Construction Obligations except for "punchlist items", and both the following conditions
22  are satisfied: (i) Tenant is legally permitted to occupy the Store in order to perform any work
23  required of Tenant, and (ii) Tenant is otherwise able, legally and in accordance with sound business
24  practice, to conduct its normal retail operations (including, without limitation, interviewing and
25  hiring employees, installing fixtures and equipment, stocking the Store with merchandise and
26  opening for business to the public) without material impediment arising from incomplete or
27  defective performance of Landlord's Construction Obligations;

28            (i)    The Common Areas have been completed and approved by the applicable
29  governmental authorities, including obtaining any requisite governmental authorizations and
30  approvals to permit Tenant to open for business, subject to Tenant's completion of Tenant's Work;

31            (j)    Tenant's receipt of Landlord's approval of Tenant's plans for Tenant's Work
32  and Tenant's receipt of approval by governmental authorities for Tenant's plans for Tenant's Work;

33            (k)    Landlord shall cause the pylon and monument and directional sign structure
34  in the Shopping Center as shown on **Exhibit B** to remain in place so that Tenant may at any time
35  install its sign panel thereon as depicted on **Exhibit J**;

36            (l)    Landlord has installed permanent power to the Store;

37            (m)    Landlord has provided certified test results by Independent Floor Testing
38  and Inspection, Inc (or other independent concrete slab inspection company approved by Tenant's

"Palm Springs"                        - 8 -                        9/14/2009
Palm Springs Plaza                                                   Final
Palm Springs, FL
Store No. 1345
MED 0058 5.5.5

1    construction representative) of all floor slabs in the Store, whether existing or new, certifying that
2    the floor slab has passed the test for moisture content, alkalinity, and the seventy-two (72) hour
3    bond tests as specified in Tenant's prototype plans and specifications;

4            (n)    Landlord has restriped the parking lot and ensured that the Common Areas
5    have lighting producing candle illumination that meets code (except that the existing lighting, if it is
6    less than current code requirements as of the Effective Date, may be "grandfathered");

7            (o)    If not previously delivered to Tenant, Landlord has delivered the
8    Non-Disturbance Agreement(s) and/or Sublease Non-Disturbance Agreement(s), executed by
9    Landlord and Landlord's current lender, as required by Section 13.1.1;

10           (p)    The Store has been secured by Landlord from unauthorized entry by persons
11   without a key;

12           (q)    Landlord has delivered to Tenant all certificates of insurance required to be
13   maintained by Landlord pursuant to this Lease; and

14           (r)    Tenant has not given the Due Diligence Termination Notice within the time
15   period permitted by Section 26.17.

16           Notwithstanding anything to the contrary contained in this Lease, and notwithstanding any
17   delays in completion of Landlord's Construction Obligations due to Force Majeure, unless Tenant in
18   its sole discretion elects to take delivery on a day other than a Permitted Delivery Day, the Delivery
19   Date will not be on a day other than a Permitted Delivery Day.  If a Force Majeure event occurs and
20   Landlord complies with the notice provisions of Section 26.13, the Delivery Date will be, at
21   Tenant's option, either (a) the date Landlord tenders delivery of the Store to Tenant with all
22   Delivery Conditions satisfied, or (b) the next Permitted Delivery Day which occurs after the date
23   Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, and the
24   Commencement Date shall be determined in accordance with Section 1.4.1.  Notwithstanding the
25   foregoing, if the Delivery Date would have occurred on a Permitted Delivery Day but for a Tenant
26   Delay, Tenant will accept delivery on the date the Store is delivered by Landlord as if such delivery
27   were made on a Permitted Delivery Day.

28           **Due Diligence Period.**  See Section 26.17.

29           **Environmental Regulations.**  See Section 11.4.1.

30           **Exempted Discontinuances.**  See Section 6.1.3(e).

31           **Final Plans.**  See **Exhibit C.**

32           **Force Majeure.**  See Section 26.13.

33           **Full Lease Year.**  The expression "Full Lease Year" refers to a Lease Year which consists
34   of twelve (12) complete calendar months commencing on a February 1 and terminating on the
35   ensuing January 31.

1      **Gross Sales.** This definition applies to the calculation of Substitute Rent only. Gross Sales
2  are revenue received by Tenant from the selling price of all merchandise or services contracted to be
3  sold in or from the Store by Tenant, its subtenants, licensees and concessionaires, whether for cash
4  or for credit, excluding, however, the following: (a) the sales price of all merchandise returned and
5  accepted for full credit or the amount of the cash refund or allowance made thereon; (b) the sums
6  and credits received in settlement of claims for loss or damage to merchandise; (c) the consideration
7  received in connection with a sale of inventory which occurs other than in the ordinary course of
8  Tenant's business, including, but not limited to, a sale in bulk or to a jobber, liquidator or assignee;
9  (d) sales taxes, so-called luxury taxes, excise taxes, gross receipt taxes, and other taxes now or
10  hereafter imposed upon the sale or value of merchandise or services, whether added separately to
11  the selling price of the merchandise or services and collected from customers or included in the
12  retail selling price; (e) receipts from up to two (2) vending machines for employees' use only, and
13  from the collection of public Utility bills; (f) bank card discounts or fees (e.g., Visa, MasterCard,
14  etc.), interest, carrying charges, or other finance charges in respect of sales made on credit, not to
15  exceed two percent (2%) of Gross Sales; (g) sales of fixtures, trade fixtures, or personal property that
16  are not merchandise held for sale at retail; (h) sales to employees and senior citizens at discount,
17  each not to exceed two percent (2%) of Gross Sales; (i) revenue received from mailing, alterations,
18  delivery or other services performed on a non-profit basis for the benefit of customers; (j) Tenant's
19  accounts receivable, not to exceed two percent (2%) of Gross Sales, which have been determined to
20  be uncollectible for federal income tax purposes during the Lease Year; provided, however, that if
21  such accounts are actually collected in a later Lease Year, the amount shall be included in the Gross
22  Sales for such later Lease Year; (k) rents, subrents or other consideration received in connection
23  with an assignment, sublease, license, concession or other transfer of any portion of the Store;
24  (l) amounts received for merchandise transferred to any other place of business of Tenant (or its
25  subtenants, concessionaires and/or licensees) or to any business organization affiliated with Tenant
26  wherever located; provided such transfer is not effected for the purpose of diverting sales from the
27  Store, and that the merchandise is not used to complete a sale originated in the Store; and (m) any
28  Internet or other sale contracted on a telecommunications network whether or not the sale item is
29  delivered to the customer at the Store, provided that the Store is used for retail sales to walk-in
30  customers and not as a warehouse facility for Internet sales.

31      **Hazardous Materials.** See Section 11.4.1.

32      **HVAC.** See Section 11.1.

33      **Inline Building.** The building in the Shopping Center in which the Store is situated and
34  any other building in the Shopping Center that is not located on an "Outparcel" and which has
35  more than one (1) tenant with common demising walls.

36      **Insurance Bill.** See Section 9.1.4.

37      **Intended Delivery Date.** The date specified in Section 1.4.2.

38      **Invitee(s).** An Invitee shall mean any agent, employee, customer or other entity or
39  individual who comes upon the Shopping Center property for business or retail consumption
40  purposes, or to perform services for the occupants of the Shopping Center, by the invitation of any

"Palm Springs"            - 10 -            9/14/2009
Palm Springs Plaza                               Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1   party who is entitled to grant access to the Shopping Center such as Landlord, Tenant or any other
2   occupant of the Shopping Center.

3       **Landlord's Construction Obligations.**   The construction obligations imposed on
4   Landlord by Section 5.1.1.

5       **Landlord's Parcel.**   For purposes of this Lease, the term "Landlord's Parcel" shall mean
6   "Shopping Center."

7       **Leasable Floor Area.**   All areas available, or held for the exclusive use and occupancy of
8   occupants or future occupants of Landlord's Parcel, measured from the exterior surface of exterior
9   walls and from the center of interior demising partitions excepting that:

10          (a)   Any mezzanines intended to be used for distribution, sale or display of
11  merchandise to retail customers ("Retail") shall be excluded from the computation of Leasable Floor
12  Area. Any such mezzanines not intended for Retail shall be excluded from Leasable Floor Area.

13          (b)   Any areas ("Outdoor Areas") which are located wholly or partially outside of
14  a building, or which, although located substantially inside of a building, are not bounded on all sides
15  by exterior walls or a roof, such as outdoor sales, seating, garden or storage areas, or enclosed truck
16  docks or loading areas, shall be included in Leasable Floor Area if and to the extent that such
17  Outdoor Areas are available or held for the exclusive use and occupancy of occupants or future
18  occupants of Landlord's Parcel, whether or not such Outdoor Areas are clearly delineated and
19  whether or not any rental or other charges are paid by tenants with respect to such Outdoor Areas.
20  Outdoor Areas shall, to the extent that they are bounded by walls, be measured in the same manner
21  as provided above; otherwise, they shall be measured along lines which reasonably delineate the
22  boundaries of such Outdoor Areas.

23          (c)   Kiosks shall be includable in Leasable Floor Area. A "kiosk" is a structure of
24  no more than one hundred (100) square feet, set within the Common Areas and completely
25  surrounded by pedestrian walkways or driveways.

26      **Lease Year.**   The first Lease Year shall extend from the Commencement Date to the first
27  January 31 thereafter.  Subsequent Lease Years shall commence on the following February 1 and
28  terminate the following January 31.

29      **Legal Rate.**   In the event any rental or other payment due from one party to the other is
30  not paid when due, or in the event interest is required to be paid under the terms of this Lease, such
31  rental or payment amount shall bear interest at the rate of the lesser of (a) ten percent (10%) per
32  annum, or (b) the prime rate per annum quoted by the Wall Street Journal for short term
33  commercial loans, plus one percent (1%) per annum, but not in any event exceeding the highest rate
34  permissible by law which is not usurious.

35      **LFA Minimums.**   Solely for purposes of calculating Co-Tenancy and Tenant's Pro Rata
36  Share of Reimbursements, the minimum amount of Leasable Floor Area in the Shopping Center or
37  Landlord's Parcel, as the case may require, agreed by the parties and set forth in Section 1.3.2.

1     **Minimum Rent.**  See Section 6.1.

2     **Off-Site Improvements.**  Intentionally Omitted.

3     **Option.**  See Section 4.4.

4     **Option Periods.**  See Section 4.4.

5     **Outparcel.**  Any parcel of land upon which a building is or may be constructed which is
6 between the Store and any street bordering the Shopping Center.

7     **Permitted Delivery Day(s).**  Permitted Delivery Days shall be the third Monday of February
8 and October and the second Monday of May only, which next follows the actual date Landlord
9 tenders possession of the Store to Tenant with all Delivery Conditions satisfied, provided that it is
10 no earlier than the Intended Delivery Date.

11     **Prohibited Uses.**  See Section 3.2.2.

12     **Property Insurance.**  See Section 9.1.1.

13     **Recommencement Date.**  See Section 21.2.

14     **Redelivery Date.**  The last of the following to occur after a Casualty or Taking:  (a) the date
15 on which Landlord's architect, or contractor having charge of the Restoration, certifies by written
16 notice to the parties that the Restoration has been completed; and (b) Tenant receives from all
17 applicable governmental agencies all necessary written approvals to reopen the Store for business.

18     **Reduced Occupancy Period.**  See Section 6.1.3.

19     **Reimbursements.**  Tenant's obligation to reimburse Landlord for Tenant's Pro Rata Share
20 under the provisions of Sections 7.4.1, 8.2.1 and 9.1.4.

21     **Rent.**  The terms "Rent" or "Rental" shall mean all Minimum Rent and Reimbursements
22 which may be due from Tenant to Landlord pursuant to this Lease.

23     **Requirements.**  See Section 11.3.2.

24     **Restoration.**  See Section 21.1.4.

25     **Roof Repairs.**  See Section 12.2.2.

26     **Section Numbers.**  In this Lease, all references to "Section" shall mean the section
27 numbers of this Lease, unless otherwise indicated.

28     **Shopping Center.**  That certain real property development with all appurtenances generally
29 described in Section 1.3 above, which is constructed or is to be constructed on the property
30 described in **Exhibit A.**

"Palm Springs"                        - 12 -                        9/14/2009
Palm Springs Plaza                                                    Final
Palm Springs, FL
Store No. 1345
MED 0058 5.5.5

1    **Site Plan.** The Site Plan is the plan attached hereto as **Exhibit B**. Landlord represents and
2    warrants that the Site Plan depicts Landlord's Parcel described on **Exhibit A** and that the
3    boundaries thereof are delineated thereon with substantial accuracy. The Inline Buildings depicted
4    thereon contain or shall contain no more than one (1) story (but mezzanines having Leasable Floor
5    Area not in excess of one-third (1/3) of the occupant's ground floor Leasable Floor Area, when not
6    used for selling purposes, shall be permitted). Further, the height (including any architectural
7    features and rooftop equipment) of any portion of the Inline Buildings shall not exceed the height of
8    the exterior elevation of the Store on the Final Plans described in **Exhibit C**. The highest point of
9    any exterior elevation of any other building in Landlord's Parcel (including architectural features and
10   rooftop equipment) between the Store and the roads which the Store and Landlord's Parcel face
11   and/or from which the Store has side visibility shall not exceed their current height as of August 7,
12   2008 measured from the finished floor elevation of Tenant's Store, except that the construction of
13   any new building on the Pier 1 pad shall be limited to twenty four (24) feet in height.

14   **Special Form Policy.** See Section 9.1.1.

15   **Store.** The Store is that portion of Landlord's Parcel designated on **Exhibit B**, having the
16   dimensions and containing the Leasable Floor Area specified in Section 1.3, including the use of the
17   roof as specified in Section 12.2.

18   **Substitute Rent.** Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two
19   percent (2%) of Tenant's Gross Sales during the preceding month. Substitute Rent, where
20   applicable in this Lease, shall be paid in lieu of Minimum Rent and Reimbursements.

21   **Support Systems.** See Section 11.4.2.

22   **Taking.** See Section 22.1.

23   **Tax or Taxes.** See Section 8.1.

24   **Tax Bill.** See Section 8.1.

25   **Tax Year.** The twelve (12) month period used by the taxing authority as the period to
26   which the Tax Bill applies.

27   **Tenant Delay.** A delay in the performance by Landlord of any obligation it is to perform
28   under **Exhibit C** to this Lease as a result of: (a) Tenant's failure to approve, consent, comment
29   upon or otherwise respond to a request for plan approval within the express time provisions of
30   **Exhibit C**; or (b) Tenant's request for a change order to Landlord's Construction Obligations which
31   directly results in a delay in Landlord's ability to perform its obligations under this Lease; or (c) the
32   interference by Tenant or Tenant's contractors in the performance by Landlord or Landlord's
33   contractors of Landlord's Construction Obligations; provided, however, in order for there to be a
34   valid "Tenant Delay" Landlord must first have given Tenant written notice within five (5) Business
35   Days of the event forming the basis for the claim of the Tenant Delay and provided Tenant with at
36   least three (3) Business Days to rectify the problem causing the delay.

1      **Tenant's Pro Rata Share**.  Tenant's share of Reimbursements calculated as set forth in
2    Section 7.2 (Common Area Charges), Section 8.2 (Tax Bill) and Section 9.1.4 (Special Form Policy
3    premium).

4      **Tenant's Work**.  The work to the Store by Tenant after the Delivery Date necessary for
5    Tenant to open the Store for business to the general public; or performed at any time during the
6    Term for the purpose of improving the Store.

7      **Term**.  References to the Term of this Lease shall include the initial term described in
8    Section 1.5.1 ("Initial Term") and any extension of such Term ("Option Period").

9      **Termination Notice**.  A notice provided by Tenant to Landlord not less than thirty (30)
10   days prior to a proposed termination of this Lease in which Tenant notifies Landlord of its election
11   to terminate this Lease if permitted to do so under any provision of this Lease.

12      **Third Party Audit**.  See Section 7.4.8.

13      **Unamortized Cost**.  The remaining balance of an original amount expended by Tenant for
14   leasehold improvements to the Store (not including any allowance paid by Landlord to Tenant for
15   Tenant's leasehold improvements as specified in **Exhibit C**), as amortized on a straight line basis
16   over no longer than a ten (10) year period according to Generally Accepted Accounting Principles in
17   the books and records of Tenant for public reporting purposes, with an interest rate of ten percent
18   (10%) per annum.

19      **Utilities**.  Utilities are electricity, gas (which Landlord warrants and represents is not present
20   within the Shopping Center), power (including steam, if present), sanitary sewer, storm sewer,
21   telecommunications (audio, video or data bit streams, whether terrestrial, over the air or satellite),
22   and water supplied by public or private entities, however Tenant acknowledges that Landlord is only
23   obligated to install or provide electricity, sanitary sewer, storm sewer and water and is in no way
24   responsible whatsoever for any gas, steam, air or satellite broadcast.

25      **Utility Room**.  See Section 3.5.

26    **3.  GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS**

27   **3.1.**   **Lease.**

28      Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Store
29   depicted on the Site Plan, together with any applicable easements, rights and privileges appurtenant
30   thereto, on the terms and conditions set forth herein.  As a material inducement, and consideration
31   for Landlord entering into this Lease, Ross Stores, Inc. shall execute a Guaranty in the form of
32   attached **Exhibit K**.

33   **3.2.**   **Nature of the Shopping Center.**

34      **3.2.1.**   Retail Use.

"Palm Springs"                  - 14 -                  9/14/2009
Palm Springs Plaza                                       Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

(a)     Tenant has entered into this Lease in reliance upon representations by Landlord that Landlord's Parcel is and shall remain retail in character, and, further, no part of Landlord's Parcel shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary services or vaccination clinic, overnight stay pet facilities, health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, the sale of adult products or adult bookstores or adult audio/video products stores (which are defined as stores, other than national or regional tenants like Barnes & Noble or Borders, in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store. No tenant or occupant of the Shopping Center shall be permitted to use space for a store primarily selling merchandise at one price or set prices, such as 99 Cents Store or Family Dollar Store as such are operated on the Effective Date. Further, excepting existing restaurant tenants set forth on **Exhibit L** and their replacements, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in Landlord's Parcel within three hundred (300) feet of the front and side perimeter walls of the Store. A "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement. The foregoing use restrictions are referred to herein as the "Ross Prohibited Uses".

(b)     Notwithstanding Section 3.2.1(a) above:

(i)     Offices may be used for medical, dental, real estate, legal, accounting, banking, tax preparation, travel agencies, securities and other investments and financial planning, insurance and similar uses (which uses shall be considered to be retail in character) provided that they are located at least two hundred (200) feet from the front and side perimeter walls of the Store and do not exceed 7,500 square feet in the aggregate. The two hundred (200) foot distance limitation does not apply to Existing Tenants set forth on **Exhibit L** – "Existing Tenants" and their replacements.   The 7,500 square foot aggregate limitation shall not apply to offices located in (a) the existing two (2) story building with primary parking facing the rear of the Shopping Center, (b) the 37,000 square foot space identified on **Exhibit B** that is on the south end of the Inline Building, or (c) the area identified on **Exhibit B** as Pier 1 may be re-developed as a bank, provided such bank building, stacking lanes and parking is located solely within the Pier 1 Building Envelope (9,600 square feet) with an entrance on the east side facing Congress Avenue.

(ii)     Supermarkets with walk up windows and other establishments primarily engaged in businesses other than serving prepared food serving coffee, snacks or other light food shall not be considered to be restaurants.

(iii)     One (1) gymnasium and one (1) health club shall be permitted in the Shopping Center provided they shall not exceed five thousand (5,000) square feet of Leasable Floor Area and shall be at least two hundred (200) feet from the perimeter of the Store. The 5,000 square foot limitation shall not apply to a gymnasium or health club located in the 37,000 square foot space identified on **Exhibit B** that is on the south end of the Inline Building.

1          (iv)   A school shall be permitted provided it is incidental to a retail use,
2   and is not closer than two hundred (200) feet from the perimeter of the Store. The "incidental"
3   limitation set forth in the preceding sentence shall not apply to a school that is located in the 37,000
4   square foot space identified on **Exhibit B** that is on the south end of the Inline Building.

5          (v)   One (1) vehicle leasing tenant of not more than one thousand five
6   hundred (1,500) square feet of Leasable Floor Area, such as Enterprise or Avis, shall be permitted in
7   the Shopping Center provided such tenant (a) is located either in the second level of the Inline Building
8   or in the stores located in the shops east of the location currently occupied by Dollar Store facing
9   Congress Avenue and (b) utilizes no more than three (3) parking spaces for its leased vehicles in the
10  area designated on **Exhibit B.**

11         (vi)   An establishment that offers video game arcades and other forms of
12  entertainment, similar to Chuck E Cheese or Dave & Busters, shall be permitted in the 37,000 square
13  foot space identified on **Exhibit B** that is on the south end of the Inline Building.

14         (vii)   A Dollar Tree or Dollar General or their affiliates or
15  assignees/sublessees (where Landlord has no right to consent to such assignees/sublessees, or where
16  Landlord has the right to consent but has agreed in the lease not to unreasonably withhold consent and
17  where Landlord, in its reasonable business judgment, believes it may not lawfully withhold consent to
18  the proposed assignee/sublessee) shall be permitted in the Shopping Center.

19
20         **3.2.2.**    Further Prohibited Uses.   Landlord agrees that the Ross Prohibited Uses set
21  forth in Section 3.2.1 and the "Landlord's Prohibited Uses" which are listed in **Exhibit D**
22  (collectively, the "Prohibited Uses") shall not be permitted in the Shopping Center.  Tenant agrees
23  that it will not violate the Prohibited Uses.

24  **3.3.   Grant of Common Area Use.**

25         Tenant, as well as its agents, employees, customers and invitees, shall have and is granted
26  nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "license"), which
27  license shall be appurtenant to the Store during the entire Term of this Lease.  Landlord shall use
28  commercially reasonable efforts to prevent Common Area use by other than the Shopping Center's
29  occupants and their Invitees, provided that Landlord may grant tenants the right to use Common
30  Areas for cart corrals or installation of bollards.  In no event shall Tenant or Tenant's Invitees' use
31  of Common Areas be conditioned upon payment of parking or other charges by Tenant.  Landlord
32  shall have the right to deny access to the Common Areas up to one day per year to prevent the
33  dedication of such areas to public use.

34  **3.4.   Grant of Utility Licenses.**

35         (a)   Subject to the reasonable approval of Landlord as to location, Landlord hereby
36  grants to Tenant and its employees, agents, contractors and vendors, the nonexclusive right by
37  license to install, replace, maintain and use Utilities of Tenant's choice serving the Store within
38  Landlord's Parcel.

1        (b)    Upon prior notice to Landlord and subject to Landlord's approval as to location,
2  which approval shall not be unreasonably withheld, delayed, or conditioned, Tenant, at Tenant's
3  election, shall have the right to install, at Tenant's expense: (i) a cart retention system within the
4  parking lot, utilizing wires or other embedded objects as a means of perimeter control provided that
5  Tenant shall repair any damage caused by such installation, and (ii) bollards in front of the Store.

6  **3.5.   Utility Rooms.**

7        In the event any meters, controls or conduits for any Utility system serving the Store are at
8  any time situated outside the Store (the "Utility Room"), Tenant shall at all times have access to the
9  Utility Room and to controls and other conduits therein in common with Landlord and other
10  tenants affected by such Utility systems.  No other parties (other than Landlord and the other
11  tenants affected by such Utility systems) shall have access to the Utility Room at any time without
12  the consent of Tenant, which consent shall not be unreasonably withheld, delayed or conditioned.
13  Unless the Utility Room is solely within the control of Tenant, Landlord shall provide adequate heat
14  and security for the Utility Room and shall cause the Utility Room to be kept locked at all times.
15  Access to the Utility Room shall be restricted to an exterior entrance situated in the rear wall of the
16  building in which it is located.

17  **3.6.   Site Plan or Shopping Center Alterations.**

18        **3.6.1.**   <u>Control Area and Inline Buildings</u>.  The Site Plan is a material consideration for
19  Tenant entering into this Lease.  No material change, alteration, deletion, or addition shall be made
20  to the Control Area on the Site Plan nor shall any change in the facade of a front wall of any
21  premises in any Inline Building be made without the prior written consent of Tenant, which consent
22  may be granted or denied in Tenant's sole and absolute discretion.

23        **3.6.2.**   <u>Common Areas</u>.  No change or alteration shall be made in the Common Areas
24  of the Shopping Center outside of the Control Area (to the extent Landlord has the legal ability to
25  control such changes or alterations) which materially and adversely affects any one or more of the
26  following, without the prior written consent of Tenant (which consent shall not be unreasonably
27  withheld, delayed or conditioned by Tenant if the change is not materially adverse to Tenant): (a) the
28  configuration of the Common Areas, (b) methods of ingress and egress, direction of traffic, lighting,
29  parking, or curbing in the Common Areas, or (c) other alterations in the Common Areas materially
30  affecting the visibility of the Store.

31        **3.6.3.**   <u>Building Envelopes</u>.  No construction of any building, or remodeling of any
32  building in Landlord's Parcel located between the Store and the roads which the Store faces or has
33  side visibility may occur except within the Building Envelopes and shall be limited in size to the
34  Leasable Floor Area as designated on **Exhibit B** unless otherwise required by applicable law.
35  Notwithstanding the foregoing, Landlord may redevelop the existing Pier 1 Imports and Eyeglass
36  World buildings so long as the new buildings do not exceed the existing square footage or Building
37  Envelope.  The redevelopment of such buildings is subject to the terms and provisions of the height
38  limitations set forth in the definition of Site Plan and the Future Re-Development Area set forth in
39  Section 5.1.2(b) of this Lease.

"Palm Springs"                - 17 -               9/14/2009
Palm Springs Plaza                                    Final
Palm Springs, FL
Store No. 1345
MED 0058.5 5.5

1      **3.6.4.**   <u>Store Exterior; Inline Building Exteriors</u>. The use of the exterior walls of the
2 Store shall be subject to the exclusive control of Tenant. Further, Landlord may not alter the
3 exterior of the Store, including, but not limited to, the color of the exterior of the Store, without the
4 prior written consent of Tenant, which consent may be granted or denied in Tenant's sole and
5 absolute discretion. No alteration or change in the color or design of any exterior wall of any
6 building within three hundred (300) feet of the Store may be made without the prior written consent
7 of Tenant, which consent shall not be unreasonably withheld, delayed or conditioned.

8      **3.6.5.**   <u>Outparcels</u>. Any Outparcel(s) which is (are) not developed as of the date that
9 Tenant opens in the Store for business ("Undeveloped Outparcels") shall be continuously
10 maintained (or caused to be maintained) by Landlord, in a neat and sightly condition until such
11 Outparcel(s) is (are) developed, at no cost or expense to Tenant (e.g., not as a Common Area
12 Charge or otherwise) in the following condition. Each Undeveloped Outparcel shall either be
13 completely paved or shall be completely landscaped with low level shrubs or grass (such grass to be
14 mowed regularly to a height not to exceed eight inches (8")). Notwithstanding the foregoing
15 sentence, Landlord may landscape such Undeveloped Outparcel with trees if required by any
16 governmental agency, however Landlord shall maintain such trees (including in a manner that does
17 not materially obstruct the site line of Tenant's storefront) at no cost to Tenant.

18 **3.7.**   **Dimensions.**

19      Within sixty (60) days following the Substantial Completion of Landlord's Construction
20 Obligations, but in any event not more than sixty (60) days after the Delivery Date, Landlord shall
21 cause the Store to be measured and shall deliver to Tenant an architect's certificate stating the
22 Leasable Floor Area thereof. In the event that the Leasable Floor Area of the Store is less than the
23 size specified in Section 1.3.3 (the "Agreed Size"), Minimum Rent and all other charges shall be
24 proportionately reduced and the parties shall set forth the actual Leasable Floor Area of the Store,
25 the adjusted Minimum Rent and other corrections necessitated by the adjustment in Store size in the
26 Acknowledgment of Commencement in **Exhibit E** hereto. In the event that the Leasable Floor
27 Area of the Store is more than the Agreed Size, Minimum Rent and all other charges shall be based
28 upon the Agreed Size. Nothing herein shall be construed as permitting a material variance in
29 dimensions or area. For purposes of this Section 3.7, a material variance is any decrease in the
30 amount of Store frontage set forth in Section 1.3.3 or any decrease in the Agreed Size by more than
31 one-half (½) of one percent (1%) of the amount of square feet of Leasable Floor Area. Landlord
32 shall simultaneously provide to Tenant a certificate from the project architect as to the total Leasable
33 Floor Area in Landlord's Parcel depicted on **Exhibit B**. Tenant shall have the right to dispute
34 through its own licensed architect the amounts so represented and, if so, any unresolved dispute
35 shall be resolved as provided in Section 20.2. Until the amounts of Leasable Floor Area in the Store
36 and in Landlord's Parcel have been finally determined, Tenant may defer payment of Minimum Rent
37 (to the extent of the disputed amount) and the disputed portion of Tenant's Pro Rata Share of any
38 charges which require the use of Leasable Floor Area for computational purposes under the terms
39 of this Lease (e.g., Taxes, insurance and Common Area Charges).

"Palm Springs"                   - 18 -                   9/14/2009
Palm Springs Plaza                                         Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

1                               **4. LEASE TERM**

2   **4.1.   Term.**

3         The Term of this Lease shall commence on the Commencement Date and shall expire as
4   specified in Section 1.5.

5   **4.2.   Commencement Date.**

6         The Term shall commence on the Commencement Date as set forth in Section 1.4.1.

7   **4.3.   Acknowledgment of Commencement.**

8         Within ninety (90) days after the Commencement Date, Landlord and Tenant shall execute a
9   written acknowledgment in the form attached hereto as **Exhibit E**, and by this reference it is hereby
10  incorporated herein.

11  **4.4.   Option Periods.**

12        Provided Tenant is not in default for which it has received written notice and an opportunity
13  to cure, the Tenant shall have the right to extend the Term of this Lease (an "Option") for the
14  number of separate, consecutive additional periods ("Option Periods") which are specified in
15  Section 1.5.2, on the terms and conditions set forth herein, except that the number of Option
16  Periods remaining to be exercised shall, in each case, be reduced by one. If Tenant elects to exercise
17  an Option, Tenant shall notify Landlord in writing at least two hundred ten (210) days prior to the
18  expiration of the Term, or the then current Option Period, as the case may be. If Tenant neglects to
19  timely exercise any Option, Tenant's right to exercise shall not expire or lapse unless Tenant fails to
20  exercise such Option within fifteen (15) days after notice from Landlord of Tenant's failure to timely
21  exercise the Option. If Landlord does so notify Tenant, Tenant shall have the right at any time
22  within fifteen (15) days after such notice to notify Landlord in writing of either Tenant's unqualified
23  and irrevocable exercise of its Option, or Tenant's unqualified and irrevocable waiver of its Option.
24  If Tenant fails to respond within such fifteen (15) day period, Tenant shall conclusively be deemed
25  to have waived its Option and this Lease shall terminate on the then expiration date of the Term.

26                      **5. CONSTRUCTION AND ACCEPTANCE**

27  **5.1.   Landlord's Construction Obligations.**

28       **5.1.1.**   <u>Current</u>.

29             (a)   On or before the Delivery Date Landlord shall, at its sole cost and
30  expense, remove all Hazardous Materials (including asbestos-containing materials) from the Store and
31  Landlord's Parcel, including, without limitation, the walls, ceilings, structural steel, flooring, pipes and
32  boilers; and (ii) perform the following work to the Store:

33                   (i)   demolish the demising wall between the spaces previously
34              occupied by 99 Cents Stuff and currently occupied by Rainbow Shops;

"Palm Springs"                              - 19 -                          9/14/2009
Palm Springs Plaza                                                        Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

1                            (ii)        completion of the Storefront in accordance with AE1 issued
2     September 18, 2009, as shown on Sheet S1 of **Exhibit J**;

3                           (iii)     reconfigure if necessary all Utilities in the Store as set forth in
4     Tenant's prototype plans and design guidelines including electric, water, fire sprinklers,
5     telephones lines (which shall mean 25 pair phone cable to the back board of the Store)
6     and separate meters;

7                           (iv)     combine existing electrical service and provide the Store with
8     not less than 600 amp, 3 phase, 4-wire 277/480 V electrical service with main
9     disconnect and meter box pursuant to Tenant's prototype plans and design guidelines;

10                         (v)      seal the floor slab with Creteseal in accordance with Tenant's
11     prototypical plans and specifications and provide Tenant with a current moisture test
12     on the existing floor slab so that the slab moisture test indicates that the floor slab
13     emits moisture vapor not in excess of five (5) pounds per one thousand (1,000) square
14     feet for twenty-four (24) hours using the calcium chloride method;

15                         (vi)    reconfigure and combine the riser (so that there is only one
16     exiting riser services the Store, with the remaining riser to be abandoned and deemed
17     unusable for Tenant's purposes), fire sprinkler and monitoring systems (hereinafter
18     "fire system") from the two existing spaces (and otherwise separate the fire system
19     from the balance of the Shopping Center) so that there is one (1) fire system that
20     separately and independently serves the Store; if necessary; and

21                         (vii)   deliver detailed AutoCad v.14 or above shell plan for the
22     Building.

