# EXHIBIT

# "5"

**LEASE**

**ROSS DRESS FOR LESS, INC.**
**PALM SPRINGS PLAZA**
**PALM SPRINGS, FLORIDA**

## TABLE OF CONTENTS

1. SALIENT LEASE TERMS ........................................................................... 1
   1.1. Effective Date. .............................................................................. 1
   1.2. Parties/Addresses. ........................................................................ 1
   1.3. Location Information. ..................................................................... 2
   1.4. Critical Dates. ............................................................................... 3
   1.5. Lease Term. ................................................................................... 4
   1.6. Minimum Rent. .............................................................................. 4
   1.7. Required Co-Tenancy. .................................................................... 5
   1.8. Common Area Charge Administrative Fee. .................................... 5
   1.9. Title Report. .................................................................................. 5
   1.10. Contents of Lease. ......................................................................... 6

2. DEFINITIONS OF GENERAL APPLICATION ...................................... 6

3. GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS ........ 15
   3.1. Lease. ........................................................................................... 15
   3.2. Nature of the Shopping Center. ..................................................... 15
   3.3. Grant of Common Area Use. .......................................................... 17
   3.4. Grant of Utility Licenses. ............................................................... 17
   3.5. Utility Rooms. ............................................................................... 18
   3.6. Site Plan or Shopping Center Alterations. ...................................... 18
   3.7. Dimensions. .................................................................................. 20

4. LEASE TERM ......................................................................................... 20
   4.1. Term. ............................................................................................ 20
   4.2. Commencement Date. .................................................................... 20
   4.3. Acknowledgment of Commencement. ............................................ 21
   4.4. Option Periods. ............................................................................. 21
   4.5. Gross Sales Termination Right. ...................................................... 21

5. CONSTRUCTION AND ACCEPTANCE ................................................ 21
   5.1. Landlord's Construction Obligations. ............................................ 21
   5.2. Construction Commencement. ....................................................... 24
   5.3. Completion of Construction. .......................................................... 24
   5.4. Delivery Notice. ............................................................................ 24
   5.5. Rollover. ....................................................................................... 25
   5.6. Remedies Cumulative. ................................................................... 25

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- i -

05/08/15
FINAL

| | 5.7. | Construction Completion Cancel Date. | 25 |
|---|---|---|---|
| | 5.8. | Automatic Termination. | 26 |
| | 5.9. | Entry Prior to Delivery Date. | 26 |
| | 5.10. | Intentionally Deleted. | 26 |
| | 5.11. | Additional Delivery Requirements. | 26 |
| **6.** | **RENT** | | **27** |
| | 6.1. | Minimum Rent. | 27 |
| | 6.2. | Reimbursements. | 30 |
| | 6.3. | Other Payment Provisions. | 30 |
| | 6.4. | Gross Sales Statement for Purposes of Calculating Substitute Rent. | 30 |
| **7.** | **COMMON AREA MAINTENANCE** | | **31** |
| | 7.1. | Landlord's Obligation to Maintain Common Areas. | 31 |
| | 7.2. | Tenant's Pro Rata Share. | 32 |
| | 7.3. | Definition of Common Area Charges. | 32 |
| | 7.4. | Payment of Tenant's Pro Rata Share. | 35 |
| **8.** | **REAL ESTATE TAXES AND ASSESSMENTS** | | **38** |
| | 8.1. | Obligation to Pay. | 38 |
| | 8.2. | Tenant's Pro Rata Share. | 39 |
| | 8.3. | Exclusions. | 40 |
| | 8.4. | Rebates. | 41 |
| | 8.5. | Contest. | 41 |
| | 8.6. | Intentionally Deleted. | 41 |
| **9.** | **INSURANCE** | | **41** |
| | 9.1. | Property Insurance. | 41 |
| | 9.2. | Liability Insurance. | 43 |
| | 9.3. | Evidence of Insurance. | 44 |
| | 9.4. | Waiver of Subrogation. | 44 |
| | 9.5. | Tenant's Right to Self-Insure. | 45 |
| **10.** | **UTILITIES SERVICES** | | **45** |
| **11.** | **MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE** | | **46** |
| | 11.1. | Maintenance and Repair by Tenant. | 46 |
| | 11.2. | Maintenance and Repair by Landlord. | 46 |
| | 11.3. | Repairs Required by Governmental Authorities. | 48 |
| | 11.4. | Hazardous Material. | 48 |
| **12.** | **ALTERATIONS** | | **52** |
| | 12.1. | Permitted Alterations. | 52 |
| | 12.2. | Communication Equipment. | 54 |
| **13.** | **NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES** | | **54** |

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- ii -

05/08/15
FINAL

| | 13.1. | Non-Disturbance and Subordination. | 54 |
| | 13.2. | Estoppel Certificates. | 55 |
| | 13.3. | Processing Fees for Non-Disturbance Agreements and Estoppel Certificates. | 56 |
| | **14. INDEMNIFICATION** | | **56** |
| | 14.1. | Tenant Indemnity. | 56 |
| | 14.2. | Landlord Indemnity. | 56 |
| | **15. USE** | | **56** |
| | 15.1. | Tenant's Business. | 56 |
| | 15.2. | Operation. | 57 |
| | 15.3. | Protection. | 57 |
| | 15.4. | Exclusive Uses. | 58 |
| | 15.5. | Other Exclusives Not Binding on Tenant. | 59 |
| | 15.6. | Go Dark. | 59 |
| | **16. SURRENDER** | | **60** |
| | 16.1. | Condition of Store. | 60 |
| | 16.2. | Continuance of Possession. | 60 |
| | **17. LANDLORD'S COVENANTS** | | **60** |
| | 17.1. | Landlord's Warranty. | 60 |
| | 17.2. | Landlord's Title. | 61 |
| | 17.3. | Remedies. | 61 |
| | **18. QUIET ENJOYMENT** | | **61** |
| | **19. ASSIGNMENT/SUBLETTING** | | **61** |
| | 19.1. | General. | 61 |
| | 19.2. | Related Entity. | 62 |
| | 19.3. | Stock. | 62 |
| | 19.4. | No Release of Liability. | 62 |
| | 19.5. | Landlord Notice to Assignee. | 62 |
| | 19.6. | Restriction on Landlord's Right to Assign. | 62 |
| | 19.7. | Recapture on Assignment or Sublease of Store. | 62 |
| | 19.8. | Assignment or Sublet in Violation of this Article 19. | 63 |
| | **20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES** | | **63** |
| | 20.1. | Defaults. | 63 |
| | 20.2. | Alternative Dispute Resolution Process. | 65 |
| | 20.3. | Unlawful Detainer. | 66 |
| | 20.4. | Attorneys' Fees. | 67 |
| | **21. CASUALTY** | | **67** |
| | 21.1. | Definitions. | 67 |
| | 21.2. | Insured Casualty. | 67 |

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- iii -

05/08/15
FINAL

21.3.   Uninsured Casualty. ....................................................... 68
21.4.   End of Term Casualty. ..................................................... 69
21.5.   Shopping Center Casualty. ............................................ 69
21.6.   Intentionally Deleted. ..................................................... 69
21.7.   Tenant Restoration. ........................................................ 69
21.8.   Waiver of Statute. ........................................................... 70
21.9.   Laws. .............................................................................. 70
21.10.  Tolling of Term. ............................................................. 70
21.11.  Effect of Termination. .................................................... 71
21.12.  Tenant's Right of First Offer. ......................................... 71

22. CONDEMNATION ..................................................................... 71
22.1.   Taking. ........................................................................... 71
22.2.   Right to Terminate. ........................................................ 72
22.3.   Claims. ........................................................................... 72
22.4.   Waiver. ........................................................................... 72

23. MECHANIC'S LIENS ................................................................ 73

24. SIGNS ....................................................................................... 73
24.1.   Governmental Approval and Compliance. .................... 73
24.2.   Building Signs. ............................................................... 73
24.3.   Pylon Signs. ................................................................... 74
24.4.   Temporary Signs. ........................................................... 74
24.5.   Visibility of Tenant's Store and Signs. ........................... 74

25. NOTICE .................................................................................... 75

26. GENERAL CONDITIONS .......................................................... 75
26.1.   Partial Invalidity. ............................................................ 75
26.2.   Relationship of Parties. .................................................. 75
26.3.   Time. .............................................................................. 75
26.4.   Waiver. ........................................................................... 76
26.5.   Partial Months. .............................................................. 76
26.6.   Consent. ......................................................................... 76
26.7.   Gender. ........................................................................... 76
26.8.   Governing Law. .............................................................. 76
26.9.   Due Authority. ................................................................ 76
26.10.  No Prior Agreements. ..................................................... 76
26.11.  Entry by Landlord. ......................................................... 77
26.12.  Neutral Interpretation. ................................................... 77
26.13.  Force Majeure. ............................................................... 77
26.14.  Successors in Interest. ................................................... 78
26.15.  Memorandum of Lease. .................................................. 78
26.16.  Real Estate Brokers. ...................................................... 78
26.17.  Intentionally Deleted. ..................................................... 78

1    26.18.  Limitation of Landlord's Liability. ................................................................ 78
2    26.19.  OFAC Statement. ........................................................................................ 78
3    26.20.  Confidentiality Agreement. ......................................................................... 79
4    26.21.  No Offer. .................................................................................................... 80

1  **THIS LEASE** (the "Lease") is made as of the Effective Date by and between Landlord and
2  Tenant who are designated in Section 1.2 hereof.  Landlord and Tenant hereby agree as follows:

3  ## 1.  SALIENT LEASE TERMS

4  **1.1.**  **Effective Date.**

5  *May 14, 2015*

6  **1.2.**  **Parties/Addresses.**

7  **1.2.1.**  Landlord:  **PHILIPS LAKE WORTH LLC,**
8  a Florida limited liability company

9  (a)  Address for all payments of Rent (which address may be changed
10  upon written notice given in accordance with Article 25 below):

11  Address:  c/o Philips International Holding Corp.
12  295 Madison Avenue, 2nd Floor
13  City/State/Zip:  New York, NY  10017
14  Landlord's Taxpayer I.D. #:  13-4165080

15  (b)  Address for all purposes other than payment of Rent:

16  Address:  419 West 49th Street, Suite 300
17  City/State/Zip:  Hialeah, FL 33012
18  Facsimile #:  (305) 821-0921
19  Phone #:  (305) 821-7111
20  Initial Contact Name:  Diana Marrone

21  with copies to:

22  Address:  295 Madison Avenue, 2nd Fl.
23  City/State/Zip:  New York, NY 10017
24  Facsimile #:  (212) 545-1355
25  Phone #:  (212) 545-1100
26  Initial Contact Name:  Vice President

27  and

28  Address:  295 Madison Avenue, 2nd Fl.
29  City/State/Zip:  New York, NY 10017
30  Facsimile #:  (212) 545-1355
31  Phone #:  (212) 545-1100
32  Initial Contact Name:  General Counsel

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 1 -

05/08/15
FINAL

1.2.2.   Tenant:   **ROSS DRESS FOR LESS, INC.,**
a Virginia corporation

    (a)   **Address for all invoices for Rent and Reimbursements due under this Lease, and change of Landlord or Payee, or change of Landlord's or Payee's address:**

| | |
|---|---|
| Address: | 5130 Hacienda Drive |
| City/State/Zip: | Dublin, CA  94568-7579 |
| Attention: | **Property Management Department** |
| | |
| Facsimile #: | (925) 965-4865 |
| Phone #: | (925) 965-4400 |

    (b)   **Address for all notices (other than invoices), including notices of default and notices pertaining to disputed invoices:**

| | |
|---|---|
| Address: | 5130 Hacienda Drive |
| City/State/Zip: | Dublin, CA  94568-7579 |
| Attention: | **Real Estate Law Department** |
| | |
| Facsimile #: | (925) 965-4174 |
| Phone #: | (925) 965-4400 |

**With a copy to:**

| | |
|---|---|
| Name: | Bartko, Zankel, Bunzel & Miller |
| Address: | One Embarcadero Center, Suite 800 |
| City/State/Zip: | San Francisco, CA  94111 |
| Attention: | **Ross Notices** |
| | |
| Facsimile #: | (415) 956-1152 |
| Phone #: | (415) 956-1900 |

    (c)   Initial Contact Name:  Jac Gee

    (d)   Tenant's Taxpayer I.D. #:  20-0594333

**1.3.   Location Information.**

    **1.3.1.**   Shopping Center Name:  Palm Springs Plaza

    Location:   Congress Avenue and 10th Avenue North
Palm Springs, Palm Beach County, Florida

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

~ 2 ~

05/08/15
FINAL

1      **1.3.2.**    Minimum Leasable Floor Area for Pro Rata Share Denominator and
2 Co-Tenancy Denominator:

3               (a)    Common Area Charges:      217,807 square feet.
4                                       (Section 7.2)

5               (b)    Taxes:                  217,807 square feet.
6                                       (Section 8.2.3)

7               (c)    Property Insurance:       217,807 square feet.
8                                       (Section 9.1.4)

9               (d)    Co-Tenancy:           137,054 square feet.
10                                       (Section 6.1.3)

11 The amount of square feet of Leasable Floor Area in Section 1.3.2(d) above reflects the exclusion of
12 the Store Agreed Size, and the Leasable Floor Area of Ross Dress For Less, the Outparcels, and the
13 premises south of and adjacent to the Store (designated as "Space 1C" on the Site Plan attached hereto
14 as **Exhibit B**), as required by Section 6.1.3(a) below. The amount of square feet of Leasable Floor
15 Area in Section 1.3.2(b) above may be reduced pursuant to the provisions of Section 8.2.3 below if any
16 portion of the Shopping Center becomes a separately taxed Tax parcel meeting the requirements of
17 Section 8.2.3.

18      **1.3.3.**    Actual Store Size and Store Agreed Size: The actual Store size ("Actual Store
19 Size") is twenty-four thousand five hundred ninety-two (24,592) square feet of Leasable Floor Area,
20 including a minimum of one hundred sixteen (116) feet of frontage on that portion of the Common
21 Areas that contain the principal parking area for Tenant's customers, subject to adjustment of the
22 Leasable Floor Area pursuant to the provisions of Section 3.7. Tenant's Store frontage shall be
23 linear, shall not include any indentations and, except as shown on **Exhibit B**, shall not be set back
24 from the storefront of adjacent tenants. Notwithstanding the Actual Store Size, Minimum Rent and
25 Tenant's Pro Rata Share of Reimbursements shall be calculated on the basis of twenty-two thousand
26 (22,000) square feet of Leasable Floor Area ("Store Agreed Size"). Tenant shall have the exclusive
27 use of the two (2) existing loading docks at the rear of the Store.

28 **1.4.**    **Critical Dates.**

29      **1.4.1.**    Tenant's obligation for Minimum Rent and Reimbursements shall commence on
30 the earlier of (a) the date that Tenant opens the Store for business to the public, or (b) one hundred
31 fifty (150) days after the later of (i) the Delivery Date, or (ii) the issuance of Tenant's building
32 permit, provided that Tenant promptly applies for and diligently pursues the issuance of the building
33 permit for Tenant's Work in accordance with **Exhibit C** (the "Commencement Date").
34                                         (Section 4.2)

35      **1.4.2.**    Intended Delivery Date: August 31, 2015.
36                                         (Article 2)

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

05/08/15
FINAL

**1.4.3.**   Date of Tenant's Right to Cancel for Landlord's failure to commence construction ("Construction Commencement Cancel Date"):  February 1, 2016.

(Section 5.2)

**1.4.4.**   Date of Tenant's Right to Cancel for Landlord's failure to complete construction ("Construction Completion Cancel Date"):   May 2, 2016.

(Section 5.7)

**1.4.5.**   Automatic Termination Date:   August 29, 2016.

(Section 5.8)

**1.5.   Lease Term.**

**1.5.1.**   Initial Term:  From the Commencement Date through the January 31 next following the expiration of one hundred twenty (120) months after the Commencement Date.  As a hypothetical example and for illustration purposes only, if the Commencement Date is September 15, 2015, then the expiration of the Initial Term shall be January 31, 2026.

**1.5.2.**   Option Periods:  Total number of five (5) year Option Periods:  Four (4).

(Section 4.4)

**1.6.   Minimum Rent.**

|  |  | Per Sq. Ft. Per Year | Monthly | Annually |
|---|---|---|---|---|
| (a) | Initial Term Commencement Date through 5th Full Lease Year | $6.00 | $11,000.00 | $132,000.00 |
|  | 6th Full Lease Year through 10th Full Lease Year | $6.50 | $11,916.67 | $143,000.00 |
| (b) | Option Periods |  |  |  |
|  | First: | $7.00 | $12,833.33 | $154,000.00 |
|  | Second: | $8.00 | $14,666.67 | $176,000.00 |
|  | Third: | $9.00 | $16,500.00 | $198,000.00 |
|  | Fourth: | $10.00 | $18,333.33 | $220,000.00 |

The Minimum Rent amounts listed above may be adjusted to reflect the actual Leasable Floor Area of the Store calculated in accordance with the provisions of Section 3.7.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 4 -

05/08/15
FINAL

1   **1.7.**    **Required Co-Tenancy.**

2       **1.7.1.**    The following Co-Tenants ("Required Co-Tenants") operating in no less than
3   the Required Leasable Floor Area, in the location for such Required Co-Tenant designated on
4   **Exhibit B**, indicated as follows:

| | Co-Tenant's Name | Required Leasable Floor Area (minimum sq. ft.) |
|---|---|---|
| (a) | Aldi | 19,845 |
| (b) | Harbor Freight Tools | 15,296 |
| (c) | Dollar Tree | 10,354 |

5                                                 (Section 6.1.3)

6       Provided that the Required Co-Tenancy set forth in Sections 1.7.1 and 1.7.2 is satisfied on
7   the Commencement Date, during the remainder of the Term, any of the Required Co-Tenants may
8   be replaced by one (1) nationally or regionally recognized replacement retail tenant reasonably
9   acceptable to Tenant, operating in no less than ninety percent (90%) of the Required Leasable Floor
10  Area of the Required Co-Tenant being replaced, under a bona fide lease with a minimum initial term
11  of at least three (3) years.  For purposes of this Lease, a replacement tenant must be an open and
12  operating retailer in the space vacated by the named Co-Tenant above which it purports to replace.
13  Notwithstanding anything herein to the contrary, Landlord may replace a grocery store tenant with a
14  different retail use.

15       **1.7.2.**    Required percentage of Leasable Floor Area of the Shopping Center to be
16  occupied by operating retailers on the Commencement Date and throughout the Term:   Sixty
17  percent (60%), excluding the Leasable Floor Area of the Store, the Ross Premises (as defined in
18  Article 2), Space 1C (as designated on **Exhibit B**), and the buildings located on the Outparcels from
19  the numerator and denominator of such calculation.
20                                                     (Section 6.1.3)

21

22  **1.8.**    **Common Area Charge Administrative Fee.**

23       Five percent (5%).
24                                                     (Section 7.3)

25  **1.9.**    **Title Report.**

26       That certain report on the state of Landlord's title to the Shopping Center or the Store
27  issued by Stewart Title Guaranty Company, dated March 9, 2015, and numbered 72526-20150126.
28                                                    (Section 17.2)

"Palm Springs"                            - 5 -                          05/08/15
Palm Springs Plaza                                                           FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1    **1.10.    Contents of Lease.**

2        **1.10.1.**    Pages:  1 - 81

3        **1.10.2.**    Sections:  1.1 - 26.21

4        **1.10.3.**    Exhibits:

5                **A**        Legal Description of the Shopping Center

6                **B**        Site Plan

7                **C**        Construction Obligations of Tenant

8                **D**        Shopping Center Prohibited Uses

9                **E**        Acknowledgment of Commencement

10               **F**        Non-Disturbance Agreement

11               **G**        Delivery Notice

12               **H**        Exclusive Uses

13               **H-1**      Ross Dress For Less, Inc. Waiver

14               **I**        Permitted Title Exceptions

15               **J**        Tenant's Signs

16               **K**        Guaranty

17               **L**        Existing Tenants

18               **M**        Elevation Plan dated March 13, 2015

19

20                    **2.  DEFINITIONS OF GENERAL APPLICATION**

21        <u>**Abatement Work**</u>.  See Section 11.4.3.

22        <u>**Annual Statement**</u>.  See Section 7.4.5.

23        <u>**Building**</u>.  The structure in which the Store is located.

24        <u>**Building Envelope**</u>.  Those certain areas designated on **Exhibit B** within the boundaries of
25    which buildings may be constructed.

26        <u>**Business Days**</u>.   Business Days shall mean Mondays through Fridays excluding the
27    following holidays:  New Year's Day, Martin Luther King, Jr. Day, President's Day, Memorial Day,
28    July 4th, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas.  If
29    any of the foregoing holidays falls on a Saturday, then the Friday before shall constitute the holiday

1  and if any of the foregoing holidays falls on a Sunday, then the Monday following shall constitute
2  the holiday.

3  **CAM Audit.** See Section 7.4.7.

4  **Casualty.** See Section 21.1.1.

5  **Commencement Date.** See Sections 1.4.1 and 4.2.

6  **Common Area(s).** Those portions of, and facilities within the Shopping Center which are
7  intended solely for the common use of the occupants, their customers, agents, employees and
8  suppliers, such as the parking areas, driveways, walkways, loading zones (whether or not such
9  loading zones are available for common use) and landscaping, but specifically excluding the whole
10 or any portion of any building located within the Shopping Center.  Enclosed malls are not
11 includable for purposes of Common Area Charges hereof unless the Store has a direct customer
12 door opening onto such mall intended for access of customers rather than emergency egress and
13 Landlord keeps the mall open to customer access during all of Tenant's operating hours.  Any area
14 which is not enclosed by demising walls, but which is substantially used for the benefit of one tenant
15 or group of tenants such as, for example, those areas sometimes referred to in the shopping center
16 industry as "food courts," shall not be considered Common Areas.  A "food court" is an open area
17 of the Shopping Center which accommodates a common seating, serving or service area for the
18 patrons of two or more retailers of prepared food whose premises are proximate to such seating,
19 serving or service area.

20 **Common Area Charges.** See Section 7.3.

21 **Communication Equipment.** See Section 12.2.1.

22 **Control Area.**  The area so designated on **Exhibit B** which may not be altered except as
23 expressly set forth in this Lease.

24 **Co-Tenancy Report.** See Section 6.1.3(f).

25 **Co-Tenants.** See Sections 1.7.1 and 6.1.3.

26 **Delivery Date.**  The Delivery Date is the first Permitted Delivery Day after the last of the
27 following conditions is satisfied (hereinafter "deliver" or "delivery").  Each of the conditions set
28 forth in clauses (a) through (o) below are conditions of delivery and in the aggregate are the
29 "Delivery Conditions."  All documents and other written evidence required below to be submitted
30 to satisfy the Delivery Conditions (the "Delivery Evidence") shall be delivered to Tenant at the
31 address specified in Section 1.2.2(b).

32         (a)      Landlord has completed Landlord's Construction Obligations in compliance
33 with the terms of this Lease;

34         (b)      Landlord has (i) completed (or caused to be completed) all of the Common
35 Areas and Off-Site Improvements, (ii) completed the buildings depicted on **Exhibit B** (excluding

1    Outparcel buildings) consisting of at least two hundred seventeen thousand (217,000) square feet of
2    Leasable Floor Area (the "Minimum Building LFA"), and (iii) fulfilled all construction obligations
3    imposed by this Lease and applicable governmental authorities, including obtaining any requisite
4    governmental authorizations and approvals to permit Tenant to open for business, subject to
5    Tenant's completion of Tenant's Work, and excluding Tenant's permits and licenses.  Tenant
6    acknowledges that as of the Effective Date, Landlord has met the foregoing Delivery Conditions set
7    forth in (i) and (ii) above, and Landlord covenants that the conditions shall not be changed in any
8    material respect prior to the Delivery Date;

9           (c)    Receipt by Tenant of written evidence that Landlord's Construction
10   Obligations have passed final inspection by the authority by whom the building permit for
11   Landlord's Construction Obligations was issued;

12         (d)    If the Store is to be constructed within an existing Building, Landlord's
13   delivery to Tenant of a report and certificate from a licensed environmental consultant reasonably
14   acceptable to Tenant, certifying to Tenant that such consultant conducted a comprehensive survey
15   of the Store, dated not more than one hundred twenty (120) days prior to the date of the Delivery
16   Notice, and that the Store, including, without limitation, the walls, ceilings, structural steel, flooring,
17   pipes and boilers, are free of Hazardous Materials (including asbestos-containing materials) present
18   in violation of applicable Environmental Regulations as that term is defined herein.  The Vertex
19   Companies, Inc. is deemed to be a reasonably acceptable licensed environmental consultants.
20   Landlord and Tenant acknowledge the environmental concerns related to the former Ocean
21   Cleaners dry cleaning facility at 3321 South Congress Ave., and Landlord will comply with any
22   governmental requirements at no cost to Tenant and with a full indemnification of Tenant from any
23   costs or damages associated with such environmental concerns as and to the extent provided in
24   Section 11.4.6 of this Lease;

25         (e)    The roof of the Store shall be in a watertight condition and covered under
26   Landlord's existing roof warranty through 2026, a copy of which warranty Landlord provided to
27   Tenant prior to the Effective Date of this Lease.  Tenant acknowledges receipt of said roof
28   warranty;

29         (f)    Receipt by Tenant of at least one (1) fully executed original of this Lease, and
30   a Memorandum of Lease signed by Landlord and Tenant and notarized so that such Memorandum
31   of Lease may be recorded;

32         (g)    Delivery to Tenant of exclusive possession of the Store in broom clean
33   condition with Landlord's and its contractors' agents and employees' and previous tenant's tools,
34   equipment, materials and personal property removed from the Store;

35         (h)    Tenant's receipt of Landlord's approval of Tenant's plans for Tenant's Work
36   and Tenant's receipt of approval by governmental authorities for Tenant's plans for Tenant's Work;

37         (i)    Landlord shall have cooperated with Tenant to obtain the permit for
38   Tenant's signage, including having signed any governmental permit application if required for

"Palm Springs"                         - 8 -                    05/08/15
Palm Springs Plaza                                          FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

Tenant to obtain its signage permit, and the pylon sign structures in the Shopping Center as shown on **Exhibit B** shall be ready for Tenant to install its sign panels thereon as depicted on **Exhibit J**;

        (j)    Landlord has installed permanent power to the Store;

        (k)    After sealing the floor slab as provided in Section 5.1.1(a)(iii)(E) below, Landlord has provided certified test results by Independent Floor Testing and Inspection, Inc. (or other independent concrete slab inspection company approved by Tenant's construction representative) of all floor slabs in the Store, whether existing or new, certifying that the floor slab has passed the test for moisture content, alkalinity, and the seventy-two (72) hour bond tests as specified in Tenant's prototype plans and specifications;

        (l)    Landlord has delivered to Tenant all certificates of insurance required to be maintained by Landlord pursuant to this Lease;

        (m)    Landlord has completed lighting of the Common Areas that meets applicable code requirements, and Landlord has installed lighting in Tenant's rear loading area and in front of the Store with fixtures producing an average of not less than five (5) foot candle illumination. Landlord may use wall packs to achieve the required five (5) foot candle illumination;

        (n)    If not previously delivered to Tenant, Landlord has delivered the Non-Disturbance Agreement(s) executed by Landlord and Landlord's current lender, as required by Section 13.1.1; and

        (o)    The Store has been secured by Landlord from unauthorized entry by persons without a key.

Notwithstanding anything to the contrary contained in this Lease, and notwithstanding any delays in completion of Landlord's Construction Obligations due to Force Majeure, unless Tenant in its sole discretion elects to take delivery on a day other than a Permitted Delivery Day, the Delivery Date will not be on a day other than a Permitted Delivery Day. If a Force Majeure event occurs and Landlord complies with the notice provisions of Section 26.13, the Delivery Date will be, at Tenant's option, either (a) the date Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, or (b) the next Permitted Delivery Day which occurs after the date Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, and the Commencement Date shall be determined in accordance with Section 1.4.1. Notwithstanding the foregoing, if the Delivery Date would have occurred on a Permitted Delivery Day but for a Tenant Delay, Tenant will accept delivery on the date the Store is delivered by Landlord as if such delivery were made on a Permitted Delivery Day.

    **Environmental Regulations**.  See Section 11.4.1.

    **Exempted Discontinuances**.  See Section 6.1.3(e).

    **Final Plans**.  See **Exhibit C**.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 9 -

05/08/15
FINAL

1    <u>Force Majeure</u>.  See Section 26.13.

2    **Full Lease Year.**  The expression "Full Lease Year" refers to a Lease Year which consists
3    of twelve (12) complete calendar months commencing on a February 1 and terminating on the
4    ensuing January 31.

5    <u>Gross Sales</u>.  This definition applies to the calculation of Substitute Rent and for purposes
6    of Section 4.5 only.  Gross Sales are revenue received by Tenant from the selling price of all
7    merchandise or services contracted to be sold in or from the Store by Tenant, its subtenants,
8    licensees and concessionaires, whether for cash or for credit, excluding, however, the following:
9    (a) the sales price of all merchandise returned and accepted for full credit or the amount of the cash
10   refund or allowance made thereon; (b) the sums and credits received in settlement of claims for loss
11   or damage to merchandise; (c) the consideration received in connection with a sale of inventory
12   which occurs other than in the ordinary course of Tenant's business, including, but not limited to, a
13   sale in bulk or to a jobber, liquidator or assignee; (d) sales taxes, so-called luxury taxes, excise taxes,
14   gross receipt taxes, and other taxes now or hereafter imposed upon the sale or value of merchandise
15   or services, whether added separately to the selling price of the merchandise or services and
16   collected from customers or included in the retail selling price; (e) receipts from up to two (2)
17   vending machines for employees' use only, and from the collection of public Utility bills; (f) bank
18   card discounts or fees (e.g., Visa, MasterCard, etc.), interest, carrying charges, or other finance
19   charges in respect of sales made on credit, not to exceed two percent (2%) of Gross Sales; (g) sales
20   of fixtures, trade fixtures, or personal property that are not merchandise held for sale at retail;
21   (h) sales to employees and senior citizens at discount, each not to exceed two percent (2%) of Gross
22   Sales; (i) revenue received from mailing, alterations, delivery or other services performed on a
23   non-profit basis for the benefit of customers; (j) Tenant's accounts receivable, not to exceed two
24   percent (2%) of Gross Sales, which have been determined to be uncollectible for federal income tax
25   purposes during the Lease Year; provided, however, that if such accounts are actually collected in a
26   later Lease Year, the amount shall be included in the Gross Sales for such later Lease Year; (k) rents,
27   subrents or other consideration received in connection with an assignment, sublease, license,
28   concession or other transfer of any portion of the Store; (l) amounts received for merchandise
29   transferred to any other place of business of Tenant (or its subtenants, concessionaires and/or
30   licensees) or to any business organization affiliated with Tenant wherever located; provided such
31   transfer is not effected for the purpose of diverting sales from the Store, and that the merchandise is
32   not used to complete a sale originated in the Store; and (m) any Internet or other sale contracted on
33   a telecommunications network whether or not the sale item is delivered to the customer at the Store,
34   provided that the Store is used for retail sales to walk-in customers and not as a warehouse facility
35   for Internet sales.

36   **Hazardous Materials.**  See Section 11.4.1.

37   **HVAC.**  See Section 11.1.

38   **Inline Building.**  The Building in the Shopping Center in which the Store is situated and
39   any other building in the Shopping Center that is not located on an "Outparcel" and which has
40   more than one (1) tenant with common demising walls.

1     **Insurance Bill.** See Section 9.1.4.

2     **Intended Delivery Date.** The date specified in Section 1.4.2.

3     **Invitee(s).** An Invitee shall mean any agent, employee, customer or other entity or
4 individual who comes upon the Shopping Center property for business or retail consumption
5 purposes, or to perform services for the occupants of the Shopping Center, by the invitation of any
6 party who is entitled to grant access to the Shopping Center such as Landlord, Tenant or any other
7 occupant of the Shopping Center.

8     **Landlord's Construction Obligations.** The construction obligations imposed on
9 Landlord by Section 5.1.1.

10     **Landlord's Parcel.** For purposes of this Lease, the term "Landlord's Parcel" shall mean
11 "Shopping Center."

12     **Leasable Floor Area.** All areas available, or held for the exclusive use and occupancy of
13 occupants or future occupants of Landlord's Parcel, measured from the exterior surface of exterior
14 walls and from the center of interior demising partitions excepting that:

15         (a) Any mezzanines intended to be used for distribution, sale or display of
16 merchandise to retail customers ("Retail") shall be excluded from the computation of Leasable Floor
17 Area. Any such mezzanines not intended for Retail shall be excluded from Leasable Floor Area.

18         (b) Any areas ("Outdoor Areas") which are located wholly or partially outside of
19 a building, or which, although located substantially inside of a building, are not bounded on all sides
20 by exterior walls or a roof, such as outdoor sales, seating, garden or storage areas, or enclosed truck
21 docks or loading areas, shall be included in Leasable Floor Area if and to the extent that such
22 Outdoor Areas are available or held for the exclusive use and occupancy of occupants or future
23 occupants of Landlord's Parcel, whether or not such Outdoor Areas are clearly delineated and
24 whether or not any rental or other charges are paid by tenants with respect to such Outdoor Areas.
25 Outdoor Areas shall, to the extent that they are bounded by walls, be measured in the same manner
26 as provided above; otherwise, they shall be measured along lines which reasonably delineate the
27 boundaries of such Outdoor Areas.

28         (c) Kiosks shall be includable in Leasable Floor Area. A "kiosk" is a structure of
29 no more than one hundred (100) square feet, set within the Common Areas and completely
30 surrounded by pedestrian walkways or driveways.

31     **Lease Year.** The first Lease Year shall extend from the Commencement Date to the first
32 January 31 thereafter. Subsequent Lease Years shall commence on the following February 1 and
33 terminate the following January 31.

34     **Legal Rate.** In the event any rental or other payment due from one party to the other is
35 not paid when due, or in the event interest is required to be paid under the terms of this Lease, such
36 rental or payment amount shall bear interest at the rate of the lesser of **(a)** ten percent (10%) per

"Palm Springs"                 – 11 –                 05/08/15
Palm Springs Plaza                                               FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

annum, or (b) the prime rate per annum quoted by the Wall Street Journal for short term commercial loans, plus one percent (1%) per annum, but not in any event exceeding the highest rate permissible by law which is not usurious.

**LFA Minimums**.  Solely for purposes of calculating Co-Tenancy and Tenant's Pro Rata Share of Reimbursements, the minimum amount of Leasable Floor Area in the Shopping Center agreed by the parties and set forth in Section 1.3.2.

**Minimum Rent**.  See Section 6.1.

**Off-Site Improvements**.  Intentionally Deleted.

**Option**.  See Section 4.4.

**Option Periods**.  See Section 4.4.

**Outparcel**.  Any parcel of land upon which a building is or may be constructed which is between the Store and any street bordering the Shopping Center.

**Permitted Delivery Day(s)**.  Permitted Delivery Days shall be the first Monday of February and May and the last Monday of August only, which next follows the actual date Landlord tenders possession of the Store to Tenant with all Delivery Conditions satisfied, provided that it is no earlier than the Intended Delivery Date.

**Prohibited Uses**.  See Section 3.2.2.

**Property Insurance**.  See Section 9.1.1.

**Recommencement Date**.  See Section 21.2.

**Redelivery Date**.  The last of the following to occur after a Casualty or Taking:  (a) the date on which Landlord's architect, or contractor having charge of the Restoration, certifies by written notice to the parties that the Restoration has been completed; and (b) Tenant receives from all applicable governmental agencies all necessary written approvals to reopen the Store for business.

**Reduced Occupancy Period**.  See Section 6.1.3.

**Reimbursements**.  Tenant's obligation to reimburse Landlord for Tenant's Pro Rata Share under the provisions of Sections 7.4.1, 8.2.1 and 9.1.4.

**Rent**.  The terms "Rent" or "Rental" shall mean all Minimum Rent and Reimbursements which may be due from Tenant to Landlord pursuant to this Lease.

**Requirements**.  See Section 11.3.2.

**Restoration**.  See Section 21.1.4.

Roof Repairs. See Section 12.2.2.

Ross Dress For Less Lease. Philips Lake Worth L.P., a New York limited partnership (Landlord's predecessor in interest) and Tenant entered into a lease (Store No. 1345) with an Effective Date of September 22, 2009 (the "Ross Dress For Less Lease") for a store doing business in the Shopping Center as a Ross Dress For Less store in the location depicted as "Ross" on **Exhibit B** (the "Ross Premises"). Neither Landlord nor Tenant, by execution of this Lease, intend to modify, amend, or otherwise revise the Ross Dress For Less Lease in any manner, and the Ross Dress For Less Lease shall stand on its own with regard to administration and enforcement of the rights and obligations of the parties contained therein. Landlord and Tenant further acknowledge that the operation of a dd's DISCOUNTS store in the Shopping Center, pursuant to the terms of this Lease, does not violate any section of the Ross Dress For Less Lease.

Section Numbers. In this Lease, all references to "Section" shall mean the section numbers of this Lease, unless otherwise indicated.

Shopping Center. That certain real property development with all appurtenances generally described in Section 1.3 above, which is constructed or is to be constructed on the property described in **Exhibit A**. The Shopping Center may also be referred to herein as "Landlord's Parcel."

Site Plan. The Site Plan is the plan attached hereto as **Exhibit B**. Landlord represents and warrants that the Site Plan depicts Landlord's Parcel described on **Exhibit A** and that the boundaries thereof are delineated thereon with substantial accuracy. Other than "Building H" (as designated on **Exhibit B**) in which the Store is located, a portion of which contains two (2) stories as of the Effective Date, the Inline Buildings depicted thereon contain or shall contain no more than one (1) story (but mezzanines having Leasable Floor Area not in excess of one-third (1/3) of the occupant's ground floor Leasable Floor Area, when not used for selling purposes, shall be permitted). Further, the height (including any architectural features and rooftop equipment) of any portion of the Inline Buildings shall not exceed the greater of the height thereof as of the Effective Date or the height of the exterior elevation of the Store on the Final Plans described in **Exhibit C**. The highest point of any exterior elevation of any other building in Landlord's Parcel (including architectural features and rooftop equipment) shall not exceed twenty-eight (28) feet in height measured from the finished floor elevation of the Store; provided, however, that any such buildings in existence on the Effective Date may not exceed the greater of (a) the height thereof existing on that date, or (b) the finished floor elevation of the Store. Landlord and Tenant acknowledge that the building located on the Outparcel designated as "Eyeglass World" on **Exhibit B** also contains two (2) stories.

Special Form Policy. See Section 9.1.1.

Store. The Store is that portion of Landlord's Parcel designated on **Exhibit B**, having the dimensions and containing the Leasable Floor Area specified in Section 1.3, including the use of the roof as specified in Section 12.2.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 13 -

05/08/15
FINAL

1      **Substitute Rent.**  Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two
2    percent (2%) of Tenant's Gross Sales during the preceding month.  Substitute Rent, where
3    applicable in this Lease, shall be paid in lieu of Minimum Rent and Reimbursements.