23                (b)     <u>Completed Plans</u>.  Landlord's architect(s) (hereinafter "Architect") shall
24 provide Tenant with a copy of complete plans of the Landlord's Work to be performed in fulfillment
25 of Landlord's construction obligations for Tenant's Store as set forth in Section 5.1.1(a) above for
26 Tenant's review and comment ("Landlord's Plans").  Within fifteen (15) Business Days after receipt of
27 Landlord's Plans, Tenant shall approve or disapprove the Landlord's Plans and provide the Architect
28 with Tenant's requested modifications, if any.  Within fifteen (15) Business Days following receipt of
29 any comments by Tenant to the Landlord's Plans, Landlord's architect shall prepare and submit revised
30 Landlord's Plans to Tenant for approval.  Landlord and Tenant shall each have ten (10) Business Days
31 thereafter to either approve or disapprove the revised plans.  Any disapproval by either Landlord or
32 Tenant must be accompanied by a specific description of the revisions that the disapproving party
33 would require in order to approve the revised Landlord's Plans.  Architect shall incorporate any
34 suggested revisions received from Landlord or Tenant into the revised Landlord's Plans and resubmit
35 the revised Landlord's Plans to both Landlord and Tenant for approval within five (5) Business Days
36 following receipt of a notice of disapproval. If the parties cannot reach agreement within twenty (20)
37 Business Days after receipt of the revised Landlord's Plans, the Lease may be terminated by either
38 party on written notice to the other within thirty (30) days thereafter.  The Landlord's Final Plans
39 ("Landlord's Final Plans") shall consist of the revised Landlord's Plans with all requested and mutually
40 approved modifications incorporated therein.   The Landlord's Final Plans shall include exterior
41 elevations, as well as the demising of the Store building.   The Store building shall contain

"Palm Springs"                         - 20 -                     9/14/2009
Palm Springs Plaza                                                   Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1     approximately the number of square feet as set forth in this Lease. The Final Plans shall set forth the
2     construction to be performed by each party. Landlord shall obtain Tenant's written approval of the
3     Final Plans prior to the commencement by Landlord of the Landlord's Work and the construction of
4     exterior elevations. A Record Set, identified as such, of the Permitted Work embodied in the Final
5     Plans to be performed pursuant to the Landlord's construction obligations under the Lease shall be
6     submitted to Tenant within ten (10) Business Days of issuance of any permit required for such
7     Landlord's Work. The Record Set shall include AutoCad v.14 files of the exterior elevations of the
8     Tenant's Store and Site Plan.

9             (c)     If the Store is part of a larger premises existing as of the Effective Date,
10    Landlord shall be responsible, at its sole cost and expense, for any requirement (whether governmental,
11    insurance or otherwise), for construction of fire access, including corridors or fire doors.

12            (d)     Landlord shall indemnify, defend, protect and hold Tenant harmless from
13    all claims, demands and liabilities, including attorneys' fees and expenses, arising out of such
14    construction, remodeling, alteration or other work performed by Landlord, including but not limited
15    to, claims for defective work. The obligations of this Section 5.1 are a material consideration to Tenant
16    without which Tenant would not have entered into this Lease.

17            (e)     Landlord shall perform, at its own cost and expense, any work required by
18    local laws, rules, regulations, ordinances, or work imposed by any local governing body as part of any
19    approval process to the extent such work involves the Common Areas of the Shopping Center, any
20    Outparcel and/or any part of the Shopping Center buildings outside of the Store so long as the cost of
21    such work does not exceed One Hundred Thousand Dollars ($100,000). In the event that such cost
22    exceeds One Hundred Thousand Dollars ($100,000), then Landlord shall have the right to terminate
23    this Lease within ten (10) days of the expiration of the Due Diligence Period or complete such work.
24    In the event that Landlord terminates the Lease, Tenant shall have the right to vitiate Landlord's
25    termination notice by agreeing to reimburse Landlord for such costs that are in excess of One
26    Hundred Thousand Dollars ($100,000). Tenant shall reimburse Landlord for such costs within thirty
27    (30) days of Landlord's written request, which shall be accompanied by invoices showing the total cost
28    of such work, inclusive of the original One Hundred Thousand Dollars ($100,000).

29            (f)     Except as expressly provided herein, Tenant expressly acknowledges that it
30    has inspected the Store premises and is fully familiar with the condition thereof, and Tenant agrees to
31    accept the Store premises in its "as-is" condition.

32       **5.1.2.**     Future.

33            (a)     Future Upgrades. If at any time during the Term, Landlord undertakes the
34    upgrading of the exterior of buildings in Landlord's Parcel other than the Store, then Landlord shall be
35    obligated to similarly upgrade the exterior of the Building so that Landlord's Parcel presents a uniform
36    appearance of quality, design and age. Landlord's failure to perform its obligations under this
37    Section 5.1.2 within sixty (60) days following the completion of the general upgrading of other
38    buildings in Landlord's Parcel shall constitute a material default under the provisions of this Lease
39    entitling Tenant to all remedies at law, in equity and/or under the terms hereof.

"Palm Springs"                       - 21 -                      9/14/2009
Palm Springs Plaza                                               Final
Palm Springs, FL
Store No. 1345
MED 0058 5.5.5

1          (b)     Future Re-Development Area.  Landlord's construction of the buildings
2    and Common Areas within the Future Development Area shown on the Site Plan ("Future Re-
3    Development Area") commenced after the Delivery Date shall comply with the provisions of this
4    Section 5.1.2(b).  The Leasable Floor Area of any building within the Future Development Area shall
5    not exceed six thousand (6,000) square feet.  Landlord shall establish a specific staging area for the
6    Future Re-Development in the location specified on the Site Plan (the "Future Re-Development
7    Staging Area").  The Future Re-Development Staging Area on Landlord's Parcel shall be surrounded if
8    necessary by appropriate fencing in accordance with local governmental requirements, and all activities
9    related to the Future Re-Development shall be performed in a manner to minimize any dust, debris or
10   noise and in such a manner so as not to unreasonably interfere with Tenant's or invitees' use and
11   access to the Store, the Common Areas, and use of the drive aisles in the Shopping Center.  No
12   portion of the Common Areas outside of the Future Re-Development Staging Area shall be used:
13   (A) as staging areas for construction equipment or materials, (B) for the parking of construction
14   vehicles, or (C) as a parking area or for other use by construction employees.  The Future Re-
15   Development Staging Area shall not be in existence for more than eighteen (18) consecutive calendar
16   months from the date that such Future Re-Development Staging Area is erected, and no construction
17   shall be performed for a period in excess of such eighteen (18) month construction period.  Further,
18   from and after the Delivery Date no construction shall be performed during the months of November
19   and December, excepting: (i) any construction performed prior to the occurrence of the Delivery Date,
20   and (ii) any construction of the Inline Buildings located within the Future Development Area (as
21   shown on the Site Plan) or construction that is performed entirely within the shell of a building, but
22   construction activities in the Common Areas within the Future Development Area shall not be
23   permitted during November and December from and after the Delivery Date.  Should Landlord fail to
24   comply with any of the requirements of this Section 5.1.2(b), and such failure continues for sixty (60)
25   days following Tenant's notice of such non-compliance to Landlord, then Tenant's obligation for Rent
26   shall be replaced by Substitute Rent until such time that Landlord has cured such violation.

27

28   **5.2.   Construction Commencement.**

29         Subject to delays caused by Force Majeure and Tenant Delays, if Landlord fails to
30   commence to perform Landlord's Construction Obligations, prior to the Construction
31   Commencement Cancel Date specified in Section 1.4.3 of this Lease, then at any time thereafter, but
32   prior to Landlord's commencement of Landlord's Construction Obligations, upon thirty (30) days
33   prior written notice to Landlord, Tenant shall have the right to terminate this Lease by notifying
34   Landlord in writing.  Commencement of Construction means the day that the contractor's workers
35   commence Landlord's Construction Obligations as described in Section 5.1.

36   **5.3.   Completion of Construction.**

37         Landlord shall use commercially reasonable efforts to complete Landlord's Construction
38   Obligations and deliver possession of the Store to Tenant on the Intended Delivery Date, subject to
39   delays caused by Force Majeure and Tenant Delays.

1    **5.4.    Delivery Notice.**

2        (a)    The parties acknowledge the necessity for Landlord to provide Tenant with the
3    Delivery Notice specified in this Section 5.4 in order that Tenant shall have adequate time to, among
4    other things, hire personnel, arrange promotion, purchase and deliver merchandise, perform Tenant's
5    improvements and fixturization of the Store and enter into other commitments required to timely
6    occupy and conduct business within the Store.  Not less than sixty (60) calendar days prior to the
7    Delivery Date, Landlord must notify Tenant in writing as to when the Delivery Date will occur (the
8    "Delivery Notice") in the form set forth in **Exhibit G** (a Delivery Date must be on a Permitted
9    Delivery Day).  Landlord shall undertake all due diligence and necessary efforts to complete Landlord's
10   Construction Obligations, and satisfy the Delivery Conditions, and deliver the Store on the Delivery
11   Date specified in the Delivery Notice.  Once Landlord delivers its Delivery Date Notice to Tenant,
12   the Delivery Date is not subject to alteration, including due to an event of Force Majeure.   In the
13   event Landlord does not timely satisfy all the Delivery Conditions by the Delivery Date stated in the
14   Delivery Notice (subject to delays caused by events of Force Majeure or Tenant Delay), Tenant will
15   suffer damages arising from Tenant's need for adequate and proper advance notice of delivery.  It
16   would be impractical or extremely difficult to fix actual damages in the event of Landlord's breach
17   under this Section 5.4.  Therefore, in the event of a breach by Landlord of its obligations under this
18   Section 5.4, the parties acknowledge that the damages to be suffered by Tenant in such event are
19   difficult to ascertain.  However, after negotiation the parties have made their best reasonable estimate
20   of such damage and have agreed that Landlord shall pay to Tenant, as liquidated damages (the
21   "Liquidated Damages"), the sum of Fifty Thousand Dollars ($50,000) which sum shall be paid to
22   Tenant in a lump sum by Landlord to Tenant upon demand at any time following a breach by
23   Landlord of its obligations under this Section 5.4.  Nothing herein shall prohibit Tenant, in addition to
24   claiming the Liquidated Damages, from postponing occupancy and the commencement of payment of
25   Rent as specified in Section 5.5 hereof.  In the event Landlord fails to pay to Tenant the Liquidated
26   Damages as required by this Section 5.4(a), Tenant may, at its option, deduct the full amount of the
27   Liquidated Damages from the Rent or other charges coming due until Tenant has fully recovered the
28   full amount of Liquidated Damages.   In addition to Landlord's obligation to pay the Liquidated
29   Damages, Landlord shall remain obligated to diligently complete Landlord's Construction Obligations
30   and to satisfy the Delivery Conditions.  Notwithstanding the foregoing, if Landlord fails to deliver the
31   Store on the date stated in the Delivery Notice due to a delay caused by an event of Force Majeure or
32   Tenant Delay, Landlord's obligation to pay the Liquidated Damages shall be excused for the period of
33   the Force Majeure delay (subject to the provisions of Section 26.13) or Tenant Delay, provided,
34   Landlord gives Tenant the notice required by Section 26.13 in the case of Force Majeure and by the
35   Definition of Tenant Delay, and provided Landlord uses diligent efforts to complete Landlord's
36   Construction Obligations and satisfy the Delivery Conditions.  If Landlord does not deliver a Delivery
37   Notice, there shall be no Liquidated Damages, but Tenant shall have the remedies specified in
38   Sections 5.5 and 5.6.

39       (b)    Landlord may tender delivery of the Store to Tenant on other than a Permitted
40   Delivery Day, however, Tenant shall be under no obligation to take delivery, or, if Tenant does take
41   delivery, to pay Rent or any other charge, until the Commencement Date or as otherwise specified in
42   this Lease.

1   **5.5.   Rollover.**

2       Notwithstanding any other provisions of this Lease, Tenant shall not be obligated to accept
3   delivery of the Store at any time other than on a Permitted Delivery Day.  If (a) Landlord offers to
4   deliver the Store to Tenant on a date other than a Permitted Delivery Day, or (b) Landlord fails to
5   deliver a timely Delivery Notice to Tenant, or (c) Landlord delivers a Delivery Notice to Tenant and
6   thereafter Landlord fails to timely deliver the Store to Tenant on the date specified in the Delivery
7   Notice, then, in each such event, the Delivery Date shall, at Tenant's option, be deferred until the
8   next Permitted Delivery Day which occurs or is in effect after the sixtieth (60th) day after the actual
9   date Landlord satisfies all Delivery Conditions and tenders possession of the Store to Tenant.
10  Tenant's rights to defer the Delivery Date pursuant to this Section 5.5 are referred to herein as the
11  "Rollover" remedy and are in addition to Tenant's rights to recover Liquidated Damages pursuant to
12  Section 5.4 above, if applicable.

13  **5.6.   Remedies Cumulative.**

14      The Rollover remedy described in Section 5.5 above shall apply in addition to all other
15  remedies at law, or in equity, or under the terms of this Lease.

16  **5.7.   Construction Completion Cancel Date.**

17      If for any reason Landlord has not completed Landlord's Construction Obligations, or the
18  Store is not delivered to Tenant prior to the Construction Completion Cancel Date specified in
19  Section 1.4.4 of this Lease, except due to a delay caused by an event of Force Majeure or Tenant
20  Delay, Tenant may, at its sole option, cancel this Lease by written notice to Landlord.
21  Notwithstanding the preceding sentence, if the Delivery Date has not occurred by the date set forth
22  in Section 1.4.4 of this Lease solely because Tenant has not received all governmental approvals for
23  Tenant's plans for Tenant's Work (the "Approval Delivery Condition") and Tenant has not elected
24  to terminate this Lease, then Landlord shall have the right to terminate this Lease upon thirty (30)
25  days' written notice to Tenant and this Lease shall terminate unless, prior to the expiration of the
26  thirty (30) day period, Tenant either (a) receives all governmental approvals for Tenant's plans for
27  Tenant's Work and notifies Landlord that the Approval Delivery Condition has been satisfied; or
28  (b) Tenant notifies Landlord in writing that Tenant waives the Approval Delivery Condition as a
29  condition to delivery.  In either such event, Landlord's termination notice shall be void and the
30  Delivery Date shall be the next Permitted Delivery Day following the satisfaction or Tenant's waiver
31  of the foregoing Approval Delivery Condition.

32  **5.8.   Automatic Termination.**

33      Subject to Tenant Delay, this Lease shall be automatically terminated if the Delivery Date
34  does not occur on or before the Automatic Termination Date specified in Section 1.4.5 of this Lease
35  notwithstanding any Force Majeure events.

36  **5.9.   Entry Prior to Delivery Date.**

37      Tenant shall have the right, without any obligation to pay Rent, to enter the Store for any
38  legal purpose, including to perform Tenant's due diligence work described in Section 26.17 and to

1  prepare for and commence Tenant's Work. Tenant agrees that it shall diligently seek to avoid
2  impeding the progress of Landlord's Work by such entry. No such entry by Tenant shall be deemed
3  an acceptance of the Store. Tenant hereby indemnifies Landlord, and agrees to hold Landlord
4  harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs,
5  expenses and claims of any and every kind whatsoever, including, without limitation, attorneys' and
6  consultants' fees and costs, paid, incurred or suffered by, or asserted against, Landlord as a result of
7  Tenant's entry into the Store prior to the Delivery Date and exercise of any of its rights pursuant to
8  this Section 5.9.

9  **5.10.   Intentionally Deleted.**

10  **5.11.   Additional Delivery Requirements.**

11      **5.11.1.**   <u>On the Delivery Date</u>. Tenant's occupancy of the Store shall not constitute an
12  acceptance of Landlord's Work, or relieve Landlord of responsibility for any warranty or
13  maintenance obligations under this Lease.

14      **5.11.2.**   <u>Sixty Days After the Delivery Date</u>.

15          (a)   Within sixty (60) days after the Delivery Date, Landlord shall deliver all of
16  the following to Tenant:

17             A certificate of completion or comparable permit or certificate;

18             A list of all contractors, subcontractors and suppliers, each of which
19  provided labor, services or materials in excess of Twenty-Five Thousand Dollars ($25,000) ("Major
20  Contractors") for the construction of the Store. Said list shall contain the following information about
21  each contractor, subcontractor or supplier: name, business address, phone number (including area
22  code), facsimile number and e-mail address, contact person for the project, and state license number if
23  required for the execution of work on the Store;

24             To the extent in Landlord's possession, equipment operation manuals,
25  catalogue data sheets and material safety data sheets on all major equipment and/or fixtures used in the
26  Store;

27             For maintenance use, one percent (1%) of the floor and wall covering
28  material installed of each color and pattern required for the Store; a one (1) gallon container of paint
29  for each color and surface texture used and each container, box or roll shall be labeled with color,
30  texture and room location in addition to manufacturer's label;

31             Completed Punchlist properly signed and dated by Landlord or its
32  general contractor indicating that all items have been completed;

33             One (1) copy of final project record documents for the Store indicating
34  actual as-built conditions.

"Palm Springs"          - 25 -          9/14/2009
Palm Springs Plaza                        Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1   (b)   Within six (6) months after the Delivery Date, Landlord shall deliver to
2   Tenant all fully executed and dated warranties and guarantees applying to the Store.

3   (c)   If the items required in Sections 5.11.2(a) and (b) above, are not furnished
4   to Tenant within the required time periods, Tenant may defer payment of one (1) month's Minimum
5   Rent due under this Lease until such items are furnished to Tenant.

6   **5.11.3.**   Until the foregoing items specified in Sections 5.11.1 and 5.11.2 have been
7   furnished to Tenant, Tenant may defer payment of all Rent due under this Lease.

8   ## 6.   RENT

9   **6.1.   Minimum Rent.**

10   **6.1.1.**   Payment and Amount.   Commencing on the Commencement Date and
11   continuing through the Term of this Lease (except as otherwise expressly set forth in this Lease),
12   without demand or set off except as otherwise specified in this Lease, Tenant shall pay Minimum
13   Rent to Landlord in equal monthly installments at the rates specified in Section 1.6 (the "Minimum
14   Rent"). Minimum Rent shall be payable in advance on or before the first (1st) day of each calendar
15   month. If this Lease commences other than on the first day of a calendar month, the first month's
16   Minimum Rent shall be prorated accordingly and paid with the Minimum Rent for the first full
17   month.

18   **6.1.2.**   Place of Payment.   All Minimum Rent and other payments to be made by Tenant
19   to Landlord shall be sent to the place to which Landlord's notices are required to be sent, unless
20   otherwise directed by Landlord in writing.

21   **6.1.3.**   Required Co-Tenancy.

22   (a)   Co-Tenancy Requirements.   A "Reduced Occupancy Period" shall occur
23   unless all of the following requirements are satisfied on the Commencement Date and thereafter
24   throughout the Term: (i) the Required Co-Tenants specified in Section 1.7.1, shall be open in the
25   Shopping Center every customary Business Day for retail business at least from 10:00 a.m. to
26   6:00 p.m., except customary holidays; (ii) the Required Co-Tenants are operating in at least the
27   Required Leasable Floor Area for each Required Co-Tenant specified in Section 1.7.1 under bona fide
28   leases of a minimum of three (3) years' duration as of the inception of such leases; and (iii) retail tenants
29   of the Shopping Center, including the Required Co-Tenants, are open and operating, except customary
30   holidays, under bona fide leases in at least the percentage of the Leasable Floor Area of the Shopping
31   Center indicated in Section 1.7.2 (the Leasable Floor Area of the Store and the Leasable Floor Area of
32   the buildings located on the Outparcels designated on **Exhibit B** shall be excluded from the
33   numerator and denominator of the fraction used to calculate such percentage). For purposes of
34   calculating the percentages in this paragraph, the denominator of the fraction may not be less than the
35   LFA Minimum described in Section 1.3.2(d).

36   (b)   Commencement Date Reduced Occupancy Period.   If a Reduced
37   Occupancy Period exists on the Commencement Date ("Commencement Date Reduced Occupancy
38   Period"), Tenant shall not be required to open the Store for business (notwithstanding any contrary

provision in this Lease), and, further, regardless of whether Tenant opens for business in the Store, no Rent shall be due or payable whatsoever until and unless the Commencement Date Reduced Occupancy Period is cured, except that Tenant shall be obligated to nevertheless pay Minimum Rent for the first forty (40) days, or such lesser time necessary to compensate Landlord for the work to the Storefront as set forth in Section 1.4.1, but thereafter shall not be obligated to pay Minimum Rent pursuant to the remainder of this Section 6.1.3(b). If the Commencement Date Reduced Occupancy Period continues for a period of twelve (12) consecutive calendar months, then Tenant shall either (i) commence paying full Rent or (ii) terminate this Lease upon thirty (30) days' notice to Landlord (the "Reduced Occupancy Termination Notice"), provided the Reduced Occupancy Termination Notice is given prior to the expiration of the Commencement Date Reduced Occupancy Period.

(c)   Secondary Reduced Occupancy Period.  If a Reduced Occupancy Period occurs and continues for one hundred eighty (180) days at any time after the Commencement Date and after satisfaction of the Required Co-Tenancy set forth in Sections 1.7.1 and 1.7.2 and such Reduced Occupancy Period is not the result of an Exempted Discontinuance as hereinafter defined ("Secondary Reduced Occupancy Period"), Tenant's total obligation for Rent commencing on the one hundred eighty first (181st) day following the onset of the Reduced Occupancy Period shall be replaced by Substitute Rent which shall be payable within fifteen (15) days after the close of each calendar month during the Secondary Reduced Occupancy Period and continuing until the expiration of the Secondary Reduced Occupancy Period (or earlier if Tenant terminates this Lease as hereinafter provided in this Section 6.1.3(c)). If the Secondary Reduced Occupancy Period continues for a period of twelve (12) consecutive calendar months (except in the event of an Exempted Discontinuance), then Landlord shall have the right to terminate the Lease by giving thirty (30) days written notice to Tenant within thirty (30) days of the end of the twelve (12) month period ("Landlord's Termination Notice"). Tenant shall have the right to vitiate Landlord's Termination Notice by giving written notice ("Tenant's Vitiation Notice") within thirty (30) days of receipt of the Termination Notice that Tenant shall recommence paying full Rent on the first day of the calendar month following Tenant's Vitiation Notice.  The provisions of this Section 6.1.3(c) shall apply to any subsequent Secondary Reduced Occupancy Period.

(d)   Unamortized Cost of Leasehold Improvements.  In the event Landlord or Tenant terminates this Lease pursuant to Sections 6.1.3(b) or (c) above, Landlord shall pay to Tenant an amount equal to the Unamortized Cost of Tenant's leasehold improvements, which sum shall be due and payable to Tenant within thirty (30) Business Days following the date of the Reduced Occupancy Termination Notice. If the Unamortized Cost of Tenant's leasehold improvements is not timely paid, Tenant may deduct the amount due from any payments due to Landlord, if any hereunder, in addition to and cumulative with any other remedies available to Tenant at law, in equity, or under the terms of this Lease.

(e)   Exempted Discontinuance.  An Exempted Discontinuance shall mean the closure of a tenant's store because of casualty, condemnation, repairs or remodeling for a period not to exceed two hundred (200) days.  A tenant's store which is closed due to an Exempted Discontinuance shall not be considered closed for purposes of determining whether a Secondary Reduced Occupancy Period is in effect (and the Leasable Floor Area of such tenant's store shall not be calculated in the numerator or the denominator of the fraction specified in Section 1.7.2) from the commencement of the Exempted Discontinuance until the earlier of:  (i) the expiration of such two hundred (200) day period; or (ii) the expiration of the Exempted Discontinuance.

1         (f)    <u>Landlord Reporting Requirements</u>.  Within sixty (60) days following
2    Tenant's written request, Landlord shall provide Tenant a Co-Tenancy Report certified as current as of
3    the date of the report plus a Landlord's Co-Tenancy Certification certified as current as of the date of
4    the certificate.  In the event Landlord fails to provide the Landlord's Co-Tenancy Certification and/or
5    the Co-Tenancy Report within the time periods specified above and such failure continues for thirty
6    (30) days following Tenant's written request therefor, Tenant may defer any payments relating to Rent
7    until such time as the Landlord's Co-Tenancy Certification and/or Co-Tenancy Report is received by
8    Tenant.  Tenant shall pay the amount due within thirty (30) days following Tenant's receipt of the
9    Co-Tenancy Report and the Landlord's Co-Tenancy Certification.

10    **6.2.    Reimbursements.**

11    In addition to the Minimum Rent described in Section 6.1, Tenant shall be responsible to
12    pay Tenant's Pro Rata Share of Common Area Charges as described in Section 7.4.1, the Tax Bill as
13    described in Section 8.2.1, and the Special Form Policy premium as described in Section 9.1.4.

14    **6.3.    Other Payment Provisions.**

15    **6.3.1.**    <u>Late Payment</u>.  Any sum including Rent accruing to Landlord or Tenant under
16    the provisions of this Lease which is not paid within ten (10) days following written notice that such
17    sum is past due ("Payment Notice Period"), shall bear interest at the Legal Rate from the expiration
18    of the Payment Notice Period to the date paid unless the past due sum is disputed pursuant to
19    Section 6.3.3.

20    **6.3.2.**    <u>Timely Billing of Charges</u>.  All charges due from Tenant to Landlord for which
21    Tenant must be billed by Landlord shall be billed within twenty-four (24) months after the close of
22    the calendar year in which the charge is incurred by Landlord, or Landlord will have waived its right
23    to reimbursement as otherwise provided in this Lease.

24    **6.3.3.**    <u>Disputed Sums</u>.  Under the terms of this Lease numerous charges are and may
25    be due from Tenant to Landlord and vice versa, including without limitation, real estate Taxes,
26    Common Area Charges, casualty and liability insurance premium reimbursements and other items.
27    In the event that at any time during the Term a bona fide dispute arises with respect to the amount
28    due for any of such charges claimed by a party to be due, the party disputing any such charge shall
29    notify the other party in writing of the dispute and that portion of the amount which is undisputed
30    shall be paid by Tenant or Landlord, as the case may be, pending the resolution of the dispute
31    between the parties by litigation or otherwise, and the disputed portion may be withheld pending
32    resolution.  Tenant's withholding of a disputed amount in the event of a bona fide dispute shall not
33    be deemed a default by Tenant under the terms of this Lease.  Upon resolution of any dispute, the
34    obligated party shall pay to the other the remaining sum liquidated as due (if any) with interest
35    thereupon at the Legal Rate.

36    **6.4.    Gross Sales Statement for Purposes of Calculating Substitute Rent.**

37    **6.4.1.**    <u>Gross Sales Statement</u>.  In the event Tenant pays Substitute Rent pursuant to
38    clause (b) of the Substitute Rent definition in Article 2, within fifteen (15) days after the close of
39    each calendar month, Tenant shall submit to Landlord a statement indicating the amount of its

"Palm Springs"                - 28 -                     9/14/2009
Palm Springs Plaza                                             Final
Palm Springs, FL
Store No. 1345
MED 0058 5.5.5

1  Gross Sales for the previous month. Landlord covenants to keep such information confidential,
2  except for information provided to its accountants or lenders, or if required pursuant to any
3  litigation between the parties hereto or as acquired by law.

4      **6.4.2.**    Maintenance of Records. In the event Tenant pays Substitute Rent during any
5  Lease Year, Tenant shall maintain adequate records for a period of two (2) years after the close of
6  each such Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for
7  such Lease Year. At any time within said two (2) year period, Landlord or its agents may inspect
8  such records at Tenant's main office specified in Section 1.2.2 hereinabove during Tenant's normal
9  business hours. If such inspection or audit discloses an underpayment of Substitute Rent, Landlord
10  shall promptly deliver a copy of the audit report to Tenant for its review. Within thirty (30) days
11  thereafter, Tenant may, by written notice to Landlord, object to the conclusions or process of the
12  audit report stating its conclusions as to the amount due, if any. If Landlord disputes Tenant's
13  conclusions, then within ten (10) days of receipt of Tenant's objection to its audit report, Landlord
14  may institute the appropriate alternative dispute resolution under Section 20.2 of this Lease. If
15  Tenant agrees with the audit report, then it shall promptly thereafter pay to Landlord the amount of
16  the underpayment. In the event an adjustment is required because of an understatement of Gross
17  Sales in excess of three percent (3%), and additional Substitute Rent is due, Tenant shall reimburse
18  Landlord for Landlord's reasonable expenses incurred in conducting such inspection or audit.

19      **6.4.3.**    No Representation. Landlord acknowledges that Tenant has made no
20  representation as to the Gross Sales which may be generated from the Store.

21                          **7.  COMMON AREA MAINTENANCE**

22  **7.1.   Landlord's Obligation to Maintain Common Areas.**

23      **7.1.1.**    Maintain Common Areas. Landlord shall maintain all Common Areas in first
24  class condition, repair and cleanliness, including ice and snow removal, and sidewalk steam cleaning
25  and shall keep the Common Areas free of any material impediments and open for reasonably easy
26  and safe movement within the Common Areas. Landlord shall keep the Common Areas well
27  lighted for a period of sixty (60) minutes following the end of Tenant's business hours in the Store
28  and thereafter maintain reasonable security. Any costs incurred for lighting the Common Areas
29  other than as specified in the preceding sentence shall be borne solely by those tenants requesting
30  the additional lighting hours, and costs incurred in respect to additional lighting shall not be
31  includable as Common Area Charges. No construction or construction-related activity shall be
32  permitted in the Common Areas, except for emergency repairs (or necessary repairs which cannot
33  be delayed) diligently pursued, during the period from October 15 of any year to January 2 of the
34  ensuing year, without the prior written consent of Tenant, which consent may not unreasonably be
35  withheld and may include conditions designed to eliminate interference with the operation of the
36  Shopping Center or the effect of such activity upon Tenant's business.

37      **7.1.2.**    Common Area Metering. The Common Areas shall be served by meters which do
38  not serve any other areas of the Shopping Center. Landlord shall cause all Utilities for the Common
39  Areas to be separately metered from those of Tenant and/or the Store.

1       **7.1.3.** Holiday Event. Landlord shall have the right, but not the obligation, not more than
2    once in any Lease Year to conduct a one (1) day holiday event in the primary parking area of the
3    Shopping Center between the hours of 8:00 a.m. and 12:00 p.m., provided that such event does not
4    obstruct Tenant's and Tenant's customers' ingress and egress to the Store or is conducted in the
5    parking field bounded between the Store and Congress Avenue and the main drive aisle and 10th
6    Avenue North. Furthermore, any profits derived from such Holiday Event shall be applied to the
7    Common Area to offset Common Area Charges and Tenant shall have no obligation to pay for any
8    costs (except as may otherwise be expressly provided for in this Lease), included but not limited to
9    setup and cleaning associated with the Holiday Event.

10   **7.2.** **Tenant's Pro Rata Share.**

11      **7.2.1.** Pro Rata Share. Tenant's Pro Rata Share of Common Area Charges is defined as
12   that fraction of Common Area Charges the numerator of which is the Leasable Floor Area in the
13   Store and the denominator of which is the Leasable Floor Area in the Shopping Center.

14      **7.2.2.** Shopping Center. In no event shall Tenant's Pro Rata Share of Common Area
15   Charges exceed the amount Tenant would have incurred had its Pro Rata Share been a fraction, the
16   numerator of which is the Leasable Floor Area in the Store, and the denominator of which is the
17   Leasable Floor Area in the Shopping Center, which fraction shall be applied to the Common Area
18   Charges for the Shopping Center provided, however, in no event shall the denominator of such
19   fraction be less than the Minimum Leasable Floor Area set forth in Section 1.3.2(a).

20   **7.3.** **Definition of Common Area Charges.**

21      **7.3.1.** Included Charges. The following costs reasonably incurred during the Term for
22   maintenance and repair of the Common Areas shall be included as Common Area Charges:
23   maintaining and repairing the parking area of the Common Areas (including slurry-sealing, restriping
24   parking spaces and filling potholes), sidewalks and loading zones (whether or not such sidewalks and
25   loading zones are Common Areas) provided that if no other tenant or occupant's loading zones are
26   maintained by Landlord, then Tenant shall reimburse Landlord's costs incurred to maintain Tenant's
27   loading area payable together with its Pro Rata Share of Common Area Charges provided Landlord
28   itemizes the billing for such charges; Shopping Center security; cleaning, sweeping and other
29   janitorial services; sanitation; maintenance of Common Area refuse receptacles; replanting existing
30   landscaping; maintenance of directional signs and other markers; electricity to light the Common
31   Areas during the hours required by Section 7.1 (excluding other tenants' after-hours lighting);
32   electricity to light and maintenance of pylon and monument signs identifying the Shopping Center
33   (but not other pylon or monument signs on which Tenant's signage does not appear) as well as
34   Tenant's signs on such pylon or monument signs; repair and maintenance of lighting fixtures;
35   replacement of lighting elements; any repair and maintenance of other Utility systems to serve the
36   Common Areas; premiums of Landlord's liability insurance for the Common Areas; trash removal
37   for the Common Areas of Landlord's Parcel (Landlord shall arrange for separate, segregated
38   dumpsters for Common Area trash, the allocated cost of which shall be includable in Common Area
39   Charges); and the administrative fee described in Section 1.8 which may be included only to the
40   extent assessed against the remainder of Common Area Charges after excluding therefrom liability
41   insurance premiums, Utility costs, security costs, management fees paid to third parties and capital
42   expenditures, if any are expressly authorized by this Section 7.3.1. Taxes as defined in Article 8, and

"Palm Springs"                           - 30 -                       9/14/2009
Palm Springs Plaza                                                     Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1    Property Insurance pursuant to Section 9.1 are not included as Common Area Charges, and,
2    accordingly, are not included in the computation of the administrative fee specified in Section 1.8.
3    Notwithstanding the exclusion of capital expenditures from Common Area Charges as set forth in
4    clause (3) of Section 7.3.2 below, Landlord shall be permitted to include in Common Area Charges
5    capital expenditures which reduce Common Area energy costs, maintenance costs and repair costs
6    or other Common Area Charges provided that (a) the portion of such capital expenditures included
7    as Common Area Charges in any Lease Year shall be the annual amount which results from
8    amortization of the capital expenditure with an interest rate of five percent (5%) per annum over the
9    useful life of the improvement for which it is incurred as determined in accordance with generally
10   accepted accounting principles and customary first class shopping center maintenance procedures in
11   the area of the Shopping Center, and (b) provided further that in no event shall the Common Area
12   Charges payable by Tenant which includes such annual amortization amount exceed the Common
13   Area Charges that would have been payable by Tenant had the capital expenditure not been made
14   ("Permitted Capital Expenditure"). Further notwithstanding any provision to the contrary contained
15   in this Lease, Common Area Charges shall include a portion of the capital expenditures incurred by
16   Landlord with respect to parking lot repaving performed after the expiration of the Initial Term of
17   the Lease. The portion of such parking lot repaving capital expenditures included as Common Area
18   Charges in any Lease Year shall be the annual amount applicable to such Lease Year which results
19   from amortization of the capital expenditures on a straight-line basis over the useful life of the
20   improvement as determined in accordance with generally accepted accounting principles and
21   customary first class shopping Center maintenance procedures in the area of the Shopping Center
22   with interest at a rate of five percent (5%) per annum.