4      **Support Systems.**  See Section 11.4.2.

5      **Taking.**  See Section 22.1.

6      **Tax or Taxes.**  See Section 8.1.

7      **Tax Bill.**  See Section 8.1.

8      **Tax Year.**  The twelve (12) month period used by the taxing authority as the period to
9    which the Tax Bill applies.

10     **Tenant Delay.**  A delay in the performance by Landlord of any obligation it is to perform
11   under **Exhibit C** to this Lease as a result of:  (a) Tenant's failure to approve, consent, comment
12   upon or otherwise respond to a request for plan approval within the express time provisions of
13   **Exhibit C**; or (b) Tenant's request for a change order to Landlord's Construction Obligations which
14   directly results in a delay in Landlord's ability to perform its obligations under this Lease; or (c) the
15   interference by Tenant or Tenant's contractors in the performance by Landlord or Landlord's
16   contractors of Landlord's Construction Obligations; provided, however, in order for there to be a
17   valid "Tenant Delay" Landlord must first have given Tenant written notice within five (5) Business
18   Days of the event forming the basis for the claim of the Tenant Delay and provided Tenant with at
19   least three (3) Business Days to rectify the problem causing the delay.

20     **Tenant's Pro Rata Share.**  Tenant's share of Reimbursements calculated as set forth in
21   Section 7.2 (Common Area Charges), Section 8.2 (Tax Bill) and Section 9.1.4 (Special Form Policy
22   premium).

23     **Tenant's Work.**  The work to the Store by Tenant after the Delivery Date necessary for
24   Tenant to open the Store for business to the general public; or performed at any time during the
25   Term for the purpose of improving the Store.

26     **Term.**  References to the Term of this Lease shall include the initial term described in
27   Section 1.5.1 ("Initial Term") and any extension of such Term ("Option Period").

28     **Termination Notice.**  A notice provided by Tenant to Landlord not less than thirty (30)
29   days (or such other notice period required under the terms of this Lease) prior to a proposed
30   termination of this Lease in which Tenant notifies Landlord of its election to terminate this Lease if
31   permitted to do so under any provision of this Lease.

32     **Unamortized Cost.**  The remaining balance of an original amount expended by Tenant for
33   leasehold improvements to the Store (not including any allowance paid by Landlord to Tenant for
34   Tenant's leasehold improvements as specified in **Exhibit C**), as amortized on a straight line basis
35   over no longer than a ten (10) year period according to Generally Accepted Accounting Principles

"Palm Springs"                - 14 -                05/08/15
Palm Springs Plaza                                            FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1   ("GAAP") in the books and records of Tenant for public reporting purposes, with an interest rate of
2   ten percent (10%) per annum.

3   **Utilities.**   Utilities are electricity, gas, power (including steam, if present), sanitary sewer,
4   storm sewer, telecommunications (audio, video or data bit streams, whether terrestrial, over the air
5   or satellite), and water supplied by public or private entities; however, Tenant acknowledges that
6   Landlord is only obligated to install or provide electricity, sanitary sewer, storm sewer and water and
7   is in no way responsible whatsoever for any steam, air or satellite broadcast.

8   **Utility Room.**   See Section 3.5.

9   ## 3.   GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS

10   **3.1.   Lease.**

11   Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Store
12   depicted on the Site Plan, together with any applicable easements, rights and privileges appurtenant
13   thereto, on the terms and conditions set forth herein.   As a material inducement and in
14   consideration for Landlord entering into this Lease, Ross Stores, Inc. shall execute a Guaranty in the
15   form attached hereto as **Exhibit K.**

16   **3.2.   Nature of the Shopping Center.**

17   **3.2.1.**   Retail Use.

18   (a)   Tenant has entered into this Lease in reliance upon representations by
19   Landlord that the Shopping Center is and shall remain retail in character, and, further, subject to the
20   provisions of Section 3.2.1(b)(i) below, no part of the Shopping Center shall be used for office or
21   residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public
22   assembly, "flea market," mortuary or funeral home, veterinary services or pet vaccination clinic or
23   overnight stay pet facilities, gymnasium or health club, dance hall, billiard or pool hall, massage parlor,
24   video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of
25   motor vehicles, on-premises consumption of alcoholic beverages except as incidental to a primarily
26   restaurant use, including any night club, bar, sports bar, or any restaurant where the on-premises
27   consumption of alcohol exceeds forty percent (40%) of gross sales (and which shall include Buffalo
28   Wild Wings, Elephant Bar and BJ's Brewhouse regardless of the percentage sale of alcohol, and other
29   similar establishments), facility offering gambling to the public (including any so-called Internet café
30   that offers gambling to the public, off track betting facility, casino or gaming facility), provided that the
31   incidental sale of lottery tickets shall be permitted, or the sale of adult products or adult bookstores or
32   adult audio/video products stores (which are defined as stores other than national tenants such as
33   Barnes and Noble in which at least ten percent (10%) of the inventory is not available for sale or rental
34   to children under the age of majority in the state in which the Store is located because such inventory
35   explicitly deals with or depicts human sexuality).   No ATM or similar machine shall be permitted in the
36   Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store,
37   except if located wholly within the interior of another tenant's or occupant's premises.   Landlord shall

1   not permit the sale of whole bean or ground coffee in the Shopping Center by a nationally known
2   specialty coffee retailer, having one thousand (1,000) stores or more and leasing or occupying five
3   thousand (5,000) square feet of Leasable Floor Area or less; provided, however, that the foregoing
4   restriction shall not apply to the sale of whole bean or ground coffee by a supermarket or grocery store,
5   or by Dunkin' Donuts, Caribou Coffee, Peet's, Coffee Bean & Tea Leaf, Coffee Beanery, Gloria Jeans,
6   or Tully's or retailers which obtain the majority of their revenue from the sale of donuts, bagels, bakery
7   goods or sandwiches.  Landlord shall not lease space nor allow space to be occupied in the Shopping
8   Center by any occupant, other than Tenant, whose use of the space shall be (i) for a store primarily
9   selling merchandise at one price or set prices such as 99 Cents stores, as they are  operated as of the
10  Effective Date, or (ii) for a discount department store under twenty thousand (20,000) square feet of
11  Leasable Floor Area, such as Family Dollar stores, as they are operated as of the Effective Date.
12  Further, other than Chili's restaurant (and a Permitted Chili's Replacement as herein defined) in the
13  location designated as "Chili's" on **Exhibit B** and those Existing Tenants (as defined in Section
14  3.2.1(b) below) in the building designated as "Building G" on **Exhibit B** that are using their premises
15  for restaurant use as of the Effective Date (and their Permitted Existing Tenant Restaurant
16  Replacements as herein defined), no restaurant or other "High Intensity Parking User" (as hereinafter
17  defined) shall be permitted in the Shopping Center within three hundred fifty (350) feet of the front
18  and side perimeter walls of the Store.  A Permitted Chili's Replacement shall mean (A) another Brinker
19  concept restaurant, or (B) a similar style restaurant such as TGIF, Applebee's or Ruby Tuesday, or
20  (C) a retail use (not otherwise a Ross Prohibited Use) and a bank.  A Permitted Existing Tenant
21  Restaurant Replacement shall mean a similar style restaurant as the Existing Tenant being replaced,
22  e.g., a quick-serve restaurant can replace a quick-serve restaurant and a full service sit down restaurant
23  can replace a full service sit down restaurant.  A "High Intensity Parking User" is a tenant or occupant
24  whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable
25  Floor Area in accordance with either customary shopping center practices or governmental regulations,
26  whichever has a higher parking requirement.  The foregoing use restrictions are referred to herein as
27  the "Ross Prohibited Uses."

28          (b)     Notwithstanding Section 3.2.1(a) above:

29                  (i)     The Ross Prohibited Uses set forth in this Section 3.2.1 shall not
30  apply to those tenants or occupants of the Shopping Center (or their successors) who, in accordance
31  with the terms of existing leases or occupancy agreements in effect on the Effective Date ("Existing
32  Tenants"), cannot be prohibited from so operating, but only for the balance of the term(s) of such
33  existing lease(s) or occupancy agreement(s), as the same may be extended.  Landlord covenants and
34  agrees that if Landlord has the right to consent to a change in use of the premises occupied by any
35  such Existing Tenant, Landlord shall not consent to a change in use of the premises which violates the
36  Ross Prohibited Uses.  Notwithstanding the foregoing, the Dollar Tree store in operation on the
37  Effective Date, in the location designated on **Exhibit B**, may be replaced with a dollar store, i.e., a
38  store primarily selling merchandise at one price or set prices such as 99 Cents stores, as they are
39  operated as of the Effective Date, in the same or other location in the Shopping Center.

40                  (ii)    Ground floor office space within the Shopping Center may be
41  used for medical, dental, real estate, legal, accounting, banking, tax preparation, travel agencies,
42  securities and other investments and financial planning, insurance and similar uses, provided that (A)
43  each such office is located at least one hundred (100) feet from the front and side perimeter walls of

1   the Store, (B) the aggregate square footage of all ground floor office tenants (including Existing
2   Tenants) does not exceed ten percent (10%) of the aggregate Leasable Floor Area within the Shopping
3   Center, and (C) no single office on the ground floor (excluding Existing Tenants) shall exceed two
4   thousand (2,000) square feet of Leasable Floor Area.  In addition, office use shall be permitted in the
5   "Second Floor" of Building H, as designated on **Exhibit B**, and the foregoing ten percent (10%)
6   aggregate limitation shall not apply to such Second Floor office uses.

7                             (iii)     Chili's restaurant shall be permitted within the Shopping Center,
8   provided such restaurant (A) is in the location designated as "Chili's" on **Exhibit B**, and (B) does not
9   exceed six thousand two hundred seventy-five (6,275) square feet of Leasable Floor Area.

10                            (iv)      One (1) gymnasium or one (1) health club shall be permitted in
11  the Shopping Center, provided that such gymnasium or health club (A) shall not exceed five thousand
12  (5,000) square feet of Leasable Floor Area, and (B) shall not be located within two hundred (200) feet
13  of the perimeter of the Store.  Notwithstanding the foregoing, should the Ross Dress For Less Lease
14  terminate, then Landlord may lease such Ross Dress For Less premises for use as a health club or
15  gymnasium, provided that such health club or gymnasium does not exceed twenty-six thousand
16  (26,000) square feet of Leasable Floor Area.

17                            (v)       One (1) ballet/dance studio shall be permitted, provided that such
18  ballet/dance studio (A) is not located within one hundred (100) feet of the perimeter of the Store, and
19  (B) does not exceed three thousand (3,000) square feet of Leasable Floor Area.

20          **3.2.2.**     Further Prohibited Uses.  Landlord agrees that the Ross Prohibited Uses set
21  forth in Section 3.2.1 and the "Shopping Center Prohibited Uses" which are listed in **Exhibit D**
22  (collectively, the "Prohibited Uses") shall not be permitted in the Shopping Center.  Tenant agrees
23  that it will not violate the Prohibited Uses.

24  **3.3.    Grant of Common Area Use.**

25          Tenant, as well as its agents, employees, customers and Invitees, shall have and is granted
26  nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "license"), which
27  license shall be appurtenant to the Store during the entire Term of this Lease.  Landlord shall use
28  commercially reasonable efforts to prevent Common Area use by other than the Shopping Center's
29  occupants and their Invitees, provided that Landlord may grant tenants the right to use Common
30  Areas for cart corrals or installation of bollards.  In addition, Landlord shall use commercially
31  reasonable efforts to require occupants of the second (2nd) floor office spaces, and their employees
32  and Invitees, to park in the rear of the Shopping Center.  In no event shall Tenant or Tenant's
33  Invitees' use of Common Areas be conditioned upon payment of parking or other charges by
34  Tenant.  Landlord shall have the right to deny access to the Common Areas up to one (1) day per
35  year to prevent the dedication of such areas to public use.

36  **3.4.    Grant of Utility Licenses.**

37          **(a)**     Subject to the reasonable written approval of Landlord as to location, Landlord
38  hereby grants to Tenant and its employees, agents, contractors and vendors, the nonexclusive right

1   by license to install, replace, maintain and use Utilities of Tenant's choice serving the Store within
2   Landlord's Parcel. Such installation, maintenance and replacement shall not unreasonably interfere
3   with the operation of the Shopping Center.

4          (b)      Upon prior notice to Landlord and subject to Landlord's approval as to location,
5   which approval shall not be unreasonably withheld, delayed, or conditioned, Tenant, at Tenant's
6   election, shall have the right to install, at Tenant's expense: (i) a cart retention system within the
7   parking lot, utilizing wires or other embedded objects as a means of perimeter control provided that
8   Tenant shall repair any damage caused by such installation, and (ii) bollards in front of the Store. If
9   required by Landlord at the time Landlord grants consent for the cart retention system, Tenant shall
10  agree to remove the cart retention system upon termination of this Lease.

11  **3.5.    Utility Rooms.**

12          In the event any meters, controls or conduits for any Utility system serving the Store are at
13  any time situated outside the Store (the "Utility Room"), Tenant shall at all times have access to the
14  Utility Room and to controls and other conduits therein in common with Landlord and other
15  tenants affected by such Utility systems. No other parties (other than Landlord and the other
16  tenants affected by such Utility systems) shall have access to the Utility Room at any time without
17  the consent of Tenant, which consent shall not be unreasonably withheld, delayed or conditioned.
18  Unless the Utility Room is solely within the control of Tenant, Landlord shall provide adequate heat
19  and security for the Utility Room and shall cause the Utility Room to be kept locked at all times.
20  Access to the Utility Room shall be restricted to an exterior entrance situated in the rear wall of the
21  building in which it is located.

22  **3.6.    Site Plan or Shopping Center Alterations.**

23          **3.6.1.**      <u>Control Area and Inline Buildings</u>. The Site Plan is a material consideration for
24  Tenant entering into this Lease. No material change, alteration, deletion, or addition shall be made
25  to the Control Area on the Site Plan nor shall any change in the façade of a front wall of any
26  premises in any Inline Building be made without the prior written consent of Tenant, which consent
27  may be granted or denied in Tenant's sole and absolute discretion.

28          **3.6.2.**      <u>Common Areas</u>.

29          (a)      No change or alteration shall be made in the Common Areas of the
30  Shopping Center outside of the Control Area (to the extent Landlord has the legal ability to control
31  such changes or alterations) which materially and adversely affects any one or more of the following,
32  without the prior written consent of Tenant (which consent shall not be unreasonably withheld,
33  delayed or conditioned by Tenant if the change is not materially adverse to Tenant): (i) the
34  configuration of the Common Areas, (ii) methods of ingress and egress, direction of traffic, lighting,
35  parking, or curbing in the Common Areas, or (iii) other alterations in the Common Areas materially
36  affecting the visibility of the Store.

37          (b)      Landlord shall not permit any other occupant of the Shopping Center
38  and/or any other person and/or entity to use the Common Areas (including Common Areas within

1   the Control Area) for sales areas, whether or not temporary or permanent sales areas, nor for any
2   parking of vehicles such as rental vehicles or delivery trucks whereby such vehicles are stored, displayed
3   or provided to customers in the Common Areas but not including customer parking.  Notwithstanding
4   the foregoing, Aaron Rents, Bennett Auto Supply, and Party Supply are permitted to park rental
5   vehicles/store trucks in the area designated on **Exhibit B** as "Existing Tenant Auto/Truck Parking."
6   In addition, Harbor Freight has the right to have tent sales in the "Existing Harbor Freight Tent Sales
7   Area" designated on **Exhibit B** no more than four (4) times per year and for no more than four (4)
8   days each.  Landlord shall also maintain appropriate and enforceable non-solicitation policies with
9   respect to the Common Areas.

10          **3.6.3.**    Building Envelopes.  No construction of any building, or remodeling of any
11   building in Landlord's Parcel may occur except within the Building Envelopes and shall be limited in
12   size to the Leasable Floor Area as designated on **Exhibit B** unless otherwise required by applicable
13   law.  Subject to conditions existing on the Effective Date, no storefront, storefront architectural
14   feature and/or canopy of any building, other than the Store, may extend into any sidewalk, drive
15   aisle or parking field beyond what exists as of the Effective Date as depicted on **Exhibit B**.

16          **3.6.4.**    Store Exterior; Inline Building Exteriors.  The use of the exterior walls of the
17   Store shall be subject to the exclusive control of Tenant, provided that any changes made by Tenant
18   to the design or color of the exterior of the Store shall be harmonious with the color, design and
19   architectural theme of the Shopping Center.  Further, Landlord may not alter the exterior of the
20   Store, including, but not limited to, the color of the exterior of the Store, without the prior written
21   consent of Tenant, which consent may be granted or denied in Tenant's sole and absolute
22   discretion.  No alteration or change in the color or design of any exterior wall of any building within
23   the Shopping Center may be made without the prior written consent of Tenant, which consent shall
24   not be unreasonably withheld, delayed or conditioned.  Notwithstanding the preceding sentence,
25   Tenant's consent shall not be required with respect to changes in the design and color of storefronts
26   (other than Tenant's), provided (a) such color and design changes are harmonious with the color,
27   design and architectural theme of the Shopping Center, and (b) the other express height and
28   building limitations set forth in this Lease are not violated.

29          **3.6.5.**    Outparcels.  Any Outparcel(s) which is (are) not developed as of the date that
30   Tenant opens in the Store for business ("Undeveloped Outparcels") shall be continuously
31   maintained (or caused to be maintained) by Landlord, in a neat and sightly condition until such
32   Outparcel(s) is (are) developed, at no cost or expense to Tenant (e.g., not as a Common Area
33   Charge or otherwise) in the following condition.  Each Undeveloped Outparcel shall either be
34   completely paved or shall be completely landscaped with low level shrubs or grass (such grass to be
35   mowed regularly to a height not to exceed eight inches (8")).  Notwithstanding the foregoing
36   sentence, Landlord may landscape such Undeveloped Outparcel with trees if required by any
37   governmental agency; however, Landlord shall maintain such trees (including in a manner that does
38   not materially obstruct the site line of Tenant's storefront) at no cost to Tenant.

39          **3.6.6.**    Tenant's Loading Docks and Loading Area.  Landlord covenants and agrees that
40   Tenant shall have undisturbed access to and use of its loading docks and loading area.  If access to
41   and/or use of Tenant's loading docks and/or loading area is disturbed or interfered with in any
42   material respect for any reason, and such disturbance or interference is not cured by Landlord within

one (1) Business Day following Landlord's receipt of written notice from Tenant, then, in addition to availing itself of any other remedies available at law or in equity or under this Lease, Tenant may, upon written notice to Landlord, terminate this Lease at any time prior to the date such disturbance or interference is cured, or if Tenant has not terminated this Lease, all Rent shall abate until the disturbance or interference is cured.

**3.7.   Dimensions.**

Within sixty (60) days following the substantial completion of Landlord's Construction Obligations, but in any event not more than sixty (60) days after the Delivery Date, Landlord shall cause the Store to be measured and shall deliver to Tenant an architect's certificate stating the Leasable Floor Area thereof.  In the event that the Leasable Floor Area of the Store is less than the size specified in Section 1.3.3 (the "Agreed Size"), Minimum Rent and all other charges shall be proportionately reduced and the parties shall set forth the actual Leasable Floor Area of the Store, the adjusted Minimum Rent and other corrections necessitated by the adjustment in Store size in the Acknowledgment of Commencement in **Exhibit E** hereto.  In the event that the Leasable Floor Area of the Store is more than the Agreed Size, Minimum Rent and all other charges shall be based upon the Agreed Size.  Nothing herein shall be construed as permitting a material variance in dimensions or area.  For purposes of this Section 3.7, a material variance is any decrease in the amount of Store frontage set forth in Section 1.3.3 or any decrease in the Agreed Size by more than one-half (½) of one percent (1%) of the amount of square feet of Leasable Floor Area.  Landlord shall simultaneously provide to Tenant a certificate from the project architect as to the total Leasable Floor Area in Landlord's Parcel depicted on **Exhibit B**.  Tenant shall have the right to dispute through its own licensed architect the amounts so represented and, if so, any unresolved dispute shall be resolved as provided in Section 20.2.  Until the amounts of Leasable Floor Area in the Store and in Landlord's Parcel have been finally determined, Tenant may defer payment of Minimum Rent (to the extent of the disputed amount) and the disputed portion of Tenant's Pro Rata Share of any charges which require the use of Leasable Floor Area for computational purposes under the terms of this Lease (e.g., Taxes, insurance and Common Area Charges).

## 4.   LEASE TERM

**4.1.   Term.**

The Term of this Lease shall commence on the Commencement Date and shall expire as specified in Section 1.5.

**4.2.   Commencement Date.**

The Term shall commence on the Commencement Date as set forth in Section 1.4.1.

### 4.3.   Acknowledgment of Commencement.

Within ninety (90) days after the Commencement Date, Landlord and Tenant shall execute a written acknowledgment in the form attached hereto as **Exhibit E**, and by this reference it is hereby incorporated herein.

### 4.4.   Option Periods.

Provided Tenant is not in default for which it has received written notice and an opportunity to cure, Tenant shall have the right to extend the Term of this Lease (an "Option") for the number of separate, consecutive additional periods ("Option Periods") which are specified in Section 1.5.2, on the terms and conditions set forth herein, except that the number of Option Periods remaining to be exercised shall, in each case, be reduced by one. If Tenant elects to exercise an Option, Tenant shall notify Landlord in writing at least two hundred seventy (270) days prior to the expiration of the Term, or the then current Option Period, as the case may be. If Tenant neglects to timely exercise any Option, Tenant's right to exercise shall not expire or lapse unless Tenant fails to exercise such Option within fifteen (15) days after notice from Landlord of Tenant's failure to timely exercise the Option. If Landlord does so notify Tenant, Tenant shall have the right at any time within fifteen (15) days after such notice to notify Landlord in writing of either Tenant's unqualified and irrevocable exercise of its Option, or Tenant's unqualified and irrevocable waiver of its Option. If Tenant fails to respond within such fifteen (15) day period, Tenant shall conclusively be deemed to have waived its Option and this Lease shall terminate on the then expiration date of the Term.

### 4.5.   Gross Sales Termination Right.

In the event the Gross Sales from the Store do not exceed Six Million Five Hundred Thousand Dollars ($6,500,000) for the Third Full Lease Year ("Measuring Period") (a Full Lease Year commences February 1 and terminates on the ensuing January 31), then Tenant shall have the right to terminate this Lease upon three hundred sixty-five (365) days' prior written notice to Landlord (the "Gross Sales Termination Notice"), which notice must be delivered no later than one hundred eighty (180) days following the end of the Third Full Lease Year and no sooner than the last day of the Third Full Lease Year. Tenant shall deliver to Landlord, concurrently with the delivery of the Gross Sales Termination Notice, a Gross Sales Statement indicating the amount of Tenant's Gross Sales during the Measuring Period. Said notice must specify the termination date, which termination date shall be no later than twelve (12) months following the date of Tenant's Gross Sales Termination Notice. Tenant shall vacate the Store on or before such termination date.

## 5.   CONSTRUCTION AND ACCEPTANCE

### 5.1.   Landlord's Construction Obligations.

#### 5.1.1.   Current.

(a)   On or before the Delivery Date, Landlord shall, at its sole cost and expense: (i) remove all Hazardous Materials (including asbestos-containing materials) from the Store,

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 21 -

05/08/15
FINAL

1   including, without limitation, the walls, ceilings, structural steel, flooring, pipes and boilers, and roof
2   and roof coverings; (ii) complete any roof repair work required to ensure that the roof is in a watertight
3   condition pursuant to clause (e) of the Article 2 - Delivery Date definition; and (iii) perform the
4   following work to the Store:

5                               (A)      install all demising walls (minimum six (6) inch metal studs not
6   more than twenty-four (24) inches on center extending from the floor to the underside of the roof
7   deck; with tracks and runners set in acoustic sealant; with a continuous, full height layer of wire mesh
8   installed on Tenant's side of the studs; with two (2) full height layers five-eighths (5/8) inch type X
9   gypsum wallboard installed on both sides with staggered joints each layer and side, taped and sanded;
10  and, with minimum three and one-half (3-1/2) inch glass fiber acoustical insulation in cavity; or, if
11  demising wall is block, tilt-wall or other construction, such wall is to be acoustically sealed, designed by
12  the architect of record to meet a minimum sound transmission coefficient of fifty (50) and finished on
13  Tenant's side with five-eighths (5/8) inch type X gypsum wallboard on hat channels or studs not more
14  than twenty-four (24) inches on center, taped and sanded).  Such demising walls must have a minimum
15  one (1) hour fire resistive rating; a minimum fifty (50) sound transmission coefficient; must not have
16  any kind of penetrations; may not contain Utility piping of any kind including plumbing and electrical
17  whether serving Tenant or other tenant space or Common Area; must have all construction joints,
18  cracks and holes, if any, acoustically sealed on both sides; and, must not be used for the mounting of
19  motors, speakers or any other equipment or device producing sound or vibration;

20                              (B)      reconfigure the storefront of the Store in accordance with the
21  Elevation Plan dated March 13, 2015, a copy of which is attached hereto as **Exhibit M**, and install
22  hurricane shutters in accordance with Tenant's prototype plans and specifications;

23                              (C)      install all Utilities in the Store as set forth in Tenant's prototype
24  plans and design guidelines including electric, water, fire sprinklers, gas and telephone lines and
25  separate meters; provided, however, that Landlord may provide for Tenant's use a one and one-quarter
26  inch (1.25") gas line at the rear of the Building and an existing two inch (2") water line stubbed outside
27  the Store in a mutually acceptable location.  Additionally, Landlord may provide for Tenant's use the
28  existing sanitary line, provided that it is a four inch (4") sanitary line;

29                              (D)      separate existing electrical service and provide the Store with
30  not less than 600 amp, 3 phase, 4-wire 277/480 V electrical service with main disconnect and meter
31  box pursuant to Tenant's prototype plans and design guidelines; alternatively, Landlord may provide
32  Tenant with the existing 800 amp, 277/480 V electrical service, provided that it is separate and
33  independently serves the Store;

34                              (E)      seal the floor slab (of both the existing floor slab and any new
35  floor slab) with sealant as specified in Tenant's prototype plans and specifications, and provide Tenant
36  with a current moisture test on the floor slab and a certification by Independent Floor Testing and
37  Inspection, Inc. (or other independent concrete slab inspection company approved by Tenant's
38  construction representative) of all floor slabs, whether existing or new, certifying that the floor slab has
39  passed the following test standards:  when uniformly tested at one (1) test per one thousand (1,000)
40  square feet of area, no calcium chloride moisture test result may exceed the limit of five (5) pounds per

1   one thousand (1,000) square feet; no alkalinity test result may exceed a pH of nine (9); and there shall
2   be no failure on any seventy-two (72) hour bond test;

3                                   (F)      reconfigure and separate the fire sprinkler, riser and monitoring
4   systems to separately and independently serve the Store.  Landlord shall install a four inch (4") separate
5   and independent fire line from the riser with a separate flow and tamper switch for the Store.  Space
6   1C shall have a separate independent fire sprinkler and fire riser;

7                                   (G)      deliver, to the extent in Landlord's possession or control,
8   detailed AutoCAD v.2004 or above shell plan for the Building, and all reports pertaining to the Store,
9   including, but not limited to, roofing, mechanical, electrical, HVAC and environmental reports; and

10                                  (H)      all Utility lines (including sprinkler lines) that run through the
11  Store shall exclusively serve the Store and Landlord shall remove any Utility lines (including sprinkler
12  lines) that run through the Store that do not exclusively serve the Store and shall cut and cap any
13  sprinkler lines serving other premises at the demising walls so that the sprinkler system is independent
14  to the Store.

15                          (b)      If the Store is part of a larger premises existing as of the Effective Date,
16  Landlord shall be responsible, at its sole cost and expense, for any requirement (whether governmental,
17  insurance or otherwise), for construction of fire access, including corridors or fire doors.

18                          (c)      Landlord shall indemnify, defend, protect and hold Tenant harmless from
19  all claims, demands and liabilities, including attorneys' fees and expenses, arising out of such
20  construction, remodeling, alteration or other work performed by Landlord, including but not limited
21  to, claims for defective work.  The obligations of this Section 5.1 are a material consideration to Tenant
22  without which Tenant would not have entered into this Lease.

23                          (d)      Landlord shall perform, at its own cost and expense, any work required by
24  local laws, rules, regulations, ordinances, or work imposed by any local governing body as part of any
25  approval process to the extent such work involves the Common Areas of the Shopping Center, any
26  Outparcel and/or any part of the Shopping Center buildings outside of the Store so long as the cost of
27  such work does not exceed Fifty Thousand Dollars ($50,000).  In the event that such cost exceeds Fifty
28  Thousand Dollars ($50,000), then Landlord shall have the right to terminate this Lease upon thirty (30)
29  days' prior written notice to Tenant, or complete such work.  In the event that Landlord terminates this
30  Lease, Tenant shall have the right to vitiate Landlord's termination notice by agreeing to reimburse
31  Landlord for such costs that are in excess of Fifty Thousand Dollars ($50,000).  Tenant shall reimburse
32  Landlord for such costs within thirty (30) days of Landlord's written request, which shall be
33  accompanied by invoices showing the total cost of such work, inclusive of the original Fifty Thousand
34  Dollars ($50,000).

35          **5.1.2.**    Future Upgrades.   If at any time during the Term, Landlord undertakes the
36  upgrading of the exterior of buildings in Landlord's Parcel other than the Store, then Landlord shall
37  be obligated to similarly upgrade the exterior of the Building so that Landlord's Parcel presents a
38  uniform appearance of quality, design and age.  Landlord's failure to perform its obligations under
39  this Section 5.1.2 within sixty (60) days following the completion of the general upgrading of other

1  buildings in Landlord's Parcel shall constitute a material default under the provisions of this Lease
2  entitling Tenant to all remedies at law, in equity and/or under the terms hereof.

3  **5.2.    Construction Commencement.**

4  Subject to delays caused by Force Majeure and Tenant Delays, if Landlord fails to
5  commence to perform Landlord's Construction Obligations, prior to the Construction
6  Commencement Cancel Date specified in Section 1.4.3 of this Lease, then at any time thereafter, but
7  prior to Landlord's commencement of Landlord's Construction Obligations, upon thirty (30) days'
8  prior written notice to Landlord, Tenant shall have the right to terminate this Lease by notifying
9  Landlord in writing.  Commencement of Construction means the day that the contractor's workers
10  commence Landlord's Construction Obligations as described in Section 5.1.

11  **5.3.    Completion of Construction.**

12  Landlord shall use commercially reasonable efforts to complete Landlord's Construction
13  Obligations and deliver possession of the Store to Tenant on the Intended Delivery Date, subject to
14  delays caused by Force Majeure and Tenant Delays.

15  **5.4.    Delivery Notice.**

16  (a)    The parties acknowledge the necessity for Landlord to provide Tenant with the
17  Delivery Notice specified in this Section 5.4 in order that Tenant shall have adequate time to, among
18  other things, hire personnel, arrange promotion, purchase and deliver merchandise, perform Tenant's
19  improvements and fixturization of the Store and enter into other commitments required to timely
20  occupy and conduct business within the Store.  Not less than thirty (30) calendar days prior to the
21  Delivery Date, Landlord must notify Tenant in writing as to when the Delivery Date will occur (the
22  "Delivery Notice") in the form set forth in **Exhibit G** (a Delivery Date must be on a Permitted
23  Delivery Day).  Landlord shall undertake all due diligence and necessary efforts to complete Landlord's
24  Construction Obligations, and satisfy the Delivery Conditions, and deliver the Store on the Delivery
25  Date specified in the Delivery Notice.  Once Landlord delivers its Delivery Date Notice to Tenant,
26  the Delivery Date is not subject to alteration, including due to an event of Force Majeure.   In the
27  event Landlord does not timely satisfy all the Delivery Conditions by the Delivery Date stated in the
28  Delivery Notice (subject to delays caused by events of Force Majeure or Tenant Delay), Tenant will
29  suffer damages arising from Tenant's need for adequate and proper advance notice of delivery.  It
30  would be impractical or extremely difficult to fix actual damages in the event of Landlord's breach
31  under this Section 5.4.  Therefore, in the event of a breach by Landlord of its obligations under this
32  Section 5.4, the parties acknowledge that the damages to be suffered by Tenant in such event are
33  difficult to ascertain.  However, after negotiation the parties have made their best reasonable estimate
34  of such damage and have agreed that Landlord shall pay to Tenant, as liquidated damages (the
35  "Liquidated Damages"), the sum of Fifty Thousand Dollars ($50,000) which sum shall be paid to
36  Tenant in a lump sum by Landlord to Tenant upon demand at any time following a breach by
37  Landlord of its obligations under this Section 5.4.  Nothing herein shall prohibit Tenant, in addition to
38  claiming the Liquidated Damages, from postponing occupancy and the commencement of payment of
39  Rent as specified in Section 5.5 hereof.  In the event Landlord fails to pay to Tenant the Liquidated
40  Damages as required by this Section 5.4(a), Tenant may, at its option, deduct the full amount of the

1     Liquidated Damages from the Rent or other charges coming due until Tenant has fully recovered the
2     full amount of Liquidated Damages.  In addition to Landlord's obligation to pay the Liquidated
3     Damages, Landlord shall remain obligated to diligently complete Landlord's Construction Obligations
4     and to satisfy the Delivery Conditions.  Notwithstanding the foregoing, if Landlord fails to deliver the
5     Store on the date stated in the Delivery Notice due to a delay caused by an event of Force Majeure or
6     Tenant Delay, then Landlord shall not be obligated to pay the Liquidated Damages for such delay,
7     provided Landlord gives Tenant the notice required by Section 26.13 in the case of Force Majeure and
8     by the definition of Tenant Delay, as applicable, and provided Landlord uses diligent efforts to
9     complete Landlord's Construction Obligations and satisfy the Delivery Conditions.  If Landlord does
10    not deliver a Delivery Notice, there shall be no Liquidated Damages, but Tenant shall have the
11    remedies specified in Sections 5.5 and 5.6.

12         (b)    Landlord may tender delivery of the Store to Tenant on other than a Permitted
13    Delivery Day, however, Tenant shall be under no obligation to take delivery, or, if Tenant does take
14    delivery, to pay Rent or any other charge, until the Commencement Date or as otherwise specified in
15    this Lease.

16    **5.5.    Rollover.**

17         Notwithstanding any other provisions of this Lease, Tenant shall not be obligated to accept
18    delivery of the Store at any time other than on a Permitted Delivery Day.  If (a) Landlord offers to
19    deliver the Store to Tenant on a date other than a Permitted Delivery Day, or (b) Landlord fails to
20    deliver a timely Delivery Notice to Tenant, or (c) Landlord delivers a Delivery Notice to Tenant and
21    thereafter Landlord fails to timely deliver the Store to Tenant on the date specified in the Delivery
22    Notice, then, in each such event, the Delivery Date shall, at Tenant's option, be deferred until the
23    next Permitted Delivery Day which occurs or is in effect after the sixtieth (60th) day after the actual
24    date Landlord satisfies all Delivery Conditions and tenders possession of the Store to Tenant.
25    Tenant's rights to defer the Delivery Date pursuant to this Section 5.5 are referred to herein as the
26    "Rollover" remedy and are in addition to Tenant's rights to recover Liquidated Damages pursuant to
27    Section 5.4 above, if applicable.

28    **5.6.    Remedies Cumulative.**

29         The Rollover remedy described in Section 5.5 above shall apply in addition to all other
30    remedies at law, or in equity, or under the terms of this Lease.

31    **5.7.    Construction Completion Cancel Date.**

32         If for any reason Landlord has not completed Landlord's Construction Obligations, or the
33    Store is not delivered to Tenant prior to the Construction Completion Cancel Date specified in
34    Section 1.4.4 of this Lease, except due to a delay caused by an event of Force Majeure or Tenant
35    Delay, Tenant may, at its sole option, cancel this Lease by written notice to Landlord.
36    Notwithstanding the preceding sentence, if the Delivery Date has not occurred by the date set forth
37    in Section 1.4.4 of this Lease solely because Tenant has not received all governmental approvals for
38    Tenant's plans for Tenant's Work (the "Approval Delivery Condition") and Tenant has not elected
39    to terminate this Lease, then Landlord shall have the right to terminate this Lease upon thirty (30)

"Palm Springs"                      - 25 -                       05/08/15
Palm Springs Plaza                                                FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1   days' written notice to Tenant and this Lease shall terminate unless, prior to the expiration of the
2   thirty (30) day period, Tenant either (a) receives all governmental approvals for Tenant's plans for
3   Tenant's Work and notifies Landlord that the Approval Delivery Condition has been satisfied; or
4   (b) Tenant notifies Landlord in writing that Tenant waives the Approval Delivery Condition as a
5   condition to delivery.  In either such event, Landlord's termination notice shall be void and the
6   Delivery Date shall be the next Permitted Delivery Day following the satisfaction or Tenant's waiver
7   of the foregoing Approval Delivery Condition.

8   **5.8.  Automatic Termination.**

9   Subject to Tenant Delay, this Lease shall be automatically terminated if the Delivery Date
10  does not occur on or before the Automatic Termination Date specified in Section 1.4.5 of this Lease
11  notwithstanding any Force Majeure events.

12  **5.9.  Entry Prior to Delivery Date.**

13  Tenant shall have the right, without any obligation to pay Rent, to enter the Store for any
14  legal purpose, including to prepare for and commence Tenant's Work.  Tenant agrees that it shall
15  diligently seek to avoid impeding the progress of Landlord's Work by such entry.  No such entry by
16  Tenant shall be deemed an acceptance of the Store.  Tenant hereby indemnifies Landlord, and
17  agrees to hold Landlord harmless from and against any and all losses, liabilities, damages, injuries,
18  penalties, fines, costs, expenses and claims of any and every kind whatsoever, including, without
19  limitation, attorneys' and consultants' fees and costs, paid, incurred or suffered by, or asserted
20  against, Landlord as a result of Tenant's entry into the Store prior to the Delivery Date and exercise
21  of any of its rights pursuant to this Section 5.9.

22  **5.10.  Intentionally Deleted.**

23  **5.11.  Additional Delivery Requirements.**

24  **5.11.1.**   On the Delivery Date.  Tenant's occupancy of the Store shall not constitute an
25  acceptance of Landlord's Work, or relieve Landlord of responsibility for any warranty or
26  maintenance obligations under this Lease.

27  **5.11.2.**   After the Delivery Date.

28  (a)   Within sixty (60) days after the Delivery Date, Landlord shall deliver all of
29  the following to Tenant:

30  (i)   A signed final inspection card, certificate of completion or
31  comparable permit or certificate relating to Landlord's Construction Obligations;

32  (ii)   A list of all contractors, subcontractors and suppliers, each of
33  which provided labor, services or materials in excess of Twenty-Five Thousand Dollars ($25,000)
34  ("Major Contractors") for any separate category of service in the construction of the Store. By way of
35  example, plumbing, flooring, roofing, and electrical services shall each be considered a separate

category of service.  Said list shall contain the following information about each contractor, subcontractor or supplier: name, business address, phone number (including area code), facsimile number and e-mail address, contact person for the project, and state license number if required for the execution of work on the Store;

(iii)  To the extent in Landlord's possession, equipment operation manuals, catalogue data sheets and material safety data sheets on all major equipment and/or fixtures used in the Store; and

(iv)  For maintenance use, a one (1) gallon container of paint for each color and surface texture applied to the front of the Store as part of Landlord's Construction Obligations, with each labeled with color and texture in addition to manufacturer's label.