23       **7.3.2.**    Excluded Charges. In no event shall Common Area Charges include any of the
24   following:  (1) costs of original construction (as distinguished from maintenance and repair) of the
25   Shopping Center or any expansion, remodeling or renovation thereof; (2) principal and/or interest
26   payments on any financing for the Shopping Center or any portion thereof or rental under any
27   ground lease or other underlying lease; (3) capital expenditures (i.e., expenditures which, in the
28   customary course of maintenance practice for shopping centers similar in type and location to that
29   of the Shopping Center, do not recur annually) including, but not limited to, repaving, petromatting
30   or resurfacing of the parking area of the Common Areas; (4) the costs of correcting defects in the
31   design or construction of the Shopping Center, or repair and/or replacement of any materials or
32   equipment required as a result of such defects; (5) any expense resulting from deferred maintenance
33   or the negligence of Landlord, its agents, servants or employees, or any additional expense incurred
34   as a direct result of Landlord's failure to use competitive bidding to minimize expenses to the extent
35   possible without detracting from the standards of a shopping center comparable to the Shopping
36   Center; (6) the cost of any repair to remedy damage caused by or resulting from the negligence of
37   any other tenant(s) in the Shopping Center, including their agents, servants or employees;
38   (7) reserves for anticipated future expenses; (8) legal and other fees, leasing commissions, advertising
39   expenses and other costs incurred in connection with development, leasing or operation of the
40   Shopping Center, or in connection with negotiations or disputes with tenants, occupants or
41   prospective tenants or occupants, or legal fees incurred in connection with this Lease; (9) cost of
42   repairs or other work occasioned by fire, casualty or other insurable risk or the exercise of the right
43   of eminent domain; (10) expenses incurred in the build out, renovation, alteration, improvement,
44   decoration, or redecoration of any portion of any building in the Shopping Center (except for
45   graffiti removal and associated spot repainting); (11) any items for which Landlord is entitled to be

"Palm Springs"                        - 31 -                      9/14/2009
Palm Springs Plaza                                                Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

reimbursed or compensated, including, without limitation, contractors' warranty or right of reimbursement from any tenant or occupant of the Shopping Center, but excluding contributions for Common Area Charges; (12) any bad debt loss, rent loss or reserves for bad debts or rent loss; (13) cleaning, sweeping, and removal of debris within the seating area of any restaurant; (14) expenses in connection with services or other benefits of a type which are not provided Tenant but which are provided only to or for another tenant or occupant of the Shopping Center; (15) any interest, late charges, or penalties incurred as a result of Landlord's failure to pay any bill as the same shall become due; (16) any and all other costs associated with the operation of the business of Landlord, intending by this exclusion to distinguish the same from the costs of maintenance and repair of the Common Areas (excluded items shall specifically include, but shall not be limited to, formation of the Landlord entity, internal accounting and legal matters, including, but not limited to, preparation of tax returns and financial statements and gathering of data therefor, costs of selling, syndication, financing, mortgaging or hypothecating any of Landlord's interest in the Shopping Center, and costs of any disputes between Landlord and its employees); (17) salaries and bonuses of officers and executives of Landlord and compensation paid to clerks, attendants or other persons in commercial concessions operated by Landlord; (18) advertising and promotional expenditures or customer services; (19) costs, fines, or fees incurred by Landlord due to violations of any federal, state or local law, statute or ordinance, or any rule, regulation, judgment or decree of any governmental rule or authority; (20) any costs or expenses associated with the removal, cleanup or remediation of any Hazardous Materials (as hereinafter defined) from the Shopping Center as required pursuant to applicable Environmental Regulations (as hereinafter defined), any restoration in connection therewith or compliance with any Environmental Regulations; (21) the cost of compliance with any other Requirements (as hereinafter defined) (including, without limitation, the Americans With Disabilities Act) which are capital in nature, unless such capital costs are permitted under Section 7.3.1; (22) the cost of any work or services performed for any facility other than the Shopping Center; (23) any costs representing an amount paid to a person, firm, corporation or other entity related to Landlord which is in excess of the amount which would have been paid in the absence of such relationship; (24) management, supervision, administrative and  overhead costs (including, but not limited to, office space, equipment, Utilities, and personnel) other than the fee described in Section 1.8; (25) the cost of acquiring sculptures or other art objects and costs of decorative monuments; (26) costs of tools and equipment for operation, repair and maintenance of the Common Area which are not customarily expensed in the year placed in operation pursuant to generally accepted accounting principles; (27) costs incurred in the construction, maintenance, repair or replacement of any buildings in the Shopping Center (whether relating to structural or nonstructural, exterior or interior portions of such buildings), specifically excluding from Common Area Charges any costs incurred for maintenance, repair, Utilities or any other costs with respect to restrooms or restroom facilities, or signs which identify the Shopping Center (except for signage required to be maintained by Landlord pursuant to Section 24.3); (28) any costs to clean up or repair the Common Area as a result of promotional activities or because of construction, maintenance, or reconstruction of buildings in the Shopping Center; (29) premiums for liability insurance of any kind except as specified in Section 7.3.1 above; (30) costs incurred by Landlord as a result of any claim covered by the insurance which Landlord is required to maintain under this Lease, including deductible amounts; (31) any expense associated with "food courts" as that term is described in Article 2 - "Common Areas", such as maintenance, repair, purchase of personal property or any other cost related thereto; (32) if Tenant is paying any charges for sewer under the provisions of Article 10, sewer charges, whether separately billed or included with the billing for water charges

from the Utility provider, in which latter case, the charges for sewer shall be separated out; (33) should there be commercial offices within the Shopping Center which occupy, in the aggregate more than five thousand (5,000) square feet of Leasable Floor Area, the charges incurred in respect of such office facilities such as, by way of example, elevator charges, common hallways, electricity, water and janitorial expenses; (34) any unreimbursed Common Area Charges arising from a reimbursement to Landlord from an occupant of the Shopping Center of less than its mathematical pro rata share thereof calculated based upon Leasable Floor Area occupied by such occupant relative to the Leasable Floor Area of all occupants of the Shopping Center; (35) the cost of promotional and seasonal decorations, including the purchase, leasing, storage, installation and/or removal and clean-up of same; (36) costs of replacing, repairing, or restoring the Shopping Center, or any portion thereof, in the event of a casualty of any type, regardless of whether insurable or uninsurable, insured or uninsured; (37) rent or other costs for security offices or a police station in the Shopping Center; (38) intentionally omitted; (39) costs for the construction of any pylon or monument signs for the Shopping Center, except as may be set forth in Article 24.3; and (40) any costs or expenses incurred by Landlord in sponsoring events in or upon the Shopping Center or in creating a "brand" or name recognition for the Shopping Center. Additionally, Tenant shall have no obligation to contribute to a marketing fund or merchants' association for the Shopping Center.

**7.4.    Payment of Tenant's Pro Rata Share.**

**7.4.1.** <u>Payment</u>. Provided Landlord maintains the Common Areas as specified in Section 7.1, commencing on the Commencement Date, Tenant shall pay Tenant's Pro Rata Share of the Common Area Charges in the manner set forth herein.

**7.4.2.** <u>Estimated Payments</u>. Landlord shall have the right, once a year, to estimate Common Area Charges for the ensuing calendar year, and Tenant's share thereof, based on the previous year's actual expenditures and Landlord's reasonable projections for the following calendar year (except if the Shopping Center has not been operated for one (1) year or more as of the Commencement Date of the Term, Common Area Charges shall be based on Landlord's reasonable estimate thereof based on typical charges for similar shopping centers within five (5) miles of the Shopping Center), and Landlord shall so inform Tenant of such projections in writing along with the Annual Statement referred to below.   Notwithstanding the preceding sentence, in the event Landlord fails to retain its records of Common Area Charges as required by Section 7.4.7 and records of Common Area Charges for the immediately preceding calendar year are not available to Tenant, then, in addition to all other remedies available to Tenant at law or in equity, Landlord shall not be permitted to increase its estimate of Common Area Charges for the following calendar year and Tenant shall be under no obligation with respect to such calendar year to pay more than the amount payable by Tenant for the last calendar year for which Landlord's records of Common Area Charges were reviewed and approved by Tenant.  Beginning with the first (1st) day of the first calendar month of the Term following Tenant's receipt of Landlord's written estimate of its annual obligation in respect of Common Area Charges (but not in any event before thirty (30) days after receipt thereof), Tenant shall include one-twelfth ($1/12^{th}$) of its annual obligations set forth in such estimate with each payment of Minimum Rent for the ensuing twelve (12) month period. After the first calendar year, any proposed increase in total Common Area Charges in excess of five percent (5%) over the previous year's expenditures must be justified by itemization of each element of charge, together with (a) a written explanation of the reason (i.e., increased scope of work, deferred work, etc.) for the increase in excess of five percent (5%), and (b) copies of the competitive bids

1   described in Section 7.4.3 below.  Such justification shall be promptly provided by Landlord, but
2   only upon Tenant's reasonable request.  The requirement for bids shall also apply at any time an
3   element of the Common Area Charge is proposed to increase more than ten percent (10%) in any
4   year, in relation to the cost for such element for the previous twelve (12) month period, whether the
5   resulting proposed Common Area Charges for the subject year will be in excess of five percent (5%)
6   over the amount paid by Tenant for the previous twelve (12) month period.  In the absence of the
7   required justification of the proposed increase in Common Area Charges in excess of five percent
8   (5%), Tenant shall be under no obligation in respect of such year to pay more than the amount
9   payable by Tenant for the previous twelve (12) months plus five percent (5%).

10      **7.4.3.**  <u>Landlord's Contracts</u>.  All Landlord's contracts with third parties for work,
11  service or materials, the cost of which may be included in the Common Area Charges, shall include
12  a detailed description of the work, service, or material to be provided by the contractor.  No such
13  contracts shall involve a duplication of the work or service provided by other contractors, their
14  employees or agents or the employees of Landlord.  Landlord shall maintain detailed job
15  descriptions for all employees employed by Landlord for the purpose of performing Common Area
16  maintenance activities whose salaries, wages and/or benefits may be included in Common Area
17  Charges.  Landlord's employees shall not provide duplicate services to those provided by Landlord's
18  third party contractors.  Any individual third party contract in excess of Fifty Thousand Dollars
19  ($50,000) shall be awarded by competitive bidding from at least two (2) bona fide third party
20  contractors.

21      **7.4.4.**  <u>Intentionally Deleted</u>.

22      **7.4.5.**  <u>Annual Statement</u>.  Within one hundred twenty (120) days following the close of
23  each calendar year, Landlord shall submit to Tenant a statement ("Annual Statement"), in which
24  Landlord shall set forth in reasonable detail the actual expenditures for Common Area Charges for
25  such calendar year and Tenant's Pro Rata Share of Common Area Charges thereof.  The Annual
26  Statement shall be certified by an authorized agent of Landlord to be correct.  Within twenty (20)
27  days of Tenant's request, Landlord shall provide Tenant with copies of all invoices and other written
28  evidence of Common Area Charges ("CAM Evidence") paid by Landlord.  In the event Landlord
29  fails to provide such Annual Statement or CAM Evidence within the time periods required hereby,
30  Tenant may thereupon continue to make current payments without increase until such time as the
31  Annual Statement is received by Tenant, and Tenant shall pay the amount due within thirty (30) days
32  thereafter.  Landlord may elect to provide the Annual Statement and CAM Evidence in electronic
33  format provided such electronic files are reasonably organized.

34      **7.4.6.**  <u>Reconciliation of Annual Statement</u>.  If the Annual Statement indicates that
35  Tenant's payments of estimated Common Area Charges exceeded Tenant's total obligation relating
36  to such calendar year, Landlord shall accompany said Annual Statement with a memo crediting
37  Tenant's account in the amount of such overpayment or, if the amount of the credit exceeds one (1)
38  full month's estimated payment for Common Area Charges, Landlord shall accompany said Annual
39  Statement with a payment to Tenant of the amount of such excess.  If the Annual Statement shows
40  that Tenant's payments of estimated Common Area Charges were less than its total obligation
41  relating to such calendar year, Tenant shall pay the difference to Landlord within forty-five (45) days
42  of Tenant's receipt of the Annual Statement.  Notwithstanding the foregoing, if at the time Landlord
43  delivers such Annual Statement to Tenant, Tenant is auditing Landlord's records of Common Area

1  Charges, any adjustment (if required) and any credit or payment shall be made upon conclusion of
2  such audit.

3         (a)    Audit.  Tenant shall have the right, not more frequently than once in any
4  calendar year, to audit (the "CAM Audit") all of Landlord's or Landlord's agent's records pertaining to
5  Common Area Charges with a representative of Tenant's choice.  Landlord shall retain its records
6  regarding Common Area Charges for a period of at least four (4) years following the final billing for
7  each calendar year during the Term.  Landlord covenants and agrees that in the event Landlord assigns
8  this Lease in connection with a transfer of the Shopping Center, Landlord shall deliver to the assignee
9  all of the records of Common Area Charges required to be retained by Landlord pursuant to this
10 Lease.  In the event Landlord fails to retain its records as required by this Section 7.4.6, Landlord's
11 failure shall constitute a default by Landlord under this Lease, and, in addition to all other remedies
12 available to Tenant at law or in equity, Tenant may, elect to pay no more than Tenant's Pro Rata Share
13 of Common Area Charges payable by Tenant for the last calendar year for which Landlord's records of
14 Common Area Charges were reviewed and approved by Tenant, or for which Tenant did not review
15 such records and Tenant's Audit rights have expired.

16        At any time during such four (4) year period, upon at least thirty (30) days' advance notice to
17 Landlord, Tenant may conduct a CAM Audit.  The CAM Audit shall commence on a date (the
18 "Audit Date") of which Tenant has notified Landlord not less than thirty (30) days in advance.  In
19 the event of cancellation of the CAM Audit by Landlord, Tenant shall be relieved of its obligation to
20 make monthly payments of the estimated Common Area Charges until the first to occur of twelve
21 (12) months thereafter, or until the CAM Audit is performed and completed.  In addition, in the
22 event Landlord cancels the CAM Audit less than ten (10) days prior to the scheduled Audit Date for
23 reasons other than an event of Force Majeure, Landlord shall reimburse Tenant for all costs incurred
24 by Tenant, such as, for example, the cost of nonrefundable airfares, resulting from Landlord's
25 cancellation of the CAM Audit.  Landlord shall reimburse such costs to Tenant within ten (10) days
26 following receipt of Tenant's invoice therefor, and if Landlord fails to do so, Tenant may deduct the
27 full amount of such costs from any subsequent Rents coming due under this Lease.  Any overbilling
28 discovered in the course of the CAM Audit shall be refunded to Tenant (together with interest at the
29 Legal Rate) within thirty (30) days following the date that Landlord is provided with a copy of
30 Tenant's CAM Audit (the "Refund Date").  In the event the overbilling of charges exceeds three
31 percent (3%) of the sum previously billed to Tenant by Landlord, Landlord shall also reimburse
32 Tenant for all reasonable expenses of the CAM Audit by the Refund Date.  On or before the
33 Refund Date, Landlord shall:  (a) refund any overbilled amount (together with interest at the Legal
34 Rate) and the CAM Audit expenses, if applicable; or (b) provide Tenant with (i) the reasons for any
35 disagreement by Landlord with the findings of Tenant's CAM Audit, (ii) together with any
36 supporting documentation, and (iii) accompanied by cash payment in the amount of any undisputed
37 overbilling.  In the event Landlord fails to respond by either of the foregoing methods, the CAM
38 Audit shall be deemed conclusive and Tenant may, in addition to its other remedies, deduct the full
39 amount of such overbilling from any subsequent Rents coming due under this Lease.  In the event
40 Landlord disputes Tenant's CAM Audit and provides the reasons and documentation supporting
41 such claim, the parties shall diligently, within ten (10) Business Days thereafter, attempt to resolve
42 their differences, and, in failing to do so, the matter may be submitted by either party for Arbitration
43 under the provisions of Section 20.2.3 hereof.  In the event Landlord fails to pay Tenant the
44 overbilled amount (together with interest at the Legal Rate) as well as CAM Audit expenses, if

1   applicable, by the Refund Date, or within thirty (30) days of a final arbitration/court order if
2   Landlord disputes the CAM Audit of Tenant's billing, Tenant shall have the right to deduct all
3   unpaid amounts from the Rent coming due from Tenant until Tenant is fully paid. The expenses of
4   this audit, when taken together with expenses of the Tenant Audits in Section 8.2.5 and 9.1.4(c),
5   shall not exceed Five Thousand One Hundred Dollars ($5,100), with annual increases pursuant to
6   the annual change in the CPI (as hereinafter defined) during the immediately preceding calendar
7   year. CPI shall mean the Consumer Price Index [All Urban Consumers] (base year 1982-84 = 100)
8   for the U.S. City Average published by the United States Department of Labor, Bureau of Labor
9   Statistics. If the CPI is changed so that the base is changed from 1982-84 = 100, the CPI shall be
10  converted in accordance with the conversion factor published by the United States Department of
11  Labor, Bureau of Labor Statistics. If the CPI is discontinued or revised during the Term, such other
12  governmental index or computation with which it is replaced shall be used in order to obtain
13  substantially the same result as would be obtained if the CPI had not been discontinued or revised.
14  If there is no such replacement, then Landlord and Tenant shall select another price index that is
15  reasonably satisfactory to both. The amount shall not be reduced below the prior year's amount on
16  the basis of the CPI adjustment above.

17              ## 8.  REAL ESTATE TAXES AND ASSESSMENTS

18  **8.1.    Obligation to Pay.**

19              (a)     Landlord shall pay all real property taxes and assessments ("Tax" or "Taxes")
20  levied by a government agency against Landlord's Parcel or smaller Tax parcel which includes the
21  Store (the "Tax Bill") on or before the last day that such Taxes may be paid without penalty,
22  commission, interest or other charge or such earlier date as will secure the maximum discount,
23  rebate or other reduction of Taxes as may be available. In the event that Landlord elects not to
24  secure the maximum discount, rebate or other reduction that may be available through an early
25  payment, then Tenant's share of Taxes shall be calculated using the maximum discount, rebate or
26  other reduction offered by the taxing jurisdiction. A "Tax parcel" is a single parcel of land for which
27  the relevant taxing authority renders a separate billing.

28              (b)     All payments made by Tenant shall be accompanied by the applicable Rent
29  Tax, which are such additional taxes only as are, pursuant to the wording of the tax statute or law of
30  the jurisdiction in which the Store is located, applicable exclusively to sales, privilege or rentals from
31  real estate and no other forms of receipts, and are attributable solely to Tenant's Lease of the Store
32  and not on an average of Landlord's rental for the Shopping Center as a whole, but only to the
33  extent that the State of Florida requires payment of such tax

34  **8.2.    Tenant's Pro Rata Share.**

35              **8.2.1.**    Payment of Tenant's Pro Rata Share. In addition to the Minimum Rent herein
36  reserved, Tenant shall reimburse Landlord for Tenant's Pro Rata Share (calculated in accordance
37  with Section 8.2.3 hereafter) of the Tax Bill, applicable to each Tax Year or part thereof which falls
38  within the Term. Tenant's payment shall be made within thirty (30) days after receipt by Tenant of
39  (a) a copy of Landlord's Tax Bill, and (b) a statement in writing from Landlord setting forth the
40  amount of Tenant's Pro Rata Share of the Tax Bill and the method of calculation thereof. Subject

1  to Tenant's receipt of written evidence of Landlord's payment of Landlord's Tax Bill as specified
2  above, Tenant's schedule of payments shall be concurrent with Landlord's obligations for payment
3  to the taxing authority. Upon Tenant's written request, Landlord shall provide a copy of Landlord's
4  cancelled check for payment of Taxes or other evidence of payment reasonably satisfactory to
5  Tenant. To the extent that Taxes are payable at a discount for early payment, Tenant shall have the
6  right to deduct such discount from Tenant's Pro Rata Share of Taxes if Tenant shall pay Tenant's
7  Pro Rata Share of Taxes during the period qualifying for such discount for early payment

8       **8.2.2.** <u>Installments</u>. In the event of tax assessments which may be paid in installments
9  by reason of bonding or otherwise, Landlord shall elect to make payment based upon the longest
10 period of installment payments permitted by the appropriate taxing authority. Tenant shall bear no
11 liability as to installments due following the expiration or earlier termination of this Lease except for
12 prorated amounts due prior to the expiration or earlier termination of this Lease. Tenant shall not
13 be responsible for any interest, late charge or other penalty resulting from Landlord's late payment
14 or non-payment of Taxes, nor any administrative or other charge which may be claimed by
15 Landlord, unless such late payment or non-payment of Taxes is due to Tenant's failure to pay
16 Tenant's Pro Rata Share of Taxes in a timely manner.

17      **8.2.3.** <u>Calculation of Tenant's Pro Rata Share</u>. Tenant's Pro Rata Share of the Tax Bill
18 is defined as that fraction of Taxes the numerator of which is the Leasable Floor Area in the Store
19 and the denominator of which is the Leasable Floor Area in the Tax parcel of which the Store is a
20 part; provided, however, in no event shall the denominator of said fraction be less than the
21 Minimum Leasable Floor Area as set forth in Section 1.3.2(b). Such computation shall be made
22 separately for each Tax Year and shall be set forth in reasonable detail as a part of Landlord's
23 statement to Tenant pursuant to Section 7.4.5. The Tax parcel in which the Store is located shall
24 not contain more Common Areas than is consistent with the overall Common Area square footage
25 to building area ratio of the Shopping Center.

26      **8.2.4.** <u>Partial Year</u>. Should Tenant be in occupancy during only a portion of the first or
27 final Tax Years, Tenant shall be responsible to pay Landlord only for a ratable portion of its Tax
28 obligation, based on the portion of such Tax Year included in the Term of this Lease.

29      **8.2.5.** <u>Tenant Audit</u>. Upon at least thirty (30) days' prior notice, Tenant shall have the
30 right to audit Landlord's or Landlord's agent's records pertaining to Taxes with a representative of
31 Tenant's choice. Landlord shall retain its records regarding Taxes for a period of at least four (4)
32 years following the final billing for each calendar year in question. At any time during such four (4)
33 year period, Tenant may conduct its audit. Any overbilling discovered in the course of such audit
34 shall be refunded to Tenant with interest thereon at the Legal Rate within thirty (30) days of
35 Landlord's receipt of a copy of the audit and Tenant's billing ("Tax Refund Date"). In the event
36 Landlord's overstatement of Tax charges to Tenant exceeds three percent (3%) of the sum
37 previously billed to Tenant by Landlord, Landlord shall reimburse Tenant for all of Tenant's
38 reasonable audit expenses by the Tax Refund Date. In the event Landlord fails to pay Tenant the
39 overbilled amount (together with interest at the Legal Rate), and audit costs, if applicable, by the Tax
40 Refund Date, Tenant shall have the right to deduct all unpaid amounts from Rent coming due from
41 Tenant until Tenant is fully paid. The expenses of this audit, when taken together with expenses of
42 the Tenant Audits in Section 7.4.6 and 9.1.3(c), shall not exceed Five Thousand One Hundred
43 Dollars ($5,100), with annual increases pursuant to the annual change in the CPI (as hereinafter

"Palm Springs"          - 37 -          9/14/2009
Palm Springs Plaza          Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1   defined) during the immediately preceding calendar year.  CPI shall mean the Consumer Price Index
2   [All Urban Consumers] (base year 1982-84 = 100) for the U.S. City Average published by the United
3   States Department of Labor, Bureau of Labor Statistics.  If the CPI is changed so that the base is
4   changed from 1982-84 = 100, the CPI shall be converted in accordance with the conversion factor
5   published by the United States Department of Labor, Bureau of Labor Statistics.  If the CPI is
6   discontinued or revised during the Term, such other governmental index or computation with which
7   it is replaced shall be used in order to obtain substantially the same result as would be obtained if the
8   CPI had not been discontinued or revised.  If there is no such replacement, then Landlord and
9   Tenant shall select another price index that is reasonably satisfactory to both.  The amount shall not
10  be reduced below the prior year's amount on the basis of the CPI adjustment above.

11  **8.3.   Exclusions.**

12          There shall be excluded from the Taxes to which Tenant contributes any of the following:
13  (a) any increase in Taxes caused by construction in Landlord's Parcel commenced subsequent to the
14  Effective Date of this Lease until such time as such newly constructed space constitutes Leasable
15  Floor Area; (b) any increase in Taxes caused by a Change of Ownership Assessment as hereinafter
16  defined (excepting only: (i) one (1) increase resulting from a change in ownership of the Shopping
17  Center if completed within one (1) year following the Effective Date; (ii) one (1) increase caused by
18  a change in ownership during the Initial Term; and (iii) two (2) increases caused by a change in
19  ownership during the aggregate of all the Option Periods); (c) income, excess profits, gross profits,
20  estate, single business, inheritance, succession, transfer, franchise, capital or other tax or assessment
21  upon Landlord or the Rent payable under this Lease; (d) bonds and/or assessments which have
22  been or, subsequent to the date hereof are, levied for the purpose of funding the costs of
23  construction for Landlord's development or redevelopment of, all or any portion of Landlord's
24  Parcel or capital improvements constructed therein or with respect thereto, which are required as a
25  result of Landlord's redevelopment of the Shopping Center; (e)  tax increment financing, fees, taxes
26  (excluding Real Estate Taxes), or assessments; (f) any special (non-general) assessments which apply
27  to the Shopping Center; (g) any Taxes assessed against land in Landlord's Parcel that has not been
28  fully developed as buildings or Common Areas; and (h) any taxes or assessments for the
29  construction or installation of any Utilities to the Store or Landlord's parcel, or any taxes or
30  assessments related to the usage of any Utilities to the Store or Landlord's Parcel, such as water or
31  sewer charges included in the Tax Bill which exceeds the sum of fourteen cents ($0.14) per square
32  foot of Leasable Floor Area in the Store, such fourteen cent ($0.14) amount to be increased
33  proportionately with any increases in Minimum Rent set forth in Section 1.6.  A "Change of
34  Ownership Assessment" is any increase in the tax assessment of the Shopping Center or Tax parcel
35  (as herein defined) resulting from a change in the ownership or title holding of any property within
36  the Tax parcel under the provisions of any real property tax statute for the state in which the
37  property is located, such as, by way of example, California Revenue and Taxation Code section 60
38  et. seq.

39  **8.4.   Rebates.**

40          Any final, non-appealable refunds, or abatements of Taxes received by Landlord subsequent
41  to Tenant's payment of its Pro Rata Share of the Tax Bill, including, but not limited to, tax
42  increment financing rebates or subsidies received by Landlord from the applicable taxing authority,
43  shall be refunded to Tenant on a ratable basis within thirty (30) days of receipt by Landlord.  Any

1   such rebate, refund or abatement realized by Landlord prior to payment by Tenant shall result in an
2   immediate reduction in Tenant's Pro Rata Share of the Tax Bill then due to Landlord.

3   **8.5.   Contest.**

4      In the event Tenant and tenants occupying at least fifty percent (50%) of the Leasable Floor
5   Area of the Shopping Center request that Landlord contest Taxes, Landlord shall contest the validity
6   or amount of Taxes in the Tax Bill as are permitted by law. Landlord shall provide Tenant with
7   government notices of assessment (or reassessment) in time sufficient to reasonably permit Tenant,
8   to cause Landlord, to make contest; and if Landlord fails to do so, then there shall be excluded from
9   the Tax Bill, any increased Taxes resulting from such assessment (or reassessment). Landlord shall
10  notify Tenant immediately upon Landlord's filing of any contest. The term "contest" as used in this
11  Section 8.5. means contest, appeal, abatement or other proceeding prescribed by applicable law to
12  obtain a tax reduction or tax refund, howsoever denominated. The net benefit of any contest, after
13  the payment of expenses thereof, shall inure to the benefit of Tenant and all other occupants of the
14  parcel(s) included in the Tax Bill in the same proportions as their respective obligations for Taxes to
15  which the contest relates.

16  **8.6.   Intentionally Omitted.**

17                          **9.   INSURANCE**

18  **9.1.   Property Insurance.**

19      **9.1.1.**      Special Form Policy. A policy of fire and Property Insurance in the form of the
20  Insurance Services Offices' ISO Property form 1030 - Causes of Loss Special Form or equivalent
21  ("Special Form Policy"). The term "Property Insurance" means insurance covering damage to
22  tangible real and personal property.

23      **9.1.2.**      Landlord Insurance. Commencing on the Delivery Date, as defined in Article 2
24  hereof, and at all times during the Term, Landlord shall maintain a Special Form Policy insuring
25  against damage to Landlord's Parcel, including Tenant's leasehold improvements and alterations in
26  the Store, but excluding Tenant's trade fixtures, trade equipment and other personal property in the
27  Store. Further, upon completion of construction of Landlord's Parcel (exclusive of pads, Outparcels
28  and any phase of development to be completed at a later date) the Special Form Policy shall be
29  obtained with an owner's rating for Landlord's Parcel based upon a completed project as opposed to
30  a property under development. All Special Form Policy(ies) shall be in the amount of the full
31  replacement cost of the insured improvements, including demolition cost less a deductible of not
32  less than Ten Thousand Dollars ($10,000). Landlord shall, on the Delivery Date and thereafter
33  upon request of Tenant, provide Tenant with a certificate of such insurance coverage from an
34  insurer authorized to do business within the state in which the Store is located, and which insurer is
35  rated at least A- and VIII in Best's Insurance Reports, or equivalent.

36      **9.1.3.**      Tenant Insurance. Intentionally Omitted.

1       **9.1.4.**      Tenant's Pro Rata Share.

2               (a)     If Tenant does not exercise its rights to insure, Tenant shall be responsible
3    to reimburse Landlord for Tenant's Pro Rata Share of the premium for the Special Form Policy
4    described in Section 9.1.1 above, excluding (i) any management or administrative fees, and
5    (ii) terrorism insurance. Tenant shall pay Tenant's Pro Rata Share within thirty (30) days after Tenant's
6    receipt of the following: (A) written evidence of Landlord's payment of the insurance premium; and
7    (B) a statement, certified by an authorized agent of Landlord, indicating the total cost of the premium
8    applicable to Landlord's Parcel, accompanied by a copy of the premium billing ("Insurance Bill") and
9    the declaration page from Landlord's policy, together with such further information as Tenant may
10   reasonably require to substantiate the amount of such premium and the manner in which the premium
11   and Tenant's Pro Rata Share thereof have been calculated ("Landlord Special Form Information"). If
12   Landlord covers the Store with a Special Form Policy which includes property other than Landlord's
13   Parcel, Landlord shall provide a breakdown indicating the premium portion allocable to Landlord's
14   Parcel. Tenant's Pro Rata Share of the Special Form Policy premium shall be that fraction of the total
15   premium the numerator of which is the Leasable Floor Area of the Store and the denominator of
16   which is the Leasable Floor Area of the applicable portion of Landlord's Parcel which includes the
17   Store for which the Insurance Bill was issued by the insurer. In no event, however, shall the
18   denominator of the fraction stated in the preceding sentence be less than the Minimum Leasable Floor
19   Area as set forth in Section 1.3.2(c). In no event shall Tenant's payment to Landlord of Tenant's Pro
20   Rata Share of the Special Form Policy premium exceed that amount which Tenant would have paid for
21   the same or comparable coverage for the Store had Tenant reasonably obtained such insurance from
22   its own carrier. Tenant shall not be responsible for any interest, late charge or other penalty resulting
23   from Landlord's late payment or nonpayment of the Special Form Policy premium.