(b)  Within six (6) months after the Delivery Date, Landlord shall deliver to Tenant all fully executed and dated warranties and guarantees applying to the Store.

(c)  If the items required in Sections 5.11.2(a) and (b) above, are not furnished to Tenant within the required time periods, Tenant may defer payment of one (1) month's Minimum Rent due under this Lease until such items are furnished to Tenant.

**5.11.3.**  Until the foregoing items specified in Sections 5.11.1 and 5.11.2 have been furnished to Tenant, Tenant may defer payment of Minimum Rent and Reimbursements for one (1) full month; provided, however, that Tenant shall first given Landlord written notice of Landlord's failure to provide the required items and thirty (30) days thereafter to provide same.  When all of the foregoing items have been furnished to Tenant, Tenant shall promptly pay to Landlord the amount of Minimum Rent previously withheld by Tenant, if any.

# 6.  RENT

**6.1.  Minimum Rent.**

**6.1.1.**  _Payment and Amount_.  Commencing on the Commencement Date and continuing through the Term of this Lease (except as otherwise expressly set forth in this Lease), without demand or set off except as otherwise specified in this Lease, Tenant shall pay Minimum Rent and the applicable Florida State Sales Tax to Landlord in equal monthly installments at the rates specified in Section 1.6 (the "Minimum Rent").  Minimum Rent shall be payable in advance on or before the first (1st) day of each calendar month.  If this Lease commences other than on the first day of a calendar month, the first month's Minimum Rent shall be prorated accordingly and paid with the Minimum Rent for the first full month.

**6.1.2.**  _Place of Payment_.  All Minimum Rent and other payments to be made by Tenant to Landlord shall be sent to the place to which Landlord's notices are required to be sent, unless otherwise directed by Landlord in writing.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 27 -

05/08/15
FINAL

1       **6.1.3.**    <u>Required Co-Tenancy</u>.

2             (a)    <u>Co-Tenancy Requirements</u>. A "Reduced Occupancy Period" shall occur
3 unless all of the following requirements are satisfied on the Commencement Date and thereafter
4 throughout the Term: (i) the Required Co-Tenants specified in Section 1.7.1, shall be open in the
5 Shopping Center every customary Business Day for retail business at least from 10:00 a.m. to
6 6:00 p.m., except customary holidays; (ii) the Required Co-Tenants are operating in at least the
7 Required Leasable Floor Area for each Required Co-Tenant specified in Section 1.7.1 under bona fide
8 leases of a minimum of three (3) years' duration as of the inception of such leases; and (iii) retail
9 tenants of the Shopping Center, including the Required Co-Tenants, are open and operating, except
10 customary holidays, under bona fide leases in at least the percentage of the Leasable Floor Area of the
11 Shopping Center indicated in Section 1.7.2 (the Leasable Floor Area of the Store, the Ross Dress For
12 Less Lease, Space 1C, and the buildings located on the Outparcels designated on **Exhibit B** shall be
13 excluded from the numerator and denominator of the fraction used to calculate such percentage). For
14 purposes of calculating the percentages in this paragraph, the denominator of the fraction may not be
15 less than the LFA Minimum described in Section 1.3.2(d).

16             (b)    <u>Commencement Date Reduced Occupancy Period</u>. If a Reduced
17 Occupancy Period exists on the Commencement Date ("Commencement Date Reduced Occupancy
18 Period"), Tenant shall not be required to open the Store for business (notwithstanding any contrary
19 provision in this Lease), and if Tenant does not open for business in the Store, no Rent shall be due or
20 payable whatsoever until and unless the Commencement Date Reduced Occupancy Period is cured.
21 Notwithstanding the preceding sentence, if Tenant elects to open for business during a
22 Commencement Date Reduced Occupancy Period, then Tenant's total obligation for Rent shall be
23 replaced by Substitute Rent which shall be payable within fifteen (15) days after the close of each
24 calendar month during the Commencement Date Reduced Occupancy Period and continuing until the
25 expiration of the Commencement Date Reduced Occupancy Period. If the Commencement Date
26 Reduced Occupancy Period continues for a period of twelve (12) consecutive calendar months, then
27 Tenant shall either (i) commence paying full Rent, or (ii) terminate this Lease upon thirty (30) days'
28 notice to Landlord (the "Reduced Occupancy Termination Notice"), provided the Reduced
29 Occupancy Termination Notice is given prior to the expiration of the Commencement Date Reduced
30 Occupancy Period.

31             (c)    <u>Secondary Reduced Occupancy Period</u>. If a Reduced Occupancy Period
32 occurs at any time after the Commencement Date and after the satisfaction of the Required
33 Co-Tenancy set forth in Section 1.7.1 and Section 1.7.2, and such Reduced Occupancy Period is not
34 the result of an Exempted Discontinuance as hereinafter defined ("Secondary Reduced Occupancy
35 Period"), Tenant's total obligation for Rent shall be replaced by Substitute Rent which shall be payable
36 within fifteen (15) days after the close of each calendar month during the Secondary Reduced
37 Occupancy Period and continuing until the expiration of the Secondary Reduced Occupancy Period
38 (or earlier if Tenant terminates this Lease as hereinafter provided in this Section 6.1.3(c)).
39 Notwithstanding the foregoing, if a Secondary Reduced Occupancy Period occurs because Aldi
40 discontinues its operations in the Shopping Center, then Tenant's right to pay Substitute Rent shall not
41 commence until one hundred eighty (180) days after commencement of such Secondary Reduced
42 Occupancy Period, provided that such 180-day period shall run concurrently with the period of any
43 Exempted Discontinuance. If the Secondary Reduced Occupancy Period continues for a period of

"Palm Springs"                               – 28 –                           05/08/15
Palm Springs Plaza                                                     FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1   twelve (12) consecutive calendar months (except in the event of an Exempted Discontinuance), then
2   Landlord shall have the right to terminate this Lease by giving ninety (90) days' written notice to
3   Tenant within thirty (30) days of the end of the twelve (12) month period ("Landlord's Termination
4   Notice"). Tenant shall have the right to vitiate Landlord's Termination Notice by giving Landlord
5   written notice ("Tenant's Vitiation Notice") no later than the end of such 90-day period, indicating that
6   Tenant shall resume payment of full Rent on the first day of the calendar month following Tenant's
7   Vitiation Notice. The provisions of this Section 6.1.3(c) shall apply to any subsequent Secondary
8   Reduced Occupancy Period.

9              (d)    Unamortized Cost of Leasehold Improvements.  In the event Landlord or
10  Tenant terminates this Lease pursuant to Sections 6.1.3(b) or (c) above, as applicable, Landlord shall
11  pay to Tenant an amount equal to the Unamortized Cost of Tenant's leasehold improvements, which
12  sum shall be due and payable to Tenant within thirty (30) Business Days following the date of receipt
13  of the Reduced Occupancy Termination Notice or Landlord's Termination Notice, as applicable, and
14  Landlord's receipt of Tenant's written certification as to the value of the Unamortized Cost of Tenant's
15  leasehold improvements.  If the Unamortized Cost of Tenant's leasehold improvements is not timely
16  paid, Tenant may deduct the amount due from any payments due to Landlord, if any hereunder, in
17  addition to and cumulative with any other remedies available to Tenant at law, in equity, or under the
18  terms of this Lease.  Landlord's obligation for payment of the Unamortized Cost of Tenant's leasehold
19  improvements shall survive the termination of this Lease.

20             (e)    Exempted Discontinuance.  An Exempted Discontinuance shall mean the
21  closure of a tenant's store because of Casualty, condemnation, repairs or remodeling for a period not to
22  exceed two hundred (200) days.  A tenant's store which is closed due to an Exempted Discontinuance
23  shall not be considered closed for purposes of determining whether a Secondary Reduced Occupancy
24  Period is in effect (and the Leasable Floor Area of such tenant's store shall not be calculated in the
25  numerator or the denominator of the fraction specified in Section 1.7.2) from the commencement of
26  the Exempted Discontinuance until the earlier of:  (i) the expiration of such two hundred (200) day
27  period; or (ii) the expiration of the Exempted Discontinuance.

28             (f)    Landlord Reporting Requirements.  Within sixty (60) days following
29  Tenant's written request, Landlord shall provide Tenant with a Shopping Center tenant roster and
30  occupancy/vacancy report for the entire Shopping Center which shall include the Leasable Floor Area
31  occupied by each tenant and the percentage of Leasable Floor Area of the Shopping Center occupied
32  by all operating retailers in the Shopping Center ("Co-Tenancy Report") certified as current as of the
33  date of the Co-Tenancy Report, plus a Landlord's Co-Tenancy Certification certified as current as of
34  the date of the Co-Tenancy Certification.  In the event Landlord fails to provide the Landlord's
35  Co-Tenancy Certification and/or the Co-Tenancy Report within the time periods specified above and
36  such failure continues for thirty (30) days following Tenant's written request therefor, Tenant may
37  defer any payments relating to Rent until such time as the Landlord's Co-Tenancy Certification and/or
38  Co-Tenancy Report is received by Tenant.  Tenant shall pay the amount due within thirty (30) days
39  following Tenant's receipt of the Co-Tenancy Report and the Landlord's Co-Tenancy Certification.

**6.2.    Reimbursements.**

In addition to the Minimum Rent described in Section 6.1, Tenant shall be responsible to pay Tenant's Pro Rata Share of Common Area Charges as described in Section 7.4.1, the Tax Bill as described in Section 8.2.1, and the Special Form Policy premium as described in Section 9.1.4.

**6.3.    Other Payment Provisions.**

**6.3.1.    Late Payment.**  Any sum including Rent accruing to Landlord or Tenant under the provisions of this Lease which is not paid within ten (10) days following written notice that such sum is past due ("Payment Notice Period"), shall bear interest at the Legal Rate from the expiration of the Payment Notice Period to the date paid unless the past due sum is disputed pursuant to Section 6.3.3.

**6.3.2.    Timely Billing of Charges.**  All charges due from Tenant to Landlord for which Tenant must be billed by Landlord shall be billed within twenty-four (24) months after the close of the calendar year in which the charge is incurred by Landlord, or Landlord will have waived its right to reimbursement as otherwise provided in this Lease.

**6.3.3.    Disputed Sums.**  In the event that at any time during the Term a bona fide dispute arises with respect to the amount due for any Reimbursements or other charges claimed by a party to be due, or with respect to Tenant's payment of Substitute Rent or Tenant's non-payment of Rent pursuant to Tenant's right to pay Substitute Rent or to defer, withhold, deduct or offset Rent in accordance with this Lease, including, but not limited to, pursuant to Section 6.1.3(f), Section 11.2 and Section 20.1.2(b), the party claiming a dispute shall notify the other party in writing of the basis for the dispute.  Pending the resolution of the dispute between the parties by litigation or otherwise, any undisputed portion of any Reimbursements or other charges, Substitute Rent, or Rent, as applicable, shall be paid by Tenant or Landlord, as the case may be, and the disputed portion of any Reimbursements or other charges, Substitute Rent, or Rent, as the case may be, may be withheld pending resolution of the dispute.  Tenant's withholding of the disputed amount, or offsetting of an amount previously paid in the event of a bona fide dispute shall not be deemed a default by Tenant under the terms of this Lease.  Upon resolution of any dispute, the obligated party shall pay to the other the remaining sum liquidated as due (if any) with interest thereupon at the Legal Rate.

**6.4.    Gross Sales Statement for Purposes of Calculating Substitute Rent.**

**6.4.1.    Gross Sales Statement.**  In the event Tenant pays Substitute Rent pursuant to clause (b) of the Substitute Rent definition in Article 2, within fifteen (15) days after the close of each calendar month, Tenant shall submit to Landlord a statement indicating the amount of its Gross Sales for the previous month.  Landlord covenants to keep such information confidential, except for information provided to its accountants or lenders, or if required pursuant to any litigation between the parties hereto or as required by law.

**6.4.2.    Maintenance of Records.**  In the event Tenant pays Substitute Rent during any Lease Year, Tenant shall maintain adequate records for a period of two (2) years after the close of each such Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for

1   such Lease Year. At any time within said two (2) year period, upon the written request of Landlord,
2   Tenant shall provide written documentation of Tenant's Gross Sales to Landlord, the confidentiality
3   of which information shall be maintained by Landlord in accordance with Section 6.4.1 above. If,
4   during such two (2) year period, Landlord has remaining questions regarding Tenant's Gross Sales,
5   then Landlord or its agents may inspect such records at Tenant's main office specified in
6   Section 1.2.2 hereinabove during Tenant's normal business hours. If such inspection or audit
7   discloses an underpayment of Substitute Rent, Landlord shall promptly deliver a copy of the audit
8   report to Tenant for its review. Within thirty (30) days thereafter, Tenant may, by written notice to
9   Landlord, object to the conclusions or process of the audit report stating its conclusions as to the
10  amount due, if any. If Landlord disputes Tenant's conclusions, then within ten (10) days of receipt
11  of Tenant's objection to its audit report, Landlord may institute the appropriate alternative dispute
12  resolution under Section 20.2 of this Lease. If Tenant agrees with the audit report, then it shall
13  promptly thereafter pay to Landlord the amount of the underpayment. In the event an adjustment
14  is required because of an understatement of Gross Sales in excess of three percent (3%), and
15  additional Substitute Rent is due, Tenant shall reimburse Landlord for Landlord's reasonable
16  expenses incurred in conducting such inspection or audit.

17          **6.4.3.**     <u>No Representation</u>.     Landlord acknowledges that Tenant has made no
18  representation as to the Gross Sales which may be generated from the Store.

19                          **7.  COMMON AREA MAINTENANCE**

20  **7.1.    Landlord's Obligation to Maintain Common Areas.**

21          **7.1.1.**     <u>Maintain Common Areas</u>.  Landlord shall maintain all Common Areas in first
22  class condition, repair and cleanliness, including ice and snow removal, and sidewalk steam cleaning
23  and shall keep the Common Areas free of any material impediments and open for reasonably easy
24  and safe movement within the Common Areas.  Landlord shall keep the Common Areas well
25  lighted for a period of sixty (60) minutes following the end of Tenant's business hours in the Store
26  and thereafter maintain reasonable security.  Any costs incurred for lighting the Common Areas
27  other than as specified in the preceding sentence shall be borne solely by those tenants requesting
28  the additional lighting hours, and costs incurred in respect to additional lighting shall not be
29  includable as Common Area Charges.  No construction or construction-related activity shall be
30  permitted in the Common Areas, except for emergency repairs (or necessary repairs which cannot
31  be delayed) diligently pursued, during the period from October 15 of any year to January 2 of the
32  ensuing year, without the prior written consent of Tenant, which consent may not be unreasonably
33  withheld and may include conditions designed to eliminate interference with the operation of the
34  Shopping Center or the effect of such activity upon Tenant's business.

35          **7.1.2.**     <u>Common Area Metering</u>.  The Common Areas shall be served by meters which do
36  not serve any other areas of the Shopping Center.  Landlord shall cause all Utilities for the Common
37  Areas to be separately metered from those of Tenant and/or the Store.

38          **7.1.3.**     <u>Holiday Event</u>.  Landlord shall have the right, but not the obligation, not more than
39  once in any Lease Year to conduct a one (1) day holiday event in the primary parking area of the

1 Shopping Center between the hours of 8:00 a.m. and 12:00 p.m., provided that such event does not
2 obstruct Tenant's and Tenant's customers' ingress and egress to the Store or is conducted in the
3 parking field bounded between the Store and Congress Avenue and the main drive aisle and 10th
4 Avenue North. Furthermore, any profits derived from such Holiday Event shall be applied to the
5 Common Area to offset Common Area Charges and Tenant shall have no obligation to pay for any
6 costs (except as may otherwise be expressly provided for in this Lease), included, but not limited to,
7 setup and cleaning associated with the Holiday Event.

8 **7.2.   Tenant's Pro Rata Share.**

9 Tenant's Pro Rata Share of Common Area Charges is defined as that fraction of Common
10 Area Charges the numerator of which is the Leasable Floor Area in the Store and the denominator of
11 which is the Leasable Floor Area in the Shopping Center; provided, however, in no event shall the
12 denominator of such fraction be less than the Minimum Leasable Floor Area set forth in
13 Section 1.3.2(a).

14 **7.3.   Definition of Common Area Charges.**

15 **7.3.1.**   Included Charges.  The following costs reasonably incurred during the Term for
16 maintenance and repair of the Common Areas shall be included as Common Area Charges:
17 maintaining and repairing the parking area of the Common Areas (including slurry-sealing, restriping
18 parking spaces and filling potholes), sidewalks and loading zones (whether or not such sidewalks and
19 loading zones are Common Areas), provided that if no other tenant or occupant's loading zones are
20 maintained by Landlord, then Tenant shall reimburse Landlord's costs incurred to maintain Tenant's
21 loading zone outside of the Store, payable together with its Pro Rata Share of Common Area
22 Charges, provided Landlord itemizes the billing for such charges; Shopping Center security;
23 cleaning, sweeping and other janitorial services; sanitation; maintenance of Common Area refuse
24 receptacles; replanting existing landscaping; maintenance of directional signs and other markers;
25 electricity to light the Common Areas during the hours required by Section 7.1 (excluding other
26 tenants' after-hours lighting); electricity to light and maintenance of pylon identifying the Shopping
27 Center (but not other pylon signs on which Tenant's signage does not appear) as well as lighting for
28 Tenant's signs on such pylon signs (Tenant shall be responsible for the maintenance of its sign
29 panels on the pylon signs at Tenant's sole cost and expense); repair and maintenance of lighting
30 fixtures; replacement of lighting elements; any repair and maintenance of other Utility systems to
31 serve the Common Areas; premiums of Landlord's liability insurance for the Common Areas; trash
32 removal for the Common Areas of Landlord's Parcel (Tenant shall pay for the trash removal for the
33 Store, using the trash removal contractor required by the City of Palm Springs, if any; if trash
34 removal for any tenant or occupant of the Shopping Center is not segregated from the trash removal
35 for the Common Areas, then Landlord shall reasonably allocate the cost attributable to the
36 Common Areas and only those costs be included in the Common Area Charges for which
37 Tenant must pay its Pro Rata Share); and the administrative fee described in Section 1.8 which may
38 be included only to the extent assessed against the remainder of Common Area Charges after
39 excluding therefrom liability insurance premiums, Utility costs, security costs, management fees paid
40 to third parties and capital expenditures, if any are expressly authorized by this Section 7.3.1. Taxes
41 as defined in Article 8, and Property Insurance pursuant to Section 9.1 are not included as Common
42 Area Charges, and, accordingly, are not included in the computation of the administrative fee

specified in Section 1.8.  Notwithstanding the exclusion of capital expenditures from Common Area Charges as set forth in clause (3) of Section 7.3.2 below, Landlord shall be permitted to include in Common Area Charges capital expenditures which reduce Common Area energy costs, maintenance costs and repair costs or other Common Area Charges, provided that (a) the portion of such capital expenditures included as Common Area Charges in any Lease Year shall be the annual amount which results from amortization of the capital expenditure with an interest rate of five percent (5%) per annum over the useful life of the improvement for which it is incurred as determined in accordance with GAAP and customary first class shopping center maintenance procedures in the area of the Shopping Center, and (b) provided further that in no event shall the Common Area Charges payable by Tenant which includes such annual amortization amount exceed the Common Area Charges that would have been payable by Tenant had the capital expenditure not been made ("Permitted Capital Expenditure").   Further notwithstanding any provision to the contrary contained in this Lease, Common Area Charges shall include a portion of the capital expenditures incurred by Landlord with respect to parking lot repaving performed after the expiration of the Initial Term of this Lease. The portion of such parking lot repaving capital expenditures included as Common Area Charges in any Lease Year shall be the annual amount applicable to such Lease Year which results from amortization of the capital expenditures on a straight-line basis over the useful life of the improvement as determined in accordance with GAAP and customary first class shopping center maintenance procedures in the area of the Shopping Center with interest at a rate of five percent (5%) per annum.

   7.3.2.    Excluded Charges.  In no event shall Common Area Charges include any of the following:  (1) costs of original construction (as distinguished from maintenance and repair) of the Shopping Center or any expansion, remodeling or renovation thereof; (2) principal and/or interest payments on any financing for the Shopping Center or any portion thereof or rental under any ground lease or other underlying lease; (3) capital expenditures (i.e., expenditures which, in the customary course of maintenance practice for shopping centers similar in type and location to that of the Shopping Center, do not recur annually) including, but not limited to, repaving, petromatting or resurfacing of the parking area of the Common Areas; (4) the costs of correcting defects in the design or construction of the Shopping Center, or repair and/or replacement of any materials or equipment required as a result of such defects; (5) any expense resulting from deferred maintenance or the negligence of Landlord, its agents, servants or employees, or any additional expense incurred as a direct result of Landlord's failure to use competitive bidding to minimize expenses to the extent possible without detracting from the standards of a shopping center comparable to the Shopping Center; (6) the cost of any repair to remedy damage caused by or resulting from the negligence of any other tenant(s) in the Shopping Center, including their agents, servants or employees; (7) reserves for anticipated future expenses; (8) legal and other fees, leasing commissions, advertising expenses and other costs incurred in connection with development, leasing or operation of the Shopping Center, or in connection with negotiations or disputes with tenants, occupants or prospective tenants or occupants, or legal fees incurred in connection with this Lease; (9) cost of repairs or other work occasioned by fire, Casualty or other insurable risk or the exercise of the right of eminent domain; (10) expenses incurred in the build out, renovation, alteration, improvement, decoration, or redecoration of any portion of any building in the Shopping Center (except for power washing, graffiti removal and associated spot repainting, which may be included in Common Area Charges); (11) any items for which Landlord is entitled to be reimbursed or compensated, including,

1    without limitation, contractors' warranty or right of reimbursement from any tenant or occupant of
2    the Shopping Center, but excluding contributions for Common Area Charges; (12) any bad debt
3    loss, rent loss or reserves for bad debts or rent loss; (13) cleaning, sweeping, and removal of debris
4    within the seating area of any restaurant; (14) expenses in connection with services or other benefits
5    of a type which are not provided Tenant but which are provided only to or for another tenant or
6    occupant of the Shopping Center; (15) any interest, late charges, or penalties incurred as a result of
7    Landlord's failure to pay any bill as the same shall become due; (16) any and all other costs
8    associated with the operation of the business of Landlord, intending by this exclusion to distinguish
9    the same from the costs of maintenance and repair of the Common Areas (excluded items shall
10    specifically include, but shall not be limited to, formation of the Landlord entity, internal accounting
11    and legal matters, including, but not limited to, preparation of tax returns and financial statements
12    and gathering of data therefor, costs of selling, syndication, financing, mortgaging or hypothecating
13    any of Landlord's interest in the Shopping Center, and costs of any disputes between Landlord and
14    its employees); (17) salaries and bonuses of officers and executives of Landlord and compensation
15    paid to clerks, attendants or other persons in commercial concessions operated by Landlord;
16    (18) advertising and promotional expenditures or customer services; (19) costs, fines, or fees
17    incurred by Landlord due to violations of any federal, state or local law, statute or ordinance, or any
18    rule, regulation, judgment or decree of any governmental rule or authority; (20) any costs or
19    expenses associated with the removal, cleanup or remediation of any Hazardous Materials (as
20    hereinafter defined) from the Shopping Center as required pursuant to applicable Environmental
21    Regulations (as hereinafter defined), any restoration in connection therewith or compliance with any
22    Environmental Regulations; (21) the cost of compliance with any other Requirements (as hereinafter
23    defined) (including, without limitation, the Americans With Disabilities Act) which are capital in
24    nature, unless such capital costs are permitted under Section 7.3.1; (22) the cost of any work or
25    services performed for any facility other than the Shopping Center; (23) any costs representing an
26    amount paid to a person, firm, corporation or other entity related to Landlord which is in excess of
27    the amount which would have been paid in the absence of such relationship; (24) management,
28    supervision, administrative and  overhead costs (including, but not limited to, office space,
29    equipment, Utilities, and personnel) other than the fee described in Section 1.8; (25) the cost of
30    acquiring sculptures or other art objects and costs of decorative monuments; (26) costs of tools and
31    equipment for operation, repair and maintenance of the Common Area which are not customarily
32    expensed in the year placed in operation pursuant to GAAP; (27) costs incurred in the construction,
33    maintenance, repair or replacement of any buildings in the Shopping Center (whether relating to
34    structural or nonstructural, exterior or interior portions of such buildings), specifically excluding
35    from Common Area Charges any costs incurred for maintenance, repair, Utilities or any other costs
36    with respect to restrooms or restroom facilities, or signs which identify the Shopping Center (except
37    for signage required to be maintained by Landlord pursuant to Section 24.3); (28) any costs to clean
38    up or repair the Common Area as a result of promotional activities or because of construction,
39    maintenance, or reconstruction of buildings in the Shopping Center; (29) premiums for liability
40    insurance of any kind except as specified in Section 7.3.1 above; (30) costs incurred by Landlord as a
41    result of any claim covered by the insurance which Landlord is required to maintain under this
42    Lease, including deductible amounts; (31) any expense associated with "food courts" as that term is
43    described in Article 2 - "Common Areas", such as maintenance, repair, purchase of personal
44    property or any other cost related thereto; (32) if Tenant is paying any charges for sewer under the
45    provisions of Article 10, sewer charges, whether separately billed or included with the billing for

"Palm Springs"               - 34 -               05/08/15
Palm Springs Plaza                                      FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1   water charges from the Utility provider, in which latter case, the charges for sewer shall be separated
2   out; (33) should there be commercial offices within the Shopping Center which occupy, in the
3   aggregate more than five thousand (5,000) square feet of Leasable Floor Area, the charges incurred
4   in respect of such office facilities such as, by way of example, elevator charges, common hallways,
5   electricity, water and janitorial expenses; (34) any unreimbursed Common Area Charges arising from
6   a reimbursement to Landlord from an occupant of the Shopping Center of less than its
7   mathematical pro rata share thereof calculated based upon Leasable Floor Area occupied by such
8   occupant relative to the Leasable Floor Area of all occupants of the Shopping Center; (35) the cost
9   of promotional and seasonal decorations, including the purchase, leasing, storage, installation and/or
10  removal and clean-up of same; (36) costs of replacing, repairing, or restoring the Shopping Center,
11  or any portion thereof, in the event of a Casualty of any type, regardless of whether insurable or
12  uninsurable, insured or uninsured; (37) rent or other costs for security offices or a police station in
13  the Shopping Center; (38) Intentionally Deleted; (39) costs for the construction of any pylon or
14  other signs for the Shopping Center, except as may be set forth in Section 24.3; and (40) any costs or
15  expenses incurred by Landlord in sponsoring events in or upon the Shopping Center or in creating a
16  "brand" or name recognition for the Shopping Center.  Additionally, Tenant shall have no
17  obligation to contribute to a marketing fund or merchants' association for the Shopping Center.

18  **7.4.    Payment of Tenant's Pro Rata Share.**

19          **7.4.1.**   _Payment._   Provided Landlord maintains the Common Areas as specified in
20  Section 7.1, commencing on the Commencement Date, Tenant shall pay Tenant's Pro Rata Share of
21  the Common Area Charges in the manner set forth herein.

22          **7.4.2.**   _Estimated Payments._   Landlord shall have the right, once a year, to estimate
23  Common Area Charges for the ensuing calendar year, and Tenant's share thereof, based on the
24  previous year's actual expenditures and Landlord's reasonable projections for the following calendar
25  year (except if the Shopping Center has not been operated for one (1) year or more as of the
26  Commencement Date of the Term, Common Area Charges shall be based on Landlord's reasonable
27  estimate thereof based on typical charges for similar shopping centers within five (5) miles of the
28  Shopping Center), and Landlord shall so inform Tenant of such projections in writing along with the
29  Annual Statement referred to below.  Notwithstanding the preceding sentence, in the event
30  Landlord fails to retain its records of Common Area Charges as required by Section 7.4.7 and
31  records of Common Area Charges for the immediately preceding calendar year are not available to
32  Tenant, then, in addition to all other remedies available to Tenant at law or in equity, Landlord shall
33  not be permitted to increase its estimate of Common Area Charges for the following calendar year
34  and Tenant shall be under no obligation with respect to such calendar year to pay more than the
35  amount payable by Tenant for the last calendar year for which Landlord's records of Common Area
36  Charges were reviewed and approved by Tenant.  Beginning with the first (1st) day of the first
37  calendar month of the Term following Tenant's receipt of Landlord's written estimate of its annual
38  obligation in respect of Common Area Charges (but not in any event before thirty (30) days after
39  receipt thereof), Tenant shall include one-twelfth (1/12th) of its annual obligations set forth in such
40  estimate with each payment of Minimum Rent for the ensuing twelve (12) month period.  After the
41  first calendar year, any proposed increase in total Common Area Charges in excess of five percent
42  (5%) over the previous year's expenditures must be justified by itemization of each element of
43  charge, together with (a) a written explanation of the reason (i.e., increased scope of work, deferred

work, etc.) for the increase in excess of five percent (5%), and (b) copies of the competitive bids described in Section 7.4.3 below. Such justification shall be promptly provided by Landlord, but only upon Tenant's reasonable request. The requirement for bids shall also apply at any time an element of the Common Area Charge is proposed to increase more than ten percent (10%) in any year, in relation to the cost for such element for the previous twelve (12) month period, whether the resulting proposed Common Area Charges for the subject year will be in excess of five percent (5%) over the amount paid by Tenant for the previous twelve (12) month period. In the absence of the required justification of the proposed increase in Common Area Charges in excess of five percent (5%), Tenant shall be under no obligation in respect of such year to pay more than the amount payable by Tenant for the previous twelve (12) months plus five percent (5%).

**7.4.3.** <u>Landlord's Contracts</u>. All Landlord's contracts with third parties for work, service or materials, the cost of which may be included in the Common Area Charges, shall include a detailed description of the work, service, or material to be provided by the contractor. No such contracts shall involve a duplication of the work or service provided by other contractors, their employees or agents or the employees of Landlord. Landlord shall maintain detailed job descriptions for all employees employed by Landlord for the purpose of performing Common Area maintenance activities whose salaries, wages and/or benefits may be included in Common Area Charges. Landlord's employees shall not provide duplicate services to those provided by Landlord's third party contractors. Except for Landlord's trash collection contract with Republic Services and any subsequent contractor that Landlord is also required by the City of Palm Springs to use for trash collection at the Shopping Center, any individual third party contract in excess of Fifty Thousand Dollars ($50,000) shall be awarded by competitive bidding from at least two (2) bona fide third party contractors.

**7.4.4.** <u>Intentionally Deleted</u>.

**7.4.5.** <u>Annual Statement</u>. Within one hundred twenty (120) days following the close of each calendar year, Landlord shall submit to Tenant a statement ("Annual Statement"), in which Landlord shall set forth in reasonable detail the actual expenditures for Common Area Charges for such calendar year and Tenant's Pro Rata Share of Common Area Charges thereof. The Annual Statement shall be certified by an authorized agent of Landlord to be correct. Within twenty (20) days of Tenant's request, Landlord shall provide Tenant with copies of all invoices and other written evidence of Common Area Charges ("CAM Evidence") paid by Landlord. In the event Landlord fails to provide such Annual Statement or CAM Evidence within the time periods required hereby, Tenant may thereupon continue to make current payments without increase until such time as the Annual Statement is received by Tenant, and Tenant shall pay the amount due within thirty (30) days thereafter. Landlord may elect to provide the Annual Statement and CAM Evidence in electronic format provided such electronic files are reasonably organized.

**7.4.6.** <u>Reconciliation of Annual Statement</u>. If the Annual Statement indicates that Tenant's payments of estimated Common Area Charges exceeded Tenant's total obligation relating to such calendar year, Landlord shall accompany said Annual Statement with a memo crediting Tenant's account in the amount of such overpayment or, if the amount of the credit exceeds two (2) full months' estimated payment for Common Area Charges, Landlord shall accompany said Annual Statement with a payment to Tenant of the amount of such excess. If the Annual Statement shows

1    that Tenant's payments of estimated Common Area Charges were less than its total obligation
2    relating to such calendar year, Tenant shall pay the difference to Landlord within forty-five (45) days
3    of Tenant's receipt of the Annual Statement.  Notwithstanding the foregoing, if at the time Landlord
4    delivers such Annual Statement to Tenant, Tenant is auditing Landlord's records of Common Area
5    Charges, any adjustment (if required) and any credit or payment shall be made upon conclusion of
6    such audit.

7          7.4.7.    Audit.  Tenant shall have the right, not more frequently than once in any
8    calendar year, to audit (the "CAM Audit") all of Landlord's or Landlord's agent's records pertaining
9    to Common Area Charges with a representative of Tenant's choice.  Landlord shall retain its records
10   regarding Common Area Charges for a period of at least three (3) years following the final billing for
11   each calendar year during the Term.  Landlord covenants and agrees that in the event Landlord
12   assigns this Lease in connection with a transfer of the Shopping Center, Landlord shall deliver to the
13   assignee all of the records of Common Area Charges required to be retained by Landlord pursuant
14   to this Lease.  In the event Landlord fails to retain its records as required by this Section 7.4.7,
15   Landlord's failure shall constitute a default by Landlord under this Lease and, in addition to all other
16   remedies available to Tenant at law or in equity, Tenant may elect to pay no more than Tenant's Pro
17   Rata Share of Common Area Charges payable by Tenant for the last calendar year for which
18   Landlord's records of Common Area Charges were reviewed and approved by Tenant, or for which
19   Tenant did not review such records and Tenant's audit rights have expired.

20         At any time during such three (3) year period, upon at least thirty (30) days' advance notice
21   to Landlord, Tenant may conduct a CAM Audit.  The CAM Audit shall commence on a date (the
22   "Audit Date") of which Tenant has notified Landlord not less than thirty (30) days in advance.  In
23   the event of cancellation of the CAM Audit by Landlord, Tenant shall be relieved of its obligation to
24   make monthly payments of the estimated Common Area Charges until the first to occur of twelve
25   (12) months thereafter, or until the CAM Audit is performed and completed.  In addition, in the
26   event Landlord cancels the CAM Audit less than ten (10) days prior to the scheduled Audit Date for
27   reasons other than an event of Force Majeure, Landlord shall reimburse Tenant for all costs incurred
28   by Tenant, such as, for example, the cost of nonrefundable airfares, resulting from Landlord's
29   cancellation of the CAM Audit.  Landlord shall reimburse such costs to Tenant within ten (10) days
30   following receipt of Tenant's invoice therefor, and if Landlord fails to do so, Tenant may deduct the
31   full amount of such costs from any subsequent Rents coming due under this Lease.  Any overbilling
32   discovered in the course of the CAM Audit shall be credited to Tenant's account (together with
33   interest at the Legal Rate) or, if the amount of the credit exceeds two (2) full month's estimated
34   payments for Common Area Charges, such overbilled amount shall be refunded to Tenant (together
35   with interest at the Legal Rate) within thirty (30) days following the date that Landlord is provided
36   with a copy of Tenant's CAM Audit (the "Refund Date").  In the event the overbilling of charges
37   exceeds three percent (3%) of the sum previously billed to Tenant by Landlord, Landlord shall also
38   reimburse Tenant for all reasonable expenses of the CAM Audit by the Refund Date.  On or before
39   the Refund Date, Landlord shall:  (a) refund any overbilled amount (together with interest at the
40   Legal Rate) and the CAM Audit expenses, if applicable; or (b) provide Tenant with (i) the reasons
41   for any disagreement by Landlord with the findings of Tenant's CAM Audit, (ii) together with any
42   supporting documentation, and (iii) accompanied by cash payment in the amount of any undisputed
43   overbilling.  In the event Landlord fails to respond by either of the foregoing methods, the CAM

"Palm Springs"                            - 37 -                           05/08/15
Palm Springs Plaza                                                          FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1   Audit shall be deemed conclusive and Tenant may, in addition to its other remedies, deduct the full
2   amount of such overbilling from any subsequent Rents coming due under this Lease. In the event
3   Landlord disputes Tenant's CAM Audit and provides the reasons and documentation supporting
4   such claim, the parties shall diligently, within ten (10) Business Days thereafter, attempt to resolve
5   their differences, and, in failing to do so, the matter may be submitted by either party for Arbitration
6   under the provisions of Section 20.2.3 hereof. In the event Landlord fails to pay Tenant the
7   overbilled amount (together with interest at the Legal Rate) as well as CAM Audit expenses, if
8   applicable, by the Refund Date, or within thirty (30) days of a final arbitration/court order if
9   Landlord disputes the CAM Audit of Tenant's billing, Tenant shall have the right to deduct all
10  unpaid amounts from the Rent coming due from Tenant until Tenant is fully paid. The expenses of
11  this CAM Audit, when taken together with expenses of the Tenant audits in Sections 8.2.5 and
12  9.1.4(c), shall not exceed Three Thousand Five Hundred Dollars ($3,500), with annual increases
13  pursuant to the annual change in the CPI (as hereinafter defined) during the immediately preceding
14  calendar year. CPI shall mean the Consumer Price Index [All Urban Consumers] (base year 1982-84
15  = 100) for the U.S. City Average published by the United States Department of Labor, Bureau of
16  Labor Statistics. If the CPI is changed so that the base is changed from 1982-84 = 100, the CPI
17  shall be converted in accordance with the conversion factor published by the United States
18  Department of Labor, Bureau of Labor Statistics. If the CPI is discontinued or revised during the
19  Term, such other governmental index or computation with which it is replaced shall be used in
20  order to obtain substantially the same result as would be obtained if the CPI had not been
21  discontinued or revised. If there is no such replacement, then Landlord and Tenant shall select
22  another price index that is reasonably satisfactory to both. The amount shall not be reduced below
23  the prior year's amount on the basis of the CPI adjustment above.

24                              **8.  REAL ESTATE TAXES AND ASSESSMENTS**

25  **8.1.    Obligation to Pay.**

26          (a)     Landlord shall pay all real property taxes and assessments ("Tax" or "Taxes") levied
27  by a government agency against Landlord's Parcel or smaller Tax parcel which includes the Store
28  (the "Tax Bill") on or before the last day that such Taxes may be paid without penalty, commission,
29  interest or other charge or such earlier date as will secure the maximum discount, rebate or other
30  reduction of Taxes as may be available. In the event that Landlord elects not to secure the
31  maximum discount, rebate or other reduction that may be available through an early payment, then
32  Tenant's share of Taxes shall be calculated using the maximum discount, rebate or other reduction
33  offered by the taxing jurisdiction. A "Tax parcel" is a single parcel of land for which the relevant
34  taxing authority renders a separate billing.

35          (b)     All payments made by Tenant shall be accompanied by the applicable Rent Tax,
36  which are such additional taxes only as are, pursuant to the wording of the tax statute or law of the
37  jurisdiction in which the Store is located, applicable exclusively to sales, privilege or rentals from real
38  estate and no other forms of receipts, and are attributable solely to Tenant's Lease of the Store and
39  not on an average of Landlord's rental for the Shopping Center as a whole, but only to the extent
40  that the State of Florida requires payment of such tax.