24              (b)     In the event Landlord fails to provide the Landlord Special Form
25   Information as required in Section 9.1.4(a) above after twenty (20) days' written notice from Tenant,
26   and after a second (2nd) written five (5) day notice from Tenant, Tenant may obtain the same or
27   comparable insurance coverage and deduct from Rent coming due under this Lease an amount equal
28   to the amount of Tenant's Pro Rata Share of the Special Form Policy premium, which sum shall be
29   repaid to Landlord (less the cost of any insurance Tenant carried before Landlord provided the
30   evidence of coverage) upon Landlord's delivery to Tenant of the Landlord Special Form Information.
31   Further, if Tenant receives a notice of cancellation of the Special Form Policy or other evidence
32   indicating that Landlord has failed to maintain the Special Form Policy on the Store, Tenant shall not
33   be responsible for reimbursement under Section 9.1.4(a). In the event Landlord fails to maintain the
34   Special Form Policy on the Store and it is not possible for Tenant to separately insure the Store, Tenant
35   may obtain the Special Form Policy for the entire Landlord's Parcel and deduct all premium amounts
36   related thereto from Rent coming due.

37              (c)     Landlord or Landlord's agent shall retain full and detailed records of all
38   costs incurred by Landlord for the Special Form Policy. Copies of said records shall be made available
39   to Tenant upon request and Tenant shall have the right to audit all of such records, including the
40   Special Form Policy, upon thirty (30) days' prior notice, with a representative of Tenant's choice. Any
41   overbilling discovered in the course of Tenant's audit shall be refunded to Tenant, together with
42   interest at the Legal Rate, within thirty (30) days of Landlord's receipt of a copy of the audit and
43   Tenant's billing ("Insurance Refund Date"). In the event the overstatement of charges for Tenant's
44   Pro Rata Share of the Special Form Policy premium exceeds three percent (3%) of the sum previously

1   billed to Tenant by Landlord, Landlord shall reimburse Tenant for all reasonable expenses of such
2   audit. In the event Landlord fails to pay Tenant the overbilled amount, together with interest at the
3   Legal Rate and the audit costs, if applicable, by the Insurance Refund Date, Tenant shall have the right
4   to deduct all such amounts from Rent coming due from Tenant until Tenant is fully paid. Landlord
5   shall retain its records regarding all insurance premiums for insurance required to be carried by
6   Landlord under this Lease for a period of at least four (4) years following the final billing for the
7   calendar year in question. At any time during such four (4) year period, Tenant may conduct its audit.
8   The expenses of this audit, when taken together with expenses of the Tenant Audits in Section 7.4.6
9   and 8.2.5, shall not exceed Five Thousand One Hundred Dollars ($5,100), with annual increases
10  pursuant to the annual change in the CPI (as hereinafter defined) during the immediately preceding
11  calendar year. CPI shall mean the Consumer Price Index [All Urban Consumers] (base year 1982-84 =
12  100) for the U.S. City Average published by the United States Department of Labor, Bureau of Labor
13  Statistics. If the CPI is changed so that the base is changed from 1982-84 = 100, the CPI shall be
14  converted in accordance with the conversion factor published by the United States Department of
15  Labor, Bureau of Labor Statistics. If the CPI is discontinued or revised during the Term, such other
16  governmental index or computation with which it is replaced shall be used in order to obtain
17  substantially the same result as would be obtained if the CPI had not been discontinued or revised. If
18  there is no such replacement, then Landlord and Tenant shall select another price index that is
19  reasonably satisfactory to both. The amount shall not be reduced below the prior year's amount on the
20  basis of the CPI adjustment above.

21  **9.2.   Liability Insurance.**

22      **9.2.1.**   Tenant. Tenant shall, at its sole cost and expense, commencing on the Delivery
23  Date, and at all times during the Term, keep in force a policy or policies of commercial general
24  liability insurance, or an endorsement on a blanket commercial general liability insurance policy or
25  policies, naming Landlord as an additional insured, as their interests may appear, protecting against
26  (except to the extent caused by the negligence or willful act of Landlord or its agents, contractors,
27  employees or representatives and not waived per Section 9.4 hereof) any and all claims and liabilities
28  arising out of injuries to or the death of any persons in the Store, or for property damage in the
29  Store, in the minimum amount of ONE MILLION DOLLARS ($1,000,000) per occurrence so long
30  as Tenant also carries an excess liability policy in an amount of at least EIGHT MILLION
31  DOLLARS ($8,000,000), the coverage of which includes the Store. Tenant's policy or policies shall
32  include contain a cross-liability endorsement, and shall be with an insurer which is rated at least A-
33  and X in Best's Insurance Reports, or equivalent.

34      **9.2.2.**   Landlord. Landlord shall, subject to Tenant's reimbursement as provided
35  hereafter in this Section 9.2.2, commencing on the Delivery Date, as defined in Article 2 hereof, and
36  at all times during the Term, keep (or cause to be kept) in force a policy or policies of commercial
37  general liability insurance for the Common Areas, or an endorsement on a blanket commercial
38  general liability insurance policy or policies, naming Tenant as an additional insured, protecting
39  against (except to the extent caused by the negligence or willful act of Tenant or its agents,
40  contractors, employees or representatives and not waived per Section 9.4 hereof) any and all claims
41  and liabilities arising out of injuries to or the death of any persons in the Common Area or for
42  property damage in the Common Area, in the minimum amount of FIVE MILLION DOLLARS
43  ($5,000,000) combined single limit for any one occurrence with a deductible not less than Ten
44  Thousand Dollars ($10,000). Said policy or policies shall contain a cross-liability endorsement, and

1   shall be with an insurer which is rated at least B+ and X in Best's Insurance Reports, or equivalent.
2   Tenant's Pro Rata Share of Landlord's commercial general liability insurance for the Common Areas
3   shall not exceed the commercially reasonable cost for such insurance for similar shopping centers in
4   the same geographic area as the Shopping Center.

5   **9.3.    Evidence of Insurance.**

6   Landlord and Tenant agree to deliver to the other certificates of insurance evidencing the
7   existence in force of the policies of insurance described in Sections 9.1.1, 9.2.1 and 9.2.2, together
8   with endorsements showing that the parties have been named as additional insureds. Landlord's and
9   Tenant's insurers shall each use reasonable efforts to provide the party designated on the certificate
10  of insurance as the holder thereof, with at least twenty (20) days' prior written notice of cancellation
11  or of a material change to the insurance policy. Landlord's certificate related to Section 9.2.2 shall
12  provide a breakdown of the premium cost related to the Common Area only as distinguished from
13  the buildings and the remainder of Landlord's Parcel.

14  **9.4.    Waiver of Subrogation.**

15  On and after the Delivery Date and throughout the Term, Landlord and Tenant hereby
16  waive and release any and all right to maintain a direct action to recover against the other, including
17  the employees, officers, directors and agents of Landlord and Tenant, for damages and any and all
18  loss (including loss of Rent) to any property located within the Store or the Shopping Center, which
19  damage or loss occurs during a period which is covered or could be covered by a Special Form
20  Policy required under this Lease, and which arises out of the other party's negligence or otherwise
21  tortious acts or omissions, but only to the extent that the cost of repairing such damage or loss is
22  covered by insurance required under this Lease, or would have been covered by insurance proceeds
23  payable under any policy required to be maintained under this Lease, but not so maintained. Each
24  policy of such insurance shall either, (a) contain a waiver of subrogation by the insurer against
25  Tenant and Landlord, as the case may be, or (b) include the name of Landlord or Tenant, as the case
26  may be, as an additional insured, but not as a party to whom any loss shall be made payable. In the
27  event a party is unable to obtain such a waiver, it shall immediately notify the other of this inability.
28  In the absence of such notification, each party shall be deemed to have obtained such waiver of
29  subrogation. Further, Tenant's agreement to indemnify Landlord, and Landlord's agreement to
30  indemnify Tenant under this Lease, are not intended and shall not relieve any insurance carrier of its
31  obligations under policies required to be carried by Tenant or Landlord pursuant to the provisions
32  of this Lease, to the extent such policies cover, or if carried would have covered the matters subject
33  to the parties' respective indemnification obligations; nor shall they supersede any inconsistent
34  agreement of the parties set forth in any other provision of this Lease. This mutual waiver is in
35  addition to any other waiver or release contained in this Lease. The provisions of this Section 9.4
36  shall not apply to Landlord's obligation to repair and replace any portion of the Store and Tenant's
37  merchandise damaged by roof leaks as specified in Section 11.2.1.

38  **9.5.    Tenant's Right to Self-Insure.**

39  Notwithstanding anything to the contrary herein contained, provided either the Tenant
40  described in Section 1.2.2 (the "Signatory Tenant") or Ross Stores, Inc., as Guarantor, maintains a
41  net worth of at least FIFTY MILLION DOLLARS ($50,000,000), then the Signatory Tenant shall

1   have the option, either alone or in conjunction with any parent, subsidiaries or affiliates of Signatory
2   Tenant, to maintain self-insurance and/or provide or maintain any insurance required by Signatory
3   Tenant under this Lease under blanket and/or broad form insurance policies maintained by
4   Signatory Tenant or by any such parent, subsidiaries or affiliates of Signatory Tenant, provided the
5   same does not thereby decrease the insurance coverage or limits set forth in this Lease.   Any
6   self-insurance shall be deemed to contain all of the terms and conditions applicable to such
7   insurance as required in this Lease, including, without limitation, a full waiver of subrogation.   If
8   Signatory Tenant elects to so self-insure, then with respect to any claims which may result from
9   incidents occurring during the Lease Term, such self-insurance obligation shall survive the
10   expiration or earlier termination of this Lease to the same extent as the insurance required would
11   survive.

## 10. UTILITIES SERVICES

13   As of the Delivery Date, Landlord agrees to make available for Tenant's use at the Store all necessary
14   Utilities including electric, water, gas, sewerage, as well as access (but not the system itself) for Tenant's
15   communications and telephone lines, all sufficient to service Tenant's operations, and having no less
16   capacity than specified in the Final Plans (as defined in **Exhibit C**). Notwithstanding the foregoing,
17   Landlord shall not be obligated to provide Tenant with DSL, T-1 cable or Internet or other similar
18   communications lines or audio or video telecommunication lines, however Landlord shall provide 25
19   pair phone cable to the back board of the Store.   Tenant agrees to pay all use charges for all such
20   Utilities provided to the Store commencing on the Delivery Date and throughout the Term. If
21   Landlord or an affiliated company of Landlord provides some or all of such Utility services, Tenant's
22   obligation to pay for such services shall be commercially reasonable rates charged by regional or local
23   utility providers.   At all times during the Term, Tenant shall have the right to contract with any third
24   party of Tenant's choice to provide some or all of the Utility services for the Store. Landlord shall, at
25   Landlord's sole cost and expense, pay for all Utility hookup, connection or impact fees and permits.
26   However, if the Store does not have a separate water meter, Landlord shall provide to Tenant the
27   calculation of Tenant's water usage as prepared by or compiled by the Utility agency which provides
28   water service so as to calculate Tenant's share of the sewer service charges without consideration of the
29   use of water by any other tenant in the Shopping Center.   In the event that the Utility agency will not
30   calculate Tenant's share of sewer service charges, Landlord shall be permitted to have the calculation
31   determined by an independent Utility consultant reasonably acceptable to Tenant.     Landlord shall
32   separate out all Utilities and install separate meters for the Store.   The Utilities shall be registered by
33   Tenant in Tenant's name.   In the event that Landlord is unable to install separate meters, Landlord
34   shall install submeters and shall cause each submeter to be read on a monthly basis, billing Tenant for
35   its proper share.   Each such bill shall be accompanied by such supporting information as Tenant may
36   reasonably request and shall be payable within thirty (30) days after Tenant's receipt of the bill (with
37   Tenant to have the right to check the submeters at any time).   However, Landlord shall permit Tenant
38   to read each submeter and to bill Landlord an amount equal to the charges not attributable to Tenant,
39   which sum shall be paid by Landlord to Tenant within thirty (30) days after Landlord's receipt of each
40   bill.   No administrative or management charge or fee shall be payable by Tenant related to any Utility
41   charges emanating from a meter used in common by Tenant with any other party.   Further, in the
42   event of a meter-sharing arrangement, Tenant may require that the charges emanating from any
43   common meter be allocated, by a reputable Utility engineer reasonably approved by Tenant, among the
44   common users thereof in accordance with usage.   Neither party shall have the right to charge the other

"Palm Springs"              - 43 -               9/14/2009
Palm Springs Plaza                                                 Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1    party any administrative, service or other fee in connection with the reading of the submeters. Tenant
2    shall be entitled to collect, and Landlord shall cooperate with Tenant in collecting, any rebate which is
3    made available by a utility company for the installation of energy efficient lighting. All Utilities serving
4    the Common Areas shall be separately metered. Landlord represents and warrants that as of the
5    Effective Date gas will not be made available to any of the Inline Buildings located in the Shopping
6    Center and if in the future gas is made available in any of the Inline Buildings it will also be made
7    available for Tenant's use in the Store. For so long as gas is not supplied to the Store Tenant shall have
8    the right, at its sole election and at its sole cost and expense, to obtain propane gas service for the
9    Store, subject to Landlord's reasonable approval of the location of any such propane tank(s). Tenant
10   shall install, operate and maintain such propane tank(s), at Tenant's sole cost and expense, in
11   compliance with all laws and environmental regulations.

12               **11. MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE**

13   **11.1.**   **Maintenance and Repair by Tenant.**

14         Except for Landlord's interior maintenance obligations under Section 11.2, and subject to
15   the terms of Articles 21 and 22, Tenant shall maintain the storefront (except canopy), plate glass,
16   and all exterior doors, as well as the interior and interior systems (including interior sprinkler heads
17   and sprinkler recertification in the event Tenant modifies the sprinkler system) serving the Store
18   (except for Landlord's interior and systems maintenance obligations under Section 11.2 hereof, it
19   being understood that Tenant is responsible for the maintenance and repair of pipes, conduits
20   wiring and plumbing that is located inside of and exclusively services the Store), and all other
21   systems exclusively serving the Store, in good repair and condition, reasonable wear and tear
22   excepted. Tenant shall, at its expense, perform or cause to be performed all routine maintenance
23   and servicing of the heating, ventilating, and air conditioning system serving the Store (the "HVAC")
24   in accordance with the terms of a customary air conditioning service contract as performed by
25   reputable service companies in the state in which the Shopping Center is located. Neither party
26   shall be responsible for replacing the HVAC. A "replacement," as that term is used in this
27   Section 11.1, shall mean that the compressor, condenser, motors, the chiller, duct work or
28   heating/cooling coils must be removed and replaced by new equipment, in the reasonable judgment
29   of Tenant's HVAC consultant (it being understood that neither Tenant or Landlord have the
30   obligation to replace the HVAC). Tenant's obligations above are contingent upon receipt by Tenant
31   prior to the Commencement Date of a valid assignment, in form satisfactory to Tenant's counsel, of
32   all warranties (if any) which are available from subcontractors, suppliers, manufacturers, and
33   materialmen for construction of that portion of the Store which is part of Landlord's Work, but
34   which will be Tenant's maintenance responsibility under this Section 11.1. All such warranties are
35   described in **Exhibit C.**

36   **11.2.**   **Maintenance and Repair by Landlord.**

37         **11.2.1.**   (a)   <u>Landlord's Obligations</u>. Landlord shall, at its sole cost and expense (not
38   passed through to Tenant as a Common Area Charge), be responsible for correcting all defects in
39   Landlord's (or Landlord's contractor's) construction of the Store. Further, Landlord, at Landlord's
40   sole cost and expense (not passed through to Tenant as a Common Area Charge) shall maintain,
41   repair and replace, in good and sightly condition consistent with comparable shopping centers in the
42   county in which the Store is located, the foundation, floor slab [including maintaining moisture

"Palm Springs"                 - 44 -                 9/14/2009
Palm Springs Plaza                                          Final
Palm Springs, FL
Store No. 1345
MED 0058 5.5.5

1    vapor emissions at or below five (5) pounds per one thousand (1,000) square feet per twenty-four
2    (24) hours using the calcium chloride method], flooring (including flooring damaged by moisture
3    vapor emissions or subterranean water infiltration but excluding maintenance, repair and
4    replacement required due to Tenant's ordinary wear and tear), roof (including all structural elements
5    and waterproofing membrane), roofing (including the interior ceiling, walls, floors and merchandise
6    damaged from leaking), roof drainage system, including gutters and downspouts, exterior walls, all
7    exterior walls, all structural portions of the Store, sprinkler system (excluding interior sprinkler heads
8    but including the fire detection monitoring panel and the regular testing and inspection thereof and
9    Landlord shall provide Tenant with copies of all testing and inspection reports), all concealed wiring
10   and plumbing, pipes, conduits and Utility systems and lines inside, but not exclusively servicing the
11   Store, including in the exterior walls and interior walls of the Store, and Landlord shall maintain and
12   repair all such wiring, plumbing, pipes, conduits and Utility systems and lines outside the Store,
13   whether exclusively serving the Store or not, as well as all portions of the Store which are not
14   specifically Tenant's obligation under Section 11.1 above.

15   (b)      Notice for Repair.    Tenant may give Landlord notice of the need for
16   those repairs as may be required under the terms of Section 11.2.1(a) above, and Landlord shall
17   proceed forthwith to effect the same with reasonable diligence, but in no event later than thirty (30)
18   days after having received notice. If Landlord fails to repair or maintain the Store within the thirty
19   (30) day period imposed herein, or such additional reasonable time as shall be required, provided
20   that Landlord has commenced cure within the thirty (30) day period and is diligently prosecuting
21   such cure to completion (which additional reasonable rime shall not in any event exceed sixty (60)
22   days) then, provided Tenant notifies Landlord in writing and Landlord still does not repair same
23   within ten (10) days of Tenant's notice, Tenant may perform the repairs, maintenance or
24   replacements and deduct the cost thereof from the subsequent Rent payment(s) next coming due if
25   not paid within thirty (30) days after receipt of billing therefor from Tenant. In the event of an
26   emergency, Tenant may undertake immediate repairs (without the need for advance notice) which
27   are Landlord's responsibility. Tenant shall notify Landlord as soon as reasonably practicable under
28   the circumstances. If Landlord shall fail to reimburse Tenant for the cost of an emergency repair
29   within thirty (30) days after receipt of billing therefor from Tenant, Tenant may deduct the cost
30   from the subsequent installments of Rent payment(s) thereafter coming due.

31   11.2.2.      Earth Movement.  Landlord agrees that any maintenance, repairs, alterations or
32   replacements that shall be required at any time on or after the Delivery Date and during the Term of
33   this Lease as a result of movement of the Store such as settling, or as the result of settling of the
34   Common Areas, shall be without charge to Tenant whether directly or through Reimbursements.

35   11.2.3.      Shopping Center Maintenance.  Landlord shall, at no cost or expense to Tenant,
36   maintain and repair (or cause to be maintained and repaired) all buildings within the Shopping
37   Center in good condition, consistent with the standards for comparable shopping centers in the
38   county in which the Shopping Center is located.

39   **11.3.   Repairs Required by Governmental Authorities.**

40   11.3.1.      Store.  After completion of Landlord's Construction Obligations, any repairs,
41   alterations or other improvements to the Store required by governmental authority or insurance
42   rating bureau having jurisdiction shall be performed by Tenant at its sole cost and expense. Any

1  such work, however, which is required to the Shopping Center in general, other than for tenants or
2  occupants obligated similarly to Tenant, or to all similar buildings or uses in the area of the
3  Shopping Center, shall be done at the sole cost and expense of Landlord.

4  **11.3.2.**  <u>Shopping Center</u>.  Landlord covenants that the construction and the proposed
5  use of the Shopping Center's Common Areas and buildings, including the Store, for retail and office
6  purposes shall comply with all laws, ordinances, regulations and standards of public authorities and
7  insurance rating bureaus having jurisdiction, including, without limitation, Environmental
8  Regulations, as hereinafter defined, and zoning and building codes as of the Delivery Date (all of the
9  foregoing being hereinafter collectively referred to as the "Requirements").

10  **11.3.3.**  <u>Non-Compliance</u>.  Landlord agrees that if, at any time on or after the Delivery
11  Date, any governmental authorities or insurance rating bureau having jurisdiction shall determine
12  that Landlord's Work to the Store or that Landlord's Parcel was constructed, or is being operated, in
13  violation of, any Requirement and shall request compliance, with any Requirement or, absent such a
14  request from the governmental authority, if the Store or Landlord's Parcel is otherwise not in
15  compliance with or is in violation of any Requirement (and provided the violation is not due to
16  Tenant's Work), and if failure to comply shall in any way adversely affect the use of the Store by
17  Tenant or adversely affect any other rights of Tenant under this Lease or impose any obligation
18  upon Tenant not contained in this Lease or shall increase the obligation of Tenant (such as, by way
19  of example, increased insurance costs), Landlord shall, upon receipt of notice thereof, at Landlord's
20  sole cost and expense, cause such repairs, alterations or other work to be done or action to be taken
21  so as to bring about the compliance, or to effect the Requirement requested.  If by reason of such
22  failure of compliance or by reason of such repairs, alterations or other work done by Landlord,
23  Tenant shall be deprived of the use or enjoyment of the whole or any material part of the Store or
24  the Common Areas, Rent shall abate and in lieu thereof Tenant shall pay Substitute Rent on a per
25  diem basis until compliance with the Requirement is completed.

26  **11.3.4.**  <u>Zoning</u>.  If, from and after the Delivery Date, the applicable zoning shall not
27  permit the retail sale of apparel, soft goods, and merchandise customarily sold in Tenant's Florida
28  stores, Tenant may, without waiving any other rights Tenant may have on account thereof,
29  terminate this Lease by giving notice thereof to Landlord.

30  **11.4.  Hazardous Material.**

31  **11.4.1.**  <u>Definition</u>.  As used herein, the term "Hazardous Material" or "Hazardous
32  Materials" shall mean (a) any waste, material or substance (whether in the form of a liquid, a solid, or
33  a gas and whether or not air-borne), which is or is deemed by governmental authority to be a
34  pollutant or a contaminant, or which is or is deemed by governmental authority to be hazardous,
35  toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or which presents a risk, to
36  public health or to the environment, or which is or may become regulated by or under the authority
37  of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes
38  or other governmental restrictions, guidelines or requirements, any amendments or successor(s)
39  thereto, replacements thereof or publications promulgated pursuant thereto ("Environmental
40  Regulations"); (b) petroleum, including crude oil or any fraction thereof; (c) any asbestos or asbestos
41  containing material; (d) any polychlorinated biphenyl; (e) any radioactive material; (f) radon gas; and
42  (g) urea formaldehyde.

1       **11.4.2.**    <u>Landlord's Warranties and Representations</u>.   Landlord expressly represents and
2 warrants that:

3                 (a)      To Landlord's actual knowledge, and except as set forth in that certain
4 Phase I Environmental Site Assessment Report dated January 2, 2006, and prepared by EBI
5 Consulting ("Environmental Report"), no escape, seepage, leakage, spillage, discharge, emission, release
6 or disposal of Hazardous Material has occurred within the Store to date, and the Store, as well as the
7 soil, groundwater and soil vapor within or under the Store, are free of Hazardous Material in violation
8 of applicable Environmental Regulations as of the Effective Date, and will be free of Hazardous
9 Material as of the Delivery Date and throughout the Lease Term.

10                 (b)      Landlord shall not use or knowingly permit any Hazardous Materials to be
11 used in violation of applicable Environmental Regulations in the construction of the Store or in
12 connection with the installation of any Utility system or other facility which serves the Store including
13 by way of example, but not by limitation, the interior of any partition or demising walls, whether
14 structural or otherwise, columns or beams, and all Utility lines, shafts and ducts, HVAC or other
15 equipment. Such Utility systems and other facilities as hereinabove described, whether located in (i)
16 the Store or (ii) other portions of the Building or the Shopping Center that would have a material
17 impact on Tenant, shall be collectively referred to as "Support Systems."

18       **11.4.3.**    <u>Landlord's Responsibilities Prior to the Delivery Date to Tenant</u>.   Tenant
19 acknowledges the receipt of the Environmental Report. If, prior to the Delivery Date, Hazardous
20 Materials are found to be present in violation of applicable Environmental Regulations in the Store
21 or the Support Systems, then Landlord, at its sole cost and expense, shall cause such Hazardous
22 Materials to be removed from the Store in accordance with recognized industry standards
23 (hereinafter referred to as the "Abatement Work"), and Landlord shall complete such removal prior
24 to the Delivery Date. Upon completion of the Abatement Work, Landlord shall furnish Tenant
25 evidence of such removal of the Hazardous Material, including copies of the final inspection report
26 together with a clearance certificate or other document of release or approval from any applicable
27 governmental authority as aforesaid ("Clearance Certificate"), if applicable.

28       **11.4.4.**    <u>Landlord's Responsibilities After the Delivery Date</u>. If Hazardous Materials are
29 found to be present in violation of applicable Environmental Regulations in the Store at any time
30 after delivery of possession of the Store to Tenant, then Tenant shall have the right to vacate the
31 Store, at which time all Rent shall abate, unless the Hazardous Materials were introduced by Tenant,
32 its agents, employees or contractors. Landlord shall, at its sole cost and expense, complete such
33 Abatement Work in accordance with applicable Environmental Regulations as soon as practicable
34 after the discovery of such Hazardous Materials. Upon completion of the Abatement Work,
35 Landlord shall furnish Tenant with a copy of the Clearance Certificate, if applicable. During such
36 Abatement Work, Tenant's fixturization or construction period, if applicable (as provided for
37 elsewhere in this Lease), shall be tolled until the Abatement Work is complete and a Clearance
38 Certificate, if applicable, or a final report documenting the Abatement Work from a licensed
39 environmental consultant reasonably acceptable to Tenant is issued. In the event Landlord is
40 required to undertake Abatement Work, it is understood and agreed that Landlord shall be
41 responsible for the cost of the replacement of all of Tenant's improvements and alterations damaged
42 or destroyed as a result of such Abatement Work. If Tenant is required to undertake Abatement
43 Work because the Hazardous Materials were introduced by Tenant, Tenant shall be responsible for

"Palm Springs"                            - 47 -                                 9/14/2009
Palm Springs Plaza                                                           Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1    the costs associated with the Abatement Work and any necessary repairs and replacement of the
2    Store.

3        **11.4.5.**   Tenant's Rights.

4             (a)   Tenant's Awareness of Hazardous Materials. If, at any time, Tenant
5    becomes aware of the presence of Hazardous Materials in the Store in violation of applicable
6    Environmental Regulations, Tenant may give Landlord written notice to remove and/or abate same
7    and to restore (i) the Store, and/or (ii) the Support Systems and/or Landlord's Parcel (to the extent
8    that there is a material impact on Tenant's operations in the Store) to a condition which is free of
9    Hazardous Materials in violation of applicable Environmental Regulations, unless the presence of such
10   Hazardous Materials was a result of the acts of Tenant, its employees, agents, contractors or invitees.
11   If within sixty (60) days of receipt of such notice Landlord has not completed the Abatement Work,
12   Tenant may either (i) terminate this Lease upon thirty (30) days' written notice to Landlord, or (ii)
13   undertake all necessary Abatement Work, including the hiring of any contractors and experts Tenant
14   reasonably deems necessary to effect and supervise the Abatement Work.

15          (b)   Claim Against Landlord. If Tenant effects Abatement Work, Tenant shall
16   be entitled to claim from Landlord all reasonable costs and expenses associated therewith, including,
17   but not limited to, (i) the Abatement Work, (ii) disposal of Hazardous Materials, (iii) air quality and
18   materials testing, (iv) related consultants' and experts' fees, and (v) fines, fees or costs of any nature
19   whatsoever charged or assessed by any governmental authority or agency regulating and/or supervising
20   such Abatement Work and/or disposal of Hazardous Materials.

21          (c)   Reimbursement of Tenant. Landlord shall promptly reimburse Tenant for
22   Tenant's costs and expenses incurred pursuant to Section 11.4.5(b) above within thirty (30) days after
23   Landlord's receipt of copies of Tenant's paid invoices or documentation. In addition to any other
24   remedy which Tenant may have under this Lease, at law or in equity, in the event of Landlord's breach
25   of any of the provisions of this Section 11.4, Tenant shall be entitled (i) to deduct from Rent payable to
26   Landlord hereunder all consequential damages (including lost profits), expenses, costs, fees and fines
27   incurred by it as a result of such breach, and (ii) to extend the Term hereof by a period equal to the
28   time elapsed from the date of Tenant's initial notice to Landlord to the date that the Abatement Work
29   is completed, and during such period, all Rent and other charges payable hereunder shall abate.

30        **11.4.6.**   Landlord's Indemnity. Excepting Hazardous Materials existing solely as a result
31   of the acts of Tenant or Tenant's agents, employees, contractors or invitees, Landlord hereby
32   indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and
33   assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines,
34   costs, expenses and claims of any and every kind whatsoever, including, without limitation,
35   attorneys' and consultants' fees and costs, and the costs of cleanup, remediation, Abatement Work,
36   paid, incurred or suffered by, or asserted against, Tenant and/or its successors and/or assigns as a
37   result of any claim, demand or judicial or administrative action by any person or entity (including
38   governmental or private entities) for, with respect to, or as a direct or indirect result of, the presence
39   on or under, or the escape, seepage, leakage, spillage, discharge, emission, release or disposal on,
40   under or from the Shopping Center or the improvements thereon of any Hazardous Material in
41   violation of applicable Environmental Regulations, or the breach of any Environmental Regulations
42   to which Landlord or any portion of the Shopping Center is subject. Landlord shall be solely

"Palm Springs"              - 48 -           9/14/2009
Palm Springs Plaza                    Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1   responsible for and shall comply with all laws, rules, ordinances or regulations of any governmental
2   authority having jurisdiction over the Store and the Shopping Center with respect to the presence or
3   removal of Hazardous Materials, unless the presence of such Hazardous Materials is the result of the
4   acts of Tenant or Tenant's agents, employees, contractors or invitees.

5       **11.4.7.**   Tenant's Indemnity.   Tenant hereby indemnifies Landlord and its successors and
6   assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any
7   and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and
8   every kind whatsoever, including, without limitation, attorneys' and consultants' fees and costs, and
9   the costs of cleanup, remediation, Abatement Work, paid, incurred or suffered by, or asserted
10  against, Landlord and/or its successors and/or assigns as a result of any claim, demand or judicial or
11  administrative action by any person or entity (including governmental or private entities) for, with
12  respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage,
13  leakage, spillage, discharge, emission, release or disposal on, under or from the Store of any
14  Hazardous Material in violation of Environmental Regulations, or the breach of any Environmental
15  Regulations to which Tenant or any portion of the Store is subject which are solely the result of the
16  acts of Tenant or Tenant's agents, employees, contractors or invitees.   Tenant shall not cause any
17  Hazardous Materials to be released or discharged on, under or from the Store in violation of
18  Environmental Regulations.

19      **11.4.8.**   Survival.   The representations, warranties and indemnities contained in this
20  Article 11 shall survive the termination of this Lease.

21      **11.4.9.**   Radon.   Radon is a naturally occurring radioactive gas that, when it has
22  accumulated in a building in sufficient quantities, may present health risks to persons who are
23  exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in
24  buildings in Florida. Additional information regarding radon and radon testing may be obtained
25  from your county public health unit.

26                              **12. ALTERATIONS**

27  **12.1.   Permitted Alterations.**

28      **12.1.1.**   Tenant may make non-structural alterations or improvements to the interior of
29  the Store, and signage on the exterior of the Store and its signage on the Shopping Center pylon and
30  monument signs, provided Tenant shall make all such alterations or improvements in a good and
31  workmanlike manner, and in conformity with all laws, ordinances and regulations of public
32  authorities having jurisdiction. Tenant may, in connection with any non-structural alterations or
33  improvements to the interior of the Store install roll down security shutters that are QMI Security
34  Solutions surface mounted interior "Safestore" manual/spring operated shutters with AL5-E slates
35  in a "Punch Style 51" pattern or the like. Tenant shall not make any alterations to the foundation,
36  roof, or any structural portions of the Store without first obtaining the written approval of Landlord,
37  except as specified in Section 12.2. Such approval by Landlord may not be unreasonably withheld,
38  conditioned or delayed. Any disapproval shall be supported by a written statement of reasons and
39  suggested revisions to the proposed work that, if incorporated by Tenant, shall constitute the plans
40  as approved without further review by Landlord. Subject to Section 12.1.2 following, all alterations

1  and improvements made to the Store by Landlord or Tenant (other than Store furniture, trade
2  fixtures, equipment and personal property installed by Tenant), shall, at the end of the Term,
3  become Landlord's property, and, at the end of the Term, shall remain in the Store without
4  compensation to Tenant, unless otherwise stated in this Lease to the contrary. Following the
5  completion of any such alterations, and upon Landlord's written request, Tenant shall furnish "as
6  built" plans showing such alterations, in detailed AutoCad v.14 or above if same have been
7  generated by Tenant and are available.

8      **12.1.2.**    It is further agreed that upon termination of this Lease, Tenant may remove its
9  furniture, fixtures, equipment and personal property, and Landlord will accept the Store, with all
10 alterations made by Tenant, without any obligation upon Tenant to restore the Store to its former
11 condition, provided, however, Tenant shall repair any damage caused by any removal of Tenant's
12 fixtures and equipment.

13     **12.1.3.** All Tenant alterations shall be subject to the following: Cost of Tenant's Alterations.