1   **8.2.    Tenant's Pro Rata Share.**

2       **8.2.1.    Payment of Tenant's Pro Rata Share.**  In addition to the Minimum Rent herein
3   reserved, Tenant shall reimburse Landlord for Tenant's Pro Rata Share (calculated in accordance
4   with Section 8.2.3 hereafter) of the Tax Bill, applicable to each Tax Year or part thereof which falls
5   within the Term.  Tenant's payment shall be made within thirty (30) days after receipt by Tenant of
6   (a) a copy of Landlord's Tax Bill, and (b) a statement in writing from Landlord setting forth the
7   amount of Tenant's Pro Rata Share of the Tax Bill and the method of calculation thereof.  Subject
8   to Tenant's receipt of written evidence of Landlord's payment of Landlord's Tax Bill as specified
9   above, Tenant's schedule of payments shall be concurrent with Landlord's obligations for payment
10  to the taxing authority.  Upon Tenant's written request, Landlord shall provide a copy of Landlord's
11  cancelled check for payment of Taxes or other evidence of payment reasonably satisfactory to
12  Tenant.  To the extent that Taxes are payable at a discount for early payment, Tenant shall have the
13  right to deduct such discount from Tenant's Pro Rata Share of Taxes if Tenant shall pay Tenant's
14  Pro Rata Share of Taxes during the period qualifying for such discount for early payment.

15      **8.2.2.    Installments.**  In the event of Tax assessments which may be paid in installments
16  by reason of bonding or otherwise, Landlord shall elect to make payment based upon the longest
17  period of installment payments permitted by the appropriate taxing authority.  Tenant shall bear no
18  liability as to installments due following the expiration or earlier termination of this Lease except for
19  prorated amounts due prior to the expiration or earlier termination of this Lease.  Tenant shall not
20  be responsible for any interest, late charge or other penalty resulting from Landlord's late payment
21  or non-payment of Taxes, nor any administrative or other charge which may be claimed by
22  Landlord, unless such late payment or non-payment of Taxes is due to Tenant's failure to pay
23  Tenant's Pro Rata Share of Taxes in a timely manner.

24      **8.2.3.    Calculation of Tenant's Pro Rata Share.**  Tenant's Pro Rata Share of the Tax Bill
25  is defined as that fraction of Taxes the numerator of which is the Leasable Floor Area in the Store
26  and the denominator of which is the Leasable Floor Area in the Tax parcel of which the Store is a
27  part; provided, however, the denominator of said fraction shall not be less than the Minimum
28  Leasable Floor Area set forth in Section 1.3.2(b) unless a portion of the Shopping Center becomes a
29  separately taxed Tax Parcel, in which case the Minimum Leasable Floor Area set forth in
30  Section 1.3.2(b) shall be reduced to reflect the Leasable Floor Area within the Tax parcel of which
31  the Store is a part, subject to the final sentence in this Section 8.2.3.  Such computation shall be
32  made separately for each Tax Year and shall be set forth in reasonable detail as a part of Landlord's
33  statement to Tenant pursuant to Section 7.4.5.  The Tax parcel in which the Store is located shall
34  not contain more Common Areas than is consistent with the overall Common Area square footage
35  to building area ratio of the Shopping Center.

36      **8.2.4.    Partial Year.**  Should Tenant be in occupancy during only a portion of the first or
37  final Tax Years, Tenant shall be responsible to pay Landlord only for a ratable portion of its Tax
38  obligation, based on the portion of such Tax Year included in the Term of this Lease.

39      **8.2.5.    Tenant Audit.**  Upon at least thirty (30) days' prior notice, Tenant shall have the
40  right to audit Landlord's or Landlord's agent's records pertaining to Taxes with a representative of
41  Tenant's choice.  Landlord shall retain its records regarding Taxes for a period of at least three (3)

years following the final billing for each calendar year in question.  At any time during such three (3) year period, Tenant may conduct its audit.  Any overbilling discovered in the course of such audit shall be refunded to Tenant with interest thereon at the Legal Rate within thirty (30) days of Landlord's receipt of a copy of the audit and Tenant's billing ("Tax Refund Date").  In the event Landlord's overstatement of Tax charges to Tenant exceeds three percent (3%) of the sum previously billed to Tenant by Landlord, Landlord shall reimburse Tenant for all of Tenant's reasonable audit expenses by the Tax Refund Date.  In the event Landlord fails to pay Tenant the overbilled amount (together with interest at the Legal Rate), and audit costs, if applicable, by the Tax Refund Date, Tenant shall have the right to deduct all unpaid amounts from Rent coming due from Tenant until Tenant is fully paid.  The expenses of this audit, when taken together with expenses of the Tenant audits in Sections 7.4.7 and 9.1.4(c), shall not exceed Three Thousand Five Hundred Dollars ($3,500), with annual increases pursuant to the annual change in the CPI (as defined in Section 7.4.7).

**8.3.    Exclusions.**

There shall be excluded from the Taxes to which Tenant contributes any of the following: (a) any increase in Taxes caused by construction in Landlord's Parcel commenced subsequent to the Effective Date of this Lease until such time as such newly constructed space constitutes Leasable Floor Area; (b) any increase in Taxes caused by a Change of Ownership Assessment as hereinafter defined (excepting only: (i) one (1) increase resulting from a change in ownership of the Shopping Center if completed within one (1) year following the Effective Date; (ii) one (1) increase caused by a change in ownership during the Initial Term; and (iii) two (2) increases caused by a change in ownership during the aggregate of all the Option Periods); (c) income, excess profits, gross profits, estate, single business, inheritance, succession, transfer, franchise, capital or other tax or assessment upon Landlord or the Rent payable under this Lease; (d) bonds and/or assessments which have been or, subsequent to the date hereof are, levied for the purpose of funding the costs of construction for Landlord's development or redevelopment of, all or any portion of Landlord's Parcel or capital improvements constructed therein or with respect thereto, which are required as a result of Landlord's redevelopment of the Shopping Center; (e) tax increment financing, fees, taxes (excluding Real Estate Taxes), or assessments; (f) any special (non-general) assessments which apply to the Shopping Center; (g) any Taxes assessed against land in Landlord's Parcel that has not been fully developed as buildings or Common Areas; and (h) any taxes or assessments for the construction or installation of any Utilities to the Store or Landlord's Parcel, or any taxes or assessments related to the usage of any Utilities to the Store or Landlord's Parcel, such as water or sewer charges included in the Tax Bill which exceeds the sum of Fourteen Cents ($0.14) per square foot of Leasable Floor Area in the Store, such $0.14 amount to be increased proportionately with any increases in Minimum Rent set forth in Section 1.6.  A "Change of Ownership Assessment" is any increase in the Tax assessment of the Shopping Center or Tax parcel (as herein defined) resulting from a change in the ownership or title holding of any property within the Tax parcel under the provisions of any real property tax statute for the state in which the property is located, such as, by way of example, California Revenue and Taxation Code section 60 et. seq.

1   **8.4.     Rebates.**

2          Any final, non-appealable refunds, or abatements of Taxes received by Landlord subsequent
3   to Tenant's payment of its Pro Rata Share of the Tax Bill, including, but not limited to, tax
4   increment financing rebates or subsidies received by Landlord from the applicable taxing authority,
5   shall be refunded to Tenant on a ratable basis within thirty (30) days of receipt by Landlord.  Any
6   such rebate, refund or abatement realized by Landlord prior to payment by Tenant shall result in an
7   immediate reduction in Tenant's Pro Rata Share of the Tax Bill then due to Landlord.

8   **8.5.     Contest.**

9          In the event Tenant and tenants occupying at least fifty percent (50%) of the Leasable Floor
10  Area of the Shopping Center request that Landlord contest Taxes, Landlord shall contest the validity
11  or amount of Taxes in the Tax Bill as are permitted by law. Landlord shall provide Tenant with
12  government notices of assessment (or reassessment) in time sufficient to reasonably permit Tenant,
13  to cause Landlord, to make contest; and if Landlord fails to do so, then there shall be excluded from
14  the Tax Bill, any increased Taxes resulting from such assessment (or reassessment). Landlord shall
15  notify Tenant immediately upon Landlord's filing of any contest, provided that Landlord's failure to
16  so notify Tenant shall not be a default by Landlord hereunder unless Landlord fails to notify Tenant
17  in writing of Landlord's election to contest or not to contest the Taxes within ten (10) days of
18  Tenant's written request for confirmation of such election. The term "contest" as used in this
19  Section 8.5, means contest, appeal, abatement or other proceeding prescribed by applicable law to
20  obtain a tax reduction or tax refund, howsoever denominated. The net benefit of any contest, after
21  the payment of expenses thereof, shall inure to the benefit of Tenant and all other occupants of the
22  parcel(s) included in the Tax Bill in the same proportions as their respective obligations for Taxes to
23  which the contest relates.

24  **8.6.     Intentionally Deleted.**

25                                **9.   INSURANCE**

26  **9.1.     Property Insurance.**

27          **9.1.1.**     Special Form Policy.  A policy of fire and Property Insurance in the form of the
28  Insurance Services Offices' ISO Property form 1030 - Causes of Loss Special Form or equivalent
29  ("Special Form Policy").   The term "Property Insurance" means insurance covering damage to
30  tangible real and personal property.

31          **9.1.2.**     Landlord Insurance.  Commencing on the Delivery Date, as defined in Article 2
32  hereof, and at all times during the Term, Landlord shall maintain a Special Form Policy insuring
33  against damage to Landlord's Parcel, including Tenant's leasehold improvements and alterations in
34  the Store, but excluding Tenant's trade fixtures, trade equipment and other personal property in the
35  Store.  Further, upon completion of construction of Landlord's Parcel (exclusive of pads, Outparcels
36  and any phase of development to be completed at a later date) the Special Form Policy shall be
37  obtained with an owner's rating for Landlord's Parcel based upon a completed project as opposed to

a property under development.  All Special Form Policy(ies) shall be in the amount of the full replacement cost of the insured improvements, including demolition cost less a deductible of not less than Ten Thousand Dollars ($10,000).  Landlord shall, on the Delivery Date and thereafter upon request of Tenant, provide Tenant with a certificate of such insurance coverage from an insurer authorized to do business within the state in which the Store is located, and which insurer is rated at least A- and X in Best's Insurance Reports, or equivalent.

**9.1.3.**    Intentionally Deleted.

**9.1.4.**    Tenant's Pro Rata Share.

(a)    Tenant shall be responsible to reimburse Landlord for Tenant's Pro Rata Share of the premium for the Special Form Policy described in Section 9.1.1 above, excluding (i) any management or administrative fees, and (ii) terrorism insurance.  Tenant shall pay Tenant's Pro Rata Share within thirty (30) days after Tenant's receipt of the following:  (A) written evidence of Landlord's payment of the insurance premium; and (B) a statement, certified by an authorized agent of Landlord, indicating the total cost of the premium applicable to Landlord's Parcel, accompanied by a copy of the premium billing ("Insurance Bill") and the declaration page from Landlord's policy, together with such further information as Tenant may reasonably require to substantiate the amount of such premium and the manner in which the premium and Tenant's Pro Rata Share thereof have been calculated ("Landlord Special Form Information").  If Landlord covers the Store with a Special Form Policy which includes property other than Landlord's Parcel, Landlord shall provide a breakdown indicating the premium portion allocable to Landlord's Parcel.  Tenant's Pro Rata Share of the Special Form Policy premium shall be that fraction of the total premium the numerator of which is the Leasable Floor Area of the Store and the denominator of which is the Leasable Floor Area of the applicable portion of Landlord's Parcel which includes the Store for which the Insurance Bill was issued by the insurer.  In no event, however, shall the denominator of the fraction stated in the preceding sentence be less than the Minimum Leasable Floor Area as set forth in Section 1.3.2(c).  In no event shall Tenant's payment to Landlord of Tenant's Pro Rata Share of the Special Form Policy premium exceed that amount which Tenant would have paid for the same or comparable coverage for the Store had Tenant reasonably obtained such insurance from its own carrier.  Tenant shall not be responsible for any interest, late charge or other penalty resulting from Landlord's late payment or nonpayment of the Special Form Policy premium.

(b)    In the event Landlord fails to provide the Landlord Special Form Information as required in Section 9.1.4(a) above after twenty (20) days' written notice from Tenant, and after a second (2nd) written five (5) day notice from Tenant, Tenant may obtain the same or comparable insurance coverage and deduct from Rent coming due under this Lease an amount equal to the amount of Tenant's Pro Rata Share of the Special Form Policy premium, which sum shall be repaid to Landlord (less the cost of any insurance Tenant carried before Landlord provided the evidence of coverage) upon Landlord's delivery to Tenant of the Landlord Special Form Information.  Further, if Tenant receives a notice of cancellation of the Special Form Policy or other evidence indicating that Landlord has failed to maintain the Special Form Policy on the Store, Tenant shall not be responsible for reimbursement under Section 9.1.4(a).  In the event Landlord fails to maintain the Special Form Policy on the Store and it is not possible for Tenant to separately insure the Store, Tenant

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 42 -

05/08/15
FINAL

may obtain the Special Form Policy for the entire Landlord's Parcel and deduct all premium amounts related thereto from Rent coming due.

(c)    Landlord or Landlord's agent shall retain full and detailed records of all costs incurred by Landlord for the Special Form Policy. Copies of said records shall be made available to Tenant upon request and Tenant shall have the right to audit all of such records, including the Special Form Policy, upon thirty (30) days' prior notice, with a representative of Tenant's choice. Any overbilling discovered in the course of Tenant's audit shall be refunded to Tenant, together with interest at the Legal Rate, within thirty (30) days of Landlord's receipt of a copy of the audit and Tenant's billing ("Insurance Refund Date"). In the event the overstatement of charges for Tenant's Pro Rata Share of the Special Form Policy premium exceeds three percent (3%) of the sum previously billed to Tenant by Landlord, Landlord shall reimburse Tenant for all reasonable expenses of such audit. In the event Landlord fails to pay Tenant the overbilled amount, together with interest at the Legal Rate and the audit costs, if applicable, by the Insurance Refund Date, Tenant shall have the right to deduct all such amounts from Rent coming due from Tenant until Tenant is fully paid. Landlord shall retain its records regarding all insurance premiums for insurance required to be carried by Landlord under this Lease for a period of at least three (3) years following the final billing for the calendar year in question. At any time during such three (3) year period, Tenant may conduct its audit. The expenses of this audit, when taken together with expenses of the Tenant audits in Sections 7.4.7 and 8.2.5, shall not exceed Three Thousand Five Hundred Dollars ($3,500), with annual increases pursuant to the annual change in the CPI (as defined in Section 7.4.7).

## 9.2.   Liability Insurance.

**9.2.1.**   <u>Tenant</u>. Tenant shall, at its sole cost and expense, commencing on the Delivery Date, and at all times during the Term, keep in force a policy or policies of commercial general liability insurance, or an endorsement on a blanket commercial general liability insurance policy or policies, naming Landlord as an additional insured, as their interests may appear, protecting against (except to the extent caused by the negligence or willful act of Landlord or its agents, contractors, employees or representatives and not waived per Section 9.4 hereof) any and all claims and liabilities arising out of injuries to or the death of any persons in the Store, or for property damage in the Store, in the minimum amount of ONE MILLION DOLLARS ($1,000,000) per occurrence so long as Tenant also carries an excess liability policy in an amount of at least EIGHT MILLION DOLLARS ($8,000,000), the coverage of which includes the Store. Tenant's policy or policies shall contain a cross-liability endorsement, and shall be with an insurer which is rated at least A- and X in Best's Insurance Reports, or equivalent.

**9.2.2.**   <u>Landlord</u>. Landlord shall, subject to Tenant's reimbursement as provided hereafter in this Section 9.2.2, commencing on the Delivery Date, as defined in Article 2 hereof, and at all times during the Term, keep (or cause to be kept) in force a policy or policies of commercial general liability insurance for the Common Areas, or an endorsement on a blanket commercial general liability insurance policy or policies, naming Tenant as an additional insured, protecting against (except to the extent caused by the negligence or willful act of Tenant or its agents, contractors, employees or representatives and not waived per Section 9.4 hereof) any and all claims and liabilities arising out of injuries to or the death of any persons in the Common Area or for property damage in the Common Area, in the minimum amount of FIVE MILLION DOLLARS

1   ($5,000,000) combined single limit for any one occurrence with a deductible not less than Ten
2   Thousand Dollars ($10,000). Said policy or policies shall contain a cross-liability endorsement, and
3   shall be with an insurer which is rated at least A- and X in Best's Insurance Reports, or equivalent.
4   Tenant's Pro Rata Share of Landlord's commercial general liability insurance for the Common Areas
5   shall not exceed the commercially reasonable cost for such insurance for similar shopping centers in
6   the same geographic area as the Shopping Center.

7   **9.3.   Evidence of Insurance.**

8   Landlord and Tenant agree to deliver to the other certificates of insurance evidencing the
9   existence in force of the policies of insurance described in Sections 9.1.1, 9.2.1 and 9.2.2, together
10  with endorsements showing that the parties have been named as additional insureds. Landlord's and
11  Tenant's insurers shall each use reasonable efforts to provide the party designated on the certificate
12  of insurance as the holder thereof, with at least twenty (20) days' prior written notice of cancellation
13  or of a material change to the insurance policy. Landlord's certificate related to Section 9.2.2 shall
14  provide a breakdown of the premium cost related to the Common Area only as distinguished from
15  the buildings and the remainder of Landlord's Parcel.

16  **9.4.   Waiver of Subrogation.**

17  On and after the Delivery Date and throughout the Term, Landlord and Tenant hereby
18  waive and release any and all right to maintain a direct action to recover against the other, including
19  the employees, officers, directors and agents of Landlord and Tenant, for damages and any and all
20  loss (including loss of Rent) to any property located within the Store or the Shopping Center, which
21  damage or loss occurs during a period which is covered or could be covered by a Special Form
22  Policy required under this Lease, and which arises out of the other party's negligence or otherwise
23  tortious acts or omissions, but only to the extent that the cost of repairing such damage or loss is
24  covered by insurance required under this Lease, or would have been covered by insurance proceeds
25  payable under any policy required to be maintained under this Lease, but not so maintained. Each
26  policy of such insurance shall either, (a) contain a waiver of subrogation by the insurer against
27  Tenant and Landlord, as the case may be, or (b) include the name of Landlord or Tenant, as the case
28  may be, as an additional insured, but not as a party to whom any loss shall be made payable. In the
29  event a party is unable to obtain such a waiver, it shall immediately notify the other of this inability.
30  In the absence of such notification, each party shall be deemed to have obtained such waiver of
31  subrogation. Further, Tenant's agreement to indemnify Landlord, and Landlord's agreement to
32  indemnify Tenant under this Lease, are not intended and shall not relieve any insurance carrier of its
33  obligations under policies required to be carried by Tenant or Landlord pursuant to the provisions
34  of this Lease, to the extent such policies cover, or if carried would have covered the matters subject
35  to the parties' respective indemnification obligations; nor shall they supersede any inconsistent
36  agreement of the parties set forth in any other provision of this Lease. This mutual waiver is in
37  addition to any other waiver or release contained in this Lease. The provisions of this Section 9.4
38  shall not apply to Landlord's obligation to repair and replace any portion of the Store and Tenant's
39  merchandise damaged by roof leaks as specified in Section 11.2.1.

1   **9.5.**    **Tenant's Right to Self-Insure.**

2         Notwithstanding anything to the contrary herein contained, provided either the Tenant
3   described in Section 1.2.2 (the "Signatory Tenant") or Ross Stores, Inc., as Guarantor, maintains a
4   net worth of at least FIFTY MILLION DOLLARS ($50,000,000), then the Signatory Tenant shall
5   have the option, either alone or in conjunction with any parent, subsidiaries or affiliates of Signatory
6   Tenant, to maintain self-insurance and/or provide or maintain any insurance required by Signatory
7   Tenant under this Lease under blanket and/or broad form insurance policies maintained by
8   Signatory Tenant or by any such parent, subsidiaries or affiliates of Signatory Tenant, provided the
9   same does not thereby decrease the insurance coverage or limits set forth in this Lease. Any
10   self-insurance shall be deemed to contain all of the terms and conditions applicable to such
11   insurance as required in this Lease, including, without limitation, a full waiver of subrogation. If
12   Signatory Tenant elects to so self-insure, then with respect to any claims which may result from
13   incidents occurring during the Lease Term, such self-insurance obligation shall survive the
14   expiration or earlier termination of this Lease to the same extent as the insurance required would
15   survive.

16                   **10. UTILITIES SERVICES**

17         As of the Delivery Date, Landlord agrees to make available for Tenant's use at the Store all
18   necessary Utilities including electric, water, gas, sewerage, as well as access (but not the system itself)
19   for Tenant's communications and telephone lines, all sufficient to service Tenant's operations, and
20   having no less capacity than specified in the Final Plans (as defined in **Exhibit C**). Notwithstanding the
21   foregoing, Landlord shall not be obligated to provide Tenant with DSL, T-1 cable or Internet or other
22   similar communications lines or audio or video telecommunication lines; however, Landlord shall
23   provide telephone lines. All Utility lines (including sprinkler lines) that run through the Store shall
24   exclusively serve the Store and Landlord shall remove any Utility lines (including sprinkler lines) that
25   run through the Store that do not exclusively serve the Store. Tenant agrees to pay all use charges for
26   all such Utilities provided to the Store commencing on the Delivery Date and throughout the Term. If
27   Landlord or an affiliated company of Landlord provides some or all of such Utility services, Tenant's
28   obligation to pay for such services shall be commercially reasonable rates charged by regional or local
29   Utility providers. At all times during the Term, Tenant shall have the right to contract with any third
30   party of Tenant's choice to provide some or all of the Utility services for the Store. Landlord shall, at
31   Landlord's sole cost and expense, pay for all Utility hookup, connection or impact fees and permits.
32   However, if the Store does not have a separate water meter, Landlord shall provide to Tenant the
33   calculation of Tenant's water usage as prepared by or compiled by the Utility agency which provides
34   water service so as to calculate Tenant's share of the sewer service charges without consideration of the
35   use of water by any other tenant in the Shopping Center. In the event that the Utility agency will not
36   calculate Tenant's share of sewer service charges, Landlord shall be permitted to have the calculation
37   determined by an independent Utility consultant reasonably acceptable to Tenant. Landlord shall
38   separate out all Utilities and install separate meters for the Store. The Utilities shall be registered by
39   Tenant in Tenant's name. In the event that Landlord is unable to install separate meters, Landlord
40   shall install submeters and shall cause each submeter to be read on a monthly basis, billing Tenant for
41   its proper share. Each such bill shall be accompanied by such supporting information as Tenant may
42   reasonably request and shall be payable within thirty (30) days after Tenant's receipt of the bill (with

"Palm Springs"                            - 45 -                        05/08/15
Palm Springs Plaza                                                        FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1    Tenant to have the right to check the submeters at any time).  However, Landlord shall permit Tenant
2    to read each submeter and to bill Landlord an amount equal to the charges not attributable to Tenant,
3    which sum shall be paid by Landlord to Tenant within thirty (30) days after Landlord's receipt of each
4    bill.  No administrative or management charge or fee shall be payable by Tenant related to any Utility
5    charges emanating from a meter used in common by Tenant with any other party.  Further, in the
6    event of a meter-sharing arrangement, Tenant may require that the charges emanating from any
7    common meter be allocated, by a reputable Utility engineer reasonably approved by Tenant, among the
8    common users thereof in accordance with usage.  Neither party shall have the right to charge the other
9    party any administrative, service or other fee in connection with the reading of the submeters.  Tenant
10   shall be entitled to collect, and Landlord shall cooperate with Tenant in collecting, any rebate which is
11   made available by a Utility company for the installation of energy efficient lighting.  All Utilities serving
12   the Common Areas shall be separately metered.  Landlord represents and warrants to Tenant that no
13   Utility lines run under Tenant's loading docks.

14        **11.  MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE**

15   **11.1.    Maintenance and Repair by Tenant.**

16        Except for Landlord's interior maintenance obligations under Section 11.2, and subject to
17   the terms of Articles 21 and 22, Tenant shall maintain the plate glass, all exterior doors, all wiring
18   and plumbing inside the Store and concealed in the exterior walls and interior walls of the Store,
19   including sprinkler heads, and the fire detection monitoring panel and the regular testing and
20   inspection thereof, and the interior of the Store (except for Landlord's interior and systems
21   maintenance obligations under Section 11.2 hereof).  Tenant shall, at its expense, perform or cause
22   to be performed all routine maintenance and servicing of the heating, ventilating, and air
23   conditioning system serving the Store (the "HVAC") in accordance with the terms of a customary
24   air conditioning service contract as performed by reputable service companies in the state in which
25   the Shopping Center is located.  Neither party shall be responsible for replacing the HVAC.  A
26   "replacement," as that term is used in this Section 11.1, shall mean that the compressor, condenser,
27   motors, the chiller, duct work or heating/cooling coils must be removed and replaced by new
28   equipment, in the reasonable judgment of Tenant's HVAC consultant (it being understood that
29   neither Tenant nor Landlord has an obligation to replace the HVAC).  Tenant's obligations above
30   are contingent upon receipt by Tenant prior to the Commencement Date of a valid assignment, in
31   form satisfactory to Tenant's counsel, of all warranties (if any) which are available from
32   subcontractors, suppliers, manufacturers, and materialmen for construction of that portion of the
33   Store which is part of Landlord's Work, but which will be Tenant's maintenance responsibility under
34   this Section 11.1.

35   **11.2.    Maintenance and Repair by Landlord.**

36        **11.2.1.    (a)    Landlord's Obligations.**  Landlord shall, at its sole cost and expense (not
37   passed through to Tenant as a Common Area Charge), be responsible for correcting all defects in
38   Landlord's (or Landlord's contractor's) construction of the Store.  Further, Landlord, at Landlord's
39   sole cost and expense (not passed through to Tenant as a Common Area Charge) shall maintain,
40   repair and replace, in good and sightly condition consistent with comparable shopping centers in the

1   county in which the Store is located, the foundation, floor slab [including maintaining moisture
2   vapor emissions at or below five (5) pounds per one thousand (1,000) square feet per twenty-four
3   (24) hours using the calcium chloride method], flooring (including flooring damaged by moisture
4   vapor emissions or subterranean water infiltration but excluding maintenance, repair and
5   replacement required due to Tenant's ordinary wear and tear or other damage caused by Tenant),
6   roof (including all structural elements and waterproofing membrane), roofing (including the interior
7   ceiling, walls, floors, fixtures and merchandise damaged from leaking, provided that Landlord was
8   notified by Tenant of the need for roof repairs of which Tenant had actual knowledge, which notice
9   may be verbal in the event of an emergency such as water leaking into the interior of the Store, and
10  Landlord failed to commence the repairs within twenty-four (24) hours of receipt of notice of the
11  need for such repairs or failed to complete such repairs in a commercially reasonable manner and
12  timeframe), roof drainage system, including gutters and downspouts, exterior walls (including any
13  wallpack or other lighting fixtures located thereon unless installed by Tenant), storefront (including
14  the canopy, but excluding plate glass and exterior doors), all structural portions of the Store,
15  sprinkler system (excluding interior Utility lines and sprinkler heads and the fire detection
16  monitoring panel and the regular testing and inspection thereof), and Landlord shall maintain and
17  repair all wiring, plumbing, pipes, conduits and Utility systems and lines outside the Store, whether
18  exclusively serving the Store or not, as well as all portions of the Store which are not specifically
19  Tenant's obligation under Section 11.1 above. Landlord shall not be required to deliver any HVAC
20  equipment for use in the Store either prior to or during the Term of this Lease.

21              (b)   Notice for Repair.   Tenant may give Landlord notice of the need for
22  those repairs as may be required under the terms of Section 11.2.1(a) above, and Landlord shall
23  proceed forthwith to effect the same with reasonable diligence, but in no event later than thirty (30)
24  days after having received notice. If Landlord fails to repair or maintain the Store within the thirty
25  (30) day period imposed herein, or such additional reasonable time as shall be required, provided
26  that Landlord has commenced cure within the thirty (30) day period and is diligently prosecuting
27  such cure to completion (which additional reasonable time shall not in any event exceed sixty (60)
28  days) then, provided Tenant notifies Landlord in writing and Landlord still does not repair same
29  within ten (10) days of Tenant's notice, Tenant may perform the repairs, maintenance or
30  replacements and deduct the cost thereof from the subsequent Rent payment(s) next coming due if
31  not paid within thirty (30) days after receipt of billing therefor from Tenant.   In the event of an
32  emergency, Tenant may undertake immediate repairs (without the need for advance notice) which
33  are Landlord's responsibility. Tenant shall notify Landlord as soon as reasonably practicable under
34  the circumstances.   If Landlord shall fail to reimburse Tenant for the cost of an emergency repair
35  within thirty (30) days after receipt of billing therefor from Tenant, Tenant may deduct the cost
36  from the subsequent installments of Rent payment(s) thereafter coming due.

37          11.2.2.   Earth Movement.   Landlord agrees that any maintenance, repairs, alterations or
38  replacements that shall be required at any time on or after the Delivery Date and during the Term of
39  this Lease as a result of movement of the Store such as settling, or as the result of settling of the
40  Common Areas, shall be without charge to Tenant whether directly or through Reimbursements.

41          11.2.3.   Shopping Center Maintenance.   Landlord shall, at no cost or expense to Tenant,
42  maintain and repair (or cause to be maintained and repaired) all buildings within the Shopping

1   Center in good condition, consistent with the standards for comparable shopping centers in the
2   county in which the Shopping Center is located.

3   **11.3.**   **Repairs Required by Governmental Authorities.**

4       **11.3.1.**   <u>Store</u>.  After completion of Landlord's Construction Obligations, any repairs,
5   alterations or other improvements to the Store required by governmental authority or insurance
6   rating bureau having jurisdiction shall be performed by Tenant at its sole cost and expense. Any
7   such work, however, which is required to the Shopping Center in general, other than for tenants or
8   occupants obligated similarly to Tenant, or to all similar buildings or uses in the area of the
9   Shopping Center, shall be done at the sole cost and expense of Landlord.

10       **11.3.2.**   <u>Shopping Center</u>.  Landlord covenants that the construction and the proposed
11   use of the Shopping Center's Common Areas and buildings, including the Store, for retail and office
12   purposes shall comply with all laws, ordinances, regulations and standards of public authorities and
13   insurance rating bureaus having jurisdiction, including, without limitation, Environmental
14   Regulations, as hereinafter defined, and zoning and building codes as of the Delivery Date (all of the
15   foregoing being hereinafter collectively referred to as the "Requirements").

16       **11.3.3.**   <u>Non-Compliance</u>.  Landlord agrees that if, at any time on or after the Delivery
17   Date, any governmental authorities or insurance rating bureau having jurisdiction shall determine
18   that Landlord's Work to the Store or that Landlord's Parcel was constructed, or is being operated, in
19   violation of, any Requirement and shall request compliance, with any Requirement or, absent such a
20   request from the governmental authority, if the Store or Landlord's Parcel is otherwise not in
21   compliance with or is in violation of any Requirement (and provided the violation is not due to
22   Tenant's Work), and if failure to comply shall in any way adversely affect the use of the Store by
23   Tenant or adversely affect any other rights of Tenant under this Lease or impose any obligation
24   upon Tenant not contained in this Lease or shall increase the obligation of Tenant (such as, by way
25   of example, increased insurance costs), Landlord shall, upon receipt of notice thereof, at Landlord's
26   sole cost and expense, cause such repairs, alterations or other work to be done or action to be taken
27   so as to bring about the compliance, or to effect the Requirement requested.  If by reason of such
28   failure of compliance or by reason of such repairs, alterations or other work done by Landlord,
29   Tenant shall be deprived of the use or enjoyment of the whole or any material part of the Store or
30   the Common Areas, Rent shall abate and in lieu thereof Tenant shall pay Substitute Rent on a per
31   diem basis until compliance with the Requirement is completed.

32       **11.3.4.**   <u>Zoning</u>.  If, from and after the Delivery Date, the applicable zoning shall not
33   permit the retail sale of apparel, soft goods, and merchandise customarily sold in Tenant's Florida
34   stores, Tenant may, without waiving any other rights Tenant may have on account thereof,
35   terminate this Lease by giving notice thereof to Landlord.

36   **11.4.**   **Hazardous Material.**

37       **11.4.1.**   <u>Definition</u>.  As used herein, the term "Hazardous Material" or "Hazardous
38   Materials" shall mean (a) any waste, material or substance (whether in the form of a liquid, a solid, or
39   a gas and whether or not air-borne), which is or is deemed by governmental authority to be a

"Palm Springs"                       - 48 -                       05/08/15
Palm Springs Plaza                                              FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1  pollutant or a contaminant, or which is or is deemed by governmental authority to be hazardous,
2  toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or which presents a risk, to
3  public health or to the environment, or which is or may become regulated by or under the authority
4  of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes
5  or other governmental restrictions, guidelines or requirements, any amendments or successor(s)
6  thereto, replacements thereof or publications promulgated pursuant thereto ("Environmental
7  Regulations"); (b) petroleum, including crude oil or any fraction thereof; (c) any asbestos or asbestos
8  containing material ("ACM"); (d) any polychlorinated biphenyl; (e) any radioactive material;
9  (f) radon gas; (g) urea formaldehyde; and (h) mold.  Hazardous Materials shall not include the
10 foregoing materials to the extent such materials are in compliance with Environmental Regulations
11 and do not require monitoring by applicable governmental authorities.  Notwithstanding the
12 preceding sentence, ACM, lead paint and mold shall constitute Hazardous Materials regardless of the
13 condition and regardless of whether such ACM and/or lead paint and/or mold is/are at levels in
14 compliance with Environmental Regulations.  Notwithstanding the preceding sentence, Landlord's
15 representations, covenants and obligations in Section 11.4 with respect to mold shall only apply to
16 mold caused by Landlord or Landlord's agents or by any third party or from sources exterior to the
17 Store such as mold arising from water leakage from the exterior of the Store into the Store as
18 opposed to mold that is naturally occurring in the environment.  Tenant shall be responsible to
19 remediate or remove mold caused by Tenant or Tenant's agents or from sources inside the Store
20 (unless caused by Landlord, Landlord's agents or third parties).

21     **11.4.2.**    Landlord's Warranties and Representations.  Landlord expressly represents and
22 warrants that:

23                    (a)         To Landlord's actual knowledge, and except as set forth in (i) that
24 certain Phase I Environmental Site Assessment Report dated January 2, 2006, and prepared by EBI
25 Consulting, and (ii) that certain Regulated Materials Survey dated November 7, 2014, by the Vertex
26 Companies, Inc. ("Environmental Reports"), no escape, seepage, leakage, spillage, discharge, emission,
27 release or disposal of Hazardous Material has occurred within the Store to date, and the Store, as well
28 as the soil, groundwater and soil vapor within or under the Store, are free of Hazardous Material in
29 violation of applicable Environmental Regulations as of the Effective Date, and will be free of
30 Hazardous Material as of the Delivery Date and throughout the Lease Term.

31                    (b)         Landlord shall not use or knowingly permit any Hazardous Materials to
32 be used in violation of applicable Environmental Regulations in the construction of the Store or in
33 connection with the installation of any Utility system or other facility which serves the Store including
34 by way of example, but not by limitation, the interior of any partition or demising walls, whether
35 structural or otherwise, columns or beams, and all Utility lines, shafts and ducts, HVAC or other
36 equipment.  Such Utility systems and other facilities as hereinabove described, whether located in (i)
37 the Store, or (ii) other portions of the Building or the Shopping Center that would have a material
38 impact on Tenant, shall be collectively referred to as "Support Systems."

39     **11.4.3.**    Landlord's Responsibilities Prior to the Delivery Date to Tenant.  Tenant
40 acknowledges the receipt of the Environmental Reports.  If, prior to the Delivery Date, Hazardous
41 Materials are found to be present in violation of applicable Environmental Regulations in the Store
42 or the Support Systems, then Landlord, at its sole cost and expense, shall cause such Hazardous

1  Materials to be removed from the Store in accordance with recognized industry standards
2  (hereinafter referred to as the "Abatement Work"), and Landlord shall complete such removal prior
3  to the Delivery Date.  Upon completion of the Abatement Work, Landlord shall furnish Tenant
4  evidence of such removal of the Hazardous Material, including copies of the final inspection report
5  together with a clearance certificate or other document of release or approval from any applicable
6  governmental authority as aforesaid ("Clearance Certificate"), if applicable.

7  **11.4.4.**  Landlord's Responsibilities After the Delivery Date.  If Hazardous Materials are
8  found to be present in violation of applicable Environmental Regulations in the Store at any time
9  after delivery of possession of the Store to Tenant, then Tenant shall have the right to vacate the
10  Store, at which time all Rent shall abate, unless the Hazardous Materials were introduced by Tenant,
11  its agents, employees or contractors. Landlord shall, at its sole cost and expense, complete such
12  Abatement Work in accordance with applicable Environmental Regulations as soon as practicable
13  after the discovery of such Hazardous Materials. Upon completion of the Abatement Work,
14  Landlord shall furnish Tenant with a copy of the Clearance Certificate, if applicable. During such
15  Abatement Work, Tenant's fixturization or construction period, if applicable (as provided for
16  elsewhere in this Lease), shall be tolled until the Abatement Work is complete and a Clearance
17  Certificate, if applicable, or a final report documenting the Abatement Work from a licensed
18  environmental consultant reasonably acceptable to Tenant is issued.  In the event Landlord is
19  required to undertake Abatement Work, it is understood and agreed that Landlord shall be
20  responsible for the cost of the replacement of all of Tenant's improvements and alterations damaged
21  or destroyed as a result of such Abatement Work. If Tenant is required to undertake Abatement
22  Work because the Hazardous Materials were introduced by Tenant, Tenant shall be responsible for
23  the costs associated with the Abatement Work and any necessary repairs and replacement of the
24  Store.

25  **11.4.5.**  Tenant's Rights.

26  (a)  Tenant's Awareness of Hazardous Materials.  If, at any time, Tenant
27  becomes aware of the presence of Hazardous Materials in the Store in violation of applicable
28  Environmental Regulations, Tenant may give Landlord written notice to remove and/or abate same
29  and to restore (i) the Store,  and/or (ii) the Support Systems and/or Landlord's Parcel (to the extent
30  that there is a material impact on Tenant's operations in the Store) to a condition which is free of
31  Hazardous Materials in violation of applicable Environmental Regulations, unless the presence of such
32  Hazardous Materials was a result of the acts of Tenant, its employees, agents, contractors or Invitees.
33  Landlord shall complete the Abatement Work within sixty (60) days following receipt of written notice
34  from Tenant; provided, however, if the nature of the Abatement Work is such that it cannot
35  reasonably be completed within sixty (60) days, Landlord shall have such additional time as may be
36  reasonably required to complete the Abatement Work, provided Landlord promptly commences the
37  Abatement Work following receipt of notice from Tenant and thereafter completes the Abatement
38  Work with diligence and continuity.  Notwithstanding the foregoing, if Landlord has not completed
39  the Abatement Work within ninety (90) days following receipt of written notice from Tenant, Tenant
40  may either (i) terminate this Lease upon thirty (30) days' written notice to Landlord, or (ii) undertake all
41  necessary Abatement Work, including the hiring of any contractors and experts Tenant reasonably
42  deems necessary to effect and supervise the Abatement Work.