14         (a)    Cost of Tenant's Alterations. Tenant's Alterations shall be performed
15 by Tenant at Tenant's sole cost and expense.

16         (b)    Compliance. Tenant will perform all Tenant's alterations with
17 reasonable dispatch, using only new materials and supplies, in a good and workmanlike manner in
18 accordance with Tenant's plans and with all Legal Requirements and any and all approvals, permits,
19 licenses or consents required by any ordinance, law or public regulations or by any authority at any
20 time having jurisdiction and in accordance with the requirements of any public or quasi-public body
21 having similar jurisdiction. Tenant warrants that Tenant's alterations, when completed, will comply
22 with all Legal Requirements, and that the Shopping Center shall not violate any Legal Requirements as
23 a result of Tenant's alterations.

24         (c)    Insurance. During the course of Tenant's alterations, Tenant (an
25 all of its contractors and subcontractors) will carry or cause to be carried adequate Worker's
26 Compensation Insurance, Builders Risk, Comprehensive General Liability and such other insurance as
27 may be required by law to be carried by Landlord or Tenant or required by Article 9 hereof in
28 connection with such construction, and such insurance (except the Worker's Compensation Insurance)
29 shall name Landlord, Landlord's managing agent, and all mortgagees and ground lessors and such
30 other parties as Landlord shall designate as additional insureds.

31         (d)    Non-Interference. All of Tenant's alterations shall be done in such
32 a manner so as not to interfere with, delay, or impose any expense upon Landlord in the maintenance
33 of the Shopping Center; nor to physically affect any part of the Shopping Center outside the interior of
34 the Store: nor impair the structural integrity of any building nor affect the proper functioning of any of
35 the mechanical, electrical, HVAC, plumbing, sanitary or other systems of the Shopping Center. In
36 addition, Tenant agrees that all of Tenant's Work shall be performed in a manner which will not create
37 any work stoppage, labor disruption or dispute or violate Landlord's union contracts (if any) affecting
38 the Shopping Center, nor will it interfere with the business of Landlord, or with any other tenant or
39 occupant of the Shopping Center.

1       (e)  <u>Permits</u>.  No Tenant's alterations shall be undertaken until
2 Tenant shall have procured and paid for, so far as the same may be required from time to time, all
3 permits and authorizations of all municipal departments and governmental subdivisions having
4 jurisdiction.

5 **12.2.** **Communication Equipment.**

6    **12.2.1.**  At any time subsequent to the Delivery Date, Tenant shall have the right to place
7 upon the Store one or more so-called "satellite dish(es)" or other similar device(s) and to replace,
8 remove, and repair any such device(s), such as antenna, for the purpose of receiving and sending
9 radio, television, computer, telephone, or other communication signals (collectively, the
10 "Communication Equipment"). Any such installation shall be in accordance with plans and
11 specifications previously approved by Landlord and shall comply with applicable laws and codes.
12 Such equipment shall be installed in a location or locations reasonably approved by Landlord and/or
13 substantially shielded from visibility from the principal frontages of the Shopping Center.  Tenant
14 shall be responsible for any damage to the Store caused by installing, removing, replacing, or
15 repairing any such device(s).  The use of the Communication Equipment shall comply with
16 applicable statutes and rules of the Federal Communications Commission or successor agency.
17 Tenant shall install the Communication Equipment in such manner as not to cause any water
18 intrusion or other damage to the Store or the roof.  Tenant shall use Landlord's roofing contractor
19 for any such installations and assure that any roof warranty shall not be rendered invalid.  Tenant
20 shall be responsible to assure that the Communication Equipment shall be secured or removed prior
21 to any windstorm so as not to pose a threat to the Shopping Center or its occupants.

22    **12.2.2.**  In the event Landlord desires to perform roof repairs and/or roof replacements
23 to the Store and/or the Building or its rooftop equipment in which the Store is located (the "Roof
24 Repairs"), Landlord shall give Tenant at least fifteen (15) days' prior written notice of the date
25 Landlord intends to commence such non-emergency Roof Repairs.  Tenant shall, within fifteen (15)
26 days following receipt of notice of such repairs from Landlord, undertake such measures as it deems
27 suitable to protect its Communication Equipment from interference by Landlord, its agents,
28 contractors or employees, in the course of any Roof Repairs.  Nothing herein shall relieve Landlord
29 of its obligation not to cause any interference with, or damage to, the Communication Equipment,
30 and Landlord shall remain fully responsible for any loss, cost, or claim resulting from any damage to
31 any part of the Communication Equipment arising as a result of the Roof Repairs.

32

33

34        **13. NON-DISTURBANCE AND SUBORDINATION/**
35          **ESTOPPEL CERTIFICATES**

36 **13.1.** **Non-Disturbance and Subordination.**

37    **13.1.1.**  <u>Existing Loans/Master Lease(s)</u>.  Landlord covenants to obtain from each lender
38 whose loan is secured by the Store or Landlord's Parcel, an executed agreement ("Non-Disturbance
39 Agreement"), in the form set forth in **Exhibit F**.  Any such Non-Disturbance Agreement or
40 Sublease Non-Disturbance Agreement shall be fully executed by Landlord and lender, or Landlord

"Palm Springs"          - 51 -          9/14/2009
Palm Springs Plaza                     Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1     and the Overlessor, as applicable, and shall be delivered to Tenant concurrent with Landlord's
2     Delivery Notice. If Landlord breaches its obligation(s) hereunder, or if the Lender will not execute
3     an SNDA in the form set forth in **Exhibit F** (which form may not be altered, except in Tenant's
4     sole and absolute discretion) Tenant may terminate this Lease by written notice to Landlord at any
5     time prior to Tenant's receipt of all required Non-Disturbance Agreements, or if Tenant has not
6     terminated this Lease, Rent shall abate pending delivery of said Agreements. In the event that the
7     Lease terminates pursuant to this Section 13.1.1, then Landlord shall reimburse Tenant for the cost
8     of its Construction Drawings, not to exceed Thirty Thousand Dollars ($30,000), within thirty (30)
9     days of the termination date.

10        **13.1.2.**     Future Loans. Tenant shall, within twenty (20) Business Days after Tenant's
11     receipt of Landlord's request, subordinate this Lease in the future to any first mortgage or deed of
12     trust placed by Landlord upon the Store, or the Shopping Center or building of which the Store
13     forms a part, with an insurance company, bank or any other lender which customarily provides
14     financing for shopping centers, provided that such lender executes a Non-Disturbance Agreement
15     substantially in the form set forth in **Exhibit F**.

16     **13.2.**     **Estoppel Certificates.**

17        Within twenty (20) Business Days after the last to occur of (a) receipt of request therefor,
18     and, if the request is made by Landlord (b) receipt by Tenant of the fee described in Section 13.3
19     below, either party shall deliver to the other a written statement acknowledging (i) the
20     Commencement Date and termination date of this Lease, (ii) that this Lease is in full force and
21     effect (if true), (iii) that this Lease has not been modified (or if it has, stating the date of such
22     modifications), and (iv) any such other pertinent information which is customary to supply to such a
23     requesting party for purposes of financing or sale (in the case of Landlord's request) or financing,
24     assignment or sublease, or sale (in the case of Tenant's request). Landlord may exercise its right
25     hereunder only in connection with a proposed sale, financing or refinancing of the Shopping Center
26     plus another one (1) each calendar year, and Tenant may exercise its right hereunder only in
27     connection with a proposed assignment or subletting of the Store, or a financing of its furniture,
28     fixtures, equipment or personal property.

29     **13.3.**     **Processing Fees for Non-Disturbance Agreements and Estoppel Certificates.**

30        At the time of the second request within any two (2) year period for a Non-Disturbance
31     Agreement under Section 13.1.2 or the second request for an Estoppel Certificate Under Section
32     13.2 during the Term, the requesting party shall pay the other, or defray the expenses of processing,
33     the sum of Seven Hundred Fifty Dollars ($750) for each such Non-Disturbance Agreement or
34     Estoppel Certificate.

35                       **14. INDEMNIFICATION**

36     **14.1.**     **Tenant Indemnity.**

37        Tenant agrees to hold Landlord harmless from and indemnify and defend Landlord against
38     any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
39     (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of

"Palm Springs"                    - 52 -                 9/14/2009
Palm Springs Plaza                                            Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

1    whatever nature, to any person or property caused or claimed to be caused by or resulting from any
2    occurrence within the Store or the Shopping Center on and after the Delivery Date and during the
3    Term resulting from the negligent or willful act or omission of Tenant, or Tenant's employees,
4    agents or contractors, provided nothing contained herein shall require Tenant to indemnify
5    Landlord against matters resulting solely from the negligence or willful acts or omissions of
6    Landlord or Landlord's employees, agents, or contractors, except to the extent Tenant has waived a
7    claim against Landlord pursuant to Section 9.4 hereof.

8    **14.2.   Landlord Indemnity.**

9    Landlord agrees to hold Tenant harmless from and indemnify and defend Tenant against any
10   and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
11   (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
12   whatever nature, to any person or property caused or claimed to be caused by or resulting from any
13   occurrence within the Common Area, or any portion of the Shopping Center (including the Store),
14   on and after the Effective Date of this Lease, provided nothing contained herein shall require
15   Landlord to indemnify Tenant against matters resulting solely from the negligence or willful acts or
16   omissions of Tenant or Tenant's employees, agents or contractors, except to the extent Landlord
17   has waived a claim against Tenant pursuant to Section 9.4 hereof.

18   <div align="center">**15. USE**</div>

19   **15.1.   Tenant's Business.**

20   Tenant's intended use of the Store shall be as a full line department store including, at its
21   option, the sale of soft goods merchandise, including men's, women's and children's apparel, shoes,
22   accessories, such as jewelry and cosmetics, health and beauty aids and related sundries, domestics
23   and linens, housewares, art, pictures, posters, frames, artificial floral, office supplies, sporting goods,
24   furniture and lamps, window and floor coverings, electronics, prerecorded audio and video
25   merchandise and electronic games software and technological evolutions thereof, books, toys, party
26   goods, pet supplies, luggage and packaged foods, and such other items as are sold in Tenant's
27   similarly merchandised stores, subject to the Exclusive Uses set forth in **Exhibit H** and the
28   Prohibited Uses set forth in **Exhibit D**.

29   **15.2.   Operation.**

30   Notwithstanding any provision in this Lease to the contrary, it is expressly acknowledged by
31   Landlord that this Lease contains no express or implied covenant for Tenant to conduct business in
32   the Store, continuously or otherwise, or (when conducting business in the Store) to operate during
33   any particular hours or to conduct its business in any particular manner. Tenant has the sole right in
34   its unrestricted discretion to decide whether or not to operate in the Store and in what manner to
35   conduct operations, if any, and if the Store has more than one (1) customer door ("Excess Customer
36   Doors"), Tenant may, at its option, close any such Excess Customer Doors and operate with only
37   one (1) customer door.

"Palm Springs"                 - 53 -               9/14/2009
Palm Springs Plaza                                     Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

**15.3.    Protection.**

Except for one store to be occupied by Bed Bath & Beyond, Anna's Linens or a comparable home goods/linens tenant, Landlord shall not enter into a lease for space in the Shopping Center, or permit the assignment or sublease of any lease for space (to the extent Landlord may withhold its consent thereto) whereby such tenant or occupant shall (a) use in excess of fifteen thousand (15,000) square feet of Leasable Floor Area of its premises for the Off Price Sale (as hereinafter defined) of merchandise, or (b) use in excess of eighteen thousand (18,000) square feet of Leasable Floor Area of its premises for the sale of apparel. The foregoing restriction on the sale of apparel in more than eighteen thousand (18,000) square feet shall not apply to JC Penney, Kohl's, Belk's, Target or comparable stores, provided such tenants or occupant operate in more than sixty thousand (60,000) square feet. For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of non-replenishably purchased and not restocked items (as contrasted to regularly purchased and restocked items sold at a discount price) on an every day basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshalls, A.J. Wright, Fallas Paredes, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, Steinmart, Filene's Basement, or Beall's Outlet.). If any of the foregoing provisions is violated ("Protection Violation"), commencing on the first day of the Protection Violation and continuing throughout the period of the Protection Violation, Tenant, in addition to all other remedies available at law or in equity, including injunctive relief, shall have the ongoing right, exercisable by written notice to Landlord, either to terminate this Lease or to pay Substitute Rent within fifteen (15) days after the close of each calendar month. The parties agree that the monetary damages to be suffered by Tenant as a result of a breach by Landlord (or Landlord's tenant(s)) of the provisions of this Section 15.3 are difficult to ascertain and that the payment of Substitute Rent, after negotiation, constitutes the best estimate by the parties of the amount of such damage. If Tenant elects to terminate this Lease as provided in this Section 15.3, this Lease shall terminate on a date indicated by Tenant in its notice of termination, which in no event shall be sooner than thirty (30) nor later than ninety (90) days after the date of Tenant's notice of termination. In the event of termination, Landlord shall be obligated to pay Tenant for the Unamortized Cost of Tenant's leasehold improvements in the Store, which costs Tenant agrees to specify in its notice of termination. If Tenant elects to pay Substitute Rent, (a) such payment of Substitute Rent shall be retroactive to the date any such Protection Violation commenced, and Tenant shall deduct any overpayments of Rent from Rent coming due under this Lease, and (b) at such time as all such Protection Violations cease (the "Cure Date"), Rent shall resume at the rate which would have pertained at the Cure Date had the Protection Violation not occurred. The provisions of this Section 15.3 shall apply to any subsequent Protection Violation. Notwithstanding that the following tenants may be considered Off-Price Users, Tenant agrees that a lease to Bed Bath & Beyond, Anna's Linens or a comparable tenant (including options to extend as contained therein) of the Shopping Center is not deemed to be a violation of this Section 15.3.

**15.4.    Exclusive Uses.**

Tenant shall not use the Store for any use which is listed on **Exhibit H** (the "Exclusive Use"), so long as the Exclusive Use is in existence in the Shopping Center. Any exclusive granted by Landlord which is not listed on **Exhibit H** (the "Unauthorized Exclusive") shall be null and void

1   as against Tenant and any Related Entity of Tenant.  Landlord shall indemnify, defend and hold
2   harmless Tenant and any Related Entity of Tenant against any and all claims by any other occupant
3   of the Shopping Center that Tenant and/or a Related Entity of Tenant has violated an
4   Unauthorized Exclusive.

5   **15.5.   Other Exclusives Not Binding on Tenant.**

6          Except for those Exclusive Uses specifically set forth in **Exhibit H**, Landlord agrees that it
7   has not entered into a lease or other occupancy agreement with nor shall it lease to or permit
8   occupancy in the Shopping Center by any tenant, subtenant, assignee or other occupant, which has
9   imposed or proposes to impose a restriction on Tenant or Tenant's business.  Landlord shall hold
10  Tenant harmless from any claims or damages suffered or claimed to be suffered by Tenant as a
11  result of any breach or alleged breach of Landlord's representation and warranty set forth in this
12  Section 15.5.

13  **15.6.   Go Dark.**

14          **15.6.1.**      As specified in Section 15.2, Tenant is not required to operate its Store or
15  otherwise conduct retail operations within the Store.  However, if Tenant discontinues retail
16  operations in the Store (other than an Exempted Discontinuance of Retail Operations as hereinafter
17  defined) for a period in excess of one hundred eighty (180) consecutive calendar days (the "Go Dark
18  Period"), Landlord, within the sixty (60) days following the expiration of the Go Dark Period, may
19  elect to terminate this Lease by notifying Tenant thereof (the "Go Dark Termination Notice"), in
20  which event this Lease shall terminate as to all obligations thereafter accruing thirty (30) days after
21  receipt by Tenant of the Go Dark Termination Notice ("Termination Date").  In the event of Lease
22  termination pursuant to this Section, Landlord shall reimburse Tenant for the Unamortized Cost of
23  Tenant's leasehold improvements to the Store within ten (10) days after receipt from Tenant of a
24  statement of the Unamortized Cost, which statement shall be delivered to Landlord within fifteen
25  (15) days after Tenant's receipt of the Go Dark Termination Notice.  Landlord may have access to
26  Tenant's relevant books and records for a period of ten (10) days after receipt of Tenant's statement
27  of Unamortized Costs to verify the amount thereof.  Landlord's obligation for reimbursement shall
28  survive the termination of this Lease.

29          **15.6.2.**      The following shall constitute Exempted Discontinuances of Retail Operations:
30  (i) any discontinuance occasioned by an event of Force Majeure (as defined in this Lease); (ii) the
31  temporary cessation of retail operations in connection with an assignment or sublet (provided that
32  the assignee or subtenant commences retail operations within one (1) year after Tenant discontinues
33  such operations); (iii) a temporary discontinuance in connection with remodeling; or (iv) any other
34  temporary discontinuance, provided that such other temporary discontinuance does not exceed sixty
35  (60) days in length.

36          **15.6.3.**      Notwithstanding the foregoing, Tenant may notify Landlord at any time within
37  fifteen (15) days after receipt of Landlord's Go Dark Termination Notice that (i) Tenant intends to
38  resume retail operations, or (ii) Tenant is in negotiation with another retailer for an assignment of
39  this Lease or a sublease of the Store (the "Withdrawal Notice"). If Tenant so notifies Landlord, and
40  if within one hundred twenty (120) days thereafter Tenant either resumes retail operations or enters
41  into such assignment or sublease, then Landlord's Go Dark Termination Notice shall automatically

1   become void and of no force or effect (a "Withdrawal Event"). If a Withdrawal Event does not
2   timely occur, this Lease shall terminate on the later of (i) the Termination Date, or (ii) the one
3   hundred twenty-first (121st) day after Tenant's Withdrawal Notice.

# 16. SURRENDER

## 16.1.   Condition of Premises.

6       Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession
7   of the Store to Landlord in broom clean condition, and in good order and repair, reasonable wear
8   and tear and damage by Casualty or condemnation excepted, and with all of Tenant's alterations and
9   leasehold improvements in place. Tenant may remove from the Store Tenant's furniture, fixtures,
10  equipment and personal property. However, Tenant shall have no obligation to remove from the
11  Store or to demolish any alterations or leasehold improvements made to the Store nor to restore the
12  Store to its condition prior to Tenant's use and occupancy thereof.

## 16.2.   Continuance of Possession.

14      If Tenant shall remain in possession of the Store or any portion thereof after the expiration
15  of the Term, then in the absence of an agreement in writing between the parties, Tenant shall be
16  deemed a tenant at sufferance until acceptance of Rent by Landlord, at which time, Tenant shall
17  become a tenant from month-to-month under the same terms and conditions as existed immediately
18  prior to the expiration of this Lease, however, Minimum Rent shall be increased to an amount equal
19  to one hundred twenty-five percent (125%) of the most recent monthly installment of Minimum
20  Rent.

# 17. LANDLORD'S COVENANTS

## 17.1.   Landlord's Warranty.

23      Landlord warrants to Tenant that (a) Tenant, while operating in the Store for the use stated
24  in Section 15.1, except as to the Prohibited Uses set forth in **Exhibit D** or the Exclusive Uses set
25  forth in **Exhibit H**, will not be in violation of any exclusives, restrictions or other agreements which
26  Landlord may have with other lessees, lenders, governmental authorities or any other parties, and
27  (b) as of the Effective Date, the use stated in Section 15.1 is not a violation of any restrictions
28  imposed by any governmental body or authority. Landlord shall hold Tenant harmless from any
29  claims or damages suffered or claimed to be suffered by Tenant as a result of any breach or alleged
30  breach of Landlord's warranties.

## 17.2.   Landlord's Title.

32      Landlord has provided Tenant with the Title Report. Landlord covenants that: (a) Landlord
33  has lawful title to the Shopping Center and full right to make and execute this Lease; (b) at the time
34  of recording of the Memorandum of Lease, the Shopping Center will be free from all other liens,
35  title exceptions and other encumbrances of any kind whatsoever, except those set forth in **Exhibit I**
36  attached hereto and incorporated by this reference ("Permitted Title Exceptions"); and (c) except for

1   its present lender, Eurohypo AG, no other party is required to consent to this Lease as a condition
2   to the effectiveness of this Lease or any of the provisions hereof, including, but not limited to, the
3   consent of any lender or ground lessor relating to the Shopping Center.

4   **17.3. Remedies.**

5        In the event of any violation of any of the covenants made by Landlord in this Article 17,
6   Tenant may give Landlord notice of the violation. If Landlord fails to cure the violation within sixty
7   (60) days of such notice, and if such violation has a material and adverse effect upon Tenant's
8   business operations in the Store or Tenant's interest in this Lease, Tenant may exercise its remedies
9   available at law and in equity, including the right to terminate this Lease by written notice to
10   Landlord. The provisions of this Article 17 shall supersede and prevail over any inconsistent
11   provision in Article 20 of this Lease.

12   **17.4. Termination of Rainbow Lease.**

13        Landlord shall terminate the Lease with Rainbow and provide a copy of such termination to
14   Tenant not later than the date that Landlord provides Tenant with a Delivery Notice (hereinafter the
15   "Rainbow Termination"). Tenant acknowledges that Landlord may provide a copy of such
16   Rainbow Termination concurrent with the Delivery Notice. In the event that Landlord does not
17   provide the Rainbow Termination within said time period, Tenant shall have the right to terminate
18   this Lease upon thirty (30) days written notice, which termination of this Lease may be avoided by
19   Landlord if it provides the Rainbow Termination to Tenant prior to the termination date set forth in
20   Tenant's notice to Landlord. In the event that the Lease terminates pursuant to this Section 17.4,
21   then Landlord shall reimburse Tenant for the cost of its Construction Drawings, not to exceed
22   Thirty Thousand Dollars ($30,000), within thirty (30) days of the termination date.

23   <div align="center">

## 18. QUIET ENJOYMENT
</div>

24        Landlord represents and warrants that it has full authority to execute and perform this Lease
25   and to grant the subject leasehold estate to Tenant, and that Tenant shall peaceably and quietly have,
26   hold and enjoy the Store with all appurtenances on and after the Delivery Date and during the Term
27   and without any manner of hindrance or interference with its quiet enjoyment, possession and use.

28   <div align="center">

## 19. ASSIGNMENT/SUBLETTING
</div>

29   **19.1. General.**

30        During the full Term of this Lease, including any Option Periods, Tenant shall have the right
31   to assign this Lease, or sublet the Store or any portion thereof (a "Transfer" and the assignee or
32   sublessee thereof is herein a "Transferee") with the prior written consent of Landlord which consent
33   shall not be unreasonably withheld or delayed. If Landlord fails to respond within thirty (30) days,
34   then Tenant shall provide a second (2nd) five (5) day notice, and upon Landlord's failure to respond
35   within five (5) days of Tenant's second (2nd) written request for consent to a proposed Transfer,
36   such failure shall be deemed Landlord's consent. If Landlord denies consent to any proposed
37   Transfer, Landlord shall specify in writing the reasons for Landlord's denial of consent. Tenant shall

"Palm Springs"          - 57 -          9/14/2009
Palm Springs Plaza              Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

1    have the right to operate departments within the Store by means of subleases, licenses or concession
2    agreements without Landlord's consent.  An assignee or sublessee shall be subject the then existing
3    exclusives in the Shopping Center, provided Landlord has supplied Tenant with a current list of
4    exclusives in existence as of the date of the assignment or sublet.

5    **19.2.    Related Entity.**

6            An assignment or other transfer of this Lease or any sublease of all or any portion of the
7    Store to a "Related Entity" shall not constitute a Transfer under the terms of this Lease.  The term
8    "Related Entity" means:  a corporation or other entity with which Tenant may merge or consolidate;
9    or to which Tenant sells at least ten (10) stores in the State of Florida; or any parent, affiliate or
10   subsidiary of Tenant; or an affiliate or subsidiary of Tenant's parent.

11   **19.3.    Stock.**

12           The sale of stock by Tenant or by any shareholder of Tenant shall not constitute a Transfer
13   under the terms of this Lease.

14   **19.4.    No Release of Liability.**

15           In the event of a Transfer of this Lease (including a sublease or assignment to a Related
16   Entity), Tenant and Tenant's Guarantor shall remain liable.

17   **19.5.    Landlord Notice to Assignee.**

18           Landlord, when giving notice to any Transferee of this Lease related to any default
19   hereunder, shall simultaneously give notice thereof to Tenant, who may cure said default at any time
20   during the notice period; and in the event that Tenant shall cure the default, Tenant shall be
21   subrogated to all rights and remedies of Landlord as against the Transferee related to the default and
22   shall have the right at its election to recover possession of the Store from the defaulting Transferee,
23   to cancel and revoke the Transfer, and to be restored by Landlord to its leasehold estate hereunder.

24   **19.6.    Restriction on Landlord's Right to Assign.**

25           Landlord shall not assign this Lease prior to the Commencement Date except to an assignee
26   by an assignment which satisfies the following criteria:  (a) all shareholders or partners of Landlord
27   have at least a fifty-one percent (51%) interest in the assignee, (b) Landlord continues as the
28   managing agent and developer of Landlord's Parcel, and (c) Landlord performs all of its obligations
29   and duties under this Lease which are conditions precedent to this Lease becoming effective.

30           Any purported assignment or subletting consummated in violation of the provisions of this
31   Article 19 shall, at Landlord's election, be null and void, of no force or effect, and shall be a default
32   under this Lease.  The receipt of rental from any party other than Tenant shall not be deemed a
33   consent to an assignment or subletting, nor relieve Tenant of its obligations to pay rental or from its
34   covenants or obligation of this Lease

1    **19.7.    Recapture on Assignment or Sublease of Store.**

2    Except for a transfer to a Related Entity, in the event that Tenant intends to seek a sublessee
3    or assignee (a "Transferee") for twenty-five percent (25%) or more of the Leasable Floor Area of the
4    Store to a business entity which operates fewer than twenty (20) retail stores or has a net worth of
5    less than TWENTY MILLION DOLLARS ($20,000,000) in the United States, then prior to making
6    the Store available for any such subletting or assignment (a "Transfer"), Tenant shall first give
7    Landlord written notice of its intention to do so ("Transfer Notice"), which notice shall include (a)
8    the identity of the Transferee and a copy of such Transferee's audited financial statements for its
9    most recently completed fiscal year, (b) a statement of the Unamortized Cost of leasehold
10   improvements to the Store which were paid for by Tenant, and (c) a proposed Lease termination
11   date which is not sooner than ninety (90) nor later than one hundred eighty (180) days following the
12   date of the Transfer Notice. If Tenant issues a Transfer Notice to Landlord, Landlord may terminate
13   this Lease; provided, however, it must do so by written notice ("Recapture Notice") given to Tenant
14   within thirty (30) days after the date of the Transfer Notice ("Election Period") electing a
15   termination date sixty (60) days from the date of the Recapture Notice. Landlord's Recapture Notice
16   shall be accompanied by Landlord's payment to Tenant of the Unamortized Costs as set forth in the
17   Transfer Notice. In the event Landlord gives Tenant a Recapture Notice within the Election Period,
18   this Lease shall terminate as to all obligations accruing on and after the date of termination
19   designated by Landlord in the Recapture Notice, unless Tenant rescinds the Transfer Notice by
20   written notice to Landlord given with twenty (20) days following receipt of the Recapture Notice. If
21   Landlord does not give a Recapture Notice within the Election Period as provided for by this
22   Section 19.7, then at anytime thereafter Tenant may Transfer the entire Store to the Transferee,
23   provided that none of the provisions of this Lease shall be changed in any manner.

24

25                    **20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES**

26   **20.1.    Defaults.**

27            **20.1.1.    Tenant's Default.**

28            (a)    Breach.    The occurrence of either of the following shall constitute a default
29   by Tenant pursuant to this Lease: (i) a failure by Tenant to pay Rent within ten (10) Business Days
30   after Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by Tenant
31   to perform obligations pursuant to this Lease, other than as specified in (i) above, within thirty (30)
32   days after Tenant's receipt of written notice from Landlord specifying such failure; however, such thirty
33   (30) day period may be extended for such period of time as may be reasonably required to perform the
34   obligation provided: (A) such obligation cannot be reasonably performed within thirty (30) days after
35   such notice; (B) Tenant commences efforts to cure the default within thirty (30) days after receipt of
36   Landlord's notice of default; (C) Tenant diligently pursues completion of the obligation; and (D) such
37   cure period shall not exceed ninety (90) days after Tenant's receipt of Landlord's notice of default.
38   Tenant's withholding, deducting or offsetting of, or failure to pay Rent pursuant to a bona fide dispute
39   between Landlord and Tenant shall not be deemed a default by Tenant under the provisions of this
40   Lease. Tenant, however, agrees to pay any undisputed amount in the event of a bona fide dispute.

1                 (b)    Insolvency. If Tenant makes an assignment for the benefit of creditors, or
2 if any proceedings are commenced under the provisions of the Bankruptcy Act whereby Tenant seeks
3 to be, or would be, discharged of its debts, or the payment of its debts are sought to be delayed, this
4 Lease shall be governed by the provisions of the Federal Bankruptcy Act.

5                 (c)    Prohibition Against Landlord Accelerating Rent.

6                      (i)    Except as provided in Section 20.1.1(c)(ii) below, and whether or
7 not Landlord terminates this Lease, Tenant shall have no obligation to pay Rent until the date it would
8 otherwise be due in the absence of Tenant's default. Landlord shall have no right to accelerate Rent
9 which would become due except as provided hereafter.

10                     (ii)    In the event Landlord terminates this Lease due to a default by
11 Tenant, Landlord may recover from Tenant the balance of the Rent payable by Tenant for the
12 remainder of the Term, minus the fair market rental value of the Store for such period, each
13 discounted to present value using a discount rate of the Federal Reserve Bank of San Francisco at the
14 time of the award, plus one percent (1%) per annum, together with the costs and expenses proximately
15 caused by Tenant's breach of this Lease.

16                 (d)    Personal Property Waiver. Landlord waives such liens, if any, to which it
17 may have a right with respect to the merchandise, furniture, trade fixtures and other personal property
18 of Tenant located on or about the Store, and Landlord shall from time to time execute such documents
19 as Tenant may reasonably request to acknowledge such waiver.

20                 (e)    Landlord's Remedy for Improper Offset. Certain provisions of this Lease
21 grant to Tenant the right to offset specified amounts against, or to deduct such amounts from, Rent or
22 other charges payable under this Lease. The exercise by Tenant of any such right or Tenant's
23 withholding of any disputed amount of Rent or other sum shall not constitute a default under this
24 Lease by Tenant unless and until (i) an arbitrator per Section 20.2.3 shall determine by means of a final
25 award that such right to offset, deduct, or refusal to pay has been exercised improperly by Tenant, and
26 (ii) following the entry of such award, and within thirty (30) days after receipt by Tenant from Landlord
27 of a bill in the amount determined by such award to have been improperly offset, deducted, or
28 withheld by Tenant, Tenant shall fail to pay such amount to Landlord, together with interest thereon at
29 the Legal Rate retroactive to the date that the offset or deduction was taken by Tenant.

30       **20.1.2.**    Landlord's Default.

31                 (a)    Breach. Except for a violation by Landlord of express provisions of this
32 Lease which require specific notice provisions which are shorter or longer than thirty (30) days (which
33 notice provisions shall control over the provisions of this Section 20.1.2(a)), the occurrence of the
34 following shall constitute a default by Landlord pursuant to this Lease: Landlord's failure to perform
35 any of its obligations under this Lease, which default continues for a period of more than thirty (30)
36 days after receipt of written notice from Tenant specifying such default; however, such thirty (30) day
37 period may be extended for such period of time as may be reasonably required to perform the
38 obligation (not to exceed ninety (90) days after Landlord's receipt of such notice) provided: (i) such
39 obligation cannot be reasonably performed within thirty (30) days after such notice; (ii) Landlord

"Palm Springs"                   - 60 -                 9/14/2009
Palm Springs Plaza                                     Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

1    commences efforts to cure the default within thirty (30) days after receipt of Tenant's notice of default;
2    and (iii) Landlord diligently pursues completion of the obligation.

3               (b)    Remedies.

4                       (i)    General.    Except as otherwise provided in this Lease, in the event
5    of Landlord's monetary or material default under this Lease, and in the event Landlord fails to cure
6    same after an additional ninety (90) days' notice, in addition to availing itself of any other remedies
7    available at law and in equity and without the requirement of any further additional ninety (90) day
8    notice, Tenant may, at its option, upon written notice to Landlord, terminate this Lease, or may incur
9    any expense necessary to perform the obligation of Landlord specified in such notice and deduct such
10   expense from the Rent or other charges coming due, provided that Tenant shall not be permitted to
11   terminate this Lease while such termination is being contested through any Arbitration or Mediation.
12   So long as Tenant has any right to set off a monetary obligation of Landlord from Rent (and the
13   amount of such setoff does not exceed the Rent then due for the remainder of the term of this Lease),
14   Landlord shall not be considered to be in default of its monetary obligations hereunder.