1        (b)    <u>Claim Against Landlord</u>.  If Tenant effects Abatement Work, Tenant
2    shall be entitled to claim from Landlord all reasonable costs and expenses associated therewith,
3    including, but not limited to, (i) the Abatement Work, (ii) disposal of Hazardous Materials, (iii) air
4    quality and materials testing, (iv) related consultants' and experts' fees, and (v) fines, fees or costs of any
5    nature whatsoever charged or assessed by any governmental authority or agency regulating and/or
6    supervising such Abatement Work and/or disposal of Hazardous Materials.

7        (c)    <u>Reimbursement of Tenant</u>.  Landlord shall promptly reimburse Tenant
8    for Tenant's costs and expenses incurred pursuant to Section 11.4.5(b) above within thirty (30) days
9    after Landlord's receipt of copies of Tenant's paid invoices or documentation. In addition to any other
10   remedy which Tenant may have under this Lease, at law or in equity, in the event of Landlord's breach
11   of any of the provisions of this Section 11.4, Tenant shall be entitled (i) to deduct from Rent payable to
12   Landlord hereunder all consequential damages (including lost profits), expenses, costs, fees and fines
13   incurred by it as a result of such breach, and (ii) to extend the Term hereof by a period equal to the
14   time elapsed from the date of Tenant's initial notice to Landlord to the date that the Abatement Work
15   is completed, and during such period, all Rent and other charges payable hereunder shall abate.

16      **11.4.6.**   <u>Landlord's Indemnity</u>.  Excepting Hazardous Materials existing solely as a result
17   of the acts of Tenant or Tenant's agents, employees, contractors or Invitees, Landlord hereby
18   indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and
19   assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines,
20   costs, expenses and claims of any and every kind whatsoever, including, without limitation,
21   attorneys' and consultants' fees and costs, and the costs of cleanup, remediation, Abatement Work,
22   paid, incurred or suffered by, or asserted against, Tenant and/or its successors and/or assigns as a
23   result of any claim, demand or judicial or administrative action by any person or entity (including
24   governmental or private entities) for, with respect to, or as a direct or indirect result of, the presence
25   on or under, or the escape, seepage, leakage, spillage, discharge, emission, release or disposal on,
26   under or from the Shopping Center or the improvements thereon of any Hazardous Material in
27   violation of applicable Environmental Regulations, or the breach of any Environmental Regulations
28   to which Landlord or any portion of the Shopping Center is subject.  Landlord shall be solely
29   responsible for and shall comply with all laws, rules, ordinances or regulations of any governmental
30   authority having jurisdiction over the Store and the Shopping Center with respect to the presence or
31   removal of Hazardous Materials, unless the presence of such Hazardous Materials is the result of the
32   acts of Tenant or Tenant's agents, employees, contractors or Invitees.

33      **11.4.7.**   <u>Tenant's Indemnity</u>.  Tenant hereby indemnifies Landlord and its successors and
34   assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any
35   and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and
36   every kind whatsoever, including, without limitation, attorneys' and consultants' fees and costs, and
37   the costs of cleanup, remediation, Abatement Work, paid, incurred or suffered by, or asserted
38   against, Landlord and/or its successors and/or assigns as a result of any claim, demand or judicial or
39   administrative action by any person or entity (including governmental or private entities) for, with
40   respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage,
41   leakage, spillage, discharge, emission, release or disposal on, under or from the Store of any
42   Hazardous Material in violation of Environmental Regulations, or the breach of any Environmental
43   Regulations to which Tenant or any portion of the Store is subject which are solely the result of the

"Palm Springs"                    - 51 -                      05/08/15
Palm Springs Plaza                                                    FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1    acts of Tenant or Tenant's agents, employees, contractors or Invitees.  Tenant shall not cause any
2    Hazardous Materials to be released or discharged on, under or from the Store in violation of
3    Environmental Regulations.  If Tenant causes any Hazardous Materials to be released or discharged
4    on, under or from the Store in violation of Environmental Regulations, Tenant shall promptly
5    perform all required Abatement Work and after completion of the Abatement Work shall furnish
6    Landlord with a Clearance Certificate.  Landlord shall be entitled to claim from Tenant all actual
7    damages (excluding lost profits and punitive damages) arising out of Tenant's breach of any of the
8    provisions of this Section 11.4.  Furthermore, if Landlord effects Abatement Work on Tenant's
9    behalf, Landlord shall be entitled to claim from Tenant all costs and expenses associated therewith,
10   including, but not limited to, (i) the Abatement Work, (ii) disposal of Hazardous Materials, (iii) air
11   quality and materials testing, (iv) related consultants' and experts' fees, and (v) fines, fees or costs of
12   any nature whatsoever charged or assessed by any governmental authority or agency regulating
13   and/or supervising such Abatement Work and/or disposal of Hazardous Materials.

14        **11.4.8.**    Survival.    The representations, warranties and indemnities contained in this
15   Article 11 shall survive the termination of this Lease.

16        **11.4.9.**    Radon.    Radon is a naturally occurring radioactive gas that, when it has
17   accumulated in a building in sufficient quantities, may present health risks to persons who are
18   exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in
19   buildings in Florida. Additional information regarding radon and radon testing may be obtained
20   from your county public health unit.

21                                **12. ALTERATIONS**

22   **12.1.    Permitted Alterations.**

23        **12.1.1.**    Tenant may make non-structural alterations or improvements to the interior of
24   the Store, and signage on the exterior of the Store and its signage on the Shopping Center pylon,
25   provided Tenant shall make all such alterations or improvements in a good and workmanlike
26   manner, and in conformity with all laws, ordinances and regulations of public authorities having
27   jurisdiction.  Tenant may, in connection with any non-structural alterations or improvements to the
28   interior of the Store install roll down security shutters that are QMI Security Solutions surface
29   mounted interior "Safestore" manual/spring operated shutters with AL5-E slates in a "Punch Style
30   51" pattern or the like.  Tenant shall not make any alterations to the foundation, roof, or any
31   structural portions of the Store without first obtaining the written approval of Landlord, except as
32   specified in Section 12.2.    Such approval by Landlord may not be unreasonably withheld,
33   conditioned or delayed.  Any disapproval shall be supported by a written statement of reasons and
34   suggested revisions to the proposed work that, if incorporated by Tenant, shall constitute the plans
35   as approved without further review by Landlord.  Subject to Section 12.1.2 following, all alterations
36   and improvements made to the Store by Landlord or Tenant (other than Store furniture, trade
37   fixtures, equipment and personal property installed by Tenant), shall, at the end of the Term,
38   become Landlord's property, and, at the end of the Term, shall remain in the Store without
39   compensation to Tenant, unless otherwise stated in this Lease to the contrary.  Following the
40   completion of any such alterations, and upon Landlord's written request, Tenant shall furnish "as

1  built" plans showing such alterations, in detailed AutoCad v.14 or above if same have been
2  generated by Tenant and are available.

3  **12.1.2.**  It is further agreed that upon termination of this Lease, Tenant may remove its
4  furniture, fixtures, equipment and personal property, and Landlord will accept the Store, with all
5  alterations made by Tenant, without any obligation upon Tenant to restore the Store to its former
6  condition, provided, however, Tenant shall repair any damage caused by any removal of Tenant's
7  fixtures and equipment.

8  **12.1.3.**  All Tenant alterations shall be subject to the following:

9  (a)  Cost of Tenant's Alterations.  Tenant's alterations shall be performed by
10  Tenant at Tenant's sole cost and expense.

11  (b)  Compliance.  Tenant will perform all Tenant's alterations with
12  reasonable dispatch, using only new materials and supplies, in a good and workmanlike manner in
13  accordance with Tenant's plans and with all Legal Requirements and any and all approvals, permits,
14  licenses or consents required by any ordinance, law or public regulations or by any authority at any
15  time having jurisdiction and in accordance with the requirements of any public or quasi-public body
16  having similar jurisdiction. Tenant warrants that Tenant's alterations, when completed, will comply
17  with all Legal Requirements, and that the Shopping Center shall not violate any Legal Requirements as
18  a result of Tenant's alterations.

19  (c)  Insurance.  During the course of Tenant's alterations, Tenant (an all of its
20  contractors and subcontractors) will carry or cause to be carried adequate Worker's Compensation
21  Insurance, Builders Risk, Comprehensive General Liability and such other insurance as may be
22  required by law to be carried by Landlord or Tenant or required by Article 9 hereof in connection with
23  such construction, and such insurance (except the Worker's Compensation Insurance) shall name
24  Landlord, Landlord's managing agent, and all mortgagees and ground lessors and such other parties as
25  Landlord shall designate as additional insureds.

26  (d)  Non-Interference. All of Tenant's alterations shall be done in such a
27  manner so as not to interfere with, delay, or impose any expense upon Landlord in the maintenance of
28  the Shopping Center; nor to physically affect any part of the Shopping Center outside the interior of
29  the Store; nor impair the structural integrity of any building nor affect the proper functioning of any of
30  the mechanical, electrical, HVAC, plumbing, sanitary or other systems of the Shopping Center. In
31  addition, Tenant agrees that all of Tenant's Work shall be performed in a manner which will not create
32  any work stoppage, labor disruption or dispute or violate Landlord's union contracts (if any) affecting
33  the Shopping Center, nor will it interfere with the business of Landlord, or with any other tenant or
34  occupant of the Shopping Center.

35  (e)  Permits.  No Tenant's alterations shall be undertaken until Tenant shall
36  have procured and paid for, so far as the same may be required from time to time, all permits and
37  authorizations of all municipal departments and governmental subdivisions having jurisdiction.

1   **12.2.   Communication Equipment.**

2   **12.2.1.**   At any time subsequent to the Delivery Date, Tenant shall have the right to place
3   upon the Store one or more so-called "satellite dish(es)" or other similar device(s) and to replace,
4   remove, and repair any such device(s), such as antenna, for the purpose of receiving and sending
5   radio, television, computer, telephone, or other communication signals (collectively, the
6   "Communication Equipment"). Any such installation shall be in accordance with plans and
7   specifications previously approved by Landlord and shall comply with applicable laws and codes.
8   Such equipment shall be installed in a location or locations reasonably approved by Landlord and/or
9   substantially shielded from visibility from the principal frontages of the Shopping Center. Tenant
10  shall be responsible for any damage to the Store caused by installing, removing, replacing, or
11  repairing any such device(s). The use of the Communication Equipment shall comply with
12  applicable statutes and rules of the Federal Communications Commission or successor agency.
13  Tenant shall install the Communication Equipment in such manner as not to cause any water
14  intrusion or other damage to the Store or the roof. Tenant shall use Landlord's roofing contractor
15  for any such installations and assure that any roof warranty shall not be rendered invalid. Tenant
16  shall be responsible to assure that the Communication Equipment shall be secured or removed prior
17  to any windstorm so as not to pose a threat to the Shopping Center or its occupants.

18  **12.2.2.**   In the event Landlord desires to perform non-emergency roof repairs and/or
19  roof replacements to the Store and/or the Building or its rooftop equipment in which the Store is
20  located (the "Roof Repairs"), Landlord shall give Tenant at least fifteen (15) days' prior written
21  notice of the date Landlord intends to commence such non-emergency Roof Repairs. Tenant shall,
22  within fifteen (15) days following receipt of notice of such repairs from Landlord, undertake such
23  measures as it deems suitable to protect its Communication Equipment from interference by
24  Landlord, its agents, contractors or employees, in the course of any Roof Repairs. Nothing herein
25  shall relieve Landlord of its obligation not to cause any interference with, or damage to, the
26  Communication Equipment, and Landlord shall remain fully responsible for any loss, cost, or claim
27  resulting from any damage to any part of the Communication Equipment arising as a result of the
28  Roof Repairs. Notwithstanding the foregoing, in the event of an emergency, Landlord shall only be
29  required to give such notice as is reasonable under the emergency circumstances. Notwithstanding the
30  foregoing, Landlord has the right to perform roof inspections and to perform minor roof repairs
31  and maintenance without prior notice to Tenant, provided that Landlord does not interfere with or
32  disrupt Tenant's and Tenant's Invitees use of the Store.

33                **13. NON-DISTURBANCE AND SUBORDINATION/**
34                     **ESTOPPEL CERTIFICATES**

35  **13.1.   Non-Disturbance and Subordination.**

36  **13.1.1.**   <u>Existing Loans/Master Lease(s)</u>. Landlord covenants to obtain from each lender
37  whose loan is secured by the Store or Landlord's Parcel, an executed agreement ("Non-Disturbance
38  Agreement"), in the form set forth in **Exhibit F**, with such reasonable modifications thereto as are
39  agreed to by Tenant and such lender. Any such Non-Disturbance Agreement shall be fully executed
40  by such lender, or Landlord and the Overlessor, as applicable, and shall be delivered to Tenant

concurrent with Landlord's execution and delivery of this Lease to Tenant. If Landlord breaches its obligation(s) hereunder, or if the lender will not execute a Non-Disturbance Agreement in the form set forth in **Exhibit F** (with such reasonable modifications thereto as are agreed to by Tenant and such lender), Tenant may terminate this Lease by written notice to Landlord at any time prior to Tenant's receipt of all required Non-Disturbance Agreements, or if Tenant has not terminated this Lease, Rent shall abate pending delivery of said Non-Disturbance Agreements. In the event that this Lease terminates pursuant to this Section 13.1.1, then Landlord shall reimburse Tenant for the cost of its Construction Drawings, not to exceed Thirty Thousand Dollars ($30,000), within thirty (30) days of the termination date. Landlord represents to Tenant that there is no Overlessor as of the Effective Date. If Landlord executes and delivers to Landlord's lender an assignment of leases and rents or other similar document conveying the Rent under the Lease upon an event of default by Landlord under the Mortgage, after Tenant's receipt of notice from such lender, that Rents under the Lease shall be paid to such lender, Tenant shall thereafter pay to such lender all monies thereafter due to Landlord under the Lease in accordance with the terms of this Lease. Landlord agrees that in such event, Tenant shall be entitled to rely solely upon the notice from Landlord's lender and Landlord acknowledges and agrees that Tenant shall be entitled to full credit under the Lease for any Rents paid to such lender in accordance with this provision. Any dispute between Landlord and Landlord's lender as to the existence of a default by Landlord under the Mortgage shall be dealt with and adjusted solely between lender and Landlord, and Tenant shall not be made a party thereto.

   **13.1.2.** _Future Loans_.  Tenant shall, within twenty (20) Business Days after Tenant's receipt of Landlord's request, subordinate this Lease in the future to any first mortgage or deed of trust placed by Landlord upon the Store, or the Shopping Center or Building of which the Store forms a part, with an insurance company, bank or any other lender which customarily provides financing for shopping centers, provided that such lender executes a Non-Disturbance Agreement substantially in the form set forth in **Exhibit F**, with such reasonable modifications thereto as are agreed to by Tenant and such lender.

**13.2.   Estoppel Certificates.**

   Within twenty (20) Business Days after the last to occur of (a) receipt of request therefor, and, if the request is made by Landlord (b) receipt by Tenant of the fee described in Section 13.3 below, either party shall deliver to the other a written statement acknowledging (i) the Commencement Date and termination date of this Lease, (ii) that this Lease is in full force and effect (if true), (iii) that this Lease has not been modified (or if it has, stating the date of such modifications), and (iv) any such other pertinent information which is customary to supply to such a requesting party for purposes of financing or sale (in the case of Landlord's request) or financing, assignment or sublease, or sale (in the case of Tenant's request). Landlord may exercise its right hereunder only in connection with a proposed sale, financing or refinancing of the Shopping Center plus another one (1) each calendar year, and Tenant may exercise its right hereunder only in connection with a proposed assignment or subletting of the Store, or a financing of its furniture, fixtures, equipment or personal property.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7                              - 55 -                              05/08/15
                                                                                 FINAL

**13.3.    Processing Fees for Non-Disturbance Agreements and Estoppel Certificates.**

At the time of the second request within any two (2) year period for a Non-Disturbance Agreement under Section 13.1.2 or the second request for an Estoppel Certificate under Section 13.2 during the Term, the requesting party shall pay the other, or defray the expenses of processing, the sum of Seven Hundred Fifty Dollars ($750) for each such Non-Disturbance Agreement or Estoppel Certificate.

# 14.  INDEMNIFICATION

**14.1.    Tenant Indemnity.**

Tenant agrees to hold Landlord harmless from and indemnify and defend Landlord against any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of whatever nature, to any person or property caused or claimed to be caused by or resulting from any occurrence within the Store or the Shopping Center on and after the Delivery Date and during the Term resulting from the negligent or willful act or omission of Tenant, or Tenant's employees, agents or contractors, provided nothing contained herein shall require Tenant to indemnify Landlord against matters resulting solely from the negligence or willful acts or omissions of Landlord or Landlord's employees, agents, or contractors, except to the extent Tenant has waived a claim against Landlord pursuant to Section 9.4 hereof.

**14.2.    Landlord Indemnity.**

Landlord agrees to hold Tenant harmless from and indemnify and defend Tenant against any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of whatever nature, to any person or property caused or claimed to be caused by or resulting from any occurrence within the Common Area, or any portion of the Shopping Center (including the Store), on and after the Effective Date of this Lease, provided nothing contained herein shall require Landlord to indemnify Tenant against matters resulting solely from the negligence or willful acts or omissions of Tenant or Tenant's employees, agents or contractors, except to the extent Landlord has waived a claim against Tenant pursuant to Section 9.4 hereof.

# 15.  USE

**15.1.    Tenant's Business.**

Tenant's intended use of the Store shall be as a full line department store including, at its option, the sale of soft goods merchandise, including men's, women's and children's apparel, shoes, accessories, such as jewelry and cosmetics, health and beauty aids and related sundries, domestics and linens, housewares, art, pictures, posters, frames, artificial flora, office supplies, sporting goods, furniture and lamps, window and floor coverings, electronics, prerecorded audio and video

1    merchandise and electronic games software and technological evolutions thereof, books, toys, party
2    goods, pet supplies, luggage, packaged foods (including ground and whole bean coffee and packaged
3    teas and tea leaves), and such other items as are sold in Tenant's similarly merchandised stores,
4    subject to the Exclusive Uses set forth in **Exhibit H** and the Shopping Center Prohibited Uses set
5    forth in **Exhibit D**.  With respect to the Exclusive Use in favor of Ross Dress For Less, Inc. set
6    forth on **Exhibit H**, attached hereto as **Exhibit H-1** is a waiver of said Exclusive Use in connection
7    with this Lease.

8    **15.2.   Operation.**

9       Notwithstanding any provision in this Lease to the contrary, it is expressly acknowledged by
10   Landlord that this Lease contains no express or implied covenant for Tenant to conduct business in
11   the Store, continuously or otherwise, or (when conducting business in the Store) to operate during
12   any particular hours or to conduct its business in any particular manner.  Tenant has the sole right in
13   its unrestricted discretion to decide whether or not to operate in the Store and in what manner to
14   conduct operations, if any, and if the Store has more than one (1) customer door ("Excess Customer
15   Doors"), Tenant may, at its option, close any such Excess Customer Doors and operate with only
16   one (1) customer door.

17   **15.3.   Protection.**

18      Subject to the rights of Existing Tenants (as noted below), without the prior written consent
19   of Tenant, which consent may be withheld in the absolute and sole discretion of Tenant, no tenant
20   or occupant of the Shopping Center (other than Tenant) may use, and Landlord, if it has the
21   capacity to do so, shall not permit any other tenant or occupant of the Shopping Center to (a) use its
22   premises for the Off Price Sale (as hereinafter defined) of merchandise, or (b) use more than fifteen
23   thousand (15,000) square feet of Leasable Floor Area of its premises for the sale of apparel (except
24   for discount department stores in excess of sixty thousand (60,000) square feet of Leasable Floor
25   Area), or (c) use more than fifteen thousand (15,000) square feet of Leasable Floor Area of its
26   premises for the sale of soft goods merchandise (including men's, women's and children's apparel);
27   shoes; accessories (such as jewelry and cosmetics); domestics and linens, and housewares.  The
28   foregoing restriction on the sale of apparel in clause (b) above shall not apply to JC Penney, Kohl's,
29   Belk's and Mervyn's, provided such tenants or occupants operate in at least sixty thousand (60,000)
30   square feet of Leasable Floor Area.  For purposes of this Section 15.3, "Off Price Sale" shall mean
31   the retail sale of non-replenishably purchased and not restocked items (as contrasted to regularly
32   purchased and restocked items sold at a discount price) on an everyday basis at prices reduced from
33   those charged by full price retailers, such as full price department stores; provided, however, this
34   definition shall not prohibit sales events by a retailer at a price discounted from that retailer's
35   everyday price.  (As of the Effective Date, examples of Off Price Sale retailers include such retailers
36   as T.J. Maxx, Marshalls, Fallas Paredes, Nordstrom Rack, Factory 2U, Burlington Coat, Steinmart,
37   Filene's Basement, Gordmans or Beall's Outlet.)  If any of the foregoing provisions is violated
38   ("Protection Violation"), commencing on the first day of the Protection Violation and continuing
39   throughout the period of the Protection Violation, Tenant, in addition to all other remedies available
40   at law or in equity, including injunctive relief, shall have the ongoing right, exercisable by written
41   notice to Landlord, either to terminate this Lease or to pay Substitute Rent within fifteen (15) days
42   after the close of each calendar month.  The parties agree that the monetary damages to be suffered

1  by Tenant as a result of a breach by Landlord (or Landlord's tenant(s)) of the provisions of this
2  Section 15.3 are difficult to ascertain and that the payment of Substitute Rent, after negotiation,
3  constitutes the best estimate by the parties of the amount of such damage.  If Tenant elects to
4  terminate this Lease as provided in this Section 15.3, this Lease shall terminate on a date indicated
5  by Tenant in its notice of termination, which in no event shall be sooner than thirty (30) nor later
6  than ninety (90) days after the date of Tenant's notice of termination.  In the event of termination,
7  Landlord shall be obligated to pay Tenant for the Unamortized Cost of Tenant's leasehold
8  improvements in the Store, which costs Tenant agrees to specify in its notice of termination.  If
9  Tenant elects to pay Substitute Rent, (a) such payment of Substitute Rent shall be retroactive to the
10  date any such Protection Violation commenced, and Tenant shall deduct any overpayments of Rent
11  from Rent coming due under this Lease, and (b) at such time as all such Protection Violations cease
12  (the "Cure Date"), Rent shall resume at the rate which would have pertained at the Cure Date had
13  the Protection Violation not occurred.  Notwithstanding the foregoing, if a Protection Violation is
14  not due to Landlord's act or omission (but is due to the act of another tenant or occupant of the
15  Shopping Center), Tenant shall notify Landlord of the occurrence of such Protection Violation of
16  which Tenant has actual knowledge, and provided that Landlord diligently pursues all rights and
17  remedies available to Landlord to cause such a Protection Violation to cease (including
18  commencement of litigation), then in such event, Tenant shall defer exercising its right to pay
19  Substitute Rent for a period not to exceed ninety (90) days.  After Tenant has paid Substitute Rent
20  for twelve (12) consecutive months as a results of such Protection Violation ("Substitute Rent
21  Period"), Tenant shall, by written notice to Landlord given within thirty (30) days after the
22  expiration of the Substitute Rent Period ("Election Notice"), elect either to (i) terminate this Lease
23  effective not more than (90) days after the date of the Election Notice; or (ii) resume payments of
24  Minimum Rent (and Reimbursements) in accordance with this Lease.  The provisions of this Section
25  15.3 shall apply to any subsequent Protection Violation.  Notwithstanding that the following tenants
26  may be considered Off Price Sale retailers, Tenant agrees that Landlord may lease space within the
27  Shopping Center to Bed Bath & Beyond, Anna's Linens or a comparable tenant (but specifically
28  excluding HomeGoods), and such lease (including options to extend as contained therein) shall not
29  be deemed to be a violation of this Section 15.3.

30  The foregoing use restrictions shall not apply to Existing Tenants (which term includes
31  successors as defined in Section 3.2.1(b)(i) above) who are occupying their premises in the Shopping
32  Center pursuant to leases or occupancy agreements executed prior to the Effective Date (as the
33  same may be extended or renewed) to the extent Landlord does not have the right, pursuant to the
34  lease or occupancy agreement to restrict the use of the premises of the Existing Tenants.  However,
35  if Landlord has the right of consent to any change in use of the premises occupied by an Existing
36  Tenant or its successor or if Landlord subsequently owns or controls the premises occupied by an
37  Existing Tenant, Landlord shall not permit any use in such premises in violation of the use
38  restrictions set forth in this Section 15.3.  In the event of a violation of this provision, Tenant shall
39  have all of its rights and remedies set forth in this Section 15.3, in addition to any other rights, at law
40  or in equity under this Lease, for the breach of the provisions of this Lease.

41  **15.4.   Exclusive Uses.**

42  Tenant shall not use the Store for any use which is listed on **Exhibit H** (the "Exclusive
43  Use"), so long as the Exclusive Use is in existence in the Shopping Center.  Any exclusive granted

1  by Landlord which is not listed on **Exhibit H** (the "Unauthorized Exclusive") shall be null and void
2  as against Tenant and any Related Entity of Tenant. Landlord shall indemnify, defend and hold
3  harmless Tenant and any Related Entity of Tenant against any and all claims by any other occupant
4  of the Shopping Center that Tenant and/or a Related Entity of Tenant has violated an
5  Unauthorized Exclusive.

6  **15.5.    Other Exclusives Not Binding on Tenant.**

7  Except for those Exclusive Uses specifically set forth in **Exhibit H** and the Shopping
8  Center Prohibited uses set forth in **Exhibit D**, Landlord agrees that there is no lease or other
9  occupancy agreement with (nor shall Landlord enter into a lease with, or permit occupancy in the
10 Shopping Center by) any tenant, subtenant, assignee or other occupant, which imposes, or proposes
11 to impose, a restriction on Tenant or Tenant's business. Landlord shall hold Tenant harmless from
12 any claims or damages suffered or claimed to be suffered by Tenant as a result of any breach or
13 alleged breach of Landlord's representation and warranty set forth in this Section 15.5.

14 **15.6.    Go Dark.**

15 (a)    As specified in Section 15.2, Tenant is not required to operate its Store or otherwise
16 conduct retail operations within the Store. However, if Tenant discontinues retail operations in the
17 Store (other than an Exempted Discontinuance of Retail Operations as hereinafter defined) for a
18 period in excess of one hundred eighty (180) consecutive calendar days (the "Go Dark Period")
19 Landlord, within the thirty (30) days following the expiration of the Go Dark Period, and within the
20 thirty (30) day period that follows each anniversary of a Go Dark Period, provided that as of such
21 anniversary date, Tenant continues to be in a Go Dark Period, may elect to terminate this Lease by
22 notifying Tenant thereof (the "Go Dark Termination Notice"), in which event this Lease shall
23 terminate as to all obligations thereafter accruing thirty (30) days after receipt by Tenant of the Go
24 Dark Termination Notice ("Termination Date"). In the event of Lease termination pursuant to this
25 Section 15.6, Landlord shall reimburse Tenant for the Unamortized Cost of Tenant's leasehold
26 improvements to the Store within ten (10) days after receipt from Tenant of a statement of the
27 Unamortized Cost, which statement shall be delivered to Landlord within fifteen (15) days after
28 Tenant's receipt of the Go Dark Termination Notice. Landlord may have access to Tenant's
29 relevant books and records for a period of ten (10) days after receipt of Tenant's statement of
30 Unamortized Costs to verify the amount thereof. Landlord's obligation for reimbursement shall
31 survive the termination of this Lease.

32 (b)    The following shall constitute Exempted Discontinuances of Retail Operations:
33 (i) any discontinuance occasioned by an event of Force Majeure (as defined in this Lease); (ii) the
34 temporary cessation of retail operations in connection with an assignment or sublet (provided that
35 the assignee or subtenant commences retail operations within one (1) year after Tenant discontinues
36 such operations); (iii) a temporary discontinuance in connection with remodeling; or (iv) any other
37 temporary discontinuance, provided that such other temporary discontinuance does not exceed sixty
38 (60) days in length.

39 (c)    Notwithstanding the foregoing, Tenant may notify Landlord at any time within fifteen
40 (15) days after receipt of Landlord's Go Dark Termination Notice that (i) Tenant intends to resume

1  retail operations, or (ii) Tenant is in negotiation with another retailer for an assignment of this Lease or
2  a sublease of the Store (the "Go Dark Withdrawal Notice"). If Tenant so notifies Landlord, and if
3  within one hundred twenty (120) days thereafter Tenant either resumes retail operations or enters into
4  such assignment or sublease, then Landlord's Go Dark Termination Notice shall automatically become
5  void and of no force or effect (a "Go Dark Withdrawal Event"). If a Go Dark Withdrawal Event does
6  not timely occur, this Lease shall terminate on the later of (A) the Termination Date, or (B) the one
7  hundred twenty-first (121st) day after Tenant's Go Dark Withdrawal Notice.

8  **16. SURRENDER**

9  **16.1.  Condition of Store.**

10  Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession
11  of the Store to Landlord in broom clean condition, and in good order and repair, reasonable wear
12  and tear and damage by Casualty or condemnation excepted, and with all of Tenant's alterations and
13  leasehold improvements in place.  Tenant may remove from the Store Tenant's furniture, fixtures,
14  equipment and personal property.  However, Tenant shall have no obligation to remove from the
15  Store or to demolish any alterations or leasehold improvements made to the Store nor to restore the
16  Store to its condition prior to Tenant's use and occupancy thereof.  Notwithstanding the foregoing,
17  any refrigeration units, bank vaults and other large, bulky items of personal property (whether or not
18  affixed to the Store) shall be removed from the Store by the then-current Tenant upon termination
19  of this Lease.

20  **16.2.  Continuance of Possession.**

21  If Tenant shall remain in possession of the Store or any portion thereof after the expiration
22  of the Term, then in the absence of an agreement in writing between the parties, Tenant shall be
23  deemed a tenant at sufferance until acceptance of Rent by Landlord, at which time, Tenant shall
24  become a tenant from month-to-month under the same terms and conditions as existed immediately
25  prior to the expiration of this Lease, however, Minimum Rent shall be increased to an amount equal
26  to one hundred twenty-five percent (125%) of the most recent monthly installment of Minimum
27  Rent.

28  **17. LANDLORD'S COVENANTS**

29  **17.1.  Landlord's Warranty.**

30  Landlord warrants to Tenant that (a) Tenant, while operating in the Store for the use stated
31  in Section 15.1, except as to the Shopping Center Prohibited Uses set forth in **Exhibit D** or the
32  Exclusive Uses set forth in **Exhibit H**, will not be in violation of any exclusives, restrictions or
33  other agreements which Landlord may have with other lessees, lenders, governmental authorities or
34  any other parties, and (b) as of the Effective Date, the use stated in Section 15.1 is not a violation of
35  any restrictions imposed by any governmental body or authority.  Landlord shall hold Tenant

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

– 60 –

05/08/15
FINAL

1  harmless from any claims or damages suffered or claimed to be suffered by Tenant as a result of any
2  breach or alleged breach of Landlord's warranties.

3  **17.2.   Landlord's Title.**

4  Landlord has provided Tenant with the Title Report.  Landlord covenants that:  (a) Landlord
5  has lawful title to the Shopping Center and full right to make and execute this Lease; (b) at the time
6  of recording of the Memorandum of Lease, the Shopping Center will be free from all other liens,
7  title exceptions and other encumbrances of any kind whatsoever, except those set forth in **Exhibit I**
8  attached hereto and incorporated by this reference ("Permitted Title Exceptions"); and (c) except
9  for its present lender, no other party is required to consent to this Lease as a condition to the
10  effectiveness of this Lease or any of the provisions hereof, including, but not limited to, the consent
11  of any lender or ground lessor relating to the Shopping Center.

12  **17.3.   Remedies.**

13  In the event of any violation of any of the covenants made by Landlord in this Article 17,
14  Tenant may give Landlord notice of the violation.  If Landlord fails to cure the violation within sixty
15  (60) days of such notice, and if such violation has a material and adverse effect upon Tenant's
16  business operations in the Store or Tenant's interest in this Lease, Tenant may exercise its remedies
17  available at law and in equity, including the right to terminate this Lease by written notice to
18  Landlord.  The provisions of this Article 17 shall supersede and prevail over any inconsistent
19  provision in Article 20 of this Lease.

20  ## 18. QUIET ENJOYMENT

21  Landlord represents and warrants that it has full authority to execute and perform this Lease
22  and to grant the subject leasehold estate to Tenant, and that, subject to the terms of this Lease,
23  Tenant shall peaceably and quietly have, hold and enjoy the Store with all appurtenances on and
24  after the Delivery Date and during the Term and without any manner of hindrance or interference
25  with its quiet enjoyment, possession and use.

26  ## 19. ASSIGNMENT/SUBLETTING

27  **19.1.   General.**

28  During the full Term of this Lease, including any Option Periods, Tenant shall have the right
29  to assign this Lease, or sublet the Store or any portion thereof (a "Transfer" and the assignee or
30  sublessee thereof is herein "Transferee") with the prior written consent of Landlord, which consent
31  shall not be unreasonably withheld or delayed.  If  Landlord fails to respond within thirty (30) days,
32  then Tenant shall provide a second (2nd) five (5) day notice, and upon Landlord's failure to respond
33  within five (5) days of Tenant's second (2nd) written request for consent to a proposed Transfer,
34  such failure shall be deemed Landlord's consent.  If Landlord denies consent to any proposed
35  Transfer, Landlord shall specify in writing the reasons for Landlord's denial of consent.  Tenant shall

have the right to operate departments within the Store by means of subleases, licenses or concession agreements without Landlord's consent. A Transferee shall be subject the then existing exclusives in the Shopping Center, provided Landlord has supplied Tenant with a current list of exclusives in existence as of the date Landlord consents to the Transfer, or is deemed to have consented thereto.

**19.2. Related Entity.**

An assignment or other transfer of this Lease or any sublease of all or any portion of the Store to a "Related Entity" shall not constitute a Transfer under the terms of this Lease. The term "Related Entity" means: a corporation or other entity with which Tenant may merge or consolidate; or to which Tenant sells at least ten (10) stores in the State of Florida; or any parent, affiliate or subsidiary of Tenant; or an affiliate or subsidiary of Tenant's parent.

**19.3. Stock.**

The sale of stock by Tenant or by any shareholder of Tenant shall not constitute a Transfer under the terms of this Lease.

**19.4. No Release of Liability.**

In the event of a Transfer of this Lease (including a sublease or assignment to a Related Entity), Tenant and Tenant's Guarantor shall remain liable.

**19.5. Landlord Notice to Assignee.**

Landlord, when giving notice to any Transferee of this Lease related to any default hereunder, shall simultaneously give notice thereof to Tenant, who may cure said default at any time during the notice period; and in the event that Tenant shall cure the default, Tenant shall be subrogated to all rights and remedies of Landlord as against the Transferee related to the default and shall have the right at its election to recover possession of the Store from the defaulting Transferee, to cancel and revoke the Transfer, and to be restored by Landlord to its leasehold estate hereunder.

**19.6. Restriction on Landlord's Right to Assign.**

Landlord shall not assign this Lease prior to the Commencement Date except to an assignee by an assignment which satisfies the following criteria: (a) all shareholders or partners of Landlord have at least a fifty-one percent (51%) interest in the assignee, (b) Landlord continues as the managing agent and developer of Landlord's Parcel, and (c) Landlord performs all of its obligations and duties under this Lease which are conditions precedent to this Lease becoming effective.

**19.7. Recapture on Assignment or Sublease of Store.**

Except for a transfer to a Related Entity, in the event that Tenant intends to seek a Transferee for twenty-five percent (25%) or more of the Leasable Floor Area of the Store to a business entity which operates fewer than twenty (20) retail stores or has a net worth of less than TWENTY MILLION DOLLARS ($20,000,000) in the United States, then prior to making the Store available for any such Transfer, Tenant shall first give Landlord written notice of its intention to do

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 62 -

05/08/15
FINAL

1    so ("Transfer Notice"), which notice shall include (a) the identity of the Transferee and a copy of
2    such Transferee's audited financial statements for its most recently completed fiscal year, (b) a
3    statement of the Unamortized Cost of leasehold improvements to the Store which were paid for by
4    Tenant, and (c) a proposed Lease termination date which is not sooner than ninety (90) nor later
5    than one hundred eighty (180) days following the date of the Transfer Notice. If Tenant issues a
6    Transfer Notice to Landlord, Landlord may terminate this Lease; provided, however, it must do so
7    by written notice ("Recapture Notice") given to Tenant within thirty (30) days after the date of the
8    Transfer Notice ("Election Period") electing a termination date sixty (60) days from the date of the
9    Recapture Notice. Landlord's Recapture Notice shall be accompanied by Landlord's payment to
10    Tenant of the Unamortized Costs as set forth in the Transfer Notice. In the event Landlord gives
11    Tenant a Recapture Notice within the Election Period, this Lease shall terminate as to all obligations
12    accruing on and after the date of termination designated by Landlord in the Recapture Notice,
13    unless Tenant rescinds the Transfer Notice by written notice to Landlord given with twenty (20)
14    days following receipt of the Recapture Notice. If Landlord does not give a Recapture Notice within
15    the Election Period as provided for by this Section 19.7, then at any time thereafter Tenant may
16    Transfer the entire Store to the Transferee, provided that none of the provisions of this Lease shall
17    be changed in any manner.

18    **19.8.**   **Assignment or Sublet in Violation of this Article 19.**

19    Any purported assignment or subletting by either party consummated in violation of the
20    provisions of this Article 19 shall, at the other party's election, be null and void, of no force or
21    effect, and shall be a default under this Lease. The receipt of rental from any party other than
22    Tenant shall not be deemed a consent to an assignment or subletting, nor relieve Tenant of its
23    obligations to pay rental or from its covenants or obligation of this Lease.

24    **20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES**

25    **20.1.**   **Defaults.**

26        **20.1.1.**   Tenant's Default.

27            (a)    Breach.  The occurrence of either of the following shall constitute a
28    default by Tenant pursuant to this Lease:  (i) a failure by Tenant to pay Rent within ten (10) Business
29    Days after Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by
30    Tenant to perform obligations pursuant to this Lease, other than as specified in (i) above, within thirty
31    (30) days after Tenant's receipt of written notice from Landlord specifying such failure; however, such
32    thirty (30) day period may be extended for such period of time as may be reasonably required to
33    perform the obligation provided:  (A) such obligation cannot be reasonably performed within thirty
34    (30) days after such notice; (B) Tenant commences efforts to cure the default within thirty (30) days
35    after receipt of Landlord's notice of default; (C) Tenant diligently pursues completion of the obligation;
36    and (D) such cure period shall not exceed ninety (90) days after Tenant's receipt of Landlord's notice
37    of default.  Tenant's withholding, deducting or offsetting of, or failure to pay Rent pursuant to a bona
38    fide dispute between Landlord and Tenant shall not be deemed a default by Tenant under the

"Palm Springs"                    - 63 -                05/08/15
Palm Springs Plaza                                              FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1 provisions of this Lease.  Tenant, however, agrees to pay any undisputed amount in the event of a
2 bona fide dispute.