15                      (ii)    Interruption of Utility Service.    In addition to the remedies
16   described above, in the event the Tenant is prevented from using the Store, or any portion thereof (the
17   "Unusable Area"), to conduct its normal retail operations for a period in excess of thirty (30) Business
18   Days if within the control of Landlord or for a period in excess of one hundred eighty (180) Business
19   Days if not within the control of Landlord because of (A) the interruption of any utility service to the
20   Unusable Area which is required to be provided by Landlord pursuant to the terms of this Lease,  or
21   (B) due to Force Majeure, then the provisions of this Subsection 20.1.2.(b)(ii) shall apply.  Tenant shall
22   promptly deliver to Landlord notice of the interruption (the "Interruption Notice") of such condition.
23   If any condition set forth in the first sentence of this Subsection shall not be cured within forty-five
24   (45) days after Landlord's receipt of the Interruption Notice, then Tenant, upon notice to Landlord
25   after expiration of such period, may terminate this Lease either as to (a) the Unusable Area in which
26   case this Lease shall be amended to reflect that the Unusable Area is no longer a part of the Store, and
27   the Rent payable hereunder by Tenant shall be adjusted proportionately or (b) the entire Store, which
28   termination shall be deemed effective upon Tenant's vacation of the entire Store.

29   **20.2.    Alternative Dispute Resolution Process.**

30              **20.2.1.**    Means of Resolution.    In the event that any controversy or dispute ("Dispute")
31   shall arise under this Lease and in the event that the parties have been unable to resolve such
32   Dispute within thirty (30) days, the Dispute shall be resolved as provided in this Section 20.2.  All
33   Disputes, the monetary value of which exceeds Fifty Thousand Dollars ($50,000), or which involve
34   an equitable remedy, shall first require the utilization of Mediation as provided in Section 20.2.2
35   below.  All Disputes, the monetary value of which is Fifty Thousand Dollars ($50,000) or less shall
36   be settled by Arbitration as discussed in Section 20.2.3 below.

37              **20.2.2.**    Mediation.    The parties shall first try in good faith to settle the Dispute by
38   mediation pursuant to the provisions as set forth below. Either party may initiate Mediation. The
39   party commencing the Mediation shall first give a written notice (a "Mediation Notice") to the other
40   party setting forth the nature of the Dispute. The Mediation shall be administered by the American
41   Arbitration Association under its Commercial Mediation Rules, except to the extent that this

1   Section 20.2.2 is inconsistent therewith, in which event this Section 20.2.2 shall govern and prevail.
2   If the parties cannot agree on the selection of a Mediator within twenty (20) days after receipt of the
3   Mediation Notice, the Mediator shall be selected in accordance with the American Arbitration
4   Association procedure. If the Dispute or any part thereof has not been resolved by mediation as
5   provided above within sixty (60) days after receipt of the Mediation Notice, or if a party fails to
6   participate in Mediation, then at the option of either party by written notice, the Dispute shall be
7   determined by suit or action in court, unless it is a matter for Arbitration as described in
8   Section 20.2.1 above. The costs of the Mediator and the Mediation service shall be shared equally
9   by the parties; each party shall otherwise bear its own costs incurred in connection with the
10  Mediation, including its own attorneys' fees.

11      **20.2.3.**    Arbitration.  Either or both parties may initiate the Arbitration process.  The
12  party initiating the Arbitration process shall first give a written notice (an "Arbitration Notice") to
13  the other party setting forth the nature of the Dispute. The Arbitration shall be administered by the
14  American Arbitration Association in accordance with its Commercial Arbitration Rules, except to
15  the extent that this Section 20.2.3 is inconsistent therewith, in which event this Section 20.2.3 shall
16  govern and prevail. Judgment upon the award rendered by the Arbitrator may be entered in any
17  court of competent jurisdiction.  Unless otherwise agreed to by the parties, the matter shall be
18  submitted to one (1) Arbitrator and shall be heard in the state in which the Store is located.  If the
19  parties cannot agree on the selection of an Arbitrator within ten (10) days after the initiation of the
20  Arbitration process, the Arbitrator shall be selected in accordance with the American Arbitration
21  Association procedure, which selection shall be binding on the parties. The Arbitrator shall resolve
22  the controversy in accordance with applicable law and the terms and conditions of this Lease. The
23  Arbitrator shall allow the parties reasonable opportunities for pre-hearing document exchange and
24  other pre-hearing discovery of evidence as determined by the arbitrator in his or her discretion. The
25  determination of the Arbitrator shall be final, binding and conclusive upon the parties.

26      **20.2.4.**    Confidentiality.  Except as otherwise required by law, the parties, Mediator
27  and/or Arbitrator agree to keep confidential and not disclose to third parties any information or
28  documents obtained in connection with the Mediation and/or Arbitration process, including the
29  resolution of the Dispute.

30  **20.3.   Unlawful Detainer.**

31      Landlord agrees not to file, prosecute, or maintain any proceeding for eviction, unlawful
32  detainer, or termination of this Lease against Tenant (and any such proceeding shall be null and
33  void) during the Alternative Dispute Resolution process as set forth in Section 20.2 and/or in the
34  event of a bona fide dispute between the parties with respect to any alleged default by Tenant or any
35  provision of this Lease, including, without limitation, Tenant's non-payment of Rent pursuant to
36  Tenant's right to withhold, deduct or offset Rent in accordance with this Lease.

37  **20.4.   Attorneys' Fees.**

38      **20.4.1.**    Third Party Litigation.  If either party becomes a party to any litigation (including
39  Arbitration) concerning this Lease, the Store or the Shopping Center by reason of any act or
40  omission of the other party or its authorized representatives, and not by its own act or omission or
41  that of its authorized representatives, the other party shall be liable to that party for reasonable

1   attorneys' fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it
2   in the litigation.

3        **20.4.2.**  <u>Actions Between the Parties</u>.  If either party commences an action against the
4   other party arising out of or in connection with this Lease, or in the event of an Arbitration
5   proceeding between the parties relating to this Lease, the prevailing party shall be entitled to have
6   and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs,
7   discovery costs, and expert witness fees and costs, including costs of appeal.  When this Lease
8   imposes upon a party an obligation to indemnify the other, the indemnification obligation shall
9   include the obligation to pay the indemnitee's reasonable attorneys' fees, costs and disbursements,
10  whether the indemnitee be the plaintiff or defendant.

11                            **21. CASUALTY**

12  **21.1.  Definitions.**

13       **21.1.1.**  <u>Casualty</u>.  An event, or act of God, such as fire, windstorm, flood, earthquake,
14  riot, civil commotion, strike, perils or other matters which are unforeseen and unpredictable,
15  whether insured or uninsured, which causes damage or destruction to the Store or the Shopping
16  Center.

17       **21.1.2.**  <u>Casualty Date</u>.  The date of the occurrence of a Casualty.

18       **21.1.3.**  <u>Permitted Repair Period</u>.  A period of two hundred seventy (270) days following
19  the Casualty Date.

20       **21.1.4.**  <u>Restoration (sometimes referred to herein as "Restore")</u>.  Restoration, rebuilding
21  or repairs due to a Casualty under Section 21.2 of this Lease or due to a Taking under Section 22.1
22  of this Lease.

23  **21.2.  Insured Casualty.**

24       If the Store is damaged or destroyed by a Casualty insured against or that Landlord is
25  obligated to insure against under this Lease, to the extent that Restoration cannot reasonably be
26  completed within the Permitted Repair Period, as reasonably determined by Landlord (and Landlord
27  shall deliver notice to Tenant of such determination within sixty (60) days of the Casualty Date),
28  Tenant may, at its option, terminate this Lease as of the Casualty Date by notice to Landlord within
29  thirty (30) days after the after the later of (a) Landlord's Notice, or (b) the Casualty Date.  If Tenant
30  does not so terminate this Lease, or if Restoration to the Store may be completed within the
31  Permitted Repair Period, then this Lease shall not terminate, and Landlord shall diligently proceed to
32  Restore the Store to substantially the condition as existed immediately prior to the Casualty, and
33  Landlord shall diligently pursue such Restoration to completion.  If the Restoration is not completed
34  within the Permitted Repair Period, Tenant may terminate this Lease by written notice to Landlord
35  at any time prior to the Redelivery Date.  All Rent payable hereunder shall abate from the Casualty
36  Date to the earlier of (a) sixty (60) days following the Redelivery Date (but only if the Redelivery
37  Date falls on a Permitted Delivery Day, and if the Redelivery Date does not fall on a Permitted
38  Delivery Day, the sixtieth (60th) day following the next Permitted Delivery Day); or (b) the date on

"Palm Springs"          - 63 -          9/14/2009
Palm Springs Plaza          Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1  which Tenant again opens for business in the Store (in either case the "Recommencement Date");
2  provided that if Tenant continues to do business in the Store during the period of Restoration,
3  Tenant's total obligation for Rent shall equitably abate with reference to the nature, extent and
4  duration of the deprivation of Tenant's business in connection with such Restoration, and provided
5  Further that in the event of any dispute as to such equitable abatement, the matter shall be referred
6  to Alternative Dispute Resolution pursuant to Section 20.2 above. The election by Tenant to carry
7  the insurance on the Store pursuant to the terms of Section 9.1.3 shall not create any obligation on
8  the part of Tenant to Restore, but Tenant shall make available to Landlord the proceeds from such
9  insurance for Landlord's use in discharging Landlord's Restoration obligations under this
10  Section 21.2.

11  **21.3. Uninsured Casualty.**

12  If the Store is damaged or destroyed by a peril not covered by the standard form of Special
13  Form Policy (hereinafter an "Uninsured Casualty"), or if not otherwise covered by Landlord's
14  insurance and the cost of the Restoration of the Store as reasonably determined by Landlord
15  exceeds by more than Two-Hundred Fifty Thousand Dollars ($250,000), the amount of insurance
16  proceeds available (i.e., net of any applicable deductible) to Landlord, Landlord shall have the option
17  to elect not to Restore the Store and to terminate this Lease on at least ninety (90) days prior written
18  notice to Tenant. If only the Store and no other part of the building containing the Store is
19  damaged, Tenant may elect to pay the difference between the cost of Restoration and available
20  insurance proceeds (the "Difference") by delivering written notice of such election, together with
21  payment of such Difference, to Landlord within thirty (30) days after delivery of Landlord's notice
22  of election to terminate this Lease. Upon receipt of such notice and payment, the Landlord
23  termination shall be deemed rescinded and Landlord shall proceed with the Restoration of the Store.
24  If Landlord elects to terminate this Lease under this Section 21.3 and Tenant does not elect to pay
25  the Difference, this Lease shall terminate as of the date set forth in Landlord's notice of election to
26  terminate this Lease. If this Lease is not terminated under this Section 21.3, all Rent payable
27  hereunder shall abate from the Casualty Date to the Recommencement Date; provided that if
28  Tenant continues to do business in the Store during the period of Restoration, Tenant's total
29  obligation for Rent shall equitably abate with reference to the nature, extent and duration of the
30  deprivation of Tenant's business in connection with such Restoration, and provided further that in
31  the event of any dispute as to such equitable abatement, the matter shall be referred to Alternative
32  Dispute Resolution pursuant to Section 20.2 above.

33  **21.4. End of Term Casualty.**

34  Notwithstanding any provision in this Article 21 to the contrary, Landlord shall not be
35  required to Restore any Casualty to the Store occurring during the final eighteen (18) months of the
36  Term if the cost of such Restoration is greater than One Hundred Fifty Thousand Dollars
37  ($150,000) unless, within thirty (30) days after receipt of Landlord's notice to Tenant that it intends
38  not to effect Restoration, Tenant exercises in writing any next immediately succeeding Option to
39  extend the Term given Tenant hereunder. If Tenant does not elect to exercise the next immediately
40  succeeding Option so as to extend the Term, Tenant shall so notify Landlord within thirty (30) days
41  of Landlord's notice of election not to Restore, and, thereupon, this Lease shall terminate effective
42  as of the Casualty Date.

1     **21.5.   Shopping Center Casualty.**

2         In the event that the Store is not damaged or destroyed by a Casualty, but other buildings in
3 the Shopping Center, or the Building, excluding the Store, or if any of the Common Areas, are
4 damaged or destroyed by a Casualty, whether or not insured against (collectively a "Shopping Center
5 Casualty"), Landlord shall promptly remove all rubble and debris resulting from such damage or
6 destruction, and Landlord shall promptly Restore the damaged buildings in the Shopping Center as
7 well as the Common Areas as nearly as possible to the condition the same were in immediately prior
8 to such damage or destruction. Notwithstanding anything to the contrary contained herein, and
9 regardless of the extent of damage, Landlord shall promptly remove all rubble and debris so that the
10 Common Areas are usable. If the damage to the Common Areas shall render the whole or any part
11 of the Store unsuitable for Tenant's use, all Rent payable hereunder shall abate from the Casualty
12 Date to the Recommencement Date; provided that if Tenant continues to do business in the Store
13 during the period of Restoration, Tenant's total obligation for Rent shall equitably abate with
14 reference to the nature, extent and duration of the deprivation of Tenant's business in connection
15 with such Restoration, and provided further that in the event of any dispute as to such equitable
16 abatement, the matter shall be referred to Alternative Dispute Resolution pursuant to Section 20.2
17 above.

18     **21.6.   Insurance Proceeds.**

19         Intentionally Omitted.

20     **21.7.   Tenant Repair.**

21         If Landlord is obligated to Restore the Store under the terms of this Article 21 but does not
22 commence Restoration as soon as practicable after the Casualty, or does not continue the
23 Restoration of the Store thereafter with reasonable dispatch, Tenant, upon thirty (30) days' prior
24 notice to Landlord, shall have the right to terminate this Lease; provided that if Tenant elects to
25 continue to do business in the Store during the period of Restoration, Tenant's total obligation for
26 Rent shall equitably abate with reference to the nature, extent and duration of the deprivation of
27 Tenant's business in connection with such Restoration and provided that in the event of any dispute
28 as to such equitable abatement, the matter shall be referred to Alternative Dispute Resolution
29 pursuant to Section 20.2 above. In addition, Tenant shall be relieved of the obligation to pay for
30 casualty insurance for the remainder of the Term.

31     **21.8.   Waiver of Statute.**

32         The parties waive such rights of Lease termination as are granted to them under the laws of
33 the state wherein the Store is located, it being their agreement that the rights of termination in the
34 event of Casualty, as set forth herein, shall be exclusive.

35     **21.9.   Laws.**

36         If applicable governmental laws and regulations prohibit the Restoration of any damage to
37 the Store or Common Areas, either party may elect to terminate this Lease effective thirty (30) days
38 after the delivery to the other party of written notice of the election to terminate. Notwithstanding

"Palm Springs"                           - 65 -                          9/14/2009
Palm Springs Plaza                                               Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

1  anything in this Article 21 to the contrary, if applicable laws and regulations require seismic,
2  disability access, life safety or other retrofitting as a condition to Restoration and the costs of same
3  exceed Landlord's insurance Proceeds, and if Tenant does not elect to pay Landlord the Difference,
4  then Landlord shall have the right to elect to terminate this Lease effective thirty (30) days after
5  delivery to Tenant of written notice to terminate.

6  **21.10.  Tolling of Term.**

7  During the period between Landlord's completion of Landlord's Restoration obligations and
8  the Recommencement Date, Tenant and Tenant's employees, agents and contractors shall have the
9  right to enter upon the Store for the purpose of erecting, constructing, or installing such
10  improvements, alterations, fixtures, equipment and furniture as Tenant deems necessary for
11  resuming business in the Store. In the event Rent shall completely abate for any period pursuant to
12  the provisions of this Article 21, the Term shall toll for the period of such abatement, in which
13  event, the monthly installments of Rent following the end of the period of such abatement shall
14  recommence and thereafter continue at the same Rent rate that was in effect at the time of such
15  abatement; the remaining scheduled increases of Minimum Rent shall be postponed for the period
16  of such abatement to reflect such tolling, the expiration date of the then applicable Term (whether
17  the Initial Term or any Option Period) and the commencement and expiration dates of any
18  subsequent Option Periods shall be extended for the period of such abatement, as shall be the
19  deadline dates for notices exercising Option Periods. Any period of tolling shall be added to the
20  calculation of the Initial Term (or any then current Option Period, as the case may be) for purposes
21  of the calculation of the Expiration Date. For example, if the Term of this Lease is tolled under the
22  provisions of this Section 21.10 for a period of four (4) months, and the tolling occurs during the
23  Initial Term, then the definition of Initial Term in Section 1.5.1 shall be:      "From the
24  Commencement Date through the January 31 next following the expiration of one hundred
25  twenty-four (124) months thereafter."

26  **21.11.  Effect of Termination.**

27  Upon termination of this Lease pursuant to this Article 21, (a) each of the parties shall be
28  thereby released from all further obligations and duties to the other party as of the Casualty Date,
29  except for items and liabilities which have theretofore accrued and be then unpaid and for Tenant's
30  Pro Rata Share of the Common Area Charges for the partial year in which the Lease terminates, and
31  (b) Landlord shall promptly refund to Tenant all unearned Rent and other amounts prepaid by
32  Tenant under this Lease.

33  **21.12.  Tenant's Right of First Offer.**

34  The provisions of this Article 21 to the contrary notwithstanding, if this Lease is terminated
35  in accordance with this Article 21, and Landlord elects to rebuild the Store or a substantially similar
36  building in Landlord's Parcel within one (1) years after the Casualty Date, Landlord shall, before
37  marketing space in such building to any person or entity, first offer space in such building to Tenant
38  on terms no less favorable than those for which Landlord will market such space on the open
39  market.

1                              **22. CONDEMNATION**

2    **22.1. Taking.**

3         A "Taking" means any governmental act, condemnation proceeding, moratorium, initiative,
4    or referendum whereby Landlord or Tenant is divested of ownership or any of the incidents thereof,
5    or any transfer in lieu thereof, and physical possession is taken by the governmental or condemning
6    authority. In the event Tenant does not terminate this Lease as provided in Section 22.2 following,
7    Landlord shall promptly and diligently Restore the Store, Common Areas, or other space, as the case
8    may be, to as near their condition as existed prior to such Taking as is reasonably possible. During
9    the course of such Restoration, if Tenant is not operating in the Store, all Rent shall abate from the
10   date of the Taking to the Recommencement Date. If Tenant continues to do business in the Store
11   during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent
12   within fifteen (15) days after the close of each calendar month. When Restoration is complete,
13   Tenant's total obligation for Minimum Rent shall be adjusted as provided in Section 3.7 in the event
14   the size of the Store is reduced. When Restoration is complete, if the size of the Store is not
15   reduced, but the size of the Common Areas is reduced, Minimum Rent shall thereafter be reduced
16   to an amount calculated by multiplying the Minimum Rent stated in this Lease by a fraction the
17   numerator of which is the fair market rental value of the Store immediately following the Taking and
18   the denominator of which is the fair market rental value of the Store immediately prior to the
19   Taking.

20   **22.2. Right to Terminate.**

21        Tenant may terminate this Lease upon written notice to Landlord in the event of any one or
22   more of the following Takings:

23        **22.2.1.**    A Taking of any portion of or interest in the Store;

24        **22.2.2.**    Any Taking of the Common Areas if the number of parking spaces is reduced
25   below eight hundred and fifty (850) spaces, or access to the Store is materially impaired, or access to
26   the Shopping Center is materially impaired;

27        **22.2.3.**    Any Taking of any portion of the Shopping Center which impairs the operation
28   of Tenant's business; or

29        **22.2.4.**    Any Taking of twenty percent (20%) or more of the Leasable Floor Area of the
30   Shopping Center (not including the Store in either the numerator or denominator of such
31   calculation).

32        **22.2.5.**    Landlord shall promptly notify Tenant of any Taking. Tenant's termination must
33   be exercised by written notice to Landlord given within sixty (60) days following the date of
34   Tenant's receipt of Landlord's notice of the occurrence of such Taking (as defined in Section 22.1).

35        **22.2.6.**    Landlord may terminate this Lease upon written notice to Tenant, within sixty
36   (60) days following the date of such Taking, in the event of any one or both of the following
37   Takings:

1               (a)      A Taking of the Store; or

2               (b)      Any Taking of fifty percent (50%) or more of the Leasable Floor Area of
3 the Shopping Center (not including the Store in either the numerator or denominator of such
4 calculation).

5 **22.3.  Claims.**

6       Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any
7 condemnation proceedings or otherwise for the value of their respective interests, as well as any
8 damages.

9 **22.4.  Waiver.**

10       The parties waive such rights of Lease termination as may be granted them in the event of
11 condemnation by the laws of the state wherein the Store is located, it being their agreement that the
12 rights of termination set forth in this Lease shall be exclusive.

13 <div align="center">

**23. MECHANIC'S LIENS**
</div>

14       Pursuant to Florida Statutes, Section 713.10, it is the intent of the parties that Landlord's
15 interest in the Store or Landlord's Parcel shall not be subject to any liens filed for improvements
16 made by Tenant and/or because of Tenant's failure to make timely payments in connection with
17 Tenant's Work at or on the Store. The Memorandum of Lease provided for in Section 26.16 shall
18 expressly give notice of and prohibit such liability by Landlord as stated in the preceding sentence.
19 Landlord and Tenant shall prevent any mechanic's, materialman's or other liens against the Store or
20 Landlord's Parcel in connection with any labor, materials or services furnished or claimed to have
21 been furnished. If any such lien shall be filed against the Store or Landlord's Parcel, the party
22 through whom the lien arose will cause the same to be discharged within thirty (30) days of the filing
23 of the lien, provided, however, that either party may contest, or cause to be contested, any such lien,
24 so long as the enforcement thereof is stayed by bonding or otherwise expunging the lien from the
25 official property records in the jurisdiction. Tenant agrees that Landlord shall not be required to
26 bond or expunge the lien; however, Landlord agrees that Tenant shall nevertheless be indemnified
27 for any actual and reasonable costs incurred as a result of a lien filed in connection with labor,
28 materials or service supplied at Landlord's request. In addition, if a mechanic's lien is recorded as a
29 result of work done by any other tenant of the Shopping Center, Landlord shall not be required to
30 bond or expunge such lien so long as Landlord demonstrates to Tenant that pursuant to Florida law,
31 such mechanic's lien does not encumber the Shopping Center.
32

33 <div align="center">

**24. SIGNS**
</div>

34 **24.1.  Governmental Approval and Compliance.**

35       All signs shall be subject to approval by local governmental authority.  Landlord shall
36 cooperate fully with Tenant and assist Tenant in Tenant's efforts to obtain approval for Tenant's
37 signs as shown on **Exhibit J** ("Tenant's Signs") and made a part hereof, from the local

"Palm Springs"            - 68 -            9/14/2009
Palm Springs Plaza            Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

1  governmental authority.  Landlord's approval for a change to Tenant's signage on the exterior of the
2  Store or Tenant's sign panels on the Shopping Center's pylon or monument or directional signs shall
3  not be required if such change is in connection with a corporate-wide and/or multi-store signage
4  change program by Tenant, however, such change shall not materially increase in size and shall be
5  subject to the approval of the local governmental authority.  Landlord approves of all Tenant's Signs
6  shown on **Exhibit J.**

7  **24.2.   Building Signs.**

8       Tenant may erect and maintain Tenant's Signs upon the exterior of the Store, as specified on
9  **Exhibit J.**  Tenant's Signs, including Tenant's signage on any sign structure(s) provided by Landlord,
10  shall be fabricated, installed and maintained by Tenant at its sole cost and expense and, at Tenant's
11  election, shall be of no less sign area than the largest sign of any other tenant or occupant in the
12  Shopping Center.  Subject to governmental approvals, in no event shall Tenant's storefront Signs be
13  configured with less than a seventy-two (72) inch "Ross" and a forty-two (42) inch "Dress for Less."
14  Tenant shall have the right, but not the obligation, to install under-canopy signs if permitted by local
15  governmental authority.  In the event the sign criteria for the Shopping Center require only a
16  specific type or style of under-canopy sign, then Tenant shall have the right to approve any such
17  under-canopy sign prior to such under-canopy sign's installation.

18  **24.3.   Pylon or Monument or Directional Signs.**

19       Landlord   shall,   at   its   sole   cost   and   expense,   maintain   and   repair   the
20  pylon/monument/directional sign structure(s) specified in the Site Plan and **Exhibit J.** Tenant may
21  install and maintain Tenant's sign panels as specified in **Exhibit J.**  Landlord shall cooperate fully
22  with Tenant and assist Tenant, at Tenant's sole cost and expense, in obtaining all permits to install
23  Tenant's sign panels on Landlord's pylon/monument/directional sign structure(s) as specified on
24  **Exhibit J.**  The size and location of the panels shall be as specified in **Exhibit J** attached hereto.
25  Landlord shall provide, at Tenant's sole cost and expense, blank panels for Tenant's pylon and
26  monument signage, with panel faces made of the material Landlord requires on all pylon and
27  monument signs at the Shopping Center (e.g., acrylic, aluminum or other material reasonably
28  specified by Landlord for such sign panels).  Tenant shall have the right to decorate such blank
29  panels with Tenant's logo and/or trade name in format and color typically used or adopted by
30  Tenant.  Tenant shall pay for the expense of installing and maintaining its sign panels on the
31  pylon/monument/directional sign structure(s).  Utility charges and maintenance and repair for the
32  pylon sign(s) on which Tenant places its sign panels shall be paid through Tenant's Common Area
33  Charge.

34  **24.4.   Temporary Signs.**

35       During the period of construction described in Section 5.1, Tenant shall have the right to
36  construct temporary signage adjacent to and/or on the Store and at the perimeter of the Shopping
37  Center indicating the anticipated opening of the Store for business.  Additionally, Tenant may,
38  through the thirtieth (30th) day following the opening of the Store for business, advertise such new
39  business by means of banners, flags and other signage attached to the Store, provided only such
40  temporary signage is (a) permissible under local ordinances, and (b) does not permanently damage
41  the building exterior.

1           ## 25. NOTICE

2           Any notice to be given in connection with this Lease shall reference (a) this Lease, (b) the
3   store number which has been assigned to the Store by Tenant (if known to Landlord), and (c) the
4   location of the Store.  The notice shall be served (a) personally, or (b) by certified mail, return
5   receipt requested, or (c) by reputable courier service which provides written evidence of delivery,
6   addressed to Landlord as specified in Section 1.2.1 and addressed to Tenant as specified in
7   Section 1.2.2 (or to such other address as requested by either party in writing), or (d) by telephone
8   facsimile upon which the date and time of transmission is machine imprinted to the number
9   specified in Section 1.2.1 as to Landlord and as specified in Section 1.2.2 as to Tenant.  Copies of
10  any notices sent to Tenant (addressed to Tenant as specified in Section 1.2.2) shall also be sent to
11  Bartko, Zankel, Tarrant & Miller, 900 Front Street, Suite 300, San Francisco, CA 94111, Attention:
12  Ross Notices.  Copies of any notices to Landlord shall also be sent to Akerman Senterfitt, One
13  Southeast Third Avenue, Miami, FL 33131, Attention: Ronald A. Kriss, Esq. All notices given in the
14  manner specified herein shall be effective upon actual receipt or upon refusal to accept delivery All
15  notices given in the manner specified herein shall be effective upon actual receipt or upon refusal to
16  accept delivery.

17          Either party, by written notice to the other, may designate two (2) additional parties to
18  receive copies of notices.  Any notice party to this Lease may change its address or location for
19  service of notices, for themselves or any of their respective designees by written notice.

20          ## 26. GENERAL CONDITIONS

21  **26.1.   Partial Invalidity.**

22          If any term, covenant, condition, provision or restriction of this Lease is held by a Court of
23  competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof
24  shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

25  **26.2.   Relationship of Parties.**

26          Nothing contained in this Lease shall be deemed or construed by the parties hereto or by
27  any third person to create the relationship of principal and agent, or of partnership, or of joint
28  venture, or of any other association between the parties other than Landlord and Tenant, or to
29  prevent Landlord or Tenant from entering into ventures in direct competition with the Shopping
30  Center, or the Store.

31  **26.3.   Time.**

32          Time is of the essence in the performance of each provision of this Lease.

33  **26.4.   Waiver.**

34          The waiver of the performance of any term, covenant, condition, provision or restriction of
35  this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the
36  same term, covenant, condition, provision or restriction.  The various rights, options, elections,

powers and remedies of the parties contained in this Lease shall be construed as cumulative and no one of them exclusive of any other or of any legal or equitable remedy which either party might otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a party shall not in any way impair its right to any other right or remedy.

**26.5.  Partial Months.**

For purposes of computing dates for expirations, Option Periods, Rent adjustments or cancellations (except for those dates specifically designated herein), any partial month at the commencement of the Term shall be disregarded.

**26.6.  Consent.**

Unless a different standard is otherwise specifically stated, wherever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

**26.7.  Gender.**

Words of gender used in this Lease shall be deemed to include other genders, and singular and plural words shall be deemed to include the other, as the context may require.

**26.8.  Governing Law.**

This Lease shall be construed in accordance with and governed by the laws of the state wherein the Store is located, except as otherwise required by mandatory provisions of law.

**26.9.  Due Authority.**

If Tenant or Landlord is a corporation, partnership, limited liability company, trustee or other entity, each individual executing this Lease on behalf of said entity (in his/her representative capacity only) represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the entity and that this Lease is binding upon the entity.

**26.10.  No Prior Agreements.**

It is understood that there are no oral agreements or representations between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements or representations and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. There are no other representations or warranties between the parties, and all reliance with respect to representations is solely upon the representations and agreements contained in this Lease. This Lease may be modified or amended only by an agreement in writing signed by the parties hereto.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

- 71 -

9/14/2009
Final

1  **26.11.  Entry by Landlord.**

2  Upon reasonable prior notice, in no event to be less than five (5) Business Days (except in
3  the case of a bona fide emergency, in which event, no prior written notice shall be required, but
4  prior verbal notice shall be required promptly confirmed in writing thereafter), Landlord may enter
5  the Store during Tenant's business hours for purposes of inspection, to show the Store to
6  prospective purchasers and lenders, or to perform maintenance and repair obligations imposed upon
7  Landlord by this Lease.  All maintenance, repairs or replacements by Landlord to the interior of the
8  Store or using the interior of the Store or maintenance, repairs or replacements to any portion of the
9  Shopping Center that will create dust, noise, vibration or other disturbance of Tenant's use of the
10  Store shall be performed only during hours that the Store is not open to the public.  Should
11  Landlord unreasonably interfere with Tenant's business by such entry, Rent shall equitably abate in
12  an amount reasonably determined with reference to the nature, extent and duration of the
13  deprivation of Tenant's business in connection with Landlord's entry into the Store. In the event of
14  any dispute as to such equitable abatement, the matter shall be referred to Alternative Dispute
15  Resolution pursuant to Section 20.2 above.

16  **26.12.  Neutral Interpretation.**

17  Landlord and Tenant agree that this Lease has been freely negotiated and that in the event a
18  dispute arises with respect to the meaning or interpretation of any provision of this Lease, no
19  presumption, inference or conclusion shall be drawn against the party that drafted the provision in
20  question.

21  **26.13.  Force Majeure.**

22  As used in this Lease, the term "Force Majeure" means delay resulting from causes beyond a
23  party's reasonable control such as strikes, walkouts or other labor disputes; acts of God; inability to
24  obtain labor, materials or merchandise; judicial orders; war; riot or civil commotion; fire or casualty;
25  governmental laws or regulations (hereinafter "governmental matters"), provided that
26  "governmental matters" shall exclude planning and building permits, governmental inspections,
27  permanent or temporary certificates of occupancy (or their equivalent in the applicable local
28  jurisdiction) and similar governmental approvals.  The party obliged to perform shall give notice to
29  the other as soon as reasonably possible after the onset of such delay stating the cause and an
30  estimate of the duration thereof.  If, as a result of an event of Force Majeure, either party shall be
31  delayed or hindered or prevented from the performance of any act required hereunder (other than
32  the making of payments) within the time period set forth herein, the performance of such act shall
33  be excused for the period of delay not to exceed sixty (60) days, and the period of performance of
34  such act shall be extended for a period equivalent to the period of such delay, not to exceed sixty
35  (60) days, unless a provision of this Lease expressly states that Force Majeure is not applicable.
36  Financial inability to perform shall not constitute an event of Force Majeure.

37  **26.14.  Successors in Interest.**

38  The terms, conditions and covenants herein contained shall inure to the benefit of and be
39  binding upon the heirs, assigns and other successors in interest to the parties hereto, except as
40  otherwise provided in this Lease.

1  **26.15.  Memorandum of Lease.**

2       This Lease shall not be recorded.  However, a Memorandum of Lease shall be executed, in
3  recordable form, by both parties concurrently herewith.  Either party may record the same at its own
4  cost and expense.

5  **26.16.  Real Estate Brokers.**

6       Landlord and Tenant each represents and warrants to the other party that it has not
7  authorized or employed, or acted by implication to authorize or employ, any real estate broker or
8  salesman to act for it in connection with this Lease, other than The Shopping Center Group, LLC
9  ("Broker"), who shall be paid by Landlord at the rate of Two Dollars ($2) per square foot of
10  Leasable Floor Area in the Store, fifty percent (50%) upon the execution of this Lease by Landlord
11  and Tenant and fifty percent (50%) upon the earlier of (a) Tenant opening the Store for business, or
12  (b) the Commencement Date.  Landlord and Tenant shall each indemnify, defend and hold the
13  other party harmless from and against any and all claims by any other real estate broker or salesman
14  whom the indemnifying party authorized or employed, or acted by implication to authorize or
15  employ, to act for the indemnifying party in connection with this Lease.  Further, in the event
16  Landlord fails to pay the Brokers within ten (10) days of the date that such commission is due to be
17  paid, Tenant, at its option, may pay the Brokers' fees and deduct the same from Rent as it comes
18  due.