3         (b)    <u>Insolvency</u>.  If Tenant makes an assignment for the benefit of
4 creditors, or if any proceedings are commenced under the provisions of the Bankruptcy Act whereby
5 Tenant seeks to be, or would be, discharged of its debts, or the payment of its debts are sought to be
6 delayed, this Lease shall be governed by the provisions of the Federal Bankruptcy Act.

7         (c)    Prohibition Against Landlord Accelerating Rent.

8         (i)    Except as provided in Section 20.1.1(c)(ii) below, and whether or
9 not Landlord terminates this Lease, Tenant shall have no obligation to pay Rent until the date it would
10 otherwise be due in the absence of Tenant's default.  Landlord shall have no right to accelerate Rent
11 which would become due except as provided hereafter.

12         (ii)    In the event Landlord terminates this Lease due to a default by
13 Tenant, Landlord may recover from Tenant the balance of the Rent payable by Tenant for the
14 remainder of the Term, minus the fair market rental value of the Store for such period, each
15 discounted to present value using a discount rate of the Federal Reserve Bank of San Francisco at the
16 time of the award, plus one percent (1%) per annum, together with the costs and expenses proximately
17 caused by Tenant's breach of this Lease.

18         (d)    <u>Personal Property Waiver</u>.  Landlord waives such liens, if any, to which
19 it may have a right with respect to the merchandise, furniture, trade fixtures and other personal
20 property of Tenant located on or about the Store, and Landlord shall from time to time execute such
21 documents as Tenant may reasonably request to acknowledge such waiver.

22         (e)    <u>Landlord's Remedy for Improper Offset</u>.  Certain provisions of this
23 Lease grant to Tenant the right to offset specified amounts against, or to deduct such amounts from,
24 Rent or other charges payable under this Lease.  The exercise by Tenant of any such right or Tenant's
25 withholding of any disputed amount of Rent or other sum shall not constitute a default under this
26 Lease by Tenant unless and until (i) an arbitrator per Section 20.2.3 shall determine by means of a final
27 award that such right to offset, deduct, or refusal to pay has been exercised improperly by Tenant, and
28 (ii) following the entry of such award, and within thirty (30) days after receipt by Tenant from Landlord
29 of a bill in the amount determined by such award to have been improperly offset, deducted, or
30 withheld by Tenant, Tenant shall fail to pay such amount to Landlord, together with interest thereon at
31 the Legal Rate retroactive to the date that the offset or deduction was taken by Tenant.

32     **20.1.2.**    <u>Landlord's Default</u>.

33         (a)    <u>Breach</u>.  Except for a violation by Landlord of express provisions of
34 this Lease which require specific notice provisions which are shorter or longer than thirty (30) days
35 (which notice provisions shall control over the provisions of this Section 20.1.2(a)), the occurrence of
36 the following shall constitute a default by Landlord pursuant to this Lease:  Landlord's failure to
37 perform any of its obligations under this Lease, which default continues for a period of more than
38 thirty (30) days after receipt of written notice from Tenant specifying such default; however, such thirty

"Palm Springs"                    - 64 -                   05/08/15
Palm Springs Plaza                                          FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1  (30) day period may be extended for such period of time as may be reasonably required to perform the
2  obligation (not to exceed ninety (90) days after Landlord's receipt of such notice) <u>provided</u>: (i) such
3  obligation cannot be reasonably performed within thirty (30) days after such notice; (ii) Landlord
4  commences efforts to cure the default within thirty (30) days after receipt of Tenant's notice of default;
5  and (iii) Landlord diligently pursues completion of the obligation.  In addition to giving Landlord
6  notice as provided in this Section 20.1.2(a), Tenant shall give notice of any Landlord default to
7  Landlord's lender, provided Landlord has previously provided Tenant the name and address of the
8  lender at least twenty (20) days prior to the date Tenant gives notice. The lender shall have the same
9  opportunity as is provided to Landlord to perform any Landlord obligation which is the subject of
10  such notice.

11  (b)  Remedies.

12  (i)  <u>General</u>.  Except as otherwise provided in this Lease, in the event
13  of Landlord's monetary or material default under this Lease, and in the event Landlord fails to cure
14  same after an additional ninety (90) days' notice, in addition to availing itself of any other remedies
15  available at law and in equity and without the requirement of any further additional ninety (90) day
16  notice, Tenant may, at its option, upon written notice to Landlord, terminate this Lease, or may incur
17  any expense necessary to perform the obligation of Landlord specified in such notice and deduct such
18  expense from the Rent or other charges coming due, provided that Tenant shall not be permitted to
19  terminate this Lease while such termination is being contested through any Arbitration or Mediation.
20  So long as Tenant has any right to set off a monetary obligation of Landlord from Rent (and the
21  amount of such setoff does not exceed the Rent then due for the remainder of the Term of this Lease),
22  Landlord shall not be considered to be in default of its monetary obligations hereunder.

23  (ii)  <u>Interruption of Utility Service</u>.  In addition to the remedies
24  described above, in the event Tenant is prevented from using the Store, or any portion thereof (the
25  "Unusable Area"), to conduct its normal retail operations for a period in excess of thirty (30) Business
26  Days if within the control of Landlord or for a period in excess of one hundred eighty (180) Business
27  Days if not within the control of Landlord because of (A) the interruption of any Utility service to the
28  Unusable Area which is required to be provided by Landlord pursuant to the terms of this Lease,  or
29  (B) due to Force Majeure, then the provisions of this Section 20.1.2(b)(ii) shall apply.  Tenant shall
30  promptly deliver to Landlord notice of the interruption (the "Interruption Notice") of such condition.
31  If any condition set forth in the first sentence of this Section 20.1.2(b)(ii) shall not be cured within
32  forty-five (45) days after Landlord's receipt of the Interruption Notice, then Tenant, upon notice to
33  Landlord after expiration of such period, may terminate this Lease either as to (1) the Unusable Area in
34  which case this Lease shall be amended to reflect that the Unusable Area is no longer a part of the
35  Store, and the Rent payable hereunder by Tenant shall be adjusted proportionately, or (2) the entire
36  Store, which termination shall be deemed effective upon Tenant's vacation of the entire Store.

37  **20.2.  Alternative Dispute Resolution Process.**

38  **20.2.1.**  <u>Means of Resolution</u>.  In the event that any controversy or dispute ("Dispute")
39  shall arise under this Lease and in the event that the parties have been unable to resolve such
40  Dispute within thirty (30) days, the Dispute shall be resolved as provided in this Section 20.2.  All
41  Disputes, the monetary value of which exceeds Fifty Thousand Dollars ($50,000), or which involve

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 65 -

05/08/15
FINAL

1    an equitable remedy, shall first require the utilization of Mediation as provided in Section 20.2.2
2    below.  All Disputes, the monetary value of which is Fifty Thousand Dollars ($50,000) or less shall
3    be settled by Arbitration as discussed in Section 20.2.3 below.

4         **20.2.2.**    <u>Mediation</u>.  The parties shall first try in good faith to settle the Dispute by
5    Mediation pursuant to the provisions as set forth below. Either party may initiate Mediation. The
6    party commencing the Mediation shall first give a written notice (a "Mediation Notice") to the other
7    party setting forth the nature of the Dispute. The Mediation shall be administered by the American
8    Arbitration Association under its Commercial Mediation Rules, except to the extent that this
9    Section 20.2.2 is inconsistent therewith, in which event this Section 20.2.2 shall govern and prevail.
10   If the parties cannot agree on the selection of a Mediator within twenty (20) days after receipt of the
11   Mediation Notice, the Mediator shall be selected in accordance with the American Arbitration
12   Association procedure. If the Dispute or any part thereof has not been resolved by Mediation as
13   provided above within sixty (60) days after receipt of the Mediation Notice, or if a party fails to
14   participate in Mediation, then at the option of either party by written notice, the Dispute shall be
15   determined by suit or action in court, unless it is a matter for Arbitration as described in
16   Section 20.2.1 above.  The costs of the Mediator and the Mediation service shall be shared equally
17   by the parties; each party shall otherwise bear its own costs incurred in connection with the
18   Mediation, including its own attorneys' fees.

19        **20.2.3.**    <u>Arbitration</u>.  Either or both parties may initiate the Arbitration process.  The
20   party initiating the Arbitration process shall first give a written notice (an "Arbitration Notice") to
21   the other party setting forth the nature of the Dispute. The Arbitration shall be administered by the
22   American Arbitration Association in accordance with its Commercial Arbitration Rules, except to
23   the extent that this Section 20.2.3 is inconsistent therewith, in which event this Section 20.2.3 shall
24   govern and prevail.  Judgment upon the award rendered by the Arbitrator may be entered in any
25   court of competent jurisdiction.   Unless otherwise agreed to by the parties, the matter shall be
26   submitted to one (1) Arbitrator and shall be heard in the state in which the Store is located.  If the
27   parties cannot agree on the selection of an Arbitrator within ten (10) days after the initiation of the
28   Arbitration process, the Arbitrator shall be selected in accordance with the American Arbitration
29   Association procedure, which selection shall be binding on the parties. The Arbitrator shall resolve
30   the controversy in accordance with applicable law and the terms and conditions of this Lease. The
31   Arbitrator shall allow the parties reasonable opportunities for pre-hearing document exchange and
32   other pre-hearing discovery of evidence as determined by the Arbitrator in his or her discretion. The
33   determination of the Arbitrator shall be final, binding and conclusive upon the parties.

34        **20.2.4.**    <u>Confidentiality</u>.  Except as otherwise required by law, the parties, Mediator
35   and/or Arbitrator agree to keep confidential and not disclose to third parties any information or
36   documents obtained in connection with the Mediation and/or Arbitration process, including the
37   resolution of the Dispute.

38   **20.3.   Unlawful Detainer.**

39        Landlord agrees not to file, prosecute, or maintain any proceeding for eviction, unlawful
40   detainer, or termination of this Lease against Tenant (and any such proceeding shall be null and
41   void) during the Alternative Dispute Resolution process as set forth in Section 20.2 and/or in the

event of a bona fide dispute between the parties with respect to any alleged default by Tenant of any provision of this Lease, including, without limitation, Tenant's non-payment of Rent pursuant to Tenant's right to withhold, deduct or offset Rent in accordance with this Lease.

**20.4.  Attorneys' Fees.**

**20.4.1.**  _Third Party Litigation_.  If either party becomes a party to any litigation (including Arbitration) concerning this Lease, the Store or the Shopping Center by reason of any act or omission of the other party or its authorized representatives, and not by its own act or omission or that of its authorized representatives, the other party shall be liable to that party for reasonable attorneys' fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it in the litigation.

**20.4.2.**  _Actions Between the Parties_.  If either party commences an action against the other party arising out of or in connection with this Lease, or in the event of an Arbitration proceeding between the parties relating to this Lease, the prevailing party shall be entitled to have and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs, discovery costs, and expert witness fees and costs, including costs of appeal.  When this Lease imposes upon a party an obligation to indemnify the other, the indemnification obligation shall include the obligation to pay the indemnitee's reasonable attorneys' fees, costs and disbursements, whether the indemnitee be the plaintiff or defendant.

## 21. CASUALTY

**21.1.  Definitions.**

**21.1.1.**  _Casualty_.  An event, or act of God, such as fire, windstorm, flood, earthquake, riot, civil commotion, strike, perils or other matters which are unforeseen and unpredictable, whether insured or uninsured, which causes damage or destruction to the Store or the Shopping Center.

**21.1.2.**  _Casualty Date_.  The date of the occurrence of a Casualty.

**21.1.3.**  _Permitted Repair Period_.  A period of two hundred seventy (270) days following the Casualty Date.

**21.1.4.**  _Restoration (sometimes referred to herein as "Restore")_.  Restoration, rebuilding or repairs due to a Casualty under Section 21.2 of this Lease or due to a Taking under Section 22.1 of this Lease.

**21.2.  Insured Casualty.**

If the Store is damaged or destroyed by a Casualty insured against or that Landlord is obligated to insure against under this Lease, to the extent that Restoration cannot reasonably be completed within the Permitted Repair Period, as reasonably determined by Landlord (and Landlord shall deliver notice to Tenant of such determination within sixty (60) days of the Casualty Date),

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

05/08/15
FINAL

Tenant may, at its option, terminate this Lease as of the Casualty Date by notice to Landlord within thirty (30) days after the later of (a) Landlord's notice, or (b) the Casualty Date. If Tenant does not so terminate this Lease, or if Restoration to the Store may be completed within the Permitted Repair Period, then this Lease shall not terminate, and Landlord shall diligently proceed to Restore the Store to substantially the condition as existed immediately prior to the Casualty, and Landlord shall diligently pursue such Restoration to completion. If the Restoration is not completed within the Permitted Repair Period, Tenant may terminate this Lease by written notice to Landlord at any time prior to the Redelivery Date. Notwithstanding the foregoing sentence, if Landlord notifies Tenant in writing, within ten (10) days after Landlord's receipt of Tenant's Termination Notice, that the Store will be completed within forty-five (45) days of Landlord's notice, then the effective date for termination of this Lease shall be extended to the last day of such forty-five (45) day period and, if Landlord completes the Restoration within that forty-five (45) day period, then Tenant's Termination Notice shall be void and of no further force or effect. All Rent payable hereunder shall abate from the Casualty Date to the earlier of (i) sixty (60) days following the Redelivery Date (but only if the Redelivery Date falls on a Permitted Delivery Day, and if the Redelivery Date does not fall on a Permitted Delivery Day, the sixtieth (60th) day following the next Permitted Delivery Day); or (ii) the date on which Tenant again opens for business in the Store (in either case the "Recommencement Date"); provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall equitably abate with reference to the nature, extent and duration of the deprivation of Tenant's business in connection with such Restoration, and provided Further that in the event of any dispute as to such equitable abatement, the matter shall be referred to Alternative Dispute Resolution pursuant to Section 20.2 above. The election by Tenant to carry the insurance on the Shopping Center pursuant to the terms of Section 9.1.4(b) shall not create any obligation on the part of Tenant to Restore, but Tenant shall make available to Landlord the proceeds from such insurance for Landlord's use in discharging Landlord's Restoration obligations under this Section 21.2.

**21.3.   Uninsured Casualty.**

If the Store is damaged or destroyed by a peril not covered by the standard form of Special Form Policy (hereinafter an "Uninsured Casualty"), or if not otherwise covered by Landlord's insurance and the cost of the Restoration of the Store as reasonably determined by Landlord exceeds by more than Two Hundred Fifty Thousand Dollars ($250,000), the amount of insurance proceeds available (i.e., net of any applicable deductible) to Landlord, Landlord shall have the option to elect not to Restore the Store and to terminate this Lease on at least ninety (90) days prior written notice to Tenant. If only the Store and no other part of the Building containing the Store is damaged, Tenant may elect to pay the difference between the cost of Restoration and available insurance proceeds (the "Difference") by delivering written notice of such election, together with payment of such Difference, to Landlord within thirty (30) days after delivery of Landlord's notice of election to terminate this Lease. Upon receipt of such notice and payment, the Landlord termination shall be deemed rescinded and Landlord shall proceed with the Restoration of the Store. If Landlord elects to terminate this Lease under this Section 21.3 and Tenant does not elect to pay the Difference, this Lease shall terminate as of the date set forth in Landlord's notice of election to terminate this Lease. If this Lease is not terminated under this Section **21.3**, all Rent payable hereunder shall abate from the Casualty Date to the Recommencement Date; provided that if

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

– 68 –

05/08/15
FINAL

1   Tenant continues to do business in the Store during the period of Restoration, Tenant's total
2   obligation for Rent shall equitably abate with reference to the nature, extent and duration of the
3   deprivation of Tenant's business in connection with such Restoration, and provided further that in
4   the event of any dispute as to such equitable abatement, the matter shall be referred to Alternative
5   Dispute Resolution pursuant to Section 20.2 above.

6   **21.4.    End of Term Casualty.**

7   Notwithstanding any provision in this Article 21 to the contrary, Landlord shall not be
8   required to Restore any Casualty to the Store occurring during the final eighteen (18) months of the
9   Term if the cost of such Restoration is greater than One Hundred Fifty Thousand Dollars
10  ($150,000) unless, within thirty (30) days after receipt of Landlord's notice to Tenant that it intends
11  not to effect Restoration, Tenant exercises in writing any next immediately succeeding Option to
12  extend the Term given Tenant hereunder.  If Tenant does not elect to exercise the next immediately
13  succeeding Option so as to extend the Term, Tenant shall so notify Landlord within thirty (30) days
14  of Landlord's notice of election not to Restore, and, thereupon, this Lease shall terminate effective
15  as of the Casualty Date.

16  **21.5.    Shopping Center Casualty.**

17  In the event that the Store is not damaged or destroyed by a Casualty, but other buildings in
18  the Shopping Center, or the Building, excluding the Store, or if any of the Common Areas, are
19  damaged or destroyed by a Casualty, whether or not insured against (collectively a "Shopping Center
20  Casualty"), Landlord shall promptly remove all rubble and debris resulting from such damage or
21  destruction, and Landlord shall promptly Restore the damaged buildings in the Shopping Center as
22  well as the Common Areas as nearly as possible to the condition the same were in immediately prior
23  to such damage or destruction.  Notwithstanding anything to the contrary contained herein, and
24  regardless of the extent of damage, Landlord shall promptly remove all rubble and debris so that the
25  Common Areas are usable.  If the damage to the Common Areas shall render the whole or any part
26  of the Store unsuitable for Tenant's use, all Rent payable hereunder shall abate from the Casualty
27  Date to the Recommencement Date; provided that if Tenant continues to do business in the Store
28  during the period of Restoration, Tenant's total obligation for Rent shall equitably abate with
29  reference to the nature, extent and duration of the deprivation of Tenant's business in connection
30  with such Restoration, and provided further that in the event of any dispute as to such equitable
31  abatement, the matter shall be referred to Alternative Dispute Resolution pursuant to Section 20.2
32  above.

33  **21.6.    Intentionally Deleted.**

34  **21.7.    Tenant Restoration.**

35  If Landlord is obligated to Restore the Store under the terms of this Article 21 but does not
36  commence Restoration as soon as practicable after the Casualty, or does not continue the
37  Restoration of the Store thereafter with reasonable dispatch, Tenant, upon thirty (30) days' prior
38  notice to Landlord, shall have the right to terminate this Lease; provided that if Tenant elects to
39  continue to do business in the Store during the period of Restoration, Tenant's total obligation for

1    Rent shall equitably abate with reference to the nature, extent and duration of the deprivation of
2    Tenant's business in connection with such Restoration and provided that in the event of any dispute
3    as to such equitable abatement, the matter shall be referred to Alternative Dispute Resolution
4    pursuant to Section 20.2 above.

5    **21.8.    Waiver of Statute.**

6        The parties waive such rights of Lease termination as are granted to them under the laws of
7    the state wherein the Store is located, it being their agreement that the rights of termination in the
8    event of Casualty, as set forth herein, shall be exclusive.

9    **21.9.    Laws.**

10        If applicable governmental laws and regulations prohibit the Restoration of any damage to
11    the Store or Common Areas, either party may elect to terminate this Lease effective thirty (30) days
12    after the delivery to the other party of written notice of the election to terminate.  Notwithstanding
13    anything in this Article 21 to the contrary, if applicable laws and regulations require seismic,
14    disability access, life safety or other retrofitting as a condition to Restoration and the costs of same
15    exceed Landlord's insurance proceeds, and if Tenant does not elect to pay Landlord the Difference,
16    then Landlord shall have the right to elect to terminate this Lease effective thirty (30) days after
17    delivery to Tenant of written notice to terminate.

18    **21.10.    Tolling of Term.**

19        During the period between Landlord's completion of Landlord's Restoration obligations and
20    the Recommencement Date, Tenant and Tenant's employees, agents and contractors shall have the
21    right to enter upon the Store for the purpose of erecting, constructing, or installing such
22    improvements, alterations, fixtures, equipment and furniture as Tenant deems necessary for
23    resuming business in the Store.  In the event Rent shall completely abate for any period pursuant to
24    the provisions of this Article 21, the Term shall toll for the period of such abatement, in which
25    event, the monthly installments of Rent following the end of the period of such abatement shall
26    recommence and thereafter continue at the same Rent rate that was in effect at the time of such
27    abatement; the remaining scheduled increases of Minimum Rent shall be postponed for the period
28    of such abatement to reflect such tolling, the expiration date of the then applicable Term (whether
29    the Initial Term or any Option Period) and the commencement and expiration dates of any
30    subsequent Option Periods shall be extended for the period of such abatement, as shall be the
31    deadline dates for notices exercising Option Periods.  Any period of tolling shall be added to the
32    calculation of the Initial Term (or any then current Option Period, as the case may be) for purposes
33    of the calculation of the Expiration Date.  For example, if the Term of this Lease is tolled under the
34    provisions of this Section 21.10 for a period of four (4) months, and the tolling occurs during the
35    Initial Term, then the definition of Initial Term in Section 1.5.1 shall be:  "From the
36    Commencement Date through the January 31 next following the expiration of one hundred
37    twenty-four (124) months thereafter."

**21.11.  Effect of Termination.**

Upon termination of this Lease pursuant to this Article 21, (a) each of the parties shall be thereby released from all further obligations and duties to the other party as of the Casualty Date, except for items and liabilities which have theretofore accrued and be then unpaid and for Tenant's Pro Rata Share of the Common Area Charges for the partial year in which this Lease terminates, and (b) Landlord shall promptly refund to Tenant all unearned Rent and other amounts prepaid by Tenant under this Lease.

**21.12.  Tenant's Right of First Offer.**

The provisions of this Article 21 to the contrary notwithstanding, if this Lease is terminated in accordance with this Article 21, and Landlord elects to rebuild the Store or a substantially similar building in Landlord's Parcel within one (1) year after the Casualty Date, Landlord shall, before marketing space in such building to any person or entity, first offer space in such building to Tenant on terms no less favorable than those for which Landlord will market such space on the open market. If Tenant does not agree to the terms offered by Landlord, or the parties fail to execute a letter of intent incorporating such terms offered by Landlord, each within sixty (60) days after Tenant's receipt of Landlord's offer notice, Landlord can proceed to market the Store and sign a lease with any third party on terms no more favorable than those offered by Landlord to Tenant.

# 22. CONDEMNATION

**22.1.  Taking.**

A "Taking" means any governmental act, condemnation proceeding, moratorium, initiative, or referendum whereby Landlord or Tenant is divested of ownership or any of the incidents thereof, or any transfer in lieu thereof, and physical possession is taken by the governmental or condemning authority. In the event Tenant does not terminate this Lease as provided in Section 22.2 following, Landlord shall promptly and diligently Restore the Store, Common Areas, or other space, as the case may be, to as near their condition as existed prior to such Taking as is reasonably possible. During the course of such Restoration, if Tenant is not operating in the Store, all Rent shall abate from the date of the Taking to the Recommencement Date. If Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month. When Restoration is complete, Tenant's total obligation for Minimum Rent shall be adjusted as provided in Section 3.7 in the event the size of the Store is reduced. When Restoration is complete, if the size of the Store is not reduced, but the size of the Common Areas is reduced, Minimum Rent shall thereafter be reduced to an amount calculated by multiplying the Minimum Rent stated in this Lease by a fraction the numerator of which is the fair market rental value of the Store immediately following the Taking and the denominator of which is the fair market rental value of the Store immediately prior to the Taking.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 71 -

05/08/15
FINAL

**22.2.**   **Right to Terminate.**

Tenant may terminate this Lease upon written notice to Landlord in the event of any one or more of the following Takings:

**22.2.1.**   A Taking of any portion of or interest in the Store;

**22.2.2.**   Any Taking of the Common Areas if the number of parking spaces is reduced below the number required under applicable Requirements, or access to the Store is materially impaired, or access to the Shopping Center is materially impaired;

**22.2.3.**   Any Taking of any portion of the Shopping Center which impairs the operation of Tenant's business; or

**22.2.4.**   Any Taking of twenty percent (20%) or more of the Leasable Floor Area of the Shopping Center (not including the Store in either the numerator or denominator of such calculation).

**22.2.5.**   Landlord shall promptly notify Tenant of any Taking. Tenant's termination must be exercised by written notice to Landlord given within sixty (60) days following the date of Tenant's receipt of Landlord's notice of the occurrence of such Taking (as defined in Section 22.1).

**22.2.6.**   Landlord may terminate this Lease upon written notice to Tenant, within sixty (60) days following the date of such Taking, in the event of any one or both of the following Takings:

(a)   A Taking of the Store; or

(b)   Any Taking of fifty percent (50%) or more of the Leasable Floor Area of the Shopping Center (not including the Store in either the numerator or denominator of such calculation).

**22.3.**   **Claims.**

Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any condemnation proceedings or otherwise for the value of their respective interests, as well as any damages.

**22.4.**   **Waiver.**

The parties waive such rights of Lease termination as may be granted them in the event of condemnation by the laws of the state wherein the Store is located, it being their agreement that the rights of termination set forth in this Lease shall be exclusive.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 72 -

05/08/15
FINAL

1  **23. MECHANIC'S LIENS**

2  Pursuant to Florida Statutes, Section 713.10, it is the intent of the parties that Landlord's
3  interest in the Store or Landlord's Parcel shall not be subject to any liens filed for improvements
4  made by Tenant and/or because of Tenant's failure to make timely payments in connection with
5  Tenant's Work at or on the Store. The Memorandum of Lease provided for in Section 26.15 shall
6  expressly give notice of and prohibit such liability by Landlord as stated in the preceding sentence.
7  Landlord and Tenant shall prevent any mechanic's, materialman's or other liens against the Store or
8  Landlord's Parcel in connection with any labor, materials or services furnished or claimed to have
9  been furnished. If any such lien shall be filed against the Store or Landlord's Parcel, the party
10  through whom the lien arose will cause the same to be discharged within thirty (30) days of the filing
11  of the lien, provided, however, that either party may contest, or cause to be contested, any such lien,
12  so long as the enforcement thereof is stayed by bonding or otherwise expunging the lien from the
13  official property records in the jurisdiction.  Tenant agrees that Landlord shall not be required to
14  bond or expunge the lien; however, Landlord agrees that Tenant shall nevertheless be indemnified
15  for any actual and reasonable costs incurred as a result of a lien filed in connection with labor,
16  materials or service supplied at Landlord's request.  In addition, if a mechanic's lien is recorded as a
17  result of work done by any other tenant of the Shopping Center, Landlord shall not be required to
18  bond or expunge such lien so long as Landlord demonstrates to Tenant that pursuant to Florida law,
19  such mechanic's lien does not encumber the Shopping Center.

20  **24. SIGNS**

21  **24.1.   Governmental Approval and Compliance.**

22  All signs shall be subject to approval by local governmental authority.  Landlord shall
23  cooperate fully with Tenant and assist Tenant in Tenant's efforts to obtain approval for Tenant's
24  signs as shown on **Exhibit J** ("Tenant's Signs") and made a part hereof, from the local
25  governmental authority.  Landlord's approval for a change to Tenant's signage on the exterior of the
26  Store or Tenant's sign panels on the Shopping Center's pylon signs shall not be required if such
27  change is in connection with a corporate-wide and/or multi-store signage change program by
28  Tenant, however, such change shall not materially increase in size and shall be subject to the
29  approval of the local governmental authority.  Landlord approves of all Tenant's Signs shown on
30  **Exhibit J**.

31  **24.2.   Building Signs.**

32  Tenant may erect and maintain Tenant's Signs upon the exterior of the Store, as specified on
33  **Exhibit J**.  Tenant's Signs shall be included by Landlord in the sign criteria for the Shopping Center.
34  Tenant's Signs, including Tenant's signage on any sign structure(s) provided by Landlord, shall be
35  fabricated, installed and maintained by Tenant at its sole cost and expense and, at Tenant's election,
36  shall be of no less sign area than the largest sign of any other tenant or occupant in the Shopping
37  Center.  Subject to governmental approvals, in no event shall Tenant's storefront signs be
38  configured with less than an eighty-four (84) inch "dd's" and a thirty-three (33) inch
39  "DISCOUNTS" and a twenty-eight (28) inch "Ladies-Kids-Men-Shoes-Home" department sign.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 73 -

05/08/15
FINAL

Tenant shall have the right, but not the obligation, to install under-canopy signs if permitted by local governmental authority.  In the event the sign criteria for the Shopping Center require only a specific type or style of under-canopy sign, then Tenant shall have the right to approve any such under-canopy sign prior to such under-canopy sign's installation.

**24.3.   Pylon Signs.**

Landlord shall, at its sole cost and expense, maintain and repair the pylon sign structure(s) specified in the Site Plan and **Exhibit J**. Tenant may install and maintain Tenant's sign panels as specified in **Exhibit J**. Landlord shall cooperate fully with Tenant and assist Tenant, at Tenant's sole cost and expense, in obtaining all permits to install Tenant's sign panels on Landlord's "North Pylon" and "Middle Pylon" sign structures as specified on **Exhibit J**. The size and location of the panels shall be as specified in **Exhibit J** attached hereto. Landlord shall provide, at Landlord's sole cost and expense, blank panels for Tenant's pylon signage, with panel faces made of the material Landlord requires on all pylon signs at the Shopping Center (e.g., acrylic, aluminum or other material reasonably specified by Landlord for such sign panels). Tenant shall have the right to decorate such blank panels with Tenant's logo and/or trade name in format and color typically used or adopted by Tenant. Tenant shall pay for the expense of installing and maintaining its sign panels on the pylon sign structure(s). Utility charges and maintenance and repair for the pylon sign(s) on which Tenant places its sign panels shall be paid through Tenant's Common Area Charge.

**24.4.   Temporary Signs.**

During the period of construction described in Section 5.1, Tenant shall have the right to construct temporary signage adjacent to and/or on the Store and at the perimeter of the Shopping Center indicating the anticipated opening of the Store for business.  Additionally, Tenant may, through the thirtieth (30th) day following the opening of the Store for business, advertise such new business by means of banners, flags and other signage attached to the Store, provided only such temporary signage is (a) permissible under local ordinances, and (b) does not permanently damage the building exterior.

**24.5.   Visibility of Tenant's Store and Signs.**

Landlord's obligations and Tenant's rights set forth in this Section 24.5 are subject to applicable Requirements.  Landlord covenants and agrees that no landscaping, structures (other than those existing on the Effective Date) or other improvements shall be installed or permitted in the Shopping Center which materially and adversely interfere with or materially and adversely obstruct the visibility of the Store or any of Tenant's Signs (each, a "Material Obstruction").  Landlord further covenants and agrees that it shall regularly prune the landscaping in the Shopping Center so that such landscaping does not result in a Material Obstruction.  If any such landscaping, structures or other improvements are or become a Material Obstruction, Tenant may give Landlord written notice thereof and Landlord shall have fifteen (15) days from the date of Tenant's notice to remove or alter the structures or other improvements or to remove or prune the landscaping to eliminate such Material Obstruction ("Corrective Measures").  If Landlord fails to complete the Corrective Measures prior to the expiration of the fifteen (15) day period, then Tenant shall have the right, at its election and upon written notice to Landlord of such election, to take such Corrective Measures as

1    Tenant deems reasonably necessary to eliminate the Material Obstruction, and Tenant may deduct
2    the cost of such Corrective Measures from Rent due under this Lease.

3 **25. NOTICE**

4       Any notice to be given in connection with this Lease shall be in writing and shall reference
5 (a) this Lease, (b) the store number which has been assigned to the Store by Tenant (if known to
6 Landlord), and (c) the location of the Store.  The notice shall be served (i) personally, or (ii) by
7 certified mail, return receipt requested, or (iii) by reputable courier service which provides written
8 evidence of delivery, addressed to Landlord as specified in Section 1.2.1 and addressed to Tenant as
9 specified in Section 1.2.2 (or to such other address as requested by either party in writing), or (iv) by
10 telephone facsimile upon which the date and time of transmission is machine imprinted to the
11 number specified in Section 1.2.1 as to Landlord and as specified in Section 1.2.2 as to Tenant,
12 provided that a copy of the notice is concurrently sent by reputable courier service in accordance
13 with clause (iii) above.  Copies of any notices sent to Tenant (addressed to Tenant as specified in
14 Section 1.2.2) shall also be sent to Bartko, Zankel, Bunzel & Miller, One Embarcadero Center,
15 Suite 800, San Francisco, CA 94111, Attention: Ross Notices.  All notices given in the manner
16 specified herein shall be effective upon actual receipt or upon refusal to accept delivery.

17       Either party, by written notice to the other, may designate two (2) additional parties to
18 receive copies of notices.  Any notice party to this Lease may change its address or location for
19 service of notices, for themselves or any of their respective designees by written notice.

20 **26. GENERAL CONDITIONS**

21 **26.1.  Partial Invalidity.**

22       If any term, covenant, condition, provision or restriction of this Lease is held by a Court of
23 competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof
24 shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

25 **26.2.  Relationship of Parties.**

26       Nothing contained in this Lease shall be deemed or construed by the parties hereto or by
27 any third person to create the relationship of principal and agent, or of partnership, or of joint
28 venture, or of any other association between the parties other than Landlord and Tenant, or to
29 prevent Landlord or Tenant from entering into ventures in direct competition with the Shopping
30 Center, or the Store.

31 **26.3.  Time.**

32       Time is of the essence in the performance of each provision of this Lease.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

- 75 -

05/08/15
FINAL

1    **26.4.   Waiver.**

2    The waiver of the performance of any term, covenant, condition, provision or restriction of
3    this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the
4    same term, covenant, condition, provision or restriction. The various rights, options, elections,
5    powers and remedies of the parties contained in this Lease shall be construed as cumulative and no
6    one of them exclusive of any other or of any legal or equitable remedy which either party might
7    otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a
8    party shall not in any way impair its right to any other right or remedy.

9    **26.5.   Partial Months.**

10    For purposes of computing dates for expirations, Option Periods, Rent adjustments or
11    cancellations (except for those dates specifically designated herein), any partial month at the
12    commencement of the Term shall be disregarded.

13    **26.6.   Consent.**

14    Unless a different standard is otherwise specifically stated, wherever in this Lease Landlord
15    or Tenant is required to give its consent or approval to any action on the part of the other, such
16    consent or approval shall not be unreasonably withheld, conditioned or delayed.

17    **26.7.   Gender.**

18    Words of gender used in this Lease shall be deemed to include other genders, and singular
19    and plural words shall be deemed to include the other, as the context may require.

20    **26.8.   Governing Law.**

21    This Lease shall be construed in accordance with and governed by the laws of the state
22    wherein the Store is located, except as otherwise required by mandatory provisions of law.

23    **26.9.   Due Authority.**

24    Each individual executing this Lease on behalf of Landlord or Tenant (in his/her
25    representative capacity only) represents and warrants that he or she is duly authorized to execute and
26    deliver this Lease on behalf of the applicable entity and that this Lease is binding upon the entity.

27    **26.10.   No Prior Agreements.**

28    It is understood that there are no oral agreements or representations between the parties
29    hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations,
30    arrangements, brochures, agreements or representations and understandings, if any, between the
31    parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and
32    none thereof shall be used to interpret or construe this Lease. There are no other representations or
33    warranties between the parties, and all reliance with respect to representations is solely upon the

1   representations and agreements contained in this Lease.  This Lease may be modified or amended
2   only by an agreement in writing signed by the parties hereto.

3   **26.11.  Entry by Landlord.**

4        Upon reasonable prior notice, in no event to be less than five (5) Business Days (except in
5   the case of a bona fide emergency, in which event, no prior written notice shall be required, but
6   prior verbal notice shall be required and promptly confirmed in writing thereafter), Landlord may
7   enter the Store during Tenant's business hours for purposes of inspection, to show the Store to
8   prospective purchasers and lenders, or to perform maintenance and repair obligations imposed upon
9   Landlord by this Lease.  All maintenance, repairs or replacements by Landlord to the interior of the
10  Store or using the interior of the Store or maintenance, repairs or replacements to any portion of the
11  Shopping Center that will create dust, noise, vibration or other disturbance of Tenant's use of the
12  Store shall be performed only during hours that the Store is not open to the public.  Should
13  Landlord unreasonably interfere with Tenant's business by such entry, Rent shall equitably abate in
14  an amount reasonably determined with reference to the nature, extent and duration of the
15  deprivation of Tenant's business in connection with Landlord's entry into the Store. In the event of
16  any dispute as to such equitable abatement, the matter shall be referred to Alternative Dispute
17  Resolution pursuant to Section 20.2 above.

18  **26.12.  Neutral Interpretation.**

19        Landlord and Tenant agree that this Lease has been freely negotiated and that in the event a
20  dispute arises with respect to the meaning or interpretation of any provision of this Lease, no
21  presumption, inference or conclusion shall be drawn against the party that drafted the provision in
22  question.

23  **26.13.  Force Majeure.**

24        As used in this Lease, the term "Force Majeure" means delay resulting from causes beyond a
25  party's reasonable control such as strikes, walkouts or other labor disputes; acts of God; inability to
26  obtain labor, materials or merchandise; judicial orders; war; riot or civil commotion; fire or Casualty;
27  governmental laws or regulations (hereinafter "governmental matters"), provided that
28  "governmental matters" shall exclude planning and building permits, governmental inspections,
29  permanent or temporary certificates of occupancy (or their equivalent in the applicable local
30  jurisdiction) and similar governmental approvals.  The party obliged to perform shall give notice to
31  the other as soon as reasonably possible after the onset of such delay stating the cause and an
32  estimate of the duration thereof.  If, as a result of an event of Force Majeure, either party shall be
33  delayed or hindered or prevented from the performance of any act required hereunder (other than
34  the making of payments) within the time period set forth herein, the performance of such act shall
35  be excused for the period of delay not to exceed sixty (60) days, and the period of performance of
36  such act shall be extended for a period equivalent to the period of such delay, not to exceed sixty
37  (60) days, unless a provision of this Lease expressly states that Force Majeure is not applicable.
38  Financial inability to perform shall not constitute an event of Force Majeure.

"Palm Springs"                           - 77 -                            05/08/15
Palm Springs Plaza                                                         FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

1   **26.14.  Successors in Interest.**

2   The terms, conditions and covenants herein contained shall inure to the benefit of and be
3   binding upon the heirs, assigns and other successors in interest to the parties hereto, except as
4   otherwise provided in this Lease.

5   **26.15.  Memorandum of Lease.**

6   This Lease shall not be recorded.  However, a Memorandum of Lease shall be executed, in
7   recordable form, by both parties concurrently herewith.  Either party may record the same at its own
8   cost and expense.