19  **26.17.  Contingency; Tenant's Due Diligence Period.**

20       Tenant requires a period of time within which to perform its due diligence investigation with
21  respect to the condition of the Store and the feasibility of Tenant's contemplated plans for
22  construction of the Store and other related matters.  Landlord acknowledges that this Lease is
23  contingent upon Tenant's due diligence investigation and Tenant's approval, in Tenant's sole
24  discretion of the Due Diligence Matters defined below.  Tenant shall be given access to the Store for
25  a period that ends ninety (90) days following the Effective Date of this Lease (the "Due Diligence
26  Period") during which period Tenant and its agents and contractors may (i) conduct physical surveys
27  and inspections of the Store, make assessments of the structure of the Store and its systems, make
28  measurements of areas, quantities and capacities of the Store, test materials and undertake such
29  other inspections and tests as may be necessary to prepare for Tenant's Work; (ii) prepare plans,
30  specifications and designs for Tenant's Work; (iii) obtain bids for Tenant's Work; and (iv) obtain
31  permits for Tenant's Work (collectively "Due Diligence Matters").  Tenant shall notify Landlord if
32  Tenant has approved or disapproved the Due Diligence Matters (which approval or disapproval
33  shall be in Tenant's sole discretion) upon the expiration of the Due Diligence Period.  If Tenant
34  disapproves the Due Diligence Matters and elects to terminate this Lease, Tenant shall so notify
35  Landlord in writing ("Due Diligence Termination Notice"), and this Lease shall terminate effective
36  as of the date of the Due Diligence Termination Notice.  Tenant shall indemnify Landlord and hold
37  Landlord harmless from and against any costs and expenses arising from damage to the Store caused
38  by Tenant's due diligence investigation of the Store.  The foregoing Tenant indemnity shall survive
39  the termination of this Lease.

"Palm Springs"                 - 73 -                 9/14/2009
Palm Springs Plaza                                     Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5 5

**26.18.  Limitation of Landlord's Liability.**

Except for Landlord's (i) fraud or (ii) intentional material misconduct or misrepresentation, Landlord's liability hereunder shall be limited to Landlord's then interest in the Shopping Center for recovery of any judgment against Landlord, and o other assets of Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries, members or officers) shall be subject to any action or proceeding for the enforcement of any right or remedy of Tenant hereunder nor shall Landlord(or its representatives, agents, partners, shareholders, directors, employees, fiduciaries, members or officers) be personally liable for any judgment under this Lease.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

- 74 -

9/14/2009
Final

1    **26.18.  Limitation of Landlord's Liability.**

2    Except for Landlord's (i) fraud or (ii) intentional material misconduct or misrepresentation,
3    Landlord's liability hereunder shall be limited to Landlord's then interest in the Shopping Center for
4    recovery of any judgment against Landlord, and o other assets of Landlord (or its representatives,
5    agents, partners, shareholders, directors, employees, fiduciaries, members or officers) shall be subject to
6    any action or proceeding for the enforcement of any right or remedy of Tenant hereunder nor shall
7    Landlord(or its representatives, agents, partners, shareholders, directors, employees, fiduciaries,
8    members or officers) be personally liable for any judgment under this Lease.

1
2
3    **26.19.   OFAC Statement.**

4          Landlord and Tenant, each for itself, represents that it is not listed, nor is it controlled by, or
5    acting for or on behalf of, any person or entity on the list of Specially Designated Nationals and
6    Blocked Persons that is maintained by the Office of Foreign Assets Control ("OFAC") of the United
7    States Department of the Treasury (the "OFAC List").   Landlord and Tenant, each for itself,
8    represents to the best of its knowledge that it is not currently engaged in any transactions or dealings or
9    otherwise associated with any person or entity on the OFAC List in connection with the use or
10   occupancy of the Store.  Notwithstanding anything to the contrary stated herein, neither Landlord nor
11   Tenant shall knowingly permit the Store or any portion thereof to be used, occupied or operated by or
12   for the benefit of any person or entity on the OFAC List.

13

**LANDLORD:**                              **TENANT:**
**PHILIPS LAKE WORTH L.P.,**               **ROSS DRESS FOR LESS, INC.,**
a New York limited partnership             a Virginia corporation


By:  Philips International Holding Corp.,   By: _____
     as agent for Philips Lake Worth L.P.       James Fassio
                                           Its:   Executive Vice President

By: _____              Witness: _____
    Michael Pilevsky, Managing Director     Printed Name: _Sandra Powers_
                                           Witness: _Mona Mang_
Witness: _____          Printed Name: _Mona Gang_
Printed Name: _Dana Marrone_
Witness: _____          By: _____
Printed Name: _Robyn Tuerk_                     Gregg McGillis
                                           Its:   Group Vice President, Real Estate

                                           Witness: _____
                                           Printed Name: _Sandra Powers_
                                           Witness: _Mona Mang_
                                           Printed Name: _Mona Gang_

14



State of California                          )
                                             )
County of Alameda                            )

On _September 22, 09_ before me, _Sandra Powers_____, a Notary Public, personally
appeared James Fassio and Gregg McGillis, who proved to me on the basis of satisfactory evidence to
be the persons whose names are subscribed to the within instrument and acknowledged to me that
they executed the same in their authorized capacities, and that by their signatures on the instrument the
persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

SANDRA POWERS
Commission # 1628767
Notary Public - California
Alameda County
My Comm. Expires Dec 11, 2009

_Sandra Powers_
Notary Public

State of _New York_____                  )
                                             )
County of _New York_____                 )

On _9/24/2009_____ before me, _Tara Miceli_____,
a Notary Public, personally appeared _Michael Pilevsky_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

**TARA MICELI**
Notary Public, State of New York
No. 01MI6164710
Qualified in Richmond County
Commission Expires April 30, 20...../0.

_Tara Miceli_
Notary Public

"Palm Springs"                               - 76 -                              9/14/2009
Palm Springs Plaza                                                               Final
Palm Springs, FL
Store No. 1345
MED 0058.5.5.5

## EXHIBIT A
## LEGAL DESCRIPTION OF THE SHOPPING CENTER

PARCEL I

A PORTION OF SECTION 19, TOWNSHIP 44 SOUTH, RANGE 43 EAST, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 6, PAGE 66 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHEAST CORNER OF LOT 1, BLOCK 75-A OF THAT CERTAIN PLAT OF A REPLAT OF A PORTION OF VILLAGE OF PALM SPRINGS PLAT NO. 8, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 26, PAGE 116, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA; THENCE RUN SOUTH 89°42'47" EAST ALONG A LINE PARALLEL TO AND 55 FEET SOUTH OF AS MEASURED AT RIGHT ANGLES TO THE NORTH LINE OF THE SOUTH ½ OF THE NORTHEAST ¼ OF SECTION 19, TOWNSHIP 44 SOUTH, RANGE 43 EAST FOR 397.36 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG THE LAST DESCRIBED COURSE FOR 725.14 FEET TO A POINT OF CURVATURE; THENCE RUN ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 25 FEET AND A CENTRAL ANGLE OF 89°42'47" FOR AN ARC DISTANCE OF 39.14 FEET TO A POINT OF TANGENCY; THENCE RUN SOUTH 00°02'00" EAST ALONG A LINE PARALLEL TO AND 40 FEET WEST OF AS MEASURED AT RIGHT ANGLES TO THE EAST LINE OF THE NORTHEAST ¼ OF SECTION 19 FOR 1,223.40 FEET; THENCE RUN NORTH 89°43'04" WEST ALONG A LINE PARALLEL TO AND 40 FEET NORTH OF, AS MEASURED AT RIGHT ANGLES TO THE SOUTH LINE OF THE SAID NORTHEAST ¼ OF SECTION 19 FOR 750.01 FEET TO A POINT; THENCE RUN NORTH 00°02'00" WEST ALONG A LINE PARALLEL TO AND 790 FEET WEST OF, AS MEASURED AT RIGHT ANGLES TO THE EAST LINE OF THE NORTHEAST ¼ OF SECTION 19, FOR 1248.11 FEET TO THE POINT OF BEGINNING; LESS THE WEST 123.64 FEET THEREOF AND LESS THE EAST 10 FEET AS ADDITIONAL RIGHT-OF-WAY FOR CONGRESS AVENUE.

LESS AND EXCEPTING THEREFROM THAT PARCEL OF LAND AS CONVEYED TO PALM BEACH COUNTY BY THAT RIGHT-OF-WAY WARRANTY DEED RECORDED IN OFFICIAL RECORDS BOOK 8102, PAGE 1830, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORDIA.

ALSO LESS AND EXCEPTING:

THE SOUTH 40 FEET OF THE EAST 790 FEET OF THE SOUTH ONE-HALF (S ½) OF THE NORTHEAST ONE-QUARTER (NE ¼) OF SECTION 19, TOWNSHIP 44 SOUTH, RANGE 43 EAST LESS THE WEST 123.64 FEET AND THE EAST 50 FEET, PALM BEACH COUNTY, FLORIDA.

PARCEL II

PARCEL 4 OF CONGRESS PROFESSIONAL CENTER, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 81, PAGE 161, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

PARCEL III

NON-EXCLUSIVE EASEMENTS FOR THE BENEFIT OF PARCEL II AS CREATED BY THAT CERTAIN DECLARATION OF PROTECTIVE COVENANTS FOR CONGRESS PROFESSIONAL CENTER, RECORDED IN OFFICIAL RECORDS BOOK 9773, PAGE 366, OVER AND ACROSS PORTIONS OF THE FOLLOWING DESCRIBED LAND:

THE SOUTH 348 FEET OF THE EAST 590 FEET OF THE WEST 650 FEET OF THE NORTHWEST ONE-QUARTER OF THE SOUTHWEST ONE-QUARTER OF SECTION 17, TOWNSHIP 44 SOUTH, RANGE 43 EAST, PALM BEACH COUNTY, FLORIDA;

AND

LOTS 4, 5, 6 AND 7, BANDLOW SUBDIVISION, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 21, PAGE 92 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA, LESS SO MUCH OF THE NORTH 30.00 FEET OF SAID LOT 7 AS LIES EAST OF A LINE THAT IS PARALLEL TO AND 52.18 FEET WESTERLY FROM, MEASURED AT RIGHT ANGLES TO, THE EAST LINE OF SAID LOT 7. SAID LOTS ARE NOW KNOWN AS WATER MANAGEMENT TRACT 1 OF THE PLAT OF CONGRESS PROFESSIONAL CENTER, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 81, PAGE 161, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

"Palm Springs"     EXHIBIT A     FINAL
Palm Springs Plaza     Page 2 of 2
Palm Springs, FL
Store No. 1345
MED 0058.v2





## EXHIBIT C

## ROSS BUILT
## CONSTRUCTION OBLIGATIONS OF TENANT
## (LANDLORD PAYS NO CONSTRUCTION COSTS)

1.  **Description of Work.** To effect completion of the work described in the Final Plans (hereinafter called the "Work" or the "Improvements"), Landlord authorizes Tenant to act as construction supervisor. The duties of Tenant as construction supervisor shall include the obligation to arrange, contract (in Tenant's name) and pay for the furnishing of all labor and materials to construct and complete in a good, expeditious, workmanlike and substantial manner the Improvements. In its capacity as construction supervisor, Tenant shall supervise and direct all Work, using its best skill and attention. Tenant shall be solely responsible for all construction means and methods, techniques, sequences and procedures, and for coordinating all portions of the Work. All Work shall be performed in accordance with this Agreement. Delegation to Tenant of the obligation to construct the Improvements in no way constitutes a waiver of Landlord's ownership rights in the Improvements as provided in Section 12.1 of the Lease.

2.  **Preliminary Plans.** Tenant shall deliver to the Landlord a set of plans and specifications (hereinafter the "Preliminary Plans") for the improvements within ninety (90) days after the later to occur of (a) the date of execution of the Lease, or (b) Landlord's delivery to Tenant of a survey of the Store, which survey shall in no event be delivered more than ten (10) days after execution of the Lease. In the event a proceeding for a Land Entitlement Permit is required, the time for delivery of the Preliminary Plans shall be extended by the period required for acquisition of such entitlement permit in accordance with Section 6 below.

3.  **Final Plans.** Within fifteen (15) days following the date the Preliminary Plans are delivered to Landlord by Tenant, Landlord shall, in writing, approve or disapprove said plans, which approval may not be unreasonably withheld. The sole reasonable ground for Landlord's disapproval of Preliminary Plans, or any part thereof, shall be that the Improvements described are of such a special purpose and nature that a subsequent tenant in the same business as Tenant could not reasonably use the Improvements for its own purposes. Preliminary Plans approved by both Landlord and Tenant are hereinafter referred to as "Final Plans." Any disapproval must be accompanied by a specific description of the revisions Landlord would require in order to approve the Preliminary Plans, which revisions must be reasonable. In the event the Preliminary Plans are disapproved by Landlord, Tenant shall incorporate into the Preliminary Plans the suggested revisions received from the Landlord, and shall resubmit such revised Preliminary Plans to Landlord within thirty (30) days following receipt of Landlord's notice of disapproval; Landlord shall have fifteen (15) days thereafter in which to approve or disapprove the same, and in the event Landlord disapproves the same, such disapproval shall be on reasonable grounds stated in writing. In lieu of adopting Landlord's suggested revisions, Tenant may negotiate with Landlord for modifications of suggested revisions within the ensuing thirty (30) day period. If the parties cannot agree on the Final Plans, the Lease may be terminated by either party by written notice to the other at any time following expiration of the thirty (30) day period following

"Palm Springs"       EXHIBIT C       FINAL
Palm Springs Plaza      Page 1 of 3
Palm Springs, FL
Store No. 1345
MED 0058.v2

Landlord's disapproval, except, however, that Landlord shall not have the right to terminate if its approval of the Preliminary Plans has been unreasonably withheld, or disapproval of the Preliminary Plans has not been on reasonable grounds. In the event Landlord fails to disapprove the Preliminary Plans or Tenant's revisions thereto, in writing, or fails to state the reasons for disapproval or disapproves the same on unreasonable grounds within the fifteen (15) day time period set forth above, then such Preliminary Plans or revisions thereto shall be deemed approved. Tenant shall have the right, without Landlord's consent, to modify the Final Plans in connection with non-structural alterations or improvements to the interior of the Store and signage on the exterior of the Store (subject to the provisions of Article 24 of the Lease with respect to Tenant's signage on the exterior of the Store).

   **4.**  **Site Plan.** Any site plan included in the Final Plans shall conform generally to Exhibit B of the Lease. The Store shall contain approximately the number of square feet as set forth in the Lease.

   **5.**  **Approvals and Permits.**

     (a)  Upon approval of the Final Plans by both parties, Tenant shall forthwith make application to all appropriate governmental agencies for all necessary building permits, licenses and other grants for authority which may be required in connection with the construction of the Improvements (hereinafter collectively the "Building Permit"). Upon issuance of the Building Permit, a final initialed and dated set of plans reflecting all governmentally required changes shall be delivered to Landlord.

     (b)  Tenant shall have ninety (90) days from the date the Preliminary Plans are approved by both parties in which to obtain the Building Permit. If the Building Permit is not obtained (including the inability to obtain any required variance from such governmental authority) within the ninety (90) day period, Tenant, at its sole option, may terminate the Lease upon written notice to Landlord. If the Building Permit is not obtained, within two hundred seventy (270) days from the date the Preliminary Plans are approved by both parties hereto, either party may terminate the Lease thereafter by written notice to the other.

   **6.**  **Land Entitlement Permits.** Should it be necessary for Landlord to obtain a Land Entitlement Permit (as defined hereinbelow) of any sort, the time for preparation of Preliminary or Final Plans shall be extended by the time reasonably required to obtain such Land Entitlement Permit. Tenant shall prepare such plans and specifications as may be reasonably required for the processing of such Land Entitlement Permit for the Store only. The term "Land Entitlement Permit" as used herein shall include without limitation by enumeration an environmental impact report or statement or its equivalent, a zoning change or variance, an architectural or design review approval, general plan change, planned unit development approval or its equivalent, subdivision approval or its equivalent, or any other approval pertaining to the Work or use or general design of the Store and Improvements as opposed to the structural integrity of the Improvements.

"Palm Springs"           EXHIBIT C          FINAL
Palm Springs Plaza         Page 2 of 3
Palm Springs, FL
Store No. 1345
MED 0058.v2

      **7.**    **Access to Premises.**  Tenant's architect at all times shall have access to the Store during construction for purposes of inspection.

"Palm Springs"                                  EXHIBIT C                            FINAL
Palm Springs Plaza                  Page 3 of 3
Palm Springs, FL
Store No. 1345
MED 0058.v2

**EXHIBIT D**
**LANDLORD'S PROHIBITED USES**

1.     The Prohibited Uses as set forth in Section 3.2.1 of the Lease.

2.     The Landlord's Prohibited Uses as set forth below:

Prohibited Uses for Any Store in Shopping Center

1. Bowling alley
2. Theater
3. Health club – except as stated in Section 3.2.1 of the Lease as it pertains to the 37,000 square foot building
4. Bar or game or amusement room – except as stated in Section 3.2.1 of the Lease as it pertains to the 37,000 square foot building

Prohibited Uses of "Pier 1 Building"

1. Gas station or auto repair use
2. Pornographic use including, but not limited to, "adult" bookstores, theaters showing primarily "adult" movies and massage parlors
3. Movie theaters
4. Supermarket or convenience food store
5. Bowling alley, skating rink, pool hall, billiard room, discotheque, bar or tavern
6. A beauty school, barber college, reading room, or any other operation catering primarily to students or trainees rather than to customers

1  **EXHIBIT E**
2  **ACKNOWLEDGMENT OF COMMENCEMENT**
3
4      This Acknowledgment is made as of _____, 20___ with reference to that
5  certain lease (hereinafter referred to as the "Lease") dated _____, 20____,
6  between **PHILIPS LAKE WORTH L.P.**, as "Landlord" therein, and **ROSS DRESS FOR**
7  **LESS, INC.**, as "Tenant."

8      The undersigned hereby confirms the following:

9      1.    The    Delivery    Date    (as    described    in    said    Lease)    occurred    on
10 _____.

11     2.    In accordance with the provisions of said Lease the commencement date of the term
12 is _____, and that, unless sooner terminated, the original term thereof
13 expires on _____.

14     3.    The Agreed Size is _____ square feet.

15     4.    The notice date for the exercise of the first option is on or before _____,
16 20___.

17
18
   **LANDLORD:**                              **TENANT:**
   **PHILIPS LAKE WORTH L.P.**,               **ROSS DRESS FOR LESS, INC.**,
   **a New York limited partnership**         **a Virginia corporation**


   By: Philips International Holding Corp.,    By: _____
       as agent for Philips Lake Worth L.P.        James Fassio
                                               Its:  Executive Vice President
   By:_____
       Michael Pilevsky, Managing Director
                                               By: _____
                                                   Gregg McGillis
                                               Its:  Group Vice President, Real Estate

19

## EXHIBIT F

PREPARED AND RECORDING REQUESTED BY:

Ross Dress For Less, Inc.

AND WHEN RECORDED MAIL TO:

Ross Dress For Less, Inc.
4440 Rosewood Drive
Mail Stop PL4 4E 2
Pleasanton, CA 94588-3050
Attn.: Mark E. Daspit, Esq.
    Real Estate Law Department

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

## LOCATION:  PALM SPRINGS, FLORIDA

1
2          This Subordination, Nondisturbance and Attornment Agreement (the "Agreement") is
3  effective as of this ___ day of _____ 200_, by and between _____
4  (the "Lender"), ROSS DRESS FOR LESS, INC., a Virginia corporation (the "Tenant") and PHILIPS
5  LAKE WORTH L.P., a New York limited partnership (the "Landlord").

6                                           RECITALS

7          A.     Lender is or will be the holder of indebtedness secured by a lien or liens upon the real
8  property described in Exhibit "A" attached hereto and by this reference incorporated herein.  The Exhibit
9  "A" property and improvements thereon is hereinafter referred to as the "Shopping Center."   The
10  instruments creating such lien or liens whether they be denominated as being "mortgage," "deed of trust,"
11  "deed to secure debt," "security agreement," "vendor's lien," or otherwise, and any instruments modifying
12  or amending the same, or entered into in substitution or replacement thereof, are hereinafter collectively
13  referred to as being the "Mortgage."

14         B.     Tenant or Tenant's predecessor in interest has executed, or will execute, a certain lease
15  with Landlord, dated for reference purposes on _____, for all or a portion of the Shopping Center,
16  which portion (the "Premises") is more particularly set forth in said lease.  Said lease and all amendments
17  and modifications thereto are herein collectively referred to as the "Lease."

18         C.     Tenant has requested that Lender agree not to disturb Tenant's possessory rights under the
19  Lease in the event that Lender should foreclose on the Mortgage, provided that Tenant is not in default of
20  the Lease.

21         D.     The parties desire to establish certain rights and obligations with respect to their respective
22  interests by means of this Agreement.

1
2                                         AGREEMENTS

3           NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein
4    contained, and intending to be legally bound by hereby agree as follows:

5           1.      Subject to the terms and conditions of this Agreement, and for so long as this Agreement
6    remains binding upon Lender, the Lease shall be, in accordance with the terms and conditions hereof,
7    subordinate to the lien of the Mortgage and all voluntary and involuntary advances made thereunder.

8
9           2.      Lender approves of the Lease.

10
11          3.      Provided that Tenant is not in default so as to permit the Landlord to terminate the Lease or
12   Tenant's right to possession of the Premises, Lender or the purchaser at a foreclosure sale pursuant to any
13   action or proceeding to foreclose the Mortgage, whether judicial or non-judicial, or Lender pursuant to
14   acceptance of a deed in lieu of foreclosure or any assignment of Landlord's interest under the Lease, in the
15   exercise of any of the rights arising, or which may arise, out of the Mortgage or in any other manner:
16   (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its right to use,
17   quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit or privilege
18   granted to or inuring to the benefit of Tenant under the Lease (including any right of renewal or extension
19   thereof); (ii) shall not terminate or affect the Lease;  (iii) shall recognize Tenant's rights, benefits and
20   privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all of the terms,
21   covenants, and conditions of the Lease for the remaining balance of the term of the Lease with the same
22   force and effect as if Lender were the Landlord under the Lease.  Lender hereby covenants that any sale by
23   it of the Shopping Center pursuant to the exercise of any rights and remedies under the Mortgage or
24   otherwise, shall be made subject to the Lease and the rights of Tenant thereunder. However, in no event
25   shall Lender be:

26          (a)     Liable for any act or omission of Landlord arising prior to the date Lender takes
27   possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent
28   such act or omission is of a continuing nature, such as, for example, a repair obligation;

29          (b)     Liable for any offsets or deficiencies which the Tenant might be entitled to assert
30   against the Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease
31   or becomes a mortgagee in possession, except to the extent that Lender has received the benefit of the act
32   of the Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that would
33   otherwise have been paid by Lender as Landlord;

34          (c)     Bound by any payment of rent or additional rent made by Tenant to Landlord for
35   more than one month in advance, which payment was not required under the terms of the Lease;

36          (d)     Bound by any amendment or modification of the Lease executed after the date of
37   this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the

1    Lease; and, (ii) is made without Lender's prior written consent (except to the extent that the Lease may
2    specifically contemplate any amendment or modification thereof).

4        4.     In the event of the termination of the Mortgage by foreclosure, summary proceedings or
5    otherwise, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the
6    Landlord thereunder to terminate the Lease, then, and in any such event, Tenant shall not be made a party
7    in the action or proceeding to terminate the Mortgage unless not to do so would be disadvantageous
8    procedurally to Lender, in which case, such joinder of Tenant as a party shall not extinguish or interfere
9    with any rights of Tenant under the Lease, nor shall Tenant be evicted or moved or its possession or right
10   to possession under the terms of the Lease be disturbed or in any way interfered with, and, subject to the
11   provisions of this Agreement, Tenant will attorn to Lender or any other party which obtains title to the
12   Shopping Center pursuant to any remedy provided for by the Mortgage or otherwise, such attornment to
13   be effective and self-operative without the execution of any other instruments on the part of any party, and
14   the Lease shall continue in full force and effect as a direct Lease from Lender or such party to Tenant
15   under all the terms and provisions of the Lease (including any rights to renew or extend the term thereof).
16   In the event of such attornment, Lender shall be deemed to have assumed and shall assume the
17   performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the
18   time Lender becomes Landlord and until such time as such obligations are assumed by a bona fide
19   purchaser.

21        5.     Tenant hereby confirms that the Lease is in full force and effect.

23        6.     Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of
24   Tenant to cure any default of the Landlord under the Lease in accordance with and subject to the
25   provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so
26   deduct under the provisions of the Lease.

28        7.     Unless and until Lender or any subsequent purchaser succeeds to the interest of Landlord
29   under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease.

31        8.     If Landlord executes and delivers to Lender an Assignment of Leases and Rents conveying
32   the rent under the Lease upon an event of default by Landlord under the Mortgage, after receipt of notice
33   from Lender to Tenant (at the address set forth below) that rents under the Lease should be paid to Lender,
34   Tenant shall thereafter pay to Lender all monies thereafter due to Landlord under the Lease.  In such
35   event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Lender hereby indemnify
36   and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims,
37   damages or liabilities arising out of Tenant's compliance with such notice or performance of the
38   obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice.
39   Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with the
40   provisions hereof.  Any dispute between Lender (or any other purchaser) and Landlord as to the existence

"Palm Springs"                    EXHIBIT F                              FINAL
Palm Springs Plaza                Page 3
Palm Springs, FL
Store No. 1345
MED 0058.v3

1   of a default by Landlord under the provisions of the Mortgage, shall be dealt with and adjusted solely
2   between Lender (or any other purchaser) and Landlord, and Tenant shall not be made a party thereto.

3
4        9.     Lender shall use the proceeds of any insurance recovery or condemnation award for the
5   purposes stated in the Lease.

6
7       10.    No modification, amendment, waiver or release of any provision of this Agreement or of
8   any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose
9   whatsoever unless in writing and duly executed by the party against which the same is brought to be
10   asserted.

11
12       11.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto
13   and their respective heirs, legal representatives, successors and assigns, including without limitation, the
14   covenants of Lender herein shall be specifically binding upon any purchaser of the Shopping Center at
15   foreclosure or at a sale under power of sale.

16
17       12.    In the event any one or more of the provisions contained in this Agreement shall for any
18   reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of
19   no further force or effect.

20
21       13.    This Agreement shall be governed and construed according to the laws of the state where
22   the Shopping Center is located.

23
24       14.    Lender shall not institute any litigation naming Tenant as a defendant for the purpose of
25   foreclosing or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises
26   unless Tenant is required to be named in such litigation by law, and then only for the purpose of
27   complying with the applicable foreclosure statute and so long as Tenant's failure to defend against any
28   such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in
29   this Agreement. The term "Lender" as used herein shall include any successor-in-interest to the Lender
30   (including a purchaser at foreclosure or sale in lieu thereof).

31
32       15.    To be effective, any notice or other communication given pursuant to this Agreement must
33   be in writing and sent postage paid by United States registered or certified mail with return receipt
34   requested. Rejection or other refusal to accept, or inability to deliver because of changed address of which
35   no notice has been given, will constitute receipt of the notice or other communication. For purposes
36   hereof, Lender's address is:

"Palm Springs"                EXHIBIT F                FINAL
Palm Springs Plaza              Page 4
Palm Springs, FL
Store No. 1345
MED 0058.v3

```
 1
 2                    _____
 3                    _____
 4                    _____
 5          Attn.:_____
 6
 7   and Tenant's address is:
 8                    Ross Dress For Less, Inc.
 9                    4440 Rosewood Drive
10                    Mail Stop PL4 4E 2
11                    Pleasanton, CA  94588-3050
12                    Attn.:  Real Estate Legal Notice Department
13
14   and Landlord's address is:
15                    PHILIPS LAKE WORTH L.P.
16                    419 West 49th Street, Suite 300
17                    Hialeah, FL 33012
18                    Attn.: Diana Marrone
19
20   With copies to:
21
22                    PHILIPS LAKE WORTH L.P.
23                    295 Madison Avenue, 2nd Floor
24                    New York, NY  10017
25                    Attn.:  Vice President
26   and
27
28                    PHILIPS LAKE WORTH L.P.
29                    295 Madison Avenue, 2nd Floor
30                    New York, NY  10017
31                    Attn.:  General Counsel
32
33
34          At any time(s), each party may change its address for the purposes hereof by giving the
35   other party a change of address notice in the manner stated above.
```

36     16.    This Agreement (a) contains the entire understanding of Lender and Tenant regarding
37   matters dealt with herein (any prior written or oral agreements between them as to such matters being
38   superseded hereby), (b) can be modified or waived in whole or in part only by a written instrument signed
39   on behalf of the party against whom enforcement of the modification or waiver is sought, and (c) will bind
40   and inure to the benefit of the parties hereto and their respective successors and assigns.

17.     In the event of any litigation arising out of the enforcement or interpretation of any of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its reasonable attorneys' fees, including costs of suit, discovery and appeal. The "prevailing party" shall be that party who obtains substantially the relief sought in the action.

18.     In the event the Lease is terminated as a result of Landlord's bankruptcy or reorganization, whereby Lender obtains fee title to the Shopping Center (or in the case Lender is the ground lessor, retains fee title without the encumbrance of the ground lease), Lender agrees that the Lease shall remain in effect as between Lender (as Landlord) and Tenant, subject to the terms of this Agreement, and, upon Tenant's written request, Lender and Tenant agree to execute a reinstatement agreement documenting that the Lease has been reinstated as between Lender (as Landlord) and Tenant and that the terms and conditions thereof shall be as stated in the Lease, subject to the provisions of this Agreement.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first written above.

**TENANT:**
**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**

**LENDER:**
_____
_____

By: _____
Gregg McGillis
Its:   Group Vice President, Real Estate

By: _____
Name: _____
Its: _____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

**LANDLORD:**
**PHILIPS LAKE WORTH L.P.,**
**a New York limited partnership**

By: Philips International Holding Corp.,
as agent for Philips Lake Worth L.P.

By: _____
Michael Pilevsky, Managing Director

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 1345
MED 0058.v3

EXHIBIT F
Page 6

FINAL

1

State of California                           )
                                             )
County of Alameda                            )

2
3
4   On _____ before me, _____, a Notary Public,
5   personally appeared Gregg McGillis, who proved to me on the basis of satisfactory evidence to be the
6   person whose name is subscribed to the within instrument and acknowledged to me that he executed the
7   same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon
8   behalf of which the person acted, executed the instrument.
9
10  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
11  paragraph is true and correct.
12
13  WITNESS my hand and official seal.
14

                                                        _____
                                                        Notary Public
15

16

State of _____ )
                                   )
County of _____ )

17
18
19  On _____ before  me, _____, a Notary  Public,
20  personally  appeared _____, who proved to me on the basis of
21  satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
22  acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
23  by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
24  person(s) acted, executed the instrument.
25
26  WITNESS my hand and official seal.
27

                                                        _____
                                                        Notary Public

1

State of _____ )
                              )
County of _____ )

2
3
4  On _____ before me, _____, a Notary Public,
5  personally appeared _____, who proved to me on the basis of
6  satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
7  acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
8  by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
9  person(s) acted, executed the instrument.
10
11 WITNESS my hand and official seal.
12

                                        _____
                                              Notary Public
13
14

## EXHIBIT G

## DELIVERY NOTICE

1.     The "Lease"
        Landlord:    PHILIPS LAKE WORTH L.P.
        Tenant:      ROSS DRESS FOR LESS, INC.
        Location:     Palm Springs, Florida
        Lease Dated:   _____

2.     All terms used herein shall be as defined in the Lease.

3.     Date of this Notice:    _____

4.     Ross Store #:    1345
        Project Address:  Palm Springs Plaza
                    Congress Ave. & 10th Ave. North
                    Palm Springs, Palm Beach County, Florida

5.     Pursuant to Section 5.4 of the Lease, this shall constitute the "Delivery Notice":

    (a)    The "Delivery Date," shall occur on: _____.

    (b)    Landlord acknowledges that all the requirements specified in Article 2, "Delivery Date," will be satisfied by the date specified in subparagraph (a), above.

**LANDLORD:**
**PHILIPS LAKE WORTH L.P.,**
**a New York limited partnership**

By: Philips International Holding Corp.,
     as agent for Philips Lake Worth L.P.

By:_____
     Michael Pilevsky, Managing Director

Dated:_____

# EXHIBIT H
# EXCLUSIVE USES

**Paluda, Inc.**

Tenant is using the Demised Premises for the use set forth in Section 8.01, the Landlord hereafter agrees not to enter into any new Lease for space in that portion of the shopping center in which the Demised Premises is a part cross-hatched on Exhibit D (the "Exclusive Area") to a Tenant whose primary business is a "Supermarket".

**Harbor Freight Tools**

Tenant shall have the exclusive right to use the Premises for operation of a retail store for sales of hardware tools and Landlord will not hereafter enter into another lease (or amend any existing lease) for the Shopping Center that would permit as a primary use the sale of hardware and tools. For purposes of this provision, "primary use" means that the tenant devotes ten percent (10%) or more of its sales floor to the sale of hardware and tools.

**KME.rx / Medicap**

The Landlord hereafter agrees not to enter into any new lease for space in that portion of the Shopping Center cross-hatched on Exhibit E (the "Exclusive Area") to a tenant whose sole business is a pharmacy.