9   **26.16.  Real Estate Brokers.**

10   Landlord and Tenant each represents and warrants to the other party that it has not
11   authorized or employed, or acted by implication to authorize or employ, any real estate broker or
12   salesman to act for it in connection with this Lease, other than The Shopping Center Group, LLC
13   ("Broker"), who shall be paid by Landlord at the rate of Three Dollars ($3) per square foot of
14   Leasable Floor Area in the Store Agreed Size, for a total commission of Sixty-Six Thousand Dollars
15   ($66,000),  fifty percent (50%) upon the expiration of all contingencies to this Lease becoming
16   effective, and fifty percent (50%) upon the earlier of (a) Tenant opening the Store for business, or
17   (b) the Commencement Date.  Landlord and Tenant shall each indemnify, defend and hold the
18   other party harmless from and against any and all claims by any other real estate broker or salesman
19   whom the indemnifying party authorized or employed, or acted by implication to authorize or
20   employ, to act for the indemnifying party in connection with this Lease.  Further, in the event
21   Landlord fails to pay the Broker within ten (10) days of the date that such commission is due to be
22   paid, and Landlord fails to pay the Broker within ten (10) days following receipt of written notice
23   from Tenant, thereafter Tenant, at its option, may pay the Broker's fees and deduct the same from
24   Rent as it comes due.

25   **26.17.  Intentionally Deleted.**

26   **26.18.  Limitation of Landlord's Liability.**

27   Except for Landlord's (a) fraud, or (b) intentional material misconduct or misrepresentation,
28   Landlord's liability hereunder shall be limited to Landlord's then interest in the Shopping Center for
29   recovery of any judgment against Landlord, and/or other assets of Landlord (or its representatives,
30   agents, partners, shareholders, directors, employees, fiduciaries, members or officers) shall be subject to
31   any action or proceeding for the enforcement of any right or remedy of Tenant hereunder nor shall
32   Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries,
33   members or officers) be personally liable for any judgment under this Lease.
34
35   **26.19.  OFAC Statement.**

36   Landlord and Tenant, each for itself, represents that it is not listed, nor is it controlled by, or
37   acting for or on behalf of, any person or entity on the list of Specially Designated Nationals and

Blocked Persons that is maintained by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury (the "OFAC List"). Landlord and Tenant, each for itself, represents to the best of its knowledge that it is not currently engaged in any transactions or dealings or otherwise associated with any person or entity on the OFAC List in connection with the use or occupancy of the Store. Notwithstanding anything to the contrary stated herein, neither Landlord nor Tenant shall knowingly permit the Store or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity on the OFAC List.

**26.20.   Confidentiality Agreement.**

Landlord and Tenant agree to keep the terms of this Lease confidential and not to disclose any information with regard to this Lease, including, but not limited to, any information regarding Rent, Store opening dates, Tenant's sales figures or estimated sales figures, except that each part may release such information to: (a) its accountants, professional advisors, attorneys, investors, lenders and prospective purchasers of Landlord's Parcel or prospective assignees of Tenant's interest in this Lease, as applicable, to the extent reasonably necessary for the applicable party's business purposes, (b) as required by a subpoena, court order, in connection with litigation between the parties, or as otherwise required by law, rule or regulation, (c) as required for any SEC filing by Landlord or Tenant, and (d) in order to enforce the terms of this Lease. Under no circumstances shall Landlord issue press releases or make public disclosure to the media or other third parties (including via postings on the Internet) regarding Tenant's anticipated occupancy, Store opening, and any provisions of this Lease, nor shall Landlord post the terms of this Lease without the prior written consent of Tenant, which consent shall be at Tenant's sole discretion. Notwithstanding the foregoing, the recording of the Memorandum of Lease disclosing the Ross Prohibited Uses set forth in Section 3.2.1 and the Protection clause set forth in Section 15.3, approved and executed by Tenant and recorded pursuant to Section 26.15, shall not be deemed to violate the provisions of this Section 26.20. In addition, Landlord may disclose the Ross Prohibited Uses set forth in Section 3.2.1 and the Protection clause set forth in Section 15.3 of this Lease to tenants and prospective tenants of Landlord's Parcel without Tenant's prior consent. In the event of a breach of the obligations under this Section 26.20 by Landlord and/or its employees or agents, Tenant shall, for the first breach, issue Landlord a cease and desist notice. Nothing herein shall preclude Tenant from exercising any rights or remedies available at law or in equity or under this Lease in the event of a breach of this Section 26.20.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

– 79 –

05/08/15
FINAL

1    **26.21.  No Offer.**

2        The submission of this Lease for examination and negotiation does not constitute an offer to
3    lease, or a reservation of, or option for, the Store, and this Lease shall not become effective or
4    binding until this Lease has been fully executed by both Landlord and Tenant and an executed
5    original of this Lease has been delivered to each party.

LANDLORD:                                   TENANT:
PHILIPS LAKE WORTH LLC,                      ROSS DRESS FOR LESS, INC.,
a Florida limited liability company          a Virginia corporation

By: _____              By: _____
Name: _Diana Marino_____                 James Fassio
Its: _Secretary/Treasurer__                Its:  President and Chief Development Officer

Witness: _Iliana Crespo_____              Witness: _Sandra Powers_____
Printed Name: _Iliana Crespo__             Printed Name: _Sandra Powers__
Witness: _Maida Gutierrez_____             Witness: _Michelle Owings_____
Printed Name: _Maida Gutierrez_            Printed Name: _Michelle Owings__

By: _____              By: _____
Name: _____              Gregg McGillis
Its: _____              Its:   Group Senior Vice President, Property Development

Witness: _____              Witness: _Sandra Powers_____
Printed Name: _____              Printed Name: _Sandra Powers__
Witness: _____              Witness: _Michelle Owings_____
Printed Name: _____              Printed Name: _Michelle Owings__

6

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                    )
                                       )
County of Alameda                      )

On **May 14, 2015** before me, *Sandra Powers* a Notary Public, personally appeared James Fassio and Gregg McGillis, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

```
SANDRA POWERS
Commission # 2048841
Notary Public - California
Alameda County
My Comm. Expires Dec 11, 2017
```
_____
Notary Public

State of _____ *Florida* _____ )
                                )
County of *Miami- Dade* _____ )

On *May 20, 2015* before me, *Maida Gutierrez*, a Notary Public, personally appeared *Diana Marrone*, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

```
MAIDA GUTIERREZ
Notary Public - State of Florida
My Comm. Expires Apr 30, 2017
Commission # EE 863642
Bonded Through National Notary Assn.
```
_____
Notary Public

"Palm Springs"                                        - 81 -                                    05/08/15
Palm Springs Plaza                                                                              FINAL
Palm Springs, FL
Store No. 5296
6061.1319/868020.7

## EXHIBIT A

## LEGAL DESCRIPTION OF THE SHOPPING CENTER

A portion of Section 19, Township 44 South, Range 43 East, according to the Plat thereof, recorded in Plat Book 6, Page 66, of the Public Records of Palm Beach County, Florida, more particularly described as follows:

Commence at the Northeast corner of Lot 1, Block 75-A, of that certain plat of a REPLAT OF A PORTION OF VILLAGE OF PALM SPRINGS PLAT NO. 8, according to the Plat thereof, recorded in Plat Book 26, page 116, of the Public Records of Palm Beach County, Florida, thence run South 89 degrees 42 minutes 47 seconds East, along a line parallel to and 55 feet South of as measured at right angles to the North line of the South 1/2 of the Northeast 1/4 of Section 19, Township 44 South, Range 43 East for 397.36 feet to the Point of Beginning; thence continue along the last described course for 725.14 feet to a point of curvature, thence run along a curve to the right having a radius of 25 feet and a central angle of 89 degrees 42 minutes 47 seconds for an arc distance of 39.14 feet to point of tangency; thence run South 00 degrees 02 minutes 00 seconds East along a parallel to and 40 feet West of as measured at right angles to the East line of the Northeast 1/4 of Section 19 for 1,223.40 feet; thence run North 89 degrees 43 minutes 04 seconds West along a line parallel to and 40 feet North of, as measured at right angles to the South line of the said Northeast 1/4 of Section 19 for 750.01 feet to a point; thence run North 00 degrees 02 minutes 00 seconds West along a line parallel to and 790 feet West of, as measured at right angles to the East line of the Northeast 1/4 of Section 19, for 1,248.11 feet to the Point of Beginning; LESS the West 123.64 feet thereof and less the East 10 feet as additional right-of-way for Congress Avenue.

LESS AND EXCEPTING THEREFROM that parcel of land as conveyed to PALM BEACH COUNTY by that Right-of-way Warranty Deed recorded in Official Records Book 8102, Page 1830, of the Public Records of Palm Beach County, Florida.

ALSO LESS AND EXCEPTING THEREFROM that parcel of land as conveyed to LAKE WORTH DRAINAGE DISTRICT by that Quit Claim Deed recorded in Official Records Book 14174, Page 1178, of the Public Records of Palm Beach County, Florida, described as follows: The South 40 feet of the East 790 feet of the South One-Half (S 1/2) of the Northeast One-Quarter (NE 1/4) of Section 19, Township 44 South, Range 43 East, less the West 123.64 feet and the East 50 feet, Palm Beach County, Florida.





<u>EXHIBIT C</u>

ROSS BUILT
**CONSTRUCTION OBLIGATIONS OF TENANT**
**(LANDLORD PAYS NO CONSTRUCTION COSTS)**

1.  **Description of Work.**  To effect completion of the work described in the Final Plans (hereinafter called the "Work" or the "Improvements"), Landlord authorizes Tenant to act as construction supervisor.   The duties of Tenant as construction supervisor shall include the obligation to arrange, contract (in Tenant's name) and pay for the furnishing of all labor and materials to construct and complete in a good, expeditious, workmanlike and substantial manner the Improvements.   In its capacity as construction supervisor, Tenant shall supervise and direct all Work, using its best skill and attention.  Tenant shall be solely responsible for all construction means and methods, techniques, sequences and procedures, and for coordinating all portions of the Work. All Work shall be performed in accordance with this Agreement.  Delegation to Tenant of the obligation to construct the Improvements in no way constitutes a waiver of Landlord's ownership rights in the Improvements as provided in Section 12.1 of the Lease.  Capitalized terms used herein shall have the meanings ascribed to them in the Lease, unless expressly defined herein.

2.  **Preliminary Plans.**   Tenant shall deliver to the Landlord a set of plans and specifications (hereinafter the "Preliminary Plans") for the improvements within ninety (90) days after the later to occur of (a) the date of execution of the Lease by both Landlord and Tenant, or (b) Landlord's delivery to Tenant of "as built" plans for the Store to the extent available to Landlord, which "as built" plans, if available to Landlord, shall in no event be delivered more than ten (10) days after execution of the Lease.  In the event a proceeding for a Land Entitlement Permit is required, the time for delivery of the Preliminary Plans shall be extended by the period required for acquisition of such entitlement permit in accordance with Section 6 below.

3.  **Final Plans.**  Within fifteen (15) days following the date the Preliminary Plans are delivered to Landlord by Tenant, Landlord shall, in writing, approve or disapprove said plans, which approval may not be unreasonably withheld.  The sole reasonable ground for Landlord's disapproval of Preliminary Plans, or any part thereof, shall be that the Improvements described are of such a special purpose and nature that a subsequent tenant in the same business as Tenant could not reasonably use the Improvements for its own purposes.  Preliminary Plans approved by both Landlord and Tenant are hereinafter referred to as "Final Plans."  Any disapproval must be accompanied by a specific description of the revisions Landlord would require in order to approve the Preliminary Plans, which revisions must be reasonable.  In the event the Preliminary Plans are disapproved by Landlord, Tenant shall incorporate into the Preliminary Plans the suggested revisions received from the Landlord, and shall resubmit such revised Preliminary Plans to Landlord within thirty (30) days following receipt of Landlord's notice of disapproval; Landlord shall have fifteen (15) days thereafter in which to approve or disapprove the same, and in the event Landlord disapproves the same, such disapproval shall be on reasonable grounds stated in writing.  In lieu of adopting Landlord's suggested revisions, Tenant may negotiate with Landlord for modifications of suggested revisions  within the ensuing thirty (30) day period.  If the parties cannot agree on the Final Plans, the Lease may be terminated by either party by written notice to the other at any time following expiration of the thirty (30) day period following Landlord's disapproval, except, however,

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/870647.2

EXHIBIT C
Page 1

05/08/15
FINAL

that Landlord shall not have the right to terminate if its approval of the Preliminary Plans has been unreasonably withheld, or disapproval of the Preliminary Plans has not been on reasonable grounds. In the event Landlord fails to disapprove the Preliminary Plans or Tenant's revisions thereto, in writing, or fails to state the reasons for disapproval or disapproves the same on unreasonable grounds within the fifteen (15) day time period set forth above, then such Preliminary Plans or revisions thereto shall be deemed approved.  Tenant shall have the right, without Landlord's consent, to modify the Final Plans in connection with non-structural alterations or improvements to the interior of the Store and signage on the exterior of the Store (subject to the provisions of Article 24 of the Lease with respect to Tenant's signage on the exterior of the Store).

4.     **Site Plan.**  Any site plan included in the Final Plans shall conform generally to Exhibit B of the Lease.  The Store shall contain approximately the number of square feet as set forth in the Lease.

5.     **Approvals and Permits.**

(a)     Upon approval of the Final Plans by both parties, Tenant shall forthwith make application to all appropriate governmental agencies for all necessary building permits, licenses and other grants for authority which may be required in connection with the construction of the Improvements (hereinafter collectively the "Building Permit") or the installation of Tenant's signage (the "Signage Permit").  Upon issuance of the Building Permit, a final initialed and dated set of plans reflecting all governmentally required changes shall be delivered to Landlord.

(b)     Tenant shall have ninety (90) days from the date the Preliminary Plans are approved by both parties in which to obtain the Building Permit and the Signage Permit.  If the Building Permit and/or the Signage Permit is not obtained (including the inability to obtain any required variance from such governmental authority) within the ninety (90) day period, Tenant, at its sole option, may terminate the Lease upon written notice to Landlord.  If the Building Permit and/or the Signage Permit is not obtained within two hundred seventy (270) days from the date the Preliminary Plans are approved by both parties hereto, either party may terminate the Lease thereafter by written notice to the other.

6.     **Land Entitlement Permits.**  Should it be necessary for Landlord to obtain a Land Entitlement Permit (as defined hereinbelow) of any sort, the time for preparation of Preliminary or Final Plans shall be extended by the time reasonably required to obtain such Land Entitlement Permit.  Tenant shall prepare such plans and specifications as may be reasonably required for the processing of such Land Entitlement Permit for the Store only.  The term "Land Entitlement Permit" as used herein shall include without limitation by enumeration an environmental impact report or statement or its equivalent, a zoning change or variance, an architectural or design review approval, general plan change, planned unit development approval or its equivalent, subdivision approval or its equivalent, or any other approval pertaining to the Work or use or general design of the Store and Improvements as opposed to the structural integrity of the Improvements.

7.     **Access to Premises.**  Tenant's architect at all times shall have access to the Store during construction for purposes of inspection.

## EXHIBIT D

## SHOPPING CENTER PROHIBITED USES

Aldi

immediately adjacent to such merchandise display rack/cases/coolers. In addition, Landlord agrees that until the end of the Term, or any continuations or extensions thereof, Landlord shall not use or occupy, or permit the use of or occupancy of the Center for any of the "Restricted Uses" set forth on **Exhibit G**, attached hereto.

### EXHIBIT G

#### Restricted Uses

a.   laundry or dry cleaning establishment, provided, the foregoing restriction shall not include an establishment for dry cleaning drop-off and pick-up only, with no cleaning services being performed at the subject property;

b.   off-track betting establishment or facility where gambling occurs whether in person or over the internet;

c.   a pool or billiard hall (unless operated as part of a large scale family recreation or entertainment facility);

d.   a business whose primary operation is selling alcoholic beverages for on-premises consumption, except for a restaurant with sit down table service in a premises that faces 10th Avenue;

e.   adult book store or any form of adult entertainment;

f.   bingo parlor;

g.   a school, academy or learning center having more than 20 students at any one time within 200 feet of the Premises.  No school, academy or learning center over 10,000 square feet shall be permitted anywhere in the Center. Notwithstanding the foregoing, Landlord shall be permitted to lease space on the 2nd floor of the space depicted as the "School Space" on **Exhibit A-2** to a school so long as such school leases less than 4,500 square feet. Students and faculty of any such school shall park in designated areas behind the Center and not in the main parking field;

h.   a video game parlor or amusement arcade, provided that a first class entertainment venue with food such as Chuck E. Cheese or Dave & Busters (by way of example) are permitted;

i.   a business which would emit or produce noxious fumes or gases or loud noises outside of its enclosed space;

j.   an assembly or manufacturing operation;

k.   an establishment selling or exhibiting pornographic materials;

l.   any bowling alley, skating rink, nightclub, discotheque or dance hall;

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/909687.2

EXHIBIT D
Page 1

05/08/15
FINAL

m.  a lot for the sale of used automobiles;

n.  a mobile home park , trailer court, or labor camp or mobile home sales lot (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance);

o.  a "Good Will" or "Salvation Army" type store;

p.  a mortuary or funeral home;

q.  a church or other place of worship;

r.  an abortion clinic;

s.  a distilling, refining, smelting, industrial, agricultural, drilling or mining operation;

t.  a junk yard, stock yard or animal raising operation;

u.  a dump or disposal, or any operation for the incineration or reduction of garbage of refuse;

v.  any establishment which stocks, displays, sells, rents, or offers for sale or rent any merchandise or material commonly used or intended for the use with or in consumption of any narcotic, dangerous drug, or other controlled substance, including, without limitation, any hashish pipe, water pipe, bong, pipe screens, rolling papers, rolling devices, coke spoons or roach clips;

w.  flea market;

x.  an operation whose principal use is a massage parlor and/or exotic dancing, provided this shall not prohibit massages in connection with a beauty salon or health club or athletic facility;

y.  a pawn shop;

z.  no flashing neon signs may be placed on any poles located on the property;

aa.  the outdoor display, sale or storage of seasonal merchandise (Christmas trees, pumpkins, flowers, etc.); and/or the temporary or periodic (i.e., not permanent) outdoor display, sale or storage of merchandise (art work, novelties, clothing, etc.);

bb.  a use or operation which is a violation of applicable environmental law;

cc.  a store dedicated to the sale of tobacco products unless operated as an upscale cigar shop;

dd.  A gym or health club facility in excess of 5,000 square feet located within 500 feet of the Premises, such as Gold's Gym, World Gym or Rush Fitness.

**Bennett Auto Supply**

1. No outdoor circus, carnival or amusement park,

2 No shooting gallery.

3. No off-track betting (provided that the state sponsored lottery tickets shall not be prohibited).

4. No adult bookstore or facility selling or displaying pornographic books, literature, or video tapes (material shall be considered adult or pornographic for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), massage parlor,

5 No residential use, including but not limited to living quarters, sleeping sleeping apartments or lodging rooms.

6 No dance hall.

7 No cocktail lounge, bar, disco or night club.

8 No bingo or similar games of chance (provided that the state sponsored lottery tickets shall not be prohibited).

9. No skating or roller rink.

10 No second hand store, auction house or flea market.

**Ross Dress For Less**

3.2.1.   Retail Use.

(a)    Tenant has entered into this Lease in reliance upon representations by Landlord that Landlord's Parcel is and shall remain retail in character, and, further, no part of Landlord's Parcel shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary services or vaccination clinic, overnight stay pet facilities, health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, the sale of adult products or adult bookstores or adult audio/video products stores (which are defined as stores, other than national or regional tenants like Barnes & Noble or Borders, in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store. No tenant or occupant of the Shopping Center shall be permitted to use space for a store primarily selling merchandise at one price or set prices, such as 99 Cents Store or Family Dollar Store as such are operated on the Effective Date. Further, excepting existing restaurant tenants set forth on Exhibit L and their replacements, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in Landlord's Parcel within three hundred (300) feet of the front and side perimeter walls of the Store. A "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement. The foregoing use restrictions are referred to herein as the "Ross Prohibited Uses".

(b)    Notwithstanding Section 3.2.1(a) above:

(i)     Offices may be used for medical, dental, real estate, legal, accounting, banking, tax preparation, travel agencies, securities and other investments and financial planning, insurance and similar uses (which uses shall be considered to be retail in character) provided that they are located at least two hundred (200) feet from the front and side perimeter walls of the Store and do not exceed 7,500 square feet in the aggregate.  The two hundred (200) foot distance limitation does not apply to Existing Tenants set forth on Exhibit L – "Existing Tenants" and their replacements.  The 7,500 square foot aggregate limitation shall not apply to offices located in (a) the existing two (2) story building with primary parking facing the rear of the Shopping Center, (b) the 37,000 square foot space identified on Exhibit B that is on the south end of the Inline Building, or (c) the area identified on Exhibit B as Pier 1 may be re-developed as a bank, provided such bank building, stacking lanes and parking is located solely within the Pier 1 Building Envelope (9,600 square feet) with an entrance on the east side facing Congress Avenue.

(ii)     Supermarkets with walk up windows and other establishments primarily engaged in businesses other than serving prepared food serving coffee, snacks or other light food shall not be considered to be restaurants.

(iii)     One (1) gymnasium and one (1) health club shall be permitted in the Shopping Center provided they shall not exceed five thousand (5,000) square feet of Leasable Floor Area and shall be at least two hundred (200) feet from the perimeter of the Store.  The 5,000 square foot limitation shall not apply to a gymnasium or health club located in the 37,000 square foot space identified on Exhibit B that is on the south end of the Inline Building.

(iv)     A school shall be permitted provided it is incidental to a retail use, and is not closer than two hundred (200) feet from the perimeter of the Store.  The "incidental" limitation set forth in the preceding sentence shall not apply to a school that is located in the 37,000 square foot space identified on Exhibit B that is on the south end of the Inline Building.

(v)     One (1) vehicle leasing tenant of not more than one thousand five hundred (1,500) square feet of Leasable Floor Area, such as Enterprise or Avis, shall be permitted in the Shopping Center provided such tenant (a) is located either in the second level of the Inline Building or in the stores located in the shops east of the location currently occupied by Dollar Store facing Congress Avenue and (b) utilizes no more than three (3) parking spaces for its leased vehicles in the area designated on Exhibit B.

(vi)     An establishment that offers video game arcades and other forms of entertainment, similar to Chuck E Cheese or Dave & Busters, shall be permitted in the 37,000 square foot space identified on Exhibit B that is on the south end of the Inline Building.

(vii)     A Dollar Tree or Dollar General or their affiliates or assignees/sublessees (where Landlord has no right to consent to such assignees/sublessees, or where Landlord has the right to consent but has agreed in the lease not to unreasonably withhold consent and where Landlord, in its reasonable business judgment, believes it may not lawfully withhold consent to the proposed assignee/sublessee) shall be permitted in the Shopping Center.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/909687.2

EXHIBIT D
Page 4

05/08/15
FINAL

1                                     <u>EXHIBIT E</u>

2                          ACKNOWLEDGMENT OF COMMENCEMENT

3          This Acknowledgment is made as of _____, 20____ with reference to that
4   certain lease (hereinafter referred to as the "Lease") dated _____, 20____, between
5   **PHILIPS LAKE WORTH LLC**, as "Landlord" therein, and **ROSS DRESS FOR LESS, INC.**,
6   as "Tenant."

7          The undersigned hereby confirms the following:

8          1.      The Delivery Date (as described in said Lease) occurred on _____.

9          2.      In accordance with the provisions of said Lease the commencement date of the term
10  is _____, and that, unless sooner terminated, the original term thereof expires
11  on _____.

12         3.      The Agreed Size is _____ square feet.

13         4.      The notice date for the exercise of the first option is on or before _____,
14  20____.

15
16  **LANDLORD:**                          **TENANT:**
    **PHILIPS LAKE WORTH LLC,**            **ROSS DRESS FOR LESS, INC.,**
    **a Florida limited liability company**  **a Virginia corporation**


    By:_____    By:_____
                                              Gregg McGillis
    Its: _____     Its:  Group Senior Vice President, Property Development

    Witness:_____     Witness:_____
    Printed Name:_____     Printed Name:_____
    Witness:_____     Witness:_____
    Printed Name:_____     Printed Name:_____

17

RECORDING REQUESTED BY

Ross Dress For Less, Inc.

PREPARED BY AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Bunzel & Miller
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Attn.: Theani C. Louskos, Esq.

**EXHIBIT F**

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

### LOCATION:  Palm Springs, FL

APN: 70-43-44-19-20-029-0010.

This Subordination, Nondisturbance and Attornment Agreement (the "Agreement") is effective as of this ____ day of _____, 20___, by and between_____, a _____(the "Lender"), ROSS DRESS FOR LESS, INC., a Virginia corporation (the "Tenant").

### RECITALS

A.     Lender is the holder of indebtedness secured by a lien or liens upon, the real property described in Exhibit "A" attached hereto and by this reference incorporated herein.  The Exhibit "A" property and improvements thereon is hereinafter referred to as the "Shopping Center."  The instruments creating such lien or liens whether they be denominated as being "mortgage," "deed of trust," "deed to secure debt," "security agreement," "vendor's lien," "ground lease," or otherwise, and any instruments modifying or amending the same, or entered into in substitution or replacement thereof, are hereinafter collectively referred to as being the "Mortgage," recorded in the Official Records of Palm Beach County as Document No._____.

B.     Tenant has executed, or will execute, a certain lease with Philips Lake Worth, LLC ("Landlord"), dated for reference purposes on _____, for all or a portion of the Shopping Center, which portion (the "Premises") is more particularly set forth in said lease.  Said lease and all amendments and modifications thereto are herein collectively referred to as the "Lease."

C.     Tenant has requested that Lender agree not to disturb Tenant's possessory rights under the Lease in the event that Lender should foreclose on the Mortgage, provided that Tenant is not in default of the Lease.

D.     The parties desire to establish certain rights and obligations with respect to their respective interests by means of this Agreement.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/914746.1

EXHIBIT F
Page 1

05/08/15
FINAL

## AGREEMENTS

NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein contained, and intending to be legally bound by hereby agree as follows:

1.     Subject to the terms and conditions of this Agreement, and for so long as this Agreement remains binding upon Lender, the Lease shall be, in accordance with the terms and conditions hereof, subordinate to the lien of the Mortgage and all voluntary and involuntary advances made thereunder.

2.     Lender approves of the Lease.

3.     Provided that Tenant is not in default so as to permit the Landlord to terminate the Lease or Tenant's right to possession of the Premises, Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, whether judicial or non-judicial, or Lender pursuant to acceptance of a deed in lieu of foreclosure or any assignment of Landlord's interest under the Lease, in the exercise of any of the rights arising, or which may arise, out of the Mortgage or in any other manner: (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its right to use, quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit or privilege granted to or inuring to the benefit of Tenant under the Lease (including any right of renewal or extension thereof); (ii) shall not terminate or affect the Lease;  (iii) shall recognize Tenant's rights, benefits and privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all of the terms, covenants, and conditions of the Lease for the remaining balance of the term of the Lease with the same force and effect as if Lender  were the Landlord under the Lease.  Lender hereby covenants that any sale by it of the Shopping Center pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder. However, in no event shall Lender be:

(a)     Liable for any act or omission of Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent such act or omission is of a continuing nature, such as, for example, a repair obligation;

(b)     Liable for any offsets or deficiencies which the Tenant might be entitled to assert against the Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent that Lender has received the benefit of the act of the Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that would otherwise have been paid by Lender as Landlord;

(c)     Bound by any payment of rent or additional rent made by Tenant to Landlord for more than one month in advance, which payment was not required under the terms of the Lease;

(d)     Bound by any amendment or modification of the Lease executed after the date of this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the Lease; and, (ii) is made without Lender's prior written consent (except to the extent that the Lease may specifically contemplate any amendment or modification thereof).

4.     In the event of the termination of the Mortgage by foreclosure, summary proceedings or otherwise, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the Landlord thereunder to terminate the Lease, then, and in any such event, Tenant shall not be made a party in the action or proceeding to terminate the Mortgage unless not to do so would be disadvantageous

procedurally to Lender, in which case, such joinder of Tenant as a party shall not extinguish or interfere with any rights of Tenant under the Lease, nor shall Tenant be evicted or moved or its possession or right to possession under the terms of the Lease be disturbed or in any way interfered with, and, subject to the provisions of this Agreement, Tenant will attorn to Lender or any other party which obtains title to the Shopping Center pursuant to any remedy provided for by the Mortgage or otherwise, such attornment to be effective and self-operative without the execution of any other instruments on the part of any party, and the Lease shall continue in full force and effect as a direct Lease from Lender or such party to Tenant under all the terms and provisions of the Lease (including any rights to renew or extend the term thereof).  In the event of such attornment, Lender shall be deemed to have assumed and shall assume the performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the time Lender becomes Landlord and until such time as such obligations are assumed by a bona fide purchaser.

5.      Tenant hereby confirms that the Lease is in full force and effect.

6.      Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of the Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

7.      If Landlord executes and delivers to Lender an Assignment of Leases and Rents conveying the rent under the Lease upon an event of default by Landlord under the Mortgage, after receipt of notice from Lender to Tenant (at the address set forth below) that rents under the Lease should be paid to Lender, Tenant shall thereafter pay to Lender all monies thereafter due to Landlord under the Lease.  In such event, Tenant shall be entitled to rely solely upon such notice, and Lender hereby indemnifies and agrees to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice.  Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with the provisions hereof.  Any dispute between Lender (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Mortgage, shall be dealt with and adjusted solely between Lender (or any other purchaser) and Landlord, and Tenant shall not be made a party thereto.

8.      Lender shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

9.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against which the same is brought to be asserted.

10.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, including without limitation, the covenants of Lender herein shall be specifically binding upon any purchaser of the Shopping Center at foreclosure or at a sale under power of sale.

11.      In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of no further force or effect.

12.     This Agreement shall be governed and construed according to the laws of the state where the Shopping Center is located.

13.     Provided that Tenant is not in default under the Lease, Lender shall not institute any litigation naming Tenant as a defendant for the purpose of foreclosing or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises unless Tenant is required to be named in such litigation by law, and then only for the purpose of complying with the applicable foreclosure statute and so long as Tenant's failure to defend against any such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in this Agreement.  The term "Lender" as used herein shall include any successor-in-interest to the Lender (including a purchaser at foreclosure or sale in lieu thereof).

14.     To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postage paid by United States registered or certified mail with return receipt requested.  Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication.   For purposes hereof, Lender's address is:

_____
_____
_____
Attn.:  _____

and Tenant's address is:

> Ross Dress For Less, Inc.
> 5130 Hacienda Drive
> Dublin, CA  94568-7579
> Attn.:  Real Estate Legal Notice Department

At any time(s), each party may change its address for the purposes hereof by giving the other party a change of address notice in the manner stated above.

15.     This Agreement (a) contains the entire understanding of Lender and Tenant regarding matters dealt with herein (any prior written or oral agreements between them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part only by a written instrument signed on behalf of the party against whom enforcement of the modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and their respective successors and assigns.

16.     In the event of any litigation arising out of the enforcement or interpretation of any of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its reasonable attorneys' fees, including costs of suit, discovery and appeal.  The "prevailing party" shall be that party who obtains substantially the relief sought in the action.

17.     In the event the Lease is terminated as a result of Landlord's bankruptcy or reorganization, whereby Lender obtains fee title to the Shopping Center (or in the case Lender is the ground lessor, retains fee title without the encumbrance of the ground lease), Lender agrees that the Lease shall remain in effect as

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/914746.1

EXHIBIT F
Page 4

05/08/15
FINAL

between Lender (as Landlord) and Tenant, subject to the terms of this Agreement, and, upon Tenant's written request, Lender and Tenant agree to execute a reinstatement agreement documenting that the Lease has been reinstated as between Lender (as Landlord) and Tenant and that the terms and conditions thereof shall be as stated in the Lease, subject to the provisions of this Agreement.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first written above.

TENANT:                                                          LENDER:

ROSS DRESS FOR LESS, INC.,                       _____,
a Virginia corporation                                     a _____


By:_____                      By:_____
     Gregg McGillis
Its:   Group Senior Vice President, Property Development   Its:_____

Witness:_____                     Witness:_____
Printed Name:_____                      Printed Name:_____
Witness:_____                     Witness:_____
Printed Name:_____                      Printed Name:_____

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
)
County of Alameda )

On _____ before me, _____,
a Notary Public, personally appeared Gregg McGillis, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

State of_____ )
)
County of_____ )

On _____ before me, _____, a Notary Public, personally appeared _____, personally known to me or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

## EXHIBIT A

## LEGAL DESCRIPTION OF THE SHOPPING CENTER

A portion of Section 19, Township 44 South, Range 43 East, according to the Plat thereof, recorded in Plat Book 6, Page 66, of the Public Records of Palm Beach County, Florida, more particularly described as follows:

Commence at the Northeast corner of Lot 1, Block 75-A, of that certain plat of a REPLAT OF A PORTION OF VILLAGE OF PALM SPRINGS PLAT NO. 8, according to the Plat thereof, recorded in Plat Book 26, page 116, of the Public Records of Palm Beach County, Florida; thence run South 89 degrees 42 minutes 47 seconds East, along a line parallel to and 55 feet South of as measured at right angles to the North line of the South 1/2 of the Northeast 1/4 of Section 19, Township 44 South, Range 43 East for 397.36 feet to the Point of Beginning; thence continue along the last described course for 725.14 feet to a point of curvature, thence run along a curve to the right having a radius of 25 feet and a central angle of 89 degrees 42 minutes 47 seconds for an arc distance of 39.14 feet to point of tangency; thence run South 00 degrees 02 minutes 00 seconds East along a line parallel to and 40 feet West of as measured at right angles to the East line of the Northeast 1/4 of Section 19 for 1,223.40 feet; thence run North 89 degrees 43 minutes 04 seconds West along a line parallel to and 40 feet North of, as measured at right angles to the South line of the said Northeast 1/4 of Section 19 for 750.61 feet to a point; thence run North 00 degrees 02 minutes 00 seconds West along a line parallel to and 790 feet West of, as measured at right angles to the East line of the Northeast 1/4 of Section 19, for 1,248.11 feet to the Point of Beginning; LESS the West 123.64 feet thereof and less the East 10 feet as additional right-of-way for Congress Avenue.

LESS AND EXCEPTING THEREFROM that parcel of land as conveyed to PALM BEACH COUNTY by that Right-of-way Warranty Deed recorded in Official Records Book 8102, Page 1830, of the Public Records of Palm Beach County, Florida.

ALSO LESS AND EXCEPTING THEREFROM that parcel of land as conveyed to LAKE WORTH DRAINAGE DISTRICT by that Quit Claim Deed recorded in Official Records Book 14174, Page 1178, of the Public Records of Palm Beach County, Florida, described as follows: The South 40 feet of the East 790 feet of the South One-Half (S 1/2) of the Northeast One-Quarter (NE 1/4) of Section 19, Township 44 South, Range 43 East, less the West 123.64 feet and the East 50 feet, Palm Beach County, Florida.

## EXHIBIT G

### DELIVERY NOTICE

1.  The "Lease"
    Landlord:   Philips Lake Worth LLC
    Tenant:     Ross Dress For Less, Inc.
    Location:   Palm Springs, FL
    Lease Dated:  _____

2.  All terms used herein shall be as defined in the Lease.

3.  Date of this Notice:  _____

4.  Ross Store #:    5296
    Project Address:  Congress Avenue and 10th Avenue North

5.  Pursuant to Section 5.4 of the Lease, this shall constitute the "Delivery Notice":

    (a)   The "Delivery Date," shall occur on: _____.

    (b)   Landlord acknowledges that all the requirements specified in Article 2, "Delivery Date," will be satisfied by the date specified in subparagraph (a), above.

**PHILIPS LAKE WORTH LLC,**
**a Florida limited liability company**

By:_____
Its:_____

Witness:_____
Printed Name:_____
Witness:_____
Printed Name:_____

Dated: _____

"Palm Springs"                   EXHIBIT G                 05/08/15
Palm Springs Plaza                                            FINAL
Palm Springs, FL
Store No. 5296
6061.1319/870662.1

EXHIBIT H

EXCLUSIVE USES

Aldi

Landlord shall not use or occupy, or permit the use of or occupancy of the Center, other than the Premises, for the operation of a Retail Grocery Store. The term "Retail Grocery Store" shall mean, without limitation, a supermarket, meat market, grocery store, fruit and vegetable store or stand, frozen or otherwise processed food store and any store where more than 50 grocery items are sold for off-premises consumption. Further, no portion of the Center shall be owned, controlled, leased, used or occupied for the conduct of a food market or grocery department in any department store or variety store occupying or using any part of the Center. Any such department store or variety store using or occupying any part of the Center shall refrain from operating thereon a grocery department or food market. "Retail Grocery Store" shall not include (i) a delicatessen, (ii) a restaurant or lunch room wherein prepared food is sold for on-premises

consumption or for "take-out" consumption, (iii) the sale of grocery items by any tenant at the Center provided that such tenant does not use more than 1,500 square feet of floor space of such premises for the sale/display of grocery items, and provided further that no such space is used for the sale/display of more than 100 square feet of floor space for refrigerator/freezer items, milk, eggs, produce, fresh meat of any kind or any perishable items of any kind. The square footage limitations set forth in the preceding sentence shall be inclusive of the area immediately under the merchandise display racks/cases/coolers and the aisles immediately adjacent to such merchandise display rack/cases/coolers. In

Arona Corporation

Landlord shall not lease any space within the Shopping Center to any other tenant that occupies less than twenty-five thousand square feet of space for the primary use of "rent to buy" furniture, as such term is referred to in the industry (the "Items"), provided that such use is directly competitive with the "rent to buy" furniture business operated by Tenant and subject to the rights granted any tenants under leases in existence as of the date of this Lease; such right granted to Tenant herein is referred to as "Tenant's Exclusive". The "Incidental Sale" (as hereinafter defined) of the Items in connection with the overall business of another tenant shall not be deemed a violation of Tenant's Exclusive. As used herein, "Incidental Sale" shall mean sales within a space not greater than twenty-five percent (25%) of such tenant's sales area.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/909699.1

EXHIBIT H
Page 1

05/08/15
FINAL

**Bennett Auto Supply**

the Landlord hereafter agrees not to enter into any new lease for space in the Shopping Center cross-hatched on Exhibit E (the "Exclusive Area") to a tenant whose primary business is the sale of "auto parts".



LANDLORD'S PROHIBITED USES

**Chili's**

(a)   _Exclusive Use_. During the term of this Lease, including any and all Renewal Terms, except for Tenant, and subject to all existing leases in the Center, Landlord shall not use any portion of the Center for Tenant's Exclusive Use, enter into a lease or other agreement that allows an occupant of the Center to operate for Tenant's Exclusive Use or consent to a change of permitted use under an existing lease that would permit any tenant or occupant of the Center to operate for Tenant's Exclusive Use "Tenant's Exclusive Use" shall mean the operation of a restaurant which is similar to Chili's Grill & Bar, such as, for example purposes only, Applebee's, B.J.'s Restaurant & Brewery, Brickhouse Tavern & Tapp, Buffalo Wild Wings, Cheddar's, Duffy's, Houlihan's, Miller's Ale House, Red Robin, Ruby Tuesday's and T.G.I. Friday's

**Dollar Tree Stores**

a.   Landlord shall not lease, rent, occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, for the operation of a single price point variety retail store ("Exclusive" or "Exclusive Use"). For the purposes of this Lease, a single price point variety retail store is defined as a store that offers all of its merchandise for sale at a single price point, which price point shall be $5.00 or less.

b.   Landlord will not permit any other occupant in the Shopping Center to operate the following uses (hereinafter, "Restricted Uses") without Tenant's consent and such consent shall be in Tenant's sole and absolute discretion:

   (1)   Variety retail operations with the word "Dollar" in their trade name, (provided that this shall not preclude the operation of a service business);

   (2)   A retail store whose "principal business" (hereinafter defined) is:

      a.   Selling variety retail merchandise at a single price point, which shall be $5.00 or less;

For the purpose of this Section, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half [1/2] of the adjacent aisle space).