**Eyeglass World**

Landlord agrees hereafter not to enter into any new lease for retail space in that portion of the Shopping Center set forth on Exhibit A-1 as the "Exclusive Area" which permits as the primary use retail sale of eyeglasses, contacts and corrective laser surgery.

**Bennett Auto Supply**

The Landlord hereafter agrees not to enter into any new lease for space in the Shopping Center cross-hatched on Exhibit E (the "Exclusive Area") to a tenant whose primary business is the sale of "auto parts".

**Aaron Rents**

Landlord shall not lease any space within the Shopping Center to any other tenant that occupies less than twenty-five thousand square feet of space for the primary use of "rent to buy" furniture, as such term is referred to in the industry (the "terms"), provided that such use is directly competitive with the "rent to buy" furniture business operated by Tenant and subject to the rights granted any tenants under leases in existence as of the date of this Lease; such right granted to Tenant herein is referred to as "Tenant's Exclusive". The "Incidental Sale" (as hereinafter

defined) of the items in connection with the overall business of another tenant shall not be deemed a violation of Tenant's Exclusive. As used herein, "Incidental Sale" shall mean sales within a space not greater than twenty-five percent (25%) of such tenant's sales area.

**Mercedes Jewelry**

Landlord shall not lease any space within area designated in Exhibit D attached hereto (the "Exclusive Area") to any other tenant that occupies less than 2,500 square feet of space for the primary use of the sale of non-costume jewelry as such term is commonly referred to in the jewelry industry, subject to the rights granted any tenants under leases in existence as of the date of this Lease, such right granted to Tenant herein is referred to as "Tenant's Exclusive".

**Dollar Tree**

a. Landlord shall not lease, rent, occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, for the operation of a single price point variety retail store ("Exclusive" or "Exclusive Use"). For the purposes of this Lease, a single price point variety retail store is defined as a store that offers all of its merchandise for sale at a single price point, **which price point shall be $5.00 or less.**

b. Landlord will not permit any other occupant in the Shopping Center to operate the following uses (hereinafter, "Restricted Uses") without Tenant's consent and such consent shall be in Tenant's sole and absolute discretion:

(1) Variety retail operations with the word "Dollar" in their trade name, (provided that this shall not preclude the operation of a service business);

(2) A retail store whose "principal business" (hereinafter defined) is:

a. Selling variety retail merchandise at a single price point, **which shall be $5.00 or less;**

For the purpose of this Section, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half (1/2) of the adjacent aisle space).

## EXHIBIT I
## PERMITTED TITLE EXCEPTIONS

ROSS DRESS FOR LESS, INC., a Virginia corporation, agrees to take its leasehold interest subject only to the following exceptions stated in that certain commitment for title insurance report issued by First American Title Insurance Company (the "Title Company"), numbered NCS-206472A-CLW2, with an effective date of October 14, 2008, for the subject location in the County of Palm Beach, State of Florida:

Schedule B – Section II

The lien of the taxes for the year 2009 and all subsequent years, which are not yet due and payable.

Exceptions numbered 9 through 37.

However, with respect to the Mortgage Deed and Security Agreement and related security instruments listed as Exception nos. 9, 10 and 24, the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

However, with respect to Exception nos. 22 and 25, Tenant takes notice only of such tenancies and limitations set forth in the recorded documents and does not agree to be bound by the provisions of such Leases except to the extent expressly set forth, if at all, in the Memorandum of Leases.

If Tenant provides the Title Company with a current survey, the survey matters shown on such survey will be included.  If Tenant does not provide the Title Company with a current survey, the following will be included:

Easements or claims of easements not shown by the public records.

Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey or inspection of the premises.







VICINITY MAPS
NOT TO SCALE

SITE PLAN
NOT TO SCALE

EXHIBIT J
Page 1 of 9

bma
bill moore & associates

ROSS DRESS FOR LESS

**#1345 PALM SPRINGS**
Palm Springs Plaza
SWC Congrss Av. & 10th Av. North
The Village of Palm Springs

drawn 10/17/08

SHEET K

GENERAL NOTES:

LANDLORD TO FURNISH ADEQUATE ACCESS BEHIND LOGO LETTERS FOR INSTALLATION AND MAINTENANCE, PER ARTICLE 600 OF THE 2005 N.E.C.

LANDLORD TO SUPPLY THREE (3) 20 AMP 120V ISOLATED SIGN CIRCUITS (DIRECTLY CONNECTED TO ELECTRICAL PANEL WITH NO COMMON GROUNDS OR COMMON NEUTRALS, WITH # 10 WIRE MIN.) AND JUNCTION BOXES TO AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM.

LANDLORD TO PROVIDE AT LEAST 1/2" THICK PLYWOOD BACKING BEHIND ALL E.I.F.S. WALL SYSTEMS FOR SIGN AND BANNER SUPPORT.

SIGN BACKGROUND FOR THE "ROSS DRESS FOR LESS" SIGN(S) LETTERS IS TO BE FREE OF JOINTS & REVEALS, AND OF A LIGHT COLOR (MINIMUM 80% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE BLUE SIGN. THE BASE BUILDING COLOR IS TO HAVE A MINIMUM L.R.V OF 55%. ALL COLORS ARE SUBJECT TO ROSS STORES, INC. REVIEW AND APPROVAL.

IF THE SIGNAGE PROPOSED IN THIS EXHIBIT IS ALTERED BY THE ACTION OF LOCAL GOVERNMENTAL AUTHORITY, ROSS STORES INC. RESERVES THE RIGHT TO, AT NO COST, ALTER THE ARCHITECTURAL FEATURES TO BEST ACCOMMODATE THE ALTERED SIGNAGE.

(A) 72"H INDIVIDUAL "ROSS" PAN CHANNEL LETTER-LOK LOGO LETTERS:
FACES: TUF-GLAS EG 2120-E4 MATTE BLUE
RETURNS: 8"D ALUM. W/ WHITE FINISH
TRIM CAP: 2" WHITE JEWELITE
LETTER BACKS: ALUMINUM
NEON: FOUR-TUBE 15MM EGL E40 BLUE
MOUNTING: 1/4"-20 GALV. THRU BOLTS
PEG OFF: 1/2" SPACERS

(B) 42"H INDIVIDUAL "DFL" LOGO LETTERS:
ALL CALLOUTS SAME AS "ROSS" EXCEPT
RETURNS: 5"D ALUM. W/ WHITE FINISH
TRIM CAP: 1" WHITE JEWELITE
NEON: THREE-TUBE 15MM EGL E40 BLUE

(C) SIGN FASCIA BY LANDLORD (SEE NOTES)

(D) 24" H X 48" W X 1" D SINTRA OVAL "ROSS" LOGO WALL PLAQUE WITH ACCENT LIGHTING FROM SOFFIT ABOVE
TWO (2) REQUIRED AS SHOWN
(SEE SHEET E1 FOR DETAILS)
IF BACKGROUND IS UNEVEN DRESS SURFACE 2" BEYOND & BEHIND ROSS OVAL WALL PLAQUE SO THAT PLAQUE SITS FLUSH AGAINST WALL

(E) ARCHITECTURAL LIGHTING BY LANDLORD SUBJECT TO ROSS APPROVAL

(F) BLUE TILE IDENTITY BANDS:
16" X 16" TRENWYTH "OCEAN BLUE" GLAZED CMU, BY LANDLORD

(G) CLEAR ANODIZED ALUMINUM STOREFRONT & DOORS BY LANDLORD

(H) RECESSED ILLUMINATED TILE NICHE BY LANDLORD

(I) 23" H X 46" W X 10" D DOUBLE-FACE INTERNALLY ILLUMINATED UC SIGN 8'-6" ABOVE FINISH FL
CENTER OVER ENTRANCE DOORS
(SEE SHEET UC FOR DETAILS)

(J) THREADED EYE-BOLTS SPACED 3'-9" X 20'-0", FOR BANNER ATTACHMENTS. LOCATIONS SHOWN SUPERSEDES LOCATION SHOWN ON TENANT ELEVATION AE1-1.

(K) ADJACENT PARAPET MAY NOT BE HIGHER THAN THE ROSS BASE BUILDING

(L) DISCONNECT SWITCH PER NEC 600



① STOREFRONT EAST ELEVATION

SCALE: 3/32" = 1'- 0"

FRONTAGE: 174'-0"



EXHIBIT
J
Page ___ of ___



1057 solano ave.
p.o. box 6753
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates



#1345 PALM SPRINGS
Palm Springs Plaza
SWC Congress Av. & 10th Av. North
The Village of Palm Springs, FL

| | drawn | 08/10/09 |
|---|---|---|
| revised per 1345_ELEV WORKING5 FOR S1_b.pdf | | 08/24/09 |
| revised per 1345-AE1-1.pdf | | 09/02/09 |
| new location>2 sets eyebolts | | 09/02/09 |
| revised per 090917-1345-REDUCED STOREFRONT HEIGHT.pdf | | 09/18/09 |

SHEET
S1





**INSTALLATION INSTRUCTIONS:**

DRILL FIVE (5) 5/16" DIA X 3" DEEP HOLES INTO WALL AS PER PATTERN.
SCREW 1/4-20 MACHINE-THREAD END OF GALV. FURNITURE BOLTS INTO EMPTY T-NUTS
IN BACK OF PLAQUE UNTIL THEY CONTACT THE PVC (DO NOT OVER TIGHTEN).
FILL HOLES IN WALL, COAT SCREW-THREAD ENDS OF FURNITURE BOLTS AND BACK OF PLAQUE
WITH GE CONSTRUCTION SCS 1200 SILICONE SEALANT.
MOUNT PLAQUE ONTO WALL PUSHING BOLTS INTO HOLES UNTIL PLAQUE IS FLUSH
AGAINST WALL SURFACE.

3" HOLE      1" PLAQUE

3" X 1/4-20 GALV. STUD.

ONLY IF APPLICABLE

SEE NOTES BELOW FOR
APPLICABLE CONDITIONS

24" X 48" X 1" SINTRA PVC PLAQUE
WITH DIGITALLY PRINTED GRAPHIC OVERLAY

CLEAR "TEDLAR" GRAFFITI PROTECTING
GUARD FILM (USE WET CLOTH & SOAP
TO REMOVE MARKS)

THREADED 1/4-20 T-NUT PRE-SET INTO SINTRA
BACKING. TYPICAL OF FIVE (5)

1/4-20 X 3" GALV. FURNITURE BOLT
TYPICAL OF FIVE (5)

GE CONSTRUCTION SCS 1200
SILICONE SEALANT

5/16" DIA. X 3" DEEP HOLE IN WALL
TYPICAL OF FIVE (5)

FINISH WALL MATERIAL (TO BE VERIFIED)

1" WHITE PVC SINTRA BOARD W/ ALL EXPOSED
SURFACES PRIMED AND SEALED, EDGE PAINTED
W/ GLOSS FINISH PAINT TO MATCH
PMS #2945C BLUE

**A   SECTION AT MOUNT**

3/4 SCALE

48" PLAQUE
4"      20"      20"      4"
C FOR T-NUTS      C FOR T-NUTS
0.25"      35" ROSS      0.25"

DIGITALLY PRINTED 3M CONTROL TAC GRAPHIC
W/ CLEAR "TEDLAR" GRAFFITI GUARD FILM:

WHITE COPY
PMS #296C DARK BLUE COPY OUTLINE
PMS #2945C BLUE BACKGROUND
PMS #296C DARK BLUE 1ST OUTLINE
WHITE 2ND OUTLINE
PMS #2945C BLUE 3RD OUTLINE

**1   OVAL ENTRANCE LOGO PLAQUE ELEVATION**

SCALE: 1-1/2" = 1'- 0"

**NOTES:**

SEE SHEET 51 FOR PLAQUE LOCATIONS.

BMA TO SUPPLY PLAQUES, HARDWARE AND INSTALLATION PATTERNS.

MOUNTING DETAIL MAY VARY ACCORDING TO TYPE OF WALL CONSTRUCTION:
LANDLORD'S CONTRACTOR TO VERIFY CONDITIONS.

IF WALL SURFACE IS UNEVEN (EXAMPLE: SPLIT FACE BLOCK OR RIVER ROCK),
THEN KNOCK DOWN ROUGH SURFACE 2" BEYOND WALL PLAQUE, SO THAT
THE PLAQUE WILL SIT FLUSH AGAINST WALL. BMA TO FURNISH FULL SIZED
OVAL TEMPLATE TO L/L CONTRACTOR TO FACILITATE THE RESURFACING OF
THE AREA TO BE PROVIDED BEHIND THE SIGN.

EXHIBIT
J

Page 3 of 9

**#1345 PALM SPRINGS**
Palm Springs Plaza
SWC Congrss Av. & 10th Av. North
The Village of Palm Springs

drawn   05/10/09
05/11/08

SHEET
EL

bill moore & associates

ROSS DRESS FOR LESS



LANDLORD TO PROVIDE 120V PRIMARY ELECTRICAL SERVICE
AND J-BOX ABOVE CEILING WITHIN FIVE (5) FEET OF SIGN

SIGN INSTALLERS TO PROVIDE WOOD OR STEEL ANGLE CROSS MEMBER
(AND WOOD BLOCKING IF NECESSARY)
ANCHORED TO CANOPY JOISTS.
DRILL 2" DIA. FOR PIPE SUPPORTS AND FASTEN WITH FENDER
WASHERS AND LOCK NUTS AS REQUIRED.

ESCUTCHEON PLATE AT CEILING
(PROVIDED WITH SHIPMENT)
INSTALLER TO SECURE WITH 2 SCREWS,
PRIME AND PAINT SCREW HEADS AND PLATES
TO MATCH CEILING

SIGN INSTALLERS TO PROVIDE 1-1/2" DIA.
GALVANIZED STEEL PIPE SUPPORTS
(TYP. OF TWO) CUT TO LENGTH FOR FINISH
CABINET HEIGHT AND THREAD ENDS
TO SECURE INSIDE CABINET AND
ABOVE CEILING.
PRIME AND PAINT TO MATCH CEILING.

23" x 46" x 10" DOUBLE-FACED ALUM. CABINET
PRIME W/ ZINC CHROMATE PAINT CABINET
EDGE AND 1" RETAINERS TO MATCH
SULTAN BLUE.
FACES: 0.177 (3/16") WHITE LEXAN FACE WITH
9 1/4" HIGH 'ROSS' COPY AND 3/4" WIDE WHITE
OUTLINE REVERSED OUT OF 3M 3630-157
SULTAN BLUE TRANSLUCENT VINYL OVERLAY

INSTALL CABINET SO THAT DISCONNECT
SWITCH AND U.L. LABEL ARE ON END CABINET
FACING STORE

SIGN INSTALLER TO PROVIDE
WEATHERPROOF SILICONE SEAL
AROUND PIPE PENETRATIONS
INTO CABINET, TYP.

TWO-LAMP BALAST

1 x 1" METAL RETAINER
PAINTED TO MATCH SULTAN BLUE

1-1/2" PIPE FLANGE
1" x 4" 'C' CHANNEL
WELDED TO CABINET EDGE

2" x 2" 'C' CHANNEL LAMP
SUPPORT WELDED TO
CABINET EDGE

F36-T12-DHO FLUORESCENT
LAMP, TYPICAL OF TWO (2)

FOG INSIDE OF CABINET WHITE

CABINET EDGE PAINTED
TO MATCH SULTAN BLUE

1/4" DIA. DRAINHOLE
AT BOTTOM OF CABINET, TYP.

LAMPS AT 18" O.C.

10"

A ← A

48" MAX

TO BE VERIFIED BY FIELD CHECK.

3 1/4" OUTLINE
1" RETAINER

EQ

24" O.C.

EQ

EQ

9 1/4"
COPY

23"

EQ

9'-6"
MIN. A.F.F.

3/4"   1"   3/4"

EQ

33-1/2" COPY

EQ

46"

3/4" OUTLINE
1" RETAINER

**(A) SECTION A-A**
SCALE: 1" = 1'- 0"

**(B) FRAMING ELEVATION**
SCALE: 1" = 1'- 0"

**(1) D/F UNDER-CANOPY SIGN ELEVATION**
SCALE: 1" = 1'- 0"

NOTES:

SEE SHEET S1 FOR UNDER-CANOPY SIGN LOCATION.

LANDLORD TO PROVIDE ACCESS ABOVE CEILING FOR SIGN INSTALLATION,
AND 120V ELECTRICAL SERVICE AND J-BOX WITHIN FIVE (5) FEET OF SIGN
LOCATION CONNECTED TO ENERGY MANAGEMENT SYSTEM.




**#1345 PALM SPRINGS**
Palm Springs Plaza
SWC Congrss Av. & 10th Av. North
The Village of Palm Springs

drawn  08/10/09


SHEET
**UC**

bill moore & associates

**EXHIBIT**
J
Page 4 of 9



**PALM SPRINGS PLAZA**

**ROSS DRESS FOR LESS**

PYLON PHOTO RENDERING

DOUBLE-FACED PYLON SIGN BY LANDLORD

LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE AND 8'-1" HI X 10'-0" W WHITE ACRYLIC (OR WHITE PANAFLEX, AS NECESSARY, DEPENDING ON FINISHED DIMENSIONS AND RETAINER SYSTEM) BLANK FACES.

ROSS PANEL DECORATION BY ROSS STORES, INC.
FIRST SURFACE DECORATED WITH 30 3/4" HIGH "ROSS" AND 9Z" HIGH "DRESS FOR LESS" LOGO COPY REVERSED OUT OF 3M 3630-157 SULTAN BLUE VINYL OVERLAY.

TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACED PYLON SIGN IN TENANT POSITION AS SHOWN.

**HARBOR FREIGHT TOOLS**

BENNETT Auto Supply  Java Jazz
MERCEDES JEWELRY

**3319 - 3342 PHILIPS INTERNATIONAL (305) 821-7111**

(1) **D/F PYLON SIGN ELEVATION**

CONGRESS AVE          PARKING LOT          SCALE: 1/4" = 1'-0"

STREET SIDE

**ROSS DRESS FOR LESS**

(2) **"ROSS DRESS FOR LESS" TENANT FACE DETAIL**

SCALE: 1/2" = 1'-0"

SIGN CONTRACTOR TO VERIFY PANEL DIMENSIONS PRIOR TO MANUFACTURE

NOTES:
SEE SHEET K FOR PYLON SIGN POSITION.

LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE, CABINETS, FINISHES, BLANK FACES, LIGHTING AND ELECTRICAL SERVICE.

"ROSS" TENANT FACE DECORATION TO BE PROVIDED BY ROSS STORES, INC.

ROSS FACES TO BE POSITIONED AS SHOWN: NEAREST THE ADJACENT THOROUGHFARE ON BOTH SIDES OF THE STRUCTURE. ALL OTHER TENANT FACES ARE SHOWN FOR GENERAL REFERENCE ONLY AND DO NOT NECESSARILY REPRESENT THEIR FINAL POSITIONING.

SIGN CONTR. TO VERIFY EXACT FACE DIMENSIONS STRUCTURE AND LIGHTING CONDITIONS, AND TO PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRI-CATION AND PHOTOS OF FINISHED DISPLAY.

ALL DIMENSIONS TO BE VERIFIED PRIOR TO FABRICATION.

**EXHIBIT J**
Page 5 of 9

bill moore & associates

**#1345 PALM SPRINGS**
Palm Springs Plaza
SWC Congrss Av. & 10th Av. North
The Village of Palm Springs

drawn 02/25/09

SHEET **P1**

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Opening Soon" construction banner package consisting of the following elements on storefront:

(A)  6'-0" x 24'-0"  Temporary "Ross Dress For Less Opening Soon, Discover Us! www.rossstores.com" banner. Banner to be installed as soon as wall is complete.

(B)  40" x 50" "Ross Dress For Less Opening Soon" window banners (2 min.)

(C)  Threaded Eye-Bolt 2 each per side, (4 total) at 3'-9" high x 20'-0" wide centered on tile niche, for banner attachment as shown (see Detail 4, Sheet 01b).



- 6" METAL STUD WALL FRAMING
- 1-1/2" RIGID INSULATION
- E.I.F.S. WALL FINISH
- BANNER (WITH HEMS & GROMMETS)
- 1/2" PLYWOOD SHEATHING
- 1-1/4" FENDER WASHER (TYPICAL AT EACH GROMMET)
- #10 X 3" SHEET METAL SCREW

(2)  TYPICAL ATTACHMENT DETAIL AT E.I.F.S.

N.T.S.



(1)  TYPICAL STOREFRONT ELEVATION   0'   8'   16'

NOTES:

Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S. then landlord to provide plywood backing for sign & banner installation.

"Opening Soon" construction banner package to be provided and installed by Bill Moore & Associates.

Upon removal of "Opening Soon" construction banner package, all wall penetrations to be sealed, patched and touched up.

Ross Stores inc. reserves the right to install any other temporary opening promotional material or element they deem appropriate.

EXHIBIT
Page 6 of 9
Exhibit J

bma
bill moore & associates
1067 Solano Ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-0092
www.bma-ae.com

MEMBER
CSA

USGBC

ROSS DRESS FOR LESS

PROTOTYPE STOREFRONT
WITH STANDARD "OPENING SOON"
CONSTRUCTION BANNER REQ'MENTS

issued  01/17/07

SHEET
01a

**ROSS STORES, INC. REQUIRES AND WILL PROVIDE:**

Temporary "Opening Soon / Now Open" banner package consisting of the following elements on storefront:

(A) 3'-0" x 16'-0" "Opening Soon / Now Open" ("Grand Opening" New Markets only) combination double layered changeable banner (1 min). Install banner along with the installation of the building signs. Tie off to eyebolts at tile niche (by Landlord)

(B) 40" x 50" "Ross Dress For Less Opening Soon" window banners (2 min.)

(C) 3'-0" x 15'-0" "Now Hiring" banner

(D) Threaded Eye-Bolts 2 each per side, (4 total) at 3'-9" high x 20'-0" wide centered on tile niche, for banner attachment as shown (see Detail 4).



BASE BANNER "NOW OPEN": RED VINYL WITH WHITE COPY, HEMS AND GROMMETS

RED VELCRO (PART ONE) SEWN ONTO BASE BANNER IN SPOTS

VELCRO (PART TWO) ON BACK OF TOP BANNER MUST BE SEWN ALL AROUND EACH 3' LONG PIECE

ROPE WITH LOOP SEWN IN BETWEEN TOP BANNER AND VELCRO

NYLON ROPE ATTACHED TO LOOP (TO BE USED TO REMOVE TOP BANNER FROM GROUND)

TOP BANNER "OPENING SOON": RED VINYL WITH WHITE COPY

(3) **BANNER DETAIL**   N.T.S.



6" METAL STUD WALL FRAMING
1-1/2" RIGID INSULATION
E.I.F.S. WALL FINISH
BANNER (WITH HEMS & GROMMETS)
1/2" PLYWOOD SHEATHING
1-1/4" FENDER WASHER (TYPICAL AT EACH GROMMET)
#10 x 3" SHEET METAL SCREW

(2) **TYPICAL ATTACHMENT DETAIL AT E.I.F.S.**   N.T.S.

VARIES
EIFS TYP.
GALV. METAL COMPRESSION SLEEVE
GALV. METAL, STANDARD #10, 3" THREADED EYE-BOLT
GALV. METAL WASHERS
PLYWOOD SUBSTRATE TYP.

(4) **EYE-BOLT DETAIL**   N.F.S.



EXHIBIT
Page 7 of 9

(1) **TYPICAL STOREFRONT ELEVATION**   0'   8'   16'

NOTES:

Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S. then landlord to provide plywood backing for sign & banner installation.

"Opening Soon / Now Open" banner package to be provided and installed by Bill Moore & Associates.

Upon removal of "Opening Soon / Now Open" banner package, all wall penetrations to be sealed, patched and touched up.

Ross Stores Inc. reserves the right to install any other temporary opening promotional material or element they deem appropriate.

Exhibit J

1067 tolura ave.
p.o. box 6153
albany, ca 94706-0153
510/528-0296 ph 526-6092
www.billmoore.com
**bill moore & associates**

CSA

**ROSS DRESS FOR LESS**

**PROTOTYPE STOREFRONT WITH STD. "OPENING SOON/NOW OPEN" BANNER REQUIREMENTS**

issued 01/12/07
new Now Hiring bnr.   05/15/08

SHEET
**01b**



ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

At least one (1) double-faced temporary site sign per street frontage.

Sign installer to confirm location with landlord's contractor prior to installation.

③ "NOW OPEN" BANNER

8'-0"

1'-0"

1'-0" X 8'-0" RED
SINGLE FACED BANNER
(WITH HEMS AND GROMMETS)
TWO (2) BANNERS REQUIRED.

WHITE "NOW OPEN" COPY

NOTE:

ON DATE OF STORE OPENING
SECURE 1'-0" X 8'-0" "NOW OPEN"
BANNERS OVER "COMING SOON"
WORDING

8'-0"

4'-0" X 8'-0" X 3/8" MEDEX SIGN PANEL
W/ WHITE ENAMEL FINISH. EDGES PAINTED WHITE.
TWO (2) PANELS REQUIRED INSTALLED BACK TO BACK
ON TWO (2) POSTS USING LAG BOLTS AND WASHERS

WHITE "ROSS DRESS FOR LESS" LOGO
REVERSED OUT OF BLUE BACKGROUND VINYL

RED "COMING SOON" COPY

BLUE "DISCOVER US! WWW.ROSSSTORES.COM" COPY

4" X 4" X 10'-0" ROUGH SAWN POSTS PAINTED WHITE
(SEE FOOTING DETAIL AT LEFT)
MAY BE 12'-0" POSTS IF ADDITIONAL HEIGHT
IS NECESSARY FOR THE NOW HIRING PANELS

BLUE VINYL:   3M 7725-17 VIVID BLUE

RED VINYL:   3M 7725-53 CARDINAL RED

① D/F TEMPORARY SITE SIGN ELEVATION

② TYP. SECTION W/ FTG.

3'-0" DEEP X 1'-0" DIAMETER POST
HOLES (TYPICAL) BACKFILLED WITH
COMPRESSED NATURAL SOIL

GRADE

12"

4'-0"

7'-0"

10'-0"

3'-0"

EXHIBIT
J
Page 8 of 9

Exhibit J

bill moore & associates

PROTOTYPE STANDARD SITE SIGN
AND "NOW OPEN" BANNER
GRAPHIC REQUIREMENTS

issued   01/17/07
revised   05/15/08

SHEET
SS



**ROSS STORES, INC. REQUIRES AND WILL PROVIDE:**

Temporary "Now Open" banner package consisting of the following elements on storefront:

(A) 3'-0" x 16'-0" "Opening Soon / Now Open" ("Grand Opening" at New Markets only) combination double layered changeable banner (1 min). Install banner along with the installation of the building signs (see Sheet 01b). Tie off to eye-bolts at the niche (by landlord). Remove top banner layer to reveal "Now Open" or "Grand Opening" banner on the day of store opening.

(B) 3'-0" x 6'-0" or 4'-0" x 8'-0" red centered, blue and white bunting (typ. 8).

(C) 3'-0" x 15'-0" "Now Hiring" banner to remain at discretion of store manager.

(D) Threaded Eye-Bolts 2 each per side, (4 total) at 3'-9" high x 20'-0" wide centered on tile niche, for banner attachment as shown (see Detail 4).

(E) Multicolor pennant flags to be installed where applicable.

**Grand OPENING**

**NEW MARKET ONLY**
ALTERNATE BASE   N.T.S.

BASE BANNER "NOW OPEN",
RED VINYL WITH WHITE COPY,
HEMS AND GROMMETS

RED VELCRO (PART ONE)
SEWN ONTO BASE BANNER IN SPOTS

VELCRO (PART TWO)
ON BACK OF TOP BANNER
MUST BE SEWN ALL AROUND EACH 3'
LONG PIECE

ROPE WITH LOOP SEWN IN BETWEEN
TOP BANNER AND VELCRO

NYLON ROPE ATTACHED TO LOOP
(TO BE USED TO REMOVE TOP BANNER
FROM GROUND)

TOP BANNER "OPENING SOON",
RED VINYL WITH WHITE COPY

(3) **BANNER DETAIL**   N.T.S.

6" METAL STUD WALL FRAMING
1-1/2" RIGID INSULATION
E.I.F.S. WALL FINISH
BANNER (WITH HEMS & GROMMETS)
1/2" PLYWOOD SHEATHING
1-1/4" FENDER WASHER (TYPICAL AT EACH GROMMET)
#10 X 3" SHEET METAL SCREW

(2) **TYPICAL ATTACHMENT DETAIL AT E.I.F.S.**   N.T.S.

VARIES
EIFS TYP.
GALV. METAL COMPRESSION SLEEVE
GALV. METAL, STANDARD #10, 3" THREADED EYE-BOLT
GALV. METAL WASHERS
PLYWOOD SUBSTRATE TYP.

(4) **EYE-BOLT DETAIL**   N.F.S.

ROSS
DRESS FOR LESS
Now OPEN
ROSS NOW HIRING

(1) **TYPICAL STOREFRONT ELEVATION**   0'  8'  16'

**NOTES:**
Specific conditions and codes will vary by location.
BMA to provide site-specific plans prior to installation.
If storefront canopy is E.I.F.S. then landlord to provide plywood backing for sign & banner installation.
"Now Open" banner package to be provided and installed by Bill Moore & Associates.
"Now Open" banner package to be installed immediately prior to the store opening and to remain for a minimum of 30 days.
Upon removal of "Now Open" banner package, all wall penetrations to be sealed, patched and touched up.
Ross Stores Inc. reserves the right to install any other temporary opening promotional material or element they deem appropriate.

**EXHIBIT**
Page 9 of 9

Exhibit J

bill moore & associates
105 solano ave
p.o. box 6153
albany, ca 94706-0153
510/526-0296 f or 526-6090
www.billmoore.com

CSA

ROSS
DRESS FOR LESS

**PROTOTYPE STOREFRONT WITH STANDARD "NOW OPEN" BANNER REQUIREMENTS**

issued 01/17/07
new Now Hiring bnr 05/15/08

SHEET
**NO1**

## EXHIBIT K
## GUARANTY

As a material inducement to and in consideration of **PHILIPS LAKE WORTH L.P.**, a New York limited partnership ("Landlord"), entering into a written lease (the "Lease") with **ROSS DRESS FOR LESS, INC.,** a Virginia corporation ("Tenant"), dated the same date as this Guaranty, pursuant to which Landlord leased to Tenant and Tenant leased from Landlord premises located in the City of Palm Springs, County of Palm Beach, State of Florida, **ROSS STORES, INC.,** a Delaware corporation ("Guarantor"), whose address is 4440 Rosewood Drive, Mail Stop PL4 4E 2, Pleasanton, CA 94588, guarantees and promises to and for the benefit of Landlord the performance of all obligations of Tenant under the Lease.

The provisions of the Lease may be amended by agreement between Landlord and Tenant at any time provided however Guarantor shall not be bound by any amendment to which is has not consented in writing. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty except as specifically set forth in the Lease.

If Tenant defaults with respect to any payment obligation under the Lease, Landlord shall have the right to proceed immediately against Guarantor and/or Tenant, and to enforce against Guarantor and/or Tenant any rights that Landlord may have under the Lease or pursuant to applicable laws with respect to such default.  If the Lease terminates and Landlord has any right(s) that it is entitled to enforce against Tenant after termination, Landlord shall have the right to enforce such right(s) against Guarantor.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any other remedy in Landlord's power.  Guarantor waives any defense by reason of any disability of Tenant.  Until all of Tenant's monetary obligations to Landlord under the Lease have been discharged in full, Guarantor has no right of subrogation against Tenant.  Guarantor waives its right to enforce any remedies that Landlord now has, or later may have, against Tenant.  Guarantor waives any right to participate in any security now or later held by Landlord.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including, without limitation, reasonable attorneys' fees.

Guarantor's obligations under this Guaranty shall be binding on Guarantor's successors, but shall be no greater than Tenant's or as otherwise set forth in this Lease.

Dated: _____          **ROSS STORES, INC.,**
                                        **a Delaware corporation**

                                        By: _____

                                            James Fassio
                                        Its:   Executive Vice President

"Palm Springs"                      EXHIBIT K                          FINAL
Palm Springs Plaza
Palm Springs, FL
Store No. 1345
MED 0058.v2

## EXHIBIT L
## EXISTING TENANTS

- **Harbor Freight Tools**
- **KME.rx/Medicap**
- **Eyeglass World**
- **Bennett Auto Supply**
- **Aaron Rents**
- **Mercedes Jewelry**
- **Dollar Tree**
- **Pier 1 Imports**
- **El Chapin Guatemalan Restaurant**
- **Amore Beauty Salon**
- **Wok Crazy Chinese**
- **Don Pan**
- **La Reina Supermarket**
- **Randstad Staffing**
- **AT&B Wireless**
- **Alex Fashions**
- **Green Zone Outdoor**
- **Mexican Restaurant**
- **El Corte Hispano Barbershop**
- **Nail Fetish**
- **Samy Shoes**
- **Rainbow**
- **Liberty Tax**
- **Palomino Coffee Shop**
- **Z.R. Silk Imports**
- **El Rodeo**
- **Advance America**
- **Humberto's Bridal and Florist**
- **Vicky's Unisex**
- **Fish Fantasia**
- **Selective Dental**

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 1345
MED 0058.v3

EXHIBIT L

FINAL