Notwithstanding the foregoing, this Section A.13 shall not apply to (1) any tenant or occupant selling single price point apparel as its principal business, (2) any tenant selling toys as its principal business, or (3) any current occupant or tenant of the Shopping Center who is operating under their current use clause or trade name as of the date of this Lease;

## Eyeglass World

, Landlord agrees hereafter not to enter into any new lease for retail space in that portion of the Shopping Center set forth on Exhibit A-1 as the "Exclusive Area" which permits as the primary use retail sale of eyeglasses, contacts and corrective laser surgery.



## Fish Fantasia

Landlord hereafter agrees not to enter into any new lease for space in that portion of the Shopping Center cross-hatched on Exhibit D (the "Exclusive Area") to a tenant whose primary business is the sale of live pets and pet related supplies.

Harbor Freight

Landlord will not hereafter enter into another lease (or amend any existing lease) for the Shopping Center that would permit as a primary use the sale of hardware and tools.  For purposes of this provision, "primary use" means that the tenant devotes ten percent (10%) or more of its sales floor to the sale of hardware and tools.



Mercedes Jewelry

Landlord shall not lease any space within area designated in Exhibit D attached hereto (the "Exclusive Area") to any other tenant that occupies less than 2,500 square feet of space for the primary use of the sale of non-costume jewelry as such term is commonly referred to in the jewelry industry, subject to the rights granted any tenants under leases in existence as of the date of this Lease; such right granted to Tenant herein is referred to as "Tenant's Exclusive".

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/909699.1

EXHIBIT H
Page 4

05/08/15
FINAL



**Quest Diagnostics**

a general reference medical laboratory patient service   center (the "Permitted Use"). Landlord shall not lease any space in the  Shopping Center containing 4,000 square feet of rentable area or less to any other tenant to be used primarily for the Permitted Use, such right granted to Tenant herein is referred to as "Tenant's Exclusive".

**Rainbow USA**

Landlord shall not enter into any new leases for space in the Shopping Center containing 13,000 square feet or less to any nationally or regionally recognized tenant for the primary use of the discount sale of women's, juniors' and/or children's non-brand name apparel; such right granted to Tenant herein is referred to as "Tenant's Exclusive". Further, in connection with any lease in effect as of the date of this Amendment covering 13,000 square feet or less space in the Shopping Center, Landlord shall not consent to (a) any change in the use permitted under any such existing lease (whether by modification of such lease or by virtue of consenting to an assignment or subletting of the premises demised under such lease), or (b) any change in the tenant or occupant under any such existing lease (by virtue of consenting to an assignment or subletting of the premises demised under such lease where the tenant under such existing lease is required to obtain Landlord's consent to such assignment or subletting and Landlord may grant or withhold such consent in Landlord's sole and absolute discretion, which would allow any nationally or regionally recognized tenant to occupy such premises for the primary use of the discount sale of women's, juniors' and/or children's non-brand name apparel. By way of example, the parties agree that such tenants would include retailers such as Citi-Trends, Simply Fashions and Cato. As used herein, "primary use" shall mean that 25% or more of the floor area of the premises demised under such lease is used for the discount sale of women's, juniors' and/or children's non-brand name apparel.

**Ross Dress For Less\***

**15.3    Protection.**

Except for one store to be occupied by Bed Bath & Beyond, Anna's Linens or a comparable home goods/linens tenant, Landlord shall not enter into a lease for space in the Shopping Center, or permit the assignment or sublease of any lease for space (to the extent Landlord may withhold its consent thereto) whereby such tenant or occupant shall (a) use in excess of fifteen thousand (15,000) square feet of Leasable Floor Area of its premises for the Off Price Sale (as hereinafter defined) of merchandise, or

(b) use in excess of eighteen thousand (18,000) square feet of Leasable Floor Area of its premises for the sale of apparel. The foregoing restriction on the sale of apparel in more than eighteen thousand (18,000) square feet shall not apply to JC Penney, Kohl's, Belk's, Target or comparable stores, provided such tenants or occupant operate in more than sixty thousand (60,000) square feet. For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of non-replenishably purchased and not restocked items (as contrasted to regularly purchased and restocked items sold at a discount price) on an every day basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshalls, A.J. Wright, Fallas Paredes, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, Steinmart, Filene's Basement, or Beall's Outlet.).



**\*The foregoing exclusives shall not be applicable to Tenant, as Tenant and the tenant under the Ross Dress For Less lease are the same entity.**

<u>EXHIBIT H-1</u>

## ROSS DRESS FOR LESS, INC. WAIVER

_____, 2015

Ross Dress For Less, Inc.            Philips Lake Worth LLC
5130 Hacienda Drive                  419 West 49th Street, Suite 300
Dublin, CA  94568-7579               Hialeah, FL 33012
Attn:  Ms. Jac Gee                   Attn:  Mr. Ben Brody

Re:    Lease at Palm Springs Plaza; Palm Springs, FL (the "Shopping Center")
       dd's DISCOUNTS - Store No. 5296 – between Philips Lake Worth LLC ("Landlord")
       and Ross Dress For Less, Inc. ("Tenant") (the "dd's Lease")

Ladies and Gentlemen:

Philips Lake Worth L.P., a New York limited partnership (Landlord's predecessor in interest) and
Tenant entered into a lease (Store No. 1345) with an Effective Date of September 22, 2009 (the
"Existing Ross Dress For Less Lease") for a store doing business in the Shopping Center as a Ross
Dress For Less store.  Landlord and Tenant now desire to enter into the dd's Lease for the
operation of a dd's DISCOUNTS store in the Shopping Center (the "dd's Store").

Ross Dress For Less, Inc., as the tenant under the Existing Ross Dress For Less Lease, hereby
waives the exclusive use provisions contained in the Existing Ross Dress For Less Lease for the
benefit of the dd's Store and any other store operated in the Shopping Center by Tenant or any of
its affiliates or a Related Entity (as such term is defined in the Existing Ross Dress For Less Lease).

Sincerely,

ROSS DRESS FOR LESS, INC.,
a Virginia corporation


By:_____
Name: _____
Its:_____

### _Acknowledged and agreed by:_

PHILIPS LAKE WORTH LLC,
a Florida limited liability company


By:_____
Name: _____
Its:_____

## EXHIBIT I

## PERMITTED TITLE EXCEPTIONS

ROSS DRESS FOR LESS, INC. ("Tenant") agrees to take its leasehold interest subject only to the following items and exceptions stated in that certain Commitment for Title Insurance issued by Stewart Title Guaranty Company, dated March 9, 2015, No. C-72526-20150126, for the subject location in Palm Springs, Florida:

From Schedule B-I:

Requirement No. 3.

However, with respect to the Mortgage referred to in Requirement No. 3, Tenant agrees to take its leasehold interest subject to said Mortgage, subject to Tenant's receipt of a Non-Disturbance Agreement pursuant to Section 13.1.1 of the Lease.

From Schedule B-II:

Exceptions numbered 5 through 20.

However, with respect to the leases referred to in Exceptions numbered 8, 9 and 10, Tenant does not accept or agree to be subject to any provisions of such leases, except to the extent expressly set forth in the Lease between Tenant and PHILIPS LAKE WORTH LLC.

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/910662.2

EXHIBIT I

05/08/15
FINAL











## SITE PLAN
NOT TO SCALE

**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL







## VICINITY MAPS
NOT TO SCALE

Notes:

ROSS CONTRACTOR TO PROVIDE:
- ADEQUATE ACCESS BEHIND LOGO LETTERS AND CABINET FOR INSTALLATION AND MAINTENANCE, PER ARTICLE 600 OF THE N.E.C.
- FOUR (4) 20 AMP 120V ISOLATED SIGN CIRCUITS AND JUNCTION BOXES TO AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM
- AT LEAST 1/2" THICK PLYWOOD BACKING BEHIND ALL E.I.F.S. WALL SYSTEM FOR SIGN AND BANNER SUPPORT

SIGN FASCIA TO BE FREE OF JOINTS & REVEALS, AND OF A LIGHT COLOR (MINIMUM 75% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE SIGN.

ALL COLORS ARE SUBJECT TO ROSS STORES, INC. REVIEW AND APPROVAL. COLOR APPEARANCE MAY BE ALTERED BY PRINTING, SEE APPROVED FINAL CONSTRUCTION DRAWINGS FOR COLOR SPECIFICATIONS.

IF ANY SIGNAGE PROPOSED IN THIS EXHIBIT IS ALTERED BY LOCAL GOVERNMENT AUTHORITIES, ROSS STORES INC. RESERVES THE RIGHT TO, AT NO COST, ADJUST ARCHITECTURAL FEATURES TO BEST ACCOMMODATE THE ALTERED SIGNAGE.

(A) 72"H INDIVIDUAL "DD'S" PAN CHANNEL LOGO LETTERS:
FACES: TUF-GLAS SG 21249-EI PURPLE (21248-EI TEAL FOR APOSTROPHE)
RETURNS: 8"D ALUM, W/ WHITE FINISH
TRIM CAP: 2" WHITE JEWELITE
LETTER BACKS: ALUMINUM
NEON: FOUR-TUBE 15MM EGL GL-71 WHITE, U.L.
MOUNTING: 1/4"-20 GALVANIZED THRU BOLTS
PEG OFF: 1/2" SPACERS

(B) 36"H INDIVIDUAL "DISCOUNTS" PAN CHANNEL LOGO LETTERS:
FACES: TUF-GLAS SG 21248-EI TEAL
RETURNS: 8"D ALUM, W/ WHITE FINISH
TRIM CAP: 2" WHITE JEWELITE
LETTER BACKS: ALUMINUM
NEON: TWO-TUBE 15MM VOLTARC TURQUOISE, U.L.
MOUNTING: 1/4"-20 GALVANIZED THRU BOLTS
PEG OFF: 1/2" SPACERS

(C) 32"H X 40'-1"W X 8"D SINGLE-FACE INTERNALLY-ILLUMINATED CABINET SIGN:
2" RETAINERS PAINTED TO MATCH MAGENTA, RETURNS: 8"D ALUMINUM PAINTED MAGENTA TO MATCH PMS #2415C
MATTHEWS #MP00875 GLOSSY
FACE: TRANSLUCENT SG WHITE FLEX FACE WITH 3M 3630-118 INTENSE MAGENTA VINYL OVERLAY AND 13 1/4"H COPY WEEDED AWAY.
ILLUMINATION: DHO LAMPS AND BALLASTS, U.L.
MOUNTING: 1/4"-20 GALVANIZED THRU BOLTS

(D) 12"H X 48"W X 10"D DOUBLE-FACE INTERNALLY-ILLUMINATED UNDERCANOPY SIGN, U.L. SEE SHEET UC FOR DETAILS.

(E) 18"H X 66"W X 3/4"D SINTRA DD'S LOGO WALL PLAQUE. ONE (1) REQUIRED AS SHOWN. SEE SHEET EL FOR DETAILS.

1. SIGN FASCIA BY ROSS CONTRACTOR, SEE NOTES
2. TYPICAL ARCHITECTURAL LIGHTING BY ROSS CONTRACTOR
3. CLEAR ANODIZED ALUMINUM STOREFRONT & DOORS BY ROSS CONTRACTOR
4. SET OF FIVE (5) EYE-BOLTS FOR BANNER ATTACHMENT BY ROSS CONTRACTOR. TWO (2) SETS REQUIRED AS SHOWN.

5. ADJACENT PARAPET MAY NOT BE HIGHER THAN DD'S BASE BUILDING
6. EXTERNAL WINDOW GRAPHIC LIGHTING BY ROSS STORES, INC. NUMBER AND SPECIFICATION OF FIXTURES TO BE DETERMINED.



① STOREFRONT · SOUTH · SOUTH CONGRESS AVE. · ELEVATION

SCALE: 3/32" = 1'- 0"

CODE COMPLIANT
SF ALLOWED : 371.2 SF
SF USED = 243 SF

EXHIBIT J
PAGE 2 OF 11

STOREFRONT SIGN = 262 SF
UC SIGN = 4 SF
(1) ONE LOGO PLAQUE = 7 SF

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates

#5296 PALM SPRINGS
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

| | |
|---|---|
| drawn | 02/16/15 |
| wg added | 03/16/15 |
| | 05/01/15 |
| Color-DM | 05/14/15 |

RB-E-H
SHEET S1

Ⓐ TENANT FACE DECORATION BY ROSS STORES, INC.:
2'-1/4"H X 10'-0"W (VISIBLE OPENING) SOLAR GRADE, TRANSLUCENT,
BLANK WHITE ACRYLIC, LEXAN, OR PANAFLEX FACES,
FIRST SURFACE DECORATED WITH 3M 3630-118 INTENSE MAGENTA VINYL.
CUT AND WEED OUT 15 1/2"H "DD'S" AND 8 1/2"H "DISCOUNTS"
LOGO COPY TO REVEAL WHITE.

TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACED PYLON SIGN
IN TENANT POSITION AS SHOWN.

1 PYLON STRUCTURE, FOOTINGS, CABINETS, FINISHES, LIGHTING,
AND ELECTRICAL SERVICE PROVIDED AND MAINTAINED BY LANDLORD.
SIGN CONTRACTOR TO CHECK LAMPS, BALLASTS, AND WIRING, AND REPAIR OR REPLACE AS NECESSARY.
SIGN CONTRACTOR TO REPAIR DD'S PERIMETER RETAINERS AND PAINT AS NECESSARY.

2 NEW BLANK TENANT FACES PROVIDED BY LANDLORD

3 OTHER TENANT FACES SHOWN FOR REFERENCE ONLY

Installation Instructions:
• FIELD VERIFY AND CONFIRM TO BMA EXACT FACE DIMENSIONS,
  STRUCTURE AND LIGHTING CONDITIONS
• PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRICATION
• PROVIDE BMA WITH PHOTOS OF FINISHED DISPLAY



2  "DD'S DISCOUNTS" TENANT FACE DETAIL

SCALE: 3/4" = 1'-0"

1  D/F PYLON PHOTO RENDERING · EAST/WEST

SOUTH CONGRESS AVE. : SEE SHEET K FOR LOCATION

SCALE: N.T.S.

EXHIBIT  J
PAGE  3  OF  11



1067 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-0692
www.billmoore.com





bill moore & associates

#5296 PALM SPRINGS
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn          01/06/14

SHEET

P1



**(A)** TENANT FACE DECORATION BY ROSS STORES, INC.:
±3'-10"H X ±10'-0"W (VISIBLE OPENING) SOLAR GRADE, TRANSLUCENT,
BLANK WHITE ACRYLIC, LEXAN, OR PANAFLEX FACES.
FIRST SURFACE DECORATED WITH 3M 3630-118 INTENSE MAGENTA VINYL.
CUT AND WEED OUT 22"H "DD'S" AND 11 1/2"H "DISCOUNTS"
LOGO COPY TO REVEAL WHITE.

TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACED PYLON SIGN
IN TENANT POSITION AS SHOWN.

**1** PYLON STRUCTURE, FOOTINGS, CABINETS, FINISHES, LIGHTING,
AND ELECTRICAL SERVICE PROVIDED AND MAINTAINED BY LANDLORD.
SIGN CONTRACTOR TO CHECK LAMPS, BALLASTS, AND WIRING, AND REPAIR OR REPLACE AS NECESSARY.
SIGN CONTRACTOR TO REPAIR DD'S PERIMETER RETAINERS AND PAINT AS NECESSARY.

**2** NEW BLANK TENANT FACES PROVIDED BY LANDLORD

**3** OTHER TENANT FACES SHOWN FOR REFERENCE ONLY

**4** DIVIDER BAR ADDITION PROVIDED BY LANDLORD

Installation Instructions:
* FIELD VERIFY AND CONFIRM TO BMA EXACT FACE DIMENSIONS,
  STRUCTURE AND LIGHTING CONDITIONS
* PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRICATION
* PROVIDE BMA WITH PHOTOS OF FINISHED DISPLAY



**(2)** "DD'S DISCOUNTS" TENANT FACE DETAIL

SCALE: 3/4" = 1'-0"



**(1)** D/F PYLON PHOTO RENDERING · EAST/WEST

SOUTH CONGRESS AVE. : SEE SHEET K FOR LOCATION

SCALE: N.T.S.

EXHIBIT J
PAGE 4 OF 11



1067 solano ave.
p.o. box 6163
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates





**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn                01/06/14

SHEET
**P2**



### ④ PARTIAL FLOOR PLAN
SCALE: 3/32" = 1'-0"

PLAN SHOWN FOR
ILLUSTRATION ONLY.
CONDITIONS MAY VARY.
SEE SHEET S1 AND SHEET
SEC1 FOR POSITION.

SIGN INSTALLERS TO PROVIDE
WOOD OR STEEL ANGLE CROSS MEMBER
(AND WOOD BLOCKING IF NECESSARY)
ANCHORED TO CANOPY JOISTS.
DRILL FOR PIPE SUPPORTS AND FASTEN
WITH FENDER WASHERS AND
LOCK NUTS AS REQUIRED.

SIGN INSTALLER
TO PROVIDE WEATHERPROOF
SILICONE SEAL AROUND
PIPE PENETRATIONS
INTO CABINET, TYP.

LANDLORD TO PROVIDE
120V PRIMARY ELECTRICAL
SERVICE AND J-BOX
ABOVE CEILING WITHIN
FIVE (5) FEET OF SIGN

INSTALL CABINET
SO THAT DISCONNECT
SWITCH AND U.L. LABEL
ARE ON END CABINET
FACING STORE

3" DIA. ESCUTCHEON PLATE
(PAINT TO MATCH SOFFIT)

1 1/2" PIPE FLANGE

1 1/2" GALV. PIPE (PAINT TO MATCH SOFFIT)

FOG INSIDE OF CABINET WHITE

3/4" x 3/4" METAL RETAINER PAINTED M.A.P.
TO MATCH INTENSE MAGENTA

F42-T12-DHO FLUORESCENT
LAMP, TYPICAL OF TWO (2)

2" x 2" 'C' CHANNEL LAMP
SUPPORT WELDED TO
CABINET EDGE

TWO-LAMP BALAST

CABINET EDGE PAINTED
M.A.P. TO MATCH CABINET

LAMPS AT 6" O.C.

10"

### ③ SECTION A-A
SCALE: 1" = 1'-0"

TWO (2) 1/4" DIA.
DRAINHOLES
AT BOTTOM
OF CABINET, TYP.



### ② FRAMING ELEVATION
SCALE: 1" = 1'-0"

**DESCRIPTION:**
12" HIGH X 48" WIDE X 10" DEEP DOUBLE-FACED UNDER-CANOPY SIGN

CABINET:  ALUMINUM SKIN OVER ANGLE FRAME, FOG INTERIOR WHITE,
PRIME AND PAINT OUTSIDE SURFACES MATTHEWS ACRYLIC POLYURETHANE
(M.A.P.) TO MATCH INTENSE MAGENTA

RETAINERS:  3/4" ALUMINUM PAINTED TO MATCH CABINET

FACES:  0.177 (3/16") 7328 WHITE ACRYLIC WITH 6 1/2" HIGH WHITE "DD'S" COPY
AND 3 1/8" HIGH WHITE "DISCOUNTS" COPY REVERSED OUT OF 3M 3630-118
INTENSE MAGENTA TRANSLUCENT VINYL OVERLAY

LIGHTING:  TWO (2) F42-T12-DHO LAMPS

MOUNTING:  SIGN HUNG FROM SOFFIT ABOVE USING TWO (2) 1 1/2" GALV. PIPES,
PENETRATION CONCEALED BY ESCUTCHEON PLATES.
PIPES AND PLATES PAINTED TO MATCH SOFFIT (SEE DETAIL AT LEFT)

24" O.C.

12"    6 1/2"    3 1/8"    8'-6" MIN.

3/4"    3/4"

48"



### ① D/F UNDER-CANOPY SIGN ELEVATION
SCALE: 1" = 1'-0"

**NOTES:**

SEE SHEET S1 FOR UNDER-CANOPY SIGN LOCATION.

LANDLORD TO PROVIDE ACCESS ABOVE CEILING FOR SIGN INSTALLATION,
AND 120V ELECTRICAL SERVICE AND J-BOX WITHIN FIVE (5) FEET OF SIGN
LOCATION CONNECTED TO ENERGY MANAGEMENT SYSTEM.



bill moore & associates

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/524-0294 fax 526-6092
www.billmoore.com


dd's
DISCOUNTS

**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn          03/04/15

SHEET
UC


EXHIBIT
J
Page  5  of  11



**INSTALLATION INSTRUCTIONS:**

DRILL SIX (6) 5/16" DIA. X 3" DEEP HOLES INTO WALL AS PER PATTERN.
SCREW 1/4-20 MACHINE-THREAD END OF GALV. FURNITURE BOLTS INTO EMPTY T-NUTS IN BACK OF PLAQUE UNTIL THEY CONTACT THE PVC. (DO NOT OVER TIGHTEN).
FILL HOLES IN WALL, COAT SCREW-THREAD ENDS OF FURNITURE BOLTS AND BACK OF PLAQUE WITH GE CONSTRUCTION SCS 1200 SILICONE SEALANT.
MOUNT PLAQUE ONTO WALL PUSHING BOLTS INTO HOLES UNTIL PLAQUE IS FLUSH AGAINST WALL SURFACE.

3" HOLE

1/2" MAX.

ONLY IF APPLICABLE

3" X 1/4-20 GALV. HANGER BOLT

SEE NOTES BELOW FOR APPLICABLE CONDITIONS

5/16" DIA. X 3" DEEP HOLE IN WALL TYPICAL OF SIX (6).

1/4-20 X 3" GALV. HANGER BOLT TYPICAL OF SIX (6).

GE CONSTRUCTION SCS 1200 SILICONE SEALANT

TYPICAL 1/4-20 STEEL THREAD SERT

T-NUT TYPICAL OF SIX (6)

EXISTING WALL

16"H X 66"W X 3/4"D SINTRA WITH 3M TRANSLUCENT 3M 3630-115 INTENSE MAGENTA VINYL OVERLAY

66" O.A.

8"   25"   25"   8"

C̶ FOR SERTS   C̶ FOR SERTS

1/2"   2-5/8"   60" COPY   2-3/8"   1/2"

**②  SECTION AT MOUNT**

SCALE: 1" = 1"

9"H "DD'S" WHITE LOGO COPY AND 4-3/8"H "DISCOUNTS" WHITE LOGO COPY

16"H X 66"W X 3/4"D SINTRA WITH TRANSLUCENT 3M 3630-115 INTENSE MAGENTA VINYL OVERLAY

FLAT EVEN SURFACE REQUIRED 2" MIN. AROUND PLAQUE

**NOTES:**

SEE SHEET S1 FOR PLAQUE LOCATIONS.

BMA TO SUPPLY PLAQUES, HARDWARE AND INSTALLATION PATTERNS.

MOUNTING DETAIL MAY VARY ACCORDING TO TYPE OF WALL CONSTRUCTION: LANDLORD'S CONTRACTOR TO VERIFY CONDITIONS.

IF WALL SURFACE IS UNEVEN (EXAMPLE: SPLIT FACE BLOCK OR RIVER ROCK), THEN KNOCK DOWN ROUGH SURFACE 2" BEYOND WALL PLAQUE, SO THAT THE PLAQUE WILL SIT FLUSH AGAINST WALL.

EXHIBIT J
PAGE 6 OF 11

**①  ENTRANCE LOGO PLAQUE ELEVATION**

SCALE: 1-1/2" = 1'- 0"



1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com





**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn   03/04/15


SHEET
EL

bill moore & associates



SIGN CONTRACTOR TO
VERIFY PANEL DIMENSIONS
PRIOR TO MANUFACTURE

"ORACAL 3621" 2'-0" X 3'-6" TRIANGLE
REMOVABLE VINYL PATCH
PRINTED YELLOW (C0,M0,Y100,K0)
WITH 7 1/2"H "COMING" AND
5 1/2"H "SOON" BLACK COPY (C0,M0,Y0,K100)
TWO (2) REQUIRED.
ONE ON EACH SIDE OF D/F SIGN.
REMOVE PATCHES ON BOTH FACES
AT TIME OF STORE OPENING.

BLACK 30 1'-8" X 3'-2 TRIANGLE
VINYL PATCH PLACED STICKY
SIDE TO STICKY SIDE ON
BACK OF YELLOW PATCH

③  "COMING SOON" PATCH

① D/F PYLON PHOTO RENDERING · EAST/WEST

SOUTH CONGRESS AVE. ; SEE SHEET K FOR LOCATION          SCALE: N.T.S.



EXHIBIT ___J___

PAGE __7__ OF __11__

②  "DD'S DISCOUNTS" TENANT FACE DETAIL

SCALE: 3/4" = 1'-0"

Notes:
SEE SHEET K FOR PYLON SIGN POSITION.
SEE SHEET P2 FOR PERMANENT DD'S SIGN FACE SPECIFICATIONS.
LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE, CABINETS,
FINISHES, BLANK FACES, LIGHTING AND ELECTRICAL SERVICE.
"DD'S6" TEMPORARY TENANT FACE DECORATION TO BE PROVIDED BY ROSS
STORES, INC.
ALL DIMENSIONS TO BE VERIFIED PRIOR TO FABRICATION.



1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-0092
www.billmoore.com
bill moore & associates

MEMBER



dd's
DISCOUNTS

#5296 PALM SPRINGS
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn          03/04/15


SHEET
TP1



**① D/F PYLON PHOTO RENDERING · EAST/WEST**
SOUTH CONGRESS AVE. : SEE SHEET K FOR LOCATION     SCALE: N.T.S.



"ORACAL 3621" 2'-10" X 5'-0" TRIANGLE
REMOVABLE VINYL PATCH
PRINTED YELLOW (CO,MO,Y100,KO)
WITH 10 1/2"H "COMING" AND
8"H "SOON" BLACK COPY (CO,MO,YO,K100)
TWO (2) REQUIRED,
ONE ON EACH SIDE OF D/F SIGN.
REMOVE PATCHES ON BOTH FACES
AT TIME OF STORE OPENING.

BLACK 2'-5" X 4'-6" TRIANGLE
VINYL PATCH PLACED STICKY
SIDE TO STICKY SIDE ON
BACK OF YELLOW PATCH

SIGN CONTRACTOR TO
VERIFY PANEL DIMENSIONS
PRIOR TO MANUFACTURE

**③ "COMING SOON" PATCH**

**② "DD'S DISCOUNTS" TENANT FACE DETAIL**
SCALE: 3/4" = 1'-0"

Notes:
SEE SHEET K FOR PYLON POSITION.
SEE SHEET P2 FOR PERMANENT DD'S SIGN FACE SPECIFICATIONS.
LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE, CABINETS,
FINISHES, BLANK FACES, LIGHTING AND ELECTRICAL SERVICE.
"DD'S" TEMPORARY TENANT FACE DECORATION TO BE PROVIDED BY ROSS
STORES, INC.
ALL DIMENSIONS TO BE VERIFIED PRIOR TO FABRICATION.

EXHIBIT   J
PAGE   8   OF   11




1087 solana ave.
p.o. box 6153
albany, ca 94706-0153
510/526-6296 fax 526-6092
www.billmoore.com
bill moore & associates



**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn          03/04/15


SHEET
TP2

**Notes:**

THIS DRAWING FOR BANNER REFERENCE ONLY.

DO NOT INSTALL BANNERS ON DRYVIT (E.I.F.S.) WALL(S) WITHOUT BANNER EYE-BOLTS. SEE NOTES IN RED ABOVE FOR INSTALLATION REQUIREMENTS.

B.M.A. TO SEAL, PATCH AND TOUCH UP ALL OTHER WALL PENETRATIONS ON REMOVAL OF BANNERS.

SAVE ALL BANNERS FOR REUSE.

ROSS STORES INC. RESERVES THE RIGHT TO INSTALL ANY OTHER TEMPORARY OPENING PROMOTIONAL MATERIAL OR ELEMENT THEY DEEM APPROPRIATE.

Ⓐ 6'-0"H X 21'-0"W "DD'S DISCOUNTS
COMING SOON" BANNER
ONE (1) BANNER REQUIRED AS SHOWN.
SEE SHEET BNR, DETAILS 1 AND 7

WINDOW GRAPHICS INSTALLATION
TO BE CONFIRMED WITH
CONSTRUCTION MANAGER

ROSS CONTRACTOR TO MAINTAIN BANNER
IN VISIBLE POSITION ON STOREFRONT
AS CONSTRUCTION PROGRESSES

**Installer:**
- NEVER ATTACH BANNERS DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF FASCIA IS EIFS, VERIFY THAT EYE-BOLTS ARE PRESENT.
- IF YES, PROCEED WITH BANNER INSTALLATION AS SHOWN.
- IF NO EYE-BOLTS ARE PRESENT, DETERMINE IF BASE BUILDING CAN BE USED FOR BANNER INSTALLATION (ONLY IF NOT E.I.F.S.).
- IF YES, PROCEED WITH INSTALLATION, PLACING BANNER ON NON-E.I.F.S. WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, CALL BMA IMMEDIATELY. DO NOT INSTALL BANNERS.



**①** <u>STOREFRONT · SOUTH · SOUTH CONGRESS AVE. · ELEVATION</u>

SCALE: 3/32" = 1'- 0"

"COMING SOON"
BANNER

EXHIBIT ___J___
PAGE _9_ OF _11_



bill moore & associates
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com


**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn          10/06/13
drawn          03/17/13


SHEET
01a

**Notes:**

THIS DRAWING FOR BANNER REFERENCE ONLY.

DO NOT INSTALL BANNERS ON DRYVIT (E.I.F.S.) WALL(S) WITHOUT BANNER EYE-BOLTS. SEE NOTES IN RED ABOVE FOR INSTALLATION REQUIREMENTS.

B.M.A. TO SEAL, PATCH AND TOUCH UP ALL OTHER WALL PENETRATIONS ON REMOVAL OF BANNERS.

SAVE ALL BANNERS FOR REUSE.

ROSS STORES INC. RESERVES THE RIGHT TO INSTALL ANY OTHER TEMPORARY OPENING PROMOTIONAL MATERIAL OR ELEMENT THEY DEEM APPROPRIATE.

Ⓐ 3'-0"H X 16'-0"W "OPENING SOON" BANNER
ONE (1) BANNER REQUIRED AS SHOWN.
SEE SHEET BNR, DETAILS 2 AND 8

Ⓑ 3'-0"H X 15'-0"W "NOW HIRING" BANNER
ONE (1) BANNER REQUIRED AS SHOWN.
SEE SHEET BNR, DETAILS 3 AND 8

WINDOW GRAPHICS INSTALLATION
TO BE CONFIRMED WITH
CONSTRUCTION MANAGER

**Installer:**

• NEVER ATTACH BANNERS DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).

• IF FASCIA IS EIFS, VERIFY THAT EYE-BOLTS ARE PRESENT.

• IF YES, PROCEED WITH BANNER INSTALLATION AS SHOWN.

• IF NO EYE-BOLTS ARE PRESENT, DETERMINE IF BASE BUILDING CAN BE USED FOR BANNER INSTALLATION (ONLY IF NOT E.I.F.S.).

• IF YES, PROCEED WITH INSTALLATION, PLACING BANNER ON NON-E.I.F.S. WALLS.

• IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, CALL BMA IMMEDIATELY. DO NOT INSTALL BANNERS.



Ⓐ   Ⓑ

① **STOREFRONT · SOUTH · SOUTH CONGRESS AVE. · ELEVATION**
SCALE: 3/32" = 1'-0"

**"OPENING SOON" &
"NOW HIRING" BANNER**

EXHIBIT __J__
PAGE __10__ OF __11__



1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com

bill moore & associates







**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn                10/06/13
drawn                03/17/15

SHEET
**01b**

**Notes:**

THIS DRAWING FOR BANNER REFERENCE ONLY.

DO NOT INSTALL BANNERS ON DRYVIT (E.I.F.S.) WALL(S) WITHOUT BANNER EYE-BOLTS. SEE NOTES IN RED ABOVE FOR INSTALLATION REQUIREMENTS.

B.M.A. TO SEAL, PATCH AND TOUCH UP ALL OTHER WALL PENETRATIONS ON REMOVAL OF BANNERS.

SAVE ALL BANNERS FOR REUSE.

ROSS STORES INC. RESERVES THE RIGHT TO INSTALL ANY OTHER TEMPORARY OPENING PROMOTIONAL MATERIAL OR ELEMENT THEY DEEM APPROPRIATE.

(A) 3'-0"H X 16'-0"W "GRAND OPENING" BANNER
ONE (1) BANNER REQUIRED AS SHOWN.
SEE SHEET BNR, DETAILS 4 AND 8

(B) 3'-0"H X 15'-0"W "WE ACCEPT EBT" BANNER
ONE (1) BANNER REQUIRED AS SHOWN.
SEE SHEET BNR, DETAILS 6 AND 8

(C) 3'-6"H X 20'-0"W "NEW FASHIONS EVERYDAY" BANNER
ONE (1) BANNER REQUIRED AS SHOWN.
SEE SHEET BNR, DETAILS 5 AND 8

(D) MAGENTA AND TEAL COLORED STREAMERS
TO BE STRUNG TO NEARBY LIGHT STANDARD.
FIVE (5) TOTAL SINGLE STRINGS
(NOT TO EXCEED 60'-0")

WINDOW GRAPHICS INSTALLATION
TO BE CONFIRMED WITH
CONSTRUCTION MANAGER

**Installer:**
- NEVER ATTACH BANNERS DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF FASCIA IS EIFS, VERIFY THAT EYE-BOLTS ARE PRESENT.
- IF YES, PROCEED WITH BANNER INSTALLATION AS SHOWN.
- IF NO EYE-BOLTS ARE PRESENT, DETERMINE IF BASE BUILDING CAN BE USED FOR BANNER INSTALLATION (ONLY IF NOT E.I.F.S.).
- IF YES, PROCEED WITH INSTALLATION, PLACING BANNER ON NON-E.I.F.S. WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, CALL BMA IMMEDIATELY. DO NOT INSTALL BANNERS.



**(1) STOREFRONT · SOUTH · SOUTH CONGRESS AVE. · ELEVATION**
SCALE: 3/32" = 1'-0"

"GRAND OPENING" BANNER

EXHIBIT _J_
PAGE _11_ OF _11_



1057 solano ave.
p.o. box 6163
albany, ca 94706-0163
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates





**#5296 PALM SPRINGS**
Palm Springs Plaza
SWC South Congress Ave. & 10th Ave. North
Palm Springs, FL

drawn     10/06/13

SHEET
GO1

## EXHIBIT K

## GUARANTY

As a material inducement to and in consideration of **PHILIPS LAKE WORTH LLC**, a Florida limited liability company ("Landlord"), entering into a written lease (the "Lease") with **ROSS DRESS FOR LESS, INC.**, a Virginia corporation ("Tenant"), dated the same date as this Guaranty, pursuant to which Landlord leased to Tenant and Tenant leased from Landlord premises located in the City of Palm Springs, County of Palm Beach, State of Florida, **ROSS STORES, INC.**, a Delaware corporation ("Guarantor"), whose address is 5130 Hacienda Drive, Dublin, CA 94568-7579, guarantees and promises to and for the benefit of Landlord the performance of all obligations of Tenant under the Lease.

The provisions of the Lease may be amended by agreement between Landlord and Tenant at any time; provided, however, Guarantor shall not be bound by any amendment to which it has not consented in writing. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty, except as specifically set forth in the Lease.

If Tenant defaults with respect to any payment obligation under the Lease, Landlord shall have the right to proceed immediately against Guarantor and/or Tenant, and to enforce against Guarantor and/or Tenant any rights that Landlord may have under the Lease or pursuant to applicable laws with respect to such default. If the Lease terminates and Landlord has any right(s) that it is entitled to enforce against Tenant after termination, Landlord shall have the right to enforce such right(s) against Guarantor.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any other remedy in Landlord's power. Guarantor waives any defense by reason of any disability of Tenant. Until all of Tenant's monetary obligations to Landlord under the Lease have been discharged in full, Guarantor has no right of subrogation against Tenant. Guarantor waives its right to enforce any remedies that Landlord now has, or later may have, against Tenant. Guarantor waives any right to participate in any security now or later held by Landlord.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including, without limitation, reasonable attorneys' fees.

Guarantor's obligations under this Guaranty shall be binding on Guarantor's successors, but shall be no greater than Tenant's or as otherwise set forth in this Lease.

Dated: _____

**ROSS STORES, INC.,
a Delaware corporation**


By:_____
James Fassio
Its: President and Chief Development Officer


"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/870664.1

EXHIBIT K

05/08/15
FINAL

## EXHIBIT L

### EXISTING TENANTS

| TENANT | SQUARE FEET OF LFA |
|---|---|
| 1st Contractors School | 1,424 |
| Aaron Rents | 7,820 |
| Aldi | 20,735 |
| Amore Salon | 1,205 |
| Army Navy | 1,425 |
| Bennett Auto Supply | 9,350 |
| Berger Chiropractic LLC | 1,424 |
| Chicken Grill House | 1,960 |
| Computer Repair | 1,535 |
| Cricket Wireless | 1,386 |
| Diamond Beauty | 2,473 |
| Dollar Tree | 10,354 |
| El Corte Hispano Barbershop, Inc. | 660 |
| Eyeglass World | 5,589 |
| Fish Fantasia | 4,000 |
| Harbor Freight Tools | 15,296 |
| Liberty Tax | 1,080 |
| Little Caesars | 1,442 |
| Mercedes Jewelry | 1,386 |
| Metro PCS | 2,570 |
| Mr. Shrimp | 1,480 |

"Palm Springs"
Palm Springs Plaza
Palm Springs, FL
Store No. 5296
6061.1319/909735.1

EXHIBIT L
Page 1

05/08/15
FINAL

| TENANT | SQUARE FEET OF LFA |
|---|---|
| Nail Fetish -- Nail salon | 1,200 |
| Nutri Kingdom | 1,385 |
| Party Supply | 4,562 |
| Quest Diagnostics | 2,160 |
| Rainbow USA, Inc. | 11,500 |
| Ross Dress For Less | 25,668 |
| Samy Shoes | 1,200 |
| Selective Dental, Inc. -- Dentist | 1,468 |
| Sprint | 1,700 |
| The Closeout Store | 2,898 |
| T-Mobile | 1,775 |
| US Tops | 6,000 |
| Video Store | 1,080 |
| Wok Crazy Chinese | 1,332 |